**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TUFIN SOFTWARE TECHNOLOGIES LTD. SECURITIES LITIGATION | Master File No. 1:20-cv-5646-GHW |

Master File No. 1:20-cv-5646-GHW

Hon. Gregory H. Woods

<u>CLASS ACTION</u>

**CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE SECURITIES ACT OF 1933**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

Lead Plaintiff Mark Henry ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and upon information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Tufin Software Technologies Ltd. ("Tufin"), analysts' reports and advisories about Tufin, information readily obtainable on the Internet, interviews with former employees of Tufin, and other publicly available material and data. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.   <u>NATURE OF THE ACTION</u>

1.   This is a federal securities class action on behalf of a class consisting of persons

or entities that purchased or otherwise acquired Tufin common stock pursuant and/or traceable to Tufin's Registration Statement issued in connection with its April 11, 2019 initial public offering (the "IPO" or "Offering"), seeking to pursue remedies under §§11 and 15 of the Securities Act of 1933 (the "Securities Act").

2.      Tufin holds itself out as "pioneering a policy-centric approach to security and IT operations" that "transform[s] enterprises' security operations by helping them visualize, define and enforce a unified security policy across complex, heterogeneous IT and cloud environments." Tufin's Form F-1/A filed April 1, 2019[1] represents that in 2018 and 2019, a majority of Tufin's revenue was generated from customers in the Americas.

3.      Tufin repeatedly emphasized in the Registration Statement its "highly trained sales force" as a product of its "invest[ment] of significant time and resources in training new sales force personnel to understand our solutions and growth strategy," and represented that its "sales cycle usually lasts several months."

4.      On the contrary, Tufin's sales cycle was extremely long, technical, and complex, such that deals involving large organizations frequently took years, not months, to close. In addition, Tufin omitted that its sales force—a large constituent of which was recent hires—was understaffed, undertrained, and lacked a sufficient understanding of Tufin's products to close large complex deals with Tufin's most valuable potential customers: the Global 2000 (defined in the Registration Statement as "the world's 2,000 largest public companies as published by Forbes on June 16, 2018."). Moreover, Tufin failed to disclose that while it expected deals to close in several months, its new salespersons required six months to a year of training to learn the products, and that Tufin would regularly terminate a new salesperson if she was unable to

---

[1] The Form F-1/A filed April 1, 2019 is identified as Amendment No. 2 to Tufin's registration statement, and is the last full version of the registration statement filed with the SEC before Tufin's IPO. As used herein, the capitalized

close a deal in twelve months. Tufin additionally omitted that its exceptionally long sales cycle, combined with its failure to adequately train its sales force and its speedy terminations for lack of production, resulted in high turnover and effectively exacerbated the problems related to its inability to timely close sales.

5.      Moreover, while Tufin stated that it "may not be able to accurately predict or forecast the timing of sales," it failed to tell investors that as of the IPO, the combination of (i) a high-pressure sales culture that resulted in inflated expectations of closed sales and (ii) sales software that based its forecasts on those inflated sales expectations made it virtually impossible to predict or forecast when a sale would occur.

6.      On January 9, 2020, Tufin released preliminary unaudited revenue and non-GAAP operating loss estimates for the fourth fiscal quarter of 2019, revealing total revenue in the range of $29.5 million to $30.1 million, compared to its previous guidance of total revenue in the range of $34.0 million to $38.0 million, and an anticipated non-GAAP operating loss in the range of $1.1 million to $2.6 million, compared to previous guidance of non-GAAP operating profit in the range of $0.0 million to $3.0 million.

7.      Tufin cited an "inability to close a number of transactions, primarily in North America" as the primary reason for Tufin's revenue shortfall. It also admitted that the miss occurred because the deals were too complex and large, and that Tufin lacked the scale required in order to manage a substantial volume of large complex deals.

8.      On this news, Tufin's share price fell $4.14 per share, or 24.04%, to close at $13.08 per share on January 9, 2020. On February 26, 2020, when this action was commenced, Tufin stock closed for trading at a price of $12.15 per share.

---

term "Registration Statement" refers to the April 1, 2019 F-1/A.

## II.    JURISDICTION AND VENUE

9.    The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 22 of the Securities Act (15 U.S.C. § 77v(a)).

11.    Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 22 of the Securities Act (15 U.S.C. § 77v(a)). Tufin securities trade on the New York Stock Exchange, located within this Judicial District.

12.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## III.    PARTIES

13.    Plaintiff Mark Henry acquired Tufin shares pursuant and traceable to the IPO and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

14.    Defendant Tufin is incorporated under the laws of the State of Israel, with principal executive offices located at 5 HaShalom Road, ToHa Tower, Tel Aviv 6789205, Israel.

15.    Defendant Reuven Kitov ("Kitov") served as Tufin's CEO, Co-Founder, and Chairman of the Board at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

16.    Defendant Jack Wakileh ("Wakileh") served as Tufin's Chief Financial Officer

at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

17.  Defendant Reuven Harrison ("Harrison") served as Tufin's Chief Technology Officer, Co-Founder, and a Director at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

18.  Defendant Ohad Finkelstein ("Finkelstein") served as a Director of Tufin at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

19.  Defendant Edouard Cukierman ("Cukierman") served as a Director of Tufin at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

20.  Defendant Yair Shamir ("Shamir") served as a Director of Tufin at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

21.  Defendant Ronni Zehavi ("Zehavi") served as a Director of Tufin at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

22.  Defendant Yuval Shachar ("Shachar") served as a Director of Tufin at the time of the IPO, and signed or authorized the signing of the Registration Statement filed with the SEC.

