**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TUFIN SOFTWARE TECHNOLOGIES LTD. SECURITIES LITIGATION | Master File No. 1:20-cv-5646-GHW<br><br>Hon. Gregory H. Woods |


**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**
**THE CONSOLIDATED AMENDED COMPLAINT**

AMERICAS 107181076

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ....................................................................................................... 1

BACKGROUND ............................................................................................................................... 3

I. Tufin Software Technologies, Ltd. ............................................................................... 3

II. Tufin's Initial Public Offering ...................................................................................... 4

III. Tufin Misses Earnings Projections in Q4 2019 ........................................................... 6

IV. Plaintiff's Complaint ..................................................................................................... 7

GOVERNING LAW .......................................................................................................................... 9

ARGUMENT ................................................................................................................................... 10

I. PLAINTIFF FAILS TO STATE A CLAIM UNDER  SECTION 11 OF THE SECURITIES ACT ........................................................................................................................ 10

  A. Plaintiff Challenges Vague, General Descriptors And "Puffery"  That Are Inactionable As A Matter of Law .................................................................... 11

  B. Plaintiff's Claims Of Falsity Are Refuted By The Disclosures When The Complete Language Is Not Omitted ................................................................... 13

    1. Tufin's Statements Concerning Its Sales Force Were Not False .................... 13

    2. Tufin's Descriptions Of The Length Of Its Sales Cycle Were Not False ........ 14

  C. The Confidential Witness Accounts Do Not Plead That the Challenged Statements Were False Or Misleading ............................................................. 15

    1. The Allegations Of The CWs Are Insufficient To Support The Claim ........... 15

    2. The CW Accounts Do Not Render Tufin's Statements About Its Sales Force False ..................................................................................................... 18

    3. The CW Accounts Do Not Render Tufin's Descriptions Of The Length Of Its Sales Cycle False Or Misleading ............................................................... 19

  D. Plaintiff's Challenges To Tufin's Risk Disclosures Are Not Actionable ................... 20

    1. Tufin's Risk Disclosures Contain Forward-Looking Statements That Are Protected By The Bespeaks Caution Doctrine ............................................... 20

    2. Plaintiff's Theory That These Risks Should Have Been Stated As Facts Should Be Rejected ..................................................................................... 22

II. PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT .......................................................................................................................... 24

CONCLUSION ............................................................................................................................... 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE), 2020
U.S. Dist. LEXIS 146995 (S.D.N.Y. Aug. 14, 2020) ...........................................................17

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...............................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) .......................................9

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173 (2d
Cir. 2014) ...........................................................................................................13

*DeMaria v. Andersen*, 318 F.3d 170 (2d Cir. 2003) ...................................................................11

*ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ...................................................................... 13, 25

*Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179 (S.D.N.Y. 2020).............................................17

*Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372 (S.D.N.Y. 2018).............................17

*Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*,
422 F. Supp. 3d 821 (S.D.N.Y. 2019).................................................................12

*In re Aratana Therapeutics Inc. Sec. Litig.,* 315 F. Supp. 3d 737 (S.D.N.Y. 2018).....................12

*In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564 (S.D.N.Y.
2013), *aff'd* 566 F. App'x 93 (2d Cir. 2014) ....................................................22

*In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 U.S. Dist. LEXIS 41484
(S.D.N.Y. Mar. 29, 2016) ...................................................................................23

*In re Diebold Nixdorf, Inc. Sec. Litig.*, No. 19-cv-6180 (LAP), 2021 U.S. Dist.
LEXIS 62449 (S.D.N.Y. Mar. 30, 2021)..............................................................11

*In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP),
2015 U.S. Dist. LEXIS 109941 (S.D.N.Y. Aug. 19, 2015)...................... 20, 21, 24

*In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS), 2015 U.S.
Dist. LEXIS 50726 (S.D.N.Y. Mar. 31, 2015) ....................................................17

*In re Frontier Commc'ns, Corp. Stockholders Litig.*, No. 3:17-cv-1617 (VAB),
2020 U.S. Dist. LEXIS 50063 (D. Conn. Mar. 24, 2020) ....................................16

*In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109 (S.D.N.Y. 2010) .............................17

ii

*In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495 (S.D.N.Y. 2010) .......................18

*In re Intel Corp. Sec. Litig.*, No. 18-cv-00507-YGR, 2019 U.S. Dist. LEXIS
54615 (N.D. Cal. Mar. 29, 2019) ...................................................................................13

*In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033 (N.D. Cal. 2007)........................22

*In re Micro Focus Int'l PLC Sec. Litig.*, No. 1:18-cv-06763-ALC, 2020 U.S. Dist.
LEXIS 180621 (S.D.N.Y. Sept. 29, 2020) ....................................................................23, 24

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08-cv-9203 (RJS), 2010 U.S.
Dist. LEXIS 34459 (S.D.N.Y. Mar. 31, 2010) .................................................................22

*In re Qudian Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 U.S. Dist. LEXIS 167072
(S.D.N.Y. Sept. 27, 2019).................................................................................................17

*In re Weight Watchers Int'l Inc. Sec. Litig.*, No. 19cv2005, 2020 U.S. Dist. LEXIS
223592 (S.D.N.Y. Nov. 30, 2020) .............................................................................. 10, 16

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07-cv-3994 (LTS)(AJP), 2009 U.S.
Dist. LEXIS 14838 (S.D.N.Y. Feb. 25, 2009)..................................................................12

*Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 U.S. Dist.
LEXIS 8115 (S.D.N.Y. Jan. 17, 2013)...............................................................................10

*Kirch v. Liberty Media Corp.*, 449 F.3d 388 (2d Cir. 2006) ...........................................................9

*Kramer v. Time Warner, Inc.*, 937 F.2d 767 (2d Cir. 1991).............................................................9

*Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592
F.3d 347 (2d Cir. 2010) ................................................................................................ 10, 13

*Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447
(S.D.N.Y. 2010) ...................................................................................................................16

*Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571 (S.D.N.Y. 2007)......................................................11

*ODS Capital LLC v. JA Solar Holdings Co. Ltd.*, No. 18-CV-12083 (ALC), 2020
U.S. Dist. LEXIS 223305 (S.D.N.Y. Nov. 30, 2020) ........................................................16

*Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2 (2d Cir. 1996)........................................................11

*Plevy v. Haggerty*, 38 F. Supp. 2d 816 (C.D. Cal. 1998)..............................................................22

*Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004) .......................................................... 11, 12, 20

*Scott v. GM Co.*, 46 F. Supp. 3d 387 (S.D.N.Y. 2014) ...............................................................10