23.  Defendants Kitov, Wakileh, Harrison, Finkelstein, Cukierman, Shamir, Zehavi, and Shachar are sometimes referred to herein collectively as the "Individual Defendants."

24.  As directors, executive officers and/or major shareholders, the Individual Defendants participated in the solicitation and sale of Tufin shares in the IPO for their own benefit and the benefit of Tufin. The Individual Defendants were key members of the IPO

working group and executives of Tufin who pitched investors to purchase the shares sold in the IPO, including in IPO road shows.

25.     Tufin and the Individual Defendants are sometimes collectively, in whole or in part, referred to herein as the "Defendants."

## IV.    **CONFIDENTIAL WITNESSES**

26.     Confidential Witness ("CW") 1 was a Business Development representative at Tufin from August 2018 to January 2020, and was based in Ohio.

27.     CW2 was a Regional Sales Manager at Tufin from March 2018 to October 2018 and was based in Michigan. CW2 was responsible for pursuing approximately thirty potential customer accounts located in Michigan and Indiana.

28.     CW3 was a Regional Sales Manager at Tufin from July 2019 to May 2020 was based in Ohio. Prior to joining Tufin, CW3 had approximately twenty-five years of software-sales experience. At Tufin, CW3 was in charge of twenty accounts in his region.

29.     CW4 was a Regional Sales Manager at Tufin from April 2018 to June 2019, and was based in Pennsylvania.

30.     CW5 was a Senior Technical Account Manager/Sales Engineer at Tufin from February 2018 to March 2020. CW5 traveled across the country to meet with customer and technical teams.

31.     CW6 was a Regional Sales Manager at Tufin from April 2017 to August 2019. CW6's sales territory covered part of the New York City metro area.

32.     CW7 was a Regional Sales Director at Tufin from February 2019 to March 2020. CW7 noted that in CW7's twenty-two years of sales experience, Tufin had one of the most intense sales-management styles CW7 had ever experienced.

33.     CW8 was based in Florida as a Channel Account Manager at Tufin from May 2019 to May 2020. As a Channel Account Manager, CW8 trained third-party sellers of Tufin's products and was generally responsible for managing sales to reseller partners.

34.     CW9 was based in Tennessee as a Regional Sales Manager for Tufin from December 2017 to May 2019.

35.     CW10 was based in Ohio as a Sales Development Representative at Tufin from January 2019 to April 2020.

36.     CW11 was based in the Washington, D.C. area as a Sales Representative for Enterprise Accounts at Tufin from April 2019 to January 2020. CW11 was assigned to accounts located in the mid-Atlantic region.

## V.     SUBSTANTIVE ALLEGATIONS

### A.     Overview of Cybersecurity

37.     Cyber-crime—crime involving unauthorized access to a computer network—has become an enormous threat facing modern companies. One report notes that "[c]ybercrime is the greatest threat to every company in the world" and predicts that "cybercrime will cost the world $6 trillion annually by 2021." Steve Morgan, *2019 Official Annual Cybercrime Report*, Cybersecurity Ventures, *available at*: https://www.herjavecgroup.com/wp-content/uploads/2018 /12/CV-HG-2019-Official-Annual-Cybercrime-Report.pdf (last accessed Oct. 7, 2020).

38.     To protect themselves from cybercrime, companies deploy a variety of third-party cybersecurity tools and products at various points in their networks. According to Tufin,[2] as these companies "adopt new technologies such as cloud-based services, software-defined networks, microservices and containers, the IT and cloud environments become increasingly

complex and vulnerable to attack." Notwithstanding this increased complexity, Tufin claims that "[i]n response to the heightened threat environment, lack of a defined network perimeter and a constantly changing attack surface, enterprises continue to implement additional firewalls, endpoint security, identity and access management and other security solutions."

39.     Tufin purports to address the errors and inefficiencies resulting from companies' manual management of their security policies. Typically, while a company's cybersecurity tools and products come from third parties, it relies on an in-house team to manually manage the company's policies governing those tools and products. According to Tufin, however, this manual policy management "increases the risk of human error and cybersecurity vulnerabilities and delays the pace of application releases."

40.     Moreover, according to Tufin, businesses employing manual management must choose between "the necessary security posture" and "business requirements for speed, agility and innovation." The Registration Statement represents that Tufin's software is an effective, comprehensive way for these businesses to manage their additional firewalls, endpoint security, identity and access management, and other solutions.

### B.     Tufin's Orchestration Suite

41.     Tufin purports to "pioneer[] a policy-centric approach to security and IT [information technology] operations" that "transform[s] enterprises' security operations by helping them visualize, define and enforce a unified security policy approach across complex, heterogeneous IT and cloud environments." To accomplish its pioneering approach, Tufin claims that it developed "a data-driven framework centered on policy management and operationalized through policy-based automation," which it claimed would "enhanc[e] compliance and security while improving operational efficiency." According to the Registration

---

[2] Unless otherwise, noted, all statements attributed to Tufin are contained in the Registration Statement.