*Singh v. Cigna Corp.*, 918 F.3d 57 (2d Cir. 2019)......................................................................12

iii

*Stadnick v. Vivint Solar, Inc.*, No. 14-cv-9283 (KBF), 2015 U.S. Dist. LEXIS 166008 (S.D.N.Y. Dec. 10, 2015)....................................................................................13

*Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294 (S.D.N.Y. 2000).........................................10, 20

*Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157 (2d Cir. 2021) ................................................12, 13

*Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851, 2009 U.S. Dist. LEXIS 4667 (S.D.N.Y. Jan. 23, 2009), *aff'd* 605 F. App'x 52 (2d Cir. 2015) ...........................10, 21

## STATUTES AND RULES

15 U.S.C. § 77.................................................................................................................... 7, 10, 24

iv

AMERICAS 107181076

Defendants, by and through their undersigned counsel, submit this brief in support of their motion to dismiss the Consolidated Amended Complaint (Dkt. No. 55, the "Complaint" or "Compl.") pursuant to Rules 8 and 12(b)(6) of the Federal Rules of Civil Procedure.[1]

## PRELIMINARY STATEMENT

This case presents a classic example of "hindsight pleading," with Plaintiff trying to recoup investment losses following a public company's earnings miss by finding something to challenge in an unrelated securities filing issued many months earlier. Plaintiff alleges that Tufin missed some of its projections for the fourth quarter of 2019 and, after this was announced in January of 2020, Tufin's stock price declined. A failure to predict future earnings, however, is not actionable under the securities laws. Consequently, Plaintiff tries to tie Tufin's earnings miss to the Registration Statement from Tufin's IPO many months earlier, targeting statements about the training of Tufin's sales personnel and the length of its sales cycles. But the earnings miss had nothing to do with such statements, and Plaintiff does not allege any relationship between these statements and the projections issued to investors. Moreover, it is simply frivolous to suggest that an issuer violates the securities laws by making subjective comments about its view of the quality of its sales force, which are the kinds of comments that companies routinely make. And the record here illustrates why those type of routine statements are not actionable. Because contrary to Plaintiff's faulty premise that Tufin's sales force was inadequately trained to sell, and takes too long to sell, Tufin's revenues grew substantially both pre- and post-IPO. Plaintiff's effort to find a hook for a lawsuit in the Registration Statement fails on multiple grounds.

*First*, Plaintiff challenges statements that are inactionable as a matter of law. Several of the statements Plaintiff focuses on are vaguely positive, unquantified descriptors, such as

---

[1] Capitalized terms used and not defined herein have the meaning ascribed to them in the Complaint. Exhibit citations refer to exhibits to the Declaration of Kimberly A. Havlin, filed herewith.

descriptions of a "highly trained" sales force and "significant time and resources" invested in the training of employees. These kinds of common statements are routinely found immaterial, both because they constitute "puffery" and corporate optimism, and because they are too non-specific and unquantified for any reasonable investor to rely on. *See infra* at p. 11 *et seq*.

*Second*, Plaintiff has not pleaded facts showing that any of the challenged statements were false or misleading. Plaintiff's Complaint creates the purportedly misleading statements by omitting key parts of sentences and headings from the disclosures. When these disclosure are read as a whole, as required, Tufin disclosed exactly what Plaintiff claims is missing—including that its sales cycle is long and unpredictable, especially for larger and more complex transactions, and that this risk made predicting future earnings difficult, which is exactly the risk that manifested in January 2020. *See infra* at p. 13 *et seq*.

*Third*, Plaintiff relies solely on the accounts of anonymous former Tufin employees to allege falsity. They make allegations only about their individual training and their views of the length of the sales cycle, for the limited and unidentified sales in which they were involved, in a company that sells in 24 countries with over $30 million in annual revenue. All of the CWs were low-level sales representatives and regional personnel that offer nothing more than their individual and subjective experiences and opinions of their time at Tufin. None of the CWs claims any knowledge of Tufin's sales operation as a whole, or makes any effort to quantify or contextualize their individualized complaints about their former employer, which include irrelevant matters such as their payment terms during training and the inability to charge the company for multiple rounds of drinks. Courts do not sustain claims on that basis. Nor do any of the former employees' alleged accounts, individually or collectively, contradict Tufin's disclosures in the Registration Statement or render them false or misleading. And the notion that

2

AMERICAS 107181076

Tufin's salespeople were unable to sell Tufin's products is contradicted by Tufin's performance at the time, which was up 31.7% at the time of the IPO, and even at the end of 2019 at the time of the earnings miss, was up 22% from the prior year. *See infra* at p. 15 *et seq*.

*Fourth*, Plaintiff challenges what Tufin expressly described as forward-looking statements and risk disclosures, which are inactionable as a matter of law under the bespeaks caution doctrine. Plaintiff cannot state a claim simply by alleging these disclosed risks should have been characterized as facts, rather than risks. Courts have specifically rejected this pleading tactic and, in any event, Plaintiff has not pled facts that any of what Tufin disclosed as a risk had actually occurred when the Registration Statement was issued. *See infra* at p. 20 *et seq*.

*Fifth*, because Plaintiff fails to plead a predicate Section 11 violation, Plaintiff's control person claims under Section 15 must also be dismissed. *See infra* at p. 24 *et seq*.

## BACKGROUND

### I.      Tufin Software Technologies, Ltd.

Tufin is a network security company incorporated under the laws of Israel, and sells a variety of cutting-edge cybersecurity solutions to businesses around the world. *See* Compl. ¶¶ 14, 41; Ex. A (Tufin Registration Statement) at 1, 51. Tufin's products allow businesses of all sizes to design and enforce their security policies across their network, including cloud-based security automation. Compl. ¶ 42. A global leader in network security policy automation, Tufin has over 2,000 customers using a variety of its products. Ex. A at 1.

The digital transformation of the business world created a great deal of complexity within IT and cloud environments. As companies continue to adopt new technologies, these environments become increasingly vulnerable to attack, and the need for increased security creates a significant opportunity. Compl. ¶ 38; Ex. A at 2, 3. Tufin offers a comprehensive package of security software aimed at addressing this widespread concern. It markets a suite of

3

AMERICAS 107181076

five interrelated software solutions called the "Tufin Orchestration Suite." *See* Compl. ¶¶ 41-42; Ex. A at 12-13.

One of the main risks of Tufin's business, however, is that its security solutions require companies to switch from their standard practice of using in-house, manual security protocols. *See* Compl. ¶ 39; Ex. A at 12. Organizations that currently use home-grown tools are often hesitant to purchase Tufin's products, as they may believe that they already have sufficient security protocols in place. Ex. A at 12, 14. Tufin salespeople thus need to persuade new customers to make a significant investment in these new technologies. *Id.* at 12-13.