Statement, Tufin undertakes this claimed operational transformation through a suite of five interrelated instances of software that it calls the "Tufin Orchestration Suite" (the "Suite"): SecureTrack, SecureChange, SecureApp, Orca, and Iris.

42.     According to the Registration Statement:

> SecureTrack, SecureChange and SecureApp enable enterprises to visualize, define and enforce their security policy across heterogeneous networks, both on premise and in the cloud. SecureTrack serves as the foundation of SecureChange and SecureApp. SecureTrack provides visibility across the network and helps organizations define a unified security policy and maintain compliance. SecureChange provides customers with the ability to automate changes across the network while maintaining compliance with policy and security standards. SecureApp provides application connectivity management and streamlines communication between application developers and network engineers. Our newest products, Orca and Iris, provide cloud-based security automation solutions in response to the growth of containers and cloud-native environments.

43.     Despite ostensibly unifying and automating its customers' IT and cybersecurity policies, many customers were indifferent to Tufin's products, as expressed to Tufin's sales force. CW1 and CW2 reported that Tufin's Suite was a nice-to-have, not a must-have product. CW3 reported that cybersecurity management and automation was not a severe problem for most companies and was only a nice-to-have product instead of an essential product. CW4 reported that only large companies with at least 200 firewalls would need Tufin's products, as a smaller company could manage the process manually with a spreadsheet. CW5 reported that even when customers knew they needed Tufin's software, customers would postpone sales by at least ninety days when their budgets were tight. CW6 and CW5 reported that Tufin's pricing was out of line with the market, and that when Tufin lost sales, it was frequently because the potential customer decided to go with a lower-priced competitor instead of Tufin. As a result, low demand and exorbitant cost for Tufin's software made it difficult to predict when or if a sale would close. Moreover, due to the customers' indifference and perceived lack of need

regarding the Suite, Tufin's sales team needed an extraordinarily large amount of product knowledge and technical expertise to effectively explain Tufin's product offerings and demonstrate how Tufin's software adds value in order to close a sale.

### C.    Tufin's Sales Practices

44.    In its Registration Statement, Tufin disclosed the critical role of its revenue from the Americas region, representing that in 2018, the year prior to its IPO, "the Americas accounted for 57% of our revenues [and] [w]e expect sales in the Americas to continue to account for a majority of our revenues in the near- and medium-terms."

45.    Tufin represented in the Registration Statement that it sells its Suite using a perpetual software license, rather than using a software-as-a-service subscription model. As one commentator noted:

> In a software licensing model, the software company offers a physical piece of software.. to be downloaded, installed, run, and operated on a piece of hardware that is typically physically on site at a particular company     the software itself is made available to the licensee as a tangible product.

Kristie Prinz, *Software Licensing vs. Software-as-a-Service ("Saas"): The Importance of the Technology Model to Contract Drafting*, The Silicon Valley Software Law Blog, *available at*: https://www.siliconvalleysoftwarelaw.com/software-licensing-vs-software-as-a-service-saas-the-importance-of-the-technology-model-to-contract-drafting/ (Jan. 30, 2015). By contrast:

> In the SaaS [software-as-a-service] model, the software company generally makes no tangible software product available to its users, and the product itself is only available "on the cloud" as a hosted platform. The key feature of this model, though, is the very fact that you are offering a "service" model rather than a "tangible product" model.

*Id.*

46.    Tufin used customer-relationship-management software called "Salesforce" to manage its sales efforts. According to CW7, in Salesforce, each potential customer or sale is

tracked and categorized by the salesperson and management in various ways, including forecasting when the sale might close. As a result, according to CW8, Tufin's management acted as if selling Tufin's product was an exact science based on metrics. Specifically, CW8 reported that instead of letting its salespeople sell, Tufin's management micromanaged the sales process through incessant Salesforce-generated reports, loaded up sales representatives' schedules with conference calls, and required updates in Salesforce throughout the day. CW9 stated that Tufin's executives wanted regular Salesforce updates so that they could demonstrate the strength of Tufin's sales pipeline to the Company's investors.

47.     According to CW6, Tufin also used an add-on to Salesforce called "FunnelSource," which gave real-time updates to Tufin's management through Salesforce. According to its website, FunnelSource is "intuitive intelligence" that "helps sales teams translate business data into wins."[3] FunnelSource "pull[s] from a variety of customer specific data points to deliver a forecast you can trust," allows managers to "update deals on the fly," "view pipeline changes," and "mass-assign quotas" for sales teams at Tufin and other companies to "meet pipeline requirements" and "accelerate deal closings."[4]

48.     CW6 reported that Tufin requires its salespeople to regularly update their progress in FunnelSource, which required salespeople to estimate the sale's close date, as well as details on upcoming sales meetings. Due to the nature of FunnelSource, CW6 noted, anytime a salesperson made a change to a forecast, the change was pushed to Tufin's management immediately.