## II.     Tufin's Initial Public Offering

Tufin went public in April 2019. In connection with the IPO, Tufin issued a 400-page Registration Statement which included descriptions of Tufin's business model, its operating history, its beliefs regarding its growth opportunities and expansion, and extensive warnings and cautionary language regarding the known risks associated with Tufin's business. *See* Ex. A.

In particular, Tufin's Registration Statement discussed the uncertainty of potential future revenues in its complex, B2B business model that relies on converting sophisticated enterprises to new technologies. *Id.* at 18. For example, among the "Risk Factors" highlighted to investors, Tufin warned that "if we are unable to acquire new customers, particularly large organizations, our future revenues and operating results will be harmed," and that "our growth strategy is dependent, in part, on our ability to acquire new customers, particularly large organizations." *Id.* at 12-13. Tufin also warned of the risks of investing in this developing area, cautioning that "the security policy management market is rapidly evolving and difficult to predict." *Id.* at 12.

Plaintiff alleges that the Registration Statement was misleading because it characterized Tufin's sales cycle as lasting "several months," when in fact sales cycles took longer and could not be accurately predicted. Compl. ¶¶ 5-7, 72-73. But Tufin actually stated in the same

4

AMERICAS 107181076

sentence that its sales cycle is "often longer for larger transactions," (*id.* ¶ 72), and "even longer, less predictable and more resource-intensive for larger transactions." *Id.* ¶ 77; Ex. A at 13.  Tufin also warned that "customers may also require additional internal approvals or seek to test our products for a longer trial basis," which also extends the sales cycle.  Ex. A at 13.

Tufin further repeatedly warned that this lengthy and unpredictable sales cycle made future results difficult to predict—exactly what Plaintiff challenges in suing on Tufin's missed Q4 2019 projections.  Tufin specifically cautioned that "[w]e may not be able to accurately predict or forecast the timing of sales, which could cause our results to vary significantly from our expectations and the expectations of market analysts."  *Id.* at 14.  Tufin also warned that "[o]ur sales cycle is long and unpredictable, which may cause significant fluctuations in our quarterly results" (*id.* at 6, 13); that a risk of large sales is "the timing of individual large sales, which in some cases have occurred in a quarter subsequent to those we anticipated, or have not occurred at all" (*id.* at 12); and that "[t]he loss or delay of one or more large transactions in a quarter could impact our anticipated results of operations for that quarter and future quarters for which revenue from that transaction is delayed."  *Id.* at 14.

Plaintiff also alleges that the Registration Statement was misleading in describing Tufin's sales force as "highly trained" and recounting "significant time and resources" in training. Compl. ¶¶ 75-76.  Plaintiff ignores that the Registration Statement also fully disclosed—in the sentences immediately before and after the statements Plaintiff alleges are materially inaccurate—relevant factors and risks associated with hiring and training Tufin's sales force:

- "We expect to continue to expand our sales and marketing personnel significantly and face a number of challenges in achieving our hiring and integration goals."  Compl. ¶ 75; Ex. A at 20.

- "Our inability to attract or retain qualified personnel . . . may seriously harm our business, financial condition, and results of operations."  Compl. ¶ 75; Ex. A at 20.

5

- "There is no guarantee that our recent hires and planned new hires will become as productive as we expect or require, and we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets in which we currently operate or where we seek to conduct business."  Compl. ¶ 75; Ex. A at 20.

- "Our failure to hire a sufficient number of qualified sales force members and train them to operate at target performance levels may materially and adversely impact our projected growth rate."  Compl. ¶ 75; Ex. A at 20.

The Registration Statement also included a "Special Note Regarding Forward-Looking Statements" advising that statements relating to Tufin's plan "to invest in and grow our sales force and marketing team" are forward-looking and, therefore, "are only predictions" from which actual results could differ materially.  Ex. A at 41.

## III.    Tufin Misses Earnings Projections in Q4 2019

In the months following the IPO, in securities filings that are not challenged by Plaintiff, Tufin issued various projections, including guidance for Q4 2019 in its November 14, 2019 6-K. *See* Ex. D.  In that filing, Tufin highlighted that "the inability to acquire new customers" could cause future performance to differ significantly from the projections, and expressly incorporated each of the "Risk Factors" from the Registration Statement.  Ex. D at 4.

In a 6-K filing on January 8, 2020, Tufin reported that it had missed its revenue and income projections for Q4 2019.  Ex. E at 1.  Tufin announced expected revenue of $29.5-30.1 million on its projections of $34.0-38.0 million, and an operating loss of $1.1-2.6 million on its projection of $0-3 million in income.  *Id.*; Compl. ¶¶ 6-7.[2]

Tufin stated that the primary reason for the miss was a number of transactions "that we anticipated would close but did not close by the end of the quarter."  Ex. E at 1.  Tufin noted that it "believe[d] the vast majority of these deals were not lost to competitors and have moved into our pipeline for 2020."  *Id.*  Plaintiff does not allege that this statement was false or that Tufin

---

[2] Tufin later reported actual Q4 revenue of $30.1 million and a non-GAAP loss of $1.9 million in its February 13, 2020 Form 6-K.  Ex. G at 1.

6

failed to realize these sales in 2020 as described. On a conference call the same day, Tufin noted that the quarter saw "a record number of deals that were complex and large" (Ex. F at 6), which are exactly the kinds of deals for which Tufin had told investors that timing was lengthy and very difficult to predict. The results also closely tracked Tufin's warnings in the Registration Statement that sales deferred to later quarters can affect anticipated results. *See supra* at p. 5.

News of the earnings miss caused Tufin's stock to drop. Compl. ¶ 8. Overall, however, Tufin's fourth quarter 2019 revenue was still up 3% year over year, and Tufin's 2019 full year revenue was up a remarkable 22% from the prior year. Ex. G at 1.

## IV.   Plaintiff's Complaint

Although missed projections are not actionable, putative class actions are routinely filed following an earnings miss and accompanying stock drop, as here. On February 4, 2021, Plaintiff filed the amended and operative complaint ("Complaint") alleging claims under Sections 11 and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. § 77, *et seq.*, against Tufin and various of its officers and directors.