49.     CW9 explained that Han Wang, Tufin's Director of Global Sales Operations, would analyze the information entered into Salesforce to generate sales forecasts, often without

---

[3] *See* http://funnelsource.com/about-us (last visited Jan. 19, 2021).
[4] *See* http://funnelsource.com/product (last visited Jan. 19, 2021).

any input from the salesperson that entered the data into Salesforce.

50.     As detailed below, according to Tufin's sales staff, and notwithstanding its ability to gather and analyze sales data, its sales efforts were plagued with problems related to its salespeople's inexperience with Tufin's products, lack of sufficient resources allocated to sales, long sales cycles, high turnover, and a high-pressure sales culture that resulted in inflated expectations of closed sales.

51.     CW3 explained that management's combination of insufficient resources allocated to Tufin's sales force and excessive pressure on its salespeople was likely due to a disconnect between the view of Tufin's Suite as a transactional sale, and the reality of a consultative sales process. Transactional sales are typically quick one-time purchases where the customer already knows what it wants and makes a buying decision based on price and convenience.[5] By contrast, the customer in a consultative sale is looking to make a long-term investment in a product and is more interested in a specific outcome than a specific product, which usually indicates a longer sales cycle due to the salesperson's increased responsibility to explain the product and its value to the customer.[6] From CW3's background in consultative sales, which included twenty-six years of selling software, Tufin's Suite originally started as a transactional sale process.  As Tufin's product evolved and it began selling to larger companies, Tufin began positioning itself as a security solutions expert with a suite of solutions, which elongated the sales cycle as the process transformed from a transaction to a consultation. This conflict regarding the sales cycle—as an easy transaction that should close quickly—and the reality of a long, complex transaction, resulted in forecasts of what were truly unlikely sales and created problems with accurate forecasting.

---

[5] *See* John Duff, *Transactional Selling Vs. Consultative Selling: 4 Key Differences*, Thomson Data, *available at*: https://www.thomsondata.com/article/transactional-consultative-customers.php (Jan. 12, 2020).

**D.    Tufin's Extremely Long, Technical, Complex Sales Cycle Was Fraught with Delays**

52.    CW3 explained that management's combination of insufficient resources allocated to Tufin's sales force and excessive pressure on its salespeople was likely due to a disconnect between the view of Tufin's Suite as a transactional sale, and the reality of a consultative sales process. Transactional sales are typically quick one-time purchases where the customer already knows what it wants and makes a buying decision based on price and convenience.[7] By contrast, the customer in a consultative sale is looking to make a long-term investment in a product and is more interested in a specific outcome than a specific product, which usually indicates a longer sales cycle due to the salesperson's increased responsibility to explain the product and its value to the customer.[8]

53.    From CW3's background in consultative sales, which included twenty-six years of selling software, Tufin's Suite originally started as a transactional sale process. As Tufin's product evolved and it began selling to larger companies, Tufin began positioning itself as a security solutions expert with a suite of solutions, which elongated the sales cycle as the process transformed from a transaction to a consultation. This conflict regarding the sales cycle—as an easy transaction that should close quickly—and the reality of a long, complex transaction, resulted in forecasts of what were truly unlikely sales and created problems with accurate forecasting.

54.    Tufin's salespeople consistently reported that the length, technicality, and complexity of the Suite's sales cycle was not understood. In particular, Tufin failed to explain the complexity and length of the sales cycle to new hires, and according to CW1, the new hires

---

[6] *Id.*
[7] *See* John Duff, *Transactional Selling Vs. Consultative Selling: 4 Key Differences*, Thomson Data, *available at*: https://www.thomsondata.com/article/transactional-consultative-customers.php (Jan. 12, 2020).

could not appreciate the complexity and length of the sales cycle, resulting in unrealistic close dates for sales. Moreover, CW4 stated that his training consisted of learning about the Suite at Tufin's corporate headquarters when he was first hired, while CW10 reported that new salespeople were left to handle sales calls on their own, without any on-the-job training by experienced salespeople. As at least one commentator observes, on-the-job training "is considered to be the most effective method of training sales[people]." *See* MoneyMatters, *Types & Methods of Salesmen Training | Individual & Group Training*, *available at*: https://accountlearning.com/types-methods-salesmen-  training-individual-group-training/  (last visited Oct. 13, 2020).

55.     CW2 added that while Tufin's sales cycle was extremely long, technical, and complex, new salespeople were expected to produce results in shorter time periods of three to four months, even though deals took eighteen months to two years to close. CW1 largely agreed with CW2, noting that the sales cycle for Tufin software was typically at least a year. CW11 stated that deals could take two years to close, and that a six-month close was only achievable with luck. Upon hearing that Tufin planned to go public, CW4 thought it was a bad idea because publicly- traded companies are under constant pressure to hit quarterly revenue goals, and Tufin's reporting of sales on a quarterly basis would be difficult given the Suite's long sales cycle.