Ignoring the Registration Statement's detailed risk disclosures and cautionary language, and context, Plaintiff isolates a few sentence fragments from the Registration Statement and claims they were false or misleading.[3] Compl. ¶ 72, 75, 77. The statements Plaintiff challenges fall into two categories: (1) Tufin's description of its sales force as "highly trained" and other statements about its hiring, training, and retention; and (2) Tufin's description of the length its sales cycle. *Id.* ¶¶ 72-73, 75-78; Ex. A at 13, 52, 82-83.

The Complaint cites eleven confidential witnesses ("CWs"). Compl. ¶¶ 26-36. All are

---

[3] The challenged statements in paragraphs 72, 75, and 77 of the Complaint represent the incomplete language Plaintiff chose. Compl. ¶¶ 72, 75, 77. The full text of the challenged statements are in the Registration Statement. Ex. A at 13-14, 20, 52, 82-83.

7

AMERICAS 107181076

former Tufin employees, many held similar low-level sales positions, and almost all were at Tufin for less than two years. *Id.* Their allegations concern their individual experiences—none have the seniority or experience to speak to the practices at Tufin generally, and none claim to do so. *Id.* ¶¶ 73, 76, 78.

Plaintiff relies on the individual accounts of these disgruntled former employees to claim that the "highly trained" descriptor was inaccurate. For example, some CWs said that the sales force was "mostly new hires," that it took a long time to fully understand and sell Tufin's products, and that Tufin routinely terminated new hires. *Id.* ¶¶ 54, 60, 63-64. Another complained at having not received what was in their view "necessary on-the-job training." *Id.* ¶ 54. Others complained about receiving a half-salary during training (*id.* ¶ 61), that it was hard to get expenses approved, particularly multiple rounds of drinks (*id.*), and that Tufin did not have enough pre-sales engineers to support the sales staff (*id.* ¶ 62).

As to Tufin's sales cycle, Plaintiff challenges one Tufin statement that "[o]ur sales cycle usually lasts several months from proof of concept to purchase order," alleging sales often take longer. *Id.* ¶ 77. This claim ignores the remainder of the sentence, which continues "and is often even longer, less predictable and more resource-intensive for larger transactions." *Id.* Plaintiff equally ignores the Risk Factor on the very same subject that "we may not be able to accurately predict or forecast the timing of sales" and other similar items described above. *Id.*; *supra* at p. 5. Plaintiff cannot state a claim under the securities laws by ignoring the key portions of the relevant disclosures and the risk factors. Nor can it evade the full and accurate disclosures with the isolated accounts of low-level CWs that Tufin had not adequately explained the complexity of its sales cycle, and that they sometimes underestimated or had trouble predicting how long sales would take. Compl. ¶¶ 53-56, 58. None of these CWs identifies the number of sales they

8

had information for, or claims any insight into Tufin's sales operations as a whole.

## GOVERNING LAW

To survive a motion to dismiss for failure to state a claim upon which relief can be granted, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). It does not suffice for a complaint to offer "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* (quoting *Twombly*, 550 U.S. at 555, 557). Thus, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to [defeat] a motion to dismiss." *Kirch v. Liberty Media Corp.*, 449 F.3d 388, 398 (2d Cir. 2006). Accordingly, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)).

The Court may consider the Registration Statement and other Tufin SEC filings incorporated by reference in the Complaint, as well as other publicly filed disclosure documents. *See, e.g.*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider … documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."); *Kramer v. Time Warner, Inc*., 937 F.2d 767, 774 (2d Cir. 1991) ("[A] court may take judicial notice of the contents of relevant public disclosure documents required to be filed with the SEC as facts capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.") (citations omitted). Where the complaint's allegations "conflict with the plain language of the publicly filed

9

AMERICAS 107181076

disclosure documents, the disclosure documents control, and the court need not accept the allegations as true." *In re Weight Watchers Int'l Inc. Sec. Litig.*, No. 19cv2005, 2020 U.S. Dist. LEXIS 223592, at *19 (S.D.N.Y. Nov. 30, 2020); *see also Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300 (S.D.N.Y. 2000) ("If the plaintiffs' claims of misleading disclosures are contradicted by disclosures made on the face of the prospectus, then no additional facts can prove the claims and dismissal is proper.") (citations omitted).

## ARGUMENT

**I.      PLAINTIFF FAILS TO STATE A CLAIM UNDER
         SECTION 11 OF THE SECURITIES ACT**

To state a claim under Section 11 of the Securities Act, the complaint must allege facts demonstrating that the disclosures "contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading."  15 U.S.C. § 77k(a); s*ee Lindsay v. Morgan Stanley (In re Morgan Stanley Info. Fund Sec. Litig.)*, 592 F.3d 347, 358-59 (2d Cir. 2010).  "[T]he relevant inquiry 'is not whether . . . [the statement] later turned out to be correct, but rather whether the [defendant] knew or had reason to know, at the time the offering documents were filed, that the statement was untrue.'" *Scott v. GM Co.*, 46 F. Supp. 3d 387, 393-94 (S.D.N.Y. 2014) (alterations in original).  The "claims must allege material misrepresentations or omissions based upon the facts as they existed at the time of the offering." *Zirkin v. Quanta Capital Holdings Ltd.*, No. 07 Civ. 851, 2009 U.S. Dist. LEXIS 4667, at *30 (S.D.N.Y. Jan. 23, 2009)), *aff'd* 605 F. App'x 52 (2d Cir. 2015) (quotation and citation omitted).

Additionally, the alleged false statements or omissions must be material, meaning that "taken together and in context, [they] would have misled a reasonable investor about the nature of the securities." *Johnson v. Sequans Commc'ns S.A.*, No. 11 Civ. 6341 (PAC), 2013 U.S. Dist.

10

AMERICAS 107181076

LEXIS 8115, at *24 (S.D.N.Y. Jan. 17, 2013); *DeMaria v. Andersen*, 318 F.3d 170, 180 (2d Cir. 2003) (A fact is material if there is "a substantial likelihood that the disclosure of the omitted [information] would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available.") (citations omitted).

The purpose of Section 11 is to ensure that companies provide accurate company-specific information and risk factors so that investors can draw their own conclusions as to the advisability of the investment. Thus, in evaluating a claim, the Court should look to the offering document as a whole, and dismiss claims where the offering document adequately warns of the relevant issues and risks. *See Olkey v. Hyperion 1999 Term Tr.*, 98 F.3d 2, 5 (2d Cir. 1996) (affirming dismissal of Securities Act claims as "[i]t is undisputed that the prospectuses must be read 'as a whole'" and "[t]he prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed"); *Rombach v. Chang*, 355 F.3d 164, 175-76 (2d Cir. 2004) (dismissing Securities Act claims where offering documents warned of the relevant risks); *Miller v. Lazard, Ltd.*, 473 F. Supp. 2d 571, 579 (S.D.N.Y. 2007) ("In assessing whether statements provided in the prospectus are materially misleading, the prospectus must be read as a whole, not selectively or in a piecemeal fashion," and granting motion to dismiss where language in the prospectus addressed the allegedly omitted risks).