56.     Tufin's salespeople recognized that part of the delay was due to the tenuous nature of selling an expensive, unnecessary product. CW7 noted that getting customers to buy the Suite could be a long sales cycle that required years of meetings and navigating other companies' procurement systems. CW11 reported that selling Tufin was difficult because both networking and security teams had to sign off, and in many companies these divisions were

---

[8] *Id.*

competing for budget dollars. CW1 observed that it would take six to eight months just to get a meeting scheduled with the right person within a customer's organization to demo the product. CW1 added that the expense of Tufin's product required the involvement and approval from many distinct groups within each customer's organization. If any of those groups pushed back or balked, the sale would be delayed or called off entirely. For example, according to CW7, a deal with a national retailer fell through after intense sales pressure alienated the customer.

### E.   Excessive Pressure Resulted in Misleading Sales Projections

57.   Tufin's sales employees reported that excessive pressure resulted in inflated sales prospects. For example, CW1 reported that one of Tufin's vice president of sales for the Americas required salespeople to update Salesforce with the next three steps for each of their prospects every time they had contact with a potential customer. This could create a misleading expectation of sales because, according to CW1, not every prospect had three next steps—some were not a strong prospect, while others were stalled for reasons outside the salesperson's control. CW2 agreed with CW1's assessment, noting that despite the large-dollar valuations assigned to certain leads by management and other people on Tufin's sales team, most of the leads in CW2's pipeline did not exist or were otherwise bogus. CW9's report also agreed with CW1, noting that Tufin required its salespeople to assign a value to every potential sale, even if the sale was unlikely. CW3 observed that salespeople were pressured to forecast sales prematurely, and that many of Tufin's salespersons routinely forecasted sales closings even before they had been approved by the customer's decisionmakers.

58.   CW8 noted that Tufin's sales culture created an environment where, despite the long sales cycle, salespeople were expected to report updated progress even if there was none. Indeed, salespeople were expected to provide updates multiple times each day. CW9 explained that even though most sales took up to eighteen months to close, Tufin judged its salespeople

based on weekly progress.

59.     Moreover, CW7 and CW8 reported patterns in which a manager would alter the information that was entered into Salesforce. For example, CW7 recounted an instance where CW7 had a potential $250,000 sale with a large grocery chain that CW7 characterized as a "best case" close by December 2019.  CW7 reported to the manager that the grocery chain was not likely to purchase Tufin by December 2019 because of the grocery chain's lengthy process to approve the transaction. Notwithstanding this explanation, the manager changed the grocery chain's status in Salesforce to "commit," which falsely indicated to others in Tufin that the grocery chain had committed to close by December 2019. Based on conversations with other sales representatives, including CW8, CW7 understood that other managers were altering sales records to create the illusion that sales prospects were more substantial. CW8 corroborated CW7's reports about these alterations, adding that in addition to CW7's report, CW8 received at least four other reports about altered sales-forecast dates.

### F.     Tufin's Inexperienced Sales Force, Misallocation of Resources, and High Turnover

60.     Several members of Tufin's sales force reported that it took new salespeople a long time to get up to speed on the most effective way to sell Tufin's products. CW1 reported that due to the complexity of Tufin's product and its implementation, new salespeople needed at least six months to understand and sell Tufin's products, while CW2 noted that it could take up to a year. CW8 observed that despite twenty years of experience in IT, software, and technology sales, CW8 still needed to invest a significant amount of time to understand the product well enough to train third-party sellers on the product's advantages.

61.     Tufin also failed to allocate sufficient resources to its sales force. According to CW2, Tufin routinely kept its salespeople on half salary during their initial ramp-up, which

caused many to struggle financially while they learned how to sell Tufin's Suite effectively. CW2 added that Tufin had a policy disfavoring expense spending, noting, for example, that if salespeople took a client out for drinks, the salespeople were expected to pay for the second round out of their own pockets.

62.     While Tufin employed CW5 and other pre-sales engineers to assist its salespeople in answering technical questions and developing specific solutions for companies, there were an insufficient number of engineers to provide adequate coverage to Tufin's potential customers. CW11 reported that each pre-sales engineer at Tufin was linked to between 60-120 potential customers, and each asked highly technical questions that the Company's regular sales staff could not answer. According to CW11, Tufin needed more sales-focused software engineers and fewer sales representatives.

63.     CW2 reported that after less than a year of insufficient sales support, many salespeople would either give up or be forced out, at which point the Company would simply start over with a new batch of hires.

64.     Several other members of Tufin's sales staff reported high salesperson turnover. CW10 corroborated CW2's representation above, reporting that Tufin would routinely hire thirty to forty people, and then terminate all but one of them after a short amount of time due to low production. After terminating over 96% of its new hires, Tufin would start over again with fresh hires who had to get up to speed on Tufin's products (a six-to-twelve month process according to CW1 and CW2), and the cycle would repeat. CW1 noted that even though Tufin's sales cycle typically took over a year, Tufin would regularly terminate new salespeople after a year's employment if they had not closed a deal and would simply start over with a new salesperson.

### G.    Tufin's Initial Public Offering

65.    On November 20, 2018, Tufin filed a confidential draft Registration Statement on Form DRS with the SEC. After receiving confidential comments from the SEC, Defendants filed a Registration Statement on Form F-1 with the SEC on March 6, 2019.