### A.   Plaintiff Challenges Vague, General Descriptors And "Puffery" That Are Inactionable As A Matter of Law

Plaintiff challenges Tufin's description of its sales force as "highly trained" and its statement that Tufin invests "significant time and resources in training new sales force personnel." Compl. ¶¶ 72, 75, 77. These vague, generalized, optimistic statements of Tufin's operations are "precisely the type of puffery that [the Second Circuit] and other circuits have consistently held to be [no]nactionable." *In re Diebold Nixdorf, Inc. Sec. Litig.*, No. 19-cv-6180

11

(LAP), 2021 U.S. Dist. LEXIS 62449, at *27 (S.D.N.Y. Mar. 30, 2021); *see Rombach*, 355 F.3d at 174 (general and vague statements or "expressions of puffery and corporate optimism do not give rise to securities violations") (citation omitted).

Courts have rejected challenges to nearly identical statements. For example, in *Xinhua*, the court dismissed Section 11 claims based on the company's description of its management team as "strong," "experienced," and "capable," finding these were "nothing more than puffery, which is not actionable under the securities laws." *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07-cv-3994 (LTS)(AJP), 2009 U.S. Dist. LEXIS 14838, at *22, 25-26 (S.D.N.Y. Feb. 25, 2009); *see also Haw. Structural Ironworkers Pension Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 846 (S.D.N.Y. 2019) (descriptions of past performance as "'quick,' 'very smooth,' and 'great progress' are so vague and ill-suited to concrete measurement that they constitute puffery"); *In re Aratana Therapeutics Inc. Sec. Litig.,* 315 F. Supp. 3d 737, 757-58 (S.D.N.Y. 2018) (statements that a company had "made remarkable progress" and was "prepared for what lays ahead" were non-actionable puffery since they "are 'too general to cause a reasonable investor to rely upon them'").

These statements are also inactionable because the generalized phrases "highly trained" and "significant time and resources" that Tufin used do not "provide metrics on which a reasonable investor would rely." *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.)*, 988 F.3d 157, 171 (2d Cir. 2021). The Second Circuit rejected a challenge to a nearly identical statement in *Singh*, which dismissed securities claims based on statements that the company would "continue to allocate significant resources" to various compliance efforts, finding these descriptors were simple, generic, and "too general to cause a reasonable investor to rely upon them." *Singh v. Cigna Corp.*, 918 F.3d 57, 60-61, 63-64

12

(2d Cir. 2019).  The same was true in *ECA & Local 134 IBEW Joint Pension Trust of Chicago v. JP Morgan Chase Co.*, in which the Second Circuit dismissed Section 11 claims based on statements touting a company's "highly disciplined" risk management because they were "were merely generalizations" and thus "too general to cause a reasonable investor to rely upon them." 553 F.3d 187, 205-07 (2d Cir. 2009).  And in *Synchrony*, the Second Circuit found statements that the company's business-centric business model "provides substantial value" were too vague and "generic to express objective fact." *In re Synchrony*, 988 F.3d at 173; *see also In re Intel Corp. Sec. Litig.*, No. 18-cv-00507-YGR, 2019 U.S. Dist. LEXIS 54615, at *33 (N.D. Cal. Mar. 29, 2019) (statement describing a product as having "significant performance improvement" was "vague and immaterial as a matter of law").  Here too, Tufin's descriptors are "too open-ended and subjective" to constitute "a guarantee of some concrete fact." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185-86 (2d Cir. 2014).

**B.    Plaintiff's Claims Of Falsity Are Refuted By The Disclosures When The Complete Language Is Not Omitted**

**1.    Tufin's Statements Concerning Its Sales Force Were Not False**

A court is required to review the offering documents as a whole to determine falsity, rather than individual sentences in isolation.  *Lindsay*, 592 F.3d at 366 ("The literal truth of an isolated statement is insufficient; the proper inquiry requires an examination of defendants' representations, taken together and in context.") (citation and quotations omitted); *Stadnick v. Vivint Solar, Inc.*, No. 14-cv-9283 (KBF), 2015 U.S. Dist. LEXIS 166008, at *33 (S.D.N.Y. Dec. 10, 2015) ("The 'central issue' [] 'is not whether particular statements, taken separately, were literally true, but whether defendants' representations, taken together and in context, would have misled a reasonable investor about the nature of the securities.'").

Plaintiff asserts that Tufin's description of "significant" investments in training was false.

13

But Tufin's Registration Statement and other filings show that Tufin had, in fact, made the significant investments in its sales force and training that it described at the time of the IPO. Tufin increased its operating expenses for sales and marketing by a remarkable 33% from Q1 2018 to Q1 2019, from $9.1 to $13.6 million, which was driven by its expansion of its sales organization and reach. *See* Ex. A at 20; Ex. B at 6. Tufin again increased sales and marketing operating expenses from Q2 2018 to Q2 2019 (when the IPO launched), this time by 31%, from $11.9 million to $17.1 million. Ex. C at 6. Plaintiff cannot avoid Tufin's concrete, specific disclosures about the actual investments it was making in its sales and marketing efforts through a conclusory allegation. Moreover, a reasonable investor could not have been misled by Tufin's general narrative descriptors of its sales and training investments, when Tufin disclosed the actual expenditures it had made.

Additionally, as Plaintiff emphasizes, customer sales drive Tufin's revenue. Compl. ¶¶ 7, 44; Ex. A at 18. At the time of the IPO, Tufin's revenue had increased 31.7% from year-end 2017 to year-end 2018, and then increased 25.4% for the first quarter ended March 31, 2019 compared to the first quarter of 2018. *See* Ex. A at 58; Ex. B at 1. Tufin's revenue also increased 36% for the second quarter ended June 30, 2019 as compared to the second quarter of 2018. Ex. C at 1. Tufin's actual sales numbers disprove Plaintiff's vague allegation that Tufin's sales force was not sufficiently trained to sell products in April 2019.