66.    On March 20, 2019, 451 Research noted that "how – and when – Tufin generate[d] [its] sales" was a "crucial consideration" in considering Tufin's recent IPO filing. *See* Brenon Daly, *Playing small ball in the big leagues*, 451 Research, *available at*: http://blogs.451research.com/techdeals/security/playing-small-ball-in-the-big-leagues/    (Mar. 20, 2019). Daly observed that "Tufin sells its product in the conventional model of software licenses," which "are heavily back-end-loaded, with a make-or-break Q4 providing about 34% of total revenue for the company." *Id.* Moreover, "[s]ubscription revenue tends to be more predictable than lumpy sales of licenses, particularly when the average price tag of just the software – as it is in some cases at Tufin – climbs above $200,000." *Id.*

67.    Following amendments of the Form F-1 Registration Statement on March 18, 2019 and April 1, 2019, on April 8, 2019 Defendants sent a letter to the SEC requesting that the effective date of the Registration Statement be accelerated.

68.    On April 10, 2019, the SEC declared the Registration Statement effective.

69.    On April 11, 2019, Defendants filed a Prospectus on Form 424B4 that amended the Registration Statement and allowed the sale of securities to the public to proceed. Tufin's Offering began selling shares on April 11, 2019 at $14.00 per share, and ultimately sold 7.7 million shares, receiving approximately $100.3 million in net proceeds from the IPO.

70.    In their initiating-coverage reports, Tufin's analysts discussed representations related to the makeup and skill of the Company's sales force and noted the short interval of the Suite's sales cycle. For example, analysts at Jeffries assigned a "buy" rating with a $28

price target and noted claims that Tufin's "average sales cycle is six to nine months, but larger deals can take longer" and that "The Company recently built out its inside sales teams to help facilitate a high velocity sales model." *See* John DiFucci, *Tufin (TUFN) – Security Policy Orchestration: Music to CISO's Ears: Initiating with Buy Rating*, Jefferies Grp. LLC (May 6, 2019). Analysts at Barclays assigned an "overweight" rating with a $29 price target, in part because of the Company's claimed "purpose[ful] invest[ment] in adding more sales capacity," but noted that Tufin's use of a perpetual license model to sell its products "can lead to long sales cycles and lumpy quarterly revenue." *See* Saket Kalia, *Tufin Software Techs. – Policy Mgmt. in Early Innings & TUFN a Leader; Initiate at OW*, Barclays Bank PLC (May 6, 2019).

## VI.    Materially False and Misleading Statements in the Registration Statement

71.    The Registration Statement was negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made not false or misleading.

72.    Specifically, the Registration Statement stated:[9]

> We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners. ***Our highly trained sales force is responsible for overall market development.*** Our sales force consists of our field sales team, which accounts for most of our sales, and our inside sales team. Our field sales team targets large organizations, which we define as those comprising the Global 2000, while our inside sales team targets mid-market companies that do not belong to the Global 2000. Within our field sales team, our regional field sales representatives develop new business relationships with our key customers, and our channel account managers support and expand existing relationships with our channel partners. Our sales engineers provide technical expertise and support, and architect our solutions to address the business needs of our customers. ***Our sales cycle usually lasts several months from proof of concept to purchase order, and is often longer for larger transactions.*** As of December 31, 2018, we had sales personnel in 24 countries. We have expanded our sales force in each of the last two fiscal

---

[9] To avoid confusion, the statements Plaintiffs allege as false or misleading are emphasized with bold and italics.

years, and we plan to continue to do so.

73.     The statements in ¶72 were materially inaccurate, misleading, and/or incomplete when made because:

(1) Tufin's salespeople were not "highly trained," but were mostly new hires that all needed six months to a year before they could fully understand and sell Tufin's products;

(2) Tufin's sales force was not "highly trained" because the Company would routinely terminate over 96% of its new hires after a short amount of time and start over with a fresh batch of new, untrained hires;

(3) Tufin's managers failed to provide its salespeople with necessary on-the-job training;

(4) Tufin failed to explain the complexity and length of its sales cycle to its salespeople, which caused its salespeople to underestimate the amount of time necessary to close a sale and prevented Tufin from accurately forecasting its sales;

(5) Tufin's sales cycle typically lasts one to two years, not "several months;" and

(6) as a result, Defendants lacked a reasonable basis to claim in the Registration Statement that Tufin's sales force was "highly trained" or that the Company's sales cycle would last "several months."

74.     The representation that Tufin's sales cycle "usually lasts several months . . . and is often longer for larger transactions" is also misleading because it takes advantage of "one of the most solid tested phenomena in the world of experimental psychology": the anchoring effect. *See* Francisco Sáez, *The Anchoring Effect*, FacileThings, *available at*: https://facilethings.com/ blog/en/anchoring-effect (last visited Oct. 7, 2020) (citing Dr. Daniel Kahneman,[10] *Thinking, Fast & Slow* (Farrar, Straus & Giroux ed. 2011)). The anchoring effect:

---

[10]In 2002, Dr. Kahneman received the Sveriges Riksbank Prize in Economic Sciences in Memory of Alfred Nobel for "having integrated insights from psychological research into economic science, especially concerning human

> [I]s a cognitive bias which takes place when we consider a particular value of an unknown quantity before estimating such quantity. The value we have considered or that have been shown to us before, strongly determines the estimate we are going to make, which will always be relatively close to that previous value, which is called the *anchor*.