### 2.    Tufin's Descriptions Of The Length Of Its Sales Cycle Were Not False

Plaintiff claims that Tufin's sales cycle "typically lasts one or two years" while Tufin told investors it lasts "several months." Compl. ¶ 73. This characterization of the disclosures simply neglects key portions that disprove Plaintiff's assertion. In particular, Plaintiff cites the phrase "[o]ur sales cycle usually lasts several months from proof of concept to purchase order from our customers" as misleading, but ignores the rest of the very same sentence, which says that the

14

sales cycle "is often even longer, less predictable and more resource-intensive for larger transactions." *Id.* ¶ 77.  The Complaint also omits altogether that this statement appears under the bolded risk factor that ***"[o]ur sales cycle is long and unpredictable, which may cause significant fluctuations in our quarterly results of operations."***  Ex. A at 13 (emphasis in original).  Plaintiff also ignores other parts of the Registration Statement that speak to this exact issue.  In particular, in the section titled "Key factors Affecting Our Performance," Tufin highlighted that "large organizations sales are characterized by longer sales cycles and additional time and resources." *See id.* at 53.  Plaintiff cannot state a claim by choosing only select words to challenge, while omitting the very words that disprove the claim.

The weakness of Plaintiff's claim is perhaps best revealed by its reliance on a supposed "phenomena in the world of experimental psychology" called "the anchoring effect."  Compl. ¶ 74.  According to this alleged "phenomena," Tufin somehow "anchored" to a time frame of 'several,' and this "anchoring" created an "impression that the sales cycle was close to the anchoring value of 'several months'—not longer than a year." *Id.*  However creative and unprecedented, this resort to supposed experimental psychology is not what the disclosure actually says.  The "phenomena" also requires one to ignore the rest of the Registration Statement, particularly the specific statements that larger deals take longer and the ample cautions that these sales cycles are complex and unpredictable overall.

C.   **The Confidential Witness Accounts Do Not Plead That the Challenged Statements Were False Or Misleading**

1.   **The Allegations Of The CWs Are Insufficient To Support The Claim**

Unlike a typical securities case, there is no allegation that the issuer (or anyone else) publicly disclosed information showing that the issuer's prior statements were false.  Plaintiff in fact alleges no corrective disclosure whatsoever.  Instead, Plaintiff's only factual allegations on

15

falsity are a collection of anecdotal accounts of eleven unnamed former Tufin employees labelled CW1-11, which Plaintiff claims reveal the falsity of statements in the Registration Statement. Notably, none of these accounts say anything about the missed projections that Plaintiff cites as causing his loss, and Plaintiff does not (and cannot) allege that Tufin's earnings miss had anything to do with the statements about training and sales cycle length that he challenges in the Complaint.

The CWs' allegations are woefully deficient and amount to nothing more than subjective beliefs of disgruntled former employees. All CWs are low-level employees based in the East Coast and Midwest of the United States, who claim zero managerial responsibility or oversight of anyone. They claim no ability to speak for training or sales cycles across Tufin as a whole, which has salespeople on the ground in 24 countries. Compl. ¶ 72. At best, they can speak only to their individualized experiences in their individual spheres. Their allegations do not plead falsity, because confidential witness allegations require pleaded facts "to support the probability that a person in the position occupied by the source would possess the information alleged." *In re Weight Watchers Int'l Inc. Sec. Litig.*, 2020 U.S. Dist. LEXIS 223592, at *23-24. Hence, allegations made by confidential sources in "rank-and-file positions," like the CWs here, who lack insight into an issuer's operations as a whole, are routinely discounted. *See, e.g.*, *Local No. 38 IBEW Pension Fund v. Am. Express Co.*, 724 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2010) (discounting the allegations from CWs employed as low-level employees without access to aggregated data); *ODS Capital LLC v. JA Solar Holdings Co. Ltd.*, No. 18-CV-12083 (ALC), 2020 U.S. Dist. LEXIS 223305, at *28-29 (S.D.N.Y. Nov. 30, 2020) (dismissing claims where confidential sources were sales managers and sales staff who lacked access to aggregated data); *In re Frontier Commc'ns, Corp. Stockholders Litig.*, No. 3:17-cv-1617 (VAB), 2020 U.S. Dist.

16

AMERICAS 107181076

LEXIS 50063, at *44-45 (D. Conn. Mar. 24, 2020) (discounting allegations from confidential sources where there was no indication the source would have access to the alleged information).

Further, allegations coming solely from confidential witnesses, without facts to corroborate the allegations, will not survive a motion to dismiss. *In re IAC/Interactivecorp Sec. Litig.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010)*; see also Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 209 (S.D.N.Y. 2020) (dismissing Securities Act claims and discounting the allegations of a former employee and confidential witness where there was no corroborating information to support the confidential witness's statements).

Additionally, at least three of the eleven confidential witnesses did not even work at Tufin at the time the Registration Statement was issued, further undermining their ability to speak to conditions at Tufin at the time.[4] *See*, *e.g.*, *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS), 2015 U.S. Dist. LEXIS 50726, at *38 (S.D.N.Y. Mar. 31, 2015) (disregarding the allegations of a confidential source where the source left the company "near the very beginning of the Class Period"); *In re Qudian Sec. Litig.*, No. 17-CV-9741 (JMF), 2019 U.S. Dist. LEXIS 167072, at *16-19 (S.D.N.Y. Sept. 27, 2019) (plaintiffs failed to establish falsity where confidential witness "provided information concerning an earlier period"). Others make no effort to describe the time period they refer to, and whether the conditions they complain of existed at the time of the IPO. *See Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372, 408-09 (S.D.N.Y. 2018) (dismissing claims where "most of the allegations by the CWs are unmoored in time"); *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE), 2020 U.S. Dist. LEXIS 146995, at *30 (S.D.N.Y. Aug. 14, 2020) ("Statements of CWs that cannot situate relevant occurrences in time are sometimes disregarded because they cannot

---

[4] CW2 left Tufin more than five months before the Registration Statement was issued.  CW3 and CW8 joined Tufin after the Registration Statement was issued and after the IPO.  Compl. ¶¶ 27, 28, 33.

AMERICAS 107181076

establish that the challenged statements were knowingly false when made.").