*Id.* In the Registration Statement, Tufin anchored the above sales-cycle claim to a time frame of "several," *i.e.*, "more than one or two but not a lot"[11] of months, which created the misleading impression that the sales cycle was close to the anchoring value of "several months"—not longer than a year.

75.     Tufin's Registration Statement also contained generic, boilerplate risk warnings that failed to prominently disclose "factors that are specific to the company or its industry and make an offering speculative or one of high risk" that concisely and clearly explain "how the risk affects the issuer or the securities" as required by Item 3.D of SEC Form 20-F, incorporated by reference in SEC Form F-1. Specifically, the Registration Statement represented:

> If we do not effectively expand, train and retain our sales force, we <u>may</u> be unable to acquire new customers or sell additional products and services to existing customers, and our business will suffer.

> Our future success depends, in part, on our ability to continue to expand, train and retain our sales force. ***Our inability to attract or retain qualified personnel or delays in hiring required sales personnel <u>may</u> seriously harm our business, financial condition and results of operations.*** Any of our employees may terminate their employment at any time, subject to certain notice requirements. Our ability to continue to attract and retain highly skilled personnel is critical to our future success. During 2018, we increased the number of our sales and marketing personnel from 128 to 166. We expect to continue to expand our sales and marketing personnel significantly and face a number of challenges in achieving our hiring and integration goals. There is intense competition for individuals with sales training and experience. In addition, ***the training and integration of a large number of sales and marketing personnel in a short time requires the allocation of significant internal resources. We invest significant time and resources in training new sales force personnel to understand our solutions and growth strategy.*** However, there is no guarantee

---

judgment and decision-making under uncertainty." *See* The Royal Swedish Academy of Sciences, Press Release, *available at*: https://www.nobelprize.org/prizes/economic-sciences/2002/press-release/ (Oct. 9, 2002).
[11]*See* SEVERAL, Black's Law Dictionary (11th ed. 2019).

that our recent hires and planned new hires will become as productive as we expect or require, and *we **may** be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets in which we currently operate or where we seek to conduct business. Our failure to hire a sufficient number of qualified sales force members and train them to operate at target performance levels **may** materially and adversely impact our projected growth rate.*

76.     The statements in ¶75 were materially inaccurate, misleading, and/or incomplete when made because:

(1) at the time the SEC declared the Registration Statement effective, Tufin's salespeople were mostly new hires that all needed six months to a year before they could understand and sell Tufin's products;

(2) the Company routinely terminated over 96% of its new hires after a short amount of time and subsequently start over with a fresh batch of new hires;

(3) Tufin's managers failed to provide its salespeople with necessary on-the-job training;

(4) Tufin failed to explain the complexity and length of its sales cycle to its salespeople, which caused its salespeople to underestimate the amount of time necessary to close a sale and prevented Tufin from accurately forecasting its sales;

(5) Tufin kept its salespeople on half salary during their initial ramp-up, made it nearly impossible for its salespeople to get expenses approved, and failed to provide a sufficient number of sales engineers (such as CW5) to assist its sales staff;

(6) as a result of the foregoing, Tufin was then currently not

"train[ing] and retain[ing] [its] sales force," "attract[ing] or retain[ing] qualified personnel," "allocat[ing] significant internal resources" to "train[] and integrat[e] . . . a large number of sales and marketing personnel in a short time," "invest[ing] significant time and resources in training new sales force personnel to understand [its] solutions and growth strategy," or "hir[ing] or retain[ing] sufficient numbers of qualified individuals . . . in the markets in which [it] currently operate[s];" and

(7) these failures prevented Tufin's sales force from "understand[ing] [Tufin's] solutions

and growth strategy" and thus harmed Tufin's business, financial condition, and results of operations.

77.     Similarly, Tufin generically warned that:

The timing of our sales and related revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for our products. *We and our channel partners often spend significant time and resources to better educate and familiarize potential customers with the value proposition of our products and platform. Our sales cycle usually lasts several months from proof of concept to purchase order from our customers*, and it is often even longer, less predictable and more resource-intensive for larger transactions. Customers may also require additional internal approvals or seek to test our products for a longer trial basis before deciding to purchase our solutions. Furthermore, even if we close a large transaction during a given quarter, we may be unable to recognize the revenues derived from such a transaction due to our revenue recognition policy. See "Management's Discussion and Analysis of Financial Condition and Results of Operations— Application of Critical Accounting Policies and Estimates— Revenue Recognition."

In addition, in the past, customers have deferred significant purchases to the last quarter of the year when they can determine what amount of their annual budget remains unused. As a result, the timing of individual sales can be difficult to predict. We generally expect an increase in business activity as we approach our fiscal year end in December, driven by our customers' buying patterns. We believe that these seasonal trends will continue to affect our quarterly results. Large individual sales have, in some cases, occurred in quarters subsequent to those we anticipated or have not occurred at all. The loss or delay of one or more large transactions in a quarter could impact our anticipated results of operations for that quarter and future quarters for which revenue from that transaction is delayed. *We **may** not be able to accurately predict or forecast the timing of sales, which could cause our results to vary significantly from our expectations and the expectations of market analysts.* In addition, we might devote substantial time and effort to a particular unsuccessful sales effort, and as a result we could lose other sales opportunities or incur expenses that are not offset by an increase in revenue, which could harm our business.