> ## 2. The CW Accounts Do Not Render Tufin's Statements About Its Sales Force False

In addition to being incompetent, the CWs' accounts about Tufin's sales force do not state a claim. Plaintiff relies on the CWs' accounts to claim that Tufin spoke falsely in stating that its "highly trained sales force is responsible for overall market development" and in its reference to investing "significant time and resources in training new sales force personnel." *See* Compl. ¶¶ 72-73, 75-76. While Plaintiff offers a range of complaints and criticisms from the CWs, none actually contradict Tufin's descriptions. Plaintiff cites CW opinions such as (1) CW1's view that Tufin had a number of new hires who took six months to a year to fully understand and sell the products (*id.* ¶ 60); (2) CW10's claim that Tufin would routinely terminate over 96% of its new hires after a short amount of time and hire new ones (*id.* ¶ 64); (3) CW10's belief that new salespeople should not have had to handle sales calls on their own and instead should have received on-the-job training from more experienced salespeople (*id.* ¶ 54); and (4) CW1's belief that new salespeople underestimated the amount of time necessary to close sales (*id.* ¶ 54). These isolated accounts do not contradict Tufin's general statement that its overall sales force was highly trained and that Tufin invested significant resources in providing that training. *See In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010) (opinion of one confidential witness that defendants' appraisals were "shoddy" insufficient to sustain a Section 11 claim).

Some CWs also make claims regarding Tufin's hiring and turnover, but they are irrelevant. Plaintiff relies primarily on CW2's assertion that many salespeople would either give up or be forced out after a year. Compl. ¶ 63. But CW2 only worked at Tufin for seven months, was a low-level employee, and left Tufin six months prior to the IPO. *Id.* ¶ 27. There is no

18

indication that CW2 or CW10, who also believed that there was high sales force turnover, would have had access to general staffing information. *Id.* ¶ 64. In any case, these allegations say nothing about the training that was actually provided or the investments Tufin made in its sales force, so they do not render any statement false or misleading.

The remaining CW grievances, such as CW2's complaint about having been kept on half salary during their initial ramp up, or the long-lasting frustration at having been unable to expense a second round of drinks, likewise have nothing to do with the challenged statements. *See id.* ¶ 61.

### 3. The CW Accounts Do Not Render Tufin's Descriptions Of The Length Of Its Sales Cycle False Or Misleading

Plaintiff also relies on certain CWs to claim that Tufin sales cycle did not "usually last several months from proof of concept to purchase order." As noted above, the disclosure actually says that the sales cycle "is often even longer, less predictable and more resource-intensive for larger transactions." Ex. A at 13 ("it is often even longer, less predictable and more resource-intensive for larger transactions"), 53 ("large organizations sales are characterized by longer sales cycles"), 83 ("it is often longer for larger transactions"). The CW accounts say only that the sales cycle *can* be longer than several months, which is exactly what the Registration Statement says, repeatedly. CW1 recalled sales cycles of "typically at least a year" (Compl. ¶ 55); CW2[5] described the sales cycle as "extremely long, technical, and complex" with some deals taking "eighteen months to two years to close" (*id.* ¶ 55); CW9 alleged "most sales took up to eighteen months to close" (*id.* ¶ 58); CW7 noted the sales cycle could be "long" and require "years of meetings" (*id.* ¶ 56); and CW11 believed that "a six-month close was only achievable

---

[5] As noted above, CW2 left Tufin in November 2018, months before the 2019 IPO, and therefore should be disregarded. Compl. ¶ 27.

19

with luck."[6]  *Id.* ¶ 55.  These allegations, at most, demonstrate that these CWs experienced or observed sales cycles that lasted between six months and one or two years.  None of these CWs quantify the number of transactions that they observed as having these longer sales cycles, so there is no way to know how they compare to Tufin's total sales volume.  Nor does any CW say whether these were the larger and more complex deals that Tufin explicitly warned took longer.  The CWs' descriptions of longer sales cycles are entirely consistent with what Tufin disclosed.[7]

### D.  Plaintiff's Challenges To Tufin's Risk Disclosures Are Not Actionable

#### 1.  Tufin's Risk Disclosures Contain Forward-Looking Statements That Are Protected By The Bespeaks Caution Doctrine

Plaintiff also contends that Tufin's risk disclosures on sales force training and the length of the sales cycle, which described risks that "may" cause harm to the business or impair results, were materially false or misleading.  *See id.* ¶¶ 75, 77.  These statements are protected by the "bespeaks caution" doctrine, which protects forward-looking statements that are accompanied by cautionary language such that, when examined in the context of the total mix of information, they would not mislead an investor.  *Rombach*, 355 F.3d at 173.  This doctrine recognizes that such forward-looking statements are immaterial as a matter of law.  *Steinberg*, 88 F. Supp. 2d at 301-02, 308 (forward-looking statements are protected by the bespeaks caution doctrine when surrounded by cautionary language).  Using warning terms such as "may" signals a forward-looking statement.  *Rombach*, 355 F.3d at 173; *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 U.S. Dist. LEXIS 109941, at *44-45, 47 (S.D.N.Y. Aug.

---

[6] CW11 was at Tufin for only 10 months.  Compl. ¶ 36.

[7] In addition to the CW statements specifically addressed herein, Plaintiff also includes allegations from various CWs that do not speak to the falsity of any of the challenged statements.  For example, CW4 asserted a belief that it was a "bad idea" to go public.  Compl. ¶ 55.  CW5 and CW6 believed that when Tufin lost sales, it was because the potential customer decided to go with a lower-priced competitor.  *Id.* ¶ 43.  CW1 and CW2 opined that the Tufin Suite was a "nice-to-have, not a must-have product."  *Id.*  And CW8 complained at being "micromanaged" in having to frequently report on sales progress.  *Id.* ¶¶ 46, 59.  These expressions of subjective belief are irrelevant to the claims.

AMERICAS 107181076

19, 2015).

Here, Plaintiff acknowledges that he challenges forward-looking warnings of what "may" occur. *See* Compl. ¶¶ 75, 77. The forward-looking nature of these statements is made particularly clear in Tufin's "Special Note Regarding Forward-Looking Statements," which advised investors that words such as "believe," "may," "continue," and "expect" indicate that a statement is forward-looking. Ex. A at 41. The Note specifically advised that statements regarding "our plans to invest in and grow our sales force" and "our expectations regarding sales" are "forward-looking by their nature." *Id.* And as the Note cautioned, forward-looking statements "are subject to risks and uncertainties" and "include information about possible or assumed future results in our business, financial condition, results of operations, liquidity, plans and objectives." *Id.* Likewise, these statements are located in the "Risk Factors" section of the Registration Statement, which stated that: "[t]his offering and an investment in our ordinary shares involve a high degree of risk. . . If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our ordinary shares would likely decline, and you might lose all or part of your investment." *Id.* at 12.

Tufin's statements of what "may" occur given the key risks of its business fall squarely within the protection of the bespeaks caution doctrine. *See, e.g.*, *Zirkin*, 2009 U.S. Dist. LEXIS 4667, at *37 (forward-looking statements were protected under the bespeaks doctrine since the offering documents stated these matters were "inherently difficult to predict" and were subject to a "high level of uncertainty"); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 109941, at *41-43 (statements protected by bespeaks caution doctrine where they were identified as forward-looking and stated that they were subject to risks and uncertainties).