78.     The statements in ¶77 were materially inaccurate, misleading, and/or incomplete when made because:

(1) even though Tufin's salespeople were mostly new hires that needed six months to a year to fully understand and sell Tufin's products, the Company routinely terminated

over 96% of its new hires after a short amount of time and would subsequently start over with a fresh batch of new, untrained hires;

(2) Tufin kept its salespeople on half salary during their initial ramp-up, hampered the ability of its salespeople to get expenses approved, and failed to provide a sufficient amount of sales engineers (such as CW5) to assist its sales staff;

(3) Tufin misleadingly anchored the time of its sales cycle to "several months" instead of one to two years;

(4) Tufin failed to explain the complexity and length of its sales cycle to its salespeople, which caused its salespeople to underestimate the amount of time necessary to close a sale and prevented Tufin from having a reasonable basis for its sales forecasts; and

(5) as a result of the foregoing, Tufin then currently could not "accurately predict or forecast the timing of [its] sales.

79.     Tufin later admitted that its total revenue for the fourth quarter of 2019 was between 11.5% and 22.4% lower than its previous guidance and that it realized a non-GAAP operating-*loss* of between $1.1 million and $2.6 million, while previously guiding a non-GAAP operating *profit* of between $0 and $3 million. Tufin admitted further that the primary reason for its revenue shortfall was its lack of scale and ability to manage and close a substantial volume of large, complex transactions, primarily in North America.

## VII.   CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities that purchased or otherwise acquired Tufin common stock pursuant and/or traceable to Tufin's Registration Statement issued in connection with its April 11, 2019 IPO, seeking to pursue remedies under §§11 and 15 of the Securities Act (the "Class"). Excluded from the Class are Defendants, the officers and

directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which the officers and directors of the Company have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Tufin or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions, including being given an opportunity to exclude themselves from the Class.

82.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

83.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

84.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

    a)      whether Defendants violated the Securities Act;

    b)      whether statements made by Defendants to the investing public in the Registration Statement misrepresented material facts about the business and operations of Tufin; and

   c)  to what extent the members of the Class have sustained damages and the proper measure of damages.

85. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

**FIRST CAUSE OF ACTION**
**For Violation of Section 11 of the Securities**
**Act Against All Defendants**

86. Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

87. This Cause of Action is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all Defendants.

88. The Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

89. The Defendants are strictly liable to Plaintiff and the Class for the misstatements and omissions.

90. None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

91. By reason of the conduct herein alleged, each Defendant named herein violated,

and/or controlled a person who violated, Section 11 of the Securities Act.

92.     Plaintiff acquired Tufin common stock pursuant and/or traceable to the Registration Statement.

93.     Plaintiff and the Class have sustained damages. As of the filing of the initial complaint in this Action, the value of Tufin ordinary shares has declined substantially from its IPO price.

94.     At the time of their purchases of Tufin ordinary shares, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein. Less than one year elapsed from the time that Plaintiff discovered or reasonably could have discovered the facts upon which this Complaint is based to the time that Plaintiff commenced this action. Less than three years elapsed between the time that the securities upon which this Cause of Action is brought were offered to the public and the time Plaintiff commenced this action.

### SECOND CAUSE OF ACTION
### For Violation of Section 15 of the Securities
### Act Against the Individual Defendants

95.     Plaintiff repeats and incorporates each and every allegation contained above as if fully set forth herein.

96.     This Cause of Action is brought pursuant to Section 15 of the Securities Act, 15 U.S.C. §77o, on behalf of the Class, against the Individual Defendants.

97.     The Individual Defendants each were control persons of Tufin by virtue of their positions as directors and/or senior officers of Tufin's predecessor entities immediately prior to the IPO. The Individual Defendants each had a series of direct and/or indirect business and/or

personal relationships with other directors and/or officers and/or major shareholders of Tufin.

98.     The Individual Defendants have a financial interest in conducting the IPO, and the Individual Defendants were each critical to effecting the IPO, based on their signing and/or their authorization of the signing of the Registration Statement, by participating to execute the IPO, and by having otherwise directed through their authority the processes leading to execution of the IPO, including obtaining underwriters, registration, qualification, authorization, pricing, offering to the public, and issuance and sale of the shares in the IPO.

99.     By reason of such wrongful conduct, the Individual Defendants are liable pursuant to Section 15 of the Securities Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.      Awarding damages to Plaintiff and members of the Class pursuant to Section 11 of the Securities Act;

C.      Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

D.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

E.      Awarding such equitable/injunctive or other further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury.


DATED: February 4, 2021                    LEVI & KORSINSKY, LLP


/s/ Adam M. Apton
Nicholas I. Porritt
Adam M. Apton
55 Broadway, 10th Floor
New York, NY 10006
Tel: (212) 363-7500
Fax: (212) 363-7171

*Counsel for Lead Plaintiff Mark Henry
and Lead Counsel for the Class*