21

AMERICAS 107181076

### 2. Plaintiff's Theory That These Risks Should Have Been Stated As Facts Should Be Rejected

Plaintiff also argues that these risk disclosures themselves were false or misleading because the risks had already materialized and should have been stated as fact instead.  Compl. ¶¶ 5, 76, 78.  But courts have rejected this theory of liability and dismissed claims based on statements that risks "may" or "could" affect results, rather than saying that they "are" affecting results, exactly what Plaintiff alleges here.  For example, in *Noah*, plaintiff challenged the company's disclosure of the risk that the cost of raw materials "could" impact the company's gross margin, because plaintiff claimed the cost of these materials had already impacted the company.  *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08-cv-9203 (RJS), 2010 U.S. Dist. LEXIS 34459, at *21-23 (S.D.N.Y. Mar. 31, 2010).  The court dismissed the Section 11 claim, finding that "the lengthy, forward-looking recitation of risks facing [the company] did not imply that none of these risks, at least to some extent, would affect [the company's] most recent fiscal quarter."  *Id.*  Other courts have reached the same conclusion.  *See In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1048 (N.D. Cal. 2007) (claims based upon risk factors are "not actionable to the extent plaintiffs contend defendants should have stated that the adverse factors 'are' affecting financial results rather than 'may' affect financial results"); *Plevy v. Haggerty*, 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998) ("[W]here a company's filings contain abundant and specific disclosures regarding the risks facing the company, as opposed to terse, generic statements, the investing public is on notice of these risks and cannot be heard to complain that the risks were masked as mere contingencies.").

*Second*, for these statements to be actionable, there must be sufficient facts to show the risk existed in a definitive way at the time of the IPO.  *In re Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013), *aff'd* 566 F. App'x 93 (2d Cir. 2014).

22

Plaintiff challenges the risk disclosures regarding Tufin's hiring and training, such as its statements that "[o]ur inability to attract or retain qualified personnel or delays in hiring required sales personnel *may* seriously harm our business, financial condition and results of operations"; that Tufin "*may* be unable to hire or retain sufficient numbers of qualified individuals in the future"; and that [o]ur failure to hire a sufficient number of qualified sales force members and train them to operate at target performance levels *may* materially and adversely impact our projected growth rate." Compl. ¶ 75. As discussed above, however, the Complaint does not plead that any of these risks had materialized at the time of the Registration Statement. None of the CWs speak in any way to Tufin's overall performance, to any "serious harm" to the "business, financial condition and results of operations," to any "material and adverse impact [on] Tufin's projected growth rate," or to Tufin being short of employees overall or unable to hire. And, as addressed above, Tufin's financial performance demonstrates the contrary. *See supra* at p. 14.

*Micro Focus* is closely analogous. *In re Micro Focus Int'l PLC Sec. Litig.*, No. 1:18-cv-06763-ALC, 2020 U.S. Dist. LEXIS 180621 (S.D.N.Y. Sept. 29, 2020). There, plaintiff alleged that the company's risk warning in its Registration Statement about customer attrition were false or misleading because that risk had already materialized. *Id.* at *20. As here, Plaintiff relied on allegations from former employees, which the court noted were "about their personal experiences at the company." *Id.* at *21. The court rejected these allegations because these experiences "do not adequately plead that there was well-known, wide-spread customer attrition at the relevant time" of the Registration Statement. *Id.* at *23; *see also In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 U.S. Dist. LEXIS 41484, at *18-19 (S.D.N.Y. Mar. 29, 2016) ("generic allegations" from confidential witnesses that a company's cosmetics were "struggling,"

23

"underperforming," and "forecasted to be down" at the time of an IPO were insufficient to support Section 11 claim that risk factors were false or misleading, as they did not adequately plead that those risks had materialized).  Plaintiff's claims suffer from the same deficiency.

*Third*, Plaintiff's challenge to Tufin's warning that it "*may* not be able to accurately predict or forecast the timing of sales, which could cause our results to vary significantly from our expectations and the expectations of market analysts," on the basis that this had already transpired, fails for the same reasons.  Compl. ¶ 78.  There is no allegation from any CW or otherwise that, at the time of the IPO, the difficulty of predicting sales timing had already caused Tufin's results to vary significantly from expectations.  None of the CWs claim any insight into Tufin's projections or how they account for sales timing.  Plaintiff does not even allege a significant variance from Tufin's guidance until many months after the IPO, in early 2020.  To the contrary, as addressed above, Tufin's performance had only increased in the lead-up to, and then past, the IPO.  *See supra* at p. 7, 13.  Moreover, as noted above, Tufin stated that its sales cycles is "long and unpredictable" and "even longer [and] less predictable" for larger transactions, so Tufin in fact did warn investors that its unpredictable sales cycle was an existing fact for the business and not just a risk.  Ex. A at 13.  And finally, the isolated account of CW3 that some in the sales force issued overly optimistic forecasts (Compl. ¶ 57) is anecdotal, unquantified, and not contradicted by Tufin's disclosures, which amply warned of this risk.

## II.    PLAINTIFF FAILS TO STATE A CLAIM UNDER SECTION 15 OF THE SECURITIES ACT

Section 15 of the Securities Act "imposes liability on individuals or entities that 'control[] any person liable' under Section 11 or 12."  *In re Micro Focus Int'l PLC Sec. Litig.*, 2020 U.S. Dist. LEXIS 180621, at *46 (quoting 15 U.S.C. § 77(o)).  A plaintiff must show a primary violation of Section 11 and control of the primary violator by defendants.  *In re Fairway*

24

*Grp. Holdings Corp. Sec. Litig.*, 2015 U.S. Dist. LEXIS 109941, at \*29. Because Plaintiff has not stated a primary violation of Section 11, the Section 15 claims against the Individual Defendants should be dismissed as well. *See, e.g., JP Morgan Chase Co.*, 553 F.3d at 207 (dismissing Section 15 claims where the Section 11 claim had been dismissed).

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.


DATED:      May 20, 2021
            New York, New York

                                        WHITE & CASE LLP


                                        /s/ *Kimberly A. Havlin*
                                        Kimberly A. Havlin
                                        Glenn M. Kurtz
                                        Jennifer M. Thomas
                                        1221 Avenue of the Americas
                                        New York, New York 10020
                                        T: (212) 819-8200
                                        F: (212) 354-8113
                                        E: kim.havlin@whitecase.com

                                        *Attorneys for Defendants*

25