# EXHIBIT A

As filed with the Securities and Exchange Commission on April 1, 2019 .

Registration No. 333-230109

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

---

## AMENDMENT NO. 2
## TO
## FORM F-1
## REGISTRATION STATEMENT
### *UNDER THE SECURITIES ACT OF 1933*

---

# Tufin Software Technologies Ltd.

(Exact name of Registrant as specified in its charter)

---

**Not Applicable**
(Translation of Registrant's name into English)

---

| | | |
|---|---|---|
| **State of Israel** | **7373** | **Not Applicable** |
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification No.) |

**Tufin Software Technologies Ltd.**
**5 Shoham Street**
**Ramat-Gan 52521, Israel**
**+972 (3) 612-8118**
(Address, including zip code, and telephone number, including area code, of Registrant's principal executive offices)

---

**Tufin Software North America, Inc.**
**2 Oliver Street, Suite 702**
**Boston, Massachusetts 02109-4901**
**+1 (877) 270-7711**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

---

*Copies to:*

| | | | |
|---|---|---|---|
| **Colin J. Diamond, Esq.**<br>**White & Case LLP**<br>**1221 Avenue of the Americas**<br>**New York, New York 10020-1095**<br>**Tel: +1 (212) 819-8200**<br>**Fax: +1 (212) 354-8113** | **Amir Halevy, Adv.**<br>**Perry E. Wildes, Adv.**<br>**Gross, Kleinhendler,**<br>**Hodak, Halevy, Greenberg,**<br>**Shenhav & Co.**<br>**One Azrieli Center, Round Tower**<br>**Tel Aviv 67021, Israel**<br>**Tel: +972 (3) 607-4444**<br>**Fax: +972 (3) 607-4470** | **Kenneth J. Gordon, Esq.**<br>**Michael J. Minahan, Esq.**<br>**Goodwin Procter LLP**<br>**100 Northern Avenue**<br>**Boston, Massachusetts 02210**<br>**Tel: +1 (617) 570-1000**<br>**Fax: +1 (617) 801-8717** | **Ido Zemach, Adv.**<br>**Yoni Henner, Adv.**<br>**Goldfarb Seligman & Co.**<br>**98 Yigal Alon Street**<br>**Ampa Tower**<br>**Tel Aviv 6789141, Israel**<br>**Tel: +972 (3) 608-9999**<br>**Fax: +972 (3) 608-9855** |

**Approximate date of commencement of proposed sale to the public** : As soon as practicable after effectiveness of this registration statement.

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, check the following box. ☐

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

Indicate by check mark whether the Registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933. Emerging growth company. ☒

If an emerging growth company that prepares its financial statements in accordance with U.S. GAAP, indicate by check mark if the Registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards† provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☒

† The term "new or revised financial accounting standard" refers to any update issued by the Financial Accounting Standards Board to its Accounting Standards Codification after April 5, 2012.

---

## CALCULATION OF REGISTRATION FEE

| Title of each class of securities to be registered | Amount to be registered(1) | Proposed maximum aggregate offering price per share(2) | Proposed maximum aggregate offering price(1)(2) | Amount of registration fee(3) |
|---|---|---|---|---|
| Ordinary shares, par value NIS 0.015 per share | 8,855,000 | $14.00 | $123,970,000 | $15,026 |

(1)   Includes shares granted pursuant to the underwriters' option to purchase additional shares. See "Underwriting."
(2)   Estimated solely for the purpose of calculating the registration fee pursuant to Rule 457(a) under the Securities Act of 1933, as amended.
(3)   $12,120 previously paid.

**The Registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the Registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in**

**accordance with Section 8(a) of the Securities Act of 1933, as amended, or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to such Section 8(a), may determine.**

The information in this preliminary prospectus is not complete and may be changed. We may not sell these securities until the registration statement filed with the Securities and Exchange Commission is effective. This preliminary prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.

SUBJECT TO COMPLETION, DATED APRIL 1, 2019

PRELIMINARY PROSPECTUS

## 7,700,000 Shares



## *Ordinary Shares*

This is the initial public offering of Tufin Software Technologies Ltd. We are offering 7,700,000 ordinary shares.

Prior to this offering, there has been no public market for our ordinary shares. The estimated initial public offering price of the ordinary shares is between $12.00 and $14.00 per share. Our ordinary shares have been authorized for listing on the New York Stock Exchange under the symbol "TUFN."

Neither the U.S. Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or determined if this prospectus is truthful or complete. Any representation to the contrary is a criminal offense.

**We are an "emerging growth company" under the U.S. federal securities laws as that term is used in the Jumpstart Our Business Startups Act of 2012 and, as a result, we have elected to comply with certain reduced public company disclosure and reporting requirements.**

**Investing in our ordinary shares involves risks. See "Risk Factors" beginning on page 12 of this prospectus.**

|  | Per Share | Total |
| --- | --- | --- |
| Initial public offering price | $ | $ |
| Underwriting discounts(1) | $ | $ |
| Proceeds to us (before expenses) | $ | $ |

(1) See "Underwriting" for a description of compensation payable to the underwriters.

We have granted the underwriters an option to purchase up to 1,155,000 additional ordinary shares within 30 days from the date of this prospectus, at the initial public offering price, less underwriting discounts.

The underwriters expect to deliver the ordinary shares to purchasers on or about          , 2019.

| J.P. Morgan | Barclays | Jefferies |
| --- | --- | --- |

| Oppenheimer & Co. | Piper Jaffray | Stifel | William Blair |
| --- | --- | --- | --- |

The date of this prospectus is          , 2019.

As enterprises embrace digital transformation and adopt new technologies, IT and cloud environments become increasingly complex and vulnerable to attack.

We believe that fundamentally, your security is only as good as the policy that you define and enforce.

Our policy-driven solutions automate the manual network change process, allowing customers the ability to securely implement changes in minutes instead of days.



**tufin**

The Security Policy Company

# TABLE OF CONTENTS

| | |
|---|---|
| Summary | 1 |
| Risk Factors | 12 |
| Special Note Regarding Forward-Looking Statements | 41 |
| Market and Industry Data | 42 |
| Use of Proceeds | 43 |
| Dividend Policy | 44 |
| Capitalization | 45 |
| Dilution | 46 |
| Selected Consolidated Financial Data | 48 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 51 |
| Business | 70 |
| Management | 86 |
| Principal Shareholders | 114 |
| Certain Relationships and Related Party Transactions | 117 |
| Description of Share Capital | 120 |
| Shares Eligible for Future Sale | 128 |
| Taxation and Israeli Government Programs Applicable to our Company | 130 |
| U.S. and Israeli Tax Consequences for our Shareholders | 134 |
| Underwriting | 143 |
| Expenses of the Offering | 149 |
| Legal Matters | 150 |
| Experts | 150 |
| Enforceability of Civil Liabilities | 151 |
| Where You Can Find Additional Information | 153 |
| Index to Consolidated Financial Statements | F-1 |

———————

Neither we nor the underwriters, nor any of their respective agents, have authorized anyone to provide information different from that contained in this prospectus, any amendment or supplement to this prospectus or in any free writing prospectus prepared by us or on our behalf. Neither we nor the underwriters, nor any of their respective agents, take any responsibility for, and can provide no assurance as to the reliability of, any information other than the information in this prospectus and any free writing prospectus prepared by us or on our behalf. Neither the delivery of this prospectus nor the sale of our ordinary shares means that information contained in this prospectus is correct after the date of this prospectus. This prospectus is not an offer to sell or the solicitation of an offer to buy these ordinary shares in any circumstances under which such offer or solicitation is unlawful.

For investors outside of the United States: Neither we nor the underwriters, nor any of their respective agents, have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. You are required to inform yourselves about, and to observe any restrictions relating to, this offering and the distribution of this prospectus outside of the United States.

References in this prospectus to the Global 2000 are to the world's 2,000 largest public companies as published by Forbes on June 16, 2018.

# SUMMARY

*This summary highlights selected information contained elsewhere in this prospectus. This summary does not contain all the information that you should consider before deciding to invest in our ordinary shares. You should read the entire prospectus carefully, including "Risk Factors" and our consolidated financial statements and notes to those consolidated financial statements, before making an investment decision. In this prospectus, the terms "Tufin," "we," "us," "our" and "the company" refer to Tufin Software Technologies Ltd. and its subsidiaries .*

## Overview

We are pioneering a policy-centric approach to security and IT operations. We transform enterprises' security operations by helping them visualize, define and enforce a unified security policy across complex, heterogeneous IT and cloud environments. Our products govern how individuals, systems and applications are permitted to communicate and provide policy-based security automation, enabling customers to reduce the time to implement complex network changes from days to minutes. Our solutions increase business agility, eliminate errors from manual processes and ensure continuous compliance through a single console. Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000.

Cybersecurity is critical for enterprises of all sizes. As enterprises embrace digital transformation and adopt new technologies such as cloud-based services, software-defined networks, microservices and containers, the IT and cloud environments become increasingly complex and vulnerable to attack. In response to the heightened threat environment, lack of a defined network perimeter and a constantly changing attack surface, enterprises continue to implement additional firewalls, endpoint security, identity and access management and other security solutions. However, we believe most enterprises lack effective and comprehensive security policy management , which results in a trade-off between the necessary security posture and business requirements for speed, agility and innovation.

We believe a new approach to enterprise security is necessary: a data-driven framework centered on policy management and operationalized through policy-based automation, enhancing compliance and security while improving operational efficiency. To address this need, we have developed highly differentiated technology with four main pillars:

- *Policy-centric approach* . We enable enterprises to visualize, define and enforce a unified security policy that acts as the foundation of governance and control, replacing ad-hoc configurations across fragmented networks.

- *Automation of network changes* . We automate the network change process across complex, heterogeneous environments, increasing business agility, enabling faster application deployment and reducing human error.

- *Data-driven* . Our approach draws data from across a customer's IT and cloud environments, providing insights on connectivity and end-to-end visibility across the network.

- *Open and extensible framework* . Our open solutions serve as a centralized control layer for our customers' networks and can connect to a wide range of third-party technologies through application program interfaces, or APIs.

We offer five products that comprise the Tufin Orchestration Suite: SecureTrack, SecureChange, SecureApp and, most recently, Orca and Iris. SecureTrack, SecureChange and SecureApp enable enterprises to visualize, define and enforce their security policy across heterogeneous networks, both on premise and in the cloud. SecureTrack serves as the foundation of SecureChange and SecureApp. SecureTrack provides visibility across the network and helps organizations define a unified security policy and maintain compliance. SecureChange provides customers with the ability to automate changes across the network while maintaining compliance with policy and security standards. SecureApp provides

application connectivity management and streamlines communication between application developers and network engineers. Our newest products, Orca and Iris, provide cloud-based security automation solutions in response to the growth of containers and cloud-native environments.

We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners. Our channel partners include distributors and resellers, as well as service delivery partners that help customers successfully deploy, configure, customize and maintain our products and services.

We have experienced strong growth. For the years ended December 31, 2017 and 2018, our revenues were $64.5 million and $85.0 million , respectively, representing year-over-year growth of 31.7% . For the years ended December 31, 2017 and 2018, our net loss was $2.8 million and $4.3 million , respectively.

## Industry Background

Enterprises that lack a comprehensive security policy are facing challenges in balancing the necessary security and risk posture with their business requirements, leaving security, network and compliance professionals overwhelmed. Several industry trends contribute to operational challenges in managing risk, as set forth below:

- ***Increasing frequency and sophistication of cyberattacks.*** Enterprises worldwide are under constant security threat from both external cyberattackers and malicious insiders in search of sensitive information and vital systems. Cyberattackers are increasingly able to breach networks and locate and steal sensitive enterprise data. As a result, numerous enterprise boards are prioritizing and reshaping their cybersecurity approaches.

- ***Growing complexity of software-defined networks*** . Enterprises have been undergoing a digital transformation. They are rapidly shifting on-premise workloads to cloud environments to meet the changing demands of their markets and customers. To keep pace with this transformation, enterprises design scalable and flexible workloads and connections, which increase network complexity and the velocity of changes. The rise of technologies such as microservices and containers introduces additional complexity. The growing use of these dynamic technologies has raised business expectations on agility and increased the need for a unified security approach across networks and applications.

- ***Accelerating pace of application development and deployment*** . The accelerating pace of business and technological developments requires numerous and continuous application and infrastructure changes. The rise of the DevOps model, which is a set of software development practices that allows applications and features to be rapidly developed and deployed, has led to increased release velocity. Enterprises that use manual change processes struggle to keep pace and lack policy consistency, resulting in an ever-growing backlog of changes, delayed software releases and heightened security exposure.

- ***Evolving regulatory and compliance requirements*** . Global enterprises need to maintain compliance with a new wave of government regulations, corporate security policies and industry standards related to privacy and cybersecurity. Manual changes to network policy are difficult to track and are more likely to be non-compliant. As a result, enterprises seek cost-efficient security solutions to meet compliance requirements.

- ***Legacy security approaches can no longer address cybersecurity threats in the ever-changing IT and cloud environments*** . Traditional security policy management approaches address governance and control, but lack critical characteristics such as a unified security policy, automation, scalability, end-to-end visibility and extensibility. We believe a new approach to enterprise security is necessary: a data-driven framework centered on policy management and operationalized through automation.

2

## Benefits of Our Solutions

Our solutions enable our customers to visualize, define and enforce a security policy that dictates how users, systems and different organizational functions across the enterprise should be allowed to communicate. We automate our customers' security policy management, allowing them to accelerate application deployment time without introducing non-compliant changes that could lead to vulnerabilities, and giving better visibility and control over all of their IT and cloud environments. This approach drives business agility and cost reduction while facilitating continuous compliance across hybrid, multi-vendor, multi-platform and heterogeneous environments. Our customers use our products to:

- ***Accelerate business agility through end-to-end automation of security changes*** . Our automated solutions allow our customers to implement application changes onto their networks in minutes, not days. Our solutions accelerate security management processes, increase operational efficiency and reduce the traditional lag between software development and revenue-generating deployment. Increased efficiency frees up valuable IT resources to focus on higher-value tasks, all while remaining secure and compliant.

- ***Reduce security risk through adoption of a unified security policy and continuous compliance*** . We enable enterprises to create a unified security policy that acts as the foundation of their security decision making. Effective security policy governs how individuals, systems and applications communicate. A well-defined security policy forms the basis of our automation capabilities, guiding the change implementation logic and ensuring continuous compliance with corporate security policies, government regulations and industry standards.

- ***Navigate the complexity of hybrid and fragmented networks with a centralized control layer*** . We offer a centralized security management layer that analyzes, defines and implements enterprise-specific security policies. Our network abstraction layer allows for the automation of security changes across the network, including firewalls, traditional networks, public and private cloud environments, microservices and containers. Our solutions act as an independent third-party management layer, extending the security policy to every corner of the network, even as it grows, changes and adapts to new business demands and cybersecurity threats.

- ***Enhance visibility and control*** . Our solutions provide customers with complete visibility over their IT and cloud environments, and enable them to quickly view changes and their impact on security posture prior to deployment. Our solutions monitor, collect and record configuration changes across the enterprise. They verify the adherence of these changes to the unified security policy, helping customers visualize any resulting compliance gaps or related vulnerabilities. We use topology intelligence to map out resources and connections, even across fragmented, complex environments. Enterprises can use our products to centrally manage and enforce their security policy with significant improvements in speed and ease-of-use through a multi-environment, 'single pane of glass' interface to ensure compliance and control.

## Our Market Opportunity

We believe the majority of enterprises lack effective and comprehensive security policy management, which is critical to controlling network change. As digital transformation creates more complexity within IT and cloud environments, we believe our policy-centric, automated solutions will garner a growing share of enterprise security spend. In its September 14, 2018 publication *Forecast Analysis: Information Security, Worldwide, 2Q18 Update* , Gartner estimated that worldwide spending on information security products and services will reach more than $133 billion in 2019. In addition, 451 Research LLC's VotE Information Security: Workloads and Key Projects 2018 study, covering 550 organizations of different sizes across 10 industry verticals, found that 83% of the companies surveyed did not have security automation and orchestration technologies in place, but 54% of those companies planned to deploy such technologies within the next 24 months. We believe increased security spending and adoption of security automation and orchestration technologies represent a significant opportunity for us.

We also believe our policy management and automation solutions overlap with several markets defined by IDC. IDC has estimated that:

- the market for IT operations management, which improves user access to applications, business services and data sources on diverse platforms, will grow from $8.9 billion in 2018 to $11.7 billion by 2022, according to its *Worldwide IT Operations Management Software Forecast for 2018-2022;*

- the market for IT automation and configuration management, which supports DevOps automation and orchestration, digital enterprises, hybrid cloud architectures and microservices-based applications, will grow from $6.7 billion in 2018 to $8.4 billion in 2022, according to its *Worldwide IT Automation and Configuration Management Software Forecast for 2018-2022;*

- the market for policy and compliance (a sub-segment of security and vulnerability management), which enables enterprises to create, measure and report on security policy and regulatory compliance, will grow from $2.0 billion in 2018 to $3.1 billion in 2022, according to its *Worldwide Security and Vulnerability Management Forecast for 2018-2022* ; and

- the market for vulnerability assessment (a sub-segment of security and vulnerability management), which scans networks and applications for security vulnerabilities, will grow from $2.2 billion in 2018 to $3.7 billion by 2022, according to its *Worldwide Security and Vulnerability Management Forecast for 2018-2022* .

We believe that our solutions will attract a meaningful portion of these markets, resulting in a multi-billion dollar addressable market. As we continue to innovate and introduce new products, the use cases for our solutions will expand, which we expect will lead to incremental growth in our addressable market opportunity.

We believe our policy management and automation functionalities define a new market, and we are not aware of any third-party research that accurately defines the scope of our directly addressable opportunity. As such, we estimated the market size using third-party data and, when third-party data was not available, internal estimates. We segment enterprises based on estimates of their network infrastructure size and their need for our solutions across their networks, and apply an average annual billings figure per segment based on an estimated prior five years of inventory, resulting in an estimated directly addressable market of $10.3 billion, which includes on-premise firewalls, private cloud and public cloud orchestration segments, for the fiscal year ending December 31, 2019.

## Our Competitive Strengths

We believe we have several competitive advantages, including:

- *Pioneer in security policy management* . We are a pioneer in the security policy management market. We believe we were the first company to introduce security policy automation solutions with SecureChange and SecureApp, and we believe our position as a market leader reinforces our brand and supports our position as one of the most prominent players in an increasingly important segment.

- *Advanced technology and ongoing innovation* . We have over a decade of experience and believe our ability to innovate is the cornerstone of our position as a technology leader. Our comprehensive security policy management solutions rely on a set of proprietary technologies that provide a high level of security, scalability and performance. Our core technologies, which serve as the foundation of both our network and cloud-based products, include analysis engines, a provisioning engine, API integrations and infrastructure technology.

- *Scalable, extensible enterprise-grade solutions* . Our solutions scale up to the largest enterprises with thousands of network devices (e.g., firewalls and routers) through their distributed architecture and high availability offering. Our extensible API framework allows our customized solutions to interface with most IT management frameworks and systems, and is used by customers, partners

and our professional services team who develop scripts and extensions on top of the Tufin Orchestration Suite.

- **Customer-first approach** . Customer success has always been our priority. Since our inception, we have built a strong, customer-first approach and developed a powerful array of products and solutions to meet our customers' needs and expectations. Our premium support services are available at all times to ensure that customers' problems are addressed quickly.

- **Automation-driven return on investment** . Enterprises quickly realize value upon deployment of our solutions. Our policy-driven automation allows customers to implement accurate and compliant network changes within minutes rather than days, allowing them to introduce new business applications faster and redeploy IT resources into higher-value projects.

## Our Growth Strategy

- **Acquire new Global 2000 customers and mid-market customers** . Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000. Revenue generated from our Global 2000 customers, excluding maintenance renewals, represented an average of 65% of our total revenue over the fiscal years ended December 31, 2016 to 2018. We believe we have a significant growth opportunity with Global 2000 customers that currently lack a security policy management solution or that use a competing product that lacks automation. We also continue to pursue mid-market accounts with increasing need for security policy management solutions.

- **Expand within our customer base through new use cases and larger deployments** . We aim to drive policy management and automation across the entire enterprise to help our customers fully benefit from our solutions. Customers often contract with us for a portion of their IT and cloud environments or begin only with SecureTrack. Over time, customers often expand their network coverage or recognize the benefits of automated policy changes at the network and application levels and adopt our SecureChange and SecureApp solutions. Most recently, customers moving applications to the cloud have demonstrated interest in Orca and Iris.

- **Extend security product leadership with innovative new products** . We will continue to innovate in ways that enable frictionless collaboration between business and infrastructure teams. We intend to invest further in the Tufin Orchestration Suite to extend its functionality and features. We believe this will enhance our ability to generate revenue within our existing customer base and pursue new opportunities. We will also continue to introduce new products to broaden our appeal to customers and stay ahead of the market.

- **Grow and cultivate our security partner ecosystem** . We have built an extensive global channel partner ecosystem that extends our geographic coverage, drives awareness of our brand and accelerates usage and adoption of our products. We have also formed alliances with technology partners in the network security, security operations, incident response, vulnerability management and security compliance sectors.

- **Democratize policy management across functions** . Our customers continue to find new use cases for our policy management and automation products. For example, as enterprises continue to implement DevOps teams and practices, we believe they will need to introduce security measures earlier in the application development and deployment lifecycle.

## Risks Associated With Our Business

Investing in our ordinary shares involves risks. You should carefully consider the risks described in "Risk Factors" beginning on page 12 before making a decision to invest in our ordinary shares. If any of these risks actually occurs, our business, financial condition and results of operations would likely be materially adversely affected. In such case, the trading price of our ordinary shares would likely decline, and you may lose all or part of your investment. The following is a summary of some of the principal risks we face:

- The security policy management market is rapidly evolving and difficult to predict. If the market does not evolve as we anticipate or if our target customers do not adopt our solutions, our revenues may not grow as expected and our share price may decline.

- If we are unable to acquire new customers, particularly large organizations, our future revenues and operating results will be harmed.

- Our business depends substantially on our ability to retain customers and expand our offerings to them, and our failure to do so could harm future results of operations.

- Our sales cycle is long and unpredictable, which may cause significant fluctuations in our quarterly results of operations.

- We face competition in the security policy management market in which we operate, and we may lack sufficient financial or other resources to maintain or improve our competitive position.

- Our revenue growth rate over the past year may not be indicative of our future performance.

- Our business could be adversely affected if we are unable to manage changes to our business model over time.

- Our business and operations have experienced rapid growth, and if we do not appropriately manage any future growth, our results of operations will be harmed.

- We have a history of losses, and we may not be able to generate sufficient revenues to achieve and sustain profitability.

- We have identified a material weakness in our internal control over financial reporting. If we fail to maintain effective internal control over financial reporting, we may be unable to report our financial results accurately or meet our reporting obligations.

- If third-party applications and network products change such that we do not or cannot maintain the compatibility of our platforms and solutions with these applications and products, or if we fail to provide integrations that our customers desire, demand for our solutions and platforms could decline.

## Corporate Information

We are incorporated under the laws of the State of Israel. Our principal executive offices are located at 5 Shoham Street, Ramat-Gan 52521, Israel, and our telephone number is +972 (3) 612-8118. Our website address is www.tufin.com. Information contained on, or that can be accessed through, our website does not constitute a part of this prospectus and is not incorporated by reference herein. We have included our website address in this prospectus solely for informational purposes. Our agent for service of process in the United States is Tufin Software North America, Inc., located at 2 Oliver Street, Suite 702, Boston, Massachusetts 02109-4901, and its telephone number is +1 (877) 270-7711.

Throughout this prospectus, we refer to various trademarks, service marks and trade names that we use in our business. The "Tufin" design logo is the property of Tufin Software Technologies Ltd. Tufin ® is our registered trademark in the United States. We have several other trademarks, service marks and pending applications relating to our products. In particular, although we have omitted the "®" and "™" trademark designations in this prospectus from each reference to Unified Security Policy, Tufin Orchestration Suite,

SecureChange, SecureTrack and SecureApp, all rights to such trademarks are nevertheless reserved. Other trademarks and service marks appearing in this prospectus are the property of their respective holders.

7

# THE OFFERING

| | |
|---|---|
| Ordinary shares offered | 7,700,000 ordinary shares |
| Ordinary shares to be outstanding after this offering | 32,435,871 ordinary shares |
| Underwriters' option | We have granted the underwriters an option to purchase up to 1,155,000 additional ordinary shares for a period of 30 days after the date of this prospectus. |
| Use of proceeds | We intend to use the net proceeds we receive from this offering for working capital and other general corporate purposes. We expect to continue to invest in and to grow our research and development capabilities as well as expand our sales force and marketing team. See "Use of Proceeds." |
| Risk factors | See "Risk Factors" and other information included in this prospectus for a discussion of factors you should carefully consider before deciding to invest in our ordinary shares. |
| Proposed NYSE symbol | TUFN |

The number of ordinary shares to be outstanding after this offering is based on  24,735,871  ordinary shares outstanding as of March 31, 2019. The number of ordinary shares to be outstanding after this offering excludes 9,652,267 ordinary shares reserved for issuance under our equity incentive plans, of which there were outstanding options to purchase 7,005,419 shares at a weighted average exercise price of $2.15  per share.

Unless otherwise indicated, this prospectus:

- reflects the conversion of all outstanding preferred shares into 16,416,749 ordinary shares on a one-for-one basis, which will occur automatically immediately prior to the closing of this offering;

- assumes an initial public offering price of $13.00 per ordinary share, the midpoint of the estimated initial public offering price range set forth on the cover page of this prospectus;

- gives effect to the exercise on a cashless basis of warrants to purchase 26,667 ordinary shares with an exercise price of $ 4.30 per share issued to an Israeli non-profit organization and the resulting issuance of 17,842 ordinary shares upon the closing of this offering;

- gives effect to the adoption of our amended and restated articles of association, which will become effective upon the closing of this offering and will replace our articles of association currently in effect;

- assumes no exercise of the underwriters' option to purchase up to 1,155,000 additional ordinary shares; and

- reflects a 1.5:1 reverse share split effected on March 21, 2019.

# SUMMARY CONSOLIDATED FINANCIAL DATA

The following tables set forth our summary consolidated financial data. You should read the following summary consolidated financial data in conjunction with "Selected Consolidated Financial Data," "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus. Historical results are not necessarily indicative of the results that may be expected in the future. Our financial statements have been prepared in accordance with U.S. Generally Accepted Accounting Principles, or U.S. GAAP.

The summary consolidated statements of operations data for each of the years in the two-year period ended December 31, 2018 and the summary balance sheet data as of December 31, 2018 are derived from our audited consolidated financial statements appearing elsewhere in this prospectus.

| | Year ended December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | *(in thousands, except share and per share amounts)* | |
| **Consolidated Statements of Operations:** | | |
| Revenues: | | |
| Product | $ 30,855 | $ 42,554 |
| Maintenance and professional services | 33,685 | 42,427 |
| Total revenues | 64,540 | 84,981 |
| Cost of revenues: | | |
| Product | 1,702 | 2,324 |
| Maintenance and professional services | 7,778 | 11,112 |
| Total cost of revenues(1) | 9,480 | 13,436 |
| Gross profit | 55,060 | 71,545 |
| Operating expenses: | | |
| Research and development(1) | 17,672 | 21,363 |
| Sales and marketing(1) | 35,042 | 46,092 |
| General and administrative(1) | 4,608 | 6,022 |
| Total operating expenses | 57,322 | 73,477 |
| Operating loss | $ (2,262) | $ (1,932) |
| Financial income (loss), net | 267 | (1,047) |
| Loss before taxes on income | $ (1,995) | $ (2,979) |
| Taxes on income | (797) | (1,283) |
| Net loss | $ (2,792) | $ (4,262) |
| Basic and diluted net loss per ordinary share(2) | $ (0.35) | $ (0.53) |
| Weighted average number of ordinary shares used in computing basic and diluted net loss per ordinary share(2) | 7,872,545 | 8,045,647 |
| Basic pro forma net loss per ordinary share (unaudited)(3) | | $ (0.17) |
| Weighted average number of shares used in computing pro forma basic and diluted net loss per ordinary share (unaudited)(3) | | 24,462,397 |

|  | As of December 31, 2018 | | |
|  | Actual | Pro Forma(4) | Pro Forma As Adjusted(4) |
|  | | *(in thousands)* | |
| **Consolidated Balance Sheet Data:** | | | |
| Cash and cash equivalents | $ 15,248 | $ 15,248 | $ 106,143 |
| Working capital, excluding deferred revenue(5) | 17,781 | 17,781 | 108,676 |
| Deferred revenue, current and non-current | 31,464 | 31,464 | 31,464 |
| Total assets | 47,133 | 47,133 | 137,298 |
| Redeemable convertible preferred shares | 26,699 | — | — |
| Total shareholders' equity (deficit) | (29,946) | (3,247) | 87,359 |

|  | Year ended December 31, | |
|  | 2017 | 2018 |
|  | *(in thousands)* | |
| **Supplemental Financial Data:** | | |
| Non-GAAP operating profit (loss)(6) | $ (152) | $ 1,249 |

(1) Includes share-based compensation expense as follows:

|  | Year ended December 31, | |
|  | 2017 | 2018 |
|  | *(in thousands)* | |
| **Share-based Compensation Expense:** | | |
| Cost of revenues | $ 332 | $ 634 |
| Research and development | 660 | 731 |
| Sales and marketing | 765 | 1,458 |
| General and administrative | 353 | 358 |
| Total share-based compensation expenses | $ 2,110 | $ 3,181 |

(2) Basic and diluted net loss per ordinary share is computed based on the weighted average number of ordinary shares outstanding during each period. For additional information, see Note 2 to our consolidated financial statements included elsewhere in this prospectus.

(3) Pro forma basic and diluted net loss per ordinary share and pro forma weighted average shares outstanding assumes the conversion of all of our outstanding preferred shares into ordinary shares, which will occur immediately prior to the closing of this offering, but does not give effect to the issuance of shares in connection with this offering. For additional information on the conversion of the preferred shares, see Note 11 to our consolidated financial statements included elsewhere in this prospectus.

(4) Pro forma gives effect to the conversion of all of our outstanding preferred shares into ordinary shares, which will occur immediately prior to the closing of this offering. Pro forma as adjusted gives effect to (x) the same item as set forth in "pro forma," (y) the exercise on a cashless basis of warrants to purchase 26,667 ordinary shares and the resulting issuance of 17,842 ordinary shares upon the closing of this offering and (z) the issuance and sale of ordinary shares in this offering at an assumed initial public offering price of $13.00 per ordinary share after deducting underwriting discounts and estimated offering expenses payable by us.

(5) We define working capital as total current assets minus total current liabilities.

(6) Non-GAAP operating profit (loss) is a non-GAAP financial measure. We define non-GAAP operating profit (loss) as operating profit excluding share-based compensation expense. Because of varying available valuation methodologies, subjective assumptions and the variety of equity instruments that can impact a company's non-cash expense, we believe that providing non-GAAP financial measures that exclude non-cash share-based compensation expense allows for more meaningful comparisons between our operating results from period to period. This non-GAAP financial measure is an important tool for financial and operational decision-making and for evaluating our operating results over different periods. The following table reconciles operating loss, the most directly comparable U.S. GAAP measure, to non-GAAP operating profit (loss) for the periods presented:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | **2017** | | **2018** | |
| | *(in thousands)* | | | |
| **Reconciliation of Operating Loss to Non-GAAP Operating Profit (Loss):** | | | | |
| Operating loss | $ | (2,262) | $ | (1,932) |
| Add: share-based compensation | $ | 2,110 | $ | 3,181 |
| Non-GAAP operating profit (loss)(6) | $ | (152) | $ | 1,249 |

For a description of how we use non-GAAP operating profit (loss) to evaluate our business, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Factors Affecting Our Performance."

Other companies, including companies in our industry, may calculate non-GAAP operating profit (loss) differently or not at all, which reduces the usefulness of non-GAAP operating profit (loss) as a comparative measure. You should consider non-GAAP operating profit (loss) along with other financial performance measures, including operating profit, and our financial results presented in accordance with U.S. GAAP.

# RISK FACTORS

*This offering and an investment in our ordinary shares involve a high degree of risk. You should consider carefully the risks described below and all other information contained in this prospectus, including our financial statements and related notes thereto, before you decide to buy our ordinary shares. If any of the following risks actually occurs, our business, financial condition and results of operations could be materially and adversely affected. In that event, the trading price of our ordinary shares would likely decline, and you might lose all or part of your investment.*

## Risks Related to Our Business and Our Industry

***The security policy management market is rapidly evolving and difficult to predict. If the market does not evolve as we anticipate or if our target customers do not adopt our solutions, our revenues may not grow as expected and our share price may decline.***

We believe our future success depends in large part on growth in the security policy management market in which we compete. The security policy management market is relatively new and subject to rapid technological change, evolving industry standards, a shift in the enforcement or scope of regulations to which our customers are subject, as well as changing customer needs, requirements and preferences. As such, it is difficult to predict important market trends, including potential growth. For example, organizations that currently use home-grown tools may believe that they already have sufficient security policy management products. Therefore, such organizations may continue spending their network infrastructure budgets on other products and may not adopt our solutions in addition to or in lieu of other existing solutions. If the security policy management market does not evolve in the way we anticipate or if organizations do not recognize the benefits our solutions offer in addition to or in place of other existing solutions, then our revenues may not grow as expected and our share price could decline.

***If we are unable to acquire new customers, particularly large organizations, our future revenues and operating results will be harmed.***

Our growth strategy is dependent, in part, on our ability to acquire new customers, particularly large organizations. For example, in the year ended December 31, 2018, large organizations, which we define as those comprising the Global 2000, accounted for 68% of our revenues, excluding maintenance renewals. The size and number of customers that we add in a given period significantly and directly impacts both our short-term and long-term revenues. If we are unable to attract a sufficient number of new large organization customers or if we attract customers that place orders of an insufficient size, we may be unable to generate revenue growth at desired rates. The security policy management market is competitive and we cannot guarantee that we will out-perform our competitors. In addition, in many cases, our primary competition is in-house, manual, spreadsheet driven processes and homegrown approaches to security management . As a result, we may not be able to add new customers at the levels we expect, or may need to spend more than we budgeted on our efforts to do so. Competition in the marketplace may also result in us winning fewer new customers, lowering prices or offering sales incentives to new customers. These factors may have a material negative impact on our future revenues and operating results.

Sales to large organizations involve risks that may not be present (or that are present to a lesser extent) with sales to smaller entities. These risks include:

- increased purchasing power and leverage held by large organizations in negotiating contractual arrangements with us, including, in certain cases, clauses that provide preferred pricing of configurations with similar specifications;

- the timing of individual large sales, which in some cases have occurred in a quarter subsequent to those we anticipated, or have not occurred at all;

- longer sales cycles and the associated risk that substantial time and resources may be spent on a potential customer that ultimately elects not to purchase our products or purchases fewer products than we anticipated;

- more stringent or costly requirements imposed upon us in our maintenance and professional services contracts with such customers, including stricter response times and penalties for any failure to meet maintenance and professional services requirements;

- more complicated and costly implementation processes and network infrastructure; and

- closer relationships with, and increased dependence upon, large technology companies who may offer competing products and have stronger brand recognition.

If we are unable to increase sales of our solutions and products to large organizations while mitigating the risks associated with serving such customers, our business, results of operations, prospects and financial condition may suffer.

***Our business depends substantially on our ability to retain customers and expand our offerings to them, and our failure to do so could harm future results of operations.***

We generate a significant portion of our revenues from sales to existing customers and our business depends substantially on our ability to retain customers and expand our offerings to them. In 2017 and 2018, we generated over 75% and 70% of our revenues, respectively, from sales to existing customers, including renewals. Our Tufin Orchestration Suite is currently comprised of five products: SecureTrack, SecureChange, SecureApp and, most recently, Orca and Iris. The majority of our customers initially purchase SecureTrack to monitor part of their networks. Initial product deployments frequently expand across departments, divisions and geographies and result in the purchase of additional products, such as SecureChange and SecureApp. In addition, we expect an increasing portion of our revenues to be derived from additional sales to our customers of Orca and Iris, which allow for policy-driven automation and security management in cloud-native environments.

The rate at which our existing customers purchase additional products and services depends on a number of factors, including the perceived need for additional IT security, our customers' IT budgets, the efficacy of our solutions, general economic conditions, our customers' overall satisfaction with our products and services and the continued growth and economic health of our customer base. If our efforts to sell additional products and services to our customers are not successful, our future revenues and operating results will be harmed.

We devote significant efforts to developing and marketing product updates to existing customers and rely on these efforts for a portion of our revenues. This requires a significant investment in building and maintaining customer relationships, as well as significant research and development efforts in order to launch product updates and new products. Our future success depends, in part, on our ability to continue to expand sales of our current product offerings to existing customers, sell additional licenses for our current products to our existing customers and develop and sell new products to existing customers.

***Our sales cycle is long and unpredictable, which may cause significant fluctuations in our quarterly results of operations.***

The timing of our sales and related revenue recognition is difficult to predict because of the length and unpredictability of the sales cycle for our products. We and our channel partners often spend significant time and resources to better educate and familiarize potential customers with the value proposition of our products and platform. Our sales cycle usually lasts several months from proof of concept to purchase order from our customers, and it is often even longer, less predictable and more resource-intensive for larger transactions. Customers may also require additional internal approvals or seek to test our products for a longer trial basis before deciding to purchase our solutions. Furthermore, even if we close a large transaction during a given quarter, we may be unable to recognize the revenues derived from such a transaction due to our revenue recognition policy. See "Management's Discussion and Analysis of

Financial Condition and Results of Operations—Application of Critical Accounting Policies and Estimates—Revenue Recognition."

In addition, in the past, customers have deferred significant purchases to the last quarter of the year when they can determine what amount of their annual budget remains unused. As a result, the timing of individual sales can be difficult to predict. We generally expect an increase in business activity as we approach our fiscal year end in December, driven by our customers' buying patterns. We believe that these seasonal trends will continue to affect our quarterly results. Large individual sales have, in some cases, occurred in quarters subsequent to those we anticipated or have not occurred at all. The loss or delay of one or more large transactions in a quarter could impact our anticipated results of operations for that quarter and future quarters for which revenue from that transaction is delayed. We may not be able to accurately predict or forecast the timing of sales, which could cause our results to vary significantly from our expectations and the expectations of market analysts. In addition, we might devote substantial time and effort to a particular unsuccessful sales effort, and as a result we could lose other sales opportunities or incur expenses that are not offset by an increase in revenue, which could harm our business.

***We face competition in the security policy management market in which we operate, and we may lack sufficient financial or other resources to maintain or improve our competitive position.***

We face competition in the security policy management market in which we operate. In many cases, our primary competition is in-house, manual, spreadsheet driven processes and homegrown approaches to security management , and we and our channel partners may not be successful in educating and familiarizing potential customers with the value associated with our products and services. Our direct competitors include vendors such as AlgoSec, Inc., FireMon, LLC and Skybox Security LLC that offer solutions that compete with all or some of our products or product features. We also indirectly compete with large IT companies that offer a broad array of traditional security management solutions, such as Symantec Corporation and Cisco Systems, Inc., for a share of enterprises' IT security budgets. These large companies have the technical and financial resources and broad customer bases needed to bring products that are competitive with ours to market and already have existing relationships as a trusted vendor for other products. Such companies may use these advantages to offer products and services that are perceived to be as effective as ours at a lower price or for free as part of a larger product package or solely in consideration for maintenance and professional services fees. As the security policy management market grows, we expect competition to increase in the future from both existing competitors and new companies that may enter our markets. Some of our competitors may develop different products that compete with our current solutions and respond more quickly and effectively than we do to new or changing opportunities, technologies, standards or client requirements, including in cloud-native environments.

Organizations that use other products or home-grown tools may believe that these products or tools are sufficient to meet their security policy management needs or that our products only serve the needs of a portion of the enterprise security market. Accordingly, these organizations may continue allocating their information technology budgets for other products, and may not adopt our products. Further, many organizations have invested substantial personnel and financial resources to design and operate their networks and have established deep relationships with other providers of networking and security products. As a result, these organizations may prefer to purchase from their existing suppliers rather than add or switch to a new supplier, such as us, regardless of product performance, features, or greater services offerings or may be more willing to incrementally add solutions to their existing security infrastructure from existing suppliers than to replace it wholesale with our solutions.

Our current and potential competitors may also establish cooperative relationships among themselves or with third parties that may further enhance their resources. Current or potential competitors may be acquired by third parties with greater available resources. As a result of such acquisitions, our current or potential competitors might be able to adapt more quickly to new technologies and customer needs, devote greater resources to the promotion or sale of their products and services, initiate or withstand

substantial price competition, take advantage of other opportunities more readily or develop and expand their product and service offerings more quickly than we do.

***Our revenue growth rate over the past year may not be indicative of our future performance.***

Our revenue growth rate in recent periods should not be viewed as an indication of our future performance. For the years ended December 31, 2017 and 2018, our revenues were $64.5 million and $85.0 million , respectively, representing year-over-year growth of 31.7% . We may not achieve similar revenue growth rates in future periods. Factors that could impact our ability to increase our revenue include our ability to increase the size or efficiency of our sales force, which has expanded rapidly in recent years, our ability to achieve repeat purchases by existing customers, our ability to successfully compete with other companies and the extent to which we are successful in securing large scale deployments, particularly among Global 2000 enterprises. If we are unable to maintain consistent revenue or revenue growth, our share price could experience volatility, and our ability to achieve and maintain profitability could be adversely affected.

***Our business could be adversely affected if we are unable to manage changes to our business model over time.***

We sell our software primarily through perpetual license agreements and, to a lesser extent, term-based license agreements rather than utilizing a Software-as-a-Service, or SaaS, model. SaaS is a model of software deployment in which a software provider typically licenses an application to customers for use as a service on demand through web browser technologies. While we do not currently earn any revenue from SaaS products, in the future, we plan to deploy certain of our new products as SaaS subscriptions to enable more customers to use our solutions beyond our existing on-premise offerings. A SaaS business model can require a vendor to undertake substantial capital investments and develop related sales and support resources and personnel. In recent years, companies have begun to expect that enterprise software solutions will be provided through a SaaS model. If customers were to require that we provide our products via a SaaS deployment, we would need to deploy resources to implement this alternative business model, which would negatively affect our results. In addition, if we shift to a subscription-based model or make other significant changes to our business model, we may fail to make such a transition in a timely manner or do so at a sustainable pace, either of which could have an adverse effect on our business, results of operations, financial condition and cash flows.

***Our business and operations have experienced rapid growth, and if we do not appropriately manage any future growth, our results of operations will be harmed.***

We have experienced rapid growth over the last several years, which has placed and will continue to place significant demands on our management, administrative, operational and financial infrastructure. For example, as of December 31, 2017, we had 325 employees and independent contractors compared to 424 as of December 31, 2018, and we expect to continue to expand our headcount. We expect to manage a more complex array of internal systems and processes as we scale aspects of our business in proportion to our growth, including an expanded sales force, additional customer service and research and development personnel, as well as more complex administrative systems related to managing increased headcount.

Our success will depend in part upon our ability to manage our growth effectively. To do so, we must continue to increase the productivity of our existing employees, particularly our sales force, and hire, train, and manage new employees and expand our network of channel partners. To manage the domestic and international growth of our operations and personnel, we will need to continue to improve our operational, financial, and management controls, as well as our reporting processes and procedures. In addition, we will hire additional personnel to support our financial reporting function.

These additional investments will increase our operating costs, which will make it more difficult for us to offset any future revenue shortfalls by reducing expenses in the short term. We may not be able to successfully acquire or implement these or other improvements to our systems and processes in an

efficient or timely manner, or once implemented, we may discover deficiencies in their capabilities or effectiveness. We may experience difficulties in managing improvements to our systems and processes or in integrating with third-party technology. In addition, our systems and processes may fail to prevent or detect errors, omissions or fraud. Our failure to improve our systems and processes, or their failure to operate effectively and in the intended manner, may result in the disruption of our current operations and customer relationships, our inability to manage the growth of our business and our inability to accurately forecast and report our revenues, expenses and earnings, any of which may materially harm our business, results of operations, prospects and financial condition.

***We have a history of losses, and we may not be able to generate sufficient revenues to achieve and sustain profitability.***

We have incurred net losses in each period since our inception, including net losses of $2.8 million and $4.3 million for the years ended December 31, 2017 and 2018, respectively. As of December 31, 2018, our accumulated deficit was $40.3 million. We expect our operating expenses to increase significantly as we continue to expand our sales and marketing efforts, in part, by building our sales platforms, continue to invest in research and development and continue to expand our operations in existing and new geographies and vertical markets. We also expect to continue to devote significant research and development resources to our on-premise and cloud solutions. In addition, we expect to incur significant additional legal, accounting and other expenses related to being a public company upon the completion of this offering. While our revenues have grown in recent years, if our revenues decline or fail to grow at a rate faster than these increases in our operating expenses, we will not be able to achieve and maintain profitability in future periods. As a result, we may continue to generate losses. We cannot assure you that we will achieve profitability in the future or that, if we do become profitable, we will be able to sustain profitability.

***We have identified a material weakness in our internal control over financial reporting. If we fail to maintain effective internal control over financial reporting, we may be unable to report our financial results accurately or meet our reporting obligations.***

In connection with the issuance of our consolidated financial statements for each of the years ended December 31, 2017 and 2018, we identified a material weakness in our internal control over financial reporting as of December 31, 2017 and 2018. A "material weakness" is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis.

Specifically, we determined that we do not have sufficient finance staff to provide for effective control over our period-end financial reporting process. As a result of having insufficient staff, we were unable to adequately segregate duties in a manner consistent with control objectives for our period-end financial reporting process.

We have initiated actions toward remediating this material weakness by identifying our staffing requirements and commencing the process of hiring additional personnel for our finance team with the appropriate level of training and expertise. However, the implementation of these initiatives may not fully address this or any other material weakness or other deficiencies that we may have in our internal control over financial reporting.

We will assess our internal control environment and the potential remediation of this material weakness. If we are unable to certify that our internal control over financial reporting is effective pursuant to Section 404 of the Sarbanes-Oxley Act of 2002, we could lose investor confidence in the accuracy and completeness of our financial reports, which could harm our business, the price of our ordinary shares and our ability to access the capital markets.

***If third-party applications and network products change such that we do not or cannot maintain the compatibility of our platforms and solutions with these applications and products, or if we fail to provide integrations that our customers desire, demand for our solutions and platforms could decline.***

The attractiveness of our platforms depends, in part, on our ability to integrate with third-party applications and network products that our customers use or desire to use. Third-party providers may change the features of their applications and platforms or alter the terms governing use of their applications and platforms in an adverse manner. Further, third-party application providers may refuse to partner with us, or limit or restrict our access to their applications and platforms. Such changes could functionally limit or terminate our ability to use these third-party applications and systems with our platform, which could negatively impact our offerings and harm our business. If we fail to integrate our platforms with new third-party applications that our customers desire, or to adapt to the requirements of such third-party applications and platforms, we may not be able to offer the functionality that our customers expect, which would negatively impact our offerings and, as a result, harm our business.

***If our products do not effectively interoperate with our customers' existing or future IT infrastructures, deployments and integrations could be delayed or canceled, which would harm our business.***

Our products must effectively interoperate with our customers' existing or future IT infrastructure, which often has different specifications, utilizes multiple protocol standards, deploys products from multiple vendors and contains multiple generations of products that have been added over time. As a result, when problems occur in a network, it may be difficult to identify the sources of these problems. If we find errors in the existing software or defects in the hardware used in our customers' infrastructure or problematic network configurations or settings, we may have to modify and improve our software so that our products will integrate with our customers' infrastructure. In such cases, our products may be unable to support some of the configurations or protocols used in our customers' infrastructure. These issues could cause longer deployment and integration times for our products and could cause order cancellations, either of which would adversely affect our business, results of operations and financial condition. Additionally, any changes in our customers' IT infrastructure that degrade the functionality of our products or services, which are better supported by competitive software, could adversely affect the adoption and usage of our products.

***Estimates of market opportunity and forecasts of market growth included in this prospectus may prove to be inaccurate.***

Growth forecasts included in this prospectus relating to our market opportunity and the expected growth in the security policy management market, which are subject to significant uncertainty, may prove to be inaccurate. We believe our policy management and automation functionalities define a new market, and we are not aware of any third-party research that accurately defines the scope of our directly addressable opportunity. As such, we estimated the market size using third-party data and, when third-party data was not available, internal estimates. We segment enterprises based on estimates of their network infrastructure size and their need for our solutions across their networks, and apply an average annual billings figure per segment based on an estimated prior five years of inventory, resulting in an estimated directly addressable market of $10.3 billion, which includes on-premise firewalls, private cloud and public cloud orchestration segments, for the fiscal year ending December 31, 2019.

The addressable market we estimate may not materialize for many years. Even if the markets in which we compete meet the size estimates and growth forecast in this prospectus, our business could fail to grow at similar rates. Our growth is subject to many factors, including our success in implementing our business strategy, which is subject to many risks and uncertainties. Accordingly, the forecasts of market growth included in this prospectus are not indicative of our future growth.

***Because we derive substantially all of our revenues from sales of licenses and maintenance for SecureTrack, SecureChange and SecureApp, which belong to a single platform of products – the Tufin Orchestration Suite – the failure of these products to satisfy customers or to achieve increased market acceptance would adversely affect our business.***

In 2018, we generated substantially all of our revenues from sales of licenses and maintenance for SecureTrack, SecureChange and SecureApp. We recently introduced Orca and Iris to market, and have not yet derived revenues from the sale of these products. We expect to continue to derive a majority of our revenues from license and maintenance sales relating to the Tufin Orchestration Suite in the future. As such, market acceptance of this platform of products is critical to our continued success. Demand for licenses for the Tufin Orchestration Suite is affected by a number of factors, some of which are outside of our control, including continued market acceptance of our software by our customers and potential customers, the viability of existing and new use cases, technological change and growth or contraction in our market. If we are unable to continue to meet customer demands or to achieve more widespread market acceptance of our software, our business, operations, financial results and growth prospects will be materially and adversely affected.

***If we are unable to increase market awareness of our company and our solutions, or fail to successfully promote or protect our brand, our competitive market position and revenues may not continue to grow or may decline.***

We believe that improved awareness of our brand and the value proposition of our solutions will be essential to our continued growth and our success. Many factors, some of which are beyond our control, are important to maintaining and enhancing our brand, including our ability to increase awareness among existing and potential channels partners through various means of marketing and promotional activities. If our marketing efforts are unsuccessful in improving market awareness of our brand and our solutions, then our business, results of operations, prospects, and financial condition will be adversely affected, and we will not be able to achieve sustained growth.

Moreover, due to the intensely competitive nature of our market, we believe that building and maintaining our brand and reputation is critical to our success and that the importance of positive brand recognition will increase as competition in our market further intensifies. While we believe that we are successfully building a well-established brand and have invested and expect to continue to invest substantial resources to promote and maintain our brand, both domestically and internationally, there can be no assurances that our brand development strategies will enhance our reputation or brand recognition or lead to increased revenue.

Furthermore, an increasing number of independent industry analysts and researchers, such as Gartner, IDC and 451 Research LLC, regularly evaluate, compare and publish reviews regarding the functionality of security products and services, including our solutions. These reviews may significantly influence the market perception of our solutions. We do not have any control over the content of these independent industry analysts and researchers' reports, and our reputation and brand could be harmed if they publish negative reviews of our solutions or do not view us as a market leader. The strength of our brand may also be negatively impacted by our competitors' marketing efforts, which may include incomplete, inaccurate and misleading statements about our business, products and services. If we are unable to maintain a strong brand and reputation, sales to new and existing customers could be adversely affected, and our financial performance could be harmed.

***Our business and reputation could be harmed based on real or perceived shortcomings, defects or vulnerabilities in our solutions or the failure of our solutions to meet customers' expectations.***

Our customers face increasingly sophisticated and targeted cyberthreats. If we fail to update our products to detect or prevent such threats, our business and reputation will suffer. Moreover, as our solutions are adopted by an increasing number of enterprises and governmental entities, cyberattackers may focus on finding ways to defeat our solutions. The data stored in our products' database is highly sensitive, and includes our customers' current enterprise-wide network configuration and security policies. If our

18

products' security configuration is breached, this data could be used by malicious actors, including external hackers and rogue employees within our customers' organizations, to plan how they could effectively traverse our customers' networks and gain unauthorized access to critical systems and data. A breach or theft of our customers' sensitive business data, regardless of whether the breach or theft is attributable to the failure of our products, could adversely affect the market's perception of the efficacy of our solutions and current or potential customers may look to our competitors for alternatives to our solutions. The failure of our products may also subject us to lawsuits and financial losses stemming from indemnification of our partners and other third parties, as well as the expenditure of significant financial resources to analyze, correct or eliminate any vulnerabilities. Although we seek to limit our financial exposure in such circumstances through caps on our indemnification obligations, customers may litigate the enforceability of such caps and it is possible that such litigation may be successful in certain circumstances. Any such event could also cause us to suffer reputational harm, lose existing customers or deter them from purchasing additional products and services and prevent new customers from purchasing our solutions.

*Our business and reputation could be harmed if cybersecurity risks materialize.*

Cybersecurity threats are a growing and evolving risk, and often are difficult or impossible to detect for long periods of time or to successfully defend against. Successful attacks, whether through external or internal actors, could harm the confidentiality, integrity and availability of personal data and other sensitive information, as well as the integrity and availability of our systems, products and services in a manner that could materially and adversely affect our business. Because techniques used to obtain unauthorized access or sabotage systems change frequently and generally are not identified until they are launched against a target, we may be unable to anticipate these techniques or to implement adequate preventative measures. In addition, such a security breach could impair our ability to operate our business, including our ability to provide maintenance and support services to our customers. If this happens, our revenues could decline and our business could suffer. In addition, if we suffer a highly publicized security breach, even if our platform and solutions perform effectively, such a breach could cause us to suffer reputational harm, lose existing commercial relationships and customers or deter customers from purchasing additional solutions and prevent new customers from purchasing our solutions.

*We are subject to data privacy laws, the breach of which could subject us to fines and harm our reputation.*

We are subject to an expanding number of domestic, international and contractual legal requirements regarding privacy, personal data rights and cybersecurity. These laws, rules and regulations continue to evolve and address a range of issues, including restrictions or technological requirements regarding the collection, use, storage, protection, retention or transfer of data. Violation of these requirements could result in substantial fines, penalties and related defense costs. For example, the GDPR provides for penalties that could reach the greater of 20 million Euros or 4% of a company's worldwide annual turnover. In addition, because we operate in a number of jurisdictions, we may be subject to a variety of local data privacy laws, which can change frequently and potentially conflict with our existing obligations. These legal requirements may be interpreted and enforced in a manner that is inconsistent with our existing practices or the features of our products and services. We may also be subject to claims of liability or responsibility for the actions of third parties with whom we interact or upon whom we rely in relation to various products and services, including but not limited to our channel partners. In addition to the possibility of our being subject to enforcement actions, fines, lawsuits and other claims, we could be required to fundamentally change our business activities and practices or modify our products and services, which could have an adverse effect on our business. Any inability to adequately address customer privacy and data protection concerns, even if unfounded, or to comply with applicable privacy and data protection laws, regulations and policies, could result in additional cost and liability to us, damage our reputation, inhibit sales and adversely affect our business.

***If we do not effectively expand, train and retain our sales force, we may be unable to acquire new customers or sell additional products and services to existing customers, and our business will suffer.***

Our future success depends, in part, on our ability to continue to expand, train and retain our sales force. Our inability to attract or retain qualified personnel or delays in hiring required sales personnel may seriously harm our business, financial condition and results of operations. Any of our employees may terminate their employment at any time, subject to certain notice requirements. Our ability to continue to attract and retain highly skilled personnel is critical to our future success. During 2018, we increased the number of our sales and marketing personnel from 128 to 166. We expect to continue to expand our sales and marketing personnel significantly and face a number of challenges in achieving our hiring and integration goals. There is intense competition for individuals with sales training and experience. In addition, the training and integration of a large number of sales and marketing personnel in a short time requires the allocation of significant internal resources. We invest significant time and resources in training new sales force personnel to understand our solutions and growth strategy. However, there is no guarantee that our recent hires and planned new hires will become as productive as we expect or require, and we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets in which we currently operate or where we seek to conduct business. Our failure to hire a sufficient number of qualified sales force members and train them to operate at target performance levels may materially and adversely impact our projected growth rate.

***Our ability to enhance our products may be harmed if we are unable to attract and retain sufficient research and development personnel, and if we are unable to generate an adequate return on our investment in research and development.***

Our ability to enhance our products may be harmed if we are unable to attract and retain sufficient engineers and research and development personnel. Our principal research and development activities are conducted from our headquarters in Israel, and we face significant competition for suitably skilled engineers and research and development personnel in this region, where the availability of such personnel is limited. We also engage a number of developers in Bucharest, Romania as independent contractors in order to benefit from the significant pool of talent that is more readily available in this market. Larger companies may expend more resources than we do on employee recruitment and may be able to offer more favorable compensation and incentive packages than us. If we cannot attract or retain a sufficient number of skilled research and development employees, our business, prospects and results of operations could be adversely affected.

In order to remain competitive, we expect to continue to dedicate significant financial and other resources to develop new solutions, applications and enhancements to our existing products and platforms. For example, in 2018, we increased our dedicated research and development personnel by 33% compared to 2017. However, investing in research and development personnel, developing new products and enhancing existing products are expensive and time consuming, and there is no assurance that such activities will result in significant new marketable products or enhancements to our products, design improvements, cost savings, revenues or other expected benefits. If we delay releasing product enhancements and new solutions, or are otherwise unable to generate an adequate return on our investment, our business and results of operations may be materially and adversely affected.

***If we fail to maintain successful relationships with our channel partners, or if our channel partners fail to perform, our ability to market, sell and distribute our solutions will be limited, and our business, financial position and results of operations will be harmed.***

We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners. Our channel partners include distributors and resellers, as well as service delivery partners that help customers successfully deploy, configure, customize and maintain our products and services. Our channel partners fulfill orders constituting substantially all of our revenues. Certain of our new customer leads are generated by our channel partners. For the years ended December 31, 2017 and 2018, our two

20

largest channel partners accounted for 16% and 13% of our revenues and 13% and 10% of our revenues, respectively. Our agreements with these channel partners provide that each partner agrees to sell and distribute our products within certain territories for one year. These agreements are nonexclusive and non-transferable, and automatically renew unless terminated by either party after providing prior written notice. As of December 31, 2017, five of our channel partners accounted for 10% or more of our accounts receivable, accounting for an aggregate of 62% of our accounts receivable in 2017. As of December 31, 2018, three of our channel partners accounted for 10% of more of our accounts receivable, accounting for an aggregate of 36% of our accounts receivable in 2018. Our engagements with these channel partners are generally based on separate contractual relationships with different business units across multiple jurisdictions rather than on a single agreement.

As a result of this concentration, if a channel partner ceases to perform services for us, we may face disruptions in deploying solutions to our customers. Additionally, we are exposed to the credit risk of our channel partners in the event they become insolvent while owing us payment. If our channel partners do not effectively provide support to the satisfaction of our customers, we may be required to provide support to such customers, which would require us to invest in additional personnel and may require us to devote significant time and resources. If our channel partners do not effectively market and sell our solutions, or choose to use greater efforts to market and sell the products and services of our competitors, our ability to grow our business may be adversely affected.

Our relationships with channel partners have been, and could in the future be, terminated with little or no notice if they become subject to bankruptcy or other similar proceedings. The loss of our major channel partners, the inability to replace them or the failure to recruit additional channel partners could materially and adversely affect our results of operations. If we are unable to maintain our relationship with channel partners or otherwise develop and expand our sales channels, or if our channel partners fail to perform, our business, financial position and results of operations could be adversely affected.

***Our increasing focus on expanding security policy management to cloud-native environments presents execution and competitive risks.***

While many organizations see the cloud as a scalable extension of their existing data center, some are adopting the DevOps approach to cloud application development. Pricing and delivery models are evolving. Different usage models and network security architectures in the cloud influence customers' choice of cloud-based security products. We are devoting significant resources to develop and deploy our cloud-based strategies. Our ecosystem must continue to evolve with this changing environment. Unlike traditional enterprise applications, in which every connectivity change is controlled and managed by IT, in cloud-native environments the developers and DevOps engineers typically have administrative rights over the infrastructure. The connectivity decisions and changes made by developers in cloud-native applications can have an immediate impact on the organization's security posture, with little or no oversight by the security team. Our success in developing cloud-native solutions is connected with the fragmentation of enterprise networks between on-premise networks and the cloud environment, the growing use of cloud infrastructure and cloud-native development environments and the level of adoption of cloud platforms such as such as Google Cloud, Amazon Web Services, or AWS, and Microsoft Azure.

We may not establish sufficient market share to achieve the scale necessary to achieve our business objectives. If we are not effective in executing organizational and technical changes to increase efficiency and accelerate innovation, or if we fail to generate sufficient usage of our new products and services, we may not grow revenues in line with the infrastructure and development investments described above.

***If our maintenance or professional services are not satisfactory to our customers, they may not renew their maintenance or professional services contracts, which could adversely affect our future results of operations.***

Our customers depend in large part on customer support delivered through our channel partners or by us to resolve issues relating to the use of our solutions. Our agreements with customers typically provide certain service level commitments, including with respect to initial response time for support. Our

21

business relies on our customers' satisfaction with the technical maintenance and support and professional services we provide to support our products. While the majority of our software is sold under perpetual license agreements, all of our maintenance and professional services contracts are sold on a term basis. Our customers typically purchase one or three years of software maintenance in addition to their initial purchase of our products, with an option to renew their maintenance contracts. In order for us to maintain and improve our results of operations, it is important that our existing customers renew their maintenance contracts when the term expires. For example, for each of the years ended December 31, 2017 and 2018, our maintenance renewal rate was over 90%. Maintenance and support revenues have increased as a percentage of our revenues in each of these years.

The failure of our customers to correctly use our solutions, or our failure to effectively assist customers in deploying and integrating our solutions and providing effective ongoing support, may result in an increase in the vulnerability of our customers' networks and their sensitive business data. If we fail to provide technical support services that are responsive, satisfy our customers' expectations and resolve issues that they encounter with our products and services, then they may elect not to renew annual maintenance and support contracts and they may choose not to purchase additional products and services from us. Accordingly, our failure to provide satisfactory technical support or professional services could lead our customers not to renew their agreements with us or renew on terms less favorable to us, and therefore have a material and adverse effect on our business and results of operations.

***We depend on a single third-party hardware manufacturer for the hardware that we use to fulfill certain orders for our software licenses.***

We depend on a single third-party manufacturer to supply the computer hardware on which our licensed software is installed for certain customers. Specifically, when placing an order, a customer may elect to download our software onto its own computer hardware that meets our specifications or purchase computer hardware from us with our software pre-installed. Approximately one half of our sales i n 2017 and one third of our sales in 2018 were transactions in which customers purchased software pre-installed on computer hardware that we supplied. Our computer hardware supplier fulfills our requirements on a purchase order basis and we hold only limited inventory. We do not have a long-term contract with the supplier that guarantees capacity or the continuation of particular pricing terms. There are alternative suppliers for the computer hardware, but that hardware would initially not be optimized for our software. Furthermore, in the event of a disruption in supply, we would need to inform customers with pending orders regarding the change in hardware and offer them the choice of supplying their own hardware or using alternate hardware that we would supply, both of which may cause delays in the timely fulfillment of their orders. This could have a material adverse effect on our business and results of operations.

***If our products fail to help our customers achieve and maintain compliance with government regulations and industry standards, our business and results of operations could be materially adversely affected.***

We generate a substantial portion of our revenues from our products and services because they help our customers achieve and maintain compliance with government regulations and industry standards, and we expect that will continue for the foreseeable future. Industry standards may change with little or no notice, including changes that could make them more or less onerous for businesses. Governments may also adopt new laws or regulations, or make changes to existing laws or regulations, that could impact whether our solutions enable our customers to maintain compliance with such laws or regulations. Examples of industry and government regulations include the Payment Card Industry Data Security Standard, or PCI-DSS, the Sarbanes-Oxley Act, the North American Electric Reliability Corporation Critical Infrastructure Protection standards, or NERC-CIP, the General Data Protection Regulation, or GDPR, the NIST Cybersecurity Framework and the Health Insurance Portability and Accountability Act of 1996, or HIPAA . If we are unable to adapt our solutions to changing regulatory standards in a timely manner, or if our solutions fail to expedite our customers' compliance initiatives, our customers may lose confidence in our products and could switch to products offered by our competitors. In addition, if regulations and standards related to information security change in a manner that makes them less

onerous, our customers may view government and industry regulatory compliance as less critical to their businesses, and our customers may be less willing to purchase our products and services. In either case, our sales and financial results would suffer.

***If we are unable to adequately protect our proprietary technology and intellectual property rights, our business could suffer substantial harm.***

Our commercial success depends, in part, on our ability to protect our core technologies and other intellectual property assets. We rely on a combination of trade secrets, copyright and trademark laws, confidentiality procedures, technical know-how and continuing innovation to protect our intellectual property and maintain our competitive advantage.

Our software and other proprietary information are protected by copyright on creation. Copyright registrations, which have so far not been necessary, may be sought on an as-needed basis. We also control access to and use of our proprietary software, proprietary technology and other confidential information through the use of internal and external controls, including contractual agreements containing confidentiality obligations with our employees, independent consultants, independent contractors, professional services team, partners and customers. Our confidentiality agreements are designed to protect our proprietary information, and the clauses requiring assignment of inventions are designed to grant us ownership of technologies that are developed through our relationship with the respective counterparty. Despite our efforts to protect our trade secrets and proprietary rights through intellectual property rights, confidentiality agreements and licenses (including non-disclosure and invention assignment agreements), unauthorized parties may still copy or otherwise obtain and use our intellectual property and technology.

In addition, we seek to protect our intellectual property by filing Israeli, U.S. and other foreign patent applications related to our proprietary technology. As of December 31, 2018, we had 14 issued patents in the United States. We also had four issued patents and one pending patent application in Israel. We may file additional patent applications in the future. In order to benefit from the protection of patents and other intellectual property rights, we must monitor and detect infringement and pursue infringement claims in certain circumstances in relevant jurisdictions, all of which are costly, time-consuming and uncertain. We may choose not to seek patent protection for certain innovations or in certain jurisdictions. Furthermore, the scope of our issued patents may be insufficient, and they may not provide us with any competitive advantages. Our patents and other intellectual property rights may be challenged by others or invalidated through administrative processes or litigation. In addition, the issuance of a patent does not guarantee that we have an absolute right to practice the patented invention. As a result, we may not be able to obtain adequate protection or effectively enforce our issued patents or other intellectual property rights.

We cannot assure you that the steps taken by us will deter or prevent infringement or misappropriation of our intellectual property or technology. In addition, the laws of some foreign countries where we operate do not protect our intellectual property and technology to as great an extent as the laws of the United States, and many foreign countries do not enforce these laws as diligently as government agencies and private parties in the United States.

***We may be subject to intellectual property rights claims by third parties, which may be costly to defend, could require us to pay significant damages and could limit our ability to use certain technologies.***

Companies in the software and technology industries, including some of our current and potential competitors, own large numbers of copyrights, trademarks, trade secrets and patents, and frequently enter into litigation based on allegations of infringement, misappropriation or other violations of intellectual property rights. From time to time, third parties may assert their patent, copyright, trademark and other intellectual property rights against us, our channel partners or our customers.

Successful claims of infringement or misappropriation by a third-party could prevent us from using or distributing certain products or performing certain services or could require us to pay substantial damages

(including, for example, treble damages if we are found to have willfully infringed patents and increased statutory damages if we are found to have willfully infringed copyrights), royalties or other fees. Such claims also could require us to cease making, licensing or using solutions that are alleged to infringe or misappropriate the intellectual property of others, to expend additional development resources to attempt to redesign our products or services or otherwise to develop non-infringing technology, to enter into potentially unfavorable royalty or license agreements in order to obtain the right to use necessary technologies or intellectual property rights, and to indemnify our partners and other third parties, including our customers and channel partners whom we typically indemnify against such claims. Even if third parties may offer a license to their intellectual property, the terms of any offered license may not be acceptable, and the failure to obtain a license or the costs associated with any license could cause our business, results of operations or financial condition to be materially and adversely affected.

We indemnify our channel partners and customers against claims that our products infringe the intellectual property rights of third parties. Defending against claims of infringement or being deemed to be infringing the intellectual property rights of others could impair our ability to innovate, develop, distribute and sell our current and planned products and services. If we are unable to protect our intellectual property and technology and ensure that we are not violating the intellectual property rights of others, we may find ourselves at a competitive disadvantage to others who need not incur the additional expense, time and effort required to create the innovative products that have enabled us to be successful to date.

***Our use of open source software could negatively affect our ability to sell our software and subject us to possible litigation.***

We use open source software in our products and our development environments and expect to continue to use open source software in the future. Open source software is typically provided without warranties or assurances of any kind. Some open source licenses contain requirements that the users of such software make available source code for modifications or derivative works we create based upon the open source software used, and many open source licenses include provisions that have not been interpreted by the courts. We monitor and control our use of open source software in an effort to avoid unanticipated conditions or restrictions on our ability to successfully commercialize our products and solutions. We believe that our compliance with the obligations under the various applicable licenses has mitigated the risks that we would trigger any such conditions or restrictions. However, such use may have inadvertently occurred in the development and offering of our products and solutions. If we combine our proprietary software with open source software in a certain manner that is not intended under our policies or monitoring practices, we could, under certain open source licenses, be required to release the source code of our proprietary software to the public. This would allow our competitors to create similar products quickly with lower development effort and ultimately could result in a loss of sales for us.

The terms of many open source software licenses have not been interpreted by U.S. or foreign courts, and there is a risk that, once interpreted, those licenses could be construed in a manner that imposes unanticipated conditions or restrictions on our ability to successfully commercialize our products and solutions. For example, certain open source software licenses may be interpreted to require that we offer our products or solutions that use the open source software for no cost; that we make available the source code for modifications or derivative works we create based upon, incorporating or using the open source software (or that we grant third parties the right to decompile, disassemble, reverse engineer or otherwise derive such source code); that we license such modifications or derivative works under the terms of the particular open source license; or that otherwise impose limitations, restrictions or conditions on our ability to use, license, host or distribute our products and solutions in a manner that limits our ability to successfully commercialize our products.

This potential litigation could require us to purchase costly licenses or devote additional research and development resources to change our products or services, either of which would have a negative effect on our business and results of operations. In addition, if the license terms for the open source software we utilize change, we may be forced to reengineer our offerings or incur additional costs. Although we

monitor the use and incorporation of open source software into our products, we cannot be certain that we have, in all cases, incorporated open source software in our products in a manner that is consistent with the applicable open source license terms.

***Third parties may bring legal actions against us.***

Third parties may bring legal actions against us. Such actions, even if without merit, could harm our business. Litigation in general, and intellectual property and securities litigation in particular, can be expensive, lengthy and disruptive to normal business operations. Moreover, the results of complex legal proceedings are difficult to predict. An unfavorable resolution of any lawsuit could adversely affect our business, results of operations, prospects, or financial condition.

Although we have contractual protections, such as warranty disclaimers and limitation of liability provisions, in our standard terms and conditions of sale, they may not fully or effectively protect us from claims by customers, commercial relationships or other third parties. Any insurance coverage we have may not adequately cover all claims asserted against us, or cover only a portion of such claims. In addition, even claims that ultimately are unsuccessful could result in our expenditure of funds in litigation and divert management's time and other resources.

***We are subject to a number of risks associated with international sales and operations.***

We operate a global business with offices located in Israel, the United States and England. In the year ended December 31, 2018, we generated 56.8%, 38.4% and 4.8% of our revenues from customers in the Americas, EMEA and the rest of the world, respectively. Business practices in the international markets that we serve may differ from those in the United States and may require us to include non-standard terms in customer contracts, such as extended payment or warranty terms. To the extent that we enter into customer contracts that include non-standard terms related to payment, warranties, or performance obligations, our results of operations may be adversely impacted.

Additionally, our international sales and operations are subject to a number of risks, including the following:

- greater difficulty in enforcing contracts and managing collections, as well as longer collection periods;

- higher costs of doing business internationally, including costs incurred in establishing and maintaining office space and equipment for our international operations;

- management communication and integration problems resulting from cultural and geographic dispersion;

- risks associated with trade restrictions and foreign legal requirements, including any importation, certification, and localization of our platforms that may be required in foreign countries;

- greater risk of unexpected changes in regulatory practices, tariffs and tax laws and treaties;

- compliance with anti-bribery laws, including, without limitation, compliance with the U.S. Foreign Corrupt Practices Act, the bribery sections of the Israeli Penal Law, 5737-1977 and the U.K. Bribery Act;

- heightened risk of unfair or corrupt business practices in certain geographies and of improper or fraudulent sales arrangements that may impact financial results and result in restatements of, or irregularities in, financial statements;

- the uncertainty of protection for intellectual property rights in some countries;

- general economic and political conditions in these foreign markets; and

- double taxation of our international earnings and potentially adverse tax consequences due to changes in the tax laws of the United States, Israel or the other jurisdictions in which we operate.

These and other factors could harm our ability to generate future international revenues and, consequently, materially impact our business, results of operations and financial condition.

***We are dependent on the continued services and performance of our two founders, the loss of either of whom could adversely affect our business.***

Our business depends on the continued services and performance of our two founders, Reuven Kitov, our Chief Executive Officer and Chairman of the Board of Directors, and Reuven Harrison, our Chief Technology Officer and a director, to execute on our business plan, and to identify and pursue new opportunities and product innovations. We do not carry key man life insurance on either of Mr. Kitov or Mr. Harrison and, even if we did, such coverage would likely be insufficient to compensate us for the loss of their services. The loss of services of either of Mr. Kitov or Mr. Harrison could significantly delay or prevent the achievement of our development and strategic objectives.

***Our corporate culture has contributed to our success, and if we cannot maintain this culture as we grow, we could lose the innovation, creativity and teamwork fostered by our culture, which could adversely affect our business.***

We believe that our corporate culture has been and will continue to be a key contributor to our success. From December 31, 2016 to December 31, 2018, we increased the size of our workforce by 55 employees in Israel and by 111 employees in other countries, and we expect to continue to hire aggressively as we expand. In addition, we plan to continue to expand our international operations, which may affect our culture as we seek to find, hire and integrate additional international employees while maintaining our corporate culture. If we do not continue to maintain our corporate culture as we grow, we may be unable to continue to foster the innovation, integrity and collaboration we believe we need to support our growth. Our substantial anticipated headcount growth, international expansion and our transition from a private company to a public company may result in a change to our corporate culture, which could adversely affect our business.

***Prolonged economic uncertainties or downturns could materially adversely affect our business.***

Our business depends on our current and prospective customers' ability and willingness to invest money in security policy management, which in turn is dependent upon their overall economic health. Negative economic conditions in the global economy, including conditions resulting from financial and credit market fluctuations, could cause a decrease in corporate spending on security software. The Americas accounted for the majority of our revenues in each of the years ended December 31, 2017 and 2018, nearly all of which were generated in the United States. EMEA also accounted for a significant portion of our revenues in each of the years ended December 31, 2017 and 2018, with revenues generated in Germany representing 27% and 25%, respectively, of EMEA revenues. Economic downturns and geopolitical challenges in the Americas, EMEA or certain other parts of the world may cause our customers in those locations to reevaluate decisions to purchase our solutions or to delay their purchasing decisions, which could adversely impact our results of operations due to the importance that region to us.

In addition, a significant portion of our revenues is generated from customers in the financial services industry, including banking and insurance, and the telecommunications industry. In 2017 and 2018, we generated approximately 50% and 53%, respectively, of our revenues from customers in the financial services and telecommunications industries. Negative economic conditions may cause customers in those industries in particular to reduce their IT spending. Customers may delay or cancel IT projects, choose to focus on in-house development efforts or seek to lower their costs by renegotiating maintenance and support agreements. To the extent purchases of licenses for our software are perceived by customers and potential customers to be discretionary, our revenues may be disproportionately affected by delays or reductions in general IT spending. If the economic conditions of the general economy or industries in which we operate worsen from present levels, our results of operation could be adversely affected.

***Our business depends, in part, on sales to the public sector, and significant changes in the contracting or fiscal policies of the public sector could have an adverse effect on our business.***

We derive a portion of our revenues from sales of our solutions to federal, state, local and foreign governments, and we believe that the success and growth of our business will continue to depend in part on our successful procurement of government contracts. Factors that could impede our ability to maintain or increase the amount of revenues derived from government contracts include:

- changes in fiscal or contracting policies;

- decreases in available government funding;

- changes in government programs or applicable requirements;

- the adoption of new laws or regulations or changes to existing laws or regulations; and

- potential delays or changes in the government appropriations or other funding authorization processes.

The occurrence of any of the foregoing could cause governments and governmental agencies to delay or refrain from purchasing our solutions or otherwise have an adverse effect on our business, operating results and financial condition.

***Requirements associated with being a public company in the United States will require significant resources and management attention.***

Requirements associated with being a public company in the United States will require significant resources and management attention. After the completion of this offering, we will become subject to certain reporting requirements of the Securities Exchange Act of 1934, or the Exchange Act, and the other rules and regulations of the Securities and Exchange Commission, or the SEC, and the New York Stock Exchange, or the NYSE . We will also be subject to various other regulatory requirements, including the Sarbanes-Oxley Act. We expect these rules and regulations to increase our legal, accounting and financial compliance costs and to make some activities more time-consuming and costly. For example, we expect that these rules and regulations may make it more difficult and more expensive for us to obtain directors' and officers' liability insurance, which could make it more difficult for us to attract and retain qualified members of our board of directors. We cannot predict or estimate the amount of additional costs we will incur as a public company or the timing of such costs.

We have recently implemented a new ERP system to provide for greater depth and breadth of functionality and effectively manage our business data, communications, operations and other business processes. A failure of our new system to perform as we anticipate may result in transaction errors, processing inefficiencies and sales losses, may otherwise disrupt our operations and materially and adversely affect our business, results of operations and financial condition and may harm our ability to accurately forecast sales demand, fulfill our contractual obligations and file reports with the SEC on a timely and accurate basis. In addition, due to the systemic internal control features within ERP systems, we may experience difficulties that may affect our internal control over financial reporting, which may create a significant deficiency or material weakness in our overall internal controls. The risks associated with a new ERP system are greater for us as a newly public company.

In addition, complying with these rules and regulations and the increasingly complex laws pertaining to public companies will require substantial attention from our senior management, which could divert their attention away from the day-to-day management of our business. These cost increases and the diversion of management's attention could materially and adversely affect our business, financial condition and results of operations. We will also need to hire additional personnel to support our financial reporting function, and may face challenges in doing so.

***We may acquire other businesses, which could require significant management attention, disrupt our business, dilute shareholder value and adversely affect our results of operations.***

As part of our business strategy and in order to remain competitive, we may acquire or make investments in complementary companies, products or technologies. However, we have not made any acquisitions to date, and as a result, our ability as an organization to acquire and integrate other companies, products or technologies in a successful manner is unproven. We may not be able to find suitable acquisition candidates, and we may not be able to complete such acquisitions on favorable terms, if at all. If we do complete acquisitions, we may not ultimately strengthen our competitive position or achieve our goals, and any acquisitions we complete could be viewed negatively by our customers, analysts and investors. In addition, if we are unsuccessful at integrating such acquisitions or the technologies associated with such acquisitions, our revenues and results of operations could be adversely affected. Any integration process may require significant time and resources, and we may not be able to manage the process successfully. We may not successfully evaluate or utilize the acquired technology or personnel or accurately forecast the financial impact of an acquisition transaction, including accounting charges. We may have to pay cash, incur debt or issue equity securities to pay for any such acquisition, each of which could adversely affect our financial condition or the value of our ordinary shares. The sale of equity or issuance of debt to finance any such acquisitions could result in dilution to our shareholders. The incurrence of indebtedness would result in increased fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

***We are subject to governmental export and import controls that could subject us to liability in the event of non-compliance or impair our ability to compete in international markets.***

We incorporate encryption capabilities into certain of our products and these products thus may be subject to U.S. export control requirements. We are also subject to Israeli regulations controlling the use, import and export of encryption technology since our product development initiatives are primarily conducted in Israel. In December 2013, regulations under the Wassenaar Arrangement for the first time included a chapter on cyber-related matters. We believe that our products do not fall under this chapter; however, in the future we may become subject to this regulation or similar regulations, which would limit our sales and marketing activities and could therefore have an adverse effect on our results of operations. We have satisfied U.S. and Israeli export control requirements to export our products to most customers and jurisdictions outside of the United States and Israel, and we have satisfied other provisions of Israeli law governing the use of encryption technology. If the applicable U.S. and Israeli requirements regarding the export of encryption software or technology change or if we change the encryption means in our products or technology, we may need to satisfy additional requirements in the United States or Israel. Furthermore, various other countries regulate the import of certain encryption products and technology, including import permitting and licensing requirements, and have enacted laws that could limit our ability to distribute our products or could limit our customers' ability to implement our products in those countries.

We are also subject to U.S. and Israeli export control and economic sanctions laws, which prohibit the shipment of certain products to embargoed or sanctioned countries and regions, governments and persons. Our products and technologies could be exported to these sanctioned targets by our channel partners despite the contractual undertakings they have given us and any such export could have negative consequences, including government investigations, penalties and reputational harm. Any change in export or import regulations, economic sanctions or related legislation, shift in the enforcement or scope of existing regulations, or change in the countries, governments, persons or technologies targeted by such regulations, could result in decreased use of our products by, or in our decreased ability to export or sell our products to, existing or potential customers with international operations. Any decreased use of our products or limitation on our ability to export or sell our products would likely adversely affect our business, financial condition and results of operations.

In addition, in the future we may be subject to defense-related export controls. For example, currently our solutions are not subject to supervision under the Israeli Defense Export Control Law, 5767-2007, or the Import and Export Decree (Export Control over Dual Use Goods, Services and Technology), 5766-2006,

but if the definitions of regulated cybersecurity are changed and our products are becoming classified as defense-related, we would become subject to such regulation. In particular, under the Defense Export Control Law, an Israeli company may not conduct "defense marketing activity" without a defense marketing license from the Israeli ministry of defense and may be subject to a requirement to obtain a specific license from the Israeli ministry of defense for any export of defense-related products, services and/or know-how. The definition of defense marketing activity is broad and includes any marketing of "defense equipment, services and/or know-how" outside of Israel or to a non-Israeli, which includes dual-use equipment, services and/or know-how (equipment, services and/or know-how that can be used for civilian or defensive purposes such as our cybersecurity solutions) that is specified in the list of Goods and Dual-Use Technology annexed to the Wassenaar Arrangement on Export Controls for Conventional Arms and Dual-Use Goods and Technologies, if intended for defense use or defense user only, or is specified under Israeli legislation. Similar issues could arise under the U.S. defense/military export controls under the Arms Export Control Act and the International Traffic in Arms Regulations.

## Risks Related to Our Ordinary Shares and the Offering

*Our share price may be volatile, and you may lose all or part of your investment.*

The initial public offering price for the ordinary shares sold in this offering will be determined by negotiation between us and representatives of the underwriters. This price may not reflect the market price of our ordinary shares following this offering and the price of our ordinary shares may decline. In addition, the market price of our ordinary shares could be highly volatile and may fluctuate substantially as a result of many factors, including:

- actual or anticipated fluctuations in our results of operations;

- variance in our financial performance from the expectations of market analysts;

- announcements by us or our competitors of significant business developments, changes in service provider relationships, acquisitions or expansion plans;

- changes in the prices of our products and services;

- our involvement in litigation;

- our sale of ordinary shares or other securities in the future;

- market conditions in our industry;

- changes in key personnel;

- the trading volume of our ordinary shares;

- changes in the estimation of the future size and growth rate of our markets; and

- general economic and market conditions.

In addition, the stock markets have experienced extreme price and volume fluctuations. Broad market and industry factors may materially harm the market price of our ordinary shares, regardless of our operating performance. In the past, following periods of volatility in the market price of a company's securities, securities class action litigation has often been instituted against that company. If we were to be involved in any similar litigation, we could incur substantial costs and our management's attention and resources could be diverted.

Low trading volume may also increase the price volatility of our ordinary shares. A thin trading market could cause the price of our ordinary shares to fluctuate significantly more than the stock market as a whole.

***There has been no prior public market for our ordinary shares, and an active trading market may never develop.***

Prior to this offering, there has been no public market for our ordinary shares. An active trading market may never develop following completion of this offering or, if developed, may not be sustained. The lack of an active market may impair your ability to sell your ordinary shares at the time you wish to sell them or at a price that you consider reasonable. The lack of an active market may also reduce the fair market value of your ordinary shares. An inactive market may also impair our ability to raise capital by selling our ordinary shares and may impair our ability to acquire other companies by using our ordinary shares as consideration.

***If we do not meet the expectations of equity research analysts, if they do not publish research or reports about our business or if they issue unfavorable commentary or downgrade our ordinary shares, the price of our ordinary shares could decline.***

The trading market for our ordinary shares will rely, in part, on the research and reports that equity research analysts publish about us and our business. The analysts' estimates are based upon their own opinions and are often different from our estimates or expectations. If our results of operations are below the estimates or expectations of public market analysts and investors, our share price could decline. Moreover, the price of our ordinary shares could decline if one or more securities analysts downgrade our ordinary shares or if those analysts issue other unfavorable commentary or cease publishing reports about us or our business.

***Following the closing of this offering, a number of significant beneficial owners of our shares will have a significant influence over matters requiring shareholder approval, which could delay or prevent a change of control, and our articles of association will contain provisions that could make it difficult or expensive for a third party to pursue a takeover attempt.***

Following the closing of this offering, the largest beneficial owners of our shares, entities and individuals affiliated with Marker LLC and Catalyst Private Equity Partners (Israel) II, Limited Partnership, each of which currently beneficially owns more than 10% of our outstanding shares, will beneficially own in the aggregate 41.8% of our ordinary shares or, if the underwriters exercise their option to purchase additional ordinary shares, 40.4% of our ordinary shares. As a result, these shareholders individually could exert significant influence, and if they were to act together could exert a controlling influence, over our operations and business strategy and would have sufficient voting power to control the outcome of matters requiring shareholder approval. These matters may include:

- the composition of our board of directors, which has the authority to direct our business and to appoint and remove our officers;

- approving or rejecting a merger, consolidation or other business combination;

- raising future capital; and

- amending our articles of association, which govern the rights attached to our ordinary shares.

This concentration of ownership of our ordinary shares could delay or prevent proxy contests, mergers, tender offers, open-market purchase programs or other purchases of our ordinary shares that might otherwise give you the opportunity to realize a premium over the then-prevailing market price of our ordinary shares. This concentration of ownership may also adversely affect our share price. Further, our amended and restated articles of association, which will become effective upon the closing of this offering, contain provisions that could make it difficult or expensive for a third party to pursue a tender offer, change in control or takeover attempt that is opposed by our management and board of directors even if such a transaction would be beneficial to our shareholders. We will also have a staggered board of directors that could make it more difficult for shareholders to change the composition of our board of directors in any one year. These anti-takeover provisions could substantially impede the ability of public shareholders to change our management or board of directors.

*As a foreign private issuer, we are permitted to follow certain home country corporate governance practices instead of otherwise applicable NYSE requirements, which may, in the future, result in less protection than is accorded to investors under rules applicable to domestic U.S. issuers.*

As a foreign private issuer, we are permitted to follow certain home country corporate governance practices instead of those otherwise required under NYSE rules for U.S. domestic issuers. For example, foreign private issuers are permitted to follow home country practices with regard to director nomination procedures and the approval of compensation of officers. Additionally, foreign private issuers are not required to maintain a board comprised of a majority of independent directors. Foreign private issuers are also exempt from NYSE rules that require shareholder approval prior to (i) the adoption or amendment of an equity compensation plan or (ii) the issuance of ordinary shares, or securities convertible into or exercisable for ordinary shares, in private offerings in excess of 20% of a company's outstanding ordinary shares or voting power, as well as other private offerings to related parties. However, notwithstanding our ability to follow the corporate governance practices of our home country, Israel, we have elected to comply with NYSE corporate governance requirements that are applicable to U.S. domestic issuers. Nevertheless, we may, in the future, decide to rely on foreign private issuer exemptions and follow Israeli home country governance practices in lieu of complying with some or all NYSE corporate governance requirements, which may provide less protection to you than is accorded to investors of domestic issuers. See "Management-Corporate Governance Practices."

*As a foreign private issuer we will not be subject to the provisions of Regulation FD or U.S. proxy rules and will be exempt from filing certain Exchange Act reports.*

As a foreign private issuer, we will be exempt from a number of requirements under U.S. securities laws that apply to public companies that are not foreign private issuers. In particular, we will be exempt from the rules and regulations under the Exchange Act, related to the furnishing and content of proxy statements, and our officers, directors and principal shareholders will be exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we will not be required under the Exchange Act to file annual and current reports and financial statements with the SEC as frequently or as promptly as U.S. domestic companies whose securities are registered under the Exchange Act and we will generally be exempt from filing quarterly reports with the SEC under the Exchange Act. We will also be exempt from the provisions of Regulation FD, which prohibits the selective disclosure of material nonpublic information to, among others, broker-dealers and holders of a company's securities under circumstances in which it is reasonably foreseeable that the holder will trade in such company's securities on the basis of the information. Even though we intend to comply voluntarily with Regulation FD, these exemptions and leniencies will reduce the frequency and scope of information and protections to which you are entitled as an investor.

We are not required to comply with the proxy rules applicable to U.S. domestic filers, including the requirement applicable to emerging growth companies to disclose the compensation of our Chief Executive Officer and other two most highly compensated executive officers on an individual, rather than an aggregate, basis. Nevertheless, regulations promulgated under the Israeli Companies Law will require us, after we become a public company, to disclose the annual compensation of our five most highly compensated officers on an individual basis, rather than on an aggregate basis. This disclosure will not be as extensive as that required of a U.S. domestic issuer. We intend to commence providing such disclosure, at the latest, in the annual proxy statement for our 2020 annual general meeting of shareholders, which will be furnished under cover of a Form 6-K and we may elect to provide such information at an earlier date.

In order to maintain our current status as a foreign private issuer, either (a) more than 50% of our outstanding voting securities must be directly or indirectly owned of record by non-residents of the United States or (b)(i) a majority of our executive officers or directors may not be U.S. citizens or residents, (ii) more than 50% of our assets cannot be located in the United States and (iii) our business must be administered principally outside the United States. Following the completion of this offering or at some other time thereafter, U.S. residents may directly or indirectly own more than 50% of our outstanding

voting securities. If so, we will cease to qualify as a foreign private issuer if we do not meet the requirements set forth in (b) above .

Although we have elected to comply with certain U.S. regulatory provisions, our loss of foreign private issuer status would make such provisions mandatory. The regulatory and compliance costs to us under U.S. securities laws as a U.S. domestic issuer would be significantly higher. If we are not a foreign private issuer, we will be required to file periodic reports and registration statements on U.S. domestic issuer forms with the SEC, which are more detailed and extensive than the forms available to a foreign private issuer. We would also be required to follow U.S. proxy disclosure requirements, including the requirement to disclose more detailed information about the compensation of our senior executive officers on an individual basis. We may also be required to modify certain of our policies to comply with good governance practices associated with U.S. domestic issuers. Such conversion and modifications will involve additional costs. In addition, we would lose our ability to rely upon exemptions from certain corporate governance requirements on U.S. stock exchanges that are available to foreign private issuers.

***The market price of our ordinary shares could be negatively affected by future sales of our ordinary shares.***

After this offering, there will be 32,435,871 shares of our ordinary shares outstanding. Sales by us or our shareholders of a substantial number of ordinary shares in the public market following this offering, or the perception that these sales might occur, could cause the market price of our ordinary shares to decline or could impair our ability to raise capital through a future sale of, or pay for acquisitions using, our equity securities. Of our issued and outstanding shares, all the ordinary shares sold in this offering will be freely transferable, except for any shares acquired by our "affiliates," as that term is defined in Rule 144 under the U.S. Securities Act of 1933, as amended, or the Securities Act. Following completion of this offering, 76.3 % of our outstanding ordinary shares (or 73.6% if the underwriters exercise their option in full) will be considered restricted shares. Such securities can be resold into the public markets in the future in accordance with the requirements of Rule 144, including volume limitations, manner of sale requirements and notice requirements. See "Shares Eligible for Future Sale."

We, our executive officers and directors, and the holders of substantially all of our outstanding ordinary shares, have agreed with the underwriters that, subject to limited exceptions, for a period of 180 days after the date of this prospectus, we and they will not directly or indirectly offer, pledge, sell, contract to sell, grant any option to purchase or otherwise dispose of any ordinary shares or any securities convertible into or exercisable or exchangeable for ordinary shares, or in any manner transfer all or a portion of the economic consequences associated with the ownership of ordinary shares, or cause a registration statement covering any ordinary shares to be filed except for the ordinary shares offered in this offering, without the prior written consent of the designated representatives of the underwriters, who may, in their sole discretion and at any time without notice, release all or any portion of the shares subject to these lock-up agreements.

At any time following the closing of this offering, subject, however, to the 180-day lock-up agreement entered into with the underwriters, the holders of 23,294,601 of our ordinary shares are entitled to require that we register their shares under the Securities Act for resale into the public markets. All shares sold pursuant to an offering covered by such registration statement will be freely transferable. See "Certain Relationships and Related Party Transactions—Registration Rights."

In addition to our current shareholders' registration rights, as of December 31, 2018 we had granted options to purchase 6,750,259 shares under our share option plans and had an additional 134,349 shares available for future grant. Following this offering, we intend to file a registration statement on Form S-8 under the Securities Act registering the shares under our share option plans. Shares included in such registration statement will be available for sale in the public market immediately after such filing, subject to vesting provisions, except for shares held by affiliates who will have certain restrictions on their ability to sell.

32

***We may have exposure to greater tax liabilities than anticipated.***

We have endeavored to structure our activities in a manner so as to minimize our and our subsidiaries' aggregate tax liabilities. However, we have operations in various taxing jurisdictions, and our tax liabilities in one or more jurisdictions could be more than reported in respect of prior taxable periods and more than anticipated in respect of future taxable periods. In this regard, the amount of income taxes that we pay in future taxable periods could be higher if earnings are lower than anticipated in jurisdictions where lower statutory tax rates apply and higher than anticipated in jurisdictions where higher statutory tax rates apply.

In addition, we have entered into transfer pricing arrangements that establish transfer prices for our intercompany operations. However, our transfer pricing procedures are not binding on the applicable taxing authorities. No official authority in any country has made a binding determination as to whether or not we are operating in compliance with its transfer pricing laws. Accordingly, taxing authorities in any of the countries in which we operate could challenge our transfer prices and require us to adjust them to reallocate our income and potentially to pay additional taxes for prior tax periods. For example, the tax authorities in the United States have increased their focus on transfer pricing procedures, which could result in a greater likelihood of a challenge to our transfer pricing arrangements and the risk that we will be required to adjust them and reallocate our income. Such an adjustment could result in a higher effective tax rate than that to which we are currently subject. We expect that the issue of the validity of our transfer pricing procedures will become of greater importance as we continue our expansion in markets in which we currently have a limited presence and attempt to penetrate new markets. Any change to the allocation of our income as a result of reviews by taxing authorities could have a negative effect on our financial condition and results of operations.

Moreover, the determination of our worldwide provision for income taxes and other tax liabilities requires significant judgment and the ultimate tax determination is uncertain for many transactions and calculations. Although we believe our estimates are reasonable, our ultimate tax liability may differ from the amounts recorded in our financial statements and may materially adversely affect our financial condition and results of operations in the period or periods for which such determination is made. We have created reserves with respect to tax liabilities where we believe it to be appropriate. However, there can be no assurance that our ultimate tax liability will not exceed the reserves we have created.

The Base Erosion and Profit Shifting, or BEPS, project undertaken by the Organization for Economic Cooperation and Development, or the OECD, may also have adverse consequences on our tax liabilities. The BEPS project contemplates changes to numerous international tax principles, as well as national tax incentives, and these changes, which are being adopted in different manners by individual countries, could adversely affect our income tax liability. Even as countries translate the BEPS recommendations into specific national tax laws, it remains difficult to predict with accuracy the magnitude of any impact that such new rules may have on our financial results.

In addition, the 2017 Tax Cuts and Jobs Act, or the TCJA, made significant changes to the U.S. Internal Revenue Code, including a reduction in the U.S. federal corporate income tax rate from the previous top marginal rate of 35% to a flat rate of 21% and limitations on certain corporate deductions and credits. Also, the TCJA requires complex computations to be performed that were not previously required in U.S. tax law, significant judgments to be made in interpretation of the provisions of the TCJA and significant estimates in calculations and the preparation and analysis of information not previously relevant or regularly produced. The U.S. Treasury Department, the U.S. Internal Revenue Service, or IRS, and other standard-setting bodies could interpret or issue guidance on how provisions of the TCJA will be applied or otherwise administered that is different from our interpretation. Finally, foreign governments may enact tax laws in response to the TCJA that could result in further changes to global taxation and materially adversely affect our financial position and results of operations.

***U.S. holders that own 10% or more of the vote or value of our ordinary shares may suffer adverse tax consequences if we and/or any of our non-U.S. subsidiaries are characterized as a "controlled foreign corporation," or a CFC, under Section 957(a) of the U.S. Internal Revenue Code of 1986, as amended, or the Code.***

A non-U.S. corporation is considered a CFC if more than 50% of (1) the total combined voting power of all classes of shares of such corporation entitled to vote or (2) the total value of the shares of such corporation, is owned, or is considered as owned by applying certain constructive ownership rules, by U.S. shareholders (within the meaning of the Code) on any day during the taxable year of such non-U.S. corporation. Certain U.S. shareholders of a CFC generally are required to include currently in gross income such shareholders' share of the CFC's "Subpart F income," a portion of the CFC's earnings to the extent the CFC holds certain U.S. property and a portion of the CFC's "global intangible low-taxed income" (as defined under Section 951A of the Code). Such U.S. shareholders are subject to current U.S. federal income tax with respect to such items, even if the CFC has not made an actual distribution to such shareholders. "Subpart F income" includes, among other things, certain passive income (such as income from dividends, interests, royalties, rents and annuities or gain from the sale of property that produces such types of income) and certain sales and services income arising in connection with transactions between the CFC and a person related to the CFC. "Global intangible low-taxed income" may include most of the remainder of a CFC's income over a deemed return on its tangible assets.

As a result of the ownership of our shares, certain voting arrangements with respect to our shares, and certain changes in the U.S. tax law introduced by the TCJA, we believe that we and our non-U.S. subsidiaries may be classified as CFCs in the prior taxable year as well as the current taxable year in which this offering occurs. These determinations cannot be made with certainty. In the event that we or any of our subsidiaries are a CFC, U.S. holders who hold 10% or more of the vote or value of our ordinary shares may realize adverse U.S. federal income tax consequences, such as current U.S. taxation of Subpart F income and of any such shareholder's share of our or our subsidiaries' accumulated non-U.S. earnings and profits (regardless of whether we make any distributions), taxation of amounts treated as global intangible low-taxed income under Section 951A of the Code with respect to such shareholder and being subject to certain reporting requirements with the IRS. Any such U.S. holder who is an individual generally would not be allowed certain tax deductions or foreign tax credits that would be allowed to a U.S. corporation. If you are a U.S. holder who holds 10% or more of the vote or value of our ordinary shares, you should consult your own tax advisors regarding the U.S. tax consequences of acquiring, owning or disposing our ordinary shares and the impact of the TCJA, especially the changes to the rules relating to CFCs.

***U.S. holders of our ordinary shares may suffer adverse tax consequences if we are characterized as a passive foreign investment company, or a PFIC, under Section 1297(a) of the Code.***

Generally, if, for any taxable year, at least 75% of our gross income is passive income, or at least 50% of the average quarterly value of our total gross assets (which, if we are a CFC for the year of the offering may be measured by the adjusted tax basis of our assets, and for subsequent years, assuming we are publicly traded, the total value of our assets may be measured in part by the market value of our ordinary shares, which is subject to change) is attributable to assets that produce passive income or that are held for the production of passive income, including cash, we would be characterized as a PFIC for U.S. federal income tax purposes. For purposes of these tests, passive income includes dividends, interest, gains from the sale or exchange of investment property and rents and royalties other than rents and royalties which are received from unrelated parties in connection with the active conduct of a trade or business. Additionally, a look-through rule generally applies with respect to 25% or more owned subsidiaries. If we are characterized as a PFIC, U.S. holders of our ordinary shares may suffer adverse tax consequences, including having gains realized on the sale of our ordinary shares treated as ordinary income, rather than capital gain, the loss of the preferential tax rate applicable to dividends received on our ordinary shares by individuals who are U.S. holders and having interest charges apply to distributions by us and to the proceeds of sales of our ordinary shares. In addition, special information reporting may

34

be required. See "U.S. and Israeli Tax Consequences for our Shareholders—Certain U.S. Federal Income Tax Consequences—Passive Foreign Investment Company Considerations."

The determination of whether we are a PFIC will depend on the nature and composition of our income and the nature, composition and value of our assets from time to time. The 50% passive asset test described above is generally based on the fair market value of each asset, with the value of goodwill and going concern value determined in large part by reference to the market value of our ordinary shares, which may be volatile. If we are a CFC and not publicly traded throughout the relevant taxable year, however, the test may be applied based on the adjusted basis of our assets. Based on our belief that we may be classified as a CFC in the current taxable year in which this offering occurs and certain estimates of the adjusted tax bases of our assets, we believe that we may be classified as a PFIC with respect to the taxable year ending December 31, 2019. However, this determination is subject to uncertainty. Our status may also depend, for example, on how quickly we utilize the cash proceeds from this offering in our business. Moreover, because PFIC status is based on our income, assets and activities for the entire taxable year, it is not possible to determine whether we will be characterized as a PFIC for the 2019 taxable year or any subsequent year until after the close of the relevant year. We can therefore make no assurances regarding our PFIC status for any taxable year, and our U.S. counsel expresses no opinion with respect to our PFIC status for our current or future taxable years. We will determine whether we were a PFIC or not for each taxable year and make such determination available to U.S. holders.

The tax consequences that would apply if we were a PFIC would also be different from those described above if a U.S. holder were able to make a valid "qualified electing fund," or QEF, election. We will use commercially reasonable efforts to make available to U.S. holders such information with respect to the Company as is necessary for U.S. holders to make QEF elections with respect to the Company if we are classified as a PFIC. See "U.S. and Israeli Tax Consequences for our Shareholders—Certain U.S. Federal Income Tax Consequences—Passive Foreign Investment Company Considerations."

***You will experience immediate and substantial dilution in the net tangible book value of the ordinary shares you purchase in this offering.***

The initial public offering price of our ordinary shares substantially exceeds the pro forma net tangible book value per share of our ordinary shares immediately after this offering. Accordingly, based on an initial public offering price of $13.00 per share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, after deducting underwriting discounts and the estimated offering expenses payable by us, you will pay more for your shares than the amounts paid by our existing shareholders for their ordinary shares and you will suffer immediate dilution of $10.30 per share in pro forma net tangible book value of our ordinary shares. If outstanding options to purchase our ordinary shares are exercised in the future, you will experience additional dilution. See "Dilution."

***We have broad discretion over the use of proceeds we receive in this offering and may not apply the proceeds in ways that increase the value of your investment.***

Our management will have broad discretion in the application of the net proceeds from this offering and, as a result, you will have to rely upon the judgment of our management with respect to the use of these proceeds. Our management may spend a portion or all of the net proceeds in ways that not all shareholders approve of or that may not yield a favorable return. The failure by our management to apply these funds effectively could harm our business.

***We are an "emerging growth company," and the reduced disclosure requirements applicable to emerging growth companies may make our ordinary shares less attractive to investors.***

We are an "emerging growth company," as defined in the Jumpstart Our Business Startups Act, or the JOBS Act, and may remain an emerging growth company for up to five years. For so long as we remain an emerging growth company, we are permitted and intend to rely on exemptions from certain disclosure requirements that are applicable to other public companies that are not emerging growth companies. These exemptions include not being required to comply with the auditor attestation requirements of

Section 404 of the Sarbanes-Oxley Act not being required to comply with any requirement that may be adopted by the Public Company Accounting Oversight Board regarding mandatory audit firm rotation or a supplement to the auditor's report providing additional information about the audit and the financial statements, reduced disclosure obligations regarding executive compensation and exemptions from the requirements of holding a nonbinding advisory vote on executive compensation and shareholder approval of any golden parachute payments not previously approved. In this prospectus, we have not included all of the executive compensation-related information that would be required if we were not an emerging growth company. We cannot predict whether investors will find our ordinary shares less attractive if we rely on these exemptions. If some investors find our ordinary shares less attractive as a result, there may be a less active trading market for our ordinary shares and our share price may be more volatile.

***We do not intend to pay dividends for the foreseeable future and, as a result, your ability to achieve a return on your investment will depend on appreciation in the price of our ordinary shares.***

We have never declared or paid any cash dividends on our ordinary shares and do not intend to pay any cash dividends in the foreseeable future. We anticipate that we will retain all of our future earnings for use in the development of our business and for general corporate purposes. In addition, our ability to pay cash dividends is currently limited by the terms of our credit agreements, and any future credit agreements may contain terms prohibiting or limiting the amount of dividends that may be declared or paid on our ordinary shares. Accordingly, investors must rely on sales of their ordinary shares after price appreciation, which may never occur, as the only way to realize any future gains on their investments.

## Risks Related to Our Incorporation and Location in Israel

***Our corporate headquarters and principal research and development activities are located in Israel and, therefore, our business and operations may be adversely affected by political, economic and military conditions in Israel.***

We are incorporated under Israeli law and our corporate headquarters, including our principal research and development facilities, are located in Israel. In addition, certain of our key employees and directors and officers are residents of Israel. Accordingly, political, economic and military conditions in the Middle East in general, and in Israel in particular, directly affect our business, product development and results of operations, and we may be adversely affected by a significant increase in the rate of inflation or a significant downturn in the economic or financial condition in Israel.

Since the State of Israel was established in 1948, a number of armed conflicts have occurred between Israel and its neighboring countries, and since 2000, there have been increasing occurrences of terrorist violence. In recent years, hostilities between Israel and Hezbollah in Lebanon (and Syria) and Hamas in the Gaza Strip have both involved missile strikes in various parts of Israel causing disruption of economic activities. This violence has strained Israel's relationship with its Arab citizens, Arab countries and, to some extent, with other countries around the world. Our corporate headquarters and principal research and development activities are located in the range of missiles that could be fired from Lebanon, Syria or the Gaza Strip into Israel. In addition, Israel faces many threats from more distant neighbors, in particular, Iran (which is believed to be an ally of Hamas in Gaza and Hezbollah in Lebanon) . Any armed conflicts involving Israel or in the region or any political instability in the region, including acts of terrorism as well as cyberattacks or any other hostilities involving or threatening Israel, would likely negatively affect business conditions and could make it more difficult for us to conduct our operations in Israel, which could increase our costs and adversely affect our financial results . Our commercial insurance does not cover losses that may occur as a result of an event associated with the security situation in the Middle East, such as damages to our facilities resulting in disruption of our operations. Although the Israeli government is currently committed to covering the reinstatement value of direct damages that are caused by terrorist attacks or acts of war, we cannot assure you that this government coverage will be maintained, or if maintained, will be sufficient to compensate us fully for damages incurred. Any losses or damages incurred by us could have a material adverse effect on our business. Any armed conflict involving Israel could adversely affect our operations and results of operations.

Several countries, principally in the Middle East, as well as certain companies, organizations and movements, restrict doing business with Israel or Israeli companies, and additional countries may impose restrictions on doing business with Israel and Israeli companies. In addition, there have been increased efforts by activists to cause companies and consumers to boycott Israeli goods based on Israeli government policies. Similarly, Israeli companies are limited in conducting business with entities from several countries. Such business restrictions and boycotts, particularly if they become more widespread, may materially and adversely impact our ability to sell our products and on the expansion of our business. We could be adversely affected by the interruption or curtailment of trade between Israel and its trading partners.

***Exchange rate fluctuations between the U.S. dollar, the New Israeli Shekel, the Euro and other foreign currencies, may negatively affect our future revenues.***

We generate substantially all of our revenues in U.S. dollars. The majority of our operating expenses are incurred in foreign currencies, and are subject to fluctuations due to changes in foreign currency exchange rates, particularly changes between the U.S. dollar and the New Israeli Shekel, or the NIS, the Euro and, to a lesser extent, the British Pound. As a result, our financial results may be affected by fluctuations in the exchange rates of currencies in the countries in which our products may be sold. For example, during 2017, we witnessed a strengthening of the average exchange rate of the NIS against the dollar, which increased the dollar value of Israeli expenses. If the NIS strengthens against the dollar, as it did in 2017, the dollar value of our Israeli expenses, mainly personnel and facility-related, will increase. We have entered into forward contracts with major banks to provide partial protection against foreign currency exchange risks resulting from expenses paid in NIS during the year. Although exposure to currency fluctuations to date has not had a material adverse effect on our business, there can be no assurance that our limited hedging transactions will provide sufficient protection and that such fluctuations in the future will not have a material adverse effect on our operating results and financial condition.

***Our operations may be affected by negative labor conditions in Israel.***

Strikes and work stoppages occur relatively frequently in Israel. If Israeli trade unions threaten additional strikes or work stoppages and such strikes or work stoppages occur, these may, if prolonged, have a material adverse effect on the Israeli economy and on our business, including our ability to deliver products to our customers in a timely manner.

***Our operations could be disrupted by the obligations of our personnel to perform military service.***

As of December 31, 2018, we had 217 employees based in Israel. Our operations could be disrupted by the obligations of some of our personnel to perform military service. Certain of our employees in Israel, generally males, including executive officers, may be called upon to perform obligatory military reserve service on an annual basis until they reach the age of 40 (and in some cases, up to age 49) and, in certain emergency circumstances, may be called to immediate and prolonged active duty on very short notice. Our operations could be disrupted by the absence for military service for extended periods of a significant number of our employees. Such disruption could materially and adversely affect our business and results of operations.

***The termination or reduction of tax and other incentives that the Israeli government provides to domestic companies may increase the costs involved in operating a company in Israel.***

The Israeli government currently provides tax and capital investment incentives to domestic companies, as well as grant and loan programs relating to research and development and marketing and export activities. In recent years, the Israeli government has reduced the benefits available under these programs and the Israeli governmental authorities have indicated that the government may in the future further reduce or eliminate the benefits of those programs. We have taken in the past and may take advantage of these benefits and programs again in the future, however, there is no assurance that such benefits and programs will continue to be available to us in the future. If such benefits and programs were

37

terminated or further reduced, it could have an adverse effect on our business, operating results and financial condition.

***Enforcing a U.S. judgment against us and our current executive officers and directors, or asserting U.S. securities law claims in Israel, may be difficult.***

We are incorporated under the laws of the State of Israel. Service of process upon us and upon our directors and officers and any Israeli experts named in this registration statement, most of whom reside outside of the United States, may be difficult to obtain within the United States. Furthermore, because a majority of our assets and most of our directors, officers and such Israeli experts are located outside of the United States, any judgment obtained in the United States against us or any of them may be difficult to collect within the United States.

We have irrevocably appointed Tufin Software North America, Inc. as our agent to receive service of process in any action against us in any U.S. federal or state court arising out of this offering or any purchase or sale of securities in connection with this offering.

We have been informed by our legal counsel in Israel, Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co., that it may be difficult to assert U.S. securities law claims in original actions instituted in Israel. Israeli courts may refuse to hear a claim based on an alleged violation of U.S. securities laws on the basis that Israel is not the most appropriate forum in which to bring such a claim. In addition, even if an Israeli court agrees to hear a claim, it may determine that Israeli law and not U.S. law is applicable to the claim. There is little binding case law in Israel addressing these matters. If U.S. law is found to be applicable, the content of applicable U.S. law must be proven as a fact which can be a time-consuming and costly process. Certain matters of procedure will also be governed by Israeli law.

See "Enforceability of Civil Liabilities" for additional information on your ability to enforce civil claim against us and our executive officers and directors named in this prospectus.

***Provisions of our amended and restated articles of association and Israeli law and tax considerations may delay, prevent or make difficult an acquisition of us, which could prevent a change of control and negatively affect the price of our ordinary shares.***

Israeli corporate law regulates mergers, requires tender offers for acquisitions of shares above specified thresholds, requires special approvals for certain transactions involving directors, officers or significant shareholders and regulates other matters that may be relevant to these types of transactions. These provisions of Israeli law may delay, prevent or make difficult an acquisition of us, which could prevent a change of control and therefore negatively affect the price of our ordinary shares. For example, under the Israeli Companies Law, upon the request of a creditor of either party to a proposed merger, the court may delay or prevent the merger if it concludes that there exists a reasonable concern that as a result of the merger the surviving company will be unable to satisfy the obligations of any of the parties to the merger. In addition, our executive officers and certain other key employees are entitled to certain benefits in connection with a change of control of our company.

Our amended and restated articles of association provide that our directors (other than external directors) are elected on a staggered basis, such that a potential acquirer cannot readily replace our entire board of directors at a single annual general shareholder meeting.

Furthermore, Israeli tax considerations may make potential transactions unappealing to us or to our shareholders, especially for those shareholders whose country of residence does not have a tax treaty with Israel, which exempts such shareholders from Israeli tax. For example, Israeli tax law does not recognize tax-free share exchanges to the same extent as U.S. tax law. With respect to mergers, Israeli tax law allows for tax deferral in certain circumstances but makes the deferral contingent on the fulfillment of a number of conditions, including, in some cases, a holding period of two years from the date of the transaction during which sales and dispositions of shares of the participating companies are subject to certain restrictions. Moreover, with respect to certain share swap transactions, the tax deferral is limited in time, and when such time expires, the tax becomes payable even if no disposition of the shares has

occurred. In order to benefit from the tax deferral, a pre-ruling from the Israel Tax Authority might be required.

***We may become subject to claims for remuneration or royalties for assigned service invention rights by our employees, which could result in litigation and adversely affect our business.***

We have entered into assignment of invention agreements with our research and development employees pursuant to which such individuals agreed to assign to us all rights to any inventions created during or as a result of their employment or engagement with us or in our field of business. A significant portion of our intellectual property has been developed by our employees in the course and as a result of their employment for us. Under the Israeli Patent Law, 5727-1967, or the Patent Law, inventions conceived by an employee during the scope of his or her employment with a company and as a result thereof are regarded as "service inventions," which belong to the employer, absent a specific agreement between the employee and employer giving the employee service invention rights. The Patent Law also provides that if there is no agreement between an employer and an employee with respect to the employee's right to receive compensation for such "service inventions," the Israeli Compensation and Royalties Committee, or the Committee, a body constituted under the Patent Law, shall determine whether the employee is entitled to remuneration for his or her service inventions and the scope and conditions for such remuneration. A recent decision by the Committee clarifies that the right to receive consideration for "service inventions" can be waived by the employee and that in certain circumstances, such waiver does not necessarily have to be explicit. In order to determine the scope and validity of such wavier, the Committee will examine, on a case-by-case basis, the general contractual framework between the parties, using interpretation rules of the general Israeli contract laws. Further, the Committee has not yet determined one specific formula for calculating this remuneration (but rather uses the criteria specified in the Patent Law). Although our employees have agreed to assign to us service invention rights and have specifically waived their right to receive any special remuneration for such assignment beyond their regular salary and benefits, we may face claims that the assignment is not enforceable or demanding remuneration in consideration for assigned inventions. As a consequence of such claims, we could be required to pay additional remuneration or royalties to our current and/or former employees, or be forced to litigate such claims, which could negatively affect our business.

***The government tax benefits that we currently are entitled to receive require us to meet several conditions and may be terminated or reduced in the future.***

Some of our operations in Israel may entitle us to certain tax benefits under the Law for the Encouragement of Capital Investments, 5719-1959, or the Investment Law, once we are profitable. If we do not meet the requirements for maintaining these benefits, they may be reduced or canceled and the relevant operations would be subject to Israeli corporate tax at the standard rate, which is set at 23% in 2018 and thereafter. In addition to being subject to the standard corporate tax rate, we could be required to refund any tax benefits that we have already received, plus interest and penalties thereon. Even if we continue to meet the relevant requirements, the tax benefits that our current "Benefited Enterprise" is entitled to may not be continued in the future at their current levels or at all. If these tax benefits were reduced or eliminated, the amount of taxes that we pay would likely increase, as all of our operations would consequently be subject to corporate tax at the standard rate, which could adversely affect our results of operations. Additionally, if we increase our activities outside of Israel, for example, by way of acquisitions, our increased activities may not be eligible for inclusion in Israeli tax benefits programs. See "Taxation and Israeli Government Programs Applicable to our Company" for additional information concerning these tax benefits.

***Your rights and responsibilities as a shareholder will be governed by Israeli law, which differs in some material respects from the rights and responsibilities of shareholders of U.S. companies.***

The rights and responsibilities of the holders of our ordinary shares are governed by our amended and restated articles of association and by Israeli law. These rights and responsibilities differ in some material respects from the rights and responsibilities of shareholders in U.S. corporations. For example, a shareholder of an Israeli company has a duty to act in good faith and in a customary manner in exercising

its rights and performing its obligations towards such company and its shareholders, and to refrain from abusing its power in such company, including, among other things, voting at a general meeting of shareholders on matters such as amendments to a company's articles of association, increases in a company's authorized share capital, mergers and acquisitions and related party transactions requiring shareholder approval. In addition, a shareholder who is aware that it possesses the power to determine the outcome of a shareholder vote or to appoint or prevent the appointment of a director or executive officer in the company has a duty of fairness toward the company. There is limited case law available to assist us in understanding the nature of these duties or the implications of these provisions. These provisions may be interpreted to impose additional obligations and liabilities on holders of our ordinary shares that are not typically imposed on shareholders of U.S. corporations.

# SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

We make forward-looking statements in this prospectus that are subject to risks and uncertainties. These forward-looking statements include information about possible or assumed future results of our business, financial condition, results of operations, liquidity, plans and objectives. In some cases, you can identify forward-looking statements by terminology such as "believe," "may," "estimate," "continue," "anticipate," "intend," "should," "plan," "expect," "predict," "potential," or the negative of these terms or other similar expressions. The statements we make regarding the following matters are forward-looking by their nature:

- our expectation that policy-centric, automated solutions will garner a growing share of enterprise security spend;

- our expectations for growth in certain key verticals and geographic regions and our intention to expand international operations;

- our plans to invest in and grow our sales force and marketing team and develop our sales platform;

- our plans to deploy additional cloud-based subscription products over time, to enable more customers to consume our products beyond our existing on-premise solutions;

- our expectations regarding customer relationships developed by our hybrid sales model;

- our expectations regarding maintaining a high level of customer retention to achieve favorable return on investments;

- our expectations regarding growth in the market for enterprise security and network management products;

- our plans to continue investing in and growing our research and development capabilities;

- our expectations regarding sales of our new products, Orca and Iris;

- our intention to invest further in the Tufin Orchestration Suite to extend its functionality and features;

- our expectations regarding seasonality;

- our expectations regarding sales driven by channel partners and our technology alliance partners through joint selling efforts and go-to-market strategies; and

- our expectations regarding our tax classifications.

The preceding list is not intended to be an exhaustive list of all of our forward-looking statements. The forward-looking statements are based on our beliefs, assumptions and expectations of future performance, taking into account the information currently available to us. These statements are only predictions based upon our current expectations and projections about future events. There are important factors that could cause our actual results, levels of activity, performance or achievements to differ materially from the results, levels of activity, performance or achievements expressed or implied by the forward-looking statements. In particular, you should consider the risks provided under "Risk Factors" in this prospectus.

You should not rely upon forward-looking statements as predictions of future events. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee that future results, levels of activity, performance and events and circumstances reflected in the forward-looking statements will be achieved or will occur. Except as required by law, we undertake no obligation to update publicly any forward-looking statements for any reason after the date of this prospectus, to conform these statements to actual results or to changes in our expectations.

# MARKET AND INDUSTRY DATA

Unless otherwise indicated, information contained in this prospectus concerning our industry and the markets in which we operate, including our general expectations, market position, market opportunity and market size, is based on information from various sources, including Gartner, Inc., or Gartner, International Data Corporation, or IDC, and 451 Research LLC on assumptions that we have made that are based on those data and other similar sources and on our knowledge of the markets for our products and services. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While we believe the market position, market opportunity and market size information included in this prospectus is generally reliable, such information is inherently imprecise. In addition, projections, assumptions and estimates of our future performance and the future performance of the industry in which we operate is necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those described in "Risk Factors" and elsewhere in this prospectus. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

# USE OF PROCEEDS

We estimate that our net proceeds from this offering, after deducting the underwriting discount and estimated offering expenses payable by us, will be approximately $90.6 million, or approximately $104.6 million if the underwriters exercise in full their option to purchase additional ordinary shares, based upon an assumed initial public offering price of $13.00 per ordinary share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus.

A $1.00 increase (decrease) in the assumed initial public offering price of $13.00 per ordinary share would increase (decrease) the net proceeds to us from this offering by approximately $7.2 million, assuming the number of shares offered as set forth on the cover page of this prospectus remains the same and after deducting underwriting discounts and estimated offering expenses payable by us. Similarly, each increase (decrease) of 1,000,000 shares in the number of ordinary shares offered would increase (decrease) the net proceeds to us from this offering by approximately $12.1 million, assuming that the assumed initial public offering price remains the same, and after deducting underwriting discounts and estimated offering expenses payable by us.

We anticipate that we will use the net proceeds we receive from this offering, including any net proceeds we receive from the exercise of the underwriters' option to acquire additional ordinary shares in the offering, for working capital and other general corporate purposes. We expect to continue to invest in and to grow our research and development capabilities as well as expand our sales force and marketing team.

# DIVIDEND POLICY

We may declare a dividend to be paid to the holders of our ordinary shares in proportion to their respective shareholdings. However, we have never declared or paid any cash dividends on our ordinary shares and we do not anticipate paying any cash dividends in the foreseeable future. In addition, our ability to pay cash dividends is currently limited by the terms of our credit agreements, and any future credit agreements may contain terms prohibiting or limiting the amount of dividends that may be declared or paid on our ordinary shares. We currently intend to retain future earnings to finance operations and expand our business.

The distribution of dividends may also be limited by the Israeli Companies Law, 5759-1999, or the Israeli Companies Law, which permits the distribution of dividends only out of "profits," as such term is defined in the Israeli Companies Law. Our board of directors is authorized to declare dividends, provided that there is no reasonable concern that payment of the dividend will prevent us from satisfying our existing and foreseeable obligations as they become due. For purposes of the Israeli Companies Law, profits means the greater of retained earnings or earnings derived over the two most recent fiscal years after deduction of previous distributions that were not already deducted from the surpluses, as evidenced by financial statements prepared for periods no more than six months prior to the date of distribution. In addition, dividends may be paid with the permission of an Israeli court, provided that there is no reasonable concern that payment of the dividend will prevent a company from satisfying its existing and foreseeable obligations as they become due. Under the Israeli Companies Law, dividend distributions are determined by the board of directors and do not require the approval of the shareholders of a company unless the company's articles of association provide otherwise. Our amended and restated articles of association do not require shareholder approval of a dividend distribution and provide that dividend distributions may be determined by our board of directors, subject to the provisions of the Israeli Companies Law.

# CAPITALIZATION

The following table sets forth our cash and cash equivalents and total capitalization as of December 31, 2018, as follows:

- on an actual basis;

- on a pro forma basis to give effect to the conversion of all of our outstanding preferred shares into ordinary shares, which will occur immediately prior to the closing of this offering; and

- on a pro forma as adjusted basis to give effect to (x) the same item as set forth in "pro forma," (y) the exercise on a cashless basis of warrants to purchase 26,667 ordinary shares and the resulting issuance of 17,842 ordinary shares upon the closing of this offering and (z) the issuance and sale of ordinary shares in this offering at an assumed initial public offering price of $13.00 per ordinary share after deducting underwriting discounts and estimated offering expenses payable by us.

You should read this information in conjunction with our consolidated financial statements and the related notes appearing at the end of this prospectus and the "Management's Discussion and Analysis of Financial Condition and Results of Operations" section and other financial information contained in this prospectus.

| | As of December 31, 2018 | | |
| --- | --- | --- | --- |
| | Actual | Pro Forma | Pro Forma As Adjusted |
| | *(in thousands, except share and per share amounts)* | | |
| Cash and cash equivalents | $ 15,248 | $ 15,248 | $ 106,143 |
| Long-term loan | — | — | — |
| Redeemable Convertible Preferred Shares: | | | |
| Preferred shares of NIS 0.015 par value: 19,534,021 preferred shares authorized at December 31, 2018; 16,416,749 preferred shares issued and outstanding at December 31, 2018; no preferred shares issued and outstanding pro forma and pro forma as adjusted (unaudited) | 26,699 | — | — |
| Shareholders' (deficit) equity: | | | |
| Ordinary shares of NIS 0.015 par value; 52,666,712 shares authorized at December 31, 2017 and 2018; 7,966,612 and 8,265,988 shares issued and outstanding at December 31, 2017 and 2018; 24,682,737 shares issued and outstanding pro forma (unaudited); 32,400,579 shares issued and outstanding pro forma as adjusted (unaudited) | 30 | 96 | 127 |
| Additional paid-in capital | 10,337 | 36,970 | 127,545 |
| Accumulated deficit | (40,313) | (40,313) | (40,313) |
| Total shareholders' equity (deficit) | (29,946) | (3,247) | 87,359 |
| Total capitalization | $ (3,247) | $ (3,247) | $ 87,359 |

A $1.00 increase (decrease) in the assumed initial public offering price of $13.00 per ordinary share, would increase (decrease) the as adjusted amount of each of cash and cash equivalents, additional paid-in capital, total equity and total capitalization by approximately $7.2 million, assuming that the number of ordinary shares offered, as set forth on the cover page of this prospectus, remains the same and after deducting underwriting discounts and estimated offering expenses payable by us.

# DILUTION

If you purchase any of the shares offered by this prospectus, you will experience dilution to the extent of the difference between the offering price per share that you pay in this offering and the pro forma as adjusted net tangible book value per ordinary share immediately after this offering. Our net tangible book deficit as of December 31, 2018 was $0.13 per ordinary share. Consolidated net tangible book deficit per ordinary share was calculated by subtracting our total tangible assets from our total liabilities and dividing the difference by the number of ordinary shares outstanding.

After giving effect to the sale of ordinary shares that we are offering at an assumed initial public offering price of $13.00 per ordinary share, which is the midpoint of the estimated offering price range set forth on the cover page of this prospectus, after deducting the underwriting discount and estimated offering expenses payable by us, our consolidated net tangible book value on an adjusted basis as of December 31, 2018 would have been $2.70 per ordinary share. This amount represents an immediate increase in net tangible book value of $2.83 per ordinary share to our existing shareholders and an immediate decrease in net tangible book value of $10.30 per ordinary share to new investors purchasing ordinary shares in this offering. We determine dilution by subtracting the as adjusted net tangible book value per ordinary share after this offering from the amount of cash that a new investor paid for an ordinary share.

The following table illustrates this dilution:

| | | | | |
|---|---|---|---|---|
| Assumed initial public offering price per ordinary share | | | $ | 13.00 |
| Net tangible book deficit per ordinary share as of December 31, 2018 | $ | (0.13) | | |
| Increase per ordinary share attributable to this offering | | 2.83 | | |
| Pro forma as adjusted net tangible book value per ordinary share after this offering | | | | 2.70 |
| Dilution per ordinary share to new investors in this offering | | | $ | 10.30 |

A $1.00 increase (decrease) in the assumed initial public offering price of $13.00 per ordinary share would increase (decrease) our pro forma as adjusted net tangible book value by $7.2 million, or $0.22 per share, and would increase (decrease) the pro forma dilution per share to investors in this offering by $0.78 per share, assuming that the number of shares offered, as set forth on the cover page of this prospectus, remains the same, and after deducting underwriting discounts and estimated offering expenses payable by us. Each increase (decrease) of 1,000,000 shares in the number of shares offered would increase (decrease) our pro forma as adjusted net tangible book value by approximately $12.1 million, or $0.28 per share, and the pro forma dilution to investors in this offering would increase (decrease), as applicable, by $0.28 per share, assuming that the assumed initial public offering price remains the same, and after deducting underwriting discounts and estimated offering expenses payable by us.

If the underwriters exercise their option to purchase additional ordinary shares in full in this offering, the as adjusted net tangible book value after the offering would be $3.02 per ordinary share, the increase in net tangible book value per ordinary share to existing shareholders would be $3.15 and the decrease in net tangible book value per ordinary share to new investors would be $9.98 per ordinary share, in each case assuming an initial public offering price of $13.00 per ordinary share.

The following table summarizes, as of December 31, 2018, the differences between the number of purchased ordinary shares, the total consideration paid in cash and the average price per ordinary share that existing shareholders paid, on the one hand, and new investors are paying in this offering, on the other hand. The calculation below is based on an assumed initial public offering price of $13.00 per ordinary share before deducting underwriting discounts and estimated offering expenses payable by us.

| | Shares Purchased | | Total Consideration | | Average Price Per Share |
| --- | --- | --- | --- | --- | --- |
| | Number | Percent | Amount | Percent | |
| | *(in thousands, except share and per share amounts)* | | | | |
| Existing shareholders | 24,700,579 | 76.2% | $ 28,531 | 22.2% | $ 1.16 |
| New investors | 7,700,000 | 23.8 | 100,000 | 77.8 | 13.00 |
| Total | 32,400,579 | 100.0% | $ 128,531 | 100.0% | |

The foregoing tables and calculations exclude 6,884,608 ordinary shares reserved for issuance under our equity incentive plans, of which there were outstanding options to purchase 6,750,259 shares at a weighted average exercise price of $1.77 per share.

To the extent any of these outstanding options is exercised, there will be further dilution to new investors. To the extent all of such outstanding options had been exercised as of December 31, 2018, the as adjusted net tangible book value per share after this offering would be $2.54, and total dilution per share to new investors would be $10.46.

If the underwriters exercise their option to purchase additional shares in full:

- the percentage of ordinary shares held by existing shareholders will decrease to approximately 73.6% of the total number of our ordinary shares outstanding after this offering; and

- the number of shares held by new investors will increase to 8,855,000, or approximately 26.4% of the total number of our ordinary shares outstanding after this offering.

47

# SELECTED CONSOLIDATED FINANCIAL DATA

The following tables set forth our selected consolidated financial data. You should read the following selected consolidated financial data in conjunction with "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus. Historical results are not necessarily indicative of the results that may be expected in the future. Our financial statements have been prepared in accordance with U.S. GAAP.

The selected consolidated statements of operations data for each of the years in the two-year period ended December 31, 2018 and the consolidated balance sheet data as of December 31, 2018 are derived from our audited consolidated financial statements appearing elsewhere in this prospectus.

|  | Year ended December 31, | |
|---|---|---|
|  | 2017 | 2018 |
|  | *(in thousands, except share and per share amounts)* | |
| **Consolidated Statements of Operations:** | | |
| Revenues: | | |
| Product | $ 30,855 | $ 42,554 |
| Maintenance and professional services | 33,685 | 42,427 |
| Total revenues | 64,540 | 84,981 |
| Cost of revenues: | | |
| Product | 1,702 | 2,324 |
| Maintenance and professional services | 7,778 | 11,112 |
| Total cost of revenues(1) | 9,480 | 13,436 |
| Gross profit | 55,060 | 71,545 |
| Operating expenses: | | |
| Research and development(1) | 17,672 | 21,363 |
| Sales and marketing(1) | 35,042 | 46,092 |
| General and administrative(1) | 4,608 | 6,022 |
| Total operating expenses | 57,322 | 73,477 |
| Operating loss | $ (2,262) | $ (1,932) |
| Financial income (loss), net | 267 | (1,047) |
| Loss before taxes on income | $ (1,995) | $ (2,979) |
| Taxes on income | (797) | (1,283) |
| Net loss | $ (2,792) | $ (4,262) |
| Basic and diluted net loss per ordinary share(2) | $ (0.35) | $ (0.53) |
| Weighted average number of ordinary shares used in computing basic and diluted net loss per ordinary share(2) | 7,872,545 | 8,045,647 |
| Basic pro forma net loss per ordinary share (unaudited)(3) | | (0.17) |
| Weighted average number of shares used in computing pro forma basic and diluted net loss per ordinary share (unaudited)(3) | | 24,462,397 |

|  | | Year ended December 31, | |
| --- | --- | --- | --- |
|  | | **2017** | **2018** |
|  | | *(in thousands)* | |
| **Consolidated Balance Sheet Data:** | | | |
| Cash and cash equivalents | $ | 14,700 | $ 15,248 |
| Working capital, excluding deferred revenue(4) | | 15,247 | 17,781 |
| Deferred revenue, current and non-current | | 23,957 | 31,464 |
| Total assets | | 35,126 | 47,133 |
| Redeemable convertible preferred shares | | 26,699 | 26,699 |
| Total shareholders' equity (deficit) | | (29,028) | (29,946) |

|  | | Year ended December 31, | |
| --- | --- | --- | --- |
|  | | **2017** | **2018** |
|  | | *(in thousands)* | |
| **Supplemental Financial Data:** | | | |
| Non-GAAP operating profit (loss)(5) | $ | (152) | $ 1,249 |

(1)  Includes share-based compensation expense as follows:

|  | | Year ended December 31, | |
| --- | --- | --- | --- |
|  | | **2017** | **2018** |
|  | | *(in thousands)* | |
| **Share-based Compensation Expense:** | | | |
| Cost of revenues | $ | 332 | $ 634 |
| Research and development | | 660 | 731 |
| Sales and marketing | | 765 | 1,458 |
| General and administrative | | 353 | 358 |
| Total share-based compensation expenses | $ | 2,110 | $ 3,181 |

(2)  Basic and diluted net loss per ordinary share is computed based on the weighted average number of ordinary shares outstanding during each period. For additional information, see Note 2 to our consolidated financial statements included elsewhere in this prospectus.

(3)  Pro forma basic and diluted net loss per ordinary share and pro forma weighted average shares outstanding assumes the conversion of all of our outstanding preferred shares into ordinary shares, which will occur immediately prior to the closing of this offering, but does not give effect to the issuance of shares in connection with this offering. For additional information on the conversion of the preferred shares, see Note 11 to our consolidated financial statements included elsewhere in this prospectus.

(4)  We define working capital as total current assets minus total current liabilities.

(5) Non-GAAP operating profit (loss) is a non-GAAP financial measure. We define non-GAAP operating profit (loss) as operating profit excluding share-based compensation expense. Because of varying available valuation methodologies, subjective assumptions and the variety of equity instruments that can impact a company's non-cash expense, we believe that providing non-GAAP financial measures that exclude non-cash share-based compensation expense allows for more meaningful comparisons between our operating results from period to period. This non-GAAP financial measure is an important tool for financial and operational decision-making and for evaluating our operating results over different periods. The following table reconciles operating loss, the most directly comparable U.S. GAAP measure, to non-GAAP operating profit (loss) for the periods presented:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2018 | |
| | *(in thousands)* | | | |
| **Reconciliation of Operating Loss to Non-GAAP Operating Profit (Loss):** | | | | |
| Operating loss | $ | (2,262) | $ | (1,932) |
| Add: share-based compensation | | 2,110 | | 3.181 |
| Non-GAAP operating profit (loss) | $ | (152) | $ | 1,249 |

For a description of how we use non-GAAP operating profit (loss) to evaluate our business, see "Management's Discussion and Analysis of Financial Condition and Results of Operations—Key Factors Affecting Our Performance."

Other companies, including companies in our industry, may calculate non-GAAP operating profit (loss) differently or not at all, which reduces the usefulness of non-GAAP operating profit (loss) as a comparative measure. You should consider non-GAAP operating profit (loss) along with other financial performance measures, including operating profit, and our financial results presented in accordance with U.S. GAAP.

# MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*The following discussion should be read in conjunction with our consolidated financial statements and the related notes included elsewhere in this prospectus. This discussion contains forward-looking statements that are subject to known and unknown risks and uncertainties. Actual results and the timing of events may differ significantly from those expressed or implied in such forward-looking statements due to a number of factors, including those set forth in the section entitled "Risk Factors" and elsewhere in this prospectus. You should read the following discussion in conjunction with "Special Note Regarding Forward-Looking Statements" and "Risk Factors."*

## Overview

We are pioneering a policy-centric approach to security and IT operations. We transform enterprises' security operations by helping them visualize, define and enforce a unified security policy across complex, heterogeneous IT and cloud environments. Our products govern how individuals, systems and applications are permitted to communicate and provide policy-based security automation, enabling customers to reduce the time to implement complex network changes from days to minutes. Our solutions increase business agility, eliminate errors from manual processes and ensure continuous compliance through a single console. Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000.

We generate revenues from sales of our products and associated maintenance and professional services. We primarily sell our software through perpetual license agreements and, to a lesser extent, term-based license agreements. Our products offer the same functionality whether our customers receive them through a perpetual or term-based license. Our agreements with customers for software licenses include maintenance contracts and may also include professional services contracts. Maintenance revenues consist of fees for providing software updates and technical support for our products for a specified term, which is typically one or three years. We offer a portfolio of professional services and extended support contract options to assist our customers with integration, customization, optimization, training and ongoing advanced technical support.

Our goal is to provide significant benefits to customers seeking to enforce enterprise-wide security policies and automate network change process, which we believe will enable us to maximize the lifetime value of our customers. We believe our existing customers serve as a strong source of incremental revenues given our multiple product offerings and the growing complexity of IT and cloud environments and networks. Our products provide customers the flexibility to initially deploy one or more of our products in all or parts of their IT and cloud environments, and further expand deployment as they purchase additional products or cover additional parts of their IT and cloud environments. We believe our "land and expand" sales strategy capitalizes on this potential. We make significant investments in acquiring new customers and expect to achieve a favorable return on investments by maintaining a high level of customer retention, which we define as our maintenance renewal rate. We calculate our maintenance renewal rate by taking the total prior period maintenance revenues from customers that have renewed in the trailing 12-month period and dividing that figure by our total prior period maintenance revenues for all customers with contracts that were up for renewal in the trailing 12-month period. For each of the years ended December 31, 2017 and 2018, our maintenance renewal rate was over 90%. Our new business from existing customers, including new licenses for our products and attached maintenance and professional services contracts, constitutes a significant part of our revenues, accounting for 65% and 60% of our total revenues from new business in the years ended December 31, 2017 and 2018, respectively.

We believe our diverse global footprint provides a significant growth opportunity. We aim to continue to expand our business globally, particularly in the Americas and EMEA. In 2018, the Americas accounted for 57% of our revenues and EMEA accounted for 38% of our revenues. We expect sales in the Americas

to continue to account for a majority of our revenues in the near- and medium- terms. Our customers include leading enterprises across a broad range of geographies in a diverse set of industries, including financial services, telecommunications, automotive, manufacturing, energy, healthcare and pharmaceuticals, technology, government, retail and business services. We believe our expansion within the Global 2000 is a key indicator of our market penetration and the value that our products provide to large customers.

We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners. Our highly trained sales force is responsible for overall market development. Our sales force consists of our field sales team, which accounts for most of our sales, and our inside sales team. Our field sales team targets large organizations, which we define as those comprising the Global 2000, while our inside sales team targets mid-market companies that do not belong to the Global 2000. Within our field sales team, our regional field sales representatives develop new business relationships with our key customers, and our channel account managers support and expand existing relationships with our channel partners. Our sales engineers provide technical expertise and support, and architect our solutions to address the business needs of our customers. Our sales cycle usually lasts several months from proof of concept to purchase order, and is often longer for larger transactions. As of December 31, 2018, we had sales personnel in 24 countries. We have expanded our sales force in each of the last two fiscal years, and we plan to continue to do so.

Our channel partners include distributors and resellers, as well as service delivery partners that help customers successfully deploy, configure, customize and maintain our products and services. We sell substantially all of our products and services through our global network of channel partners, who then sell to end-user customers. When analyzing our business, we refer to end-user customers as our customers throughout this prospectus even if our direct commercial relationship is with a channel partner. We consider our channel partners active if they have sold our products or services in the trailing 12-month period.

We integrate with our platform partners, such as Check Point, Cisco, Fortinet, Palo Alto Networks, F5 Networks, Forcepoint, Juniper Networks, VMware, AWS and Microsoft Azure, to provide vendor agnostic solutions, which is key to our value proposition. In addition, we believe our technology alliance partner program, which is an ecosystem of technology partners who build certified integrations to our platform, helps to expand our common use cases.

We have been growing our business consistently over the last several years. Our revenue growth is attributable to sales to new enterprise customers and incremental sales to existing customers. For the years ended December 31, 2017 and 2018, our revenues were $64.5 million and $85.0 million , respectively, representing year-over-year growth of 31.7% .

## Key Factors Affecting Our Performance

We believe the growth of our business and our future success depends on a number of factors, including the following:

- *Number of Customers* . We believe the size of our customer base is an indicator of our market penetration and our net customer additions are an indicator of the growth of our business and future revenue opportunity. We believe we have a significant opportunity to expand our footprint through new installations and displacement of our competitors' solutions. To do so, we plan to continue to grow our sales team, leverage our channel partner relationships and enhance our marketing efforts. We believe organizations choose us for our customer-first approach, continuing innovation and seamless integration with third-party technologies.

  We define a customer as a distinct entity, division or business unit of a company that has purchased our products or services and is eligible to receive maintenance and support. Since our inception, over 2,000 customers in over 70 countries have purchased our solutions, including approximately 15% of

the Global 2000. As of December 31, 2017 and 2018, we had 1,489 and 1,566 customers, respectively.

- *Sales to Existing Customers* . We believe our existing customers provide a significant source of revenue growth. We derive an increasing portion of our revenues from existing customers. For example, during the year ended December 31, 2018, we generated approximately 60% of our revenues, excluding maintenance renewals, from sales to existing customers. We exclude maintenance renewals from this and other calculations (in each case, as indicated) in order to illustrate the impact of new sales to existing customers, isolated from the incremental maintenance revenues we receive when our existing customers renew their maintenance contracts.

  The chart below shows the initial and incremental sales of perpetual and term licenses, excluding maintenance renewals, by cohort. Each colored segment represents a new customer cohort in their initial year of purchase. The pattern of a large spend in the initial year followed by consistent and incremental buying in subsequent years reflects our ability to expand the deployment of our solutions as our existing customers purchase additional products or cover additional parts of their networks.



- *Maintenance Renewal Rates.* We believe our maintenance renewal rates are an important metric to measure our ability to provide significant value to our existing customers. We generate incremental maintenance revenues when our customers renew their maintenance contracts. We measure the maintenance renewal rate of our customers over a trailing 12-month period, based on a dollar renewal rate of contracts expiring during that time period. For each of the years ended December 31, 2017 and 2018, our maintenance renewal rate was over 90%. Our key strategies to maintain our renewal rate include continuing to provide more valuable features and network device coverage in our product updates, focusing on the quality and reliability of our customer service and support and ensuring our customers receive value from our products.

- *Sales to Large Organizations.* In the year ended December 31, 2018, large organizations, which we define as those comprising the Global 2000, accounted for 68% of our revenues, compared to 67% of our revenues in 2017, in each case excluding maintenance renewals. Sales to large organizations involve a distinct set of opportunities and challenges. Large organizations sales are characterized by longer sales cycles and additional time and resources spent on a potential customer.

  For the years ended December 31, 2017 and 2018, the average spend for all customers, excluding maintenance renewals, was $94,000 and $119,000, respectively. During those years, the average spend for Global 2000 customers, excluding maintenance renewals, was $151,000 and $201,000,

respectively; and the average spend for non-Global 2000 customers, excluding maintenance renewals, was $48,000 and $66,000, respectively. We define average spend as total sales, excluding maintenance renewals, for the relevant customer group (i.e., all customers, Global 2000 customers or non-Global 2000 customers) divided by the number of customers belonging to such customer group.

- *Seasonality* . We generally expect an increase in business activity in the fourth quarter, driven by our customers' buying patterns. We believe that these seasonal trends will continue to affect our quarterly results. The loss or delay of one or more large transactions in a quarter could impact our anticipated results of operations for that quarter and future quarters for which revenue from that transaction is delayed.

## Components of Statements of Operations

### Revenues

We derive our revenues from the following:

*Product Revenues* . We generate product revenues from sales of our software licenses and third-party hardware to new customers and sales of additional licenses and third-party hardware to existing customers. We generate the vast majority of our revenues through sales of software with less than 5% of our revenues generated through sales of third-party hardware in 2017. We primarily sell our software through perpetual license agreements and, to a lesser extent, term-based license agreements. Beginning on January 1, 2017, we adopted ASC 606. As a result, we recognize revenues from software sold through term-based license agreements upfront, upon delivery. As a percentage of total revenues, we expect our product revenues to vary from quarter to quarter based on seasonal and cyclical factors. We are focused on acquiring new customers as well as increasing product revenues from our existing customers.

*Maintenance and Professional Services Revenues.* We generate maintenance and professional services revenues by selling maintenance contracts and, to a lesser extent, by providing professional services to our customers. Maintenance includes software updates and technical support. Our contracts with customers for software licenses include maintenance for a specified term. We recognize revenues associated with maintenance on a straight-line basis over the specified maintenance period. Professional services consist of deployment services for our products, and customization of our solutions and their integration in the customer's environment. We typically bill for professional services and training services on a fixed fee basis and recognize revenues as we perform the services. As a percentage of total revenues, we expect our maintenance and professional services revenues to vary from quarter to quarter based on fluctuations in license sales, maintenance renewal rates, professional services attach rates and cyclical factors. The increase in maintenance is attributable to the growth in our software license sales to new and existing customers.

See Note 2 to our consolidated financial statements "Significant Accounting Policies—Revenue recognition" for more information.

## Geographic Breakdown of Revenues

The following table sets forth the geographic breakdown of our revenues by region for the periods indicated:

|  | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
|  | 2017 | | 2018 | |
|  | Amount | % | Amount | % |
|  | *(in thousands)* | | | |
| Americas | $ 35,020 | 54.3% | $ 48,267 | 56.8% |
| EMEA | 26,099 | 40.4 | 32,595 | 38.4 |
| Rest of World | 3,421 | 5.3 | 4,119 | 4.8 |
| Total | $ 64,540 | 100.0% | $ 84,981 | 100.0% |

The Americas accounted for the majority of our revenues in each of the years ended December 31, 2017 and 2018, nearly all of which were generated in the United States. EMEA also accounted for a significant portion of our revenues in each of the years ended December 31, 2017 and 2018, with revenues generated in Germany representing 27% and 25%, respectively, of EMEA revenues.

### Cost of Revenues and Gross Profit

Our total cost of revenues is comprised of the following:

*Cost of Product Revenues.* Cost of product revenues consist primarily of personnel costs (including share-based compensation) associated with the processing and delivery of our software licenses to customers and, to a lesser extent, the purchase and delivery of third-party hardware as well as other overhead costs. There is no direct cost of revenues associated with our software products because we deliver our software products electronically. Electronic delivery occurs when we provide the customer with access to the software and license key via a secure portal. We expect our cost of product revenues to increase in absolute dollar amounts as we increase the number of personnel involved in the delivery of our products and as we increase sales of third-party hardware.

*Cost of Maintenance and Professional Services Revenues.* Cost of maintenance and professional services revenues consist primarily of personnel costs for those responsible for providing maintenance and support and professional services to our global customer base. Such personnel costs consist of salaries, benefits, bonuses and share-based compensation. We expect our cost of maintenance and professional services revenues to continue to increase in absolute dollars as we hire additional professional services and technical support personnel to support our business.

Gross profit is total revenues less total cost of revenues. Gross margin is gross profit expressed as a percentage of total revenues. Our gross margin fluctuates from quarter-to-quarter based on the mix of product revenues and maintenance and professional services revenues. We expect our gross margins to continue to fluctuate.

### Operating Expenses

Our operating expenses consist of research and development expenses, sales and marketing expenses and general and administrative expenses. For each category, personnel costs are the most significant component of our operating expenses. Personnel costs consist of salaries and employee benefits (including vacation expenses, bonuses and share-based compensation). Sales commissions account for a significant portion of our sales and marketing compensation costs. We expect personnel and all allocated overhead costs to continue to increase in absolute dollars as we hire new employees and add facilities to accommodate our growing personnel and business.

*Research and Development* . Research and development expenses consist primarily of personnel costs attributable to our research and development personnel, subcontractors and consultants, as well as allocated overhead costs. We expense research and development expenses as incurred. We expect that our research and development expenses will continue to increase in absolute dollars as we increase our research and development headcount to further strengthen our technology platform and invest in the development of existing and new products.

*Sales and Marketing.* Sales and marketing expenses are the largest component of our operating expenses and consist primarily of personnel costs, including variable compensation, as well as travel expenses, marketing and business development costs (including marketing campaigns, tradeshows and recruitment) and allocated overhead costs. We expect sales and marketing expenses will continue to increase in absolute dollars and account for the majority of our operating costs as we expand our international sales and marketing efforts.

*General and Administrative.* General and administrative expenses consist primarily of personnel costs for our executive, finance, IT, human resources, legal and administrative personnel. General and administrative expenses also include external legal, accounting and other professional service fees. We expect that general and administrative expenses will increase in absolute dollars and as a percentage of revenues in the near term as we grow and expand our operations and prepare to operate as a public company, including higher legal, corporate insurance, investor relations and accounting expenses, and the additional costs of achieving and maintaining compliance with the Sarbanes-Oxley Act and related regulations.

### Financial Income (Loss), Net

Financial income (loss), net, consists primarily of bank charges, interest paid on our long-term loan, interest earned on our cash, cash equivalents and restricted bank deposits, and foreign currency exchange fluctuations. Foreign currency exchange fluctuations reflect gains or losses related to transactions denominated in currencies other than the U.S. dollar, particularly the NIS. As a result of our global presence, we expect to continue to incur expenses in currencies other than the U.S. dollar. As such, we expect our exposure to fluctuations in foreign currencies to continue.

### Taxes on Income

The standard corporate tax rate in Israel for 2018 and thereafter is 23%, and was 24% for 2017. We have net operating loss carry forwards. As of December 31, 2018, our net operating loss carry forwards for Israeli tax purposes amounted to approximately $20.5 million. Under Israeli law, net operating losses can be carried forward indefinitely and offset against certain future taxable income. We expect that if or when we become profitable, we will generate the substantial majority of our taxable income in Israel.

In addition, we are entitled to tax benefits under the Investment Law in Israel in respect of our status as a Benefited Enterprise. Under the Investment Law, our effective tax rate to be paid with respect to our Israeli taxable income as a Benefited Enterprise may be lower than the standard corporate tax rate. The tax benefit period for the Benefited Enterprise program under the Investment Law is expected to end in 2022. The availability of these tax benefits is subject to certain requirements, including making specified investments in property and equipment, and financing a percentage of investments with share capital. If we do not meet these requirements in the future, the tax benefits may be canceled and we could be required to refund any tax benefits that we have already received. See "Taxation and Israeli Government Programs Applicable to our Company— Tax Benefits for a Benefited Enterprise."

Our U.S. and European subsidiaries currently generate taxable income in the United States and Europe. To the extent that we generate taxable income in Israel, our effective tax rate will be a weighted average rate based on the applicable U.S., European and Israeli rates.

# Results of Operations

The following tables summarize our results of operations in dollars and as a percentage of our total revenues for the periods indicated. The period-to-period comparison of results is not necessarily indicative of results for future periods.

| | | Year ended December 31, | | | |
| --- | --- | --- | --- | --- | --- |
| | | 2017 | | 2018 | |
| | Amount | % | | Amount | % |
| | *(Dollars in thousands)* | | | | |
| Revenues: | | | | | |
| Product | $ 30,855 | 47.8 % | $ | 42,554 | 50.1 % |
| Maintenance and professional services | 33,685 | 52.2 | | 42,427 | 49.9 |
| Total revenues | 64,540 | 100.0 | | 84,981 | 100.0 |
| Cost of revenues: | | | | | |
| Product | 1,702 | 2.6 | | 2,324 | 2.7 |
| Maintenance and professional services | 7,778 | 12.1 | | 11,112 | 13.1 |
| Total cost of revenues(1) | 9,480 | 14.7 | | 13,436 | 15.8 |
| Gross profit | 55,060 | 85.3 | | 71,545 | 84.2 |
| Operating expenses: | | | | | |
| Research and development(1) | 17,672 | 27.4 | | 21,363 | 25.1 |
| Sales and marketing(1) | 35,042 | 54.3 | | 46,092 | 54.2 |
| General and administrative(1) | 4,608 | 7.1 | | 6,022 | 7.1 |
| Total operating expenses | 57,322 | 88.8 | | 73,477 | 86.5 |
| Operating loss | $ (2,262) | (3.5) | $ | (1,932) | (2.3) |
| Financial income (loss), net | 267 | 0.4 | | (1,047) | (1.2) |
| Loss before taxes on income | $ (1,995) | (3.1) | $ | (2,979) | (3.5) |
| Taxes on income | (797) | (1.2) | | (1,283) | (1.5) |
| Net loss | $ (2,792) | (4.3)% | $ | (4,262) | (5.0)% |

(1) Includes share-based compensation expense as follows:

| | | Year ended December 31, | | |
| --- | --- | --- | --- | --- |
| | | 2017 | | 2018 |
| | | *(in thousands)* | | |
| **Share-based Compensation Expense:** | | | | |
| Cost of revenues | $ | 332 | $ | 634 |
| Research and development | | 660 | | 731 |
| Sales and marketing | | 765 | | 1,458 |
| General and administrative | | 353 | | 358 |
| Total share-based compensation expenses | $ | 2,110 | $ | 3,181 |

## Comparison of the Years Ended December 31, 2017 and 2018

*Revenues*

| | Year ended December 31, | | | | Change | |
| | 2017 | 2018 | | | | |
| | Amount | Amount | | Amount | | % |
| | *(Dollars in thousands)* | | | | | |
| Revenues: | | | | | | |
| Product | $ 30,855 | $ 42,554 | $ | 11,699 | | 37.9% |
| Maintenance and support | 27,966 | 37,155 | | 9,189 | | 32.9 |
| Professional services | 5,719 | 5,272 | | (447) | | (7.8) |
| Total revenues | $ 64,540 | $ 84,981 | $ | 20,441 | | 31.7% |

Revenues increased by $20.4 million, or 31.7%, from $64.5 million in 2017 to $85.0 million in 2018. This growth was achieved primarily due to increased sales of our products and services from new customers, which accounted for $9.5 million of this increase, and existing customers, which accounted for $10.9 million of this increase, across all regions and was most pronounced in the Americas.

Product revenues increased by $11.7 million, or 37.9%, from $30.9 million in 2017 to $42.6 million in 2018. This increase was driven by increased sales volumes primarily to new customers, which accounted for $7.8 million of this increase, buying our network policy security management and automation solutions, as well as upsell and expansion sales to existing customers, which accounted for $3.9 million of this increase . The substantial majority of our product revenues was attributable to sales of perpetual licenses.

Maintenance and support revenues grew by $9.2 million, or 32.9%, from $28.0 million in 2017 to $37.2 million in 2018 due to an increase in the sale of maintenance and support services to new customers, which accounted for $2.1 million of this increase, and existing customers, which accounted for $7.1 million of this increase .

Professional services revenues decreased by $0.4 million, or 7.8%, from $5.7 million in 2017 to $5.3 million in 2018. This decrease was attributable to performance progress of services.

*Cost of Revenues*

| | Year ended December 31, | | | | Change | |
| | 2017 | 2018 | | | | |
| | Amount | Amount | | Amount | | % |
| | *(Dollars in thousands)* | | | | | |
| Cost of revenues: | | | | | | |
| Product | $ 1,702 | 2,324 | $ | 622 | | 36.5% |
| Maintenance and professional services | 7,778 | 11,112 | | 3,334 | | 42.8 |
| Total cost of revenues | $ 9,480 | 13,436 | $ | 3,956 | | 41.7% |

Cost of revenues increased by $4.0 million, or 41.7%, from $9.5 million in 2017 to $13.4 million in 2018. This increase was primarily driven by the increase in compensation costs and related overhead associated with the increase in services, support and fulfillment employees. As of December 31, 2017 and 2018, the number of our services, support and fulfillment employees was 59 and 75, respectively.

Cost of product revenues increased by $0.6 million, or 36.5%, from $1.7 million in 2017 to $2.3 million in 2018. The increased cost of product revenues was primarily attributable to the increased purchases of hardware.

Cost of maintenance and professional services revenues increased by $3.3 million, or 42.8%, from $7.8 million in 2017 to $11.1 million in 2018. The increase in cost of maintenance and professional services revenues was driven primarily by an increase in personnel costs and related overhead expenses as we grew our technical support and professional services headcount to support our increased sales.

*Gross Profit*

| | Year ended December 31, | | | | Gross Profit Change | |
| | 2017 | | 2018 | | | |
| | Gross Profit | Gross Margin | Gross Profit | Gross Margin | Amount | % |
|---|---|---|---|---|---|---|
| Gross profit | $ 55,060 | 85.3% | $ 71,545 | 84.2% | $ 16,485 | 29.9% |

Gross profit increased by $16.5 million, or 29.9%, from $55.1 million in 2017 to $71.5 million in 2018. Gross margins decreased from 85.3% to 84.2% during the same period. This decrease was driven by our costs of revenues increasing by a larger percentage than our revenues.

*Operating Expenses*

| | Year ended December 31, | | | Change | |
| | 2017 | 2018 | | | |
| | Amount | Amount | | Amount | % |
|---|---|---|---|---|---|
| | *(Dollars in thousands)* | | | | |
| Operating expenses: | | | | | |
| Research and development | $ 17,672 | $ 21,363 | | $ 3,691 | 20.9% |
| Sales and marketing | 35,042 | 46,092 | | 11,050 | 31.5 |
| General and administrative | 4,608 | 6,022 | | 1,414 | 30.7 |
| Total operating expenses | $ 57,322 | $ 73,477 | | $ 16,155 | 28.2% |

Operating expenses increased by $16.1 million, or 28.2%, from $57.3 million in 2017 to $73.5 million in 2018. This increase was driven primarily by increases in sales and marketing expenses.

*Research and Development* . Research and development expenses increased by $3.7 million, or 20.8%, from $17.7 million in 2017 to $21.4 million in 2018. This increase was primarily attributable to an increase of $2.7 million in compensation expenses as we grew our research and development team from 114 at the end of 2017 to 152 at the end of 2018 in order to enhance and further develop our existing and new products. The increase was also partially attributable to an increase of $0.7 million in allocated overhead costs.

*Sales and Marketing.* Sales and marketing expenses increased by $11.1 million, or 31.5%, from $35.0 million in 2017 to $46.1 million in 2018. This increase was attributable to a $7.3 million increase in compensation expenses as we grew our sales and marketing organization from 128 at the end of 2017 to 166 at the end of 2018, a $1.5 million increased investment in marketing programs compared to 2017. The remainder of the increase is attributable to allocated overhead costs.

*General and Administrative* . General and administrative expenses increased by $1.4 million, or 30.6%, from $4.6 million in 2017 to $6.0 million in 2018. This increase was primarily attributable to an increase of

$0.6 million in compensation costs due to increase in headcount coupled with a $0.6 million increase in accounting and legal expenses including those that are associated with this offering .

### Financial Income (Loss), Net

| | Year ended December 31, | | | | | |
| | 2017 | | 2018 | | Change | |
| | Amount | | Amount | | Amount | % |
| | (Dollars in thousands) | | | | | |
| Financial income (loss), net | $ | 267 | $ | (1,047) | $ | (1,314) | (492.1)% |

Financial income (loss), net decreased from financial income of $0.3 million in 2017 to a financial loss, net of $1.0 million in 2018. The decrease was primarily due to a loss of $0.7 million due to exchange rate fluctuations in the foreign currencies against the U.S. dollar and a $0.3 million hedging instrument loss.

### Taxes on Income

| | Year ended December 31, | | | | | |
| | 2017 | | 2018 | | Change | |
| | Amount | | Amount | | Amount | % |
| | (Dollars in thousands) | | | | | |
| Taxes on income | $ | (797) | $ | (1,283) | $ | (486) | (61.0)% |

Taxes on income increased from a tax expense of $0.8 million in 2017 to a tax expense of $1.3 million in 2018. W e have established a full valuation allowance against potential future benefits for deferred tax assets including loss carryforwards generated in Israel. In the United States, we have recorded a deferred tax asset of $0.5 million and $0.7 million as of December 31, 2017 and 2018, respectively.

60

## Quarterly Results of Operations and Seasonality

The following tables present our unaudited condensed consolidated quarterly results of operations in dollars and as a percentage of revenues for the periods indicated. In the opinion of management, the financial information reflects all adjustments, consisting only of normal recurring adjustments, which we consider necessary for a fair presentation of this data. This information should be read in conjunction with our audited consolidated financial statements and related notes included elsewhere in this prospectus. The historical quarterly results presented are not necessarily indicative of the results that may be expected for any future quarters or periods.

| | Three months ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Mar 31, 2017 | June 30, 2017 | Sept 30, 2017 | Dec 31, 2017 | Mar 31, 2018 | June 30, 2018 | Sept 30, 2018 | Dec 31, 2018 |
| | *(in thousands)* | | | | | | | |
| **Revenues:** | | | | | | | | |
| Product | $ 5,250 | $ 5,799 | $ 5,970 | $ 13,836 | $ 8,422 | $ 8,308 | $ 8,723 | $ 17,101 |
| Maintenance and professional services | 7,069 | 7,021 | 9,150 | 10,445 | 9,478 | 10,214 | 10,615 | 12,120 |
| Total revenues | 12,319 | 12,820 | 15,120 | 24,281 | 17,900 | 18,522 | 19,338 | 29,221 |
| **Cost of revenues:** | | | | | | | | |
| Product | 554 | 389 | 326 | 433 | 657 | 344 | 462 | 861 |
| Maintenance and professional services | 1,452 | 1,854 | 1,991 | 2,481 | 2,575 | 2,526 | 2,829 | 3,182 |
| Total cost of revenues(1) | 2,006 | 2,243 | 2,317 | 2,914 | 3,232 | 2,870 | 3,291 | 4,043 |
| Gross profit | 10,313 | 10,577 | 12,803 | 21,367 | 14,668 | 15,652 | 16,047 | 25,178 |
| **Operating expenses:** | | | | | | | | |
| Research and development(1) | 3,991 | 4,636 | 4,157 | 4,888 | 4,670 | 5,004 | 5,284 | 6,405 |
| Sales and marketing(1) | 7,091 | 8,297 | 8,376 | 11,278 | 9,147 | 11,896 | 12,035 | 13,014 |
| General and administrative(1) | 852 | 1,314 | 1,071 | 1,371 | 1,097 | 1,201 | 1,432 | 2,292 |
| Total operating expenses | 11,934 | 14,247 | 13,604 | 17,537 | 14,914 | 18,101 | 18,751 | 21,711 |
| Operating profit (loss) | (1,621) | (3,670) | (801) | 3,830 | (246) | (2,449) | (2,704) | 3,467 |
| Financial income, net | 188 | (147) | 119 | 107 | (112) | (244) | (231) | (460) |
| Profit (loss) before taxes on income | (1,433) | (3,817) | (682) | 3,937 | (358) | (2,693) | (2,935) | 3,007 |
| Taxes on income | (148) | (181) | (118) | (350) | (368) | (366) | (343) | (206) |
| Net income (loss) | $ (1,581) | $ (3,998) | $ (800) | $ 3,587 | $ (726) | $ (3,059) | $ (3,278) | $ 2,801 |

(1) Includes share-based compensation expense as follows:

| | Three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2017 | June 30, 2017 | Sept 30, 2017 | Dec 31, 2017 | Mar 31, 2018 | June 30, 2018 | Sept 30, 2018 | Dec 31, 2018 |
| | *(in thousands)* | | | | | | | |
| Cost of revenues | 18 | 45 | 121 | 148 | 111 | 194 | 144 | 185 |
| Research and development | 50 | 361 | 108 | 141 | 91 | 225 | 193 | 222 |
| Sales and marketing | 104 | 235 | 184 | 242 | 167 | 350 | 456 | 485 |
| General administrative | 16 | 251 | 40 | 46 | 53 | 50 | 113 | 142 |
| Total share-based compensation expenses | 188 | 892 | 453 | 577 | 422 | 819 | 906 | 1,034 |

| | Three months ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Mar 31, 2017 | June 30, 2017 | Sept 30, 2017 | Dec 31, 2017 | Mar 31, 2018 | June 30, 2018 | Sept 30, 2018 | Dec 31, 2018 |
| | *(as a percentage of total revenue)* | | | | | | | |
| Revenues: | | | | | | | | |
| Product | 42.6 % | 45.2 % | 39.5 % | 57.0 % | 47.1 % | 44.9 % | 45.1 % | 58.5 % |
| Maintenance and professional services | 57.4 | 54.8 | 60.5 | 43.0 | 52.9 | 55.1 | 54.9 | 41.5 |
| Total revenues | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |
| Cost of revenues: | | | | | | | | |
| Product | 4.5 | 3.0 | 2.2 | 1.8 | 3.7 | 1.9 | 2.4 | 2.9 |
| Maintenance and professional services | 11.8 | 14.5 | 13.2 | 10.2 | 14.4 | 13.6 | 14.6 | 10.9 |
| Total cost of revenues | 16.3 | 17.5 | 15.4 | 12.0 | 18.1 | 15.5 | 17.0 | 13.8 |
| Gross profit | 83.7 | 82.5 | 84.7 | 88.0 | 81.9 | 84.5 | 83.0 | 86.2 |
| Operating expenses: | | | | | | | | |
| Research and development | 32.4 | 36.2 | 27.5 | 20.1 | 26.1 | 27.0 | 27.3 | 21.9 |
| Sales and marketing | 57.6 | 64.7 | 55.4 | 46.4 | 51.1 | 64.2 | 62.2 | 44.5 |
| General and administrative | 6.9 | 10.2 | 7.1 | 5.6 | 6.1 | 6.5 | 7.4 | 7.8 |
| Total operating expenses | 96.9 | 111.1 | 90.0 | 72.1 | 83.3 | 97.7 | 97.0 | 74.3 |
| Operating loss | (13.2) | (28.6) | (5.3) | 15.8 | (1.4) | (13.2) | (14.0) | 11.9 |
| Financial income, net | 1.5 | (1.1) | 0.8 | 0.4 | (0.6) | (1.3) | (1.2) | (1.6) |
| Profit (loss) before taxes on income | (11.6) | (29.8) | (4.5) | 16.2 | (2.0) | (14.5) | (15.2) | 10.3 |
| Taxes on income | (1.2) | (1.4) | (0.8) | (1.4) | (2.1) | (2.0) | (1.8) | (0.7) |
| Net income (loss) | (12.8)% | (31.2)% | (5.3)% | 14.8 % | (4.1)% | (16.5)% | (17.0)% | 9.6 % |

*Quarterly Revenue Trends.* Our quarterly revenues from product has increased year-over-year due to an increase in sales of licenses to new customers buying our network policy management solutions as well as upsell and expansion sales to our existing customers. Our quarterly revenues from maintenance and professional services has increased year-over-year due to an increase in maintenance and support services to new and existing customers. Our fourth quarter has historically been our strongest quarter for sales due to the purchasing pattern of our customers. We expect this trend to continue.

*Quarterly Gross Profit and Margin Trends.* Our quarterly gross profit increased year-over-year. Our fourth quarter gross profit and our gross margin has historically been our strongest, which is consistent with our quarterly revenue trends. This fluctuation is primarily due to higher revenues in the fourth quarter relative

to other quarters without a corresponding increase in the cost of products and maintenance and professional services costs.

*Quarterly Operating Expense Trends.* Our quarterly operating expenses increased year-over-year primarily due to the addition of personnel in connection with the expansion of our business. Our total operating expenses generally increase in the fourth quarter due to increased headcount and related compensation. Research and development expenses increased sequentially over the periods as we increased our headcount to support continued investment in our future products and services offerings. Sales and marketing expense increased over the periods as we incurred higher costs associated with commission expenses to sales people, personnel counts associated with increases in headcount and an increase in overhead allocations. General and administrative expense increased over the periods primarily due to an increase in personnel and an increase in accounting and legal expenses including those expenses associated with this offering.

## Liquidity and Capital Resources

Since 2015, we have primarily funded our operations through sales of our products and services. Prior to 2015, we funded our operations primarily through the sale of preferred shares and cash generated from operating activities.

As of December 31, 2018, we had $15.2 million of cash and cash equivalents. This compared with cash and cash equivalents of $14.7 million as of December 31, 2017. We believe that our existing cash and cash equivalents together with our cash from operating activities will be sufficient to fund our operations and capital expenditures for at least the next 12 months. Our future capital requirements will depend on many factors, including our rate of revenues growth, the expansion of our sales and marketing activities, the timing and extent of spending to support product development efforts and expansion into new geographic locations, the timing of introductions of new products and enhancements to existing products and the continuing market acceptance of our products and solutions.

### *Term Loan and Revolving Credit Line*

On August 4, 2015, we entered into a Loan and Security Agreement, consisting of a $2.0 million term loan facility and a $6.0 million revolving credit line facility, by and among Tufin Software Technologies Ltd., as Israeli borrower, Tufin Software North America, Inc., as U.S. borrower and Silicon Valley Bank, as lender.

On January 24, 2017, we modified the Loan and Security Agreement to extend the maturity date to January 23, 2018 and to increase the amount of the revolving credit line facility to $10.0 million (with a one-year term extension to January 2018). As of December 31, 2017, the balance outstanding under the term loan facility, accruing interest at a floating rate per annum equal to the prime rate (as defined in the Loan and Security Agreement, as modified) plus 2.75%, was $0.9 million, out of which $0.7 million was presented to be repaid in 2018, and $0.2 million were presented as a long-term loan to be repaid in 2019. As of December 31, 2017, our maximum borrowing capacity under the revolving credit line facility was approximately $10.0 million, and effective interest rates on the used credit line varied between 4.500% and 7.125% annually, based on meeting certain covenants set forth in the Loan and Security Agreement.

We subsequently modified the Loan and Security Agreement. Pursuant to the Loan and Security Agreement, as modified, we created two debentures in favor of Silicon Valley Bank, pursuant to which Silicon Valley Bank has a first ranking floating charge over all of our present and future assets (including Intellectual Property, as defined in the Loan and Security Agreement) and a first ranking fixed charge over our registered and unissued share capital, our reputation and goodwill, our Intellectual Property, Accounts (as defined in the Loan and Security Agreement), our right to receive funds from our customers, other fixed assets and tax benefits.

On September 27, 2018, we amended and restated Loan and Security Agreement. The Loan and Security Agreement, as amended and restated, provides for customary representations, warranties, affirmative and negative covenants and events of default. In addition, at the end of each calendar year, we have undertaken under the Loan and Security Agreement, as amended and restated, to create a first

ranking fixed charge over each account existing at such time which advances are or have been made, our right to receive funds from our customers, our intellectual property and equipment, and a first ranking fixed charge over our equity holdings in the shares of Tufin Software Europe Limited.

As of December 31, 2018, the balance outstanding under the term loan facility, accruing interest at a floating rate per annum equal to the prime rate (as defined in the Loan and Security Agreement, as amended and restated) plus 2.75%, was $0.2 million, all of which has presented as credit to be repaid in 2019.

As of December 31, 2018, our maximum borrowing capacity under the revolving credit line facility was approximately $15.0 million. Borrowings under the revolving credit line facility bear interest at a rate varying between floating per annum rate equal to the prime rate (as defined in the Loan and Security Agreement, as amended and restated) plus 1.25% , provided that we meet certain covenants set forth in the Loan and Security Agreement, as amended and restated. The revolving credit line facility matures on September 27, 2019. As of December 31, 2018, we had no outstanding borrowings on our revolving credit line facility.

### Net Cash Provided by (Used in) Operating Activities

Cash provided by operating activities was $4.6 million for the year ended December 31, 2018. This was primarily due to an increased net loss of $4.3 million adjusted by non-cash charges of $4.5 million, primarily relating to depreciation of property and equipment and compensation related to options granted to our employees, and an increase of $4.4 million in our net operating assets and liabilities. The increase in net operating assets and liabilities was primarily due to (i) a $7.5 million increase in deferred revenues representing unearned amounts resulting primarily from increased maintenance and support sales, and (ii) a $5.5 million increase in trade payables, other payables and accrued payroll due to timing of payments, partially offset by (i) a $3.9 million increase in prepaid expenses and other current assets, (ii) a $3.3 million increase in accounts receivables, and (iii) a $1.4 million increase in deferred costs due to deferral of sales commissions as a result of increased sales.

Cash used in operating activities of $0.4 million for the year ended December 31, 2017, was primarily due to a net loss of $2.8 million adjusted by non-cash charges of $2.5 million, primarily relating to depreciation of property and equipment and compensation related to options granted to our employees, and a net decrease of $0.1 million in our net operating assets and liabilities. The decrease in net operating assets and liabilities was primarily due to (i) a $7.4 million increase in accounts receivables as a result of increased sales, (ii) a $0.9 million increase in deferred taxes and other non-current assets primarily related to deferred taxes, (iii) a $0.4 million increase in deferred costs due to deferral of sales commissions, and (iv) a $0.3 million increase in trade payables and other payables resulting from timing of payments, partially offset by (i) a $5.5 million increase in deferred revenues resulting primarily from increased maintenance and support sales, and (ii) a $3.4 million increase in accrued payroll.

### Net Cash Provided by (Used in) Investing Activities

Net cash used in investing activities was $1.6 million in 2018. Net cash used in investing activities was $0.8 million in 2017. Investing activities have consisted primarily of purchases of property and equipment.

### Net Cash Provided by (Used in) Financing Activities

Net cash used in financing activities was $0.6 million in 2018, consisting of $0.7 million for the repayment of a long-term loan and $0.1 million relating to deferred offering costs partially offset by $0.2 million in proceeds from the exercise of employee share options. Net cash used in financing activities was $0.3 million in 2017, consisting of $0.7 million for the repayment of a long-term loan partially offset by $0.4 million in proceeds from the exercise of employee share options. We expect the completion of this offering to result in a material increase in net cash provided by financing activities.

## Contractual Obligations

The following summarizes our contractual obligations as of December 31, 2018:

| | Total | | Less Than 1 Year | | 1 – 3 Years | | 4 – 5 Years | | More Than 5 Years |
|---|---|---|---|---|---|---|---|---|---|
| | *(U.S. $ in thousands)* | | | | | | | | |
| Operating lease obligations(1) | $ | 21,444 | $ | 1,457 | $ | 7,459 | $ | 4,258 | $ | 8,270 |
| Term loan facility—principal(2) | | 222 | | 222 | | — | | — | | — |
| Term loan facility—interest(3) | | 4 | | 4 | | — | | — | | — |
| Revolving line of credit(4) | | 38 | | 38 | | — | | — | | — |
| Total | $ | 21,706 | $ | 1,721 | $ | 7,459 | $ | 4,258 | $ | 8,270 |

(1) Operating lease obligations consist of contractual lease expenses under our operating leases. In 2019, we entered into a long-term lease agreement for additional office and parking space in Tel Aviv, Israel until January 31, 2029 with an option to extend until January 31, 2034. We granted an additional lien to a financial institution to secure the lease agreement. The lease agreement provides for future lease payments of $34,000 in 2019, $815,000 in each of 2020, 2021 and 2022 and $5.0 million in 2023 and thereafter.
(2) Represents outstanding principal on our term loan facility with Silicon Valley Bank.
(3) Represents interest on our term loan facility with Silicon Valley Bank.
(4) Represents fees on our revolving credit line facility with Silicon Valley Bank, all of which remains undrawn.

## Application of Critical Accounting Policies and Estimates

Our consolidated financial statements have been prepared in accordance with GAAP. The preparation of these consolidated financial statements requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, expenses, and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe are reasonable under the circumstances. We evaluate our estimates and assumptions on an ongoing basis. Actual results may differ from these estimates. To the extent that there are material differences between these estimates and our actual results, our future financial statements will be affected.

The critical accounting policies requiring estimates, assumptions, and judgments that we believe have the most significant impact on our consolidated financial statements are described below.

### *Revenue Recognition*

Effective January 1, 2017, we elected to early adopt Accounting Standards Codification 606, *Revenue from Contracts with Customers* , or ASC 606, on a modified retrospective basis. The revenue recognition accounting policies and estimates described below reflect the adoption of ASC 606. For additional information on our adoption of ASC 606, see Note 2 to our consolidated financial statements included elsewhere in this prospectus. We determine the appropriate revenue recognition for our contracts with customers by analyzing the type, terms and conditions of each contract. We classify the revenue components as products according to the attributes of the underlying components.

We sell our on-premises software licenses through both perpetual and, to a lesser extent, term-based license agreements. Our products offer the same functionality whether our customers receive them through a perpetual or term-based license. We deliver our software licenses electronically. Electronic delivery occurs when we provide the channel partner or customer with access to our software and license key via a secure portal. We generally recognize revenues from on-premises software licenses upfront when we make the software available to the channel partner or, if we are selling directly, customer. We recognize hardware sales upon delivery.

We generally recognize revenues from software sold through term-based license agreements upfront, upon delivery to the channel partner or, if we are selling directly, customer. We defer the associated maintenance revenues and recognize them over the contract period. Assuming we expect to recover the costs, we capitalize all incremental costs we incur to obtain a contract with a customer that we would not have incurred if we had not obtained the contract. We include amortization expense in sales and

marketing expenses in our consolidated statements of operations. We amortize costs incurred in obtaining a contract as a sales and marketing expense on a straight-line basis over the expected period of benefit. We periodically review these costs for impairment.

Our contract payment terms typically range between 30 and 120 days. We assess collectability based on several factors, including collection history.

Our contracts with customers for software licenses include maintenance and may also include training and/or professional services. Maintenance consists of fees for providing software updates and technical support for our products for a specified term. We recognize maintenance revenues ratably over the contractual service period. We bill for professional services on a fixed fee basis and recognize revenues as we perform the services. We defer payments received in advance of services performed and recognize such payments when we perform the related services.

In contracts with multiple performance obligations, we account for individual performance obligations separately if they are distinct. We allocate the transaction price to each performance obligation based on its relative standalone selling price out of the total consideration of the contract. For maintenance and support contracts, we determine the standalone selling price based on the price at which we separately sell a renewal contract. We determine the standalone selling price for sales of licenses using the residual approach. For professional services, we determine the standalone selling prices based on the price at which we separately sell those services.

### *Share-Based Compensation*

We measure and recognize share-based compensation expense in our consolidated financial statements based on the grant date fair value of the award. We recognize the grant date fair value of the award as an expense based on the straight-line method over the requisite service periods in our consolidated statements of operations.

We estimate the grant date fair value of a share option using the Black-Scholes option-pricing model. Our use of the Black-Scholes option-pricing model requires the input of highly subjective assumptions, including estimated fair value of our ordinary share price, expected share price volatility and expected term. Any changes in these highly subjective assumptions would significantly impact our share-based compensation expense.

We estimate the fair value of options granted to employees and non-employees at the date of grant using the following assumptions:

- *Risk-Free Interest Rate* . We base the risk-free interest rate on the implied yield on currently available U.S. treasury zero-coupon securities with a remaining term equal to the expected life of our options.

- *Dividend Yield* . We base dividend yield on our historical experience and expectation of no future dividend payouts. We have historically not paid cash dividends and have no foreseeable plans to pay cash dividends in the future.

- *Expected Volatility* . We base expected share price volatility on the historical volatility of the ordinary shares of comparable companies that are publicly traded.

- *Expected Term* . The expected term of options granted represents the period of time that options granted are expected to be outstanding. We estimate the fair value of our ordinary shares underlying our share-based awards using the income approach.

66

The following table summarizes the assumptions used in the Black-Scholes option-pricing model to determine the fair value of our options:

|  | Year ended December 31 | |
| --- | --- | --- |
|  | 2017 | 2018 |
| Risk-free interest rate | 2.08%-2.21% | 2.68%-3.03% |
| Expected volatility | 70% | 65%-66% |
| Expected term (in years) | 6-11 | 6 |
| Dividend yield | 0% | 0% |

### *Ordinary Share Valuation*

Our board of directors determined the fair value of the ordinary shares underlying our share options with the assistance of a third-party specialist and in accordance with the guidelines outlined in the American Institute of Certified Public Accountants Practice Aid, *Valuation of Privately-Held-Company Equity Securities Issued as Compensation* . In the absence of a public trading market, we exercised significant judgment and considered numerous objective and subjective factors to determine the fair value of our ordinary shares as of the date of each option grant, including the following factors:

- valuations performed by third-party valuation firms;

- the prices, rights, preferences and privileges of our convertible preferred shares relative to those of our ordinary shares;

- the lack of marketability of our ordinary shares

- our actual operating and financial performance;

- current business conditions and projections;

- our history and the timing of the introduction of new products and services;

- our stage of development;

- the likelihood of achieving a liquidity event, such as an initial public offering or merger or acquisition of our business given prevailing market conditions;

- the market performance of comparable publicly-traded companies; and

- U.S. and global capital market conditions.

In valuing our ordinary shares, a hybrid of the probability-weighted expected method, or PWERM, and an Option Pricing Method, or OPM, was utilized. The PWERM involves the estimation of the value of our company (the Equity Value) under future potential outcomes and estimates the probability of each outcome. The per share value of our ordinary shares determined using the PWERM is ultimately based upon probability-weighted per share values resulting from potential future scenarios - in our case: an initial public offering scenario and a non-IPO scenario.

The Equity Value in the IPO scenario was allocated to each of our shares on as converted basis, and discounted to present value equivalent using our estimated cost of equity.

In order to estimate the Equity Value in the non-IPO scenario, we first determined the fair value of our business, or Enterprise Value, using the income approach, which requires significant assumptions and judgments. The income approach estimates the fair value of our business based on the present value of our future estimated cash flows. These future cash flows are discounted to their present value equivalent using a rate of return that reflects the risks inherent in our achieving these estimated cash flows, as well

as the time value of money. The Enterprise Value was then adjusted to net financial assets (in our case, cash and cash equivalents) in order to determine the Equity Value.

The resulting Equity Value in the non-IPO scenario was allocated to our various share classes using the OPM to determine the value of the securities compromising our share capital in the aforementioned scenarios.

After we allocated the Equity Value in each of the IPO and non-IPO scenarios to the various classes of shares, we applied a discount for lack of marketability, or DLOM, to arrive at the fair value of our ordinary shares in each of the above scenarios. A DLOM is intended to account for the lack of marketability of shares that are not traded on public exchanges based on the theory that as a private company, an owner of the shares has limited opportunities to sell the shares and any such sale would involve more significant transaction costs, thereby reducing overall fair market value.

Once we are operating as a public company, we will rely on the closing price of our ordinary shares are reported by the NYSE on the date of grant to determine the fair value of our ordinary shares.

Based on the assumed initial public offering price of $13.00 per share, which is the midpoint of the price range set forth on the cover page of this prospectus, the aggregate intrinsic value of our outstanding share-based awards as of March 31, 2019 was $76.0 million, of which $47.7 million related to vested awards and $28.3 million related to unvested awards.

***Income Taxes***

We account for income taxes using the asset and liability approach, which requires the recognition of taxes payable or refundable for the current year and the deferred tax liabilities and assets for the future tax consequences of events that we have recognized in our financial statements or tax returns.

We measure current and deferred tax liabilities and assets based on provisions of the relevant tax law. We reduce the measurement of deferred tax assets, if necessary, by the amount of any tax benefits that we do not expect to realize. We classify interest and penalties relating to uncertain tax positions within taxes on income.

***Accounts Receivable***

We present accounts receivable in our consolidated balance sheets net of allowance for doubtful accounts. We estimate the collectability of accounts receivable balances and adjust its allowance for doubtful accounts based on past write-offs and collections, current credit conditions and the age of the balances. We evaluate a number of factors to assess collectability, including an evaluation of the creditworthiness of the specific customer, past due amounts, payment history, and current economic conditions. When revenue recognition criteria are not met for a sale transaction that has been billed, we do not recognize deferred revenues on our balance sheet or the related account receivable.

***Derivative Instruments***

We carry out transactions involving foreign currency exchange derivative financial instruments. These transactions are designed to hedge our exposure in currencies other than the U.S. dollar, and are not designated as an accounting hedge. We are primarily exposed to foreign exchange risk with respect to recognized assets and liabilities and anticipated transactions denominated in the NIS, Euro and British Pound, including payroll expenses.

## Off-Balance Sheet Arrangements

We do not currently engage in off-balance sheet financing arrangements. In addition, we do not have any interest in entities referred to as variable interest entities, which includes special purposes entities and other structured finance entities.

## Quantitative and Qualitative Disclosures about Market Risk

We are exposed to market risk in the ordinary course of our business. Market risk represents the risk of loss that may impact our financial position due to adverse changes in financial market prices and rates. Our market risk is primarily a result of fluctuations in foreign currency exchange rates.

### Foreign Currency Exchange Risk

We generate substantially all of our revenues in U.S. dollars. The majority of our operating expenses is incurred in foreign currencies, and is subject to fluctuations due to changes in foreign currency exchange rates, particularly changes in the NIS, the Euro and, to a lesser extent, the British Pound.

Our statements of operations and cash flows could be adversely affected in the future due to changes in foreign exchange rates. For example, an immediate 10% decrease or increase in the relative value of the U.S. dollar to the NIS would result in a $3.1 million loss or gain on our consolidated statements of operations and cash flows.

We have entered into forward contracts with major banks to protect against foreign currency exchange risks resulting from expenses paid in NIS during the year. See Note 10 to our consolidated financial statements under "Hedging Activities" for more information.

### Interest Rate Sensitivity

Our exposure to market risk for changes in interest rates relates primarily to our cash and cash equivalents and our outstanding debt obligations. Our primary exposure to market risk is interest income sensitivity, which is affected by changes in the general level of the interest rates in Europe, Israel and the United States. However, because of the short-term nature of the instruments in our portfolio, a sudden change in market interest rates would not be expected to have a material impact on our consolidated financial statements.

Our total indebtedness, including borrowings on our term loan facility and revolving credit line facility, is $0.2 million as of December 31, 2018. Our exposure to interest rates relates to the change in the amounts of interest we must pay on our borrowings, which bear variable rates of interest. The effect of a hypothetical 100 basis point change in our interest rate would not have a material impact on our interest expense in our consolidated financial statements.

## New and Revised Financial Accounting Standards

Under the JOBS Act, we meet the definition of an "emerging growth company." As such, we may avail ourselves of an extended transition period for complying with new or revised accounting standards. However, we have chosen to "opt out" of such extended transition period, and as a result, we will comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. Our decision to opt out of the extended transition period for complying with new or revised accounting standards is irrevocable.

## Recent Accounting Pronouncements

See Note 2 to our consolidated financial statements "Significant Accounting Policies—Recently issued accounting standards" for more information.

# BUSINESS

## Overview

We are pioneering a policy-centric approach to security and IT operations. We transform enterprises' security operations by helping them visualize, define and enforce a unified security policy across complex, heterogeneous IT and cloud environments. Our products govern how individuals, systems and applications are permitted to communicate and provide policy-based security automation, enabling customers to reduce the time to implement complex network changes from days to minutes. Our solutions increase business agility, eliminate errors from manual processes and ensure continuous compliance through a single console. Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000.

Cybersecurity is critical for enterprises of all sizes. As enterprises embrace digital transformation and adopt new technologies such as cloud-based services, software-defined networks, microservices and containers, the IT and cloud environments become increasingly complex and vulnerable to attack. In response to the heightened threat environment, lack of a defined network perimeter and a constantly changing attack surface, enterprises continue to implement additional firewalls, endpoint security, identity and access management and other security solutions. However, we believe most enterprises lack effective and comprehensive security policy management . For example, e nterprises often rely on their in-house network and security teams to manually process change requests, which increases the risk of human error and cybersecurity vulnerabilities and delays the pace of application releases. This results in a trade-off between the necessary security posture and business requirements for speed, agility and innovation.

We believe a new approach to enterprise security is necessary: a data-driven framework centered on policy management and operationalized through policy-based automation, enhancing compliance and security while improving operational efficiency. To address this need, we have developed highly differentiated technology with four main pillars:

- *Policy-centric approach* . We enable enterprises to visualize, define and enforce a unified security policy that acts as the foundation of governance and control, replacing ad-hoc configurations across fragmented networks.

- *Automation of network changes* . We automate the network change process across complex, heterogeneous environments, increasing business agility, enabling faster application deployment and reducing human error.

- *Data-driven* . Our approach draws data from across a customer's IT and cloud environments, providing insights on connectivity and end-to-end visibility across the network.

- *Open and extensible framework* . Our open solutions serve as a centralized control layer for our customers' networks and can connect to a wide range of third-party technologies through APIs.

We offer five products that comprise the Tufin Orchestration Suite: SecureTrack, SecureChange, SecureApp and, most recently, Orca and Iris. SecureTrack, SecureChange and SecureApp enable enterprises to visualize, define and enforce their security policy across heterogeneous networks, both on premise and in the cloud. SecureTrack serves as the foundation of SecureChange and SecureApp. SecureTrack provides visibility across the network and helps organizations define a unified security policy and maintain compliance. SecureChange provides customers with the ability to automate changes across the network while maintaining compliance with policy and security standards. SecureApp provides application connectivity management and streamlines communication between application developers and network engineers. Our newest products, Orca and Iris, provide cloud-based security automation solutions in response to the growth of containers and cloud-native environments.

Our comprehensive security policy management solutions rely on a set of proprietary technologies that provide a high level of security, scalability and performance. Our core technologies, which serve as the foundation of both our network and cloud-based products, include analysis engines, a provisioning engine, API integrations and infrastructure technology. For example, one of our analysis engines, our topology intelligence engine, uses network routing algorithms to calculate the paths between different points on the network and provides our customers with a graphic display of devices and data flows. Another analysis engine, our sophisticated policy analysis engine, calculates the expected connectivity and access behavior of network devices and cloud platforms. Our automated change provisioning engine automatically implements policy changes approved by security administrators.

We believe enterprises choose us for our customer-first approach, continuing innovation and integrations with key technology leaders. Our customers include leading enterprises across a broad range of geographies in a diverse set of industries, including financial services, telecommunications, automotive, manufacturing, energy, healthcare and pharmaceuticals, technology, government, retail and business services. We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners. Our channel partners include distributors and resellers, as well as service delivery partners that help customers successfully deploy, configure, customize and maintain our products and services. We believe our hybrid sales model helps us maintain strong customer relationships and effectively acquire new customers.

We have experienced strong growth. For the years ended December 31, 2017 and 2018, our revenues were $64.5 million and $85.0 million , respectively, representing year-over-year growth of 31.7% . For the years ended December 31, 2017 and 2018, our net loss was $2.8 million and $4.3 million , respectively.

## Industry Background

Enterprises increasingly focus on cybersecurity. In response to the heightened threat environment, lack of a defined network perimeter and a constantly changing attack surface, enterprises continue to implement additional firewalls, endpoint security, identity and access management and other security solutions. Nevertheless, cyberattackers can exploit a growing attack surface that lacks a defined network perimeter, is subject to constant change and is exposed to vulnerabilities exacerbated by human error and manual business processes.

We believe the majority of enterprises lack effective and comprehensive security policy management, which is critical to controlling security policy changes. Effective security policy governs how individuals, systems and applications communicate. Current solutions lack a comprehensive security policy and rely on network change processes that are manual, error prone and take days to implement. Enterprises that lack a comprehensive security policy are facing challenges in balancing the necessary security and risk posture with their business requirements, leaving security, network and compliance professionals overwhelmed.

Several industry trends contribute to operational challenges in managing risk, as set forth below:

- ***Increasing frequency and sophistication of cyberattacks.*** Enterprises worldwide are under constant security threat from both external cyberattackers and malicious insiders in search of sensitive information and vital systems. Cyberattackers are increasingly able to breach networks and locate and steal sensitive enterprise data. As a result, numerous enterprise boards are prioritizing and reshaping their cybersecurity approaches.

- ***Growing complexity of software-defined networks*** . Enterprises have been undergoing a digital transformation. They are rapidly shifting on-premise workloads to cloud environments to meet the changing demands of their markets and customers. To keep pace with this transformation, enterprises design scalable and flexible workloads and connections, which increase network complexity and the velocity of changes. The rise of technologies such as microservices and containers introduces additional complexity. The growing use of these dynamic technologies has

71

raised business expectations on agility and increased the need for a unified security approach across networks and applications.

- ***Accelerating pace of application development and deployment*** . The accelerating pace of business and technological developments requires numerous and continuous application and infrastructure changes. The rise of the DevOps model, which is a set of software development practices that allows applications and features to be rapidly developed and deployed, has led to increased release velocity. Enterprises that use manual change processes struggle to keep pace and lack policy consistency, resulting in an ever-growing backlog of changes, delayed software releases and heightened security exposure.

- ***Evolving regulatory and compliance requirements*** . Global enterprises need to maintain compliance with a new wave of government regulations, corporate security policies and industry standards related to privacy and cybersecurity. Examples of such regulations include PCI-DSS, the Sarbanes-Oxley Act, NERC-CIP, GDPR, the NIST Cybersecurity Framework and HIPAA. Manual changes to network policy are difficult to track and are more likely to be non-compliant. As a result, enterprises seek cost-efficient security solutions to meet compliance requirements.

- ***Legacy security approaches can no longer address cybersecurity threats in the ever-changing IT and cloud environments*** . Traditional security policy management approaches address governance and control, but lack critical characteristics such as a unified security policy, automation, scalability, end-to-end visibility and extensibility. We believe a new approach to enterprise security is necessary: a data-driven framework centered on policy management and operationalized through automation.

## Benefits of Our Solutions

Our solutions enable our customers to visualize, define and enforce a security policy that dictates how users, systems and different organizational functions across the enterprise should be allowed to communicate. We automate our customers' security policy management, allowing them to accelerate application deployment time without introducing non-compliant changes that could lead to vulnerabilities, and giving better visibility and control over all of their IT and cloud environments. This approach drives business agility and cost reduction while facilitating continuous compliance across hybrid, multi-vendor, multi-platform and heterogeneous environments. Our customers use our products to:

- ***Accelerate business agility through end-to-end automation of security changes*** . Our automated solutions allow our customers to implement application changes onto their networks in minutes, not days. Our solutions accelerate security management processes, increase operational efficiency and reduce the traditional lag between software development and revenue-generating deployment. Increased efficiency frees up valuable IT resources to focus on higher-value tasks, all while remaining secure and compliant.

- ***Reduce security risk through adoption of a unified security policy and continuous compliance*** . We enable enterprises to create a unified security policy that acts as the foundation of their security decision making. Effective security policy governs how individuals, systems and applications communicate. A well-defined security policy forms the basis of our automation capabilities, guiding the change implementation logic and ensuring continuous compliance with corporate security policies, government regulations and industry standards.

- ***Navigate the complexity of hybrid and fragmented networks with a centralized control layer*** . We offer a centralized security management layer that analyzes, defines and implements enterprise-specific security policies. Our network abstraction layer allows for the automation of security changes across the network, including firewalls, traditional networks, public and private cloud environments, microservices and containers. Our solutions act as an independent third-party management layer, extending the security policy to every corner of the network, even as it grows, changes and adapts to new business demands and cybersecurity threats.

- ***Enhance visibility and control*** . Our solutions provide customers with complete visibility over their IT and cloud environments, and enable them to quickly view changes and their impact on security posture prior to deployment. Our solutions monitor, collect and record configuration changes across the enterprise. They verify the adherence of these changes to the unified security policy, helping customers visualize any resulting compliance gaps or related vulnerabilities. We use topology intelligence to map out resources and connections, even across fragmented, complex environments. Enterprises can use our products to centrally manage and enforce their security policy with significant improvements in speed and ease-of-use through a multi-environment, 'single pane of glass' interface to ensure compliance and control.

## Our Market Opportunity

We believe the majority of enterprises lack effective and comprehensive security policy management, which is critical to controlling network change. As digital transformation creates more complexity within IT and cloud environments, we believe our policy-centric, automated solutions will garner a growing share of enterprise security spend. Gartner estimated that worldwide spending on information security products and services will reach more than $133 billion in 2019. In addition, 451 Research LLC's VotE Information Security: Workloads and Key Projects 2018 study, covering 550 organizations of different sizes across 10 industry verticals, found that 83% of the companies surveyed did not have security automation and orchestration technologies in place, but 54% of those companies planned to deploy such technologies within the next 24 months. We believe increased security spending and adoption of security automation and orchestration technologies represent a significant opportunity for us.

We also believe our policy management and automation solutions overlap with several markets defined by IDC. IDC has estimated that:

- the market for IT operations management, which improves user access to applications, business services and data sources on diverse platforms, will grow from $8.9 billion in 2018 to $11.7 billion by 2022, according to its *Worldwide IT Operations Management Software Forecast for 2018-2022;*

- the market for IT automation and configuration management, which supports DevOps automation and orchestration, digital enterprises, hybrid cloud architectures and microservices-based applications, will grow from $6.7 billion in 2018 to $8.4 billion in 2022, according to its *Worldwide IT Automation and Configuration Management Software Forecast for 2018-2022;*

- the market for policy and compliance (a sub-segment of security and vulnerability management), which enables enterprises to create, measure and report on security policy and regulatory compliance, will grow from $2.0 billion in 2018 to $3.1 billion in 2022, according to its *Worldwide Security and Vulnerability Management Forecast for 2018-2022* ; and

- the market for vulnerability assessment (a sub-segment of security and vulnerability management), which scans networks and applications for security vulnerabilities, will grow from $2.2 billion in 2018 to $3.7 billion by 2022, according to its *Worldwide Security and Vulnerability Management Forecast for 2018-2022* .

We believe that our solutions will attract a meaningful portion of these markets, resulting in a multi-billion dollar addressable market. As we continue to innovate and introduce new products, the use cases for our solutions will expand, which we expect will lead to incremental growth in our addressable market opportunity.

We believe our policy management and automation functionalities define a new market, and we are not aware of any third-party research that accurately defines the scope of our directly addressable opportunity. As such, we estimated the market size using third-party data and, when third-party data was not available, internal estimates. We segment enterprises based on estimates of their network infrastructure size and their need for our solutions across their networks, and apply an average annual billings figure per segment based on an estimated prior five years of inventory, resulting in an estimated

73

directly addressable market of $10.3 billion, which includes on-premise firewalls, private cloud and public cloud orchestration segments, for the fiscal year ending December 31, 2019.

## Our Competitive Strengths

We believe we have several competitive advantages, including:

- *Pioneer in security policy management* . We are a pioneer in the security policy management market. We believe we were the first company to introduce security policy automation solutions with SecureChange and SecureApp, and we believe our position as a market leader reinforces our brand and supports our position as one of the most prominent players in an increasingly important segment.

- *Advanced technology and ongoing innovation* . We have over a decade of experience and believe our ability to innovate is the cornerstone of our position as a technology leader. Our comprehensive security policy management solutions rely on a set of proprietary technologies that provide a high level of security, scalability and performance. Our core technologies, which serve as the foundation of both our network and cloud-based products, include analysis engines, a provisioning engine, API integrations and infrastructure technology. We are continuously improving our portfolio to create solutions that provide both agility and security for our customers, through policy-driven automation. We announced our latest product offerings, Orca and Iris, in April 2018 and November 2018, respectively. Unlike traditional security tools, Orca and Iris provide automated, policy-based security analysis in cloud-native environments, which helps enterprises develop unified, multi-cloud policies.

- *Scalable, extensible enterprise-grade solutions* . Our solutions scale up to the largest enterprises with thousands of network devices (e.g., firewalls and routers) through their distributed architecture and high availability offering. Our extensible API framework allows our customized solutions to interface with most IT management frameworks and systems, and is used by customers, partners and our professional services team who develop scripts and extensions on top of the Tufin Orchestration Suite.

- *Customer-first approach* . Customer success has always been our priority. Since our inception, we have built a strong, customer-first approach and developed a powerful array of products and solutions to meet our customers' needs and expectations. Our premium support services are available at all times to ensure that customers' problems are addressed quickly. We have a dedicated customer success team, which focuses on ensuring high customer satisfaction while driving customer loyalty and increased sales. As customer satisfaction is vital to us, we are continually improving our products and services to further solidify our customer relationships and trust. As a result, we have a long-term, loyal base of customers.

- *Automation-driven return on investment* . Enterprises quickly realize value upon deployment of our solutions. Our policy-driven automation allows customers to implement accurate and compliant network changes within minutes rather than days, allowing them to introduce new business applications faster and redeploy IT resources into higher-value projects. This also allows enterprises to accelerate development and deployment of revenue-generating applications, further increasing their return on investment.

## Our Growth Strategy

We intend to execute on the following growth strategies:

- *Acquire new Global 2000 customers and mid-market customers* . Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000. Revenue generated from our Global 2000 customers, excluding maintenance renewals, represented an average of 65% of our total revenue over the fiscal years ended December 31, 2016 to 2018. We believe we have a significant growth opportunity with Global 2000 customers that currently lack a security policy management solution or that use a competing product that lacks automation. We identified opportunities in key verticals such as the

74

federal government and plan to expand to several key geographic regions. We also continue to pursue mid-market accounts with increasing need for security policy management solutions. We plan to grow our direct sales team and develop our inside sales platform to pursue the large pool of mid-market accounts.

- ***Expand within our customer base through new use cases and larger deployments*** . We aim to drive policy management and automation across the entire enterprise to help our customers fully benefit from our solutions. Customers often contract with us for a portion of their IT and cloud environments or begin only with SecureTrack. Over time, customers often expand their network coverage or recognize the benefits of automated policy changes at the network and application levels and adopt our SecureChange and SecureApp solutions. Most recently, customers moving applications to the cloud have demonstrated interest in Orca and Iris. We believe there is significant runway within our current customer base, as we currently cover approximately 15% of the Global 2000, and approximately half of our Global 2000 customers currently use SecureChange or SecureApp.

- ***Extend security product leadership with innovative new products*** . We will continue to innovate in ways that enable frictionless collaboration between business and infrastructure teams. We intend to invest further in the Tufin Orchestration Suite to extend its functionality and features. We believe this will enhance our ability to generate revenue within our existing customer base and pursue new opportunities. We will also continue to introduce new products to broaden our appeal to customers and stay ahead of the market. In April 2018, we launched Orca, a cloud-based solution that enables users to extend our policy-based approach to secure microservices and containers. In November 2018, we launched Iris, a cloud-based application-centric solution that enables security policy management across cloud platforms. We plan to deploy additional cloud-based subscription products over time, to enable more customers to consume our products beyond our existing on-premise solutions.

- ***Grow and cultivate our security partner ecosystem*** . We have built an extensive global channel partner ecosystem that extends our geographic coverage, drives awareness of our brand and accelerates usage and adoption of our products. We have also formed alliances with technology partners in the network security, security operations, incident response, vulnerability management and security compliance sectors. In April 2018, we launched our technology alliance partner program, which is an ecosystem of technology partners who build certified integrations to our platform in order to expand our common use cases. We believe our partners contribute thought leadership and accelerated sales.

- ***Democratize policy management across functions*** . Our customers continue to find new use cases for our policy management and automation products. For example, as enterprises continue to implement DevOps teams and practices, we believe they will need to introduce security measures earlier in the application development and deployment lifecycle. We designed Orca to address this with cloud-based security automation for microservices and containers. Orca moves security earlier into the continuous integration and continuous deployment, or CI/CD, pipeline by leveraging a centralized policy engine. We envision additional use cases and revenue opportunities will be unlocked as we build out the commercial ecosystem around Orca.

## Our Products

Security and IT operations management has become an increasingly resource-intensive and high-risk task for enterprises. The accelerating pace of business and technological developments require numerous application and infrastructure changes, and enterprise networks are becoming increasingly complex. E nterprises often rely on their in-house network and security teams to manually process change requests, which increases the risk of human error and cybersecurity vulnerabilities and delays the pace of application releases.

Enterprises use our security policy management products to create a unified security policy and give them the ability to implement accurate network changes in minutes instead of days while improving their security posture and business agility. We offer five products that comprise the Tufin Orchestration Suite: SecureTrack, SecureChange, SecureApp and, most recently, Orca and Iris. SecureTrack, SecureChange and SecureApp enable enterprises to unify, visualize and control their security policy across heterogeneous networks, both on premise and in the cloud, while Orca and Iris provide visibility and security policy solutions for provisioned and cloud-native environments.



### Security Policy Automation for the Extended Enterprise

The Tufin Orchestration Suite provides a policy-centric solution for automatically designing, provisioning, analyzing and auditing enterprise security changes. From applications to firewalls, our products provide advanced automation capabilities to increase business agility, eliminate errors stemming from manual processes and ensure continuous compliance through a single interface. Our unified security policy empowers network and IT security teams to effectively safeguard complex, heterogeneous environments through a central security policy, which can be applied over all of their IT and cloud environments and across different platforms.

The majority of our customers initially purchase SecureTrack to monitor a portion of their networks. Initial product deployments frequently expand across networks, departments, divisions and geographies in response to a need for an enterprise-wide approach for security policy management, as well as the need to automate the network change process. Our "land and expand" sales strategy capitalizes on this potential. As we expanded our portfolio of solutions within the Tufin Orchestration Suite, customers have increasingly purchased SecureChange and SecureApp on top of their initial transactions.

*SecureTrack* . Enterprises use SecureTrack to understand their enterprise security infrastructure and manage a wide range of devices from a central console. SecureTrack enables security administrators to define and manage a centralized security policy, minimize the attack surface and ensure continuous compliance across the network. SecureTrack also provides a foundation of our customers to use SecureChange and SecureApp, and delivers the following key benefits:

- *Policy definition* . SecureTrack includes our unified security policy, which visualizes, defines and enforces a zone-to-zone segmentation policy that dictates how users, systems and applications can communicate across the entire enterprise. Our unified security policy serves as the security policy framework for the entire Tufin Orchestration Suite.

76

- *Security and compliance* . SecureTrack provides monitoring, assessment and alerts on security and compliance risk, ensuring real-time accountability, transparency and consistency with the unified security policy. It also generates a variety of configurable audit reports that support regulatory compliance standards.

- *Visibility* . SecureTrack builds a dynamic topology map of network connectivity across the enterprise and the cloud. It also provides real-time visibility into all security policy configurations and changes. This visibility enables security teams to efficiently manage configuration changes, troubleshoot problems and prepare for audits.

*SecureChange* . SecureChange is the change management and automation component of the Tufin Orchestration Suite. Enterprises use SecureChange to quickly and accurately assess, provision and verify security configuration changes across physical networks and cloud platforms, while maintaining security and compliance. SecureChange delivers the following key benefits:

- *Business agility* . SecureChange increases business agility through security change automation. It automates manual change processes, giving them the ability to implement changes in minutes instead of days.

- *Security and compliance* . SecureChange proactively checks every change request for risk and compliance against the unified security policy before and after changes are implemented. It also maintains comprehensive ticket and process documentation, which reduces the need for painstaking information gathering and analysis before internal and external audits.

- *Control and accuracy* . SecureChange reduces inaccuracies due to human error through automated change design and provisioning for multi-vendor environments.

*SecureApp.* SecureApp is the application management and secure connectivity automation component of the Tufin Orchestration Suite. Enterprises use SecureApp to define, manage and monitor network connectivity for their applications. SecureApp delivers the following key benefits:

- *Visibility and control* . SecureApp provides an intuitive interface to define application-critical connectivity needs. It serves as a central repository of application connectivity requirements and indicates current connectivity status.

- *Business continuity and agility* . SecureApp monitors network device configurations and alerts security administrators to changes that could affect application availability. SecureApp also provides graphical diagnostic tools that help our customers identify, troubleshoot and automatically repair connectivity issues. By providing detailed insight into an application's connectivity needs and status, SecureApp accelerates service deployment, provides business continuity and simplifies network operations.

- *Security and compliance* . SecureApp proactively creates clean, reliable network configurations. It automatically recommends policy rule changes and decommissions unnecessary network access paths that can lead to a security breach.

### Cloud-Native Security Policy Management

While many enterprises see the cloud as a scalable extension of their existing data center, some are adopting the DevOps approach to cloud application development. Unlike traditional enterprise applications, in which every connectivity change is fully controlled and managed by IT, in cloud-native environments the developers and DevOps engineers typically have full administrative rights over the infrastructure. The connectivity decisions and changes made by developers in cloud-native applications, with little or no oversight by the security team, can have an immediate impact on the enterprise's security posture.

We recently expanded our product suite to address cloud-native environments and applications. We announced our latest product offerings, Orca and Iris, in April 2018 and November 2018, respectively. Unlike traditional security tools, Orca and Iris provide automated, policy-based security analysis in cloud-

native environments, which helps enterprises develop unified, multi-cloud policies. By embedding security into the DevOps, pipeline, we believe we can enable enterprises to properly secure their cloud-native environments.

*Orca.* Orca provides policy-based security automation for microservices and secure containers. Microservices are an application development approach in which a large application is built as a collection of modular components or services. Containers are the lowest level of a microservice that hold the running application, libraries and their dependencies. DevOps teams can integrate Orca with their CI/CD tools and Kubernetes clusters (a popular container orchestrator), which secures the environment while maintaining business agility. Orca delivers the following key benefits:

- *Automation* . Orca is used to allow DevOps teams in CI/CD environments to discover connectivity among microservices and automatically identify risks and generate security policies.

- *Security and compliance* . Orca identifies and protects against the exploitation of container vulnerabilities in both development and deployment stages. It unifies policy management across Kubernetes clusters and other surrounding security controls, which are increasingly vulnerable to cyberattacks. When Orca detects an anomaly, it can automatically restrict network traffic flows and isolate the environment to reduce the attack surface.

- *Customization* . Orca integrates with third-party notification and security services using our publicly available open API, to fit each enterprise's specific platforms and needs.

*Iris.* Iris scans cloud environments, analyzing access policies and resource metadata, to visualize cloud application connectivity. It allows IT and DevOps teams to define a unified security policy for cloud applications that enables granular access control within and between applications in the cloud. Iris delivers the following key benefits:

- *Visibility* . Iris scans cloud-native environments and provides clear visibility into application connectivity, taking all of the different cloud access controls into account.

- *Security and compliance* . Iris monitors the cloud environment and discovers resources that are risky or non-compliant with the unified security policy. It automates risk monitoring in the cloud and enables IT and DevOps teams to respond quickly to critical application threats.

# Our Technology

Our comprehensive security policy management solutions rely on a set of proprietary technologies that provide a high level of security, scalability and performance. Our core technologies, which serve as the foundation of both our network and cloud-based products, include analysis engines, a provisioning engine, API integrations and infrastructure technology.



### *Analysis Engines*

- *Topology intelligence* . Our topology intelligence engine uses network routing algorithms to calculate the paths between different points on the network and provides our customers with a graphic display of devices and data flows. Network administrators use our topology intelligence to quickly determine which devices and cloud platforms a network connection can traverse, which enables them to automate network path analysis and troubleshoot issues.

- *Network usage analysis engine* . Our network usage analysis engine detects unused elements of a security policy by analyzing network flows and traffic hits over a specified time period. Our technology leverages an automated workflow process to decommission unnecessary access and reduce the attack surface.

- *Policy analysis engine.* Our policy analysis engine calculates the expected connectivity and access behavior of network devices and cloud platforms. Security administrators can use different parameters and logic to determine in real time if supported network devices and cloud security groups will allow or block specific connections.

- *Risk and compliance analysis engines* . Our risk engine proactively analyzes risk by identifying potential security violations, checking the existing configuration or the proposed access changes against the unified security policy. Our compliance analysis engine creates an audit trail in real time by automatically documenting any remedial changes.

  Our technology also provides cloud-based security automation for applications developed in CI/CD mode. Our CI/CD vulnerability scanning and compliance validation embeds security at the

development and testing stage, and enables our customers' DevOps teams to quickly identify security issues, reducing the probability of vulnerabilities in production environments.

- *Change designer engine* . Our change designer engine automates enterprise security access requests. It first identifies the connection-relevant network devices and cloud platforms based on topology intelligence, and then recommends the optimal policy change based on information from the policy analysis engine. Our technology provides vendor-specific suggestions that maximize security and performance, while offering accurate configuration changes designed to be intuitive and user friendly.

### *Provisioning Engine*

- *Change provisioning engine* . Our technology automatically implements policy changes approved by security administrators. Our automated change provisioning engine supports all major network, security and cloud vendors. In zero-touch automation mode, our technology automatically applies recommended policy changes without the need for human intervention.

### *API Integrations*

- *Extensible APIs* . Our technology features a RESTful API framework to enable extensibility and interoperability with third-party systems, including ticketing and service management systems such as ServiceNow and BMC Remedy. Our professional services team, as well as our customers and partners, use the API framework to supplement the Tufin Orchestration Suite with additional functionality by integrating with the third-party security ecosystem. We integrate with our platform partners, such as Check Point, Cisco, Fortinet, Palo Alto Networks, F5 Networks, Forcepoint, Juniper Networks, VMware, AWS and Microsoft Azure, to provide vendor agnostic solutions, which is key to our value proposition. In addition, we believe our technology alliance partner program, which is an ecosystem of technology partners who build certified integrations to our platform, helps to expand our common use cases.

### *Infrastructure Technology*

- *Distributed architecture* . Customers can deploy our products across multiple distributed servers. Rather than monitoring all devices and platforms from a single server, remote collectors monitor local network devices (e.g., firewalls and routers), process the raw data and upload compressed data to a central server over a secure connection. Using a fully distributed architecture, our products can easily scale to meet the demands of large organizations.

## Our Services

### *Professional Services*

Our professional services team helps customers with product deployment, integration, customization, optimization, operation and training. We support initial product setup, implementation and configuration, and help customers integrate our products with existing third-party applications and internally developed tools. Our professional services team also helps customers define their unified security policy, model their network topology, configure workflows, discover application connectivity and deliver customized reporting according to their requirements. In addition, we provide technical training so that our customers can use our products with confidence. We also enable our authorized service delivery partners to provide similar professional services.

### *Maintenance and Support*

We offer several levels of technical support for our products by providing customers with access to our user and partner portal, our knowledge center and our regional support centers. We provide customers with software bug repairs, system enhancements and updates, as well as access to our technical support experts. Our support engineers liaise with our product experts to diagnose and solve our customers' technical challenges. In addition to post-sales support activities, we emphasize service readiness by

coordinating with our product management team to define prerequisite product and service quality levels prior to their release. Additionally, our designated support engineers serve as ongoing, accessible customer resources.

## Our Customers

Since our inception, our solutions have been purchased by over 2,000 customers in over 70 countries, including approximately 15% of the Global 2000. We sell substantially all of our products and services through our global network of channel partners, including distributors and resellers, who then sell to end-user customers. For the years ended December 31, 2017 and 2018, our two largest channel partners accounted for 16% and 13% of our revenues and 13% and 10% of our revenues, respectively. Our agreements with these channel partners provide that each partner agrees to sell and distribute our products within certain territories for one year. These agreements are nonexclusive and non-transferable, and automatically renew unless terminated by either party after providing prior written notice.

When analyzing our business, we refer to end-user customers as our customers throughout this prospectus, even if our direct commercial relationship is with a channel partner. Our customers include leading enterprises across a broad range of geographies in a diverse set of industries, including financial services, telecommunications, automotive, manufacturing, energy, healthcare and pharmaceuticals, technology, government, retail and business services.

Our diverse global footprint is evidenced by the fact that in 2018, we generated 56.8% of our revenues from customers in the Americas, 38.4% in EMEA and 4.8% in APAC.

## Case Studies

### A Leading Telecommunications Provider

*Challenge* . The security management team at a leading telecommunications provider learned that it was not in full control of its firewall operations when an external annual audit revealed several high-risk findings. This prompted a search for a solution that would reduce the time required to plan and implement policy changes, allow administrators to pinpoint the exact change that caused a network incident and guarantee the correct implementation of all rule base changes throughout the telecommunications provider's network.

*Solutions and benefits* . The telecommunications provider initially deployed SecureTrack to improve its overall security posture and to facilitate successful annual audits. SecureTrack has allowed the telecommunications provider to effectively manage more than 700 firewalls containing over 1,000 rules each by implementing well-defined processes. Since initially deploying SecureTrack, the telecommunications provider has also deployed SecureChange and SecureApp to automate changes end-to-end, from initiating changes by application owners to automating firewall change provisioning. As a result, network changes that were previously fulfilled in days are now implemented in under an hour. Resources are now available through the Tufin Orchestration Suite to address more strategic projects, including the telecommunications provider's move to the cloud.

### A Leading Energy Trading Company

*Challenge* . Following a period of outsourcing network security, a leading energy trading company moved its network security operations in house. The energy trading company faced growing challenges, including limited visibility into the security of its cloud environment and an increasing frequency of network security changes that began to overwhelm the existing team. The energy trading company needed a solution that could consolidate security and orchestrate connectivity across a hybrid network, including firewalls and cloud platforms.

*Solutions and benefits* . After deploying our solutions, the energy trading company gained visibility of security changes across its on-premises network security infrastructure and its AWS-based cloud environment. Our solutions helped the energy trading company tighten its security posture by focusing its

security team on high-level risks rather than every change that may be pre-approved. By automating their network security changes using SecureChange, the energy trading company reduced the time to implement changes from six to eight days down to six hours. Before implementing our solutions, the energy trading company had non-auditable change processes, but after doing so, the energy trading company passed its audit with only a few days of preparation.

### A Leading Health Services Organization

*Challenges.* A leading health services organization needed to address challenges related to its manual review of firewall access rules across a large network consisting of multiple devices and multiple vendors. Large networks combined with a complex set of rules per device caused configuration changes to take as long as one to two weeks.

*Solutions and benefits.* By deploying SecureTrack and SecureChange , the health services organization improved productivity by reducing the network security engineering and architecture team's time spent on manual reviews. Our solutions automated the health services organization's process of requesting and approving firewall changes via APIs . The health services organization uses our solutions to manage its ongoing change monitoring process, identify violations and maintain continuous compliance and audit readiness throughout the year. As a result, changes that used to take days are now completed in under an hour, freeing up resources to focus on more strategic initiatives.

### A Leading Utility Company

*Challenges.* A leading utility company initially evaluated our solutions to resolve challenges involving firewall access rules across a large network that needed to comply with NERC-CIP regulations .

*Solutions and benefits.* By deploying SecureTrack and SecureChange, the utility improved productivity by reducing the time spent on manual reviews and by simplifying the process to request and approve firewall changes. The utility company also has an ongoing change monitoring process to identify violations and maintain continuous compliance and audit readiness throughout the year.

### A Leading Insurance Provider

*Challenges.* A leading insurance provider required end-to-end visibility of their firewalls and a simplified firewall request process. Due to a shortage of skilled network security personnel, the timing of the insurance provider's firewall changes exceeded its business requirements. The insurance provider's global operations team lacked central visibility and full control of its firewall infrastructure.

*Solutions and benefits.* Several years ago, the insurance provider purchased SecureTrack in order to reduce human error and minimize remediation effort. The insurance provider more recently deployed SecureChange. By building a distributed architecture, the insurance provider gained central visibility of its global firewall rules, risks and changes, which reduced infrastructure complexity creating consistent, continuous compliance.

## Sales and Marketing

### Sales

We sell our products and services through our sales force, including our field sales team and our inside sales team, which works closely with our global network of approximately 140 active channel partners.

Our highly trained sales force is responsible for overall market development. Our sales force consists of our field sales team, which accounts for most of our sales, and our inside sales team. Our field sales team targets large organizations, which we define as those comprising the Global 2000, while our inside sales team targets mid-market companies that do not belong to the Global 2000. Within our field sales team, our regional field sales representatives develop new business relationships with our key customers, and our channel account managers support and expand existing relationships with our channel partners. Our sales engineers provide technical expertise and support, and architect our solutions to address the

business needs of our customers. Our sales cycle usually lasts several months from proof of concept to purchase order, and is often longer for larger transactions. As of December 31, 2018, we had sales personnel in 24 countries. We have expanded our sales force in each of the last two fiscal years, and we plan to continue to do so.

Our channel partners include distributors and resellers, as well as service delivery partners that help customers successfully deploy, configure, customize and maintain our products and services. In addition, on October 2, 2018, we launched our "Tufin as a Service" program – a consumption-based, pay-per-use services model that enables Managed Security Service Providers, or MSSPs, to offer our security policy management solutions to their customers.

*Marketing*

Our marketing strategy is focused on promoting brand awareness through differentiated positioning, messaging and thought leadership. We achieve this by educating the market on effective security policy change management, communicating our product advantages and business benefits, generating leads for our sales force and channel partners, and promoting our brand. We market our products and services as enterprise security policy management solutions for complex networks and cloud-based environments.

We execute our marketing strategy by leveraging a combination of internal marketing professionals, external marketing partners and a network of platform and technology partners. Our internal marketing enterprise is responsible for branding, digital content generation and targeted advertising through active digital channels. We actively drive thought leadership by providing community education through our online technical webinars in multiple regions. We sponsor and host demand-generation events including our channel and technical partners' events and industry conferences, as well as local events for specific customers and prospect accounts in multiple regions. Our conferences and events demonstrate our strong commitment to enabling our partners and customers to succeed, and provide an opportunity to create a pipeline for new sales to prospective customers and additional sales to existing customers.

## Research and Development

Continued investment in research and development is critical to our business. Our research and development efforts focus primarily on improving our existing products and services with additional innovative features and functionality, as well as developing new products and services. For example, we regularly release enhanced capabilities of the Tufin Orchestration Suite. We believe the timely development of new products, including both on-premise and cloud solutions, is essential to maintaining our competitive position.

Our research and development expenses were $17.7 million in 2017 and $21.4 million in 2018. We plan to continue investing significantly in research and development initiatives across our global innovation centers in Ramat-Gan, Israel, Misgav, Israel and Bucharest, Romania. By spreading our research and development team across multiple locations, we increase our access to highly skilled engineering talent, which provides us opportunities for evolution and growth.

## Intellectual Property

Our commercial success depends, in part, on our ability to protect our core technologies and other intellectual property assets. We rely on a combination of trade secrets, copyright and trademark laws, confidentiality procedures, technical know-how and continuing innovation to protect our intellectual property and maintain our competitive advantage. Our technical personnel use their skills, knowledge and experience to develop, strengthen and maintain our proprietary position in the security policy automation market. In addition, we seek to protect our intellectual property by filing Israeli, U.S. and other foreign patent applications related to our proprietary technology.

Our software and other proprietary information are protected by copyright on creation. Copyright registrations, which have so far not been necessary, may be sought on an as-needed basis. We also control access to and use of our proprietary software, proprietary technology and other confidential

information through the use of internal and external controls, including contractual agreements containing confidentiality obligations with our employees, independent consultants, independent contractors, professional services team, partners and customers. Our confidentiality agreements are designed to protect our proprietary information, and the clauses requiring assignment of inventions are designed to grant us ownership of technologies that are developed through our relationship with the respective counterparty. We also license software from third parties for use in developing our products and for integration into our products, including open source software. Despite our efforts to protect our trade secrets and proprietary rights through intellectual property rights, confidentiality agreements and licenses (including non-disclosure and invention assignment agreements), unauthorized parties may still copy or otherwise obtain and use our intellectual property and technology.

As of December 31, 2018, we had registered two trademarks in the United States, two trademarks in Israel and two trademarks in the European Union, and have one pending trademark application in Israel. As of December 31, 2018, we had 14 issued patents in the United States. We also had four issued patents and one pending patent application in Israel.

## Competition

The security policy management market in which we operate is relatively new and evolving. We are a market-leading provider of enterprise security automation and management products. In many cases, our primary competition is in-house, manual, spreadsheet driven processes and homegrown approaches to security management . Our direct competitors include vendors such as AlgoSec, Inc., FireMon, LLC and Skybox Security LLC that offer solutions that compete with all or some of our products or product features. We also indirectly compete with large IT companies that offer a broad array of traditional security management solutions, such as Symantec Corporation and Cisco Systems, Inc., for a share of enterprises' IT security budgets.

As our market further develops, we anticipate that competition will increase based on customer demand for security automation and management solutions. Furthermore, we believe enterprises will allocate an increasing portion of their IT security budgets, and specifically security management spending, to operational security and automation solutions.

The principal competitive factors in our market include:

- security change automation;

- multi-vendor integration and heterogeneous network topology;

- application connectivity in modern IT and cloud environments;

- efficacy in provisioned and cloud-native environments;

- suitability for DevOps processes and microservice architectures;

- scalability and overall performance; and

- strong relationships with existing IT vendors.

## Properties

Our corporate headquarters are located in Ramat-Gan, Israel in an office consisting of 36,292 square feet, where we also employ our primary research and development team and a portion of our support and general administrative teams. The lease for this office expires on April 7, 2019. We recently entered into a new lease agreement for our corporate headquarters office, consisting of approximately 62,859 square feet to accommodate current and future growth. The lease for this office expires January 31, 2029 (with an option to extend until January 31, 2034). Our U.S. headquarters are located in Boston, Massachusetts in an office consisting of approximately 3,214 rentable square feet, where we employ a portion of our marketing and general administrative teams. The lease for this office expires in December 31, 2023. We

also lease an office in Karmiel, Israel (which serves as a research and development site), Akron, Ohio (which hosts the Americas technology support, professional services and inside sales teams) and Reading, England (which hosts the European inside sales team). We believe our facilities are sufficient to meet our current needs and anticipate that suitable additional space will be readily available to accommodate any foreseeable expansion of our operations.

## Employees

As of December 31, 2018, we had 424 employees, independent consultants and independent contractors, of which 217 were in located in Israel, 119 were in located the United States, 22 were located in the United Kingdom and approximately 66 were located across 21 other countries. Set forth below is a breakdown of our global workforce of employees, independent consultants and independent contractors by category of activity as of the dates indicated:

| | As of December 31, | | |
| --- | --- | --- | --- |
| | **2016** | **2017** | **2018** |
| Services, support and fulfillment | 35 | 59 | 75 |
| Research and development | 103 | 114 | 152 |
| Sales and marketing | 100 | 128 | 166 |
| General and administrative | 20 | 24 | 31 |
| Total | 258 | 325 | 424 |

## Legal Proceedings

From time to time, we may be subject to legal proceedings and claims in the ordinary course of business. We are not currently a party to any material litigation. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs, diversion of management resources and other factors.

# MANAGEMENT

## Executive Officers and Directors

The following table sets forth the name, age and position of each of our executive officers, directors and director nominees as of the date of this prospectus.

| Name | Age | Position |
|---|---|---|
| *Executive Officers* | | |
| Reuven Kitov | 45 | Chief Executive Officer, Co-Founder and Chairman of the Board |
| Reuven Harrison | 49 | Chief Technology Officer, Co-Founder and Director |
| Jack Wakileh | 47 | Chief Financial Officer |
| Kevin Maloney | 64 | Senior Vice President of Global Sales |
| Pat Walsh | 52 | Chief Marketing Officer |
| Yoram Gronich | 50 | Vice President of Research & Development |
| Pamela Cyr | 50 | Senior Vice President of Business Development |
| Rajiv Motwane | 40 | Vice President of Global Services & Support |
| Ofer Or | 42 | Vice President of Products |
| *Directors* | | |
| Ohad Finkelstein(1)(4) | 58 | Director |
| Yuval Shachar(3)(4) | 56 | Director |
| Yair Shamir(2)(3)(4) | 73 | Director |
| Edouard Cukierman(4) | 54 | Director |
| Ronni Zehavi(4) | 52 | Director |
| Peter Campbell(1)(2)(4)(5) | 54 | Director Nominee |
| Dafna Gruber(1)(2)(3)(4)(5) | 54 | Director Nominee |

(1) Member or proposed member of our audit committee upon listing on the NYSE.
(2) Member or proposed member of our compensation committee upon listing on the NYSE.
(3) Member or proposed member of our nominating and corporate governance committee upon listing on the NYSE.
(4) Independent director under NYSE rules.
(5) Proposed to serve as an external director under the Israeli Companies Law subject to ratification of their election as external directors under the Israeli Companies Law by our shareholders within three months following this offering.

*Reuven Kitov* is our Chief Executive Officer, Co-Founder and Chairman of the board of directors, which positions he has held since co-founding Tufin in January 2005. Prior to co-founding Tufin, Mr. Kitov held key project management and development roles at Check Point Software Technologies, Inc. from 1998 to 2003. Mr. Kitov holds a Bachelor of Science degree in Computer Science from the University of Maryland in College Park, Maryland.

*Reuven Harrison* is our Chief Technology Officer, Co-Founder and a director, which positions he has held since co-founding Tufin in January 2005. Prior to co-founding Tufin, Mr. Harrison held key software developer positions at Check Point Software Technologies, Inc. from 1999 to 2003, as well as other key positions at Capsule Tech, Inc. from 1997 to 1999 and ECS Inc. from 1991 to 1996. Mr. Harrison holds a Bachelor of Arts degree in Mathematics and Philosophy from Tel Aviv University in Israel.

*Jack Wakileh* is our Chief Financial Officer, which position he has held since July 2013. Prior to joining Tufin, Mr. Wakileh worked as a financial and business consultant for various technology companies from 2010 to 2013. He was a Co-Founder of iSpade Technologies Ltd. and was Chief Financial Officer from 2008 to 2010, Co-Chief Executive Officer of LEADIP Systems Ltd. from 2006 to 2007 and Chief Financial Officer of VCON Telecommunications Ltd. from 1999 to 2005 prior to which he held the Corporate

Controller position. Mr. Wakileh holds a Bachelor of Arts degree in Accounting and Economics from Tel Aviv University in Israel and is a Certified Public Accountant.

*Kevin Maloney* is our Senior Vice President of Global Sales, which position he has held since July 2015. Prior to joining Tufin, Mr. Maloney held senior management positions at Easylink Services International Corporation from December 2007 to July 2012, Network General Corporation from June 2006 to November 2007 and Check Point Software Technologies, Inc. from June 2005 to June 2006. Mr. Maloney holds a Master of Business Administration degree from the Stetson School of Business and Economics at Mercer University in Macon, Georgia and a degree from Wheeling Jesuit University in Wheeling, West Virginia.

*Pat Walsh* is our Chief Marketing Officer, which position he has held since March 2016. Prior to joining Tufin, Mr. Walsh held executive marketing positions as Vice President of Marketing at Core Security (which was acquired by Courion in 2016) from October 2013 to December 2015 and Chief Marketing Officer of Talend, Inc., a leading big data and enterprise integration vendor, from October 2010 to August 2013. He previously held key marketing positions at Progress Software from September 2008 to September 2010, IONA Technologies from 2004 to 2008, Solid Information Technology from 2000 to 2003 and HP from 1990 to 2000. Mr. Walsh holds a Master of Engineering degree in Engineering Management and a Bachelor of Arts degree in Engineering and Economics each from Dartmouth College in Hanover, New Hampshire.

*Yoram Gronich* is our Vice President of Research & Development, which position he has held since September 2008. Prior to joining Tufin, Mr. Gronich held software management and engineering positions at Symantec Corporation from 2005 to 2008. He previously held project management and team leader roles at Check Point Software Technologies, Inc. from 2002 to 2005. Mr. Gronich holds a Master of Science degree in Electrical Engineering and a Bachelor of Science degree in Physics and Computer Science each from Tel Aviv University in Israel.

*Pamela Cyr* is our Senior Vice President of Business Development, which position she has held since November 2014. Prior to joining Tufin, Ms. Cyr held key leadership development positions as Vice President, North America, of LetMobile (which was acquired by LanDesk in 2014) from July 2013 to May 2014 and Senior Vice President of Business Development and Strategic Alliances at Veracode, Inc., where she was responsible for ecosystem strategy and development, from 2011 to 2012. Prior to Veracode, she was Vice President of Business Development for Aveksa (which was acquired by RSA, the security division of EMC in July 2013) from 2007 to 2011. Ms. Cyr holds a Master of Science degree in Electrical Engineering from Worcester Polytechnic Institute in Worcester, Massachusetts and a Bachelor of Science degree in Computer Systems Engineering from the University of Massachusetts in Amherst, Massachusetts.

*Raj Motwane* is our Vice President of Global Services & Support, which position he has held since July 2017. Prior to joining Tufin, Mr. Motwane served as Senior Vice President of Client Success and Operations at IANS from September 2016 to July 2017 and General Manager of Services and Customer Success at IBM Resilient Systems from March 2015 to August 2016. He previously held key project management and customer support positions at EMC from 2004 to April 2015 and General Electric from 2001 to 2004. Mr. Motwane holds a Master of Business Administration degree from Babson College in Wellesley, Massachusetts and a Bachelor of Science degree in Information Systems from Northeastern University in Boston, Massachusetts.

*Ofer Or* has served as our Vice President of Products since July 2014. Prior to assuming this role, Mr. Or served as our Director of Research & Strategy. Prior to joining Tufin, he held senior product management positions at Check Point Software Technologies, Inc. from 2009 to 2013. Mr. Or also held product marketing and business development positions at Microsoft from 2007 to 2009 and Amdocs Ltd. from 2006 to 2007. Before that, he held several R&D Leadership positions at Check Point Software Technologies, Inc. from 2000 to 2005, and in an elite computer unit of the Israel Defense Forces from 1994 to 2000. Mr. Or holds a Master of Business Administration degree from INSEAD University in

Fontainebleau, France, and holds a Master of Arts degree in Law and a Bachelor of Arts degree in Political Science and Sociology, each from Bar Ilan University in Ramat-Gan, Israel.

*Ohad Finkelstein* has served as a director since January 2011. Mr. Finkelstein serves as Managing Partner of Danli Capital, an investment advisory firm that he founded in 2017. Mr. Finkelstein is the Co-Founding Partner of Marker LLC, which he founded in 2011. Prior to that, from 2005 to 2011, he led international investment for Venrock, an Israeli venture capital firm. He served as the Chairman, Chief Executive Officer and President at Interoute Communications Limited from 1999 to 2003. Mr. Finkelstein holds a Bachelor of Arts degree in Political Science and International Marketing from the University of California, Los Angeles.

*Yuval Shachar* has served as a director since October 2009. Mr. Shachar is the Executive Chairman and Co-Founder of Team8, a venture capital firm specializing in incubation of security companies. Mr. Shachar serves as Founding Venture Partner of Innovation Endeavors, which he joined at its inception, previously serving as an investment partner of its predecessor fund from 2013. Mr. Shachar served as Co-Founding Partner of Marker LLC and its predecessors from 2011. From 2004 to 2009, he served as General Manager of a Cisco business unit in its Service Provider group. Prior to that, Mr. Shachar served as Co-Founder, President and CEO of P-Cube (which was acquired by Cisco), and co-founded each of Pentacom and Infogear (which were each acquired by Cisco). From 1995 to 1998, Mr. Shachar served as Vice President of Research and Development at VocalTec Ltd. (which completed an IPO on The Nasdaq Stock Market, or Nasdaq , in 1996), and previously held key engineering and management positions at National Semiconductors. Mr. Shachar holds a Bachelor of Science degree in Mathematics and Computer Science from Tel Aviv University in Israel.

*Yair Shamir*  has served as a director from 2007 to 2013 and again from October 2018 to present. Mr. Shamir has been a Founding and Managing Partner of Catalyst Investments since its establishment from 1999 to 2013 and again from 2015 to present. Mr. Shamir was elected as a member of the Israeli Parliament (Knesset) and served as Minister of Agriculture of the State of Israel from 2013 to 2015. Mr. Shamir served until August 2018 as the Chairman of Board of N.T.A. – Metropolitan Mass Transit System. He served as the Chairman of Israel's National Roads Company from 2011 to 2012. Mr. Shamir served as the Chairman of Israel Aerospace Industries Ltd. from 2005 until 2011. From 2004 to 2007, Mr. Shamir was the Chairman of Shamir Optical Industry Ltd. From 2004 to 2005, Mr. Shamir served as the Chairman of EL AL. From 1997 to 2004, Mr. Shamir served as the Chief Executive Officer and Chairman of VCON Telecommunications Ltd. Mr. Shamir was a board member of DSP Group Corporation from 2005 to 2013. Mr. Shamir holds a Bachelor of Science degree in Electronics Engineering from the Technion, Israel Institute of Technology in Haifa, Israel.

*Edouard Cukierman*  has served as a director since 2014. Mr. Cukierman has been a Founding and Managing Partner of Catalyst Investments since its establishment in 1999, and has served as the Chairman of Cukierman & Co. Investment House since its establishment. Prior to establishing and managing Catalyst Investment, Mr. Cukierman was the President and Chief Executive Officer of Astra Technological Investments, a Venture Capital Fund established in 1993. Mr. Cukierman serves as a board member of Dori Media Group. He is also is the Founder of the GoforIsrael annual conference. Mr. Cukierman served as a Reserve Officer of the Crisis & Hostage Negotiation Team and IDF Spokesman Unit. Mr. Cukierman holds a Master of Business Administration degree from INSEAD University in Fontainebleau, France and a Bachelor of Science degree from the Technion, Israel Institute of Technology in Haifa, Israel.

*Ronni Zehavi* has served as a director since 2015. Mr. Zehavi serves as Chief Executive Officer of Hibob, a cloud-based people management platform, which he co-founded in October 2015. He is also a director of Shiur Archer, a non-profit education development organization, which he joined in January 2014. Mr. Zehavi was Co-Founder and Chief Executive Officer of Cotendo, an IT company that provides online training software solutions, from 2008 to 2012. He previously served as Vice President of Operations and Human Resources at Commtouch Software from 2001 to 2008. Mr. Zehavi holds a Master of Arts degree

in Organizational Sociology from Bar-Ilan University in Israel and a Bachelor of Arts degree in History and Educational Management from Tel Aviv University in Israel.

*Peter Campbell* is intended to serve as a member of our board of directors upon the listing of our shares on the NYSE and is intended to serve as an external director under the Israeli Companies Law subject to the ratification of his election as an external director by our shareholders within three months following this offering . Mr. Campbell served as Chief Financial Officer of Mimecast Ltd. (traded on Nasdaq) from 2006 to 2019, where he also served as a director from 2007 to 2015. He previously served as Chief Financial Officer of SR Telecom Inc., where he was employed from 2002 to 2006. Prior to that, Mr. Campbell was an auditor at Ernst & Young LLP in Canada. Mr. Campbell holds a Bachelor of Commerce degree and a Graduate Diploma in accounting from the John Molson School of Business at Concordia University in Canada, where he also served as a lecturer.

*Dafna Gruber* is intended to serve as member of our board of directors upon the listing of our shares on the NYSE and is intended to serve as an external director under the Israeli Companies Law subject to the ratification of her election as an external director by our shareholders within three months following this offering. Ms. Gruber has served as Chief Financial Officer of Aqua Security Ltd. since February 2019. She previously served as Chief Financial Officer of each of Landa Corporation from 2017 to 2018, Clal Industries Ltd. from 2015 to 2017, NICE Ltd. (traded on Nasdaq and the Tel Aviv Stock Exchange, or TASE) from 2007 to 2015 and Alvarion Ltd. (traded on Nasdaq and TASE) from 1995 to 2007. Ms. Gruber has also been a director, chairman of the audit committee and member of the compensation committee of TAT Technologies Ltd. (traded on Nasdaq and TASE) since November 2013 and of Nova Measuring Instruments Ltd. (traded on Nasdaq and TASE) since April 2015. Ms. Gruber holds a Bachelor of Arts degree in Accounting and Economics from Tel Aviv University in Israel and is a Certified Public Accountant.

## Corporate Governance Practices

Under the Israeli Companies Law, companies incorporated under the laws of the State of Israel whose shares are publicly traded, including companies with shares listed on the  NYSE , are considered public companies under Israeli law and are required to comply with various corporate governance requirements under Israeli law relating to matters such as external directors, the audit committee, the compensation committee and an internal auditor. This is the case even if our shares are not listed on a stock exchange in Israel. Subject to certain exceptions, these requirements are in addition to the corporate governance requirements imposed by NYSE rules and other applicable provisions of U.S. securities laws to which we will become subject (as a foreign private issuer) upon the closing of this offering and upon listing on the NYSE . Under NYSE rules, a foreign private issuer, such as us, may generally follow its home country rules of corporate governance in lieu of the comparable NYSE corporate governance requirements, except for certain matters including (among others) the composition and responsibilities of the audit committee and the independence of its members within the meaning of the rules and regulations of the SEC.

We intend to comply with the rules generally applicable to U.S. domestic companies listed on the  NYSE . We may in the future decide to use the foreign private issuer exemption with respect to certain  NYSE  corporate governance requirements.

## Board of Directors and Officers

Under the Israeli Companies Law, our board of directors determines our policies and supervises the performance of our Chief Executive Officer. Our board of directors may exercise all powers and may take all actions that are not specifically granted to our shareholders or to management. Our executive officers are responsible for our day-to-day management. Our executive officers serve at the discretion of our board of directors, subject to the terms of their respective employment agreements.

*Independent Directors*

We comply with NYSE rules, which require that a majority of our directors are independent. Our board of directors has determined that all of our directors and director nominees, other than Reuven Kitov and Reuven Harrison, qualify as independent under such rules. The definition of independent director under NYSE rules and the definition of external director under the Israeli Companies Law overlap to a significant degree such that we expect the two directors serving as external directors to satisfy the requirements to be independent under NYSE rules . In addition, both independent directors and external directors serve for a period of three years; independent directors pursuant to the staggered board provisions of our articles of association and external directors pursuant to the requirements of the Israeli Companies Law. However, external directors must be elected by a special majority of shareholders while independent directors may be elected by a simple majority. See "—External Directors" for a description of external director requirements under the Israeli Companies Law.

*Board Composition and Election*

Under our amended and restated articles of association, which will become effective upon the closing of this offering, the number of directors on our board of directors must be no less than six and no more than 10, including any external directors required to be appointed under the Israeli Companies Law and any director appointed by one or both of our founders, or a founder director, pursuant to the appointment rights described under " — Appointment Rights." The minimum and maximum number of directors may be changed, at any time and from time to time, by a special vote of the holders of at least 66 2/3% of our outstanding shares.

Other than external directors, for whom special election requirements apply under the Israeli Companies Law, as detailed below, and any founder director, our directors are divided into three classes with staggered three-year terms. Each class of directors consists, as nearly as possible, of 1/3 of the total number of directors constituting the entire board of directors (other than the external directors and any founder director). At each annual general meeting of our shareholders, the election or re-election of directors following the expiration of the term of office of the directors of that class of directors will be for a term of office that expires on the third annual general meeting following such election or re-election, such that from 2020 and after, at each annual general meeting the term of office of only one class of directors will expire. Each director, aside from our external directors and any founder director, holds office until the annual general meeting of our shareholders for the year in which his or her term expires and until his or her successor is duly appointed, unless the tenure of such director expires earlier pursuant to the Israeli Companies Law or unless removed from office by a vote of the holders of at least 66 2/3% of the total voting power of our shareholders at a general meeting of our shareholders in accordance with our articles of association.

Our directors who are not external directors or founder directors will be divided among the three classes as follows:

- the Class I directors will consist of Edouard Cukierman, Reuven Harrison and Yuval Shachar, and their terms will expire at our annual general meeting of shareholders to be held in 2020;

- the Class II directors, will consist of Ohad Finkelstein and Reuven Kitov, and their terms will expire at our annual general meeting of shareholders to be held in 2021; and

- the Class III directors will consist of Yair Shamir and Ronni Zehavi, and their terms will expire at our annual general meeting of shareholders to be held in 2022.

Peter Campbell and Dafna Gruber will serve as our external directors and, subject to their election within three months following this offering, will each have a term of three years.

*Appointment Rights*

Under our amended and restated articles of association, which will become effective upon the closing of this offering, our founders, Reuven Kitov and Reuven Harrison, jointly have the right to appoint one director to our board of directors so long as they each hold voting control over 2% of our outstanding ordinary shares. Pursuant to an agreement between them, Reuven Kitov will designate the director to be appointed in this instance subject to prior consultation with Reuven Harrison. If only one of the founders holds voting control over 2% of our outstanding ordinary shares, such founder has the sole right to appoint one director. The appointment rights of our founders are suspended if either founder is otherwise serving on our board of directors. The term of office for a founder director expires if the appointment rights are suspended or if the founders or founder, as the case may be, no longer holds the requisite voting control.

Under our amended and restated articles of association, our board of directors may appoint new directors to fill vacancies (whether such vacancy is due to a director no longer serving or due to the number of directors serving being less than the maximum required in our amended and restated articles of association). Our amended and restated articles of association provide that the term of a director appointed by our board of directors to fill any vacancy will be for the remaining term of office of the director(s) whose office(s) have been vacated. External directors are elected for an initial term of three years and may be elected for up to two additional three-year terms (or more) under the circumstances described below. External directors may be removed from office only under the limited circumstances set forth in the Israeli Companies Law. See "—External Directors."

*Other Considerations*

Under the Israeli Companies Law, the chief executive officer of a public company may not serve as the chairman of the board of directors of that company unless approved by a special majority of shareholders. However, if the roles of chief executive officer and chairman of the board of directors are held by the same person and this arrangement was approved by the company's shareholders prior to its initial public offering and is described in the company's initial public offering prospectus, shareholder approval is only required upon the lapse of the fifth anniversary of the initial public offering. Reuven Kitov, our Chief Executive Officer, also serves as our Chairman of the board of directors, as was approved by our shareholders prior to this offering. We may, at the conclusion of the five-year period, and again thereafter, seek further shareholder approval for the renewal of such dual role for up to an additional three years at a time.

In addition, under the Israeli Companies Law, our board of directors must determine the minimum number of directors who are required to have "accounting and financial expertise." Under applicable regulations, a director with accounting and financial expertise is a director who, by reason of his or her education, professional experience and skill, has a high level of proficiency in and understanding of business accounting matters and financial statements. He or she must be able to thoroughly comprehend the financial statements of the company and initiate debate regarding the manner in which financial information is presented. See also "—External Directors" below. In determining the number of directors required to have such expertise, the board of directors must consider, among other things, the type and size of the company and the scope and complexity of its operations. Our board of directors has determined that we require at least one director with the requisite accounting and financial expertise, and it has determined Dafna Gruber has such expertise.

There are no familial relationships among any of our office holders (including directors).

## Compensation of Executive Officers and Directors

The aggregate compensation, including share-based compensation, paid by us to our executive officers and directors for the year ended December 31, 2018, was approximately $3.6 million. This amount includes approximately $0.4 million set aside or accrued to provide pension, severance, retirement or similar benefits or expenses, but does not include business travel, relocation, professional and business

association dues and expenses reimbursed to officers, and other benefits commonly reimbursed or paid by companies in Israel.

Under regulations promulgated under the Israeli Companies Law, once our shares become listed on the NYSE, we will be required to disclose the compensation granted to our five most highly compensated office holders in the proxy statements we publish for our annual shareholders meetings. See "Disclosure of Compensation of Executive Officers" below.

## External Directors

Under the Israeli Companies Law, companies incorporated under the laws of the State of Israel that are "public companies," including companies with shares listed on the NYSE, are generally required to appoint at least two external directors who meet the qualification requirements set forth in the Israeli Companies Law. Effective from April 2016, companies whose shares are traded on specified U.S. stock exchanges, including the NYSE, and which do not have a controlling shareholder (as such term is defined in the Israeli Companies Law), may (but are not required to) elect to opt out of the requirement to maintain external directors and opt out of the composition requirements under the Israeli Companies Law with respect to the audit and compensation committees. Upon completion of this offering, we do not believe that we will have a controlling shareholder and therefore will qualify for such exemption, but we do not currently intend to rely on such exemption.

The appointment of external directors must be made by a general meeting of our shareholders no later than three months following the closing of this offering, and therefore we intend to hold a shareholders' meeting within three months of the closing of this offering for the appointment of two external directors.

A person may not be appointed as an external director if the person is a relative of a controlling shareholder or if on the date of the person's appointment or within the preceding two years the person or his or her relatives, partners, employers or anyone to whom that person is subordinate, whether directly or indirectly, or entities under the person's control have or had any affiliation with any of (each an "affiliated party"): (1) us; (2) any person or entity controlling us on the date of such appointment; (3) any relative of a controlling shareholder; or (4) any entity controlled, on the date of such appointment or within the preceding two years, by us or by a controlling shareholder. If there is no controlling shareholder or any shareholder holding 25% or more of voting rights in a company, a person may not be appointed as an external director if the person has any affiliation to the chairman of the board of directors, the general manager (chief executive officer), any shareholder holding 5% or more of the company's shares or voting rights or the senior financial officer as of the date of the person's appointment.

The term "controlling shareholder" means a shareholder with the ability to direct the activities of the company, other than by virtue of being an office holder. A shareholder is presumed to have "control" of the company and thus to be a controlling shareholder of the company if the shareholder holds 50% or more of the "means of control" of the company. "Means of control" is defined as (1) the right to vote at a general meeting of a company or a corresponding body of another corporation or (2) the right to appoint directors of the corporation or its general manager (chief executive officer). For the purpose of approving related-party transactions, the term also includes any shareholder that holds 25% or more of the voting rights of a company if the company has no shareholder that owns more than 50% of its voting rights and two or more shareholders who have a personal interest in such a transaction are deemed as joint holders.

The term affiliation includes:

- an employment relationship;

- a business or professional relationship maintained on a regular basis;

- control; and

- service as an office holder, excluding service as a director in a private company prior to the first offering of its shares to the public if such director was appointed as a director of the private company in order to serve as an external director following the initial public offering.

The term "relative" is defined as a spouse, sibling, parent, grandparent, descendant, spouse's descendant and the spouse of each of the foregoing.

The term "office holder" is defined as a director, general manager (chief executive officer), chief business manager, deputy general manager, vice general manager, any other person assuming the responsibilities of any of the foregoing positions, without regard to such person's title, or other manager directly subordinate to the general manager.

A person may not serve as an external director if that person or that person's relative, partner, employer, a person to whom such person is subordinate (directly or indirectly) or any entity under the person's control has a business or professional relationship with any entity that has an affiliation with any affiliated party, even if such relationship is intermittent (excluding insignificant relationships). Additionally, any person who has received compensation intermittently (excluding insignificant relationships) other than compensation permitted under the Israeli Companies Law may not continue to serve as an external director.

No person can serve as an external director if the person's position or other affairs create, or may create, a conflict of interest with the person's responsibilities as a director or may otherwise interfere with the person's ability to serve as a director or if such a person is an employee of the Israel Securities Authority or of an Israeli stock exchange. If at the time an external director is appointed all current members of the board of directors, who are not controlling shareholders or relatives of controlling shareholders, are of the same gender, then the external director to be appointed must be of the other gender. In addition, a person who is a director of a company may not be elected as an external director of another company if, at that time, a director of the other company is acting as an external director of the first company.

The Israeli Companies Law provides that an external director must meet certain "professional qualifications" or have "accounting and financial expertise" and that at least one external director must have accounting and financial expertise. However, if a company's shares are traded on certain stock exchanges, including the NYSE, then if at least one of its other directors (1) has accounting and financial expertise as defined in the Israeli Companies Law and applicable regulations (as described above) and (2) meets the independence requirements for membership on the audit committee in accordance with the applicable foreign law, then neither external director is required to possess accounting and financial expertise as long as both possess other requisite professional qualifications. The determination of whether a director possesses accounting and financial expertise is made by the board of directors.

The determination of whether a director possesses the requisite professional qualifications is made by the board of directors. The regulations promulgated under the Israeli Companies Law define an external director with requisite professional qualifications as a director who satisfies one of the following requirements: (1) the director holds an academic degree in either economics, business administration, accounting, law or public administration; (2) the director either holds an academic degree in any other field or has completed another form of higher education in the company's primary field of business or in an area which is relevant to his or her office as an external director in the company; or (3) the director has at least five years of experience serving in any one of the following, or at least five years of cumulative experience serving in two or more of the following capacities: (a) a senior business management position in a company with a substantial scope of business; (b) a senior position in the company's primary field of business; or (c) a senior position in public administration.

Until the lapse of a two-year period from the date that an external director of a company ceases to act in such capacity, the company in which such external director served, and its controlling shareholder or any entity under control of such controlling shareholder may not, directly or indirectly, grant such former external director, or his or her spouse or child, any benefit, including via (1) the appointment of such former director or his or her spouse or his child as an officer in the company or in an entity controlled by the company's controlling shareholder, (2) the employment of such former director and (3) the

93

engagement, directly or indirectly, of such former director as a provider of professional services for compensation, directly or indirectly, including via an entity under his or her control. With respect to a relative who is not a spouse or a child, such limitations shall only apply for one year from the date such external director ceased to be engaged in such capacity.

External directors are elected by shareholders. The shareholders voting in favor of their election must include at least a majority of the shares of the non-controlling shareholders of the company who voted on the matter. This minority approval requirement need not be met if the total shareholdings of those non-controlling shareholders who vote against their election represent 2% or less of all of the voting rights in the company.

The initial term of an external director is three years and he or she may be reelected for up to two additional three-year terms. Thereafter, in a company whose shares are listed for trading on, among others, the NYSE, such as the company, he or she may be reelected by our shareholders for additional periods not to exceed three years each, if the company's audit committee and the board of directors, in that order, confirm that, in light of the external director's expertise and special contribution to the work of the board of directors and its committees, the reelection for such additional period is beneficial to the company. Reelection of an external director may be effected through one of the following mechanisms: (i) the board of directors proposed the reelection of the nominee and the election was approved by the shareholders by the majority required to appoint external directors for their initial term as described above; or (ii) a shareholder holding 1% or more of the voting rights proposed the reelection of the nominee (who may not be a "related shareholder or competitor" as such term is defined in the Israeli Companies Law) or the external director himself or herself proposed their own reelection, and the reelection is approved by a majority of the votes cast by the shareholders of the company, excluding the votes of controlling shareholders and those who have a personal interest in the matter as a result of their relations with the controlling shareholders; provided that the aggregate votes cast in favor of the reelection by such non-excluded shareholders constitute more than 2% of the voting rights in the company.

External directors can be removed from office only by the same special percentage of shareholders as can elect them, or by a court, and then only if the external directors cease to meet the statutory qualifications with respect to their appointment or if they violate their duty of loyalty to the company.

Any committee of the board of directors must include at least one external director, except that the audit and compensation committees must include all of the external directors. An external director is entitled to compensation as provided in regulations adopted under the Israeli Companies Law and is otherwise prohibited from receiving any other compensation, directly or indirectly, in connection with such service.

An external director is entitled to compensation and reimbursement of expenses in accordance with regulations promulgated under the Israeli Companies Law and is prohibited from receiving any other compensation, directly or indirectly, in connection with serving as a director except for certain exculpation, indemnification and insurance provided by the company, as specifically allowed by the Israeli Companies Law.

## Audit Committee

### Israeli Companies Law Requirements

Under the Israeli Companies Law, the board of directors of any public company must also appoint an audit committee comprised of at least three directors, including all of the external directors. The audit committee may not include:

- the chairman of the board of directors;

- a controlling shareholder or a relative of a controlling shareholder;

- any director employed by us or by one of our controlling shareholders or by an entity controlled by our controlling shareholders (other than as a member of the board of directors);

- any director who regularly provides services to us, to one of our controlling shareholders or to an entity controlled by our controlling shareholders; or

- a director who derives most of his or her income from a controlling shareholder.

According to the Israeli Companies Law, the majority of the members of the audit committee, as well as the majority of members present at audit committee meetings, will be required to be "independent" (as defined below) and the chairman of the audit committee will be required to be an external director. Any persons disqualified from serving as a member of the audit committee may not be present at the audit committee meetings, unless such person qualifies under one of the exemptions of the Israeli Companies Law.

The term "independent director" is defined under the Israeli Companies Law as an external director or a director who meets the following conditions and who is appointed or classified as such according to the Israeli Companies Law: (1) the conditions for his or her appointment as an external director (as described above) are satisfied and the audit committee approves the director having met such conditions and (2) subject to certain exceptions, he or she has not served as a director of the company for over nine consecutive years with any interruption of up to two years of his or her service not being deemed a disruption to the continuity of his or her service.

### *Listing Requirements*

Under NYSE corporate governance requirements, we are required to maintain an audit committee consisting of at least three independent directors, all of whom are financially literate and one of whom has accounting or related financial management expertise.

Our audit committee will consist of Dafna Gruber, Peter Campbell and Ohad Finkelstein. Dafna Gruber will serve as the chairperson of our audit committee. All members of our audit committee meet the requirements for financial literacy under the applicable rules and regulations of the SEC and NYSE corporate governance rules. Our board of directors has determined in its business judgment that Dafna Gruber is an audit committee financial expert as defined by the SEC rules and has the requisite accounting or related financial management expertise as required by NYSE corporate governance requirements. Each of Dafna Gruber and Peter Campbell is "independent" as such term is defined in Rule 10A-3(b)(1) under the Exchange Act.

### *Approval of Transactions with Related Parties*

The approval of the audit committee is required to effect specified actions and transactions with office holders and controlling shareholders and their relatives, or in which they have a personal interest. See "—Fiduciary Duties and Approval of Specified Related Party Transactions and Compensation under Israeli Law." The audit committee may not approve an action or a transaction with a controlling shareholder or with an office holder unless, among other things, at the time of approval the audit committee meets the composition requirements under the Israeli Companies Law.

### *Audit Committee Role*

In connection with this offering, our board of directors approved an audit committee charter, which will become effective upon listing on the NYSE, setting forth the responsibilities of the audit committee consistent with the Israeli Companies Law, SEC rules and NYSE corporate governance requirements, which include:

- retaining and terminating our independent auditors, subject to board of directors and shareholder ratification;

- overseeing the independence, compensation and performance of the company's independent auditors;

- the appointment, compensation, retention and oversight of any accounting firm engaged for the purpose of preparing or issuing an audit report or performing other audit services;

- pre-approval of audit and non-audit services to be provided by the independent auditors;

- reviewing with management and our independent directors our financial statements prior to their submission to the SEC; and

- approval of certain transactions with office holders and controlling shareholders, as described below, and other related party transactions.

Additionally, under the Israeli Companies Law, the role of the audit committee includes the identification of irregularities in our business management, among other things, by consulting with the internal auditor or our independent auditors and suggesting an appropriate course of action to the board of directors. In addition, the audit committee or the board of directors, as set forth in the articles of association of the company, is required to approve the yearly or periodic work plan proposed by the internal auditor. The audit committee is required to assess the company's internal audit system and the performance of its internal auditor. The Israeli Companies Law also requires that the audit committee assess the scope of the work and compensation of the company's external auditor. In addition, the audit committee is required to determine whether certain related party actions and transactions are "material" or "extraordinary" for the purpose of the requisite approval procedures under the Israeli Companies Law and whether certain transactions with a controlling shareholder will be subject to a competitive procedure.

The audit committee charter states that in fulfilling its role the committee is empowered to conduct or authorize investigations into any matters within its scope of responsibilities.

## Compensation Committee

Under the Israeli Companies Law, public companies are required to appoint a compensation committee in accordance with the guidelines set forth thereunder.

The compensation committee must consist of at least three members. All of the external directors must serve on the committee and constitute a majority of its members. The chairman of the compensation committee must be an external director. The remaining members are not required to be external directors, but must be directors who qualify to serve as members of the audit committee (as described above).

Our compensation committee will consist of Peter Campbell, Dafna Gruber and Yair Shamir, and will assist our board of directors in determining compensation for our directors and officer. Peter Campbell will serve as the chairman of our compensation committee.

### Listing Requirements

Under SEC and NYSE rules, there are heightened independence standards for members of the compensation committee, including a prohibition against the receipt of any compensation from us other than standard supervisory board member fees. Although foreign private issuers are not required to meet this heightened standard, our board of directors has determined that all of our expected compensation committee members meet this heightened standard. Each of Peter Campbell, Dafna Gruber and Yair Shamir is "independent" and a "non-employee director" as such terms are defined in Rule 10A-3(b)(1) under the Exchange Act.

### Compensation Committee Role

In connection with this offering, our board of directors approved a compensation committee charter, which will become effective upon listing on the NYSE, setting forth the responsibilities of the compensation

committee consistent with the Israeli Companies Law, SEC rules and NYSE corporate governance requirements, which include:

- recommending to the board of directors the compensation policy for directors and officers, and to recommend to the board of directors once every three years whether the compensation policy that had been approved should be extended for a period of more than three years;

- recommending to the board of directors updates to the compensation policy, from time to time, and examine its implementation;

- deciding whether to approve the terms of office and employment of directors and officers that require approval of the compensation committee;

- deciding whether the compensation terms of the chief executive officer, which were determined pursuant to the compensation policy, will be exempted from approval by the shareholders because such approval would harm the ability to engage the chief executive officer; and

- administering and, where applicable, recommending to our board of directors regarding the awarding of employee equity grants.

### *Compensation Policy*

In general, under the Israeli Companies Law, a public company must have a compensation policy approved by the board of directors after receiving and considering the recommendations of the compensation committee. In addition, the compensation policy requires the approval of the general meeting of the shareholders, which approval requires one of the following: (i) the majority of shareholder votes counted at a general meeting including the majority of all of the votes of those shareholders who are non-controlling shareholders and do not have a personal interest in the approval of the compensation policy, who vote at the meeting (excluding abstentions) or (ii) the total number of votes against the proposal among the shareholders mentioned in clause (i) above does exceed 2% of the voting rights in the company. Under special circumstances, the board of directors may approve the compensation policy despite the objection of the shareholders on the condition that the compensation committee and then the board of directors decide, on the basis of detailed arguments and after discussing again the compensation policy, that approval of the compensation policy, despite the objection of the meeting of shareholders, is for the benefit of the company.

If a company initially offer its securities to the public, like us, adopts a compensation policy in advance of its initial public offering, and describes it in its prospectus, then such compensation policy shall be deemed a validly adopted policy in accordance with the Israeli Companies Law requirements described above. Furthermore, if the compensation policy is set in accordance with the aforementioned relief, then it will remain in effect for term of five years from the date such company has become a public company.

The compensation policy must be based on certain considerations, include certain provisions and needs to reference certain matters as set forth in the Israeli Companies Law.

The compensation policy must serve as the basis for decisions concerning the financial terms of employment or engagement of office holders, including exculpation, insurance, indemnification or any monetary payment or obligation of payment in respect of employment or engagement. The compensation policy must relate to certain factors, including advancement of the company's objectives, business plan and long-term strategy, and creation of appropriate incentives for office holders. It must also consider, among other things, the company's risk management, size and the nature of its operations. The compensation policy must furthermore consider the following additional factors:

- the education, skills, experience, expertise and accomplishments of the relevant office holder;

- the office holder's position, responsibilities and prior compensation agreements with him or her;

97

- the ratio between the cost of the terms of employment of an office holder and the cost of the employment of other employees of the company, including employees employed through contractors who provide services to the company, in particular the ratio between such cost, the average and median salary of the employees of the company, as well as the impact of such disparities on the work relationships in the company;

- if the terms of employment include variable components—the possibility of reducing variable components at the discretion of the board of directors and the possibility of setting a limit on the value of non-cash variable equity-based components; and

- if the terms of employment include severance compensation—the term of employment or office of the office holder, the terms of his or her compensation during such period, the company's performance during the such period, his or her individual contribution to the achievement of the company goals and the maximization of its profits and the circumstances under which he or she is leaving the company.

The compensation policy must also include, among others:

- with regards to variable components:

  - with the exception of office holders who report directly to the chief executive officer, determining the variable components on long-term performance basis and on measurable criteria; however, the company may determine that an immaterial part of the variable components of the compensation package of an office holder's shall be awarded based on non-measurable criteria, if such amount is not higher than three monthly salaries per annum, while taking into account such office holder contribution to the company; and

  - the ratio between variable and fixed components, as well as the limit of the values of variable components at the time of their grant;

- a condition under which the office holder will return to the company, according to conditions to be set forth in the compensation policy, any amounts paid as part of his or her terms of employment, if such amounts were paid based on information later to be discovered to be wrong, and such information was restated in the company's financial statements;

- the minimum holding or vesting period of variable equity-based components to be set in the terms of office or employment, as applicable, while taking into consideration long-term incentives; and

- a limit to retirement grants.

Our compensation policy, which will become effective immediately prior to the closing of this offering, is designed to promote retention and motivation of directors and executive officers, incentivize superior individual excellence, align the interests of our directors and executive officers with our long-term performance and provide a risk management tool. To that end, a portion of an executive officer compensation package is targeted to reflect our short and long-term goals, as well as the executive officer's individual performance. On the other hand, our compensation policy includes measures designed to reduce the executive officer's incentives to take excessive risks that may harm us in the long-term, such as limits on the value of cash bonuses and equity-based compensation, limitations on the ratio between the variable and the total compensation of an executive officer and minimum vesting periods for equity-based compensation.

Our compensation policy also addresses each of our executive officers' individual characteristics (such as his or her respective position, education, scope of responsibilities and contribution to the attainment of our goals) as the basis for compensation variation among our executive officers, and considers the internal ratios between compensation of our executive officers and directors and other employees. Pursuant to our compensation policy, the compensation that may be granted to an executive officer may include: base salary, annual bonuses and other cash bonuses (such as a signing bonus and special bonuses with respect to any special achievements, such as outstanding personal achievement, outstanding personal

effort or outstanding company performance), equity-based compensation, benefits and retirement and termination of service arrangements. All cash bonuses are limited to a maximum amount linked to the executive officer's base salary. In addition, the total variable compensation components (cash bonuses and equity-based compensation) may not exceed 95% of each executive officer's total compensation package with respect to any given calendar year.

An annual cash bonus may be awarded to executive officers upon the attainment of pre-set periodic objectives and individual targets. The annual cash bonus that may be granted to our executive officers other than our chief executive officer will be based on performance objectives and a discretionary evaluation of the executive officer's overall performance by our chief executive officer and subject to minimum thresholds. The annual cash bonus that may be granted to executive officers other than our chief executive officer may be based entirely on a discretionary evaluation. Furthermore, the performance objectives will be recommended by our chief executive officer and approved by our compensation committee (and, if required by law, by our board of directors).

The performance measurable objectives of our chief executive officer will be determined annually by our compensation committee and board of directors, will include the weight to be assigned to each achievement in the overall evaluation. A less significant portion of the chief executive officer's annual cash bonus may be based on a discretionary evaluation of the chief executive officer's overall performance by the compensation committee and the board of directors based on quantitative and qualitative criteria.

The equity-based compensation under our compensation policy for our executive officers (including members of our board of directors) is designed in a manner consistent with the underlying objectives in determining the base salary and the annual cash bonus, with its main objectives being to enhance the alignment between the executive officers' interests with our long-term interests and those of our shareholders and to strengthen the retention and the motivation of executive officers in the long term. Our compensation policy provides for executive officer compensation in the form of share options or other equity-based awards, such as restricted shares and restricted share units, in accordance with our equity incentive plans then in place. All equity-based incentives granted to executive officers shall be subject to vesting periods in order to promote long-term retention of the executive officers. The equity-based compensation shall be granted from time to time and be individually determined and awarded according to the performance, educational background, prior business experience, qualifications, role and the personal responsibilities of the executive officer.

In addition, our compensation policy contains compensation recovery provisions which allows us under certain conditions to recover bonuses paid in excess, enables our chief executive officer to approve an immaterial change in the terms of employment of an executive officer (provided that the changes of the terms of employment are in accordance our compensation policy) and allows us to exculpate, indemnify and insure our executive officers and directors subject to certain limitations set forth thereto.

Our compensation policy also provides for compensation to the members of our board of directors either (i) in accordance with the amounts provided in the Israeli Companies Regulations (Rules Regarding the Compensation and Expenses of an External Director) of 2000, as amended by the Israeli Companies Regulations (Relief for Public Companies Traded in Stock Exchange Outside of Israel) of 2000, as such regulations may be amended from time to time, or (ii) in accordance with the amounts determined in our compensation policy.

Our compensation policy was adopted on March 21, 2019 and is filed as an exhibit to the registration statement of which this prospectus forms a part.

## Nominating and Corporate Governance Committee

Upon listing on the NYSE, our nominating and corporate governance committee will consist of Dafna Gruber, Yuval Shachar and Yair Shamir . Dafna Gruber will serve as the chairperson of our nominating and corporate governance committee.

### *Listing Requirements*

Under NYSE corporate governance requirements, we are required to maintain a nominating and corporate governance committee composed only of independent directors. Although foreign private issuers are not required to comply with independent nominating and corporate governance committee requirements under the NYSE, our board of directors has determined that all of our expected nominating and corporate governance committee members meet such standards.

### *Nominating and Corporate Governance Committee Role*

In connection with this offering, our board of directors approved a nominating and corporate governance committee charter, which will become effective upon listing on the NYSE, setting forth the responsibilities of the nominating and corporate governance committee consistent with the Israeli Companies Law, SEC rules and NYSE corporate governance requirements, which include:

*   supporting and advising our board of directors in selecting director nominees, consistent with the criteria approved by our board of directors, who are best able to fulfill the responsibilities of a director;

*   overseeing the evaluation of our board of directors and our management; and

*   otherwise taking a leadership role in shaping our corporate governance establishing and maintaining effective corporate governance policies and practices, including, but not limited to, developing and recommending to our board of directors a set of corporate governance guidelines applicable to our company.

## Internal Auditor

Under the Israeli Companies Law, the board of directors of a public company must appoint an internal auditor based on the recommendation of the audit committee. The role of the internal auditor is, among other things, to examine whether a company's actions comply with applicable law and orderly business procedure. Under the Israeli Companies Law, the internal auditor may not be an interested party or an office holder or a relative of an interested party or of an office holder, nor may the internal auditor be the company's independent auditor or the representative of the same.

An "interested party" is defined in the Israeli Companies Law as (i) a holder of 5% or more of the issued share capital or voting power in a company, (ii) any person or entity who has the right to designate one or more directors or to designate the chief executive officer of the company or (iii) any person who serves as a director or as a chief executive officer of the company. As of the date of this prospectus, we have not yet appointed our internal auditor.

## Fiduciary Duties and Approval of Specified Related Party Transactions and Compensation under Israeli Law

### *Fiduciary Duties of Office Holders*

The Israeli Companies Law imposes a duty of care and a duty of loyalty on all office holders of a company. The duty of care requires an office holder to act with the degree of skill and care with which a reasonable office holder in the same position would have acted under the same circumstances. The duty of care includes, among other things, a duty to use reasonable means, in light of the circumstances, to obtain:

*   information on the advisability of a given action brought for his or her approval or performed by virtue of his or her position; and

*   all other important information pertaining to such action.

The duty of loyalty incumbent on an office holder requires him or her to act in good faith and for the benefit of the company, and includes, among other things, the duty to:

- refrain from any act involving a conflict of interest between the performance of his or her duties in the company and his or her other duties or personal affairs;

- refrain from any activity that is competitive with the business of the company;

- refrain from exploiting any business opportunity of the company for the purpose of gaining a personal advantage for himself or herself or others; and

- disclose to the company any information or documents relating to the company's affairs which the office holder received as a result of his or her position as an office holder.

***Disclosure of Personal Interests of an Office Holder and Approval of Certain Transactions***

Under the Israeli Companies Law, a company may approve an act specified above which would otherwise constitute a breach of the office holder's fiduciary duty, provided that the office holder acted in good faith, the act or its approval does not harm the company, and the office holder discloses to the company his or her personal interest in the transaction (including any significant fact or document) a reasonable time before the approval of such act. Any such approval is subject to the terms of the Israeli Companies Law, setting forth, among other things, the appropriate bodies of the company required to provide such approval, and the methods of obtaining such approval.

The Israeli Companies Law requires that an office holder promptly disclose to the company any direct or indirect personal interest that he or she may have and all related material information or documents known to him or her relating to any existing or proposed transaction by the company. An interested office holder's disclosure must be made promptly and in any event no later than the first meeting of the board of directors at which the transaction is considered. An office holder is not obliged to disclose such information if the personal interest of the office holder derives solely from the personal interest of his or her relative in a transaction that is not considered an extraordinary transaction.

If the transaction is an extraordinary transaction, the office holder must also disclose any personal interest held by:

- the office holder's relatives (spouse, siblings, parents, grandparents, descendants, spouse's descendants and the spouses of any of these people); or

- any company in which the office holder or his or her relatives holds 5% or more of the shares or voting rights, serves as a director or general manager or has the right to appoint at least one director or the general manager.

Under the Israeli Companies Law, unless the articles of association of a company provide otherwise, a transaction with an office holder or with a third party in which the office holder has a personal interest, which is not an extraordinary transaction, requires approval by the board of directors. Our amended and restated articles of association provide that such a transaction, which is not an extraordinary transaction, shall be approved by the board of directors or a committee of the board of directors or any other body or person (which has no personal interest in the transaction) authorized by the board of directors. If the transaction considered is an extraordinary transaction with an office holder or third party in which the office holder has a personal interest, then audit committee approval is required prior to approval by the board of directors. Under specific circumstances, shareholder approval may also be required. For the approval of compensation arrangements with directors and executive officers, see "— Compensation of Directors and Executive Officers."

Any persons who have a personal interest in the approval of a transaction that is brought before a meeting of the board of directors or the audit committee may not be present at the meeting or vote on the matter. However, if the chairman of the board of directors or the chairman of the audit committee, as applicable, has determined that the presence of an office holder with a personal interest is required, such

office holder may be present at the meeting for the purpose of presenting the matter. Notwithstanding the foregoing, a director who has a personal interest may be present at the meeting of the board of directors or the audit committee (as applicable) and vote on the matter if a majority of the members of the board of directors or the audit committee (as applicable) have a personal interest in the approval of such transaction. If a majority of the directors at a board of directors meeting have a personal interest in the transaction, such transaction also generally requires approval of the shareholders of the company.

A "personal interest" is defined under the Israeli Companies Law as the personal interest of a person in an action or in a transaction of the company, including the personal interest of such person's relative or the interest of any other corporate body in which the person and/or such person's relative is a director or general manager, a 5% shareholder or holds 5% or more of the voting rights, or has the right to appoint at least one director or the general manager, but excluding a personal interest stemming solely from the fact of holding shares in the company. A personal interest also includes (1) a personal interest of a person who votes according to a proxy of another person, including in the event that the other person has no personal interest, and (2) a personal interest of a person who gave a proxy to another person to vote on his or her behalf regardless of whether or not the discretion of how to vote lies with the person voting.

An "extraordinary transaction" is defined under the Israeli Companies Law as any of the following:

- a transaction other than in the ordinary course of business;

- a transaction that is not on market terms; or

- a transaction that may have a material impact on the company's profitability, assets or liabilities.

### *Disclosure of Personal Interests of a Controlling Shareholder and Approval of Transactions*

Pursuant to the Israeli Companies Law, the disclosure requirements that apply to an office holder also apply to a controlling shareholder of a public company. Extraordinary transactions with a controlling shareholder or in which a controlling shareholder has a personal interest, including a private placement in which a controlling shareholder has a personal interest, and the terms of engagement of the company, directly or indirectly, with a controlling shareholder or a controlling shareholder's relative (including through a corporation controlled by a controlling shareholder), regarding the company's receipt of services from the controlling shareholder, and if such controlling shareholder is also an office holder or employee of the company, regarding his or her terms of employment, require the approval of each of (i) the audit committee (or the compensation committee with respect to the terms of the engagement as an office holder or employee, including insurance, indemnification and compensation), (ii) the board of directors and (iii) the shareholders, in that order. In addition, the shareholder approval must fulfill one of the following requirements:

- a majority of the shares held by shareholders who have no personal interest in the transaction and are voting at the meeting must be voted in favor of approving the transaction, excluding abstentions; or

- the shares voted by shareholders who have no personal interest in the transaction who vote against the transaction represent no more than 2% of the voting rights in the company.

In addition, an extraordinary transaction with a controlling shareholder or in which a controlling shareholder has a personal interest, and an engagement of the company, directly or indirectly, with a controlling shareholder or a controlling shareholder's relative (including through a corporation controlled by a controlling shareholder), regarding the company's receipt of services from the controlling shareholder, and if such controlling shareholder is also an office holder or employee of the company, regarding his or her terms of employment, in each case with a term of more than three years requires the abovementioned approval every three years, however, transactions not involving the receipt of services or compensation can be approved for a longer term, provided that the audit committee determines that such longer term is reasonable under the circumstances. In addition, transactions with a controlling shareholder or a controlling shareholder's relative who serves as an officer in a company, directly or

indirectly (including through a corporation under his control), involving the receipt of services by a company or their compensation can have a term of five years from the company's initial public offering under certain circumstances.

The Israeli Companies Law requires that every shareholder that participates, in person or by proxy, in a vote regarding a transaction with a controlling shareholder, must indicate in advance or in the ballot whether or not that shareholder has a personal interest in the vote in question. Failure to so indicate will generally result in the invalidation of that shareholder's vote.

### *Disclosure of Compensation of Executive Officers*

For so long as we qualify as a foreign private issuer, we are not required to comply with the proxy rules applicable to U.S. domestic companies, including the requirement applicable to emerging growth companies to disclose the compensation of our chief executive officer and other two most highly compensated executive officers on an individual, rather than an aggregate, basis. Nevertheless, regulations promulgated under the Israeli Companies Law will require us, after we become a public company, to disclose the annual compensation of our five most highly compensated office holders on an individual basis, rather than on an aggregate basis. This disclosure will not be as extensive as that required of a U.S. domestic issuer. We intend to commence providing such disclosure, at the latest, in the annual proxy statement for our first annual general meeting of shareholders following this offering, which will be furnished under cover of a Form 6-K and we may elect to provide such information at an earlier date.

### *Compensation of Directors and Executive Officers*

*Directors* . Under the Israeli Companies Law, the compensation of our directors requires the approval of our compensation committee, the subsequent approval of the board of directors and, unless exempted under regulations promulgated under the Israeli Companies Law, the approval of the shareholders at a general meeting. If the compensation of our directors is inconsistent with our compensation policy, then, the compensation committee and board of directors may approve such compensation under special circumstances, as long as they consider those provisions that must be included in the compensation policy according to the Israeli Companies Law, and provided that shareholder approval is obtained, which approval should satisfy one of the following:

• at least a majority of the shares held by all shareholders who are not controlling shareholders and do not have a personal interest in such matter, present and voting at such meeting, are voted in favor of the compensation package, excluding abstentions; or

• the total number of shares of non-controlling shareholders and shareholders who do not have a personal interest in such matter voting against the compensation package does not exceed 2% of the aggregate voting rights in the company.

*Executive Officers (other than the Chief Executive Officer)* . The Israeli Companies Law requires the approval of the compensation of a public company's executive officers (other than the chief executive officer) in the following order: (i) the compensation committee, (ii) the company's board of directors and (iii) if such compensation arrangement is inconsistent with the company's compensation policy, the company's shareholders (by a special majority vote as discussed above with respect to the approval of director compensation). However, if the shareholders of the company do not approve a compensation arrangement with an executive officer that is inconsistent with the company's compensation policy, the compensation committee and board of directors may override the shareholders' decision if each of the compensation committee and the board of directors provide detailed reasons for their decision.

*Chief Executive Officer* . The Israeli Companies Law requires the approval of the compensation of a public company's chief executive officer in the following order: (i) the company's compensation committee, (ii) the company's board of directors and (iii) the company's shareholders (by a special majority vote as discussed above with respect to the approval of director compensation). However, if the shareholders of the company do not approve the compensation arrangement with the chief executive officer, the

compensation committee and board of directors may override the shareholders' decision if each of the compensation committee and the board of directors provide a detailed report for their decision. The approval of each of the compensation committee and the board of directors should be in accordance with the company's compensation policy; however, in special circumstances, they may approve compensation terms of a chief executive officer that are inconsistent with such policy provided that they have considered those provisions that must be included in the compensation policy according to the Israeli Companies Law and that shareholder approval was obtained (by a special majority vote as discussed above with respect to the approval of director compensation). In addition, the compensation committee may waive the shareholder approval requirement with regards to the approval of the engagement terms of a candidate for the chief executive officer position, if they determine that the compensation arrangement is consistent with the company's compensation policy, and that the chief executive officer did not have a prior business relationship with the company or a controlling shareholder of the company and that subjecting the approval of the engagement to a shareholder vote would impede the company's ability to employ the chief executive officer candidate.

### *Duties of Shareholders*

Under the Israeli Companies Law, a shareholder has a duty to refrain from abusing its power in the company and to act in good faith and in an acceptable manner in exercising its rights and performing its obligations to the company and other shareholders, including, among other things, when voting at meetings of shareholders on the following matters:

- an amendment to the articles of association;

- an increase in the company's authorized share capital;

- a merger; and

- the approval of related party transactions and acts of office holders that require shareholder approval.

A shareholder also has a general duty to refrain from discriminating against other shareholders.

The remedies generally available upon a breach of contract will also apply to a breach of the shareholder duties mentioned above, and in the event of discrimination against other shareholders, additional remedies may be available to the injured shareholder.

In addition, any controlling shareholder, any shareholder that knows that its vote can determine the outcome of a shareholder vote and any shareholder that, under a company's articles of association, has the power to appoint or prevent the appointment of an office holder, or any other power with respect to a company, is under a duty to act with fairness towards the company. The Israeli Companies Law does not describe the substance of this duty except to state that the remedies generally available upon a breach of contract will also apply in the event of a breach of the duty to act with fairness, taking the shareholder's position in the company into account.

### *Approval of Private Placements*

Under the Israeli Companies Law and the regulations promulgated thereunder, a private placement of securities of an Israeli public company whose shares are traded solely outside of Israel, like we will be upon completion of this offering, does not require approval at a general meeting of the shareholders of a company; provided however, that in special circumstances, such as a private placement which is intended to obviate the need to conduct a special tender offer or a private placement which qualifies as a related party transaction, approval at a general meeting of the shareholders of a company is required. See "Description of Share Capital—Acquisitions under Israeli Law." However, upon completion of this offering, we will be subject to NYSE corporate governance requirements relating to private placements.

104

## Exculpation, Insurance and Indemnification of Directors and Officers

Under the Israeli Companies Law, a company may not exculpate an office holder from liability for a breach of the duty of loyalty. An Israeli company may exculpate an office holder in advance from liability to the company, in whole or in part, for damages caused to the company as a result of a breach of duty of care but only if a provision authorizing such exculpation is included in its articles of association. Our amended and restated articles of association, which will become effective upon the closing of this offering, include such a provision. The company may not exculpate in advance a director from liability arising from a breach of his or her duty of care in connection with a prohibited dividend or distribution to shareholders.

As permitted under the Israeli Companies Law, our amended and restated articles of association provide that we may indemnify an office holder in respect of the following liabilities, payments and expenses incurred for acts performed by him or her as an office holder, either in advance of an event or following an event:

- a monetary liability incurred by or imposed on the office holder in favor of another person pursuant to a court judgment, including pursuant to a settlement confirmed as judgment or arbitrator's decision approved by a competent court. However, if an undertaking to indemnify an office holder with respect to such liability is provided in advance, then such an undertaking must be limited to events which, in the opinion of the board of directors, can be foreseen based on the company's activities when the undertaking to indemnify is given, and to an amount or according to criteria determined by the board of directors as reasonable under the circumstances, and such undertaking shall detail the abovementioned foreseen events and amount or criteria;

- reasonable litigation expenses, including reasonable attorneys' fees, which were incurred by the office holder as a result of an investigation or proceeding filed against the office holder by an authority authorized to conduct such investigation or proceeding, provided that such investigation or proceeding was either (i) concluded without the filing of an indictment against such office holder and without the imposition on him of any monetary obligation in lieu of a criminal proceeding, (ii) concluded without the filing of an indictment against the office holder but with the imposition of a monetary obligation on the office holder in lieu of criminal proceedings for an offense that does not require proof of criminal intent or (iii) in connection with a monetary sanction;

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder or which were imposed on the office holder by a court (i) in a proceeding instituted against him or her by the company, on its behalf, or by a third party, (ii) in connection with criminal indictment of which the office holder was acquitted or (iii) in a criminal indictment which the office holder was convicted of an offense that does not require proof of criminal intent;

- expenses he or she incurs as a result of administrative proceedings that may be instituted against him or her under Israeli securities laws, if applicable, and payments made to injured persons under specific circumstances thereunder; and

- any other matter in respect of which it is permitted or will be permitted under applicable law to indemnify an office holder in the company.

As permitted under the Israeli Companies Law, our amended and restated articles of association provide that we may insure an office holder against the following liabilities incurred for acts performed by him or her as an office holder:

- a breach of the duty of loyalty to the company, provided that the office holder acted in good faith and had a reasonable basis to believe that the act would not harm the company;

- a breach of duty of care to the company or to another person, to the extent such a breach arises out of the negligent conduct of the office holder;

105

- a monetary liability imposed on the office holder in favor of a third party;

- expenses he or she incurs as a result of administrative proceedings that may be instituted against him or her under the Israeli securities laws if applicable, and payments made to injured persons under specific circumstances thereunder; and

- any other matter in respect of which it is permitted or will be permitted under applicable law to insure the liability of an office holder in the company.

Under the Israeli Companies Law, a company may not indemnify, exculpate or insure an office holder against any of the following:

- a breach of the duty of loyalty, except for indemnification and insurance for a breach of the duty of loyalty to the company to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of duty of care committed intentionally or recklessly, excluding a breach arising out of the negligent conduct of the office holder;

- an act or omission committed with intent to derive illegal personal benefit; or

- a fine or forfeit levied against the office holder.

Under the Israeli Companies Law, exculpation, indemnification and insurance of office holders must be approved by the compensation committee and the board of directors and, with respect to directors or controlling shareholders, their relatives and third parties in which controlling shareholders have a personal interest, also by the shareholders.

Our amended and restated articles of association permit us to exculpate, indemnify and insure our office holders to the fullest extent permitted or to be permitted by law. Our office holders are currently covered by a directors' and officers' liability insurance policy. As of the date of this prospectus, no claims for directors' and officers' liability insurance have been filed under this policy and we are not aware of any pending or threatened litigation or proceeding involving any of our office holders, including our directors, in which indemnification is sought.

We have entered into agreements with each of our current office holders exculpating them from a breach of their duty of care to us to the fullest extent permitted by law, subject to limited exceptions, and undertaking to indemnify them to the fullest extent permitted by law, subject to limited exceptions, including, with respect to liabilities resulting from this offering, to the extent that these liabilities are not covered by insurance. This indemnification is limited, with respect to any monetary liability imposed in favor of a third party, to events determined as foreseeable by the board of directors based on our activities. The maximum aggregate amount of indemnification that we may pay to our office holders based on such indemnification agreement is the greater of (1) 25% of our total shareholders' equity pursuant to our most recent financial statements as of the time of the actual payment of indemnification and (2) $40.0 million (as may be increased from time to time by shareholders' approval); provided, however, that in relation to indemnification claimed in connection with a public offering of our securities, the amount, if higher, shall be equal to the aggregate proceeds from the sale by the Company and/or any shareholder of the Company in connection with such public offering . Such indemnification amounts are in addition to any insurance amounts. Each office holder who agrees to receive this letter of indemnification also gives his approval to the termination of all previous letters of indemnification that we have provided to him or her in the past, if any. However, in the opinion of the SEC, indemnification of office holders for liabilities arising under the Securities Act is against public policy and therefore unenforceable.

## Employment and Consulting Agreements with Executive Officers

We have entered into written employment or service agreements with each of our executive officers. See "Certain Relationships and Related Party Transactions—Agreements with Directors and Officers—Employment Agreements."

## Directors' Service Contracts

There are no arrangements or understandings between us, on the one hand, and any of our directors, on the other hand, providing for benefits upon termination of their employment or service as directors of our company.

## Share Option Plans

### 2007 Israeli Share Option Plan

*Effective Date and Shares Reserved.* On October 21, 2007, our board of directors adopted the 2007 Israeli Share Option Plan, or the 2007 Plan. The 2007 Plan generally allowed us to grant options to our employees, directors, officers, consultants, advisors and any other person providing services to us or any of our affiliates. As of December 31, 2018, options to purchase a total of 4,271,609 shares were outstanding under the 2007 Plan. In May 2017, we extended the terms of options held by certain holders under the 2007 Plan by an additional 10 years. Unless earlier terminated pursuant to the original terms of the 2007 Plan, all granted but unexercised options will expire and cease to be exercisable at 5:00 p.m. Israel time on the 10 [th] anniversary of the vesting commencement date of such options.

*Plan Administration.* The 2007 Plan may be administered by our board of directors or a committee thereof. Subject to Israeli law and our articles of association or any resolution to the contrary by our board of directors, the administrator is authorized, in its sole and absolute discretion, to exercise all powers and authorities specifically granted to it under the 2007 Plan or necessary or advisable in the administration of the 2007 Plan.

*Vesting Terms and Conditions of the Options* . Unless otherwise determined by the administrator, options under the 2007 Plan vest and become exercisable as follows: 25% of the shares covered by the options vested on the first anniversary of the vesting commencement date, 1/3 of the remaining shares vest on each subsequent anniversary of the vesting commencement date and all options become fully vested by the fourth anniversary of the vesting commencement date.

*Israeli Tax Law.* Unless otherwise determined by the administrator, any underlying shares issued upon exercise of options (granted through the "capital gains track through a trustee" in accordance with Section 102(b)(2) of the Israeli Income Tax Ordinance (New Version), 1961, or the Israeli Tax Ordinance), will be held by a trustee until the lapse of the holding period (as defined in the 2007 Plan), or, subject to a tax ruling, until the earlier of a merger (as defined in the 2007 Plan) or an initial public offering. We appointed a trustee to hold the allocated options and underlying shares issued upon the exercise off such options in a trust on behalf of each applicable Israeli grantee. No underlying shares or additional rights we issue to the trustee will be held for a period longer than 20 years after the end of the term of the options.

*Termination of Employment or Service* . In the event that the employment or service of a grantee terminates (other than by reason of death, disability retirement or for cause), all options of such grantee that are vested but unexercised on the date of the termination may be exercised unless earlier terminated in accordance with their terms and if not previously expired, no later than the earlier of (i) 90 days after such termination and (ii) the term of the option. All other granted options will expire upon such termination. In the event of a grantee's death during employment or service, or in the event of a grantee's termination due to retirement or disability, all of the grantee's vested but unexercised options will be exercisable until the earlier of (i) 180 days after the date of termination of employment and (ii) the term of the option. In the event of a grantee's termination for cause, all options, whether vested or unvested, will expire.

*Merger* . In the event of a merger transaction (as defined in the 2007 Plan), the administrator in its sole discretion, will decide (i) if and how the unvested options will be canceled, replaced or accelerated, (ii) if and how vested options will be exercised, replaced and/or sold by us or the trustee on the behalf of Israeli participants and (iii) how underlying shares issued upon exercise of the options and held by the trustee on behalf of Israeli participants will be replaced and/or sold by the trustee on behalf of the Israeli participant.

*2008 U.S. Stock Plan*

*Effective Date and Shares Reserved.* On May 25, 2008, our board of directors adopted the 2008 U.S. Stock Plan, or the 2008 Plan. The 2008 Plan generally allows for the grant of nonstatutory share options, incentive share options that satisfy the requirements of Section 422 of the Code, and the sale or award of shares to our employees, outside directors and consultants and those of Tufin Software North America, Inc., as well as any of our other subsidiaries. As of December 31, 2018, options to purchase a total of 2,262,663 shares were outstanding under the 2008 Plan. The 2008 Plan will automatically terminate 10 years after the later of (i) adoption by the board of directors or (ii) the most recent increase in the number of shares reserved under the 2008 Plan that was approved by shareholders. We no longer make awards under the 2008 Plan.

*Plan Administration* . The 2008 Plan may be administered by one or more committees of the board of directors. The entire board of directors may administer the 2008 Plan if no committee is otherwise appointed. Subject to the provisions of the 2008 Plan, the board of directors will have full authority and discretion to take any actions it deems necessary or advisable for the administration of the 2008 Plan. All decisions, interpretations and other actions of the board of directors will be final and binding on all participants.

*Terms and Conditions of Awards* . Any shares issued upon exercise of an option or awarded or sold under the 2008 Plan may be subject to the special forfeiture conditions, rights of repurchase, rights of first refusal and other transfer restrictions as the board of directors may determine.

*Options* . The 2008 Plan requires that options have an exercise price that is not less than 100% of the fair market value of a share on the grant date. Incentive share options granted to an employee owning more than 10% of our or any of our subsidiaries' combined voting power will have an exercise price of at least 110% of the fair market value of the share on the grant date. The expiration date of an option may be no later than the 10 th anniversary of the date of grant (or the fifth anniversary in the case of incentive share options granted to employees who, at the time of grant, own more than 10% of our or any of our subsidiaries' combined voting power).

*Change in Control.* In the event that we are a party to a merger, consolidation, exchange of shares, sale of all or substantially all of its assets or like event, all outstanding options will be subject to the applicable transaction agreement, which will provide for one or more of the following: (i) the continuation of our outstanding options (if we are the surviving corporation); (ii) the assumption of the outstanding option by the surviving corporation or its parent in a manner that complies with Section 424(a) of the Code; (iii) the substitution by the surviving corporation or its parent of new options for the outstanding options in a manner that complies with Section 424(a) of the Code; or (iv) the cancelation of the outstanding options without the payment of any consideration.

*2018 U.S. Equity-Based Incentive Plan*

*Effective Date and Shares Reserved* . On April 9, 2018, our board of directors adopted the 2018 U.S. Equity-Based Incentive Plan, or the 2018 Plan. The 2018 Plan generally allowed us to grant options to our employees, directors, officers, consultants, advisors and any other person providing services to us or any of our affiliates who are U.S. citizens or who are resident aliens of the United States for U.S. federal income tax purposes. The maximum aggregate number of shares that may be issued pursuant to awards under the 2018 Plan is 233,333 shares. No more than 233,333 shares may be issued as a result of the exercise of incentive share options under the 2018 Plan. As of December 31, 2018, a total of 215,987 shares were outstanding under the 2018 Plan and we had 17,333 shares available for future grants.

*Plan Administration* . The 2018 Plan may be administered by a committee of the board of directors. The entire board of directors may administer the 2018 Plan if no committee is otherwise appointed. Subject to the provisions of the 2018 Plan, the administrator of the 2018 Plan has full authority and discretion to take any actions it deems necessary or advisable for the administration of the 2018 Plan. All decisions,

interpretations and other actions of the administrator of the 2018 Plan will be final and binding on all participants, unless otherwise determined by the board of directors.

*Options.* The 2018 Plan allows for the grant of nonqualified share options and incentive share options that satisfy the requirements of Section 422 of the Code. Each award will be evidenced by an option agreement that will govern such award's terms and conditions. Only our employees or employees of our parent or subsidiaries are eligible to receive incentive share options. The 2018 Plan requires that incentive share options have an exercise price that is not less than 100% of the fair market value of a share on the grant date and that nonqualified share options have an exercise price equal to the fair market value of a share on the grant date unless the committee administering the 2018 Plan specifies otherwise and the option complies with Section 409A of the Code. Incentive share options granted to an employee owning more than 10% of our or our and our subsidiaries' combined voting power will have an exercise price of at least 110% of the fair market value of the shares on the grant date. The expiration date of an option may be no later than the 10 th anniversary of the date of grant, unless otherwise determined by the committee administering the 2018 Plan (or the fifth anniversary in the case of incentive share options granted to employees who, at the time of grant, own more than 10% of our or our parent's or subsidiaries' combined voting power).

*Termination of Employment or Service* . In the event that the employment or service of a grantee terminates (other than by reason of death, disability or retirement), all awards of such grantee that are unvested at the time of such termination will terminate on the date of such termination, and all awards of such grantee that are vested and exercisable at the time of such termination may, unless earlier terminated in accordance with their terms, be exercised within 12 months after the date of such termination (or such different period as the committee administering the 2018 Plan will prescribe). In the event of a grantee's death during employment or service or within three months following such grantee's termination, or in the event of a grantee's termination due to disability, all of the grantee's vested awards may be exercised at any time within one year after such death or disability. In the event of a grantee's retirement, all of the grantee's vested awards, unless earlier terminated in accordance with their terms, may be exercised at any time within the three month period following such retirement. If we (or our affiliate, when applicable) terminate the grantee's employment or service for cause, or if at any time during the exercise period, facts or circumstances arise or are discovered with respect to the grantee that would have constituted cause, all awards theretofore granted to such grantee will, to the extent not theretofore exercised, terminate on the date of such termination (or on such subsequent date on which such facts or circumstances arise or are discovered, as the case may be) unless otherwise determined by the committee administering the 2018 Plan.

*Merger or Sale* . In the event of a merger or sale, unless otherwise determined by the committee administering the 2018 Plan in its sole and absolute discretion, any award then outstanding will be assumed or will be substituted by us or by the successor corporation in the merger or sale or by any affiliate thereof under substantially the same terms as the award. In the event that awards are not assumed or substituted for equivalent awards, the committee administering the 2018 Plan may (i) provide for a grantee to have the right to exercise an award, or otherwise accelerate vesting of an award, as to all or part of the shares covered thereby, including shares covered by the award which would not otherwise be exercisable or vested, and/or (ii) provide for the cancelation of each outstanding award at the closing of the merger or sale, and payment to the grantee. In the event of a merger or sale, the committee administering the 2018 Plan may, without the consent of the grantee, amend, modify or terminate awards as the committee will deem in good faith to be appropriate.

### 2019 Equity-Based Incentive Plan

*Effective Date and Shares Reserved.* On February 28, 2019, our board of directors approved our 2019 Equity-Based Incentive Plan, or the 2019 Plan, which became effective upon shareholder approval on March 21, 2019. Our 2019 Plan replaced our 2007 Plan and our 2018 Plan, or the Prior Plans, under which further grants will not be made. The 2019 Plan generally allows for the grant of options, restricted shares, restricted share units and other share-based awards to our and our affiliates' employees,

directors, officers, consultants and advisors. The 2019 Plan enables us to issue awards under varying tax regimes, including Section 102 and Section 3(i) awards pursuant to the Israeli Tax Ordinance and incentive stock options within the meaning of Section 422 of the Code. The maximum aggregate number of shares that may be issued pursuant to awards under the 2019 Plan is the sum of (a) 2,750,000 shares plus (b) on January 1 of each calendar year during the term of the 2019 Plan commencing in 2020, a number of shares equal to the lesser of: (i) an amount determined by our board of directors, if so determined prior to the January 1 of the calendar year in which the increase will occur, (ii) 5% of the total number of shares outstanding on December 31 of the immediately preceding calendar year and (iii) 5,000,000 shares.

Additionally, any share (i) underlying an award under the 2019 Plan or the Prior Plans (in an amount not to exceed 813,515 shares under the Prior Plans) that has expired, or was canceled, terminated, forfeited, repurchased or settled in cash in lieu of issuance of shares, for any reason, without having been exercised , (ii) tendered to pay the exercise price of an award (or the exercise price or other purchase price of any option or other award under the Prior Plans), or withholding tax obligations with respect to an award (or any awards under the Prior Plans), or (iii) subject to an award (or any award under the Prior Plans) that is not delivered to a grantee because such shares are withheld to pay the exercise price (or of any award under the Prior Plans), or withholding tax obligations with respect to such Award (or such other award) will automatically be available for grant under the 2019 Plan. As of March 31, 2019, no awards had been made under the 2019 Plan and 2,646,849 shares were available for future grant under the 2019 Plan.

*Plan Administration* . Either our board of directors or a committee established by our board of directors administers the 2019 Plan, and such administrator will have full authority in its discretion to determine (i) eligible grantees, (ii) grants of awards and setting the terms and provisions of award agreements (which need not be identical) and any other agreements or instruments under which awards are made, including, but not limited to, the number of shares underlying each award and the class of shares underlying each award (if more than one class was designated by our board of directors), (iii) the time or times at which awards will be granted, (iv) the terms, conditions and restrictions applicable to each award (which need not be identical) and any shares acquired upon the exercise or (if applicable) vesting thereof, (v) to accelerate, continue, extend or defer the exercisability of any award or the vesting thereof, including with respect to the period following a grantee's termination of employment or other service, (vi) the interpretation of the 2019 Plan and any award agreement and the meaning, interpretation and applicability of terms referred to in applicable laws, (vii) policies, guidelines, rules and regulations relating to and for carrying out the 2019 Plan, and any amendment, supplement or rescission thereof, as it may deem appropriate, (viii) to adopt supplements to, or alternative versions of, the 2019 Plan, including, without limitation, as it deems necessary or desirable to comply with the laws of, or to accommodate the tax regime or custom of, foreign jurisdictions whose citizens or residents may be granted awards, (ix) the fair market value of the shares or other property, (x) the tax track (capital gains, ordinary income track or any other track available under the Section 102 of the Israeli Tax Ordinance) for the purpose of Section 102 to the Israeli Tax Ordinance, (xi) the authorization and approval of conversion, substitution, cancellation or suspension under and in accordance with the 2019 Plan of any or all awards or shares, (xii) the amendment, modification, waiver or supplement of the terms of each outstanding award (with the consent of the applicable grantee, if such amendments refers to the increase of the exercise price of awards or reduction of the number of shared underlying an award (but, in each case, other than as a result of an adjustment or exercise of rights in accordance with the provisions of the 2019 Plan) unless otherwise provided under the terms of the 2019 Plan, (xiii) without limiting the generality of the foregoing, and subject to the provisions of applicable law, to grant to a grantee who is the holder of an outstanding award, in exchange for the cancellation of such award, a new award having an exercise price lower than that provided in the award so canceled and containing such other terms and conditions as the committee may prescribe in accordance with the provisions of the 2019 Plan or to set a new exercise price for the same award lower than that previously provided in the award, (xiv) to correct any defect, supply any omission or reconcile any inconsistency in the 2019 Plan or any award agreement and all other determinations and take such other actions with respect to the 2019 Plan or any award as it may deem

110

advisable to the extent not inconsistent with the provisions of the 2019 Plan or applicable law, (xv) to designate any of our officers or other persons to manage the day to day administration of the awards granted under the 2019 Plan or authorize any of them to act on behalf of the committee with respect to any matter, right, obligation, determination or election which is the responsibility of or which is allocated to the committee herein, (xvi) to determine that awards, shares issuable upon the exercise or (if applicable) vesting of awards and/or any securities issued or distributed with respect thereto, shall be allocated or issued to, or held by, the representative in trust for the benefit of the grantees and (xvii) any other matter which is necessary or desirable for, or incidental to, the administration of the 2019 Plan and any award thereunder. The board of directors and the committee need not take the same action or determination with respect to all awards, with respect to certain types of awards, with respect to all service providers or any certain type of service providers and actions and determinations may differ as among the grantees, and as between the grantees and any other holders of our securities. The board of directors may, at any time, suspend, terminate, modify, or amend the 2019 Plan, whether retroactively or prospectively.

*Types and Terms and Conditions of Awards* . The committee may grant awards intended to qualify as an incentive stock option, non-qualified stock option, Section 102 award, Section 3(i) award, or other designations under other regimes. The 2019 Plan generally requires that incentive stock options have an exercise price that is not less than 100% of the fair market value of a share underlying such options or 110% in case of an employee who at the time of the grant owns shares possessing more than 10% of the total combined voting power of all classes of our shares or of any of our subsidiaries on the date of grant of such options or such other price as may be determined pursuant to the Code. The exercise price of any other awards granted will be determined by the committee.

The exercise period of an option award will be 10 years from the date of grant of the award unless otherwise determined by the committee, but subject to the vesting and the early termination provisions, provided that the period of an incentive stock option granted to an employee who at the time of the grant owns shares possessing more than 10% of the total combined voting power of all classes of our shares or of any of our subsidiaries, shall not exceed five years from the date of grant. Except as described below, an award generally may not be exercised unless the grantee is then in our employ or service and unless the grantee has remained continuously so employed since the date of grant of the award and throughout the vesting dates. In the event that the employment or service of a grantee terminates (other than by reason of death, disability or retirement), unless otherwise determined by the committee, all awards of such grantee that are unvested at the time of such termination shall terminate on the date of such termination, and all awards of such grantee that are vested and exercisable at the time of such termination may, unless earlier terminated in accordance with their terms, be exercised within up to three months after the date of such termination (or such different period as the committee will prescribe), but in any event no later than the date of expiration of the award's term as set forth in the award agreement or pursuant to this 2019 Plan. In the event of a grantee's death during employment or service or within three months following such grantee's termination, (or such longer period as determined by the committee), or in the event of a grantee's termination due to disability, all of the grantee's vested awards may be exercised at any time within one year after such death or disability (or such longer period as determined by the committee) . In the event of a grantee's retirement, all of the grantee's vested awards, unless earlier terminated in accordance with their terms, may be exercised at any time within the three month period following such retirement (or such different period as the committee shall prescribe) . If we (or our affiliate, when applicable) terminate the grantee's employment or service for cause (as defined in the 2019 Plan), or if at any time during the exercise period (whether prior to and after termination of employment or service, and whether or not the grantee's employment or service is terminated by either party as a result thereof), facts or circumstances arise or are discovered with respect to the grantee that would have constituted cause, all awards theretofore granted to such grantee (whether vested or not) shall, to the extent not theretofore exercised, terminate on the date of such termination (or on such subsequent date on which such facts or circumstances arise or are discovered, as the case may be) unless otherwise determined by the committee.

Section 102 of the Israeli Tax Ordinance allows our employees, directors and officers who are not controlling shareholders and are Israeli residents for tax purposes to receive favorable tax treatment for

share-based awards. Section 102 includes two alternatives for tax treatment involving the issuance of awards to a trustee for the benefit of the grantees and also includes an additional alternative for the issuance of awards directly to the grantee. We intend to elect the "capital gain track" pursuant to Section 102(b)(2) of the Israeli Tax Ordinance for grants to eligible Israeli grantees as provided above, which may allow favorable tax treatment for such grantees. In order to comply with the terms of the capital gain track, all awards granted under the 2019 Plan and subject to the provisions of Section 102 of the Israeli Tax Ordinance, as well as the shares issued upon exercise of such awards and any rights granted thereunder, including bonus shares, must be registered in the name of a trustee selected by the board and held in trust for the benefit of the relevant grantee for the requisite period prescribed by the Israeli Tax Ordinance or such longer period as set by the committee. The trustee may release these awards or shares to the holders thereof after the expiration of the required statutory holding period, provided that the trustee has received an acknowledgment from the Israeli Income Tax Authority that the grantee paid all applicable taxes, or the trustee and/or us and/or our affiliate withholds all applicable taxes and compulsory payments due. Our non-employee service providers and controlling shareholders may only be granted options or RSUs under Section 3(i) of the Israeli Income Tax Ordinance, which will be taxed as ordinary income upon the exercise of such awards into shares.

The administrator may grant restricted share units, or RSUs, under the 2019 Plan, which are awards covering a number of shares that are settled, if vested, by issuance of those shares. The award agreement for any restricted shares granted will provide the vesting schedule and purchase price, if any, for the restricted shares. If a grantee's employment or services to us or any of our affiliates terminates for any reason prior to the vesting of such grantee's restricted shares, any shares that remain subject to vesting will be forfeited by such grantee. No payment of exercise price (subject to applicable law and the terms of the award agreement) will be required as consideration for RSUs.

The administrator may grant other awards under the 2019 Plan, including shares (which may, but need not, be restricted shares), cash, a combination of cash and shares, awards denominated in share units, and share appreciation rights. However, to qualify as Section 102 or Section 3(i) awards pursuant to the Israeli Tax Ordinance, the award must be share-based compensation only and not cash compensation or any award that is settled in cash.

*Adjustment Provisions* . In the event of a division or subdivision of our outstanding share capital, any distribution of bonus shares (share split), consolidation or combination of our share capital (reverse stock split), reclassification with respect to our shares or any similar recapitalization events, a merger (including, a reverse merger and a reverse triangular merger), consolidation, amalgamation or like transaction of us with or into another corporation, reorganization (which may include a combination or exchange of shares, spin-off or other corporate divestiture or division, or other similar occurrences), the committee shall have the authority to make, without the need for a consent of any holder of an award, such adjustments as determined by the committee to be appropriate, in its discretion, in order to adjust (i) the number and class of shares reserved and available for grants of awards, (ii) the number and class of shares covered by outstanding awards, (iii) the exercise price per share covered by any award, (iv) the terms and conditions concerning vesting and exercisability and the term and duration of the outstanding awards and (v) any other terms of the award that in the opinion of the committee should be adjusted.

In the event of (i) a sale of all or substantially all of our assets, or a sale (including an exchange) of all or substantially all of our shares, to any person, or a purchase by any of our shareholders or by an affiliate of such shareholder, of all or substantially all of our shares held by all or substantially all other shareholders or by other shareholders who are not affiliated with such acquiring party; (ii) a merger (including, a reverse merger and a reverse triangular merger), consolidation, amalgamation or like transaction of us with or into another corporation; (iii) a scheme of arrangement for the purpose of effecting such sale, merger, consolidation, amalgamation or other transaction; (iv) change in board event, which means any time at which individuals who, as of the effective date of the 2019 Plan, constitute the incumbent board cease for any reason to constitute at least a majority of the board; provided, however, that any individual becoming a director subsequent to the effective date of the 2019 Plan whose election, or nomination for election by our shareholders, was approved by a vote of at least a majority of the directors then

112

comprising the incumbent board shall be considered as though such individual were a member of the incumbent board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a person other than the board; (v) approval by our shareholders of a complete liquidation or dissolution of the company; or (vi) such other transaction or set of circumstances that is determined by the board (being the incumbent board in case of a change in board event), in its discretion, to be a transaction subject to these provisions of the 2019 Plan; excluding any of the above transactions in clauses (i) through (v) if the board (being the incumbent board in case of a change in board event) determines that such transaction should be excluded from the definition hereof and the applicability of this provision of the 2019 Plan, any award then outstanding will be assumed or will be substituted by us or by the successor corporation in such change in control or by any affiliate thereof, as determined by the committee in its discretion, under terms as determined by the committee or the terms of the 2019 Plan applied by the successor corporation to such assumed or substituted award, unless otherwise determined by the sole and absolute discretion of the committee. Regardless of whether or not awards are assumed or substituted the committee may (but will not be obligated to), in its sole discretion: (1) provide for grantees to have the right to exercise their awards or otherwise for the acceleration of vesting of award in respect of all or part of the shares covered by the awards which would not otherwise be exercisable or vested, under such terms and conditions as the committee will determine, including the cancellation of all unexercised awards (whether vested or unvested) upon or immediately prior to the closing of the change in control; and/or (2) provide for the cancelation of each outstanding and unexercised award at or immediately prior to the closing of the change in control, and payment to the grantees of an amount in cash, our shares, the acquirer or of a corporation or other business entity which is a party to the change in control or other property, as determined by the committee to be fair in the circumstances, and subject to such terms and conditions as determined by the committee. Notwithstanding the foregoing, in the event of change in control, the committee may determine, in its sole discretion, that upon completion of such change in control, the terms of any award be otherwise amended, modified or terminated, as the committee deems in good faith to be appropriate.

*Miscellaneous Provisions* . Awards under the 2019 Plan are not transferable other than by will or by the laws of descent and distribution or to a grantee's designated beneficiary, unless, in the case of awards other than incentive stock options, otherwise determined by our committee or under the 2019 Plan, and generally expire 10 years following the grant date. The board of directors may at any time amend, suspend, terminate or modify the 2019 Plan and the administrator may at any time modify or amend any award under the 2019 Plan.

# PRINCIPAL SHAREHOLDERS

The following table sets forth information with respect to the beneficial ownership of our shares as of the date of this prospectus and after this offering by:

- each person or entity known by us to own beneficially more than 5% of our outstanding shares;

- each of our directors, director nominees and executive officers individually; and

- all of our executive officers, directors and director nominees as a group.

The beneficial ownership of ordinary shares is determined in accordance with the rules of the SEC and generally includes any ordinary shares over which a person exercises sole or shared voting or investment power, or the right to receive the economic benefit of ownership. For purposes of the table below, we deem shares subject to options or warrants that are currently exercisable or exercisable within 60 days of March 31, 2019 to be outstanding and to be beneficially owned by the person holding the options or warrants for the purposes of computing the percentage ownership of that person but we do not treat them as outstanding for the purpose of computing the percentage ownership of any other person. The percentage of shares beneficially owned prior to the offering is based on  24,735,871  ordinary shares outstanding as of March 31, 2019.

As of March 31, 2019, we had 15 holders of record of our ordinary shares in the United States. These shareholders held in the aggregate 39% of our outstanding ordinary shares.

All of our shareholders, including the shareholders listed below, have the same voting rights attached to their ordinary shares. See "Description of Share Capital—Voting Rights."

Following the closing of this offering, neither our principal shareholders nor our directors and executive officers have different or special voting rights with respect to their ordinary shares.

Unless otherwise noted below, each shareholder's address is Tufin Software Technologies Ltd., 5 Shoham Street, Ramat-Gan 52521, Israel.

A description of any material relationship that our principal shareholders have had with us or any of our predecessors or affiliates since January 1, 2016 is included under "Certain Relationships and Related Party Transactions."

| Name of Beneficial Owner | Shares Beneficially Owned Prior to Offering | | Shares Beneficially Owned After Offering | | % of Shares Beneficially Owned Following Exercise in Full of the Underwriters' Option |
|---|---|---|---|---|---|
| | Number | % | Number | % | |
| *Executive Officers, Directors and Director Nominees* | | | | | |
| Reuven Kitov(1) | 2,364,502 | 9.6% | 2,364,502 | 7.3% | 7.0% |
| Reuven Harrison | 2,364,502 | 9.6% | 2,364,502 | 7.3% | 7.0% |
| Jack Wakileh(2) | 253,032 | 1.0% | 253,032 | * | * |
| Kevin Maloney(3) | 404,850 | 1.6% | 404,850 | 1.2% | 1.2% |
| Pat Walsh | * | * | * | * | * |
| Yoram Gronich | * | * | * | * | * |
| Pamela Cyr | * | * | * | * | * |
| Rajiv Motwane | * | * | * | * | * |
| Ofer Or | * | * | * | * | * |
| Ohad Finkelstein(4) | 7,088,132 | 28.7% | 7,088,132 | 21.9% | 21.1% |
| Yuval Shachar(5) | 7,237,300 | 29.1% | 7,237,300 | 22.2% | 21.5% |
| Yair Shamir(6) | 6,481,276 | 26.2% | 6,481,276 | 20.0% | 19.3% |
| Edouard Cukierman(6) | 6,481,276 | 26.2% | 6,481,276 | 20.0% | 19.3% |
| Ronni Zehavi | * | * | * | * | * |
| Peter Campbell | — | — | — | — | * |
| Dafna Gruber | — | — | — | — | * |
| All executive officers, directors and director nominees as a group (16 persons)(7) | 20,150,976 | 75.8% | 20,150,976 | 58.8% | 56.9% |
| *Principal Shareholders* | | | | | |
| Catalyst Private Equity Partners (Israel) II, Limited Partnership(8) | 6,481,276 | 26.2% | 6,481,276 | 20.0% | 19.3% |
| Entities affiliated with Marker LLC(9) | 7,088,132 | 28.7% | 7,088,132 | 21.9% | 21.1% |
| Sberbank (SBT Venture Fund I L.P.) (10) | 1,615,536 | 6.5% | 1,615,536 | 5.0% | 4.8% |
| Entities affiliated with Vintage Investment Partners(11) | 2,569,761 | 10.4% | 2,569,761 | 7.9% | 7.7% |

\* Less than 1%.

(1) Includes 472,900 shares held in trust for family members over which Reuven Kitov is the beneficial owner.

(2) Consists of 253,032 shares issuable upon the exercise of options exercisable within 60 days of March 31, 2019.

(3) Consists of 404,850 shares issuable upon the exercise of options exercisable within 60 days of March 31, 2019.

(4) May be deemed to beneficially own 7,088,132 shares through entities affiliated with Marker LLC. See Note 9 below.

(5) Consists of 7,088,132 shares Yuval Shachar may be deemed to beneficially own through entities affiliated with Marker LLC and 149,168 shares issuable upon the exercise of options exercisable within 60 days of March 31, 2019. See Note 9 below.

(6) May be deemed to beneficially own 6,481,276 shares through Catalyst Private Equity Partners (Israel) II, Limited Partnership. See Note 8 below.

(7) See Notes 1 through 6 above. Includes 18,298,412 ordinary shares and 1,816,214 shares issuable upon the exercise of options exercisable within 60 days of March 31, 2019.

(8) Shares beneficially owned prior to this offering consist of 6,388,889 preferred shares and 92,387 common shares held by Catalyst Private Equity Partners (Israel) II, Limited Partnership ("Catalyst Israel"). Catalyst Israel holds 2,280,833 preferred shares and 32,981 common shares in trust for Catalyst Private Equity Partners (Israel B) II, L.P. and 447,222 preferred shares and 6,467 common shares in trust for Catalyst Private Equity Partners (Israel C) II, L.P. The general partner of these funds is Catalyst Investments II L.P. (the "General Partner"). The Catalyst Board is comprised of Edouard Cukierman, Yair Shamir, Roger Cukierman and Luc Muller. Voting and investment power over the shares resides with the board of directors of Catalyst Equity (2006) Ltd. (the "Catalyst Board"), the general partner of the General Partner. The address of the foregoing entities and individuals is c/o 28 Haarbaa St., Tel Aviv 6473925, Israel.

(9)    Shares beneficially owned prior to this offering consist of 754,546 shares held by Marker II LP, 1,886,364 shares held by Marker Lantern II Ltd. and 4,447,222 shares held by Marker TF Investments Ltd. Richard Scanlon is the sole director of the managers and the general partner, as the case may be, of each of the foregoing entities. Ohad Finkelstein and Yuval Shachar are independent members of the investment committee of each of the foregoing entities. Voting and investment power over the shares held by such entities resides with the general partner and the members of any such investment committee.The address of the foregoing entities and individuals is c/o Marker LLC, 10 East 53 rd Street, New York, New York 10022.

(10)   Sberbank (Sberbank of Russia) is a public company a majority of whose shares are owned by the Central Banks of the Russian Federation. The address of Sberbank (SBT Venture Fund I L.P.) is 1 East Poultry Avenue, London, EC1A 9PT, United Kingdom.

(11)   Shares beneficially owned prior to this offering consist of 871,913 shares held by Vintage Investment Partners VI (Cayman), L.P., 280,041 shares held by Vintage Investment Partners VI (Israel), L.P., 827,857 shares held by Vintage Investment Partners V (Cayman), L.P. and 589,950 shares held by Vintage Investment Partners V (Israel), L.P. The general partner of these entities is the GP of Vintage Investment Partners VI (Israel and Cayman) is Vintage Investment VI L.P.; the GP of Vintage Investment Partners V (Israel and Cayman) is Vintage Investments 5 L.P. Voting and investment power over the shares resides with the applicable GP. The address of the foregoing entities and individuals is c/o Vintage Investment Partners, 12 Abba Eban Avenue, Ackerstein Towers Building D, 10th Floor, Herzliyah Pituach 46120, Israel.

# CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS

Our policy is to enter into transactions with related parties on terms that, on the whole, are no more favorable, or no less favorable, than those available from unaffiliated third parties. Based on our experience in the business sectors in which we operate and the terms of our transactions with unaffiliated third parties, we believe that all of the transactions described below met this policy standard at the time they occurred. The following is a description of material transactions, or series of related material transactions, since January 1, 2016, to which we were or will be a party and in which the other parties included or will include our directors, executive officers, holders of more than 5% of our voting securities or any member of the immediate family of any of the foregoing persons.

## Agreements with Related Parties

### Financing Transactions

*Original Rounds of Financing* . Since 2007, we have raised capital through equity financings. Between 2007 and 2014, we raised capital through sales of our ordinary shares and our Series A, B, C, C-1 and D preferred shares.

*Series D Financing.* In August 2014, we sold Series D preferred shares convertible into 1,162,137 ordinary shares at a price per underlying preferred share of $4.30242 or an aggregate purchase price of approximately $5.0 million. Each Series D preferred share will convert into one ordinary share upon the closing of this offering. The following table sets forth the number of ordinary shares resulting from conversion upon the closing of this offering of the Series D preferred shares purchased by entities which, as of the date of this prospectus, beneficially own more than 5% of our ordinary shares assuming the conversion of all of outstanding preferred shares:

|  | Aggregate Purchase Price | Number of Ordinary Shares Resulting from the Conversion of Series D Preferred Shares |
|---|---|---|
|  | *(in thousands)* |  |
| Entities affiliated with Vintage Investment Partners | $ 6,350 | 1,475,914 |

### Registration Rights

In connection with this offering, we intend to enter into an amended and restated investors' rights agreement that will entitle certain of our shareholders to certain registration rights following the closing of this offering, including the following:

*Form F-1 Demand Rights.* At any time after the effective date of our initial public offering, the holders of at least 25% of the shares held by our former preferred shareholders can provide us a written request to file a registration statement in respect of the ordinary shares issued upon conversion of the preferred shares, or the "registrable securities." Within 10 days of the receipt of a request to effect such registration, we must give written notice of the request to the other holders of the registrable securities. We are not required to effect more than two registrations on Form F-1 that have been declared or ordered effective as promptly as practicable. We are only required to effect any such registration if the anticipated aggregate proceeds will be at least $5.0 million (net of underwriting discounts).

*Form F-3 Demand Rights.*  Upon the written request of any former preferred shareholders that we effect a registration on Form F-3, we must give written notice of the proposed registration within 10 days, and any related qualification or compliance, to all other former preferred shareholders. We must use commercially reasonable efforts to effect such registration and all such qualifications and compliances requested, together with all or such portion of the registrable securities of any other former preferred shareholders joining in such request. We are not required to effect a registration on Form F-3 more than twice in any 12-month period. We are only required to effect any such registration if the anticipated aggregate proceeds will be at least $1.0 million.

*Shelf Takedown.*  Upon the written request of any former preferred shareholders that we effect a public offering using an effective shelf registration statement, we must give written notice of the proposed offering within 10 days (or two business days in connection with an underwritten "block trade"), and any related qualification or compliance, to all other former preferred shareholders. We are not required to effect an underwritten shelf takedown if we effected a demand registration, piggyback offering or underwritten shelf takedown within the preceding 90 days. We are only required to effect an underwritten shelf takedown if the anticipated aggregate proceeds will be at least $5.0 million.

*Piggyback Offerings* . Following this offering, shareholders holding registrable securities will also have the right to request to participate in any offering initiated by us, subject to specified exceptions. Holders of registrable securities continue to have the right to participate in subsequent piggyback offerings regardless of whether the holder has opted out of prior offerings.

*Cutback.* In the event that the underwriter advises us that marketing factors require a limitation on the number of shares that can be included in a registered offering, the shares will be included in the registration statement in an agreed order of preference among the holders of registration rights. The same preference also applies in the case of a piggyback offering, but we have first preference and the amount of registrable securities to be included may not be reduced below 25% of the total amount of securities included in such offering.

*Termination.* Rights granted to holders of registrable securities pursuant to the amended and restated investors' rights agreement terminate on the fifth anniversary of the closing of this offering. With respect to any of our holders of registrable securities that hold less than 4% of our outstanding ordinary shares, such rights terminate when the shares held by such shareholder can be sold within a 90-day period under Rule 144. We have the right to terminate or delay any registration or offering, even if such registration or offering is subject to piggyback rights.

*Expenses.* We will pay all expenses in carrying out the foregoing registrations or offerings other than any underwriting discounts.

## Rights of Appointment

Our current board of directors consists of seven directors. Pursuant to our amended and restated articles of association currently in effect, Catalyst Private Equity Partners (Israel) II, Limited Partnership, or Catalyst, had the right to appoint two members of our board of directors and Marker TF Investments Ltd., or Marker, had the right to appoint one member. Catalyst appointed Yair Shamir and Edouard Cukierman to our board of directors and Marker appointed Ohad Finkelstein. These appointment rights terminate upon the closing of this offering.

As of the date of this prospectus, we are not a party to, and are not aware of, any voting agreements among our shareholders. Our founders, Reuven Kitov and Reuven Harrison, have agreed that Reuven Kitov will designate the director that our founders are permitted to jointly appoint under certain circumstances for so long as our founders share such designation right as set forth in our amended and restated articles of association, which will become effective upon the closing of this offering. See "Management—Board of Directors and Officers—Appointment Rights."

## Agreements with Directors and Officers

*Employment Agreements.* We have entered into written employment agreements with each of our executive officers. These agreements provide for notice periods of varying duration for termination of the agreement by us or by the relevant executive officer, during which time the executive officer will continue to receive base salary and benefits. These agreements also contain customary provisions regarding noncompetition, confidentiality of information and assignment of inventions. However, the enforceability of the noncompetition provisions may be limited under applicable law.

*Options.* Since October 2007, we have granted options to purchase our ordinary shares to our officers and certain of our directors. Such option agreements may contain acceleration provisions upon certain merger, acquisition, or change of control transactions. We describe our option plans under "Management—Share Option Plans." If our relationship with an executive officer or a director is terminated, except for cause (as defined in the various option plan agreements), all options that are vested will remain exercisable for 90 days after such termination (180 days in case of death, retirement or disability) or until expiration of the term of the option award, whichever is earlier.

The following table provides information regarding the options to purchase our ordinary shares held by each of our directors and officers who beneficially owns 1% or more of our ordinary shares immediately prior to the closing of this offering:

| Name/Title | Number of Shares Underlying Options | Exercise Price | Expiration Date |
|---|---|---|---|
| Jack Wakileh, Chief Financial Officer | 253,032 | $ 1.41 | 03/01/2023 - 07/18/2027 |
| Kevin Maloney, Senior Vice President of Global Sales | 404,850 | $ 1.41 | 06/08/2025 - 01/09/2027 |
| Yuval Shachar, Director | 149,168 | $ 0.64 | 07/26/2019 |

*Exculpation, Indemnification and Insurance.* Our articles of association permit us to exculpate, indemnify and insure certain of our office holders to the fullest extent permitted by the Israeli Companies Law. We intend to enter into agreements with our office holders, exculpating them from a breach of their duty of care to us to the fullest extent permitted by law and undertaking to indemnify them to the fullest extent permitted by law, subject to certain exceptions, including with respect to liabilities resulting from this offering to the extent that these liabilities are not covered by insurance. See "Management—Exculpation, Insurance and Indemnification of Directors and Officers."

# DESCRIPTION OF SHARE CAPITAL

The following descriptions of our share capital and provisions of our amended and restated articles of association are summaries and are qualified by reference to the amended and restated articles of association, which will become effective upon the closing of this offering.

## General

Upon the closing of this offering, our authorized share capital will consist of 150,000,000 ordinary shares, par value NIS 0.015 per share, of which, effective upon closing of this offering, shares will be issued and outstanding (assuming that the underwriters do not exercise their option to purchase additional ordinary shares).

All of our outstanding ordinary shares will be validly issued, fully paid and non-assessable. Our ordinary shares are not redeemable and do not have any preemptive rights.

## Our Registration Number and Purpose

Our registration number with the Israeli Registrar of Companies is 51-362739-8. Our purpose as set forth in our amended and restated articles of association is to engage in any lawful activity.

## Voting Rights and Conversion

All ordinary shares will have identical voting and other rights in all respects.

## Transfer of Shares

Our fully paid ordinary shares are issued in registered form and may be freely transferred under our amended and restated articles of association, unless the transfer is restricted or prohibited by another instrument, applicable law or the rules of a stock exchange on which the shares are listed for trade. The ownership or voting of our ordinary shares by non-residents of Israel is not restricted in any way by our amended and restated articles of association or the laws of the State of Israel, except for ownership by nationals of some countries that are, or have been, in a state of war with Israel.

## Liability to Further Capital Calls

Our board of directors may make, from time to time, such calls as it may deem fit upon shareholders with respect to any sum unpaid with respect to shares held by such shareholders, which is not payable at a fixed time. Such shareholder shall pay the amount of every call so made upon him. Unless otherwise stipulated by the board of directors, each payment in response to a call shall be deemed to constitute a pro rata payment on account of all shares with respect to which such call was made. A shareholder shall not be entitled to his rights as shareholder, including the right to dividends, unless such shareholder has fully paid all the notices of call delivered to him, or which according to our amended and restated articles of association are deemed to have been delivered to him, together with interest, linkage and expenses, if any, unless otherwise determined by the board of directors.

## Business Combinations

Under our amended and restated articles of association, which will become effective upon the closing of this offering, we may not engage in any "business combinations" with any "interested shareholder" for a three-year period following the time that such shareholder became an interested shareholder, unless:

- prior to the time that such shareholder became an interested shareholder, our board of directors approved either the business combination or the transaction which resulted in the shareholder becoming an interested shareholder; or

- upon consummation of the transaction which resulted in the shareholder becoming an interested shareholder, the interested shareholder owned at least 85% of our voting shares outstanding at the time the transaction commenced excluding for purposes of determining our voting shares outstanding (but not the outstanding voting shares owned by the interested shareholder) those shares owned by persons who are directors and also officers; or

- at the time that such shareholder became an interested shareholder, or subsequent to such time, the business combination is approved by our board of directors and authorized at a general meeting of shareholders by the affirmative vote of at least 66 2/3% of our voting shares outstanding that are not owned by the interested shareholder.

Generally, a "business combination" includes any merger, consolidation, sale or other transaction resulting in a financial benefit to the interested shareholder. Subject to certain exceptions, an "interested shareholder" is any person (other than us and any of our direct or indirect majority-owned subsidiaries) who , together with such person's affiliates and associates, owns, or within the previous three years owned, 15% or more of our voting shares.

Under certain circumstances, this provision will make it more difficult for a person who would be an "interested shareholder" to effect various business combinations with a corporation for a three-year period. This provision may encourage companies interested in acquiring us to negotiate in advance with our board of directors because the shareholder approval requirement would be avoided if our board of directors approves either the business combination or the transaction which results in the shareholder becoming an interested shareholder. These provisions also may have the effect of preventing changes in our board of directors and may make it more difficult to accomplish transactions which shareholders may otherwise deem to be in their best interests.

## Election of Directors

Our ordinary shares do not have cumulative voting rights for the election of directors. As a result, the holders of a majority of the voting power represented at a shareholders meeting have the power to elect our directors, except any founder director and subject to the special approval requirements for external directors under the Israeli Companies Law described under "Management—External Directors."

Under our amended and restated articles of association, which will become effective immediately prior to the closing of this offering, the number of directors on our board of directors must be no less than six and no more than 10, including any external directors required to be appointed under the Israeli Companies Law and any founder director. The minimum and maximum number of directors may be changed, at any time and from time to time, by a special vote of the holders of at least 2/3 of our outstanding shares.

Other than external directors, for whom special election requirements apply under the Israeli Companies Law, and any founder director, the vote required to appoint a director is a simple majority vote. In addition, under our amended and restated articles of association, our board of directors may elect new directors to fill vacancies (whether such vacancy is due to a director no longer serving or due to the number of directors serving being less than the maximum required in our amended and restated articles of association), provided that the total number of directors shall not, at any time, exceed 10 directors and provided that our board of directors may not elect external directors or any founder director. Our amended and restated articles of association provide that the term of a director appointed by our board of directors to fill any vacancy will be for the remaining term of office of the director(s) whose office(s) have been vacated. Furthermore, under our amended and restated articles of association, our directors, other than external directors and any founder director, are divided into three classes with staggered three-year terms. Each class of directors consists, as nearly as possible, of 1/3 of the total number of directors constituting the entire board of directors (other than the external directors and any founder director). For a more detailed description on the composition of our board of election procedures of our directors, other than our external directors, see "Management—Board of Directors and Officers."

External directors are elected for an initial term of three years, may be elected for additional three-year terms, and may be removed from office pursuant to the terms of the Israeli Companies Law. For further information on the election and removal of external directors, see "Management—External Directors."

## Dividend and Liquidation Rights

We have never declared or paid any cash dividends on our ordinary shares. We may declare a dividend to be paid to the holders of our ordinary shares in proportion to their respective shareholdings. See above under "Dividend Policy" for more information with respect to the requirements under Israeli law for the declaration and payment of dividends to our shareholders.

In the event of our liquidation, after satisfaction of liabilities to creditors, our assets will be distributed to the holders of our ordinary shares in proportion to their shareholdings. This right, as well as the right to receive dividends, may be affected by the grant of preferential dividend or distribution rights to the holders of a class of shares with preferential rights that may be authorized in the future.

## Exchange Controls

There are currently no Israeli currency control restrictions on remittances of dividends on our ordinary shares, proceeds from the sale of the shares or interest or other payments to non-residents of Israel, except for shareholders who are subjects of certain countries that are, or have been, in a state of war with Israel at such time.

## Shareholder Meetings

Under Israeli law, we are required to hold an annual general meeting of our shareholders once every calendar year that must be held no later than 15 months after the date of the previous annual general meeting. All general meetings other than the annual meeting of shareholders are referred to in our amended and restated articles of association as special meetings. Our board of directors may call special meetings whenever it sees fit, at such time and place, within or outside of Israel, as it may determine. In addition, the Israeli Companies Law provides that our board of directors is required to convene a special general meeting upon the written request of (i) any two of our directors or one-quarter of the members of our board of directors or (ii) one or more shareholders holding, in the aggregate, either (a) 5% or more of our outstanding issued shares and 1% or more of our outstanding voting power or (b) 5% or more of our outstanding voting power.

Under Israeli law, one or more shareholders holding at least 1% of the voting rights at the general meeting may request that the board of directors include a matter in the agenda of a general meeting to be convened in the future, such as nominating a director candidate, provided that it is appropriate to discuss such a matter at the general meeting. Our articles of association contain procedural guidelines and disclosure items with respect to the submission of shareholder proposals for shareholders meetings.

Subject to the provisions of the Israeli Companies Law and the regulations promulgated thereunder, shareholders entitled to participate and vote at general meetings are the shareholders of record on a date to be decided by the board of directors, which may be between four and 40 days prior to the date of the meeting. Furthermore, the Israeli Companies Law requires that resolutions regarding, among other things, the following matters must be passed at a general meeting of our shareholders:

- amendments to our amended and restated articles of association;

- appointment or termination of our auditors;

- election of directors, including external directors (unless otherwise determined in our amended and restated articles of association);

- approval of certain related party transactions;

- increases or reductions of our authorized share capital;

- a merger; and

- the exercise of our board of directors' powers by a general meeting, if our board of directors is unable to exercise its powers and the exercise of any of its powers is required for our proper management.

Under our amended and restated articles of association, we are not required to give notice to our registered shareholders pursuant to the Israeli Companies Law, unless otherwise required by law. The Israeli Companies Law requires that a notice of any annual general meeting or special general meeting be provided to shareholders at least 21 days prior to the meeting and if the agenda of the meeting includes the appointment or removal of directors, the approval of transactions with office holders or interested or related parties, or an approval of a merger, or as otherwise required under applicable law, notice must be provided at least 35 days prior to the meeting. Under the Israeli Companies Law, shareholders of a public company are not permitted to take action by written consent in lieu of a meeting. Our amended and restated articles of association provide that a notice of general meeting shall be published by us on Form 6-K at a date prior to the meeting as required by law.

## Voting Rights

### Quorum Requirements

Pursuant to our amended and restated articles of association, holders of our ordinary shares have one vote for each ordinary share held on all matters submitted to a vote before the shareholders at a general meeting. Under our amended and restated articles of association, the quorum required for general meetings of shareholders must consist of at least two shareholders present in person or by proxy (including by voting deed) holding 1/3 or more of our voting rights. A meeting adjourned for lack of a quorum will generally be adjourned to the same day of the following week at the same time and place, or to such other day, time or place as indicated by our board of directors if so specified in the notice of the meeting. At the reconvened meeting, any number of shareholders present in person or by proxy shall constitute a lawful quorum.

### Vote Requirements

Our amended and restated articles of association provide that all resolutions of our shareholders require a simple majority vote, unless otherwise required by the Israeli Companies Law or by our amended and restated articles of association.

Our amended and restated articles of association provide that all resolutions of our board of directors require a simple majority vote of the directors present and voting at such meeting, unless otherwise required by the Israeli Companies Law or by our amended and restated articles of association. Pursuant to our amended and restated articles of association, in the event the vote is tied, the c hairman of the board of directors will have a casting vote.

Pursuant to our amended and restated articles of association, an amendment to our amended and restated articles of association regarding any change of the composition or election procedures of our directors will require a special majority vote (66 2/3%). In addition, any change to the rights and privileges of the holders of any class of our shares requires a simple majority of the class so affected (or such other percentage of the relevant class that may be set forth in the governing documents relevant to such class), in addition to the simple majority vote of all classes of shares voting together as a single class at a shareholder meeting.

Under the Israeli Companies Law, each of (i) the approval of an extraordinary transaction with a controlling shareholder and (ii) the terms of employment or other engagement of the controlling shareholder of the company or such controlling shareholder's relative (even if not extraordinary) requires the approval described above under "Management—Fiduciary Duties and Approval of Specified Related Party Transactions and Compensation under Israeli Law—Disclosure of Personal Interests of a Controlling Shareholder and Approval of Transactions." Certain transactions with respect to remuneration of our office holders and directors require further approvals described above under "Management—

Fiduciary Duties and Approval of Specified Related Party Transactions and Compensation under Israeli Law—Compensation of Directors and Executive Officers." Another exception to the simple majority vote requirement is a resolution for the voluntary winding up, or an approval of a scheme of arrangement or reorganization, of the company pursuant to Section 350 of the Israeli Companies Law, which requires the approval of holders of 75% of the voting rights represented at the meeting, in person or by proxy and voting on the resolution.

## Access to Corporate Records

Under the Israeli Companies Law, shareholders are provided access to: minutes of our general meetings; our shareholders register and material shareholders register, our amended and restated articles of association, our financial statements and any document that we are required by law to file publicly with the Israeli Companies Registrar or the Israel Securities Authority. In addition, shareholders may request to be provided with any document related to an action or transaction requiring shareholder approval under the related party transaction provisions of the Israeli Companies Law. We may deny this request if we believe it has not been made in good faith or if such denial is necessary to protect our interest or protect a trade secret or patent.

## Modification of Class Rights

Under the Israeli Companies Law and our amended and restated articles of association, the rights attached to any class of share, such as voting, liquidation and dividend rights, may be amended by adoption of a resolution by the holders of a majority of the shares of that class present at a separate class meeting, or otherwise in accordance with the rights attached to such class of shares, in addition to the simple majority vote of all classes of shares voting together as a single class at a shareholder meeting, as set forth in our amended and restated articles of association.

## Registration Rights

In connection with this offering, we intend to enter into an amended and restated investors' rights agreement that will entitle certain of our shareholders to certain registration rights following the closing of this offering. For a discussion of such rights, see "Certain Relationships and Related Party Transactions—Agreements with Related Parties—Registration Rights."

## Acquisitions under Israeli Law

*Full Tender Offer.* A person wishing to acquire shares of an Israeli public company and who would as a result hold over 90% of the target company's issued and outstanding share capital is required by the Israeli Companies Law to make a tender offer to all of the company's shareholders for the purchase of all of the issued and outstanding shares of the company. A person wishing to acquire shares of a public Israeli company and who would as a result hold over 90% of the issued and outstanding share capital of a certain class of shares is required to make a tender offer to all of the shareholders who hold shares of the relevant class for the purchase of all of the issued and outstanding shares of that class. If the shareholders who do not accept the offer hold less than 5% of the issued and outstanding share capital of the company or of the applicable class, and more than half of the shareholders who do not have a personal interest in the offer accept the offer, all of the shares that the acquirer offered to purchase will be transferred to the acquirer by operation of law. However, a tender offer will also be accepted if the shareholders who do not accept the offer hold less than 2% of the issued and outstanding share capital of the company or of the applicable class of shares.

Upon a successful completion of such a full tender offer, any shareholder that was an offeree in such tender offer, whether such shareholder accepted the tender offer or not, may, within six months from the date of acceptance of the tender offer, petition an Israeli court to determine whether the tender offer was for less than fair value and that the fair value should be paid as determined by the court. However, under certain conditions, the offeror may include in the terms of the tender offer that an offeree who accepted the offer will not be entitled to petition the Israeli court as described above.

If (a) the shareholders who did not respond or accept the tender offer hold at least 5% of the issued and outstanding share capital of the company or of the applicable class or the shareholders who accept the offer constitute less than a majority of the offerees that do not have a personal interest in the acceptance of the tender offer or (b) the shareholders who did not accept the tender offer hold 2% or more of the issued and outstanding share capital of the company (or of the applicable class), the acquirer may not acquire shares of the company that will increase its holdings to more than 90% of the company's issued and outstanding share capital or of the applicable class from shareholders who accepted the tender offer.

*Special Tender Offer* . The Israeli Companies Law provides that an acquisition of shares of an Israeli public company must be made by means of a special tender offer if as a result of the acquisition the purchaser would become a holder of 25% or more of the voting rights in the company. Similarly, the Israeli Companies Law provides that an acquisition of shares in a public company must be made by means of a special tender offer if as a result of the acquisition the purchaser would become a holder of more than 45% of the voting rights in the company. These requirements do not apply if, in general, the acquisition (1) was made in a private placement that received shareholder approval, (2) was from a 25% or greater shareholder of the company which resulted in the acquirer becoming a 25% or greater shareholder of the company, or (3) was from a 45% or greater shareholder of the company which resulted in the acquirer becoming a 45% or greater shareholder of the company.

A special tender offer must be extended to all shareholders of a company but the offeror is not required to purchase shares representing more than 5% of the voting power attached to the company's outstanding shares, regardless of how many shares are tendered by shareholders. A special tender offer may be consummated only if (i) at least 5% of the voting power attached to the company's outstanding shares will be acquired by the offeror and (ii) the number of shares tendered in the offer exceeds the number of shares whose holders objected to the offer (excluding the purchaser and its controlling shareholders, holders of 25% or more of the voting rights in the company or any person having a personal interest in the acceptance of the tender offer or any other person acting on their behalf, including the relatives and entities under such person's control). If a special tender offer is accepted, then the purchaser or any person or entity controlling it or under common control with the purchaser or such controlling person or entity may not make a subsequent tender offer for the purchase of shares of the target company and may not enter into a merger with the target company for a period of one year from the date of the offer, unless the purchaser or such person or entity undertook to effect such an offer or merger in the initial special tender offer.

*Merger* . The Israeli Companies Law permits merger transactions if approved by each party's board of directors and, unless certain requirements described under the Israeli Companies Law are met, by a majority vote of each party's shares, and, in the case of the target company, a majority vote of each class of its shares, voted on the proposed merger at a shareholders meeting.

For purposes of the shareholder vote, unless a court rules otherwise, the merger will not be deemed approved if a majority of the votes of shares represented at the shareholders meeting that are held by parties other than the other party to the merger, or by any person (or group of persons acting in concert) who holds (or hold, as the case may be) 25% or more of the voting rights or the right to appoint 25% or more of the directors of the other party, vote against the merger. If, however, the merger involves a merger with a company's own controlling shareholder or if the controlling shareholder has a personal interest in the merger, then the merger is instead subject to the same special majority approval that governs all extraordinary transactions with controlling shareholders. See "Management—Fiduciary Duties and Approval of Specified Related Party Transactions and Compensation under Israeli Law—Disclosure of Personal Interests of a Controlling Shareholder and Approval of Transactions."

If the transaction would have been approved by the shareholders of a merging company but for the separate approval of each class or the exclusion of the votes of certain shareholders as provided above, a court may still approve the merger upon the request of holders of at least 25% of the voting rights of a company, if the court holds that the merger is fair and reasonable, taking into account the value to the parties to the merger and the consideration offered to the shareholders of the company.

Upon the request of a creditor of either party to the proposed merger, the court may delay or prevent the merger if it concludes that there exists a reasonable concern that, as a result of the merger, the surviving company will be unable to satisfy the obligations of the merging entities, and may further give instructions to secure the rights of creditors.

In addition, a merger may not be consummated unless at least 50 days have passed from the date on which a proposal for approval of the merger was filed by each party with the Israeli Registrar of Companies and at least 30 days have passed from the date on which the merger was approved by the shareholders of each party.

Israeli tax law treats some acquisitions, such as share-for-share exchanges between an Israeli company and a foreign company, less favorably than U.S. tax laws. For example, Israeli tax law may, under certain circumstances, subject a shareholder who exchanges his ordinary shares for shares in another corporation to taxation prior to the sale of the shares received in such share-for-share swap.

## Anti-Takeover Measures under Israeli Law

The Israeli Companies Law allows us to create and issue shares having rights different from those attached to our ordinary shares, including shares providing certain preferred rights with respect to voting, distributions or other matters and shares having preemptive rights. As of the closing of this offering, no preferred shares will be authorized under our amended and restated articles of association. In the future, if we do authorize, create and issue a specific class of preferred shares, such class of shares, depending on the specific rights that may be attached to it, may have the ability to frustrate or prevent a takeover or otherwise prevent our shareholders from realizing a potential premium over the market value of their ordinary shares. The authorization and designation of a class of preferred shares will require an amendment to our amended and restated articles of association, which requires the prior approval of the holders of a majority of the voting power attaching to our issued and outstanding shares at a general meeting. The convening of the meeting, the shareholders entitled to participate and the majority vote required to be obtained at such a meeting will be subject to the requirements set forth in the Israeli Companies Law as described above in "—Voting Rights."

## Borrowing Powers

Pursuant to the Israeli Companies Law and our amended and restated articles of association, our board of directors may exercise all powers and take all actions that are not required under law or under our amended and restated articles of association to be exercised or taken by our shareholders, including the power to borrow money for company purposes.

## Changes in Capital

Our amended and restated articles of association enable us to increase or reduce our share capital. Any such changes are subject to the provisions of the Israeli Companies Law and must be approved by a resolution duly adopted by our shareholders at a general meeting. In addition, transactions that have the effect of reducing capital, such as the declaration and payment of dividends in the absence of sufficient retained earnings or profits, require the approval of both our board of directors and an Israeli court.

## Establishment

We were incorporated under the laws of the State of Israel on January 2, 2005. We are registered with the Israeli Registrar of Companies.

## Transfer Agent and Registrar

The transfer agent and registrar for our ordinary shares is American Stock Transfer & Trust Company, LLC. Its address is 6201 15th Avenue, Brooklyn, New York 11219, and its telephone number is +1 (800) 937-5449.

## Listing

Our ordinary shares have been authorized for listing on the NYSE under the symbol "TUFN."

# SHARES ELIGIBLE FOR FUTURE SALE

Prior to this offering, there has been no public market for our ordinary shares. Future sales of substantial amounts of ordinary shares, including shares issued upon the exercise of outstanding options, in the public market after this offering, or the possibility of these sales occurring, could adversely affect the prevailing market price for our ordinary shares or impair our ability to raise equity capital.

Upon completion of this offering, we will have an aggregate of 32,435,871 ordinary shares outstanding. Of these shares, the 7,700,000 shares sold in this offering will be freely tradeable without restriction or further registration under the Securities Act, unless purchased by "affiliates" as that term is defined under Rule 144 of the Securities Act, who may sell only the volume of shares described below and whose sales would be subject to additional restrictions described below. The remaining 24,735,871 shares, representing 76.3 % of our outstanding shares will be held by our existing shareholders. These shares will be "restricted securities" as that phrase is defined in Rule 144 under the Securities Act. Subject to certain contractual restrictions, including the lock-up agreements described below, holders of restricted shares will be entitled to sell those shares in the public market pursuant to an effective registration statement under the Securities Act or if they qualify for an exemption from registration under Rule 144. Sales of these shares in the public market after the restrictions under the lock-up agreements lapse, or the perception that those sales may occur, could cause the prevailing market price to decrease or to be lower than it might be in the absence of those sales or perceptions.

## Lock-up Agreements

We, our directors and executive officers and substantially all of our shareholders have agreed not to offer, sell, agree to sell, directly or indirectly, or otherwise dispose of any ordinary shares or any securities convertible into or exchangeable for ordinary shares except for the ordinary shares offered in this offering without the prior written consent of J.P. Morgan Securities LLC for a period of 180 days after the date of this prospectus.

## Eligibility of Restricted Shares for Sale in the Public Market

The 24,735,871 ordinary shares that are not being sold in this offering, but which will be outstanding at the time this offering is complete, will be eligible for sale into the public market, under the provisions of Rule 144 commencing after the expiration of the restrictions under the lock-up agreements, subject to volume restrictions discussed below under "—Rule 144."

## Rule 144

In general, under Rule 144 under the Securities Act, a person (or persons whose shares are aggregated) who is not deemed to have been an affiliate of ours at any time during the three months preceding a sale, and who has beneficially owned restricted securities within the meaning of Rule 144 for at least six months (including any period of consecutive ownership of preceding non-affiliated holders) would be entitled to sell those shares, subject only to the availability of current public information about us. A non-affiliated person who has beneficially owned restricted securities within the meaning of Rule 144 for at least one year would be entitled to sell those shares without regard to the provisions of Rule 144.

A person (or persons whose shares are aggregated) who is deemed to be an affiliate of ours and who has beneficially owned restricted securities within the meaning of Rule 144 for at least six months would be entitled to sell within any three-month period a number of shares that does not exceed the greater of 1% of the then outstanding shares of our ordinary shares or the average weekly trading volume of our ordinary shares on the NYSE during the four calendar weeks preceding such sale. Such sales are also subject to certain manner of sale provisions, notice requirements and the availability of current public information about us.

## Options

Following the completion of this offering, we intend to file a registration statement on Form S-8 under the Securities Act to register 9,652,267 ordinary shares reserved for issuance under our equity incentive plans. The registration statement on Form S-8 will become effective automatically upon filing.

Ordinary shares issued upon exercise of a share option and registered under the Form S-8 registration statement will, subject to vesting provisions, lock-up agreements with the underwriters and Rule 144 volume limitations applicable to our affiliates, be available for sale in the open market immediately after the 180-day lock-up agreements expire.

## Registration Rights

Following the completion of this offering, the holders of 23,294,601 of our ordinary shares are entitled to request that we register their ordinary shares under the Securities Act, subject to cutback for marketing reasons and certain other conditions. These shareholders are also entitled to "piggyback" registration rights, which are also subject to cutback for marketing reasons and certain other conditions. Registration of such shares under the Securities Act would result in such shares becoming freely tradable without restriction under the Securities Act, except for shares purchased by affiliates, immediately upon the effectiveness of such registration. See "Certain Relationships and Related Party Transactions—Registration Rights." Any sales of securities by these shareholders could have a material adverse effect on the trading price of our ordinary shares.

# TAXATION AND ISRAELI GOVERNMENT PROGRAMS APPLICABLE TO OUR COMPANY

The following is a brief summary of the material Israeli tax laws applicable to us, and certain Israeli Government programs. Some parts of this discussion are based on new tax legislation which has not been subject to judicial or administrative interpretation. The discussion should not be construed as legal or professional tax advice and does not cover all possible tax considerations. You should consult your own tax advisor concerning the tax consequences of your particular situation, as well as any tax consequences that may arise under the laws of any state, local, foreign or other taxing jurisdiction.

## General Corporate Tax Structure in Israel

Israeli resident companies are generally subject to corporate tax, currently at the rate of 23% (in 2017 the corporate tax rate was 24%). However, the effective tax rate payable by a company that derives income from a Benefited Enterprise or a Preferred Enterprise (as discussed below) may be considerably less.

Capital gains derived by an "Israeli resident company" are subject to tax at the prevailing corporate tax rate. Under Israeli tax legislation, a corporation will be considered as an "Israeli resident company" if it meets one of the following: (i) it was incorporated in Israel or (ii) the control and management of its business are exercised in Israel.

## Law for the Encouragement of Industry (Taxes), 5729-1969

The Law for the Encouragement of Industry (Taxes), 5729-1969, the Industry Encouragement Law, provides several tax benefits for "Industrial Companies."

The Industry Encouragement Law defines an "Industrial Company" as a company resident in Israel and which was incorporated in Israel of which 90% or more of its income in any tax year, other than income from defense loans, is derived from an "Industrial Enterprise" owned by it and which is located in Israel. An "Industrial Enterprise" is defined as an enterprise whose principal activity in a given tax year is industrial production.

The following corporate tax benefits, among others, are available to Industrial Companies:

- amortization over an eight-year period of the cost of purchased know-how and patents and rights to use a patent and know-how which are used for the development or advancement of the Industrial Enterprise;

- under limited conditions, an election to file consolidated tax returns with related Israeli Industrial Companies; and

- expenses related to a public offering are deductible in equal amounts over three years.

Although as of the date of this prospectus, we do not have industrial production activities, we may qualify as an Industrial Company in the future and may be eligible for the benefits described above.

## Tax Benefits and Grants for Research and Development

Israeli tax law allows, under certain conditions, a tax deduction for expenditures, including capital expenditures, for the year in which they are incurred. Expenditures are deemed related to scientific research and development projects, if:

- the expenditures are approved by the relevant Israeli government ministry, determined by the field of research;

- the research and development must be for the promotion of the company; and

130

- the research and development is carried out by or on behalf of the company seeking such tax deduction.

The amount of such deductible expenses is reduced by the sum of any funds received through government grants for the financing of such scientific research and development projects. No deduction under these research and development deduction rules is allowed if such deduction is related to an expense invested in an asset depreciable under the general depreciation rules of the Israeli Tax Ordinance. Expenditures not so approved are deductible in equal amounts over three years.

From time to time, we may apply to the Innovation Authority for approval to allow a tax deduction for all research and development expenses during the year incurred. There can be no assurance that such application will be accepted.

## Law for the Encouragement of Capital Investments, 5719-1959

The Law for the Encouragement of Capital Investments, 5719-1959, or the Investment Law, provides certain incentives for capital investments in production facilities (or other eligible assets) by "Industrial Enterprises" (as defined under the Investment Law).

## Tax Benefits Prior to the 2005 Amendment

An investment program that is implemented in accordance with the provisions of the Investment Law prior to the 2005 Amendment, referred to as an "Approved Enterprise," is entitled to certain benefits. A company that wished to receive benefits as an Approved Enterprise must have received approval from the Investment Center of the Israeli Ministry of Economy and Industry, or the Investment Center. Each certificate of approval for an Approved Enterprise relates to a specific investment program in the Approved Enterprise, delineated both by the financial scope of the investment and by the physical characteristics of the facility or the asset.

In general, an Approved Enterprise is entitled to receive a grant from the Government of Israel or an alternative package of tax benefits, known as the alternative benefits track. The tax benefits from any certificate of approval relate only to taxable profits attributable to the specific Approved Enterprise. Income derived from activity that is not integral to the activity of the Approved Enterprise does not enjoy tax benefits.

In addition, a company that has an Approved Enterprise program is eligible for further tax benefits if it qualifies as a Foreign Investors' Company, or FIC, which is a company with a level of foreign investment, as defined in the Investment Law, of more than 25%. The level of foreign investment is measured as the percentage of rights in the company (in terms of shares, rights to profits, voting and appointment of directors), and of combined share and loan capital, that are owned, directly or indirectly, by persons who are not residents of Israel. The determination as to whether a company qualifies as an FIC is made on an annual basis.

We are currently not entitled to tax benefits for Approved Enterprise.

## Tax Benefits Subsequent to the 2005 Amendment

The 2005 Amendment applies to new investment programs commencing after 2004, but does not apply to investment programs approved prior to April 1, 2005. The 2005 Amendment provides that terms and benefits included in any certificate of approval that was granted before the 2005 Amendment became effective (April 1, 2005) will remain subject to the provisions of the Investment Law as in effect on the date of such approval. Pursuant to the 2005 Amendment, the Investment Center will continue to grant Approved Enterprise status to qualifying investments. The 2005 Amendment, however, limits the scope of enterprises that may be approved by the Investment Center by setting criteria for the approval of a facility as an Approved Enterprise, such as provisions generally requiring that at least 25% of the Approved Enterprise's income be derived from exports.

The 2005 Amendment provides that Approved Enterprise status will only be necessary for receiving cash grants. As a result, it was no longer necessary for a company to obtain Approved Enterprise status in order to receive the tax benefits previously available under the alternative benefits track. Rather, a company may claim the tax benefits offered by the Investment Law directly in its tax returns, provided that its facilities meet the criteria for tax benefits set forth in the amendment. Companies are entitled to approach the Israeli Tax Authority for a pre-ruling regarding their eligibility for benefits under the Investment Law, as amended.

In order to receive the tax benefits, the 2005 Amendment states that a company must make an investment which meets all of the conditions, including exceeding a minimum investment amount specified in the Investment Law. Such investment allows a company to receive "Benefited Enterprise" status, and may be made over a period of no more than three years from the end of the year in which the company requested to have the tax benefits apply to its Benefited Enterprise. Where the company requests to apply the tax benefits to an expansion of existing facilities, only the expansion will be considered to be a Benefited Enterprise and the company's effective tax rate will be the weighted average of the applicable rates. In this case, the minimum investment required in order to qualify as a Benefited Enterprise is required to exceed a certain percentage of the value of the company's production assets before the expansion.

The extent of the tax benefits available under the 2005 Amendment to qualifying income of a Benefited Enterprise depend on, among other things, the geographic location in Israel of the Benefited Enterprise. The location will also determine the period for which tax benefits are available. Such tax benefits include an exemption from corporate tax on undistributed income for a period of between two to 10 years, depending on the geographic location of the Benefited Enterprise in Israel, and a reduced corporate tax rate of between 10% and the applicable corporate tax for the remainder of the benefits period, depending on the level of foreign investment in the company in each year. A company qualifying for tax benefits under the 2005 Amendment which pays a dividend out of income derived by its Benefited Enterprise during the tax exemption period will be subject to corporate tax in respect of the gross amount of the dividend at the otherwise applicable corporate tax rate or a lower rate in the case of a qualified FIC which is at least 49% owned by non-Israeli residents. Dividends paid out of income attributed to a Benefited Enterprise are generally subject to withholding tax at source at the rate of 15% or such lower rate as may be provided in an applicable tax treaty.

The benefits available to a Benefited Enterprise are subject to the fulfillment of conditions stipulated in the Investment Law and its regulations. If a company does not meet these conditions, it may be required to refund the amount of tax benefits, as adjusted by the Israeli consumer price index, and interest, or other monetary penalties.

We applied for tax benefits as a "Benefited Enterprise" with 2009 and 2011 as the "Years of Election." We may be entitled to tax benefits under this regime in respect of the 2011 "Year of Election" once we are profitable for tax purposes and subject to the fulfillment of all the relevant conditions. If we do not meet these conditions, the tax benefits may not be applicable which would result in adverse tax consequences to us. Alternatively, and subject to the fulfillment of all the relevant conditions, we may elect in the future to irrevocably waive the tax benefits available for Benefited Enterprise and claim the tax benefits available to Preferred Enterprise under the 2011 Amendment (as detailed below).

## Tax Benefits for a Preferred Enterprise

The Investment Law was significantly amended as of January 1, 2011, or the 2011 Amendment. The 2011 Amendment introduced new benefits to replace those granted in accordance with the provisions of the Investment Law in effect prior to the 2011 Amendment.

The 2011 Amendment introduced new tax benefits for income generated by a "Preferred Company" through its "Preferred Enterprise," in accordance with the definition of such term in the Investment Law, which generally means that a "Preferred Company" is an industrial company meeting certain conditions (including a minimum threshold of 25% export).

A Preferred Company is entitled to a reduced corporate tax rate of 16% (prior to 2014, the tax rates were 15% for 2011 and 2012 and 12.5% for 2013) with respect to its income derived from its Preferred Enterprise, unless the Preferred Enterprise is located in development area A, in which case the rate will be 7.5%, (prior to 2017, the tax rates were 10% for 2011 and 2012, 7% for 2013 and 9% for 2014 through 2016). Our operations are currently not located in development area A.

Dividends paid out of income attributed to a Preferred Enterprise are generally subject to withholding tax at the source at the rate of 20%, or such lower rate as may be provided in an applicable tax treaty (subject to the receipt in advance of a valid certificate from the Israeli Tax Authority allowing for a reduced tax rate). However, if such dividends are paid to an Israeli company, no tax is required to be withheld (although, if the funds are subsequently distributed to individuals or to non-Israeli residents (individuals and corporations), the withholding tax would apply).

We are currently not entitled to tax benefits for a Preferred Enterprise.

# U.S. AND ISRAELI TAX CONSEQUENCES FOR OUR SHAREHOLDERS

The following description is not intended to constitute a complete analysis of all tax consequences relating to the acquisition, ownership and disposition of our ordinary shares. This section contains a discussion of material U.S. and Israeli tax consequences concerning the ownership and disposition of our ordinary shares purchased by investors in this offering. This summary does not discuss all the aspects of U.S. and Israeli tax law that may be relevant to a particular investor in light of his or her personal investment circumstances or to some types of investors subject to special treatment under U.S. or Israeli law. Examples of this kind of investor include traders in securities or persons that own, directly or indirectly, 10% or more of our outstanding voting capital, all of whom are subject to special tax regimes not covered in this discussion.

SHAREHOLDERS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS AS TO THE ISRAELI OR OTHER TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP AND DISPOSITION OF OUR ORDINARY SHARES, INCLUDING, IN PARTICULAR, THE EFFECT OF ANY FOREIGN, STATE OR LOCAL TAXES.

## Taxation of Our Shareholders

### Capital Gains

Capital gain tax is imposed on the disposition of capital assets by an Israeli resident, and on the disposition of such assets by a non-Israeli resident if those assets are either (i) located in Israel, (ii) are shares or a right to a share in an Israeli resident corporation or (iii) represent, directly or indirectly, rights to assets located in Israel. The Israeli Tax Ordinance distinguishes between "Real Gain" and the "Inflationary Surplus."

Real Gain is the excess of the total capital gain over Inflationary Surplus computed generally on the basis of the increase in the Israeli consumer price index between the date of purchase and the date of disposition. Inflationary Surplus is not currently subject to tax in Israel.

Real Gain accrued by individuals on the sale of our ordinary shares will be taxed at the rate of 25%. However, if the individual shareholder is a "Significant Shareholder" (i.e., a person who holds, directly or indirectly, alone or together with another, 10% or more of one of the Israeli resident company's means of control at the time of the sale or at any time during the preceding 12 month period), such gain will be taxed at a rate of 30%. Furthermore, where an individual claimed real interest expenses and linkage differences on securities, the capital gain on the sale of the securities will be liable to a rate of 30%, this, until the determination of provisions and conditions for the deduction of real interest expenses and linkage differences under section 101A(a)(9) and 101A(b) of the Israeli Tax Ordinance.

Real Gain derived by corporations will be generally subject to the regular corporate tax rate (23% in 2018 and thereafter). Individual shareholders whose income from the sale of securities is considered as business income are taxed at the marginal tax rates applicable to business income (up to 47% in 2018, not including the Excess Tax). Either the purchaser, the Israeli stockbrokers or the Israeli financial institution through which the shares are held, is obliged to withhold tax in the amount of consideration paid upon the sale of securities (or the Real Capital Gain realized on the sale, if known) at the Israeli corporate tax rate (23% in 2018 and thereafter) or 25% in case the seller is an individual. The individual may provide an approval from the Israel Tax Authority for a reduced tax withholding rate, according to the applicable rate.

Notwithstanding the foregoing, capital gain derived from the sale of our ordinary shares by a non-Israeli shareholder may be exempt under the Israeli Tax Ordinance from Israeli capital gain tax provided that the seller does not have a permanent establishment in Israel to which the derived capital gain is attributed. However, non-Israeli corporations will not be entitled to the foregoing exemption if more than 25% of its

means of control are held, directly and indirectly, by Israeli residents, or Israeli residents are entitled to 25% or more of the revenues or profits of the corporation, directly or indirectly. In addition, such exemption would not be available to a person whose gains from selling or otherwise disposing of the securities are deemed to be business income.

In addition, the sale of shares may be exempt from Israeli capital gain tax under the provisions of an applicable tax treaty. For example, the U.S.-Israel Tax Treaty exempts U.S. residents from Israeli capital gain tax in connection with such sale, provided (i) the U.S. resident owned, directly or indirectly, less than 10% of an Israeli resident company's voting power at any time within the 12-month period preceding such sale, (ii) the seller, being an individual, is present in Israel for a period or periods of less than 183 days during the taxable year and (iii) the capital gain from the sale was not derived through a permanent establishment of the U.S. resident in Israel.

In some instances where our shareholders may be liable for Israeli tax on the sale of their ordinary shares, the payment of the consideration may be subject to the withholding of Israeli tax at source at a rate of 25% if the seller is an individual and at the corporate tax rate (23% in 2018 and thereafter) if the seller is a corporation. Shareholders may be required to demonstrate that they are exempt from tax on their capital gains in order to avoid withholding at source at the time of sale.

Upon the sale of securities traded on a stock exchange a detailed return, including a computation of the tax due, must be filed and an advanced payment must be paid on January 31 and June 30 of every tax year in respect of sales of securities made within the previous six months. However, if all tax due was withheld at source according to applicable provisions of the Israeli Tax Ordinance and regulations promulgated thereunder, the aforementioned return need not be filed and no advance payment must be paid. Capital gain is also reportable on the annual income tax return.

### *Dividends*

We have never paid cash dividends. A distribution of a dividend by our company from income attributed to a Benefited Enterprise will generally be subject to withholding tax in Israel at a rate of 15% unless a reduced tax rate is provided under an applicable tax treaty. A distribution of a dividend by our company from income attributed to a Preferred Enterprise will generally be subject to withholding tax in Israel at the following tax rates: Israeli resident individuals - 20%; Israeli resident companies - 0% for a Preferred Enterprise; Non-Israeli residents - 20%, subject to a reduced rate under the provisions of any applicable double tax treaty. A distribution of dividends from income, which is not attributed to a Benefited Enterprise or Preferred Enterprise to an Israeli resident individual, will generally be subject to withholding tax at a rate of 25%, or 30% if the dividend recipient is a "Significant Shareholder" (as defined above) at the time of distribution or at any time during the preceding 12-month period. If the recipient of the dividend is an Israeli resident corporation, such dividend will not be subject to Israeli tax provided the income from which such dividend is distributed was derived or accrued within Israel.

The Israeli Tax Ordinance provides that a non-Israeli resident (either individual or corporation) is generally subject to Israeli withholding tax on the receipt of dividends at the rate of 25% (30% if the dividends recipient is a "Significant Shareholder" (as defined above), at the time of distribution or at any time during the preceding 12-month period); such rates may be reduced under the provisions of an applicable double tax treaty. Under the U.S.-Israel Tax Treaty. Under the U.S.-Israel Tax Treaty, the following withholding rates will apply in respect of dividends distributed by an Israeli resident company to a U.S. resident: (i) if the U.S. resident is a corporation which holds during that portion of the taxable year which precedes the date of payment of the dividend and during the whole of its prior taxable year (if any), at least 10% of the outstanding shares of the voting share capital of the Israeli resident paying corporation and not more than 25% of the gross income of the Israeli resident paying corporation for such prior taxable year (if any) consists of certain type of interest or dividends, the rate is 12.5%, (ii) if both the conditions mentioned in clause (i) above are met and the dividend is paid from an Israeli resident company's income which was entitled to a reduced tax rate applicable to an Approved Enterprise, the rate is 15% and (iii) in all other cases, the rate is 25%. The aforementioned rates under the U.S.-Israel Double Tax Treaty will not apply if the dividend income was derived through a permanent establishment of the U.S. resident in Israel.

A non-Israeli resident who receives dividends from which tax was withheld is generally exempt from the obligation to file tax returns in Israel with respect to such income, provided that (i) such income was not generated from a business conducted in Israel by the taxpayer and (ii) the taxpayer has no other taxable sources of income in Israel with respect to which a tax return is required to be filed.

Dividends are generally subject to Israeli withholding tax at a rate of 25% so long as the shares are registered with a nominee company (whether or not the recipient is a "Significant Shareholder," as defined above), unless relief is provided in a treaty between Israel and the shareholder's country of residence and provided that a certificate from the Israel Tax Authority allowing for a reduced withholding tax rate is obtained in advance.

## Excess Tax

Individuals who are subject to tax in Israel are also subject to an additional tax at a rate of 3% on annual income exceeding NIS 641,880 (for 2018 and thereafter), linked to the annual change in the Israeli consumer price index, including, but not limited to income derived from, dividends, interest and capital gains.

### *Foreign Exchange Regulations*

Non-residents of Israel who hold our ordinary shares are able to receive any dividends, and any amounts payable upon the dissolution, liquidation and winding up of our affairs, repayable in non-Israeli currency at the rate of exchange prevailing at the time of conversion. However, Israeli income tax is generally required to have been paid or withheld on these amounts. In addition, the statutory framework for the potential imposition of currency exchange control has not been eliminated, and may be restored at any time by administrative action.

### *Estate and Gift Tax*

Israeli law presently does not impose estate or gift taxes.

## Certain U.S. Federal Income Tax Consequences

The following is a description of certain U.S. federal income tax consequences relating to the acquisition, ownership and disposition of our ordinary shares. This description addresses only the U.S. federal income tax consequences to holders that are initial purchasers of our ordinary shares pursuant to the offering and that will hold such ordinary shares as capital assets. This description does not address tax considerations applicable to holders that may be subject to special tax rules, including, without limitation:

•    banks, financial institutions or insurance companies;

•    real estate investment trusts, regulated investment companies or grantor trusts;

•    brokers, dealers or traders in securities, commodities or currencies;

•    tax-exempt entities or organizations, including an "individual retirement account" or "Roth IRA" as defined in Section 408 or 408A of the Code, respectively;

•    certain former citizens or long-term residents of the United States;

•    persons that received our shares as compensation for the performance of services;

•    persons that will hold our shares as part of a "hedging," "integrated" or "conversion" transaction or as a position in a "straddle" for U.S. federal income tax purposes;

•    partnerships (including entities classified as partnerships for U.S. federal income tax purposes) or other pass-through entities, or holders that will hold our shares through such an entity;

•    S corporations;

- holders that acquire ordinary shares as a result of holding or owning our preferred shares;

- holders whose "functional currency" is not the U.S. dollar; or

- holders that own directly, indirectly or constructively 10% or more of the voting power or value of our shares.

Moreover, this description does not address the U.S. federal estate, gift or alternative minimum tax consequences, or any state, local or foreign tax consequences, of the acquisition, ownership and disposition of our ordinary shares.

This description is based on the Code, existing, proposed and temporary U.S. Treasury Regulations and judicial and administrative interpretations thereof, in each case as in effect and available on the date hereof. All of the foregoing is subject to change, which change could apply retroactively and could affect the tax consequences described below. There can be no assurances that the U.S. Internal Revenue Service, or the IRS, will not take a different position concerning the tax consequences of the acquisition, ownership and disposition of our ordinary shares or that such a position would not be sustained. Holders should consult their own tax advisors concerning the U.S. federal, state, local and foreign tax consequences of purchasing, owning and disposing of our ordinary shares in their particular circumstances.

For purposes of this description, a "U.S. Holder" is a beneficial owner of our ordinary shares that, for U.S. federal income tax purposes, is:

- a citizen or resident of the United States;

- a corporation (or other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States or any state thereof, including the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if such trust has validly elected to be treated as a U.S. person for U.S. federal income tax purposes or if (1) a court within the United States is able to exercise primary supervision over its administration and (2) one or more U.S. persons have the authority to control all of the substantial decisions of such trust.

A "Non-U.S. Holder" is a beneficial owner of our ordinary shares that is neither a U.S. Holder nor a partnership (or other entity treated as a partnership for U.S. federal income tax purposes).

If a partnership (or any other entity treated as a partnership for U.S. federal income tax purposes) holds our ordinary shares, the tax treatment of a partner in such partnership will generally depend on the status of the partner and the activities of the partnership. Such a partner or partnership should consult its tax advisor as to the particular U.S. federal income tax consequences of acquiring, owning and disposing of our ordinary shares in its particular circumstance.

**You should consult your tax advisor with respect to the U.S. federal, state, local and foreign tax consequences of acquiring, owning and disposing of our ordinary shares.**

### *Distributions*

Subject to the discussion below under "Passive Foreign Investment Company Considerations," if you are a U.S. Holder, the gross amount of any distribution made to you with respect to our ordinary shares before reduction for any Israeli taxes withheld therefrom, other than certain distributions, if any, of our ordinary shares distributed pro rata to all our shareholders, generally will be includible in your income as dividend income to the extent such distribution is paid out of our current or accumulated earnings and profits as determined under U.S. federal income tax principles. To the extent that the amount of any distribution exceeds our current and accumulated earnings and profits as determined under U.S. federal

income tax principles, it will be treated first as a return of your adjusted tax basis in our ordinary shares and thereafter as either long-term or short-term capital gain depending upon whether the U.S. Holder has held our ordinary shares for more than one year as of the time such distribution is received. However, because we do not expect to maintain calculations of our earnings and profits under U.S. federal income tax principles, U.S. Holders should expect that the entire amount of any distribution generally will be reportable as dividend income. Subject to the discussion below under "Passive Foreign Investment Company Considerations," non-corporate U.S. Holders may qualify for the preferential rates of taxation with respect to dividends on ordinary shares applicable to long-term capital gains (i.e., gains from the sale of capital assets held for more than one year), provided that certain conditions are met, including the absence of certain risk reduction transactions. In addition, some corporate U.S. Holders may be entitled to a dividends received deduction. However, such preferential rate of taxation shall not apply if we are a PFIC for the taxable year in which we pay a dividend, or if we were a PFIC for the preceding taxable year. Likewise, such dividends will not be eligible for the dividends received deduction generally allowed to corporate U.S. Holders.

Subject to certain conditions and limitations, Israeli tax withheld on dividends may be deducted from your taxable income or credited against your U.S. federal income tax liability. If you are a U.S. Holder, dividends paid to you with respect to our ordinary shares will generally be treated as foreign source income, which may be relevant in calculating your foreign tax credit limitation. However, for periods in which we are a "U.S.-owned foreign corporation," a portion of dividends paid by us may be treated as U.S. source solely for purposes of the foreign tax credit. We would be treated as a U.S.-owned foreign corporation if 50% or more of the total value or total voting power of our shares are owned, directly, indirectly or constructively by U.S. persons. To the extent any portion of our dividends is treated as U.S. source income pursuant to this rule, the ability of a U.S. Holder to claim a foreign tax credit for any Israeli withholding taxes payable in respect of our dividends may be limited. A U.S. Holder entitled to benefits under the U.S.-Israel Tax Treaty may, however, elect to treat any dividends as foreign source income for foreign tax credit purposes if the dividend income is separated from other income items for purposes of calculating the U.S. Holder's foreign tax credit. U.S. Holders should consult their own tax advisors about the impact of, and any exception available to, the special sourcing rule described in this paragraph, and the desirability of making, and the method of making, such an election.

The limitation on foreign taxes eligible for credit is calculated separately with respect to specific classes of income. For this purpose, dividends that we distribute generally should constitute "passive category income," or, in the case of certain U.S. Holders, "general category income." A foreign tax credit for foreign taxes imposed on distributions may be denied if you do not satisfy certain minimum holding period requirements. The rules relating to the determination of the foreign tax credit are complex, and you should consult your tax advisor to determine whether and to what extent you will be entitled to this credit.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," if you are a Non-U.S. Holder, you generally will not be subject to U.S. federal income (or withholding) tax on dividends received by you on our ordinary shares, unless you conduct a trade or business in the United States and such income is effectively connected with that trade or business (or, if required by an applicable income tax treaty, the dividends are attributable to a permanent establishment or fixed base that such holder maintains in the United States).

### Sale, Exchange or Other Taxable Disposition of Ordinary Shares

Subject to the discussion below under "Passive Foreign Investment Company Considerations," if you are a U.S. Holder, you generally will recognize gain or loss on the sale, exchange or other taxable disposition of our ordinary shares equal to the difference between the amount realized on such sale, exchange or other taxable disposition and your adjusted tax basis in our ordinary shares, and such gain or loss will be capital gain or loss. If Israeli tax is imposed on the sale, exchange or other disposition of our ordinary shares, a U.S. Holder's amount realized will include the gross amount of the proceeds before deduction of the Israeli tax. The adjusted tax basis in an ordinary share generally will be equal to the cost of such ordinary share. If you are a non-corporate U.S. Holder, capital gain from the sale, exchange or other

138

taxable disposition of ordinary shares is generally eligible for a preferential rate of taxation applicable to capital gains, provided that your holding period for such ordinary shares exceeds one year (i.e., such gain is long-term capital gain). The deductibility of capital losses for U.S. federal income tax purposes is subject to limitations under the Code.

Any gain or loss that a U.S. Holder recognizes from the sale, exchange or other taxable disposition of our ordinary shares generally will be treated as U.S. source income or loss for foreign tax credit limitation purposes. Accordingly, because you may use foreign tax credits to offset only the portion of U.S. federal income tax liability that is attributed to foreign source income, you may be unable to claim a foreign tax credit with respect to the Israeli tax, if any, on gains from the sale, exchange or other taxable disposition of our ordinary shares. You should consult your tax advisor as to whether the Israeli tax on gains may be creditable against your U.S. federal income tax on foreign-source income from other sources.

Subject to the discussion below under "Backup Withholding Tax and Information Reporting Requirements," if you are not a U.S. Holder, you generally will not be subject to U.S. federal income or withholding tax on any gain realized on the sale or exchange of our shares, unless:

- such gain is effectively connected with your conduct of a trade or business in the United States;

- or you are an individual and have been present in the United States for 183 days or more in the taxable year of such sale or exchange and certain other conditions are met.

***Passive Foreign Investment Company Considerations***

A non-U.S. corporation will generally be classified as a passive foreign investment company, or PFIC, for U.S. federal income tax purposes in any taxable year in which, after applying certain look-through rules with respect to the income and assets of subsidiaries, either:

- at least 75% of its gross income is "passive income"; or

- at least 50% of the average quarterly value of its total gross assets (which, if it is a CFC for the year of the offering may be measured by the adjusted tax basis of its assets, and for subsequent years, assuming it is publicly traded, the total value of its assets may be measured in part by the market value of its ordinary shares, which is subject to change) is attributable to assets that produce passive income or are held for the production of passive income.

Passive income for this purpose generally includes, among other things, dividends, interest, royalties, rents and gains from commodities transactions and from the sale or exchange of property that gives rise to passive income. Assets that produce or are held for the production of passive income may include cash, even if held as working capital or raised in a public offering, marketable securities and other assets that may produce passive income. In determining whether a non-U.S. corporation is a PFIC, a proportionate share of the income and assets of each corporation in which it owns, directly or indirectly, at least a 25% interest (by value) is taken into account.

Our status as a PFIC will depend on the nature and composition of our income and the nature, composition and value of our assets from time to time. The 50% passive asset test described above is generally based on the fair market value of each asset, with the value of goodwill and going concern value determined in large part by reference to the market value of our ordinary shares, which may be volatile. If we are a CFC and not publicly traded throughout the relevant taxable year, however, the test may be applied based on the adjusted tax bases of our assets. Based on our belief that we may be classified as a CFC in the current taxable year in which this offering occurs and certain estimates of the adjusted tax bases of our assets, we believe that we may be classified as a PFIC in the current taxable year ended December 31, 2019. This determination is, however, subject to uncertainty. Our status may also depend, for example, on how quickly we utilize the cash proceeds from this offering in our business. Moreover, because PFIC status is based on our income, assets, and activities for the entire taxable year, it is not possible to determine whether we will be characterized as a PFIC for the 2019 taxable year or any subsequent year until after the close of the relevant year. Accordingly, no assurances can be made

regarding our PFIC status in one or more subsequent years, and our U.S. counsel expresses no opinion with respect to our PFIC status in the taxable year ended December 31, 2018 or 2019, and also expresses no opinion with respect to our predictions or past determinations regarding our PFIC status in the past or in the future. We will determine whether we were a PFIC or not for each taxable year and make such determination available to U.S. Holders.

If we are a PFIC in any taxable year during which a U.S. Holder owns ordinary shares, such U.S. Holder could be liable for additional taxes and interest charges upon (1) a distribution paid during a taxable year that is greater than 125% of the average annual distributions paid in the three preceding taxable years, or, if shorter, the U.S. Holder's holding period for the ordinary shares, and (2) any gain recognized on a sale, exchange or other taxable disposition, including a pledge, of the ordinary shares, whether or not we continue to be a PFIC. In these circumstances, the tax will be determined by allocating such distribution or gain ratably over the U.S. Holder's holding period for the ordinary shares. The amount allocated to the current taxable year (i.e., the year in which the distribution occurs or the gain is recognized) and any year prior to the first taxable year in which we are a PFIC will be taxed as ordinary income earned in the current taxable year. The amount allocated to other taxable years will be taxed at the highest marginal rates in effect for individuals or corporations, as applicable, to ordinary income for each such taxable year, and an interest charge, generally applicable to underpayments of tax, will be added to the tax. If we are a PFIC for any year during which a U.S. Holder holds the ordinary shares, we must generally continue to be treated as a PFIC by that holder for all succeeding years during which the U.S. Holder holds the ordinary shares, unless we cease to meet the requirements for PFIC status and the U.S. Holder makes a "deemed sale" election with respect to the ordinary shares. If such election is made, the U.S. Holder will be deemed to have sold the ordinary shares it holds at their fair market value on the last day of the last taxable year in which we qualified as a PFIC, and any gain from such deemed sale would be subject to the consequences described above. After the deemed sale election, the U.S. Holder's ordinary shares with respect to which the deemed sale election was made will not be treated as shares in a PFIC, unless we subsequently again become a PFIC.

If we are a PFIC for any taxable year during which a U.S. Holder holds the ordinary shares and one of our non-U.S. subsidiaries is also a PFIC (i.e., a lower-tier PFIC), such U.S. Holder would be treated as owning a proportionate amount (by value) of the shares of the lower-tier PFIC and would be subject to the rules described above on certain distributions by the lower-tier PFIC and a disposition of shares of the lower-tier PFIC, even though such U.S. Holder would not receive the proceeds of those distributions or dispositions. Each U.S. Holder is advised to consult its tax advisors regarding the application of the PFIC rules to any of our subsidiaries.

The tax consequences that would apply if we were a PFIC would be different from those described above if a timely and valid "mark-to-market" election is made by a U.S. Holder for the ordinary shares held by such U.S. Holder. An electing U.S. Holder generally would take into account as ordinary income each year, the excess of the fair market value of the ordinary shares held at the end of the taxable year over the adjusted tax basis of such ordinary shares. The U.S. Holder would also take into account, as an ordinary loss each year, the excess of the adjusted tax basis of such ordinary shares over their fair market value at the end of the taxable year, but only to the extent of the excess of amounts previously included in income over ordinary losses deducted in prior years as a result of the mark-to-market election. The U.S. Holder's tax basis in the ordinary shares would be adjusted to reflect any income or loss recognized as a result of the mark-to-market election. Any gain from a sale, exchange or other taxable disposition of the ordinary shares in any taxable year in which we are a PFIC would be treated as ordinary income and any loss from such sale, exchange or other taxable disposition would be treated first as ordinary loss (to the extent of any net mark-to-market gains previously included in income) and thereafter as capital loss. If, after having been a PFIC for a prior taxable year, we cease to be classified as a PFIC, the U.S. Holder would not be required to take into account any latent gain or loss in the manner described above and any gain or loss recognized on the sale or exchange of the ordinary shares would be classified as a capital gain or loss.

140

A mark-to-market election is available to a U.S. Holder only for "marketable stock." Generally, ordinary shares will be considered marketable stock if it is "regularly traded" on a "qualified exchange" within the meaning of applicable Treasury Regulations. A class of stock is regularly traded during any calendar year during which such class of stock is traded, other than in de minimis quantities, on at least 15 days during each calendar quarter. The ordinary shares will be marketable stock as long as they remain listed on a qualified exchange, such as the NYSE or Nasdaq, and are regularly traded. A mark-to-market election will not apply to the ordinary shares for any taxable year during which we are not a PFIC, but will remain in effect with respect to any subsequent taxable year in which we become a PFIC. Such election will not apply to any subsidiary that we own. Accordingly, a U.S. Holder may continue to be subject to the PFIC rules with respect to any lower-tier PFICs notwithstanding the U.S. Holder's mark-to-market election for the ordinary shares.

The tax consequences that would apply if we were a PFIC would also be different from those described above if a U.S. Holder were able to make a valid "qualified electing fund," or QEF, election.

If we are a PFIC, a U.S. Holder that makes a timely and valid QEF election for the first tax year in which the holding period of its shares begins generally will not be subject to the default PFIC rules discussed above with respect to its shares. Rather, a U.S. Holder that makes a timely and valid QEF election will be subject to U.S. federal income tax on such U.S. Holder's pro rata share of our ordinary earnings and net capital gain, if any. A U.S. Holder that makes a QEF election will be subject to U.S. federal income tax on such amounts for each tax year in which the company is a PFIC, regardless of whether such amounts are actually distributed to such U.S. Holder by the company. However, for any tax year in which the company is a PFIC and has no net income or gain, U.S. Holders that have made a QEF election would not have any income inclusions as a result of the QEF election. If a U.S. Holder that made a QEF election has an income inclusion, such a U.S. Holder may, subject to certain limitations, elect to defer payment of current U.S. federal income tax on such amounts, subject to an interest charge. If such U.S. Holder is not a corporation, any such interest paid will be treated as "personal interest," which is not deductible.

A U.S. Holder that makes a timely and effective QEF election with respect to the company generally (a) may receive a tax-free distribution from the company to the extent that such distribution represents "earnings and profits" of the company that were previously included in income by the U.S. Holder because of such QEF election and (b) will adjust such U.S. Holder's tax basis in the shares to reflect the amount included in income or allowed as a tax-free distribution because of such QEF election. In addition, a U.S. Holder that makes a QEF election generally will recognize capital gain or loss on the sale or other taxable disposition of shares. A QEF election will be treated as "timely" if such QEF election is made for the first year in the U.S. Holder's holding period for the shares in which the company was a PFIC. A U.S. Holder may generally make a timely QEF election by filing a completed IRS Form 8621, including a PFIC Annual Information Statement, with its U.S. federal income tax return for such year. A retroactive QEF election generally may be made only by filing a protective statement with such return and if certain other requirements are met or with the consent of the IRS. If a U.S. Holder owns PFIC stock indirectly through another PFIC, separate QEF elections must be made for the PFIC in which the U.S. Holder is a direct shareholder and the subsidiary PFIC for the QEF rules to apply to both PFICs.

A QEF election will apply to the tax year for which such QEF election is timely made and to all subsequent tax years, unless such QEF election is invalidated or terminated or the IRS consents to revocation of such QEF election. If a U.S. Holder makes a QEF election and, in a subsequent tax year, the company ceases to be a PFIC, the QEF election will remain in effect (although it will not be applicable) during those tax years in which the company is not a PFIC. Accordingly, if the company becomes a PFIC in another subsequent tax year, the QEF election will be effective and the U.S. Holder will be subject to the QEF rules described above during any subsequent tax year in which the company qualifies as a PFIC.

We will use commercially reasonable efforts to make available to U.S. Holders such information with respect to the company as is necessary for U.S. Holders to make QEF elections with respect to the company if we are classified as a PFIC. We may elect to provide such information on our website. Each

141

U.S. Holder should consult its own tax advisors regarding the availability of, procedure for making, and consequences of a QEF election with respect to the company's shares.

Each U.S. Holder who is a shareholder of a PFIC must file an annual information report on IRS Form 8621 containing such information as the U.S. Treasury Department may require. The failure to file IRS Form 8621 could result in the imposition of penalties and the extension of the statute of limitations with respect to U.S. federal income tax.

The U.S. federal income tax rules relating to PFICs are very complex. Prospective U.S. investors are strongly urged to consult their own tax advisors with respect to the impact of these rules on the purchase, ownership and disposition of our ordinary shares, the consequences to them of an investment in a PFIC, any elections available with respect to the ordinary shares and the IRS information reporting obligations with respect to the purchase, ownership and disposition of the ordinary shares.

### Medicare Tax

Certain U.S. Holders that are individuals, estates or trusts are subject to a 3.8% tax on all or a portion of their "net investment income," which may include all or a portion of their dividend income and net gains from the disposition of ordinary shares. Each U.S. Holder that is an individual, estate or trust is urged to consult its tax advisors regarding the applicability of the Medicare tax to its income and gains in respect of its investment in our ordinary shares.

### Backup Withholding Tax and Information Reporting Requirements

U.S. backup withholding tax and information reporting requirements may apply to certain payments to certain holders of stock. Information reporting generally will apply to payments of dividends on, and to proceeds from the sale or redemption of, our ordinary shares made within the United States, or by a U.S. payor or U.S. middleman, to a holder of our ordinary shares, other than an exempt recipient (including a payee that is not a U.S. person that provides an appropriate certification and certain other persons). A payor will be required to withhold backup withholding tax from any payments of dividends on, or the proceeds from the sale or redemption of, ordinary shares within the United States, or by a U.S. payor or U.S. middleman, to a holder, other than an exempt recipient, if such holder fails to furnish its correct taxpayer identification number or otherwise fails to comply with, or establish an exemption from, such backup withholding tax requirements. Any amounts withheld under the backup withholding rules will be allowed as a credit against the beneficial owner's U.S. federal income tax liability, if any, and any excess amounts withheld under the backup withholding rules may be refunded, provided that the required information is timely furnished to the IRS.

### Foreign Asset Reporting

Certain U.S. Holders who are individuals are required to report information relating to an interest in our ordinary shares, subject to certain exceptions (including an exception for shares held in accounts maintained by U.S. financial institutions) by filing IRS Form 8938 (Statement of Specified Foreign Financial Assets) with their federal income tax return. U.S. Holders are urged to consult their tax advisors regarding their information reporting obligations, if any, with respect to their ownership and disposition of our ordinary shares.

**The above description is not intended to constitute a complete analysis of all tax consequences relating to acquisition, ownership and disposition of our ordinary shares. You should consult your tax advisor concerning the tax consequences of your particular situation.**

# UNDERWRITING

We are offering the ordinary shares described in this prospectus through a number of underwriters. J.P. Morgan Securities LLC, Barclays Capital Inc. and Jefferies LLC are acting as book-running managers of the offering and as representatives of the underwriters. We expect to enter into an underwriting agreement with the representatives on behalf of the underwriters. Subject to the terms and conditions of the underwriting agreement, we will agree to sell to the underwriters, and each underwriter will severally agree to purchase, at the public offering price less the underwriting discounts set forth on the cover page of this prospectus, the number of ordinary shares listed next to its name in the following table:

| Name | Number of Shares |
| --- | --- |
| J.P. Morgan Securities LLC | |
| Barclays Capital Inc. | |
| Jefferies LLC | |
| Oppenheimer & Co. Inc. | |
| Piper Jaffray & Co. | |
| Stifel, Nicolaus & Company, Incorporated | |
| William Blair & Company, L.L.C. | |
| Total | |

The underwriters will be committed to purchase all the ordinary shares offered by us if they purchase any shares. The underwriting agreement will also provide that if an underwriter defaults, the purchase commitments of non-defaulting underwriters may be increased or the offering may be terminated.

The underwriters propose to offer the ordinary shares directly to the public at the initial public offering price set forth on the cover page of this prospectus and to certain dealers at that price less a concession not in excess of $     per share. After the initial offering of the shares to the public, if all of the ordinary shares are not sold at the initial public offering price, the underwriters may change the offering price and the other selling terms. Sales of shares made outside of the United States may be made by affiliates of the underwriters.

The underwriters will have an option to buy up to 1,155,000 additional ordinary shares from us to cover sales of shares by the underwriters which exceed the number of shares specified in the table above. The underwriters will have 30 days from the date of this prospectus to exercise this option to purchase additional shares. If any shares are purchased with this option to purchase additional shares, the underwriters will purchase shares in approximately the same proportion as shown in the table above. If any additional ordinary shares are purchased, the underwriters will offer the additional shares on the same terms as those on which the shares are being offered.

The underwriting fee is equal to the public offering price per ordinary share less the amount paid by the underwriters to us per ordinary share. The underwriting fee is $     per share. The following table shows the per share and total underwriting discounts to be paid to the underwriters assuming both no exercise and full exercise of the underwriters' option to purchase additional shares.

| | Paid by the Company | |
| --- | --- | --- |
| | Without exercise of option to purchase additional shares exercise | With full exercise of option to purchase additional shares exercise |
| Per Share | $ | $ |
| Total | $ | $ |

We estimate that the total expenses of this offering, including registration, filing and listing fees, printing fees and legal and accounting expenses, but excluding the underwriting discounts, will be approximately $2,224,542. We have agreed to reimburse the underwriters for certain expenses incurred in connection with, among others, the review and clearance by the Financial Industry Regulatory Authority, Inc. in an amount of up to $30,000. In addition, the underwriters have agreed to reimburse us for certain of the expenses incurred by us in connection with this offering.

A prospectus in electronic format may be made available on the web sites maintained by one or more underwriters, or selling group members, if any, participating in the offering. The underwriters may agree to allocate a number of shares to underwriters and selling group members for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters and selling group members that may make Internet distributions on the same basis as other allocations.

We will agree that we will not, subject to limited exceptions, (i) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase or otherwise dispose of, directly or indirectly, or file with the SEC a registration statement under the Securities Act relating to, any ordinary shares or securities convertible into or exchangeable or exercisable for any ordinary shares, or publicly disclose the intention to make any offer, sale, pledge, disposition or filing, or (ii) enter into any swap or other arrangement that transfers all or a portion of the economic consequences associated with the ownership of any ordinary shares or any such other securities (regardless of whether any of these transactions are to be settled by the delivery of our ordinary shares or such other securities, in cash or otherwise), in each case without the prior written consent of J.P. Morgan Securities LLC for a period of 180 days after the date of this prospectus, other than the ordinary shares to be sold hereunder and any ordinary shares issued upon the exercise of options granted under our existing share option plans.

Our directors and executive officers, and substantially all of our shareholders will enter into lock-up agreements with the underwriters prior to the commencement of this offering pursuant to which each of these persons or entities, with limited exceptions, for a period of 180 days after the date of this prospectus, may not, without the prior written consent of J.P. Morgan Securities LLC, (1) offer, pledge, announce the intention to sell, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares or any securities convertible into or exercisable or exchangeable for our ordinary shares (including, without limitation, ordinary shares or such other securities which may be deemed to be beneficially owned by such directors, executive officers, managers and members in accordance with the rules and regulations of the SEC and securities which may be issued upon exercise of a share option or warrant) or (2) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the ordinary shares or such other securities, whether any such transaction described in clause (1) or (2) above is to be settled

144

by delivery of ordinary shares or such other securities, in cash or otherwise, or (3) make any demand for or exercise any right with respect to the registration of our ordinary shares or any security convertible into or exercisable or exchangeable for our ordinary shares.

We will agree to indemnify the underwriters against certain liabilities, including liabilities under the Securities Act.

We have applied to have our ordinary shares approved for listing on the NYSE under the symbol "TUFN."

In connection with this offering, the underwriters may engage in stabilizing transactions, which involves making bids for, purchasing and selling our ordinary shares in the open market for the purpose of preventing or retarding a decline in the market price of our ordinary shares while this offering is in progress. These stabilizing transactions may include making short sales of the ordinary shares, which involves the sale by the underwriters of a greater number of ordinary shares than they are required to purchase in this offering, and purchasing ordinary shares on the open market to cover positions created by short sales. Short sales may be "covered" shorts, which are short positions in an amount not greater than the underwriters' option to purchase additional shares referred to above, or may be "naked" shorts, which are short positions in excess of that amount. The underwriters may close out any covered short position either by exercising their option to purchase additional shares, in whole or in part, or by purchasing shares in the open market. In making this determination, the underwriters will consider, among other things, the price of shares available for purchase in the open market compared to the price at which the underwriters may purchase shares through the option to purchase additional shares. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the ordinary shares in the open market that could adversely affect investors who purchase in this offering. To the extent that the underwriters create a naked short position, they will purchase shares in the open market to cover the position.

The underwriters have advised us that, pursuant to Regulation M of the Securities Act, they may also engage in other activities that stabilize, maintain or otherwise affect the price of the ordinary shares, including the imposition of penalty bids. This means that if the representatives of the underwriters purchase ordinary shares in the open market in stabilizing transactions or to cover short sales, the representatives can require the underwriters that sold those shares as part of this offering to repay the underwriting discount received by them.

These activities may have the effect of raising or maintaining the market price of the ordinary shares or preventing or retarding a decline in the market price of the ordinary shares, and, as a result, the price of the ordinary shares may be higher than the price that otherwise might exist in the open market. If the underwriters commence these activities, they may discontinue them at any time. The underwriters may carry out these transactions on the NYSE , in the over-the-counter market or otherwise.

Prior to this offering, there has been no public market for our ordinary shares. The initial public offering price will be determined by negotiations between us and the representatives of the underwriters. In determining the initial public offering price, we and the representatives of the underwriters expect to consider a number of factors including:

- the information set forth in this prospectus and otherwise available to the representatives;

- our prospects and the history and prospects for the industry in which we compete;

- an assessment of our management;

- our prospects for future earnings;

- the general condition of the securities markets at the time of this offering;

- the recent market prices of, and demand for, publicly traded ordinary shares of generally comparable companies; and

- other factors deemed relevant by the underwriters and us.

Neither we nor the underwriters can assure investors that an active trading market will develop for our ordinary shares, or that the shares will trade in the public market at or above the initial public offering price.

Other than in the United States, no action has been taken by us or the underwriters that would permit a public offering of the securities offered by this prospectus in any jurisdiction where action for that purpose is required. The securities offered by this prospectus may not be offered or sold, directly or indirectly, nor may this prospectus or any other offering material or advertisements in connection with the offer and sale of any such securities be distributed or published in any jurisdiction, except under circumstances that will result in compliance with the applicable rules and regulations of that jurisdiction. Persons into whose possession this prospectus comes are advised to inform themselves about and to observe any restrictions relating to the offering and the distribution of this prospectus. This prospectus does not constitute an offer to sell or a solicitation of an offer to buy any securities offered by this prospectus in any jurisdiction in which such an offer or a solicitation is unlawful.

Certain of the underwriters and their affiliates have provided in the past to us and our affiliates and may provide from time to time in the future certain commercial banking, financial advisory, investment banking and other services for us and such affiliates in the ordinary course of their business, for which they have received and may continue to receive customary fees. In addition, from time to time, certain of the underwriters and their affiliates may effect transactions for their own account or the account of customers, and hold on behalf of themselves or their customers, long or short positions in our debt or equity securities or loans, and may do so in the future.

## Notice to Prospective Investors in the European Economic Area

In relation to each Member State of the European Economic Area (each, a "Relevant Member State"), no offer of ordinary shares may be made to the public in that Relevant Member State other than:

A. to any legal entity which is a qualified investor as defined in the Prospectus Directive;

B. to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the representatives; or

C. in any other circumstances falling within Article 3(2) of the Prospectus Directive, provided that no such offer of shares shall require the company or the representatives to publish a prospectus pursuant to Article 3 of the Prospectus Directive or supplement a prospectus pursuant to Article 16 of the Prospectus Directive.

Each person in a Relevant Member State who initially acquires any shares or to whom any offer is made will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of the law in that Relevant Member State implementing Article 2(1)(e) of the Prospectus Directive. In the case of any shares being offered to a financial intermediary as that term is used in Article 3(2) of the Prospectus Directive, each such financial intermediary will be deemed to have represented, acknowledged and agreed that the shares acquired by it in the offer have not been acquired on a non-discretionary basis on behalf of, nor have they been acquired with a view to their offer or resale to, persons in circumstances which may give rise to an offer of any shares to the public other than their offer or resale in a Relevant Member State to qualified investors as so defined or in circumstances in which the prior consent of the representatives has been obtained to each such proposed offer or resale.

This prospectus has been prepared on the basis that any offer of shares in any Relevant Member State will be made pursuant to an exemption under the Prospectus Directive from the requirement to publish a prospectus for offers of shares. Accordingly any person making or intending to make an offer in that Relevant Member State of shares which are the subject of the offering contemplated in this prospectus

may only do so in circumstances in which no obligation arises for the company or any of the underwriters to publish a prospectus pursuant to Article 3 of the Prospectus Directive in relation to such offer. Neither we nor the underwriters have authorized, nor do they authorize, the making of any offer of shares in circumstances in which an obligation arises for the company or the underwriters to publish a prospectus for such offer.

For the purpose of the above provisions, the expression "an offer to the public" in relation to any shares in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and the shares to be offered so as to enable an investor to decide to purchase or subscribe the shares, as the same may be varied in the Relevant Member State by any measure implementing the Prospectus Directive in the Relevant Member State and the expression "Prospectus Directive" means Directive 2003/71/EC (including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member States) and includes any relevant implementing measure in the Relevant Member State and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

## Notice to Prospective Investors in the United Kingdom

In the United Kingdom, this document is being distributed only to, and is directed only at, and any offer subsequently made may only be directed at persons who are "qualified investors" (as defined in the Prospectus Directive) (i) who have professional experience in matters relating to investments falling within Article 19(5) of the Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended, or the Order 2005, and/or (ii) who are high net worth companies (or persons to whom it may otherwise be lawfully communicated) falling within Article 49(2)(a) to (d) of the Order 2005 (all such persons together being referred to as "relevant persons") or otherwise in circumstances which have not resulted and will not result in an offer to the public of the shares in the United Kingdom within the meaning of the Financial Services and Markets Act 2000.

Any person in the United Kingdom that is not a relevant person should not act or rely on the information included in this document or use it as basis for taking any action. In the United Kingdom, any investment or investment activity that this document relates to may be made or taken exclusively by relevant persons.

## Notice to Prospective Investors in Israel

This document does not constitute a prospectus under the Israel Securities Law, 5728-1968, and has not been filed with or approved by the Israel Securities Authority nor have the securities offered under this document been approved or disapproved by the Israel Securities Authority or registered for sale in Israel. The ordinary shares will not be offered or sold to the public in Israel, except that the underwriters may offer and sell such shares, and distribute this prospectus to investors listed in the first addendum, or the Addendum, to the Israel Securities Law, consisting primarily of joint investment in trust funds, provident funds, insurance companies, banks, portfolio managers, investment advisors, members of the TASE, underwriters purchasing for their own account, venture capital funds, entities with equity in excess of NIS 50 million and "qualified individuals," each as defined in the Addendum (as it may be amended from time to time), collectively referred to as qualified investors. Qualified investors are required to complete and sign a questionnaire to confirm that they fall within the scope of the Addendum. Any resale in Israel, directly or indirectly, to the public of the securities offered by this prospectus is subject to restrictions on transferability and must be effected only in compliance with the Israel Securities Law.

## Notice to Prospective Investors in Canada

The ordinary shares may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 Prospectus Exemptions or subsection 73.3(1) of the Securities Act (Ontario), and are permitted clients, as defined in National Instrument 31-103 Registration Requirements, Exemptions and Ongoing Registrant Obligations. Any resale of the ordinary shares must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 of National Instrument 33-105 Underwriting Conflicts (NI 33-105), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

# EXPENSES OF THE OFFERING

We estimate that our expenses in connection with this offering, other than underwriting discounts, will be as follows:

| Expenses | Amount | |
|---|---:|---:|
| SEC registration fee | $ | 15,026 |
| NYSE listing fee | | 110,420 |
| FINRA filing fee | | 19,096 |
| Printing and engraving expenses | | 130,000 |
| Legal fees and expenses | | 1,700,000 |
| Accounting fees and expenses | | 200,000 |
| Miscellaneous costs | | 220,000 |
| **Total** | $ | 2,394,542 |

All amounts in the table are estimates except the SEC registration fee, the NYSE listing fee and the FINRA filing fee. We will pay all of the expenses of this offering listed above.

# LEGAL MATTERS

The validity of the ordinary shares being offered by this prospectus and other legal matters concerning this offering relating to Israeli law will be passed upon for us by Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co., Tel Aviv, Israel. Certain legal matters in connection with this offering relating to U.S. law will be passed upon for us by White & Case LLP, New York, New York. Certain legal matters in connection with this offering will be passed upon for the underwriters by Goldfarb Seligman & Co., Tel Aviv, Israel, with respect to Israeli law, and by Goodwin Procter LLP, Boston, Massachusetts, with respect to U.S. law.

# EXPERTS

The consolidated financial statements as of December 31, 2017 and 2018 and for the years then ended included in this prospectus have been so included in reliance on the report of Kesselman & Kesselman, Certified Public Accountants (Isr.), an independent registered public accounting firm and member firm of PricewaterhouseCoopers International Limited, given on the authority of said firm as experts in auditing and accounting.

# ENFORCEABILITY OF CIVIL LIABILITIES

We are incorporated under the laws of the State of Israel. Service of process upon us and upon our directors and officers and any Israeli experts named in this registration statement, most of whom reside outside of the United States, may be difficult to obtain within the United States. Furthermore, because a majority of our assets and most of our directors, officers and such Israeli experts are located outside of the United States, any judgment obtained in the United States against us or any of them may be difficult to collect within the United States.

We have irrevocably appointed Tufin Software North America, Inc. as our agent to receive service of process in any action against us in any U.S. federal or state court arising out of this offering or any purchase or sale of securities in connection with this offering.

We have been informed by our legal counsel in Israel, Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co., that it may be difficult to assert U.S. securities law claims in original actions instituted in Israel. Israeli courts may refuse to hear a claim based on an alleged violation of U.S. securities laws on the basis that Israel is not the most appropriate forum in which to bring such a claim. In addition, even if an Israeli court agrees to hear a claim, it may determine that Israeli law and not U.S. law is applicable to the claim. There is little binding case law in Israel addressing these matters. If U.S. law is found to be applicable, the content of applicable U.S. law must be proven as a fact which can be a time-consuming and costly process. Certain matters of procedure will also be governed by Israeli law.

Subject to specified time limitations and legal procedures, under the rules of private international law currently prevailing in Israel, Israeli courts may enforce a U.S. judgment in a civil matter which, subject to certain exceptions, is non-appealable, including a judgment based upon the civil liability provisions of the Securities Act or the Exchange Act and including a monetary or compensatory judgment in a non-civil matter, provided that, among other things, the following key conditions are met:

- the judgment is obtained after due process before a court of competent jurisdiction, according to the laws of the state in which the judgment is given and the judgment is enforceable according to the law of the foreign state in which the relief was granted;

- the obligation imposed by the judgment is enforceable according to the rules relating to the enforceability of judgments in Israel; and

- the substance of the judgment and its enforcement is not contrary to the law, public policy, security or sovereignty of the State of Israel.

Even if the above conditions are met, an Israeli court will not enforce a U.S. judgment in a civil matter if:

- the judgment was given in a state whose laws do not provide for the enforcement of judgments of Israeli courts (subject to exceptional cases);

- the judgment was obtained by fraud;

- the opportunity given to the defendant to bring its arguments and evidence before the court was not reasonable in the opinion of the Israeli court;

- the judgment was rendered by a court not competent to render it according to the laws of private international law as they apply in Israel;

- the judgment is contradictory to another judgment that was given in the same matter between the same parties and that is still valid; or

- at the time the action was brought in the foreign court, a lawsuit in the same matter and between the same parties was pending before a court or tribunal in Israel.

If a foreign judgment is enforced by an Israeli court, it generally will be payable in NIS, which can then be converted into non-Israeli currency and transferred out of Israel. The usual practice in an action before an Israeli court to recover an amount in a non-Israeli currency is for the Israeli court to issue a judgment for the equivalent amount in NIS at the rate of exchange in force on the date of the judgment, but the judgment debtor may make payment in non-Israeli currency. Pending collection, the amount of the judgment of an Israeli court stated in NIS ordinarily will be linked to the Israeli consumer price index plus interest at the annual statutory rate set by Israeli regulations prevailing at the time. Judgment creditors must bear the risk of unfavorable exchange rates.

# WHERE YOU CAN FIND ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form F-1 under the Securities Act relating to this offering of our ordinary shares. This prospectus does not contain all of the information contained in the registration statement. The rules and regulations of the SEC allow us to omit certain information from this prospectus that is included in the registration statement. Statements made in this prospectus concerning the contents of any contract, agreement or other document are summaries of all material information about the documents summarized, but are not complete descriptions of all terms of these documents. If we filed any of these documents as an exhibit to the registration statement, you may read the document itself for a complete description of its terms.

The SEC maintains an Internet website that contains reports and other information regarding issuers that file electronically with the SEC. Our filings with the SEC are available to the public through the SEC's website at www.sec.gov.

We are not currently subject to the informational requirements of the Exchange Act. Upon completion of this offering, we will be subject to the information reporting requirements of the Exchange Act that are applicable to foreign private issuers, and under those requirements will file reports with the SEC. As a foreign private issuer, we will be exempt from the rules under the Exchange Act related to the furnishing and content of proxy statements, and our officers, directors and principal shareholders will be exempt from the reporting and short-swing profit recovery provisions contained in Section 16 of the Exchange Act. In addition, we will not be required under the Exchange Act to file annual, quarterly and current reports and financial statements with the SEC as frequently or as promptly as U.S. companies whose securities are registered under the Exchange Act. However, we will file with the SEC, within four months after the end of each fiscal year, or such applicable time as required by the SEC, an annual report on Form 20-F containing financial statements which will be audited and reported on, with an opinion expressed, by an independent registered public accounting firm, and will furnish to the SEC, on Form 6-K, unaudited quarterly financial information for the first three quarters of each fiscal year within 60 days after the end of each such quarter, or such applicable time as required by the SEC.

# TUFIN SOFTWARE TECHNOLOGIES LTD.

# CONSOLIDATED FINANCIAL STATEMENTS

# INDEX

| | Page |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-2 |
| Consolidated Balance Sheets as of December 31, 2017 and 2018 | F-3 |
| Consolidated Statements of Operations for the years ended December 31, 2017 and 2018 | F-6 |
| Consolidated Statements of Redeemable Convertible Preferred Shares and Changes in Shareholders' Deficit as of December 31, 2017 and 2018 | F-7 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2017 and 2018 | F-8 |
| Notes to Consolidated Financial Statements | F-9 |



**Report of Independent Registered Public Accounting Firm**

To the Shareholders and Board of Directors of Tufin Software Technologies Ltd.

***Opinion on the Financial Statements***
We have audited the accompanying consolidated balance sheets of Tufin Software Technologies Ltd. and its subsidiaries (the "Company") as of December 31, 2018 and 2017, and the related consolidated statements of operations, of redeemable convertible preferred shares and changes in shareholders deficit and of cash flows for the years then ended, including the related notes (collectively referred to as the "consolidated financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2018 and 2017, and the results of its operations and its cash flows for the years then ended in conformity with accounting principles generally accepted in the United States of America.

*Change in Accounting Principles*
As discussed in Note 2 to the consolidated financial statements, the Company changed the manner in which it accounts for revenue recognition and the manner in which it accounts for forfeitures within share-based compensation in 2017.

***Basis for Opinion***

These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's consolidated financial statements based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits of these consolidated financial statements in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud.

Our audits included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that our audits provide a reasonable basis for our opinion.

/s/ Kesselman & Kesselman

Certified Public Accountants (Isr.)

A member firm of PricewaterhouseCoopers International Limited

Tel-Aviv, Israel
March 6, 2019, except for the effects of the reverse share split as discussed in Note 2(z) to the consolidated financial statements, as to which the date is April 1, 2019

We have served as the Company's auditor since 2007.

F-2

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollars in thousands**

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2018 | |
| **Assets** | | | | |
| **CURRENT ASSETS:** | | | | |
| Cash and cash equivalents | $ | 14,700 | $ | 15,248 |
| Restricted bank deposits | | 159 | | 561 |
| Accounts receivable (net of allowance for doubtful accounts of $63 and $97 at December 31, 2017 and December 31, 2018, respectively) | | 11,492 | | 14,716 |
| Deferred costs | | 207 | | 288 |
| Prepaid expenses and other current assets | | 1,257 | | 5,152 |
| **Total current assets** | | 27,815 | | 35,965 |
| **NON CURRENT ASSETS:** | | | | |
| Long-term restricted bank deposits | | 761 | | 1,789 |
| Property and equipment, net | | 1,829 | | 2,563 |
| Accrued severance fund | | 199 | | 144 |
| Deferred costs | | 3,754 | | 5,025 |
| Deferred tax assets | | 540 | | 689 |
| Deferred offering costs | | — | | 730 |
| Other non-current assets | | 228 | | 228 |
| **Total non-current assets** | | 7,311 | | 11,168 |
| **Total assets** | $ | 35,126 | $ | 47,133 |

The accompanying notes are an integral part of the consolidated financial statements.

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**CONSOLIDATED BALANCE SHEETS**
**U.S. dollars in thousands (except share and per share data)**

| | December 31, | | 2018 Pro forma Unaudited |
|---|---|---|---|
| | 2017 | 2018 | |
| **LIABILITIES, REDEEMABLE CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' DEFICIT** | | | |
| **CURRENT LIABILITIES:** | | | |
| Current maturities of long-term loan | $ 667 | $ 222 | |
| Trade payables | 640 | 3,096 | |
| Employee and payroll accrued expenses | 9,247 | 9,976 | |
| Other accounts payables | 2,014 | 4,890 | |
| Deferred revenues | 16,690 | 18,172 | |
| **Total current liabilities** | 29,258 | 36,356 | |
| **NON-CURRENT LIABILITIES:** | | | |
| Long-term loan | 222 | — | |
| Long-term deferred revenues | 7,267 | 13,292 | |
| Liability for severance pay | 287 | 220 | |
| Other non-current liabilities | 421 | 512 | |
| **Total non-current liabilities** | 8,197 | 14,024 | |
| **Total liabilities** | $ 37,455 | $ 50,380 | |
| **COMMITMENTS AND CONTINGENCIES (Note 9)** | | | |
| **REDEEMABLE CONVERTIBLE PREFERRED SHARES:** | | | |
| Series A preferred shares of NIS 0.015 par value: 10,000,000 preferred shares authorized at December 31, 2017 and 2018; 7,592,803 preferred shares issued and outstanding at December 31, 2017 and 2018; no preferred shares issued and outstanding pro forma (unaudited) | 5,073 | 5,073 | — |
| Series B preferred shares of NIS 0.015 par value: 3,333,333 preferred shares authorized at December 31, 2017 and 2018; 2,668,333 preferred shares issued and outstanding at December 31, 2017 and 2018; no preferred shares issued and outstanding pro forma (unaudited) | 4,310 | 4,310 | — |
| Series C preferred shares of NIS 0.015 par value: 4,666,667 preferred shares authorized at December 31, 2017 and 2018; 4,621,592 preferred shares issued and outstanding at December 31, 2017 and 2018; no preferred shares issued and outstanding pro forma (unaudited) | 12,416 | 12,416 | — |
| Series D preferred shares of NIS 0.015 par value: 1,534,021 preferred shares authorized at December 31, 2017 and 2018; 1,534,021 preferred shares issued and outstanding at December 31, 2017 and 2018; no preferred shares issued and outstanding pro forma (unaudited) | 4,900 | 4,900 | — |
| **TOTAL REDEEMABLE CONVERTIBLE PREFERRED SHARES** | 26,699 | 26,699 | — |

F-4

| | | | |
|---|---|---|---|
| **SHAREHOLDERS' DEFICIT :** | | | |
| Ordinary shares of NIS 0.015 par value; 52,666,712 shares authorized at December 31, 2017 and 2018; 7,966,612 and 8,265,988 shares issued and outstanding at December 31, 2017 and 2018; 24,682,737 shares issued and outstanding pro forma (unaudited) | 29 | 30 | 96 |
| Additional paid-in capital | 6,994 | 10,337 | 36,970 |
| Accumulated deficit | (36,051) | (40,313) | (40,313) |
| **TOTAL SHAREHOLDERS' DEFICIT** | (29,028) | (29,946) | (3,247) |
| **TOTAL LIABILITIES, REDEEMABLE CONVERTIBLE PREFERRED SHARES AND SHAREHOLDERS' DEFICIT** | $ 35,126 | $ 47,133 | $ 47,133 |

The accompanying notes are an integral part of the consolidated financial statements.

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**CONSOLIDATED STATEMENTS OF OPERATIONS**
**U.S. dollars in thousands (except share and per share data)**

| | | Year ended December 31, | | |
|---|---|---|---|---|
| | | 2017 | | 2018 |
| Revenues: | | | | |
| Product | $ | 30,855 | $ | 42,554 |
| Maintenance and professional services | | 33,685 | | 42,427 |
| Total revenues | | 64,540 | | 84,981 |
| Cost of revenues: | | | | |
| Product | | 1,702 | | 2,324 |
| Maintenance and professional services | | 7,778 | | 11,112 |
| Total cost of revenues | | 9,480 | | 13,436 |
| Gross profit | | 55,060 | | 71,545 |
| Operating expenses: | | | | |
| Research and development | | 17,672 | | 21,363 |
| Sales and marketing | | 35,042 | | 46,092 |
| General and administrative | | 4,608 | | 6,022 |
| Total operating expenses | | 57,322 | | 73,477 |
| Operating loss | $ | (2,262) | $ | (1,932) |
| Financial income (loss), net | | 267 | | (1,047) |
| Loss before taxes on income | $ | (1,995) | $ | (2,979) |
| Taxes on income | | (797) | | (1,283) |
| Net loss | $ | (2,792) | $ | (4,262) |
| Basic and diluted net loss per ordinary share | $ | (0.35) | $ | (0.53) |
| Weighted average number of shares used in computing net loss per ordinary share, basic and diluted | | 7,872,545 | | 8,045,647 |
| Pro forma net loss per share attributable to common stockholders, basic and diluted (unaudited) | | | $ | (0.17) |
| Weighted-average shares used in computing pro forma net loss per share attributable to common stockholders, basic and diluted (unaudited) | | | | 24,462,397 |

The accompanying notes are an integral part of the consolidated financial statements.

# TUFIN SOFTWARE TECHNOLOGIES LTD.

## CONSOLIDATED STATEMENTS OF REDEEMABLE CONVERTIBLE PREFERRED SHARES AND CHANGES IN SHAREHOLDERS' DEFICIT
### U.S. dollars in thousands (except share data)

| | Redeemable Convertible Preferred Shares | | Ordinary shares | | Additional paid-in capital | Accumulated deficit | Total capital deficiency |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | Number of Shares | Amount | Number of Shares | Amount | | | |
| **Balance as of January 1, 2017** | (*) 16,416,749 | $ 26,699 | 7,631,687 | $ 28 | $ 4,352 | $ (36,748) | $ (32,368) |
| Cumulative effect adjustment resulting from adoption of new accounting principles (see note 2) | | | | | 138 | 3,489 | 3,627 |
| Issuance of ordinary shares upon exercise of options | | | 334,925 | 1 | 394 | | 395 |
| Compensation related to options granted to employees and service providers | | | | | 2,110 | | 2,110 |
| Net loss | | | | | | (2,792) | (2,792) |
| **Balance as of December 31, 2017** | 16,416,749 | 26,699 | 7,966,612 | 29 | 6,994 | (36,051) | (29,028) |
| Issuance of ordinary shares upon exercise of options | | | 299,376 | 1 | 162 | | 163 |
| Compensation related to options granted to employees and service providers | | | | | 3,181 | | 3,181 |
| Net loss | | | | | | (4,262) | (4,262) |
| **Balance as of December 31, 2018** | 16,416,749 | $ 26,699 | 8,265,988 | $ 30 | $ 10,337 | $ (40,313) | $ (29,946) |

(*)   The total number of redeemable convertible preferred shares includes 27,778 shares representing receipt on account of preferred A shares.

The accompanying notes are an integral part of the consolidated financial statements.

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**
**U.S. dollars in thousands**

| | Year ended December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | |
| Net loss | $ (2,792) | $ (4,262) |
| **Adjustment to reconcile net loss to net cash provided by (used in) operating activities:** | | |
| Depreciation | 368 | 956 |
| Bad debt expense | 63 | 34 |
| Compensation related to options granted to employees and service providers | 2,110 | 3,181 |
| Liability for employee rights upon retirement | (65) | (67) |
| Other | — | 380 |
| **Change in operating assets and liability items:** | | |
| Accounts receivable | (7,354) | (3,258) |
| Prepaid expenses and other current assets | 36 | (3,895) |
| Deferred costs | (449) | (1,352) |
| Deferred taxes and other non-current assets | (905) | (149) |
| Trade payables | (253) | 2,456 |
| Employee and payroll accrued expenses | 3,380 | 729 |
| Other accounts payable and non-current liabilities | (43) | 2,367 |
| Deferred revenues | 5,476 | 7,507 |
| Net cash provided by (used in) operating activities | (428) | 4,627 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | |
| Purchase of fixed assets | (889) | (1,690) |
| Amounts withdrawn from severance fund | 50 | 55 |
| Net cash used in investing activities | (839) | (1,635) |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | |
| Proceeds from exercise of stock options | 395 | 163 |
| Deferred offering costs | — | (130) |
| Payment of long-term loan | (668) | (667) |
| Net cash used in financing activities | (273) | (634) |
| **Effect of exchange rate changes on cash, cash equivalents and restricted cash** | (4) | (380) |
| **INCREASE (DECREASE) IN CASH, CASH EQUIVALENTS AND RESTRICTED CASH** | (1,544) | 1,978 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH AT BEGINNING OF YEAR** | 17,164 | 15,620 |
| **CASH, CASH EQUIVALENTS AND RESTRICTED CASH AT END OF YEAR** | $ 15,620 | $ 17,598 |

**SUPPLEMENTAL DISCLOSURE OF CASH FLOW INFORMATION:**

| | | |
| --- | --- | --- |
| Property and equipment purchased but not yet paid | | $ 315 |
| Unpaid offering costs | | $ 600 |

The accompanying notes are an integral part of the consolidated financial statements.

# NOTE 1:    GENERAL

Tufin Software Technologies Ltd. (together with its subsidiaries, "Tufin" or the "Company") is an Israeli company that develops, markets and sells software-based solutions that help organizations visualize, define and enforce a unified security policy across complex, heterogeneous network environments. Tufin's solutions automate security policy management, and allow organizations to gain visibility and control over their IT and cloud environments. Substantially all of the Company's sales of products and services worldwide are made through a global network of distributors and resellers, which sell the products and services to their end-user customers.

Tufin Software Technologies Ltd. (the "Company") was incorporated as an Israeli company on January 2, 2005 and commenced operations on that date. The Company has incorporated wholly owned subsidiaries in the United States, the United Kingdom, Germany, France and Australia, primarily for marketing or distribution of its products.

The Company has an accumulated deficit of $40 million. The Company expects its operating expenses to increase significantly as it continues to expand sales and marketing efforts, invest in research and development and continue to expand its operations in existing and new geographies and vertical markets. It also expects to continue to devote significant research and development resources to its on-premise and cloud solutions. There can be no assurance that the Company will achieve profitability in the future or that, if the Company does become profitable, it will be able to sustain profitability.

The Company has one operating segment. Entity-wide disclosures on revenues and property, plant and equipment are presented in Note 16.

# NOTE 2:    SIGNIFICANT ACCOUNTING POLICIES

The consolidated financial statements have been prepared in accordance with U.S. generally accepted accounting principles ("U.S. GAAP").

### a.  Use of Estimates

The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates, judgments and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. The Company evaluates on an ongoing basis its assumptions, including those related to contingencies, income taxes, deferred taxes, share-based compensation, as well as in estimates used in applying the revenue recognition policy. The Company's management believes that the estimates, judgment and assumptions used are reasonable based upon information available at the time they are made. These estimates, judgments and assumptions can affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the dates of the consolidated financial statements, and the reported amounts of revenue and expenses during the reporting periods. Actual results could differ from those estimates.

### b.  Principles of Consolidation

The consolidated financial statements comprise the financial statements of Tufin Software Technologies Ltd. and its wholly-owned subsidiaries. All intercompany transactions and balances have been eliminated upon consolidation.

### c.  Functional Currency

A majority of the Company's revenues is generated in U.S. dollars. In addition, the investments in the Company have been in U.S. dollars and the substantial majority of the Company's costs are incurred in U.S. dollars and New Israeli Shekels ("NIS"). The Company's management believes that the U.S. dollar is the currency of the primary economic environment in which the Company and each of its subsidiaries operates. Thus, the functional currency of the Company is the U.S. dollar.

Accordingly, monetary balances maintained in currencies other than the U.S. dollar are re-measured into U.S. dollars in accordance with Statement of the Accounting Standard Codification ("ASC") No. 830 "Foreign Currency Matters" ("ASC No. 830"). All transaction gains and losses of the re-measured monetary balance sheet items are reflected in the statement of operations as financial income or expenses, as appropriate.

### d.  Cash and Cash Equivalents

Cash equivalents are short-term highly liquid deposits that are readily convertible to cash with original maturities of three months or less, at the date acquired.

### e.  Restricted Bank Deposits

As of December 31, 2017 and 2018, the Company's bank deposits were denominated in U.S. dollars and NIS and bore yearly interest at weighted average deposits rates of 0.14%. Bank deposits are presented at their cost, including accrued interest. These deposits are used as security for the rental of premises, credit cards and for the Company's hedging activities.

### f.  Accounts Receivable

Accounts receivable are presented in the Company's consolidated balance sheet net of allowance for doubtful accounts. The Company estimates the collectability of its accounts receivable balances and adjusts its allowance for doubtful accounts accordingly.

On a periodic basis, the Company evaluates its accounts receivable and establishes an allowance for doubtful accounts based on past write-offs and collections, current credit conditions and the age of the balances. The Company evaluates a number of factors to assess collectability, including an evaluation of the creditworthiness of the specific customer, past due amounts, payment history, and current economic conditions.

When revenue recognition criteria are not met for a sale transaction that has been billed, the Company does not recognize deferred revenues on the balance sheet or the related account receivable. Accordingly, as of December 31, 2017 and 2018, an amount of $16,375 thousand and $25,165 thousand, respectively, were offset from accounts receivable.

### g.  Property and Equipment

Property and equipment is stated at cost, net of accumulated depreciation. Depreciation is calculated by the straight-line method over the estimated useful lives of the residual value of the related assets at the following annual rates:

|  | % |
|---|---|
| Furniture and fixtures | 2-6 |
| Computers and software | 33 |
| Leasehold improvements | 10-33 |
| Electronic equipment | 15-33 |

Leasehold improvements are depreciated by the straight-line method over the term of the lease (including reasonably assured option periods, if applicable), or the estimated useful life of the improvements, whichever is shorter.

### h.  Long-Lived Assets

The long-lived assets of the Company are reviewed for impairment in accordance with ASC No. 360, "Property, Plant and Equipment" ("ASC No. 360"), whenever events or changes in circumstances indicate that the carrying amount of an asset may not be recoverable. The recoverability of assets to be held and

used is measured by a comparison of the carrying amount of an asset to the future undiscounted cash flows expected to be generated by such assets. If such assets are considered to be impaired, the impairment to be recognized is measured by the amount by which the carrying amount of the assets exceeds the fair value of the assets. During the years ended December 31, 2017 and 2018, no impairment triggering events were identified.

### i.  Severance Pay

Israeli labor law generally requires payment of severance pay upon dismissal of an employee or upon termination of employment in certain other circumstances. Pursuant to section 14 of the Severance Compensation Act, 1963 ("Section 14"), all of the Company's employees in Israel are entitled to monthly deposits, at a rate of 8.33% of their monthly salary, made in their name with insurance companies.

Payments under Section 14 relieve the Company from any future severance payment obligation with respect to those employees and, as such, the Company may only utilize the insurance policies for the purpose of disbursement of severance pay. As a result, the Company does not recognize an asset nor liability for these employees.

As of December 31, 2017 and 2018, all the Company's employees in Israel are subject to Section 14.

The accrued severance fund presented an asset and the liability for severance pay presented in the balance sheet reflects employees that began employment prior to Section 14.

### j.  Revenue Recognition

Effective January 1, 2017, the Company elected to early adopt the requirements of Accounting Standards Update (ASU) 2014-09, *Revenue from Contracts with Customers ("Topic 606")* on a modified retrospective basis and applied the new standard only to contracts that were not completed contracts as of January 1, 2017.

The Company follows five steps to record revenue under Topic 606: (i) identify the contract with a customer, (ii) identify the performance obligations in the contract, (iii) determine the transaction price, (iv) allocate the transaction price to the performance obligations in the contract, and (v) recognize revenue when (or as) the Company satisfies its performance obligations.

For each arrangement the Company assesses whether it is acting as the principal that has promised to provide goods or services to its customers or an agent which arranges for goods or services to be provided by the principal to an end customer. The Company has determined that for its contracts it is the principal since it is primarily responsible for fulfilling the promise to provide the specified good or service. The Company's revenue is reported net of discounts, sales tax, value added tax and related surcharges.

The Company generates revenues from selling (i) software license (perpetual and term-based), (ii) maintenance, (iii) hardware and (iv) professional services. The Company sells its products and services primarily through distributors and resellers and also through its direct sales force.

The Company determines the appropriate revenue recognition for its contracts with customers by analyzing the type, terms and conditions of each contract or arrangement with a customer. The Company classifies the components of revenue as product or services revenue based on the attributes of the underlying performance obligations. Accordingly, software license and hardware are classified as product revenues.

The most significant impact of Topic 606 related to the accounting treatment for term license arrangements and costs to obtain customer contracts. Under the previous revenue recognition standard, the Company recognized term license revenues ratably over the contract period whereas under the new revenue standard term license revenues are recognized upfront, upon delivery, and the associated maintenance revenues are deferred and recognized over the contract period. As a result, upon adoption of Topic 606 on January 1, 2017, the Company recognized a decrease in its deferred revenues amounting to $1,139 thousand with a corresponding adjustment to retained earnings (which decreased the

accumulated deficit). The Company has considered the impact of the guidance in ASC 340-40, "Other Assets and Deferred Costs" under the new standard. Under the Company's previous accounting policy, sales commissions were expensed as incurred. The new standard requires the capitalization of all incremental costs that the Company incurs to obtain a contract with a customer that it would not have incurred if the contract had not been obtained, provided the Company expects to recover the costs. Amortization expense is included in sales and marketing expenses in the accompanying consolidated statements of operations and recorded on a straight-line basis over the expected period of benefit, which is the customer relationship period. Additionally, these costs are periodically reviewed for impairment. As a result, upon adoption of Topic 606 on January 1, 2017, the Company recognized a deferred cost asset amounting to $3,512 thousand with a corresponding adjustment to retained earnings (which decreased the accumulated deficit). Furthermore, as a result of the adoption of Topic 606, the Company recognized on January 1, 2017 the related tax effect of $1,024 thousand as an adjustment to retained earnings (which increased the accumulated deficit).

The Company's contract payment terms typically range between 30 and 120 days. The Company assesses collectability based on several factors, including collection history.

The Company elected to disregard the effects of a financing component when the period between when the entity transfers a promised good or service to the customer and when the customer pays for that good or service is one year or less.

*Nature of Products and Services*

The Company's on-premise software licenses are sold through both perpetual and term-based license agreements. These licensing arrangements provide customers with the same product functionality and differ mainly in the duration over which the customer benefits from the software. The Company delivers its software licenses electronically. Electronic delivery occurs when the Company provides the customer with access to the software and license key via a secure portal. Revenue from on-premise software licenses is generally recognized upfront at the point in time when the software is made available to the customer. Hardware revenue is recognized upon delivery which is the point in time at which control has passed.

The Company's contracts with customers for on-premise software licenses include maintenance services and may also include training and professional services. Maintenance services agreements consist of fees for providing software updates on an if and when available basis and for providing technical support for software products for a specified term. Both software updates and technical support have the same pattern of transfer to the customer. Revenues related to training services are billed on a fixed fee basis and are recognized as the services are performed. Payments received in advance of services performed are deferred and recognized when the related services are performed. Revenues related to professional services are billed on a time and materials basis and are recognized as the services are performed.

In contracts with multiple performance obligations, the Company accounts for individual performance obligations separately if they are distinct. The Company allocates the transaction price to each performance obligation based on its relative standalone selling price out of total consideration of the contract. For maintenance and support, the Company determines the standalone selling price based on the price at which the Company separately sells a renewal contract. The Company determines the standalone selling price for sales of licenses using the residual approach. For professional services, the Company determines the standalone selling prices based on the price at which the Company separately sells those services.

#### k. Cost of Revenues

Cost of product revenues consist primarily of costs associated with the processing and the delivery of the Company's software licenses to the customers as well as third-party hardware and related shipping costs. Cost of maintenance and professional services revenues consist primarily of personnel costs responsible for providing maintenance and support and professional services. The Company sources its hardware from a single third-party provider based in the U.S.

### l. Accounting for Share-Based Compensation

The Company accounts for share-based compensation in accordance with ASC No. 718, "Compensation-Stock Compensation" ("ASC 718"). ASC 718 requires companies to estimate the fair value of equity-based payment awards on the date of grant using an Option-Pricing Model ("OPM"). The grant date fair value of the award is recognized as an expense in the Company's consolidated statements of operations based on the graded vesting attribution method over the related requisite service period.

Effective January 1, 2017, the Company applies the requirements of Accounting Standards Update (ASU) 2018-07, *Improvements to Nonemployee Share-Based Payment Accounting* . Accordingly, share based payment transactions with non-employees are accounted for similarly to employees accounted for under ASC 718.

The Company selected the Black-Scholes-Merton option pricing model as the most appropriate fair value method for its stock options awards. The Company's option pricing model requires the input of highly subjective assumptions, including estimated fair value of ordinary share price, the expected share price volatility and expected term. Any changes in these highly subjective assumptions would significantly impact the share-based compensation expense.

The fair value of options granted to employees and non-employee is estimated at the date of grant using the following assumptions:

The risk-free interest rate assumption is the implied yield currently available on United States treasury zero-coupon issues with a remaining term equal to the expected life of the Company's options. The dividend yield assumption is based on the Company's historical experience and expectation of no future dividend payouts and may be subject to substantial changes in the future. The Company has historically not paid cash dividends and has no foreseeable plans to pay cash dividends in the future. The expected share price volatility is based on the historical volatility of the ordinary shares of comparable companies that are publicly traded. The expected term of options granted represents the period of time that options granted are expected to be outstanding. The fair value of the Company's ordinary shares underlying the share-based awards as of December 31, 2017 and 2018 were estimated using the hybrid method which takes into consideration a probability-weighted of a non-IPO scenario (which is based on the income approach) and an IPO scenario.

Effective as of January 1, 2017, the Company adopted Accounting Standards Update 2016-09, "Compensation—Stock Compensation (Topic 718)" ("ASU 2016-09") on a modified retrospective basis. ASU 2016-09 permits entities to make an accounting policy election related to how forfeitures will impact the recognition of compensation cost for share-based compensation, which is to estimate the total number of awards for which the requisite service period will not be rendered or to account for forfeitures as they occur. Upon adoption of ASU 2016-09, the Company elected to change its accounting policy to account for forfeitures as they occur. The change was applied on a modified retrospective basis with a cumulative-effect adjustment to retained earnings of $138 thousand (which increased the accumulated deficit) as of January 1, 2017.

### m. Research and Development Costs

ASC 985 requires capitalization of certain software development costs subsequent to the establishment of technological feasibility.

Based on the Company's product development process, technological feasibility is established upon completion of a working model. The Company does not incur material costs between the completion of the working model and the point at which the products are ready for general release. Therefore, research and development costs are charged to the statement of operations as incurred.

*n.* **Sales and Marketing**

Marketing expenses consist primarily of marketing campaigns and tradeshows. Marketing expenses are charged to the statement of operations, as incurred. Marketing expenses for the years ended December 31, 2017 and 2018, amounted to $5,883 thousand and $8,093 thousand, respectively.

*o.* **Income Taxes**

Income taxes are accounted for using the asset and liability approach under ASC-740, "Income Taxes" ("ASC-740"). The asset and liability approach require the recognition of taxes payable or refundable for the current year and deferred tax liabilities and assets for the future tax consequences of events that have been recognized in the Company's financial statements or tax returns.

The measurement of current and deferred tax liabilities and assets is based on provisions of the relevant tax law. The measurement of deferred tax assets is reduced, if necessary, by the amount of any tax benefits that, based on available evidence, are not expected to be realized.

ASC-740 also clarifies the accounting and reporting for uncertainties in income tax. ASC-740 prescribes a comprehensive model for the financial statement recognition, measurement, presentation and disclosure of uncertain tax positions taken or expected to be taken in income tax returns.

The Company classifies interest and penalties recognized in the financial statements relating to uncertain tax positions within taxes on income.

*p.* **Basic and Diluted Net Loss Per Share:**

Basic net loss per ordinary share is computed by dividing net loss for each reporting period by the weighted-average number of ordinary shares outstanding during the year. Diluted loss per ordinary share is computed by dividing net loss for each reporting period by the weighted average number of ordinary shares outstanding during the period, plus dilutive potential ordinary shares considered outstanding during the period, in accordance with ASC 260-10 "Earnings Per Share".

The calculation of diluted net loss per share excludes potential share issuances of ordinary shares upon the exercise of share option, warrants to purchase ordinary shares and redeemable preferred shares as the effect is anti-dilutive.

The total number of shares related to outstanding options, warrants to purchase ordinary shares and redeemable preferred shares that have been excluded from the calculation of diluted net loss per share for the years ended December 31, 2017 and 2018 were 6,102,593, 26,667 and 16,416,749 (out of which 27,778 shares represent receipt on account of preferred A shares) and 6,750,259 , 26,667 and 16,416,749 (out of which 27,778 shares represent receipt on account of preferred A shares), respectively.

*q.* **Concentration of Credit Risks**

Financial instruments that potentially subject the Company to concentrations of credit risk consist principally of cash and cash equivalents, restricted bank deposits, trade receivables and derivative instruments.

The Company's cash and cash equivalents and restricted bank deposits are invested with major banks in Europe, Israel and the United States. Generally, these investments may be redeemed upon demand and the Company believes that the financial institutions that hold the Company's cash deposits are financially sound and, accordingly, bear minimal risk.

The trade receivables of the Company are mainly derived from sales to a diverse set of customers located primarily in the United States, Europe and Asia. The Company performs credit evaluations of its customers and, to date, has not experienced any significant losses from bad debts.

As of December 31, 2017 and 2018, each of the following distributors comprised more than 10% of the Company's accounts receivable:

| | December 31, | |
| --- | --- | --- |
| | **2017** | **2018** |
| Customer A | 17% | 8% |
| Customer B | 13% | 11% |
| Customer C | 12% | 2% |
| Customer D | 10% | 1% |
| Customer E | 10% | — |
| Customer F | 3% | 12% |
| Customer G | — | 13% |

For purposes of this calculation, the Company assessed distributors by aggregating distributors within the same holding group.

The Company has entered into foreign currency exchange derivatives with major banks to protect against the risk of changes in exchange rates. The derivative instruments hedge a portion of the Company's non-dollar currency exposure.

### r. Derivative Instruments and Hedging Activities

The Company is exposed to global market risks and to the risk that its earnings, cash flows and equity could be adversely impacted by fluctuations in foreign exchange rates. As part of the Company's risk management strategy, it uses foreign currency exchange forward contracts and other derivative to hedge against certain foreign currency exposures. The Company does not enter into derivative transactions for trading purposes. The Company recognizes these derivative instruments as either assets or liabilities in the consolidated balance sheets at their fair value. Derivatives in a gain position are reported in other current assets in the consolidated balance sheets and derivatives in a loss position are recorded in other accounts payables in the consolidated balance sheets, on a gross basis.

All derivative contracts enter into by the Company are classified as non-hedging instruments and accordingly the Company records the changes in fair value of derivative instruments in financial income, net in the consolidated statements of operations.

### s. Comprehensive Loss

There are no items of other comprehensive income or loss generated or incurred by the Company other than net loss. Thus, there are no differences between net loss and comprehensive loss.

### t. Statement of Cash Flows

On January 1, 2017, the Company early adopted ASU 2016-18 "Statement of Cash Flows (Topic 230): Restricted Cash", which requires companies to include amounts generally described as restricted cash and restricted cash equivalents in cash and cash equivalents when reconciling beginning-of-period and end-of-period total amounts shown on the statement of cash flows.

### u. Fair Value of Financial Instruments

The Company applies ASC No. 820, "Fair Value Measurements and Disclosures" ("ASC 820"), with respect to fair value measurements of all financial assets and liabilities.

The fair value hierarchy also requires an entity to maximize the use of observable inputs and minimize the use of unobservable inputs when measuring fair value.

The fair value of foreign currency contracts (used for hedging purposes) is estimated by obtaining current quotes from banks.

Fair value is an exit price, representing the amount that would be received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. As such, fair value is a market-based measurement that should be determined based on assumptions that market participants would use in pricing an asset or a liability. A three-tier fair value hierarchy is established as a basis for considering such assumptions and for inputs used in the valuation methodologies in measuring fair value:

Level 1 - Inputs are unadjusted quoted prices in active markets for identical assets or liabilities that can be accessed at the measurement date.

Level 2 - Inputs are quoted prices for similar assets and liabilities in active markets or inputs that are observable for the assets or liabilities, either directly or indirectly through market corroboration, for substantially the full term of the financial instruments.

Level 3 - Inputs are unobservable inputs based on the Company's own assumptions used to measure assets and liabilities at fair value. The inputs require significant management judgment or estimation.

In accordance with ASC 820, the Company measures its foreign currency derivative instruments, at fair value using the market approach valuation technique. Foreign currency derivative contracts as detailed in note 3 are classified within the Level 2 value hierarchy, as the valuation inputs are based on quoted prices and market observable data of similar instruments.

### *v.  Legal Contingencies*

From time to time, the Company becomes involved in legal proceedings or is subject to claims arising in its ordinary course of business. Such matters are generally subject to many uncertainties and outcomes are not predictable with assurance. The Company accrues for contingencies when the loss is probable, and it can reasonably estimate the amount of any such loss. The Company is currently not a party to any material legal or administrative proceedings and, is not aware of any material pending or threatened material legal or administrative proceedings against the Company.

### *w.  Unaudited Pro Forma Consolidated Balance Sheet*

The unaudited pro forma consolidated balance sheet information has been prepared assuming the automatic conversion of all of the outstanding shares of redeemable convertible preferred stock into 16,416,749 ordinary shares upon the closing of an initial public offering contemplated by the Company ("IPO"). The unaudited pro forma consolidated balance sheet as of December 31, 2018 (unaudited) has been prepared as though the conversion and reclassification had occurred as of that date.

### *x.  Unaudited Pro Forma Net Loss Per Share Attributable to Common Stockholders*

In contemplation of an IPO, the unaudited pro forma net loss per share attributable to common stockholders, basic and diluted, have been calculated assuming the automatic conversion of all series of the Company's outstanding redeemable convertible preferred stock (using the as-if converted method) into ordinary shares.

### *y.  Recently Issued Accounting Pronouncements Not Yet Adopted*

In February 2016, the Financial Accounting Standards Board ("FASB") issued ASU No. 2016-12, Leases (Topic 842) including following updates and amendments which were issued during 2017 and 2018 (the standard and its amendments - "ASC 842" or "The new standard"). The new standard requires the lessees to put most leases on their balance sheet. The new standard states that the lessee will recognize a lease liability for the obligation to make lease payments and a right-to-use asset for the right to use the underlying asset for the lease term. Expenses related to leases determined to be operating leases will be recognized on a straight-line basis, while those determined to be financing leases will be recognized

following a front-loaded expense profile in which interest and amortization are presented separately in the income statement. The new standard also enhances the disclosures about leasing arrangements.

The new standard is effective for annual reporting periods beginning after December 15, 2018, and interim reporting periods within those annual reporting periods, with early adoption permitted. The Company will adopt the new standard on January 1, 2019, using the modified retrospective approach, at the effective date, without adjusting the comparative periods.

The new standard provides a number of optional practical expedients and the Company expects to elect the following:

a. Transition practical expedients: The Company expects to elect the package of practical expedients that permits it not reassess under the new standard its prior conclusions about lease identification, lease classification, and initial direct costs, as well as the practical expedient that permits it not to assess existing land elements under the new standard. In addition, the Company expects to apply the practical expedient that allows using hindsight with respect to determining the lease term and in assessing any impairment of right-of-use assets for existing leases.

b. Ongoing accounting policy expedients - The Company expects to elect the following expedients:

   a. the short-term lease recognition exemption whereby right-of-use ("ROU") assets and lease liabilities will not be recognized for leasing arrangements with terms less than one year, and

   b. not separating lease and non-lease components for all real estate assets.

In addition, the Company expects to apply the portfolio approach under the new standard, mainly with respect to determination of incremental borrowing rate.

Under all of the Company's lease arrangements, the Company is the lessee (for assets such as real estates and vehicles), in an operating lease.

The Company currently expects to recognize on January 1, 2019 additional operating lease liabilities ranging from $14 million to $15 million, with corresponding ROU assets. Furthermore, the ROU assets will be adjusted and reduced for accrued rent liability amounting to $700 thousand.

In June 2016, the FASB Issued ASU 2016-13, Financial Instruments - Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments. The new standard requires financial assets measured at amortized cost be presented at the net amount expected to be collected, through an allowance for credit losses that is deducted from the amortized cost basis. The standard will be effective for the Company beginning January 1, 2020, with early adoption permitted. The Company is evaluating the impact of adopting this new accounting standard on its consolidated financial statements.

In August 2017, the FASB issued ASU 2017-12, "Targeted Improvements to Accounting for Hedging Activities." The standard better aligns an entity's hedging activities and financial reporting for hedging relationships through changes to both the designation and measurement guidance for qualifying hedging relationships and the presentation of hedge results in the financial statements. The standard will prospectively make hedge accounting easier to apply to hedging activities and also enhances disclosure requirements for how hedge transactions are reflected in the financial statements when hedge accounting is elected. The standard is effective for fiscal years beginning after December 15, 2018. The Company is currently evaluating the impact of adopting this new accounting standard on its consolidated financial statements; however, such impact, if any, is not expected to be material.

### z. *Reverse Share Split*

On March 21, 2019, the shareholder general meeting of the Company approved a 1.5:1 reverse share split, which was effected on the date thereof.

References made to outstanding shares or per share amounts in the accompanying consolidated financial statements and applicable disclosures have been retroactively adjusted to reflect this one for one and half (1:1.5) reverse stock split.

The number of authorized shares as reflected on the Consolidated Balance Sheets was affected by the reverse stock split and accordingly has been adjusted. See Note 13 for additional information.

## NOTE 3:    FAIR VALUE MEASUREMENT

The following tables summarize the Company's financial assets and liabilities that are carried at fair value on a recurring basis, by fair value hierarchy, on the consolidated balance sheet:

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | (U.S. $ in thousands) | |
| | Level 2 | Level 2 |
| Assets: | | |
| Foreign exchange contracts not designated as hedging instruments | $ 40 | $ 90 |
| Liabilities: | | |
| Foreign exchange contracts not designated as hedging instruments | 1 | 388 |
| | $ 39 | $ (298) |

The Company's foreign exchange forward contracts are classified as Level 2, as they are not actively traded and are valued using pricing models that use observable market inputs, including interest rate curves and both forward and spot prices for currencies (Level 2 inputs).

Other financial instruments consist mainly of cash and cash equivalents, restricted bank deposits, accounts receivable, bank loan, accounts payable and other accounts payables. The fair value of these financial instruments approximates their carrying values.

## NOTE 4:    CASH, CASH EQUIVALENTS AND RESTRICTED CASH

The following table provides a reconciliation of cash, cash equivalents and restricted cash reported within the statement of financial position that sum to the total of the same such amounts shown in the statement of cash flows.

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | (U.S. $ in thousands) | |
| Cash and cash equivalents | $ 14,700 | $ 15,248 |
| Restricted bank deposits | 159 | 561 |
| Long-term restricted bank deposits | 761 | 1,789 |
| Total cash, cash equivalents, and restricted cash shown in the statement of cash flows | $ 15,620 | $ 17,598 |

Amounts included in restricted cash represent those required to be set aside by a contractual agreement with lease, hedging and credit card transactions.

Total interest paid for the years ended December 31, 2017 and 2018 were $137 thousand and $95 thousand, respectively.

Total taxes paid for the years ended December 31, 2017 and 2018 were $1,386 thousand and $1,027 thousand, respectively.

## NOTE 5:    PROPERTY AND EQUIPMENT, NET

|  | December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | *(U.S. $ in thousands)* | |
| **Property and equipment, net:** | | |
| Cost: | | |
| Furniture and fixtures | $ 471 | $ 1,057 |
| Computers and software | 2,531 | 3,175 |
| Leasehold improvements | 684 | 852 |
| Electronic equipment | 1,127 | 1,419 |
|  | 4,813 | 6,503 |
| Less - Accumulated depreciation | 2,984 | 3,940 |
|  | $ 1,829 | $ 2,563 |

In July 2018, the Company entered into a long-term lease agreement for new offices in Israel until January 31, 2029 with an option to extend until January 31, 2034 (note 9c). As a result, the Company recognized accelerated depreciation for furniture and fixtures and leasehold improvements that belong to the old offices. The start date of the accelerated depreciation applied at July 1, 2018 until March 31, 2019, which reflects the remaining useful life of those assets.

## NOTE 6:    OTHER ACCOUNTS PAYABLES

|  | December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | *(U.S. $ in thousands)* | |
| Accrued expenses | $ 1,622 | $ 4,116 |
| Accrued taxes | 369 | 468 |
| Other | 23 | 306 |
|  | $ 2,014 | $ 4,890 |

As of December 31, 2018 accrued expenses included an amount of $2,816 thousand related to the Company's lease agreement for new offices as described in note 9c.

## NOTE 7:   DEFERRED REVENUES AND DEFERRED COSTS

| | | December 31, | | |
|---|---|---|---|---|
| | | **2017** | | **2018** |
| | | *(U.S. $ in thousands)* | | |
| Deferred revenues: | | | | |
| Deferred product revenues | $ | 1,281 | $ | 917 |
| Deferred maintenance and professional services revenues | | 39,051 | | 55,712 |
| | | 40,332 | | 56,629 |
| Less - amounts offset from accounts receivable | | (16,375) | | (25,165) |
| Deferred revenues | | 23,957 | | 31,464 |
| The change in deferred revenues: | | | | |
| Balance at beginning of year | | 30,061 | | 40,332 |
| Adoption of ASC 606 | | (1,139) | | — |
| Deferred revenue relating to new sales | | 34,393 | | 44,667 |
| Revenue recognition during the year | | (22,983) | | (28,370) |
| Balance at end of year | | 40,332 | | 56,629 |
| Less - amounts offset from accounts receivable | | (16,375) | | (25,165) |
| Deferred revenues | $ | 23,957 | $ | 31,464 |

As of December 31, 2017 and 2018, the total remaining performance obligation amounted to $40,332 thousand and $56,629 thousand, respectively. The Company expects that it will satisfy its remaining performance obligations over a period of three years during which, on December 31, 2017 and 2018, an amount of $27,504 thousand and $31,461 thousand, respectively, will be recognized in the next twelve months, which constitutes 68% and 56%, respectively, of total deferred revenues.

*Assets Recognized from the Costs to Obtain a Contract with a Customer*

The Company determined that certain costs related to its sales incentive programs meet the requirements to be capitalized and deferred. These assets are recorded as current and non-current assets. The Company amortizes these deferred costs over the benefit period, currently estimated to be four years. The Company considers the benefit period to exceed the initial contract term for certain costs because of anticipated renewals and because sales commission rates for renewal contracts are not commensurate with sales commissions for initial contracts.

| | | December 31, | | |
|---|---|---|---|---|
| | | **2017** | | **2018** |
| | | *(U.S. $ in thousands)* | | |
| Balance at beginning of year | $ | — | $ | 3,961 |
| Adoption of ASC 606 | | 3,512 | | — |
| Additional costs deferred | | 2,634 | | 3,111 |
| Amortization of deferred costs | | (2,185) | | (1,759) |
| Balance at end of year | $ | 3,961 | $ | 5,313 |

## NOTE 8: LOAN AND CREDIT LINE

On August 4, 2015, the Company and its wholly owned US subsidiary entered into a Loan and Credit Agreement (hereafter, the "Agreements").

The Agreements provided the Company the following:

1) A loan in the amount of $2 million accruing interest at a floating per annum rate equal to the Wall Street Journal prime rate plus 2.75%, and to be repaid in 36 equal monthly installments of principal plus the accrued interest. As of December 31, 2017, the total outstanding amount of the principal amount was $889 thousand, out of which $667 thousand were presented as current to be repaid in 2018 and $222 thousand presented as a long-term loan to be repaid in 2019. Total interest expenses in respect to the loan during 2017 and 2018 amounted to approximately $137 thousand and $218 thousand, respectively.

2) An accounts receivable revolving line of credit of up to $6 million (the "Credit Line"). Based on several conditions the Company may draw under the Credit Line amounts of up to 80% of its eligible receivables, but not more than $6 million. Effective interest rates on the used credit line vary between 4.5% and 7.125% annually, based on meeting certain covenants set in the Credit Line agreements.

   In January 2017, the Company increased the Credit Line to an amount of up to $10 million along with a one-year term extension to January 2018.

   Upon expiration of the Credit Line term, the principal sum of any outstanding Credit Line, together with accrued and unpaid interest payable, will become due and payable. As of December 31, 2017 and 2018, the Company has not drawn any credit from this Credit Line facility.

3) In 2018, the Company increased its available accounts receivable Credit Line facility to $15 million and extended its term through September 2019. Applicable interest rates have substantially remained the same.

4) The agreements are subject to meeting certain covenants. As of December 31, 2017 and 2018, the Company was in compliance with these covenants.

## NOTE 9: COMMITMENTS AND CONTINGENT LIABILITIES

a. *Liens and Pledges* : Against the Credit Line facilities described in Note 8, to secure the repayment of all amounts due or which may become due in connection with the Credit Line by the Company, the Company and its US subsidiary created a fixed and floating first-priority security interest on all assets of the Company and its subsidiaries (including non-tangible assets), as well as share pledges on the Company's holdings in its subsidiaries. Furthermore, in accordance with the Agreements, the Company shall not pay any dividends or make any distribution or payment or redeem, retire or purchase any capital stock or shares.

b. The Company has various liens granted to financial institutions to secure various operating lease agreements in connection with its office space.

c. *Lease commitments* : The Company leases its facilities under various lease agreements which expire through 2029. In addition, the Company leases certain motor vehicles under certain car operating lease agreements which expire through 2020.

In 2018, the Company entered into a long-term lease agreement for new offices in Israel until January 31, 2029 with an option to extend until January 31, 2034. The Company granted an additional lien to a financial institution to secure this operating lease agreement in an amount of $1,467 thousand. The aggregate minimum lease commitments under such new lease agreement are as follows:

|  | | (U.S. $ in thousands) |
|---|---|---|
| Year ending December 31: | | |
| 2019 | $ | 1,013 |
| 2020 | | 2,025 |
| 2021 | | 2,025 |
| 2022 | | 2,025 |
| 2023 and thereafter | | 12,320 |
| | $ | 19,408 |

The aggregate minimum lease commitments under operating leases as of December 31, 2018 (including the amounts presented in the table above) are as follows:

|  | | (U.S. $ in thousands) |
|---|---|---|
| Year ending December 31: | | |
| 2019 | $ | 1,457 |
| 2020 | | 2,478 |
| 2021 | | 2,486 |
| 2022 | | 2,495 |
| 2023 and thereafter | | 12,528 |
| | $ | 21,444 |

Rent expense for the years ended December 31, 2017 and 2018 was approximately $1,251 thousand and $2,396 thousand, respectively.

## NOTE 10:    HEDGING ACTIVITIES

The Company carries out transactions involving foreign currency exchange derivative financial instruments. The transactions are designed to hedge the Company's exposure in currencies other than the U.S. dollar, but are not designated as an accounting hedge. The Company is primarily exposed to foreign exchange risk with respect to recognized assets and liabilities and forecasted transactions denominated in NIS, Euro and GBP.

As of December 31, 2017 and 2018, the notional amounts of the Company's outstanding exchange forward and zero cost collar contracts and other derivatives, not designated as accounting hedging instruments, were $2.9 million and $29.34 million, respectively, and were used to reduce foreign currency exposures of the NIS, Euro and GBP. With respect to such derivatives, for the years ended December 31, 2017 and 2018, losses of $1 thousand and $388 thousand, respectively, and gains of $40 thousand and $90 thousand, respectively, were recognized under financial expense, net .

| | | Notional Amount | Fair Value |
|---|---|---|---|
| | **Balance sheet location** | **December 31, 2018** | **December 31, 2018** |
| | | (U.S. $ in thousands) | |
| Assets derivatives - Foreign exchange contracts | Other current assets | 17,081 | $ 90 |
| Liability derivatives - Foreign exchange contracts | Other accounts payables | 12,265 | $ 388 |

| | | Notional Amount | Fair Value |
|---|---|---|---|
| | **Balance sheet location** | **December 31, 2017** | **December 31, 2017** |
| | | (U.S. $ in thousands) | |
| Assets derivatives - Foreign exchange contracts | Other current assets | $ 2,307 | 40 |
| Liability derivatives - Foreign exchange contracts | Other accounts payables | $ 631 | 1 |

## NOTE 11: REDEEMABLE CONVERTIBLE PREFERRED SHARES

a.  Between December 2007 and September 2014, the Company entered into four Preferred Share Purchase Agreements with certain investors.

   As of December 31, 2017 and 2018, the Company's redeemable convertible preferred shares of NIS 0.015 par value, amounted to $26,699 thousand.

Shares of redeemable convertible preferred stock are not mandatorily or currently redeemable. However, a liquidation or deemed   liquidation events would constitute a redemption event that is outside of the Company's control. As such, all shares of redeemable convertible preferred stock have been presented outside of permanent equity. The Company has not adjusted the carrying values of the redeemable convertible preferred stock to the deemed liquidation values of such shares since a liquidation event was not probable at any of the balance sheet dates. Subsequent adjustments to increase or decrease the carrying values to the ultimate liquidation values will be made only if and when it becomes probable that such a liquidation event will occur.

b.  The rights, preferences and privileges with respect to the preferred shares are stipulated in the Company's Articles of Association and a summary of significant provisions are as follows:

   i.  *Right of First Refusal* : Until an IPO, each preferred shareholder shall have a right of first refusal with respect to a transfer of all or any of the shares or other securities of the Company by any shareholder with certain specified exceptions.

   ii.  *Bring Along:* If, at any time prior to an IPO, shareholders holding at least 70% of the total preferred shares of all series ("Preferred Majority") accept an offer to sell all of their shares to a third party pursuant to a purchase offer from such third party, and such offer is conditioned upon

the sale of all remaining outstanding shares to such third party, then all remaining shareholders, including the founders of the Company, shall be required to sell their shares in such transaction, on the same terms and conditions of such purchase offer, provided that such purchase offer shall be allocated in accordance with the liquidation preferences.

iii. *Liquidation Preference:* Until a qualified IPO, in the event of any liquidation or deemed liquidation, the assets shall be distributed among the shareholders as follows:

    i. The holders of preferred D shares shall be entitled to receive from the distributable proceeds an amount equal to 1.5 times their investment reduced by any amounts already paid to such holders in respect of their preferred D shares. In the event that the distributable proceeds shall be insufficient for such distribution as described above, then the distributable proceeds shall be distributed or allocated to the holders of preferred D shares on a pro-rata basis.

    ii. The holders of preferred C shares shall be entitled to receive from the remaining distributable proceeds (if any) their investment plus any declared but unpaid dividends, reduced by any amounts already paid to such holders in respect of their preferred C shares;

    iii. The holders of preferred B shares shall be entitled to receive from the remaining distributable proceeds (if any) an amount equal to 1.55 times their investment plus any declared but unpaid dividends, reduced by any amounts already paid to such holders in respect of their preferred B shares;

    iv. The holders of preferred A shares shall be entitled to receive from the remaining distributable proceeds (if any) an amount equal to 1.33 times their investment plus any declared but unpaid dividends, reduced by any amounts already paid to such holders in respect of their preferred A shares.

    v. Any remaining distributable proceeds available for distribution, if any, shall be distributed among all the holders of ordinary shares of the Company, including holders of preferred shares.

    vi. In the event the distributable proceeds in a liquidation or deemed liquidation shall equal or exceed $136.9 million then the foregoing liquidation preferences for preferred A, B and C shares shall be disregarded, and in the event the distributable proceeds in a liquidation or deemed liquidation shall provide the holders of the preferred D shares an amount per each preferred D share equal to three (3) times their investment then the liquidation preference shall also be disregarded with respect to the preferred D shares.

iv. *Dividend Preference:* The preferred shareholders will be entitled to receive, at a dividend distribution, an amount equal to the total amount paid by each preferred shareholder in consideration of its preferred shares according to the order of preference and ratio specified in the liquidation reference section above.

v. *Protective provisions* : In addition, until a qualified IPO, the Preferred Majority will have certain protective provision in decisions with regard to the amendment of the Articles of Association of the Company, the recapitalization of its shares, effecting a liquidation event, declaring dividends, or performing a merger or IPO.

vi. *Conversion and conversion price adjustment:* Each preferred share shall be convertible, at the option of the holder of such share, at any time after the purchase date of such share, into such number of fully paid and nonassessable ordinary shares of the Company as is determined by dividing the applicable original issue price for such class of shares by the conversion price at the time in effect for such class of shares. The initial conversion price per each preferred share shall be the original issue price for such class of shares, such that the initial conversion rate shall be one to one; provided, however, that the conversion price for each preferred share shall be subject

to adjustment in accordance with any recapitalization event and pursuant to the anti-dilution provisions set forth herein.

Notwithstanding anything to the contrary herein, each preferred share shall automatically be converted into fully paid and non-assessable ordinary shares at the then applicable conversion rate, upon: (i) a qualified IPO which is defined in the Company's Articles of Association as an IPO at a minimum pre-money valuation of $250 million and resulting in minimum gross proceeds to the Company of $50 million, or (ii) upon the consent in writing of the majority of the outstanding preferred shares (including the holders of two thirds or more of the preferred D shares).

## NOTE 12:    SHAREHOLDERS' EQUITY

As of December 31, 2017 and 2018, the Company had 7,966,612 and 8,265,988 ordinary shares, respectively, of NIS 0.015 par value issued and outstanding and 26,667 warrants to purchase ordinary shares. Each ordinary share is entitled to one vote and to receive dividends as declared by the Board of Directors, subject to the priority rights of holders of preferred shares.

## NOTE 13:    STOCK OPTION PLAN

a.   Under the Company's 2007 Stock Option Plan, as amended in August 2014, September 2015 and July 2017, and its 2008 and 2018 US Equity Incentive Plans (collectively, the "Plans"), stock options exercisable for an ordinary share of NIS 0.015 par value, may be granted to employees, officers, non-employee consultants and directors of the Company.

In April 2018, the Board of Directors of the Company approved an increase in the number of unissued ordinary shares reserved for issuance to the Company's employees, officers, consultants and directors under the Plans by 666,667 ordinary shares.

Under the Plans, as of December 31, 2017 and 2018, total stock options outstanding were 6,102,593 and  6,750,259 , respectively, and an aggregate of 500,880 and 134,349, respectively, stock options were still available for future grant. Each option granted under the Plans expires no later than 10-20 years from the date of grant. The vesting period of the options is generally four years vesting either quarterly or annually, unless the Board of Directors or the Compensation Committee of the Board determines otherwise. Any stock option which is forfeited or cancelled before expiration becomes available for future grants.

A summary of the Company's options activity for the year ended December 31, 2017 and 2018 is as follows:

|  | December 31, | |
|---|---|---|
|  | **2017** | **2018** |
|  | *(U.S. $ in thousands)* | |
| Cost of revenues | $         332 | $         634 |
| Research and development | 660 | 731 |
| Sales and marketing | 765 | 1,458 |
| General and administrative | 353 | 358 |
| Total share-based compensation expense | $      2,110 | $      3,181 |

In May 2017, the board of directors of the Company approved a 10-year extension of the remaining contractual term of 3,473,515 options originally granted to approximately 240 employees. The total incremental compensation cost resulting from this modification amounted to $895 thousand, out of which $783 thousand was recorded as compensation expense during the year ended December 31, 2017.

As of December 31, 2017 and 2018, the Company had 2,973,051 and 3,026,549 unvested options, respectively. As of December 31, 2017 and 2018, the unrecognized compensation cost related to all

unvested, equity-classified stock options of $2,583 thousand and $4,842 thousand is expected to be recognized as an expense over a weighted-average period of 2.78 and 2.66 years, respectively.

For the years ended December 31, 2017 and 2018, the weighted average grant date fair value of options granted was $1.19 per option and $2.72 per option, respectively. For the years ended December 31, 2017 and 2018, the total intrinsic value of the options exercised was $144 thousand and $1,772 thousand, respectively.

b.  A summary of the activity in options granted to employees for the year ended December 31, 2017 is as follows, as adjusted for the reverse Stock Split:

| | Amount of Options | | Weighted average exercise price | Weighted average remaining contractual term (in years) | Aggregate intrinsic value | |
|---|---|---|---|---|---|---|
| | | | | | (U.S. $ in thousands) | |
| Balance as of January 1, 2017 | 5,082,752 | $ | 1.28 | 13 | | |
| Granted | 1,888,901 | $ | 1.41 | 13 | | |
| Exercised | (334,925) | $ | 1.19 | 6 | | |
| Forfeited | (534,135) | $ | 1.40 | 11 | | |
| Balance as of December 31, 2017 | 6,102,593 | $ | 1.29 | 13 | $ | 11,555 |
| Exercisable as of December 31, 2017 | 3,129,542 | $ | 1.17 | 13 | $ | 6,279 |

The fair value of stock options granted was estimated using the Black-Scholes option-pricing model. The assumptions used to value options granted during 2017 were as follows:

| | |
|---|---|
| Risk-free interest rate | 2.08%-2.21% |
| Fair value of ordinary shares | $1.35-3.18 |
| Expected term (in years) | 6-11 |
| Dividend yield | 0% |
| Volatility | 70% |

c.  A summary of the activity in options granted to employees for the year ended December 31, 2018 is as follows, as adjusted for the reverse Stock Split:

| | Amount of Options | | Weighted average exercise price | Weighted average remaining contractual term (in years) | Aggregate intrinsic value | |
|---|---|---|---|---|---|---|
| | | | | | (U.S. $ in thousands) | |
| Balance as of January 1, 2018 | 6,102,593 | $ | 1.29 | 13 | | |
| Granted | 1,476,667 | $ | 3.45 | 16 | | |
| Exercised | (299,376) | $ | 0.54 | 9 | | |
| Forfeited | (529,625) | $ | 1.59 | 15 | | |
| Balance as of December 31, 2018 | 6,750,259 | $ | 1.77 | 13 | $ | 45,461 |
| Exercisable as of December 31, 2018 | 3,723,710 | $ | 1.29 | 12 | $ | 26,880 |

The fair value of stock options granted was estimated using the Black-Scholes option-pricing model. The assumptions used to value options granted during 2018 were as follows:

| | |
|---|---|
| Risk-free interest rate | 2.68%-3.03% |
| Fair value of ordinary shares | $3.9-7.83 |
| Expected term (in years) | 6 |
| Dividend yield | 0% |
| Volatility | 65%-66% |

d.  The following table summarizes the Company's outstanding and exercisable options granted as of December 31, 2017 and 2018, as adjusted for the reverse Stock Split:

| Exercise Price | | Options outstanding as of December 31, 2017 | Weighted average remaining contractual term (years) | Options exercisable as of December 31, 2017 | Weighted average remaining contractual term (years) |
|---|---|---|---|---|---|
| $ | 0.004 | 189,336 | 9 | 189,336 | 9 |
| $ | 0.60 | 114,587 | 9 | 114,587 | 9 |
| $ | 0.641 | 309,840 | 12 | 309,840 | 12 |
| $ | 0.795 | 173,336 | 12 | 173,336 | 12 |
| $ | 0.891 | 50,000 | 13 | 50,000 | 13 |
| $ | 1.406 | 5,265,494 | 14 | 2,292,443 | 13 |
| | | 6,102,593 | | 3,129,542 | |

| Exercise Price | | Options outstanding as of December 31, 2018 | Weighted average remaining contractual term (years) | Options exercisable as of December 31, 2018 | Weighted average remaining contractual term (years) |
|---|---|---|---|---|---|
| $ | 0.004 | 22,668 | 8 | 22,668 | 8 |
| $ | 0.60 | 97,916 | 10 | 97,916 | 10 |
| $ | 0.641 | 309,840 | 11 | 309,840 | 11 |
| $ | 0.795 | 150,000 | 11 | 150,000 | 11 |
| $ | 0.891 | 50,000 | 12 | 50,000 | 12 |
| $ | 1.406 | 4,714,473 | 12 | 3,033,410 | 12 |
| $ | 1.755 | 984,693 | 15 | 59,876 | 16 |
| $ | 7.545 | 420,669 | 17 | — | — |
| | | 6,750,259 | | 3,723,710 | |

## NOTE 14: INCOME TAXES

### a. Deferred Tax Assets and Liabilities

The components of the Company's deferred tax assets and liabilities as of December 31, 2017 and 2018 were as follows:

| | As of December 31, | |
|---|---|---|
| | 2017 | 2018 |
| | *(U.S. $ in thousands)* | |
| **Deferred tax assets:** | | |
| Tax loss carryforwards | $ 5,454 | $ 4,703 |
| Research and development | 3,741 | 4,216 |
| Deferred revenue | 847 | 1,334 |
| Employee and payroll accrued expenses | 975 | 684 |
| Other | 36 | — |
| Total deferred tax assets | 11,053 | 10,937 |
| **Deferred tax liabilities:** | | |
| Depreciation | (31) | (129) |
| Deferred costs | (971) | (1,352) |
| Other | — | (5) |
| Total deferred tax liabilities | (1,002) | (1,486) |
| Total deferred tax assets, net | 10,051 | 9,451 |
| Less valuation allowance for deferred tax assets | (9,511) | (8,762) |
| Deferred tax assets | $ 540 | $ 689 |

The Company's deferred tax assets are classified entirely in the consolidated balance sheet as non-current assets.

Significant judgment is required in determining any valuation allowance recorded against deferred tax assets. In assessing the need for a valuation allowance, the Company considered all available evidence, including past operating results, the most recent projections for taxable income, and prudent and feasible tax planning strategies. The Company reassess its valuation allowance periodically and if future evidence allows for a partial or full release of the valuation allowance, a tax benefit will be recorded accordingly.

As of December 31, 2017 and 2018, the Company had recorded a full valuation allowance of $9,511 thousand and $8,762 thousand, respectively, with regard to its deferred taxes, consisting primarily of tax loss carryforwards generated in Israel.

On December 22, 2017, the Tax Cuts and Jobs Act (the "Act") was enacted into law. The new legislation represents fundamental modifications to the U.S. tax system. The Act contains several key tax provisions that will impact the Company's U.S. subsidiary, including the reduction of the maximum U.S. federal corporate income tax rate from 35% to 21%, effective January 1, 2018. The Act also repeals the corporate alternative minimum tax for tax years beginning after December 31, 2017.

U.S. GAAP requires that the impact of tax legislation be recognized in the period in which the law was enacted. The Company revalued its deferred tax assets at the statutory rate of 21% as of December 31, 2017 that will be in effect in 2018 and forward.

The Company believes that all future profits of its subsidiaries will be indefinitely reinvested or that there is no expectation to distribute any taxable dividends from these subsidiaries.

*b.* *Provision for Income Taxes*

Loss (Income) before taxes on income for the years ended December 31, 2017 and 2018 were as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2017 | | 2018 | |
|  | (U.S. $ in thousands) | | | |
| Israeli | $ | 3,319 | $ | 4,879 |
| Non-Israeli |  | (1,324) |  | (1,900) |
|  | $ | 1,995 | $ | 2,979 |

The components of taxes on income for the years ended December 31, 2017 and 2018 were as follows:

|  | December 31, | | | |
|---|---|---|---|---|
|  | 2017 | | 2018 | |
|  | (U.S. $ in thousands) | | | |
| **Current** |  |  |  |  |
| Israeli | $ | 109 | $ | 105 |
| Non-Israeli |  | 1,277 |  | 1,328 |
|  |  | 1,386 |  | 1,433 |
| **Deferred** |  |  |  |  |
| Israeli |  | 88 |  | (1) |
| Non-Israeli |  | (677) |  | (149) |
|  |  | (589) |  | (150) |
| Total taxes on income | $ | 797 | $ | 1,283 |

A reconciliation of the theoretical tax benefit and actual taxes on income for the years ended December 31, 2017 and 2018 is set forth below:

| | December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | (U.S. $ in thousands) | |
| Loss before taxes on income | $ 1,995 | $ 2,979 |
| Statutory tax rate in Israel | 24% | 23% |
| Theoretical tax benefit | 479 | 685 |
| Increase (decrease) in taxes resulting from: | | |
| Effect of different tax rates applicable in foreign jurisdictions | 185 | (399) |
| Changes in valuation allowance | (546) | (708) |
| Permanent differences | (462) | (756) |
| Uncertain tax position | (91) | (91) |
| Change in tax rate | (255) | — |
| Non-recoverable taxes for excessive expenses | (89) | 1 |
| Other | (18) | (15) |
| Actual taxes on income | $ (797) | $ (1,283) |

### *Uncertain tax positions*

Significant judgment is required in evaluating the Company's tax positions and determining its provision for income taxes. During the ordinary course of business, there are transactions and calculations for which the ultimate tax determination is uncertain. The Company establishes reserves for tax-related uncertainties based on estimates of whether, and the extent to which, additional taxes will be due. These reserves are established when the Company believes that certain positions might be challenged despite its belief that its tax return positions are fully supportable. The Company adjusts these reserves in light of changing facts and circumstances, such as the outcome of a tax audit or changes in the tax law. The provision for income taxes includes the impact of reserve provisions and changes to reserves that are considered appropriate.

| | Year ended December 31, | |
| --- | --- | --- |
| | 2017 | 2018 |
| | (U.S. $ in thousands) | |
| Balance at beginning of year | $ 330 | $ 421 |
| Additions for tax positions related to the current year | 91 | 91 |
| Balance at end of year | $ 421 | $ 512 |

The Company is subject to income taxes in the U.S., Israel and certain other foreign jurisdictions. The Company files income tax returns in various jurisdictions with varying statutes of limitations. Tax returns of the U.S. subsidiary submitted in the United States through 2014 tax year are considered to be final following the completion of an Internal Revenue Service examination. Tax returns of the Israel entity submitted in Israel through the 2013 tax year are considered to be final following the completion of an Israeli Tax Authorities examination. The expiration of the statute of limitations related to the various other foreign and state income tax returns that the Company and its subsidiaries file vary by state and foreign jurisdiction.

#### c. Basis of taxation

Company incorporated in the U.S. — tax rate of 35% through December 31, 2017 and 21% beginning 2018.

Company incorporated in Germany — tax rate of 33%.

Company incorporated in UK — tax rate of 19%.

Company incorporated in France — tax rate of 33%.

#### Tax rates in Israel

Company incorporated in Israel — tax rate of 24% for 2017 and 23% beginning in 2018.

#### Tax benefits in Israel

Under Israel law, including Amendment No. 60 to the Israel law, the Company may be entitled to various tax benefits such as "approved enterprise" or "benefited enterprise" status, subject to meeting certain conditions, including generating taxable income. As of December 31, 2018, the Company does not anticipate taxable income in the foreseeable future.

The main potential tax benefits available are the following:

1) In respect of income derived from the benefited enterprises, the Company is entitled to tax exempt during a period of two years from the year in which the Company first earns taxable income (limited to twelve years from the commencement date).

2) In the event of distribution of a cash dividend from income which was tax exempt as above, the Company would have to pay 25% tax in respect of the amount distributed.

3) Entitlement to the above benefits is conditioned upon the Company's fulfilling the conditions stipulated by the above law, regulations published thereunder and the certificate of approval for the specific investments in approved enterprises or benefited enterprises. In the event of failure to comply with these conditions, the benefits may be cancelled, and the Company may be required to refund the amount of the benefits, in whole or in part, with the addition of linkage differences to the Israeli CPI and interest.

#### Israel tax loss carryforwards

Accumulated losses for tax purposes as of December 31, 2018 amounted to $20,449 thousand, and were generated in Israel. These losses may be carried forward and offset against taxable income in the future for an indefinite period. A full valuation allowance was created against the Company's deferred tax assets generated in Israel, consisting mostly of net operating loss carryovers. Management currently believes that it is more likely than not that the deferred taxes generated in Israel will not be realized in the foreseeable future.

## NOTE 15: FINANCIAL INCOME (LOSS), NET

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2018 | |
| | (U.S. $ in thousands) | | | |
| Hedging instrument gains (loss), net | $ | 88 | $ | (337) |
| Bank charges | | (18) | | (89) |
| Exchange rate gain (loss), net | | 336 | | (418) |
| Interest expense | | (137) | | (218) |
| Other, net | | (2) | | 15 |
| Total financial income (expenses), net | $ | 267 | $ | (1,047) |

## NOTE 16: ENTITY WIDE DISCLOSURES

ASC 280, "Segment Reporting," establishes standards for reporting information about operating segments. The Company manages its business based on one operating segment and derives revenues from licensing of software, sales of hardware, providing maintenance and technical support and sales of professional services.

The following is a summary of revenues within geographic areas:

| | Year ended December 31, | | | |
|---|---|---|---|---|
| | 2017 | | 2018 | |
| | (U.S. $ in thousands) | | | |
| Geography: | | | | |
| Americas: | | | | |
| United States | $ | 34,718 | $ | 47,860 |
| Other | | 302 | | 407 |
| | | 35,020 | | 48,267 |
| Israel | | 757 | | 1,161 |
| EMEA (excluding Germany) | | 18,380 | | 23,181 |
| Germany | | 6,962 | | 8,253 |
| APAC | | 3,421 | | 4,119 |
| Total | $ | 64,540 | $ | 84,981 |

Net sales are attributed to geographic areas based on the location of customer.

As of December 31, 2017 and 2018, each of the following distributors comprised more than 10% of the Company's revenue:

| | December 31, | |
|---|---|---|
| | 2017 | 2018 |
| Customer A | 16% | 13% |
| Customer B | 13% | 10% |

*Disaggregation of Revenue*

The Company generates revenue from the sale of software products, hardware products, maintenance and support, and professional services. All revenue recognized in the consolidated statement of operations is considered to be revenue from contracts with customers. The following table sets for the disaggregated revenue by revenue type and is consistent with how the Company evaluates its performance obligations:

| | Year ended December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2018 | |
| | *(U.S. $ in thousands)* | | | |
| Revenues: | | | | |
| Software products | $ | 28,655 | $ | 39,300 |
| Hardware products | | 2,200 | | 3,254 |
| Support and maintenance | | 27,966 | | 37,155 |
| Professional services | | 5,719 | | 5,272 |
| Total revenues | $ | 64,540 | $ | 84,981 |

Property, plant and equipment, net by geographical area were as follows as of December 31, 2017:

| | December 31, | | | |
| --- | --- | --- | --- | --- |
| | 2017 | | 2018 | |
| | *(U.S. $ in thousands)* | | | |
| Americas (primarily the United States) | $ | 210 | $ | 496 |
| EMEA | | 46 | | 81 |
| Israel | | 1,573 | | 1,986 |
| | $ | 1,829 | $ | 2,563 |

## NOTE 17:   SUBSEQUENT EVENTS

a)  In 2019, the Company entered into a long-term lease agreement for additional office and parking space in Tel Aviv, Israel until January 31, 2029 with an option to extend until January 31, 2034.The Company granted an additional lien to a financial institution to secure this operating lease agreement. The aggregate minimum lease commitments under such new lease agreement are as follows:

2019: $34

2020: $815

2021: $815

2022: $815

2023 and thereafter: $4,960

b)  In 2019, the Company signed an extension of the lease of its offices in Ramat Gan for an additional three months in an amount of $373 thousand.

c)  In February 2019, the Shareholders of the Company approved an increase in the number of unissued ordinary shares reserved for issuance to the Company's employees, officers, consultants and directors under the Plans by 1,000,000 ordinary shares.

d) In January 2019, the Company granted a total of 388 thousand stock options with an exercise price of $8.51 per share to employees and service providers.

e) On February 28, 2019 , the Board of Directors of the Company approved a 1.5:1 reverse share split, which became effective upon shareholder approval on March 21, 2019.

f) Subsequent events were evaluated until March 6, 2019, which is the issuance date of the financial statements. In connection with the reissuance of the financial statements, the Company has evaluated subsequent events through April 1, 2019, the date the financial statements were available to be reissued.

# tufin

## The Security Policy Company



**$85M**
Total
Revenue[1]



**2000+**
Global
Customers[2]



**30%+**
Revenue
Growth[1]



**90%+**
Maintenance
Renewal Rates[1]



**424**
Employees[1]



**80%+**
Gross
Margin[1]

[1] 12 months ended December 31, 2018
[2] Since inception

# tufin

## The Security Policy Company

Until            , 2019 (25 days after the date of this prospectus), all dealers that buy, sell or trade our ordinary shares, whether or not participating in this offering, may be required to deliver a prospectus. This is in addition to the dealers' obligation to deliver a prospectus when acting as underwriters and with respect to their unsold allotments or subscriptions.

# PART II

# INFORMATION NOT REQUIRED IN PROSPECTUS

## Item 6.  Indemnification of Directors and Officers

Under the Israeli Companies Law, a company may not exculpate an office holder from liability for a breach of the duty of loyalty. An Israeli company may exculpate an office holder in advance from liability to the company, in whole or in part, for damages caused to the company as a result of a breach of duty of care but only if a provision authorizing such exculpation is included in its articles of association. Our amended and restated articles of association to be effective immediately prior to the closing of this offering include such a provision. The company may not exculpate in advance a director from liability arising from a breach of his or her duty of care in connection with a prohibited dividend or distribution to shareholders.

As permitted under the Israeli Companies Law, our amended and restated articles of association provide that we may indemnify an office holder in respect of the following liabilities, payments and expenses incurred for acts performed by him or her as an office holder, either in advance of an event or following an event:

- a monetary liability incurred by or imposed on the office holder in favor of another person pursuant to a court judgment, including pursuant to a settlement confirmed as judgment or arbitrator's decision approved by a competent court. However, if an undertaking to indemnify an office holder with respect to such liability is provided in advance, then such an undertaking must be limited to events which, in the opinion of the board of directors, can be foreseen based on the company's activities when the undertaking to indemnify is given, and to an amount or according to criteria determined by the board of directors as reasonable under the circumstances, and such undertaking shall detail the abovementioned foreseen events and amount or criteria;

- reasonable litigation expenses, including reasonable attorneys' fees, which were incurred by the office holder as a result of an investigation or proceeding filed against the office holder by an authority authorized to conduct such investigation or proceeding, provided that such investigation or proceeding was either (i) concluded without the filing of an indictment against such office holder and without the imposition on him of any monetary obligation in lieu of a criminal proceeding, (ii) concluded without the filing of an indictment against the office holder but with the imposition of a monetary obligation on the office holder in lieu of criminal proceedings for an offense that does not require proof of criminal intent or (iii) in connection with a monetary sanction;

- reasonable litigation expenses, including attorneys' fees, incurred by the office holder or which were imposed on the office holder by a court (i) in a proceeding instituted against him or her by the company, on its behalf, or by a third party, (ii) in connection with criminal indictment of which the office holder was acquitted or (iii) in a criminal indictment which the office holder was convicted of an offense that does not require proof of criminal intent;

- expenses he or she incurs as a result of administrative proceedings that may be instituted against him or her under Israeli securities laws if applicable, and payments made to injured persons under specific circumstances thereunder; and

- any other matter in respect of which it is permitted or will be permitted under applicable law to insure the liability of an office holder in the company.

Under the Israeli Companies Law, a company may insure an office holder against the following liabilities incurred for acts performed by him or her as an office holder if and to the extent provided in the company's articles of association:

- a breach of the duty of loyalty to the company, provided that the office holder acted in good faith and had a reasonable basis to believe that the act would not harm the company;

- a breach of duty of care to the company or to another person, to the extent such a breach arises out of the negligent conduct of the office holder; and

- a monetary liability imposed on the office holder in favor of a third party;

Under the Israeli Companies Law, a company may not indemnify, exculpate or insure an office holder against any of the following:

- a breach of the duty of loyalty, except for indemnification and insurance for a breach of the duty of loyalty to the company to the extent that the office holder acted in good faith and had a reasonable basis to believe that the act would not prejudice the company;

- a breach of duty of care committed intentionally or recklessly, excluding a breach arising out of the negligent conduct of the office holder;

- an act or omission committed with intent to derive illegal personal benefit; or

- a fine or forfeit levied against the office holder.

Under the Israeli Companies Law, exculpation, indemnification and insurance of office holders must be approved by the compensation committee and the board of directors and, with respect to directors or controlling shareholders, their relatives and third parties in which controlling shareholders have a personal interest, also by the shareholders.

Our amended and restated articles of association permit us to exculpate, indemnify and insure our office holders to the fullest extent permitted or to be permitted by law. Our office holders are currently covered by a directors' and officers' liability insurance policy. As of the date of this prospectus, no claims for directors' and officers' liability insurance have been filed under this policy and we are not aware of any pending or threatened litigation or proceeding involving any of our office holders, including our directors, in which indemnification is sought.

We have entered into agreements with each of our current office holders exculpating them from a breach of their duty of care to us to the fullest extent permitted by law, subject to limited exceptions, and undertaking to indemnify them to the fullest extent permitted by law, subject to limited exceptions, including, with respect to liabilities resulting from this offering, to the extent that these liabilities are not covered by insurance. This indemnification is limited, with respect to any monetary liability imposed in favor of a third party, to events determined as foreseeable by the board of directors based on our activities. The maximum aggregate amount of indemnification that we may pay to our office holders based on such indemnification agreement is the greater of (1) 25% of our total shareholders' equity pursuant to our most recent financial statements as of the time of the actual payment of indemnification and (2) $40.0 million (as may be increased from time to time by shareholders' approval); provided, however, that in relation to indemnification claimed in connection with a public offering of our securities, the amount, if higher, shall be equal to the aggregate proceeds from the sale by the Company and/or any shareholder of the Company in connection with such public offering . Such indemnification amounts are in addition to any insurance amounts. Each office holder who agrees to receive this letter of indemnification also gives his approval to the termination of all previous letters of indemnification that we have provided to him or her in the past, if any. However, in the opinion of the SEC, indemnification of office holders for liabilities arising under the Securities Act is against public policy and therefore unenforceable.

## Item 7.  Recent Sales of Unregistered Securities

The following is a summary of transactions during the preceding three years involving sales of our securities that were not registered under the Securities Act:

- Since <u>April 1, 2016</u>, we have granted share options to employees, directors and consultants under our share option plans covering an aggregate of 4,332,235 shares, with a weighted average exercise price of $2.74 per share. As of the date of this registration statement, 34,958 of these options have been exercised, while 711,624 of these options have been forfeited and canceled without being exercised. Options that are forfeited or canceled are returned to the option pool and become eligible for reallocation. Such issuances were exempt from registration under the Securities Act in reliance on Section 4(a)(2), Rule 701 and/or Regulation S under the Securities Act.

No underwriter or underwriting discount or commission was involved in any of the transactions set forth in Item 7.

## Item 8.  Exhibits and Financial Statement Schedules

*(a)  Exhibits* .

See the Exhibit Index attached to this registration statement, which is incorporated by reference herein.

*(b)  Financial Statement Schedules.*

Schedules not listed above have been omitted because the information required to be set forth therein is not applicable or is shown in the financial statements or notes thereto.

## Item 9.  Undertakings

The undersigned Registrant hereby undertakes to provide to the underwriters at the closing specified in the underwriting agreement certificates in such denominations and registered in such names as required by the underwriters to permit prompt delivery to each purchaser.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers and controlling persons of the Registrant pursuant to the foregoing provisions, or otherwise, the Registrant has been advised that in the opinion of the SEC such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the Registrant of expenses incurred or paid by a director, officer or controlling person of the Registrant in the successful defense of any action, suit or proceeding) is asserted by such director, officer or controlling person in connection with the securities being registered, the Registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned Registrant hereby undertakes:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the Registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

# EXHIBIT INDEX

| Exhibit No. | Description |
| --- | --- |
| 1.1 | Form of Underwriting Agreement |
| 3.1 | Amended and Restated Articles of Association of the Registrant |
| 3.2 | Form of Amended and Restated Articles of Association of the Registrant, which will become effective upon the closing of this offering |
| 4.1 | Specimen share certificate |
| 5.1 | Opinion of Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co., Israeli counsel to the Registrant, as to the validity of the ordinary shares (including consent) |
| 10.1 | Amended and Restated Investors' Rights Agreement, dated March 6, 2019, by and among the Registrant and the other parties thereto |
| 10.2 | Form of Letter of Indemnification ** |
| 10.3 | Office Lease Agreement, dated July 2, 2018, by and between the Registrant and Amot Investment Ltd. and Bayside Land Corporation Ltd, and amendments thereto∞ ** |
| 10.4 | Office Lease Agreement, dated September 18, 2007, by and between the Registrant and Mazal and Bracha (1970) Ltd, and amendments thereto∞ ** |
| 10.5 | Office Lease Agreement, dated August 22, 2017, by and between Tufin Software North America, Inc. and NS Two Oliver LLC ** |
| 10.6 | Commencement Agreement, dated December 18, 2017, by and between Tufin Software North America, Inc. and NS Two Oliver LLC ** |
| 10.7 | 2007 Israeli Share Option Plan ** |
| 10.8 | Global Addendum (Non-Israeli and Non-U.S. Taxpayers) to the 2007 Israeli Share Option Plan ** |
| 10.9 | 2008 U.S. Stock Plan ** |
| 10.10 | 2018 Equity-Based Incentive Plan ** |
| 10.11 | 2019 Equity-Based Incentive Plan |
| 10.12 | Amended and Restated Loan and Security Agreement, dated September 27, 2018, by and among the Registrant, Silicon Valley Bank, and Tufin Software North America, Inc. ** |
| 10.13 | Compensation Policy |
| 21.1 | List of subsidiaries of the Registrant ** |
| 23.1 | Consent of Kesselman & Kesselman, a member of PricewaterhouseCoopers International Limited |
| 23.2 | Consent of Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co. (included in Exhibit 5.1) |
| 24.1 | Power of Attorney (included in signature page to Registration Statement) ** |
| 99.1 | Consent of Dafna Gruber as director nominee ** |
| 99.2 | Consent of Peter Campbell as director nominee |

\*      To be filed by amendment.
\*\*     Previously filed.
∞      English summary of original Hebrew document.

# SIGNATURES

Pursuant to the requirements of the Securities Act of 1933, the Registrant certifies that it has reasonable grounds to believe that it meets all of the requirements for filing on Form F‑1 and has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in Ramat-Gan, Israel on April 1, 2019 .

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

By: /s/ Reuven Kitov

Name: Reuven Kitov

Title: Chief Executive Officer, Co-Founder and Chairman of the Board

Pursuant to the requirements of the Securities Act of 1933, as amended, this registration statement has been signed by the following persons on April 1, 2019 in the capacities indicated:

| Signatures | Title |
| --- | --- |
| /s/ Reuven Kitov<br>Reuven Kitov | Chief Executive Officer, Co-Founder, Chairman of the Board<br>(Principal Executive Officer) |
| /s/ Jack Wakileh<br>Jack Wakileh | Chief Financial Officer<br>(Principal Financial Officer and Principal Accounting Officer) |
| *<br>Reuven Harrison | Chief Technology Officer, Co-Founder and Director |
| *<br>Ohad Finkelstein | Director |
| *<br>Edouard Cukierman | Director |
| *<br>Yair Shamir | Director |
| *<br>Ronni Zehavi | Director |
| *<br>Yuval Shachar | Director |

*By: /s/ Reuven Kitov

Name: Reuven Kitov

Title: Attorney-in-fact

**TUFIN SOFTWARE NORTH AMERICA, INC.**

Authorized Representative in the United States

By:     /s/ Reuven Kitov

Name:   Reuven Kitov

Title:   Chief Executive Officer, Co-Founder
          and Chairman of the Board

**Exhibit 1.1**

Tufin Software Technologies Ltd.

[_____] Ordinary Shares

<u>Underwriting Agreement</u>

[_____], 2019

J.P. Morgan Securities LLC
Barclays Capital Inc.
Jefferies LLC
As Representatives of the
   several Underwriters listed
   in Schedule 1 hereto

c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, New York 10179

c/o Barclays Capital Inc.
745 Seventh Avenue
New York, New York 10019-6801

c/o Jefferies LLC
520 Madison Avenue
New York, New York 10022

Ladies and Gentlemen:

Tufin Software Technologies Ltd., a company organized under the laws of the State of Israel (the " **Company** "), proposes to issue and sell to the several underwriters listed in Schedule 1 hereto (the " **Underwriters** "), for whom you are acting as representatives (the " **Representatives** "), an aggregate of [_____] ordinary shares, par value NIS 0.015 per share (the " **Ordinary Shares** ") of the Company (the " **Underwritten Shares** "). In addition, the Company proposes to issue and sell, at the option of the Underwriters, up to an additional [_____] Ordinary Shares (the " **Option Shares** "). The Underwritten Shares and the Option Shares are herein referred to as the " **Shares** ". The Ordinary Shares to be outstanding after giving effect to the sale of the Shares are referred to herein as the " **Securities** ".

The Company hereby confirms its agreement with the several Underwriters concerning the purchase and sale of the Shares, as follows:

1. <u>Registration Statement</u> . The Company has prepared and filed with the Securities and Exchange Commission (the " **Commission** ") under the Securities Act of 1933, as amended, and the rules and regulations of the Commission thereunder (collectively, the " **Securities Act** "), a registration statement on Form F-1 (File No. 333-230109), including a prospectus, relating to

the Shares. Such registration statement, as amended at the time it became effective, including the information, if any, deemed pursuant to Rule 430A, 430B or 430C under the Securities Act to be part of the registration statement at the time of its effectiveness (" **Rule 430 Information** "), is referred to herein as the " **Registration Statement** "; and as used herein, the term " **Preliminary Prospectus** " means each prospectus included in such registration statement (and any amendments thereto) before effectiveness, any prospectus filed with the Commission pursuant to Rule 424(a) under the Securities Act and the prospectus included in the Registration Statement at the time of its effectiveness that omits Rule 430 Information, and the term " **Prospectus** " means the prospectus in the form first used (or made available upon request of purchasers pursuant to Rule 173 under the Securities Act) in connection with confirmation of sales of the Shares. If the Company has filed an abbreviated registration statement pursuant to Rule 462(b) under the Securities Act (the " **Rule 462 Registration Statement** "), then any reference herein to the term "Registration Statement" shall be deemed to include such Rule 462 Registration Statement. Capitalized terms used but not defined herein shall have the meanings given to such terms in the Registration Statement and the Prospectus.

At or prior to the Applicable Time (as defined below), the Company had prepared the following information (collectively with the pricing information set forth on Annex A, the " **Pricing Disclosure Package** "): a Preliminary Prospectus dated [_____], 2019 and each "free-writing prospectus" (as defined pursuant to Rule 405 under the Securities Act) listed on Annex A hereto.

" **Applicable Time** " means [_____] [A.M.][P.M.], New York City time, on [_____], 2019.

2.    Purchase of the Shares . (a) The Company agrees to issue and sell the Underwritten Shares to the several Underwriters as provided in this underwriting agreement (this " **Agreement** "), and each Underwriter, on the basis of the representations, warranties and agreements set forth herein and subject to the conditions set forth herein, agrees, severally and not jointly, to purchase at a price per share of $[_____] (the " **Purchase Price** ") from the Company the respective number of Underwritten Shares set forth opposite such Underwriter's name in Schedule 1 hereto.

In addition, the Company agrees to issue and sell the Option Shares to the several Underwriters as provided in this Agreement, and the Underwriters, on the basis of the representations, warranties and agreements set forth herein and subject to the conditions set forth herein, shall have the option to purchase, severally and not jointly, from the Company the Option Shares at the Purchase Price less an amount per share equal to any dividends or distributions declared by the Company and payable on the Underwritten Shares but not payable on the Option Shares. If any Option Shares are to be purchased, the number of Option Shares to be purchased by each Underwriter shall be the number of Option Shares which bears the same ratio to the aggregate number of Option Shares being purchased as the number of Underwritten Shares set forth opposite the name of such Underwriter in Schedule 1 hereto (or such number increased as set forth in Section 10 hereof) bears to the aggregate number of Underwritten Shares being purchased from the Company by the several Underwriters, subject, however, to such adjustments

to eliminate any fractional Shares as the Representatives in their sole discretion shall make. Any such election to purchase Option Shares shall be made in proportion to the maximum number of Option Shares to be sold by the Company.

The Underwriters may exercise the option to purchase Option Shares at any time in whole, or from time to time in part, on or before the thirtieth (30 th ) day following the date of the Prospectus, by written notice from the Representatives to the Company. Such notice shall set forth the aggregate number of Option Shares as to which the option is being exercised and the date and time when the Option Shares are to be delivered and paid for, which may be the same date and time as the Closing Date (as hereinafter defined) but shall not be earlier than the Closing Date nor later than the tenth (10 th ) full business day (as hereinafter defined) after the date of such notice (unless such time and date are postponed in accordance with the provisions of Section 10 hereof). Any such notice shall be given at least two business days prior to the date and time of delivery specified therein.

(b)     The Company understands that the Underwriters intend to make a public offering of the Shares as soon after the effectiveness of this Agreement as in the judgment of the Representatives is advisable, and initially to offer the Shares on the terms set forth in the Pricing Disclosure Package. The Company acknowledges and agrees that the Underwriters may offer and sell Shares to or through any affiliate of an Underwriter.

(c)     Payment for the Shares shall be made by wire transfer in immediately available funds to the accounts specified by the Company to the Representatives in the case of the Underwritten Shares, at the offices of Goodwin Procter LLP, 100 Northern Avenue, Boston, MA 02210 at 10:00 A.M. New York City time on [_____], 2019, or at such other time or place on the same or such other date, not later than the fifth (5 th ) business day thereafter, as the Representatives and the Company may agree upon in writing or, in the case of the Option Shares, on the date and at the time and place specified by the Representatives in the written notice of the Underwriters' election to purchase such Option Shares. The time and date of such payment for the Underwritten Shares is referred to herein as the " **Closing Date** ", and the time and date for such payment for the Option Shares, if other than the Closing Date, is herein referred to as the " **Additional Closing Date** ".

Payment for the Shares to be purchased on the Closing Date or the Additional Closing Date, as the case may be, shall be made against delivery to the Representatives for the respective accounts of the several Underwriters of the Shares to be purchased on such date in definitive form registered in such names and in such denominations as the Representatives shall request in writing not later than two full business days prior to the Closing Date or the Additional Closing Date, as the case may be, with any transfer taxes payable in connection with the sale of such Shares duly paid by the Company. Delivery of the Shares shall be made through the facilities of The Depository Trust Company (" **DTC** ") unless the Representatives shall otherwise instruct. Any certificates for the Shares will be made available for inspection and packaging by the Representatives at the office of DTC or its designated custodian not later than 1:00 P.M., New York City time, on the business day prior to the Closing Date or the Additional Closing Date, as the case may be.

(d)     The Company acknowledges and agrees that the Underwriters are acting solely in the capacity of an arm's length contractual counterparty to the Company with respect to the offering of Shares contemplated hereby (including in connection with determining the terms of the offering) and not as a financial advisor or a fiduciary to, or an agent of, the Company or any other person. Additionally, neither the Representatives nor any other Underwriter is advising the Company or any other person as to any legal, tax, investment, accounting or regulatory matters in any jurisdiction. The Company shall consult with its own advisors concerning such matters and shall be responsible for making its own independent investigation and appraisal of the transactions contemplated hereby, and the Underwriters shall have no responsibility or liability to the Company with respect thereto. Any review by the Underwriters of the Company, the transactions contemplated hereby or other matters relating to such transactions will be performed solely for the benefit of the Underwriters and shall not be on behalf of the Company.

3.     <u>Representations and Warranties of the Company</u> . The Company represents and warrants to each Underwriter, as of the date hereof, that:

(a)     *Preliminary Prospectus.* No order preventing or suspending the use of any Preliminary Prospectus has been issued by the Commission, and each Preliminary Prospectus included in the Pricing Disclosure Package, at the time of filing thereof, complied in all material respects with the Securities Act, and no Preliminary Prospectus, at the time of filing thereof, contained any untrue statement of a material fact or omitted to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that the Company makes no representation or warranty with respect to any statements or omissions made in reliance upon and in conformity with information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in any Preliminary Prospectus, it being understood and agreed that the only such information furnished by any Underwriter consists of the information described as such in Section 7(b) hereof.

(b)     *Pricing Disclosure Package* . The Pricing Disclosure Package as of the Applicable Time did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; <u>provided</u> that the Company makes no representation or warranty with respect to any statements or omissions made in reliance upon and in conformity with information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in such Pricing Disclosure Package, it being understood and agreed that the only such information furnished by any Underwriter consists of the information described as such in Section 7(b) hereof. No statement of material fact included in the Prospectus has been omitted from the Pricing Disclosure Package and no statement of material fact included in the Pricing Disclosure Package that is required to be included in the Prospectus has been omitted therefrom.

(c)     *Issuer Free Writing Prospectus.* Other than the Registration Statement, the Preliminary Prospectus and the Prospectus, the Company (including its agents and representatives, other than the Underwriters in their capacity as such) has not prepared, used, authorized, approved or referred to and will not prepare, use, authorize, approve or refer to any "written communication" (as defined in Rule 405 under the Securities Act) that constitutes an offer to sell or solicitation of an offer to buy the Shares (each such communication by the Company or its agents and representatives (other than a communication referred to in clause (i) below) an " **Issuer Free Writing Prospectus** ") other than (i) any document not constituting a prospectus pursuant to Section 2(a)(10)(a) of the Securities Act or Rule 134 under the Securities Act or (ii) the documents listed on Annex A hereto, each electronic road show and any other written communications approved in writing in advance by the Representatives, which approval shall not be unreasonably withheld. Each such Issuer Free Writing Prospectus complies in all material respects with the Securities Act, has been or will be (within the time period specified in Rule 433) filed in accordance with the Securities Act (to the extent required thereby) and does not conflict with the information contained in the Registration Statement or the Pricing Disclosure Package, and, when taken together with the Preliminary Prospectus accompanying, or delivered prior to delivery of, such Issuer Free Writing Prospectus, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that the Company makes no representation or warranty with respect to any statements or omissions made in each such Issuer Free Writing Prospectus or Preliminary Prospectus in reliance upon and in conformity with information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in such Issuer Free Writing Prospectus or Preliminary Prospectus, it being understood and agreed that the only such information furnished by any Underwriter consists of the information described as such in Section 7(b) hereof.

(d)     *Emerging Growth Company* . From the time of initial confidential submission of the Registration Statement to the Commission (or, if earlier, the first date on which the Company engaged directly or through any person authorized to act on its behalf in any Testing-the-Waters Communication) through the date hereof, the Company has been and is an "emerging growth company," as defined in Section 2(a) of the Securities Act (an " **Emerging Growth Company** "). " **Testing-the-Waters Communication** " means any oral or written communication with potential investors undertaken in reliance on Section 5(d) of the Securities Act.

(e)     *Testing-the-Waters Materials.* The Company (i) has not alone engaged in any Testing-the-Waters Communications other than Testing-the-Waters Communications with the consent of the Representatives with entities that are qualified institutional buyers within the meaning of Rule 144A under the Securities Act or institutions that are accredited investors within the meaning of Rule 501 under the Securities Act and (ii) has not authorized anyone other than the Representatives to engage in Testing-the-Waters

- 5 -

Communications. The Company reconfirms that the Representatives have been authorized to act on its behalf in undertaking Testing-the-Waters Communications by virtue of a writing substantially in the form of Exhibit A hereto. The Company has not distributed or approved for distribution any Written Testing-the-Waters Communications other than those listed on Annex B hereto. " **Written Testing-the-Waters Communication** " means any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Securities Act. Any individual Written Testing-the-Waters Communication does not conflict with the information contained in the Registration Statement or the Pricing Disclosure Package, complied in all material respects with the Securities Act, and when taken together with the Pricing Disclosure Package as of the Applicable Time, did not, and as of the Closing Date and as of the Additional Closing Date, as the case may be, will not, contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading.

(f) *Registration Statement and Prospectus.* The Registration Statement has been declared effective by the Commission. No order suspending the effectiveness of the Registration Statement has been issued by the Commission, and no proceeding for that purpose or pursuant to Section 8A of the Securities Act against the Company or related to the offering of the Shares has been initiated or, to the knowledge of the Company, threatened by the Commission; as of the applicable effective date of the Registration Statement and any post-effective amendment thereto, the Registration Statement and any such post-effective amendment complied and will comply in all material respects with the Securities Act, and did not and will not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein not misleading; and as of the date of the Prospectus and any amendment or supplement thereto and as of the Closing Date and as of the Additional Closing Date, as the case may be, the Prospectus will comply in all material respects with the Securities Act and will not contain any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that the Company makes no representation or warranty with respect to any statements or omissions made in reliance upon and in conformity with information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in the Registration Statement and the Prospectus and any amendment or supplement thereto, it being understood and agreed that the only such information furnished by any Underwriter consists of the information described as such in Section 7(b) hereof.

(g) *Financial Statements.* The financial statements (including the related notes thereto) of the Company and its consolidated subsidiaries included in the Registration Statement, the Pricing Disclosure Package and the Prospectus comply in all material respects with the applicable requirements of the Securities Act and present fairly the financial position of the Company and its consolidated subsidiaries as of the dates indicated and the results of their operations and the changes in their cash flows for the periods specified; such financial statements have been prepared in conformity with

- 6 -

generally accepted accounting principles (" **GAAP** ") in the United States applied on a consistent basis throughout the periods covered thereby, and any supporting schedules included in the Registration Statement present fairly the information required to be stated therein; the other financial information included in the Registration Statement, the Pricing Disclosure Package and the Prospectus has been derived from the accounting records of the Company and its consolidated subsidiaries and presents fairly the information shown thereby; all disclosures included in the Registration Statement, the Pricing Disclosure Package and the Prospectus regarding "non-GAAP financial measures" (as such term is defined by the rules and regulations of Commission) comply with Regulation G of the Securities Exchange Act of 1934, as amended, and the rules and regulations of the Commission thereunder (collectively, the " **Exchange Act** "), and Item 10 of Regulation S-K of the Securities Act, to the extent applicable.

(h)     *No Material Adverse Change.* Since the date of the most recent financial statements of the Company included in the Registration Statement, the Pricing Disclosure Package and the Prospectus, (i) there has not been any change in the share capital (other than the issuance of Ordinary Shares upon exercise of share options and warrants described as outstanding in, and the grant of options and awards under existing equity incentive plans, or upon the conversion of the preferred shares, in each case, described in, the Registration Statement, the Pricing Disclosure Package and the Prospectus), short-term debt (other than trade payables incurred in the ordinary course of business consistent with past practices) or long-term debt of the Company or any of its subsidiaries, or any dividend or distribution of any kind declared, set aside for payment, paid or made by the Company on any class of share capital, or any material adverse change, or any development involving a prospective material adverse change, in or affecting (a) the business, properties, management, financial position, shareholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole or (b) the ability of the Company to perform its obligations under this Agreement or to consummate any transactions contemplated by this Agreement, the Pricing Disclosure Package or the Prospectus; (ii) neither the Company nor any of its subsidiaries has entered into any transaction or agreement (whether or not in the ordinary course of business) that is material to the Company and its subsidiaries taken as a whole or incurred any liability or obligation, direct or contingent, that is material to the Company and its subsidiaries taken as a whole; and (iii) neither the Company nor any of its subsidiaries has sustained any loss or interference with its business that is material to the Company and its subsidiaries taken as a whole and that is either from fire, explosion, flood or other calamity, whether or not covered by insurance, or from any labor disturbance or dispute or any action, order or decree of any court or arbitrator or governmental or regulatory authority, except in each case as otherwise disclosed in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

(i)     *Organization and Good Standing.* The Company and each of its subsidiaries have been duly organized and are validly existing and, to the extent applicable in their respective jurisdictions of organization, are in good standing under the laws of their respective jurisdictions of organization, are duly qualified to do business and

are in good standing in each jurisdiction in which their respective ownership or lease of property or the conduct of their respective businesses requires such qualification, and have all power and authority necessary to own or hold their respective properties and to conduct the businesses in which they are engaged, except where the failure to be so qualified or in good standing or have such power or authority would not, individually or in the aggregate, reasonably be expected to have a material adverse effect on the business, properties, management, financial position, shareholders' equity, results of operations or prospects of the Company and its subsidiaries taken as a whole or on the performance by the Company of its obligations under this Agreement (a " **Material Adverse Effect** "). The Company has not been designated as a "breaching company" (within the meaning of the Israeli Companies Law, 1999) (the " **Companies Law** ") by the Registrar of Companies of the State of Israel and there is no basis for such designation. The Company does not own or control, directly or indirectly, any corporation, association or other entity other than the subsidiaries listed in Exhibit 21 to the Registration Statement.

(j) *Capitalization.* The Company has an authorized capitalization as set forth in the Registration Statement, the Pricing Disclosure Package and the Prospectus under the heading "Capitalization"; all the outstanding share capital of the Company have been duly and validly authorized and issued and are fully paid and non-assessable and are not subject to any pre-emptive or similar rights, except as will be duly waived, satisfied or terminated prior to the Closing Date; except as described in or expressly contemplated by the Registration Statement, the Pricing Disclosure Package and the Prospectus, there are no outstanding rights (including, without limitation, pre-emptive rights), warrants or options to acquire, or instruments convertible into or exchangeable for, any share capital or other equity interest in the Company or any of its subsidiaries, or any contract, commitment, agreement, understanding or arrangement of any kind relating to the issuance of any share capital of the Company or any such subsidiary, any such convertible or exchangeable securities or any such rights, warrants or options; the share capital of the Company conforms in all material respects to the description thereof contained in the Registration Statement, the Pricing Disclosure Package and the Prospectus; and all the outstanding shares or other equity interests of each subsidiary owned, directly or indirectly, by the Company have been duly and validly authorized and issued, are fully paid and non-assessable (except, in the case of any foreign subsidiary, for directors' qualifying shares and except as otherwise described in the Registration Statement, the Pricing Disclosure Package and the Prospectus,) and are owned directly or indirectly by the Company, free and clear of any lien, charge, encumbrance, security interest, restriction on voting or transfer or any other claim of any third party.

(k) *Share Options.* With respect to the share options (the " **Share Options** ") granted pursuant to the stock-based compensation plans of the Company and its subsidiaries (the " **Company Share Plans** "), (i) each Share Option purported to be issued under Section 102 of the Israeli Tax Ordinance – (New Version) 1961 qualifies for treatment under that section and for treatment under either the capital gains track or the employment income track, as was indicated with respect to each such Share Option at the

date that such Share Option was granted, except as would not reasonably be expected to result in a Material Adverse Effect, (ii) each Share Option intended to qualify as an "incentive stock option" under Section 422 of the Code (as defined below) so qualifies, except as would not reasonably be expected to result in a Material Adverse Effect, (iii) each grant of a Share Option was duly authorized no later than the date on which the grant of such Share Option was by its terms to be effective (the " **Grant Date** ") by all necessary corporate action, including, as applicable, approval by the Board (or a duly constituted and authorized committee thereof) and any required shareholder approval, and the award agreement governing such grant (if any) was duly executed and delivered by each party thereto, (iv) each such grant was made in accordance with the terms of the Company Share Plans and all other applicable laws and regulatory rules or requirements, and (v) each such grant was properly accounted for in accordance with GAAP in the financial statements (including the related notes) of the Company included in the Registration Statement, Pricing Disclosure Package and Prospectus.

(l)     *Due Authorization.* The Company has full right, power and authority to execute and deliver this Agreement and to perform its obligations hereunder; and all action required to be taken for the due and proper authorization, execution and delivery by it of this Agreement and the consummation by it of the transactions contemplated hereby has been duly and validly taken.

(m)     *Underwriting Agreement.* This Agreement has been duly authorized, executed and delivered by the Company.

(n)     *The Shares.* The Shares to be issued and sold by the Company hereunder have been duly authorized by the Company and, when issued and delivered and paid for as provided herein, will be duly and validly issued, will be fully paid and nonassessable, will not be subject to any preemptive or similar rights and will conform in all material respects to the descriptions thereof in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

(o)     *Descriptions of the Underwriting Agreement.* This Agreement conforms in all material respects to the description thereof contained in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

(p)     *No Violation or Default.* Neither the Company nor any of its subsidiaries is (i) in violation of its charter or by-laws or similar organizational documents; (ii) in default, and no event has occurred that, with notice or lapse of time or both, would constitute such a default, in the due performance or observance of any term, covenant or condition contained in any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any property or asset of the Company or any of its subsidiaries is subject; or (iii) in violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority, except, in the case of clauses (ii) and (iii) above,

for any such default or violation that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(q)    *No Conflicts.* The execution, delivery and performance by the Company of this Agreement, the issuance and sale of the Shares by the Company, and the consummation by the Company of the transactions contemplated by this Agreement, the Pricing Disclosure Package and the Prospectus will not (i) conflict with or result in a breach or violation of any of the terms or provisions of, or constitute a default under, result in the termination, modification or acceleration of, or result in the creation or imposition of any lien, charge or encumbrance upon any property, right or asset of the Company or any of its subsidiaries pursuant to, any indenture, mortgage, deed of trust, loan agreement or other agreement or instrument to which the Company or any of its subsidiaries is a party or by which the Company or any of its subsidiaries is bound or to which any property, right or asset of the Company or any of its subsidiaries is subject, (ii) result in any violation of the provisions of the charter or by-laws or similar organizational documents of the Company or any of its subsidiaries or (iii) result in the violation of any law or statute or any judgment, order, rule or regulation of any court or arbitrator or governmental or regulatory authority to which the Company or any of its subsidiaries is subject, except, in the case of clauses (i) and (iii) above, for any such conflict, breach, violation, default, termination, modification, acceleration, lien, charge or encumbrance that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(r)    *No Consents Required.* No consent, notice, approval, authorization, order, registration or qualification of or with any court or arbitrator or governmental or regulatory authority is required to be obtained by the Company for the (i) execution, delivery and performance by the Company of this Agreement, (ii)the consummation of the transactions contemplated by this Agreement, except for (A) the registration of the Shares under the Securities Act and (B) the listing of the Shares on the NYSE, (iii) such consents, approvals, authorizations, orders and registrations or qualifications as may be required by the Financial Industry Regulatory Authority, Inc. (" **FINRA** ") and under applicable United States state or non-United States securities laws in connection with the purchase and distribution of the Shares by the Underwriters, and (iv) the obligation to file following the Closing certain notices with (a) the Registrar of Companies in the State of Israel regarding the issuance of shares and the Company becoming a public company in the United States and (b) the Bank of Israel of the transactions contemplated hereby. Subject to the Underwriters' compliance with their obligations under Section 5(d) hereof, the Company is not required to publish a prospectus in the State of Israel under the laws of the State of Israel with respect to the offer and sale of the Shares.

(s)    *Legal Proceedings.* Except as described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, there are no legal, governmental or regulatory investigations, actions, demands, claims, suits, arbitrations, inquiries or proceedings (" **Actions** ") pending to which the Company or any of its subsidiaries is or, to the knowledge of the Company, would reasonably be expected to be, a party or to which

- 10 -

any property of the Company or any of its subsidiaries is subject that, individually or in the aggregate, if determined adversely to the Company or any of its subsidiaries, would reasonably be expected to have a Material Adverse Effect; no such Actions are threatened or, to the knowledge of the Company, contemplated by any governmental or regulatory authority or threatened by others; and (i) there are no current or pending Actions that are required under the Securities Act to be described in the Registration Statement, the Pricing Disclosure Package or the Prospectus that are not so described in the Registration Statement, the Pricing Disclosure Package and the Prospectus and (ii) there are no statutes, regulations or contracts or other documents that are required under the Securities Act to be filed as exhibits to the Registration Statement or described in the Registration Statement, the Pricing Disclosure Package or the Prospectus that are not so filed as exhibits to the Registration Statement or described in the Registration Statement, the Pricing Disclosure Package and the Prospectus.

(t)    *Independent Accountants* . To the knowledge of the Company, Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, who have certified certain financial statements of the Company and its subsidiaries, is an independent registered public accounting firm with respect to the Company and its subsidiaries within the applicable rules and regulations adopted by the Commission and the Public Company Accounting Oversight Board (United States) and as required by the Securities Act.

(u)    *Title to Real and Personal Property.* The Company and its subsidiaries have good and marketable title in fee simple (in the case of real property) to, or have valid rights to lease or otherwise use, all items of real and personal property that are material to the respective businesses of the Company and its subsidiaries, in each case free and clear of all liens, encumbrances, claims and defects and imperfections of title except those that (i) do not materially interfere with the use made and proposed to be made of such property by the Company and its subsidiaries or (ii) would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(v)    *Intellectual Property.* (i) The Company and its subsidiaries own or have the right to use all patents, patent applications, trademarks, service marks, trade names, trademark registrations, service mark registrations, domain names and other source indicators, copyrights and copyrightable works, know-how, trade secrets, systems, procedures, proprietary or confidential information and all other worldwide intellectual property, industrial property and proprietary rights (collectively, " **Intellectual Property** ") used in the conduct of their respective businesses; (ii) to the knowledge of the Company, the Company's and its subsidiaries' conduct of their respective businesses does not infringe, misappropriate or otherwise violate any Intellectual Property of any person; (iii) the Company and its subsidiaries have not received any written notice of any claim relating to Intellectual Property; (iv) to the knowledge of the Company, the Intellectual Property of the Company and its subsidiaries is not being infringed, misappropriated or otherwise violated by any person; (v) the Company and its subsidiaries have complied in all material respects with the terms of each agreement pursuant to which any material

elements of Intellectual Property has been licensed to the Company or its subsidiaries, and all such agreements are in full force and effect; and (vi) to the Company's knowledge, no employee of the Company or any of its subsidiaries that is contributing to the Intellectual Property is in or in the past three years has been in violation of any term of any employment contract, patent disclosure agreement, invention assignment agreement, non-competition agreement, non-solicitation agreement, nondisclosure agreement or any restrictive covenant to or with a former employer where the basis of such violation relates to such employee's employment with the Company or any of its subsidiaries or actions undertaken by the employee while employed with the Company or any of its subsidiaries; except, in the case of each of (i) through (vi) above, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect .

(w) *No Undisclosed Relationships.* No relationship, direct or indirect, exists between or among the Company or any of its subsidiaries, on the one hand, and the directors, officers, shareholders, customers, suppliers or other controlled affiliates of the Company or any of its subsidiaries, on the other, that is required by the Securities Act to be described in each of the Registration Statement and the Prospectus and that is not so described in such documents and in the Pricing Disclosure Package.

(x) *Investment Company Act.* The Company is not and, after giving effect to the offering and sale of the Shares and the application of the proceeds thereof received by the Company as described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, will not be required to register as an "investment company" within the meaning of the Investment Company Act of 1940, as amended, and the rules and regulations of the Commission thereunder (collectively, the " **Investment Company Act** ").

(y) *Taxes.* The Company and its subsidiaries have paid all material United States federal, state, local, Israeli and other non-United States taxes and filed all material tax returns required to be paid or filed through the date hereof other than tax returns with respect to which the Company or its subsidiaries have properly requested extensions thereof; and except as otherwise disclosed in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus, there is no material tax deficiency that has been, or would reasonably be expected to be, asserted against the Company or any of its subsidiaries or any of their respective properties or assets.

(z) *Licenses and Permits.* The Company and its subsidiaries possess all licenses, certificates, permits and other authorizations issued by, and have made all declarations and filings with, the appropriate United States federal, state, local, Israeli or other non-United States governmental or regulatory authorities that are necessary for the ownership or lease of their respective properties or the conduct of their respective businesses, including export of their products, as described in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus, except where the failure to possess or make the same would not, individually or in the aggregate, reasonably be

expected to have a Material Adverse Effect; and except as described in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus, neither the Company nor any of its subsidiaries has received notice of any revocation or modification of any such license, certificate, permit or authorization or has any reason to believe that any such license, certificate, permit or authorization will not be renewed in the ordinary course, except where such revocation, modification or failure to renew would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(aa)   *No Labor Disputes.* No labor disturbance by or dispute with employees of the Company or any of its subsidiaries exists or, to the knowledge of the Company, is contemplated or threatened, and the Company is not aware of any existing or imminent labor disturbance by, or dispute with, the employees of any of its or its subsidiaries' principal suppliers, contractors or customers, except as would not reasonably be expected to have a Material Adverse Effect. Neither the Company nor any of its subsidiaries is a party to any collective bargaining agreement.

(bb)   *Certain Environmental Matters* . (i) The Company and its subsidiaries (x) are in compliance with all, and have not violated any, applicable U.S. federal, state, local, Israeli and other non-U.S. laws (including common law), rules, regulations, requirements, decisions, judgments, decrees, orders and other legally enforceable requirements relating to pollution or the protection of human health or safety, the environment, natural resources, hazardous or toxic substances or wastes, pollutants or contaminants (collectively, " **Environmental Laws** "); (y) have received and are in compliance with all, and, to the knowledge of the Company, have not violated any, permits, licenses, certificates or other authorizations or approvals required of them under any Environmental Laws to conduct their respective businesses; and (z) have not received notice of any actual or potential liability under or relating to, or any actual or potential violation of, any Environmental Laws, including for the investigation or remediation of any release of hazardous or toxic substances or wastes, pollutants or contaminants, and have no knowledge of any event or condition that would reasonably be expected to result in any such notice, and (ii) there are no costs or liabilities associated with Environmental Laws of or relating to the Company or its subsidiaries, except in the case of each of (i) and (ii) above, for any such matter as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect; and (iii) except as described in each of the Pricing Disclosure Package and the Prospectus, (x) there is no proceeding that is pending, or that is known to be contemplated, against the Company or any of its subsidiaries under any Environmental Laws in which a governmental entity is also a party, other than such proceeding regarding which it is reasonably believed no monetary sanctions of $100,000 or more will be imposed, (y) the Company and its subsidiaries are not aware of any facts or issues regarding compliance with Environmental Laws, or liabilities or other obligations under Environmental Laws or concerning release of hazardous or toxic substances or wastes, pollutants or contaminants, that would reasonably be expected to have a material effect on the capital expenditures, earnings or competitive position of the Company and its subsidiaries, and (z) none of the Company

or its subsidiaries anticipates material capital expenditures relating to any Environmental Laws.

(cc) *Compliance with ERISA* . (i) Each employee benefit plan, within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974, as amended (" **ERISA** "), that is subject to ERISA, for which the Company or any member of its "Controlled Group" (defined as any entity, whether or not incorporated, that is under common control with the Company within the meaning of Section 4001(a)(14) of ERISA or any entity that is treated as a single employer with the Company under Section 414(b),(c),(m) or (o) of the Internal Revenue Code of 1986, as amended (the " **Code** ")) would have any liability (each, a " **Plan** ") has been maintained in compliance with its terms and the requirements of any applicable statutes, orders, rules and regulations, including but not limited to ERISA and the Code; *provided* that this clause (i) shall not apply to any Plan that is a "multiemployer plan," within the meaning of Section 4001(c)(3) of ERISA; (ii) no prohibited transaction, within the meaning of Section 406 of ERISA or Section 4975 of the Code, has occurred with respect to any Plan, excluding transactions effected pursuant to a statutory or administrative exemption; (iii) for each Plan that is subject to the funding rules of Section 412 of the Code or Section 302 of ERISA, no Plan has failed (whether or not waived), or is reasonably expected to fail, to satisfy the minimum funding standards (within the meaning of Section 302 of ERISA or Section 412 of the Code) applicable to such Plan; (iv) no Plan is, or is reasonably expected to be, in "at risk status" (within the meaning of Section 303(i) of ERISA) and no Plan that is a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA is in "endangered status" or "critical status" (within the meaning of Sections 304 and 305 of ERISA); (v) the fair market value of the assets of each Plan subject to Title VI of ERISA exceeds the present value of all benefits accrued under such Plan (determined based on those assumptions used to fund such Plan); (vi) no "reportable event" (within the meaning of Section 4043(c) of ERISA and the regulations promulgated thereunder) has occurred or is reasonably expected to occur; (vii) each Plan that is intended to be qualified under Section 401(a) of the Code is so qualified, and nothing has occurred, whether by action or by failure to act, which would cause the loss of such qualification; (viii) neither the Company nor any member of the Controlled Group has incurred, nor reasonably expects to incur, any liability under Title IV of ERISA (other than contributions to the Plan or premiums to the Pension Benefit Guarantee Corporation, in the ordinary course and without default) in respect of a Plan (including a "multiemployer plan" within the meaning of Section 4001(a)(3) of ERISA); and (ix) none of the following events has occurred or is reasonably likely to occur: (A) a material increase in the aggregate amount of contributions required to be made to all Plans by the Company or its Controlled Group affiliates in the current fiscal year of the Company and its Controlled Group affiliates compared to the amount of such contributions made in the Company's and its Controlled Group affiliates' most recently completed fiscal year; or (B) a material increase in the Company and its subsidiaries' "accumulated post-retirement benefit obligations" (within the meaning of Accounting Standards Codification Topic 715-60) compared to the amount of such obligations in the Company and its subsidiaries' most recently completed fiscal year, except in each case with respect to the events or

- 14 -

conditions set forth in (i) through (ix) hereof, as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(dd)     *Disclosure Controls* . The Company and its subsidiaries maintain an effective system of "disclosure controls and procedures" (as defined in Rule 13a-15(e) of the Exchange Act) that are designed to comply with the requirements of the Exchange Act and that have been designed to ensure that information required to be disclosed by the Company in reports that it will file or submit under the Exchange Act is recorded, processed, summarized and reported within the time periods specified in the Commission's rules and forms, including controls and procedures designed to ensure that such information is accumulated and communicated to the Company's management as appropriate to allow timely decisions regarding required disclosure.

(ee)     *Accounting Controls.* The Company and its subsidiaries maintain internal accounting controls sufficient to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences. Except as disclosed in the Registration Statement, the Pricing Disclosure Package and the Prospectus, the Company is not aware of any material weaknesses in the Company's internal controls. The Company's auditors and the Board have been advised of: (i) all significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting that are known to the Company's management and that have adversely affected or are reasonably likely to adversely affect the Company's ability to record, process, summarize and report financial information; and (ii) any fraud known to the Company's management, whether or not material, that involves management or other employees who have a significant role in the Company's internal controls over financial reporting.

(ff)     *Insurance.* The Company and its subsidiaries maintain insurance covering their respective properties, operations and businesses, including business interruption insurance, which insurance is in amounts and insures against such losses and risks as are reasonably adequate to protect the Company and its subsidiaries and their respective businesses; and neither the Company nor any of its subsidiaries has (i) received notice from any insurer or agent of such insurer that capital improvements or other expenditures are required or necessary to be made in order to continue such insurance or (ii) any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage at reasonable cost from similar insurers as may be necessary to continue its business.

(gg)     *Cybersecurity; Data Protection.* Except as would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect (i) the Company

and its subsidiaries' information technology assets and equipment, computers, systems, networks, hardware, software, websites, applications, and databases (collectively, "**IT Systems**") are adequate for, and operate and perform in all material respects as required in connection with the operation of the business of the Company and its subsidiaries as currently conducted and, to the knowledge of the Company and its subsidiaries, are free and clear of all material bugs, errors, defects, Trojan horses, time bombs, malware and other corruptants; (ii) the Company and its subsidiaries have implemented and maintained commercially reasonable controls, policies, procedures, safeguards and other measures to maintain and protect their material confidential information and the integrity, availability and security of the IT Systems and data (including all personal, personally identifiable, sensitive, confidential or regulated data ("**Personal Data**")) used in connection with their businesses, and there have been no breaches, violations, outages or unauthorized uses of or accesses to same, except for those that have been remedied without material cost or liability or the duty to notify any other person, nor any incidents under internal review or investigations relating to the same; and (iii) the Company and its subsidiaries are in compliance with all applicable laws or statutes (including, but not limited to, the European Union General Data Protection Regulation and the Israeli Privacy Protection Regulations, Information, Security, 2017) and all applicable judgments, orders, rules and regulations of any court or arbitrator or governmental or regulatory authority, internal policies and contractual obligations relating to the privacy and security of IT Systems and Personal Data and to the protection of such IT Systems and Personal Data from unauthorized use, access, misappropriation or modification.

(hh)     *No Unlawful Payments.* Neither the Company nor any of its subsidiaries, nor any director (in his or her capacity as a director of the Company), officer or employee of the Company or any of its subsidiaries nor, to the knowledge of the Company, any agent, controlled affiliate or other person acting on behalf of the Company or any of its subsidiaries has (i) used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expense relating to political activity; (ii) made or taken an act in furtherance of an offer, promise or authorization of any direct or indirect unlawful payment or benefit to any foreign or domestic government official or employee, including of any government-owned or controlled entity or of a public international organization, or any person acting in an official capacity for or on behalf of any of the foregoing, or any political party or party official or candidate for political office; (iii) violated or is in violation of any provision of the Foreign Corrupt Practices Act of 1977, as amended, or any applicable law or regulation implementing the OECD Convention on Combating Bribery of Foreign Public Officials in International Business Transactions, or committed an offence under the Bribery Act 2010 of the United Kingdom or any other applicable anti-bribery or anti-corruption law, including, without limitation, Section 291A of the Israel Penal Law 5737-1977 and the rules and regulations thereunder; or (iv) made, offered, agreed, requested or taken an act in furtherance of any unlawful bribe or other unlawful benefit, including, without limitation, any rebate, payoff, influence payment, kickback or other unlawful or improper payment or benefit. The Company and its subsidiaries have instituted, maintain and enforce policies and procedures designed to promote and ensure compliance with all applicable anti-bribery and anti-corruption laws.

(ii)    *Compliance with Anti-Money Laundering Laws* . The operations of the Company and its subsidiaries are and have been conducted at all times in compliance with applicable financial recordkeeping and reporting requirements, including those of the Currency and Foreign Transactions Reporting Act of 1970, as amended, the applicable money laundering statutes of all jurisdictions where the Company or any of its subsidiaries conducts business including the Israel Prohibition on Money Laundering Law, 5760-2000, Israel Prohibition on Money Laundering Order, 5761-2001 and the Israel Prohibition on Terrorist Financing Law, 5765-2005, the rules and regulations thereunder and any related or similar rules, regulations or guidelines issued, administered or enforced by any governmental agency (collectively, the " **Anti-Money Laundering Laws** "), and no action, suit or proceeding by or before any court or governmental agency, authority or body or any arbitrator involving the Company or any of its subsidiaries with respect to the Anti-Money Laundering Laws is pending or, to the knowledge of the Company, threatened.

(jj)    *No Conflicts with Sanctions Laws.* Neither the Company nor any of its subsidiaries, directors or officers, nor, to the knowledge of the Company, any employee, agent, controlled affiliate or other person acting on behalf of the Company or any of its subsidiaries is currently the subject or the target of any sanctions administered or enforced by the U.S. government (including, without limitation, the Office of Foreign Assets Control of the U.S. Department of the Treasury (" **OFAC** ") or the U.S. Department of State and including, without limitation, the designation as a "specially designated national" or "blocked person"), the United Nations Security Council (" **UNSC** "), the European Union, Her Majesty's Treasury (" **HMT** ") or other relevant sanctions authority, including by virtue of similar laws or rules of the State of Israel (collectively, " **Sanctions** "), nor is the Company or any of its subsidiaries located, organized or resident in a country or territory that is the subject or target of Sanctions, including, without limitation, Crimea, Cuba, Iran, North Korea and Syria (each, a " **Sanctioned Country** "); and the Company will not directly or indirectly use the proceeds of the offering of the Shares hereunder, or lend, contribute or otherwise make available such proceeds to any subsidiary, joint venture partner or other person or entity (i) to fund or facilitate any activities of or business with any person that, at the time of such funding or facilitation, is the subject or target of Sanctions, (ii) to fund or facilitate any activities of or business in any Sanctioned Country or (iii) in any other manner that will result in a violation of Sanctions by any person participating in a transaction with the Company. For the past five years, the Company and its subsidiaries have not knowingly engaged in and are not now knowingly engaged in any dealings or transactions with any person that at the time of the dealing or transaction is or was the subject or the target of Sanctions or with any Sanctioned Country.

(kk)    *No Restrictions on Subsidiaries* . No subsidiary of the Company is currently prohibited, directly or indirectly, under any agreement or other instrument to which it is a party or is subject, from paying any dividends to the Company, from making any other distribution on such subsidiary's share capital or similar ownership interest, from repaying to the Company any loans or advances to such subsidiary from the

Company or from transferring any of such subsidiary's properties or assets to the Company or any other subsidiary of the Company.

(ll)     *No Broker's Fees.* Neither the Company nor any of its subsidiaries is a party to any contract, agreement or understanding with any person (other than this Agreement) that would give rise to a valid claim against any of them or any Underwriter for a brokerage commission, finder's fee or like payment in connection with the offering and sale of the Shares.

(mm)     *No Registration Rights* . Except as described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, no person has the right to require the Company or any of its subsidiaries to register any securities for sale under the Securities Act by reason of the filing of the Registration Statement with the Commission, the issuance and sale of the Shares by the Company.

(nn)     *No Stabilization.* Neither the Company nor any of its subsidiaries has taken, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(oo)     *Margin Rules* . Neither the issuance, sale and delivery of the Shares nor the application of the proceeds thereof by the Company as described in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus will violate Regulation T, U or X of the Board of Governors of the Federal Reserve System or any other regulation of such Board of Governors.

(pp)     *Forward-Looking Statements.* No forward-looking statement (within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act) included or incorporated by reference in any of the Registration Statement, the Pricing Disclosure Package or the Prospectus has been made or reaffirmed without a reasonable basis or has been disclosed other than in good faith.

(qq)     *Statistical and Market Data.* Nothing has come to the attention of the Company that has caused the Company to believe that the statistical and market-related data included in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus is not based on or derived from sources that are reliable and accurate in all material respects.

(rr)     *Sarbanes-Oxley Act* . There is and has been no failure on the part of the Company or, to the knowledge of the Company, any of the Company's directors or officers, in their capacities as such, to comply with any applicable provision of the Sarbanes-Oxley Act of 2002, as amended and the rules and regulations promulgated in connection therewith (the " **Sarbanes-Oxley Act** "), including Section 402 related to loans.

(ss)     *Status under the Securities Act* . At the time of filing the Registration Statement and any post-effective amendment thereto, at the earliest time thereafter that

the Company or any offering participant made a *bona fide* offer (within the meaning of Rule 164(h)(2) under the Securities Act) of the Shares and at the date hereof, the Company was not and is not an "ineligible issuer" as defined in Rule 405 under the Securities Act.

(tt)     *No Ratings* . There are (and prior to the Closing Date, will be) no debt securities, convertible securities or preferred shares issued or guaranteed by the Company or any of its subsidiaries that are rated by a "nationally recognized statistical rating organization", as such term is defined in Section 3(a)(62) under the Exchange Act.

(uu)     *Transfer Taxes* . Except for any net income, capital gains or franchise taxes that may be imposed on the Underwriters by the State of Israel or taxing authority thereof as a result of any present or former connection (other than any connection resulting from the transactions contemplated by this Agreement) between the Underwriters and the State of Israel, no stamp duties or other issuance or transfer taxes are payable by or on behalf of the Underwriters or otherwise imposed on any payments made to the Underwriters, in the State of Israel or any political subdivision or taxing authority thereof solely in connection with (A) the execution, delivery and performance of this Agreement, (B) the issuance or sale and delivery of the Shares in the manner contemplated by this Agreement and the Prospectus or (C) the sale and delivery by the Underwriters of the Shares as contemplated herein and in the Prospectus.

(vv)     *Israeli Tax Benefits.* (i) The Company is in compliance with all conditions and requirements stipulated by the instruments of approval and tax ruling (the " **Ruling** ") granted to it with respect to "Benefited Enterprise" (" **Tax Incentive Program** ") status of the Company and/or any of its facilities as well as with respect to the other tax benefits received by the Company as set forth under the caption "Israeli Tax Considerations and Government Programs" in the Prospectus and by Israeli laws and regulations relating to its Tax Incentive Program and the aforementioned other tax benefits received by the Company; (ii) all information supplied by the Company with respect to applications relating to its Tax Incentive Program (including in connection with the Ruling) was true, correct and complete when supplied to the appropriate authorities; and (iii) the Company has not received any notice of any proceeding or investigation relating to revocation or modification of any of its current or past Tax Incentive Program granted with respect to the Company and/or any of its facilities, in each case except for any failure to comply, inaccuracy or notice (as appropriate) that would not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(ww)     *No Immunity* . Neither the Company nor any of its subsidiaries or their properties or assets has immunity under the State of Israel, U.S. federal or New York state law from any legal action, suit or proceeding, from the giving of any relief in any such legal action, suit or proceeding, from set-off or counterclaim, from the jurisdiction of the State of Israel, U.S. federal or New York state court, from service of process, attachment upon or prior to judgment, or attachment in aid of execution of judgment, or from execution of a judgment, or other legal process or proceeding for the giving of any relief

- 19 -

or for the enforcement of a judgment, in any such court with respect to their respective obligations, liabilities or any other matter under or arising out of or in connection herewith; and, to the extent that the Company or any of its subsidiaries or any of its properties, assets or revenues may have or may hereafter become entitled to any such right of immunity in any such court in which proceedings arising out of, or relating to the transactions contemplated by this Agreement, may at any time be commenced, the Company has, pursuant to Section 17(d) of this Agreement, waived, and it will waive, or will cause its subsidiaries to waive, such right to the extent permitted by law.

(xx)    *Enforcement of Foreign Judgments* . Any final judgment for a fixed or determined sum of money rendered by any U.S. federal or New York state court located in the State of New York having jurisdiction under its own laws in respect of any suit, action or proceeding against the Company based upon this Agreement are enforceable against the Company by the courts of the State of Israel, without reconsideration or reexamination of the merits, subject to the limitations described in the Registration Statement under "Enforceability of Civil Liabilities."

(yy)    *Valid Choice of Law* . The choice of laws of the State of New York as the governing law of this Agreement is a valid choice of law under the laws of the State of Israel and would be enforceable by the courts of the State of Israel, subject to the restrictions described under the caption "Enforceability of Civil Liabilities" in the Registration Statement, the Pricing Disclosure Package and the Prospectus. The Company has the power to submit, and pursuant to Section 17(b) of this Agreement, has legally, validly, effectively and irrevocably submitted, to the personal jurisdiction of each New York state and United States federal court sitting in the City of New York and has validly and irrevocably waived any objection to the laying of venue of any suit, action or proceeding brought in such court.

(zz)    *Passive Foreign Investment Company* . Subject to the limitations, qualifications, and assumptions described in the Registration Statement, the Pricing Disclosure Package and the Prospectus and based on the Company's current projected income, assets and activities, as well as the expectation that it may be a "controlled foreign corporation," the Company believes that it may be classified as a "passive foreign investment company" for the taxable year ending December 31, 2019.

(aaa)    *Dividends* . Except as disclosed in the Registration Statement, the Pricing Disclosure Package and the Prospectus, (i) no approvals are currently required under the laws of the State of Israel in order for the Company to pay dividends or other distributions declared by the Company to the holders of Shares assuming the Company has sufficient profits for distribution under the Companies Law, and (ii) under current laws and regulations of the State of Israel, any amount payable with respect to the Shares upon liquidation of the Company or upon redemption thereof and dividends and other distributions declared and payable on the share capital of the Company may be paid by the Company in United States dollars or euros and freely transferred out of the State of Israel, subject to payment of applicable withholding taxes or an exemption therefrom.

(bbb)     *Legality* . The legality, validity, enforceability or admissibility into evidence of any of the Registration Statement, the Pricing Disclosure Package, the Prospectus, this Agreement or the Shares in any jurisdiction in which the Company is organized or does business is not dependent upon such document being submitted into, filed or recorded with any court or other authority in any such jurisdiction on or before the date hereof or that any tax, imposition or charge be paid in any such jurisdiction on or in respect of any such document.

(ccc)     *Legal Action* . A holder of the Shares and each Underwriter are each entitled to sue as plaintiff in the court of the jurisdiction of formation and domicile of the Company for the enforcement of their respective rights under this Agreement and the Shares and such access to such courts will not be subject to any conditions which are not applicable to residents of such jurisdiction or a company incorporated in such jurisdiction except that plaintiffs not residing in the State of Israel may be required to guarantee payment of a possible order for payment of costs or damages at the request of the defendant.

(ddd)     *Foreign Issuer* . The Company is a "foreign private issuer" as defined in Rule 405 under the Securities Act and eligible to use Form F-1.

4.     <u>Further Agreements of the Company</u> . The Company covenants and agrees with each Underwriter that:

(a)     *Required Filings.* The Company will file the final Prospectus with the Commission within the time periods specified by Rule 424(b) and Rule 430A, 430B or 430C under the Securities Act, will file any Issuer Free Writing Prospectus to the extent required by Rule 433 under the Securities Act; and the Company will furnish copies of the Prospectus and each Issuer Free Writing Prospectus (to the extent not previously delivered) to the Underwriters in New York City on the business day next succeeding the date of this Agreement in such quantities as the Representatives may reasonably request.

(b)     *Delivery of Copies.* The Company will deliver, without charge, (i) to the Representatives, three signed copies of the Registration Statement as originally filed and each amendment thereto, in each case including all exhibits and consents filed therewith; and (ii) to each Underwriter (A) a conformed copy of the Registration Statement as originally filed and each amendment thereto (without exhibits) and (B) during the Prospectus Delivery Period (as defined below), as many copies of the Prospectus (including all amendments and supplements thereto and each Issuer Free Writing Prospectus) as the Representatives may reasonably request. As used herein, the term " **Prospectus Delivery Period** " means such period of time after the first date of the public offering of the Shares as in the opinion of counsel for the Underwriters a prospectus relating to the Shares is required by law to be delivered (or required to be delivered but for Rule 172 under the Securities Act) in connection with sales of the Shares by any Underwriter or dealer.

(c)     *Amendments or Supplements, Issuer Free Writing Prospectuses.* Before preparing, using, authorizing, approving, referring to or filing any Issuer Free Writing Prospectus, and before filing any amendment or supplement to the Registration Statement or the Prospectus, the Company will furnish to the Representatives and counsel for the Underwriters a copy of the proposed Issuer Free Writing Prospectus, amendment or supplement for review and will not prepare, use, authorize, approve, refer to or file any such Issuer Free Writing Prospectus or file any such proposed amendment or supplement to which the Representatives reasonably object in a timely manner prior to using, referring to or filing such Issuer Free Writing Prospectus.

(d)     *Notice to the Representatives.* The Company will advise the Representatives promptly, and confirm such advice in writing, (i) when the Registration Statement has become effective; (ii) when any amendment to the Registration Statement has been filed or becomes effective; (iii) when any supplement to the Prospectus, any Issuer Free Writing Prospectus or any Written Testing-the-Waters Communication or any amendment to the Prospectus has been filed or distributed; (iv) of any request by the Commission for any amendment to the Registration Statement or any amendment or supplement to the Prospectus or the receipt of any comments from the Commission relating to the Registration Statement or any other request by the Commission for any additional information including, but not limited to, any request for information concerning any Testing-the-Waters Communication; (v) of the issuance by the Commission or any other governmental or regulatory authority of any order suspending the effectiveness of the Registration Statement or preventing or suspending the use of any Preliminary Prospectus, any of the Pricing Disclosure Package, or the Prospectus or any Written Testing-the-Waters Communication or the initiation or threatening of any proceeding for that purpose or pursuant to Section 8A of the Securities Act; (vi) of the occurrence of any event or development within the Prospectus Delivery Period as a result of which the Prospectus, any of the Pricing Disclosure Package, or any Issuer Free Writing Prospectus or any Written Testing-the-Waters Communication as then amended or supplemented would include any untrue statement of a material fact or omit to state a material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Prospectus, the Pricing Disclosure Package, or any such Issuer Free Writing Prospectus or any Written Testing-the-Waters Communication is delivered to a purchaser, not misleading; and (vii) of the receipt by the Company of any notice with respect to any suspension of the qualification of the Shares for offer and sale in any jurisdiction or the initiation or threatening of any proceeding for such purpose; and the Company will use its reasonable best efforts to prevent the issuance of any such order suspending the effectiveness of the Registration Statement, preventing or suspending the use of any Preliminary Prospectus, any of the Pricing Disclosure Package or the Prospectus or any Written Testing-the-Waters Communication or suspending any such qualification of the Shares and, if any such order is issued, will use its reasonable best efforts to obtain as soon as possible the withdrawal thereof.

(e)     *Ongoing Compliance.* (1) If during the Prospectus Delivery Period (i) any event or development shall occur or condition shall exist as a result of which the

Prospectus as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Prospectus is delivered to a purchaser, not misleading or (ii) it is necessary to amend or supplement the Prospectus to comply with law, the Company will promptly notify the Underwriters thereof and forthwith prepare and, subject to paragraph (c) above, file with the Commission and furnish to the Underwriters and to such dealers as the Representatives may designate such amendments or supplements to the Prospectus as may be necessary so that the statements in the Prospectus as so amended or supplemented will not, in the light of the circumstances existing when the Prospectus is delivered to a purchaser, be misleading or so that the Prospectus will comply with law and (2) if at any time prior to the Closing Date (i) any event or development shall occur or condition shall exist as a result of which the Pricing Disclosure Package as then amended or supplemented would include any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements therein, in the light of the circumstances existing when the Pricing Disclosure Package is delivered to a purchaser, not misleading or (ii) it is necessary to amend or supplement the Pricing Disclosure Package to comply with law, the Company will promptly notify the Underwriters thereof and forthwith prepare and, subject to paragraph (c) above, file with the Commission (to the extent required) and furnish to the Underwriters and to such dealers as the Representatives may designate, such amendments or supplements to the Pricing Disclosure Package as may be necessary so that the statements in the Pricing Disclosure Package as so amended or supplemented will not, in the light of the circumstances existing when the Pricing Disclosure Package is delivered to a purchaser, be misleading or so that the Pricing Disclosure Package will comply with law.

(f)     *Blue Sky Compliance.* The Company will qualify the Shares for offer and sale under the securities or Blue Sky laws of such jurisdictions as the Representatives shall reasonably request and will continue such qualifications in effect so long as required for distribution of the Shares; <u>provided</u> that the Company shall not be required to (i) qualify as a foreign corporation or other entity or as a dealer in securities in any such jurisdiction where it would not otherwise be required to so qualify, (ii) file any general consent to service of process in any such jurisdiction or (iii) subject itself to taxation in any such jurisdiction if it is not otherwise so subject.

(g)     *Earning Statement.* The Company will make generally available to its security holders and the Representatives as soon as practicable an earning statement that satisfies the provisions of Section 11(a) of the Securities Act and Rule 158 of the Commission promulgated thereunder covering a period of at least twelve months beginning with the first fiscal quarter of the Company occurring after the "effective date" (as defined in Rule 158) of the Registration Statement.

(h)     *Clear Market.* For a period of 180 days after the date of the Prospectus, the Company will not (i) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to

- 23 -

purchase, or otherwise transfer or dispose of, directly or indirectly, or, except in the case of a registration statement on Form S-8, submit to, or file with, the Commission a registration statement under the Securities Act relating to, any Securities or any securities convertible into or exercisable or exchangeable for Securities, or publicly disclose the intention to make any offer, sale, pledge, disposition, submission or filing, or (ii) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of the Securities or any such other securities, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Securities or such other securities, in cash or otherwise, without the prior written consent of J.P. Morgan Securities LLC, other than (i) the Shares to be sold hereunder, (ii) pursuant to Company Share Plans described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, (iii) pursuant to currently outstanding options, warrants or rights issued under one of those plans or described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, (iv) pursuant to employee share purchase plans described in the Registration Statement, the Pricing Disclosure Package and the Prospectus, (v) upon the conversion of outstanding preferred stock as set forth in the Pricing Disclosure Package, or (vi) the issuance of Shares in connection with the acquisition by the Company of the securities, businesses, property or other assets of another person or entity or in connection with strategic partnering transactions; provided that, in the case of subclause (vi), the aggregate number of shares issued or issuable in all such acquisitions and transactions does not exceed 10% of the outstanding ordinary shares of the Company immediately following the offering of the Shares and prior to any issuance the Company shall cause each recipient of such shares to execute and deliver to the Representatives a lock-up agreement substantially in the form of agreement attached hereto as Exhibit A (a " **Lock-Up Agreement** ").

If J.P. Morgan Securities LLC, in its sole discretion, agrees to release or waive the restrictions set forth in a lock-up letter described in Section 6(m) hereof for an officer or director of the Company and provides the Company with notice of the impending release or waiver substantially in the form of Exhibit B hereto at least three business days before the effective date of the release or waiver, the Company agrees to announce the impending release or waiver by a press release substantially in the form of Exhibit C hereto through a major news service at least two business days before the effective date of the release or waiver.

(i) *Use of Proceeds.* The Company will apply the net proceeds from the sale of the Shares as described in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus under the heading "Use of Proceeds".

(j) *No Stabilization.* Neither the Company nor its subsidiaries will take, directly or indirectly, any action designed to or that would reasonably be expected to cause or result in any stabilization or manipulation of the price of the Shares.

(k) *Exchange Listing.* The Company will use its reasonable best efforts to list, subject to notice of issuance, the Shares on the NYSE (the " **Exchange** ").

(l)    *Reports.* For a period of three years from the date of this Agreement, so long as the Shares are outstanding, the Company will furnish to the Representatives, as soon as they are available, copies of all reports or other communications (financial or other) made publicly available to holders of the Shares, and copies of any reports and financial statements furnished to or filed with the Commission or any national securities exchange or automatic quotation system; *provided* the Company will be deemed to have furnished such reports and financial statements to the Representatives to the extent they are filed on the Commission's Electronic Data Gathering, Analysis, and Retrieval system.

(m)    *Record Retention* . The Company will, pursuant to reasonable procedures developed in good faith, retain copies of each Issuer Free Writing Prospectus that is not filed with the Commission in accordance with Rule 433 under the Securities Act.

(o)    *Filings.* The Company will file with the Commission such reports as may be required by Rule 463 under the Securities Act.

(p)    *Emerging Growth Company; Foreign Private Issuer* . The Company will promptly notify the Representatives if the Company ceases to be an Emerging Growth Company or a Foreign Private Issuer at any time prior to the later of (i) completion of the distribution of Shares within the meaning of the Securities Act and (ii) completion of the 180-day restricted period referred to in Section 4(h) hereof.

5.    Certain Agreements of the Underwriters . Each Underwriter hereby severally represents and agrees that:

(a)    It has not used, authorized use of, referred to or participated in the planning for use of, and will not use, authorize use of, refer to or participate in the planning for use of, any "free writing prospectus", as defined in Rule 405 under the Securities Act (which term includes use of any written information furnished to the Commission by the Company and not incorporated by reference into the Registration Statement and any press release issued by the Company) other than (i) a free writing prospectus that contains no "issuer information" (as defined in Rule 433(h)(2) under the Securities Act) that was not included (including through incorporation by reference) in the Preliminary Prospectus or a previously filed Issuer Free Writing Prospectus, (ii) any Issuer Free Writing Prospectus listed on Annex A or prepared pursuant to Section 3(c) or Section 4(c) above (including any electronic road show), or (iii) any free writing prospectus prepared by such underwriter and approved by the Company in advance in writing (each such free writing prospectus referred to in clauses (i) or (iii), an " **Underwriter Free Writing Prospectus** ").

(b)    It has not and will not, without the prior written consent of the Company, use any free writing prospectus that contains the final terms of the Shares unless such terms have previously been included in a free writing prospectus filed with the Commission; provided that Underwriters may use a term sheet substantially in the form of Annex C hereto without the consent of the Company; provided further that any Underwriter using such term sheet shall notify the Company, and provide a copy of such

term sheet to the Company, prior to, or substantially concurrently with, the first use of such term sheet.

(c)    It is not subject to any pending proceeding under Section 8A of the Securities Act with respect to the offering (and will promptly notify the Company if any such proceeding against it is initiated during the Prospectus Delivery Period).

(d)    Other than as set forth in this Section 5(d), it will not offer any Shares to offerees in Israel, other than to investors listed in the First Addendum to the Israeli Securities Law (the " **Addendum** "), and in all cases subject to the prior written consent of the Company. The Company acknowledges, understands and agrees that Shares may be sold in Israel only by the Underwriters and only to such Israeli investors listed in the Addendum (and, subject to the prior written consent of the Company, to certain other investors who are not institutional investors in such number as shall be exempt from prospectus requirements under the Israeli Securities Law); all of whom are to be specifically identified and approved by the Underwriters, and provided further that as a prerequisite to any sale of Shares by the Underwriters to such Israeli investors, each of them shall be required to submit written confirmation to the Underwriters and the Company that such investor (i) falls within the scope of the Addendum, is aware of its meaning and agrees thereto; and (ii) is acquiring the Shares being offered to it for investment for its own account or, if applicable and permitted under the terms of the Addendum, for investment for clients who are institutional investors and who are listed in the Addendum and in any event not as a nominee, market maker or agent and not with a view to, or for the resale in connection with, any distribution thereof. The Underwriters and the Company acknowledge and agree that any failure to comply with the above procedure may result in a default under Israeli Securities Law.

6.    <u>Conditions of Underwriters' Obligations.</u> The obligation of each Underwriter to purchase the Underwritten Shares on the Closing Date or the Option Shares on the Additional Closing Date, as the case may be, as provided herein is subject to the performance by the Company of its covenants and other obligations hereunder and to the following additional conditions:

(a)    *Registration Compliance; No Stop Order.* No order suspending the effectiveness of the Registration Statement shall be in effect, and no proceeding for such purpose or pursuant to Section 8A under the Securities Act shall be pending before or threatened by the Commission; the Prospectus and each Issuer Free Writing Prospectus shall have been timely filed with the Commission under the Securities Act (in the case of an Issuer Free Writing Prospectus, to the extent required by Rule 433 under the Securities Act) and in accordance with Section 4(a) hereof; and all requests by the Commission for additional information shall have been complied with to the reasonable satisfaction of the Representatives.

(b)    *Representations and Warranties.* The representations and warranties of the Company contained herein shall be true and correct on the date hereof and on and as of the Closing Date or the Additional Closing Date, as the case may be; and the

statements of the Company and its officers made in any certificates delivered pursuant to this Agreement shall be true and correct on and as of the Closing Date or the Additional Closing Date, as the case may be.

(c)  *No Material Adverse Change.* No event or condition of a type described in Section 3(h) hereof shall have occurred or shall exist, which event or condition is not described in the Pricing Disclosure Package (excluding any amendment or supplement thereto) and the Prospectus (excluding any amendment or supplement thereto) and the effect of which in the judgment of the Representatives makes it impracticable or inadvisable to proceed with the offering, sale or delivery of the Shares on the Closing Date or the Additional Closing Date, as the case may be, on the terms and in the manner contemplated by this Agreement, the Pricing Disclosure Package and the Prospectus.

(d)  *Officer's Certificate.* The Representatives shall have received on and as of the Closing Date or the Additional Closing Date, as the case may be, a certificate of the chief financial officer or chief accounting officer of the Company and one additional senior executive officer of the Company who is satisfactory to the Representatives (i) confirming that such officers have carefully reviewed the Registration Statement, the Pricing Disclosure Package and the Prospectus and, to the knowledge of such officers, the representations of the Company set forth in Sections 3(b) and 3(d) hereof are true and correct, (ii) confirming that the other representations and warranties of the Company in this Agreement are true and correct and that the Company has complied with all agreements and satisfied all conditions on its part to be performed or satisfied hereunder at or prior to the Closing Date or the Additional Closing Date, as the case may be, and (iii) to the effect set forth in paragraphs (a) and (c) above.

(e)  *Comfort Letters.* (i) On the date of this Agreement and on the Closing Date or the Additional Closing Date, as the case may be, Kesselman & Kesselman, a member firm of PricewaterhouseCoopers International Limited, shall have furnished to the Representatives, at the request of the Company, letters, dated the respective dates of delivery thereof and addressed to the Underwriters, in form and substance reasonably satisfactory to the Representatives, containing statements and information of the type customarily included in accountants' "comfort letters" to underwriters with respect to the financial statements and certain financial information contained in each of the Registration Statement, the Pricing Disclosure Package and the Prospectus; provided, that the letter delivered on the Closing Date or the Additional Closing Date, as the case may be, shall use a "cut-off" date no more than two business days prior to such Closing Date or such Additional Closing Date, as the case may be.

(ii) On the date of this Agreement and on the Closing Date or the Additional Closing Date, as the case may be, the Company shall have furnished to the Representatives a certificate, dated the respective dates of delivery thereof and addressed to the Underwriters, of its chief financial officer with respect to certain financial data contained in the Pricing Disclosure Package and the Prospectus, providing "management

comfort" with respect to such information, in form and substance reasonably satisfactory to the Representatives.

(f)     *Opinion and 10b-5 Statement of U.S. Counsel for the Company.* White & Case LLP, U.S. counsel for the Company, shall have furnished to the Representatives, at the request of the Company, their written opinion and 10b-5 statement, dated the Closing Date or the Additional Closing Date, as the case may be, and addressed to the Underwriters, in form and substance reasonably satisfactory to the Representatives.

(g)     *Opinion of Israeli Counsel for the Company.* Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co., counsel for the Company, shall have furnished to the Representatives, at the request of the Company, their written opinion, dated the Closing Date or the Additional Closing Date, as the case may be, and addressed to the Underwriters, in form and substance reasonably satisfactory to the Representatives.

(h)     *Opinion and 10b-5 Statement of U.S. Counsel for the Underwriters.* The Representatives shall have received on and as of the Closing Date or the Additional Closing Date, as the case may be, an opinion and 10b-5 statement, addressed to the Underwriters, of Goodwin Procter LLP, counsel for the Underwriters, with respect to such matters as the Representatives may reasonably request, and such counsel shall have received such documents and information as they may reasonably request to enable them to pass upon such matters.

(i)     *Opinion of Israeli Counsel for the Underwriters.* The Representatives shall have received on and as of the Closing Date or the Additional Closing Date, as the case may be, an opinion, addressed to the Underwriters, of Goldfarb Seligman & Co., counsel for the Underwriters, with respect to such matters as the Representatives may reasonably request, and such counsel shall have received such documents and information as they may reasonably request to enable them to pass upon such matters.

(j)     *No Legal Impediment to Issuance and/or Sale.* No action shall have been taken and no statute, rule, regulation or order shall have been enacted, adopted or issued by any United States federal, state or non-United States governmental or regulatory authority that would, as of the Closing Date or the Additional Closing Date, as the case may be, prevent the issuance or sale of the Shares by the Company; and no injunction or order of any United States federal, state or non-United States court shall have been issued that would, as of the Closing Date or the Additional Closing Date, as the case may be, prevent the issuance or sale of the Shares by the Company.

(k)     *Good Standing .* The Representatives shall have received on and as of the Closing Date or the Additional Closing Date, as the case may be, satisfactory evidence of the good standing of the Company and its subsidiaries in their respective jurisdictions of organization and their good standing in such other jurisdictions as the Representatives may reasonably request, in each case in writing or any standard form of telecommunication from the appropriate governmental authorities of such jurisdictions and to the extent applicable in such jurisdiction. Notwithstanding the foregoing, for

purposes of providing satisfactory evidence of good standing in Israel the Company and its subsidiaries, as applicable, shall only be required to provide evidence that it has not been designated as a "breaching company" (within the meaning of the Israeli Companies Law, 1999) by the Registrar of Companies of the State of Israel and there is no basis for such designation.

(l)     *Exchange Listing.* The Shares to be delivered on the Closing Date or the Additional Closing Date, as the case may be, shall have been approved for listing on the Exchange, subject to official notice of issuance.

(m)     *Lock-up Agreements* . The "lock-up" agreements, each substantially in the form of Exhibit D hereto, between you and certain shareholders, officers and directors of the Company relating to sales and certain other dispositions of Securities or certain other securities, delivered to you on or before the date hereof, shall be full force and effect on the Closing Date or the Additional Closing Date, as the case may be.

(n)     *Additional Documents.* On or prior to the Closing Date or the Additional Closing Date, as the case may be, the Company shall have furnished to the Representatives such further certificates and documents as the Representatives may reasonably request.

All opinions, letters, certificates and evidence mentioned above or elsewhere in this Agreement shall be deemed to be in compliance with the provisions hereof only if they are in form and substance reasonably satisfactory to counsel for the Underwriters.

7.     Indemnification and Contribution .

(a)     *Indemnification of the Underwriters by the Company.* The Company agrees to indemnify and hold harmless each Underwriter, its affiliates, directors and officers and each person, if any, who controls such Underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, from and against any and all losses, claims, damages and liabilities (including, without limitation, reasonable legal fees and other reasonable expenses incurred in connection with any suit, action or proceeding or any claim asserted, as such fees and expenses are incurred), joint or several, that arise out of, or are based upon, (i) any untrue statement or alleged untrue statement of a material fact contained in the Registration Statement or caused by any omission or alleged omission to state therein a material fact required to be stated therein or necessary in order to make the statements therein, not misleading, or (ii) any untrue statement or alleged untrue statement of a material fact contained in the Prospectus (or any amendment or supplement thereto), any Preliminary Prospectus, any Issuer Free Writing Prospectus, any "issuer information" filed or required to be filed pursuant to Rule 433(d) under the Securities Act, any Written Testing-the-Waters Communication, any road show as defined in Rule 433(h) under the Securities Act (a " **road show** ") or any Pricing Disclosure Package (including any Pricing Disclosure Package that has subsequently been amended), or caused by any omission or alleged omission to state therein a material fact necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading, in each case except insofar as such losses, claims, damages or liabilities arise out of, or are based

- 29 -

upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to any Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use therein, it being understood and agreed that the only such information furnished by any Underwriter consists of the information described as such in subsection (b) below.

(b)     *Indemnification of the Company.* Each Underwriter agrees, severally and not jointly, to indemnify and hold harmless the Company, its directors, its officers who signed the Registration Statement and each person, if any, who controls the Company within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act to the same extent as the indemnity set forth in paragraph (a) above, but only with respect to any losses, claims, damages or liabilities that arise out of, or are based upon, any untrue statement or omission or alleged untrue statement or omission made in reliance upon and in conformity with any information relating to such Underwriter furnished to the Company in writing by such Underwriter through the Representatives expressly for use in the Registration Statement, the Prospectus (or any amendment or supplement thereto), any Preliminary Prospectus, any Issuer Free Writing Prospectus, any Written Testing-the-Waters Communication, any road show or any Pricing Disclosure Package (including any Pricing Disclosure Package that has subsequently been amended), it being understood and agreed upon that the only such information furnished by any Underwriter consists of the following information in the Preliminary Prospectus and the Prospectus furnished on behalf of each Underwriter: the statements regarding delivery of shares by the Underwriters set forth on the cover page, and the concession and reallowance figures appearing in the third paragraph under the caption "Underwriting", and the information contained in the twelfth and thirteenth paragraphs relating to stabilization transactions under the caption "Underwriting".

(c)     *Notice and Procedures.* If any suit, action, proceeding (including any governmental or regulatory investigation), claim or demand shall be brought or asserted against any person in respect of which indemnification may be sought pursuant to the preceding paragraphs of this Section 7, such person (the " **Indemnified Person** ") shall promptly notify the person against whom such indemnification may be sought (the " **Indemnifying Person** ") in writing; provided that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have under the preceding paragraphs of this Section 7 except to the extent that it has been materially prejudiced (through the forfeiture of substantive rights or defenses) by such failure; and provided, further, that the failure to notify the Indemnifying Person shall not relieve it from any liability that it may have to an Indemnified Person otherwise than under the preceding paragraphs of this Section 7. If any such proceeding shall be brought or asserted against an Indemnified Person and it shall have notified the Indemnifying Person thereof, the Indemnifying Person shall retain counsel reasonably satisfactory to the Indemnified Person (who shall not, without the consent of the Indemnified Person, be counsel to the Indemnifying Person) to represent the Indemnified Person and any others entitled to indemnification pursuant to this Section that the Indemnifying Person may designate in such proceeding and shall pay the reasonable fees and expenses in such proceeding and shall pay the reasonable fees and expenses of such counsel related to such proceeding, as incurred. In any such proceeding, any Indemnified Person shall have the right to retain its own counsel, but the fees and expenses of

- 30 -

such counsel shall be at the expense of such Indemnified Person unless (i) the Indemnifying Person and the Indemnified Person shall have mutually agreed to the contrary; (ii) the Indemnifying Person has failed within a reasonable time to retain counsel reasonably satisfactory to the Indemnified Person; (iii) the Indemnified Person shall have reasonably concluded that there may be legal defenses available to it that are different from or in addition to those available to the Indemnifying Person; or (iv) the named parties in any such proceeding (including any impleaded parties) include both the Indemnifying Person and the Indemnified Person and representation of both parties by the same counsel would be inappropriate due to actual or potential differing interests between them. It is understood and agreed that the Indemnifying Person shall not, in connection with any proceeding or related proceeding in the same jurisdiction, be liable for the reasonable fees and expenses of more than one separate firm (in addition to any local counsel which shall be limited to one firm in each jurisdiction) for all Indemnified Persons, and that all such reasonable fees and expenses shall be paid or reimbursed as they are incurred upon receipt from the Indemnified Person of a written request for payment thereof accompanied by a written statement with reasonable supporting detail of such fees and expenses. Any such separate firm for any Underwriter, its affiliates, directors and officers and any control persons of such Underwriter shall be designated in writing by the Representatives, any such separate firm for the Company, its directors, its officers who signed the Registration Statement and any control persons of the Company shall be designated in writing by the Company. The Indemnifying Person shall not be liable for any settlement of any proceeding effected without its written consent, but if settled with such consent, the Indemnifying Person agrees to indemnify each Indemnified Person from and against any loss or liability by reason of such settlement. Notwithstanding the foregoing sentence, if at any time an Indemnified Person shall have requested that an Indemnifying Person reimburse the Indemnified Person for fees and expenses of counsel as contemplated by this paragraph, the Indemnifying Person shall be liable for any settlement of any proceeding effected without its written consent if (i) such settlement is entered into in good faith by the Indemnified Person more than 60 days after receipt by the Indemnifying Person of such request, (ii) such Indemnifying Person shall have reasonable notice of the terms of such settlement at least 30 days prior to such settlement being entered into and (iii) the Indemnifying Person shall not have reimbursed the Indemnified Person in accordance with such request prior to the date of such settlement. No Indemnifying Person shall, without the written consent of the Indemnified Person, effect any settlement of any pending or threatened proceeding in respect of which any Indemnified Person is or could have been a party and indemnification could have been sought hereunder by such Indemnified Person, unless such settlement (x) includes an unconditional release of such Indemnified Person, in form and substance reasonably satisfactory to such Indemnified Person, from all liability on claims that are the subject matter of such proceeding and (y) does not include any statement as to or any admission of fault, culpability or a failure to act by or on behalf of any Indemnified Person.

(d)     *Contribution.* If the indemnification provided for in paragraphs (a) or (b) above is unavailable to an Indemnified Person or insufficient in respect of any losses, claims, damages or liabilities referred to therein, then each Indemnifying Person under such paragraph, in lieu of indemnifying such Indemnified Person thereunder, shall contribute to the amount paid or payable by such Indemnified Person as a result of such losses, claims, damages or liabilities (i) in such proportion as is appropriate to reflect the relative benefits received by the Company, on the one

hand, and the Underwriters, on the other, from the offering of the Shares or (ii) if the allocation provided by clause (i) is not permitted by applicable law, in such proportion as is appropriate to reflect not only the relative benefits referred to in clause (i) but also the relative fault of the Company, on the one hand, and the Underwriters, on the other, in connection with the statements or omissions that resulted in such losses, claims, damages or liabilities, as well as any other relevant equitable considerations. The relative benefits received by the Company, on the one hand, and the Underwriters, on the other, shall be deemed to be in the same respective proportions as the net proceeds (before deducting expenses) received by the Company from the sale of the Shares and the total underwriting discounts and commissions received by the Underwriters in connection therewith, in each case as set forth in the table on the cover of the Prospectus, bear to the aggregate offering price of the Shares. The relative fault of the Company, on the one hand, and the Underwriters, on the other, shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the Company or by the Underwriters and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(e)    *Limitation on Liability.* The Company and the Underwriters agree that it would not be just and equitable if contribution pursuant to paragraph (d) above were determined by pro rata allocation (even if the Underwriters were treated as one entity for such purpose) or by any other method of allocation that does not take account of the equitable considerations referred to in paragraph (d) above. The amount paid or payable by an Indemnified Person as a result of the losses, claims, damages and liabilities referred to in paragraph (d) above shall be deemed to include, subject to the limitations set forth above, any legal or other expenses incurred by such Indemnified Person in connection with any such action or claim. Notwithstanding the provisions of paragraphs (d) and (e), in no event shall an Underwriter be required to contribute any amount in excess of the amount by which the total underwriting discounts and commissions received by such Underwriter with respect to the offering of the Shares exceeds the amount of any damages that such Underwriter has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission. No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The Underwriters' obligations to contribute pursuant to paragraphs (d) and (e) are several in proportion to their respective purchase obligations hereunder and not joint.

(f)    *Non-Exclusive Remedies.* The remedies provided for in this Section 7 paragraphs (a) through (e) are not exclusive and shall not limit any rights or remedies which may otherwise be available to any Indemnified Person at law or in equity.

8    Effectiveness of Agreement . This Agreement shall become effective upon the execution and delivery hereof by the parties hereto.

9.    Termination . This Agreement may be terminated in the absolute discretion of the Representatives, by notice to the Company, if after the execution and delivery of this Agreement and prior to the Closing Date or, in the case of the Option Shares, prior to the Additional Closing

Date (i) trading generally shall have been suspended or materially limited on or by any of the New York Stock Exchange or The Nasdaq Stock Market; (ii) trading of any securities issued or guaranteed by the Company shall have been suspended on any exchange or in any over-the-counter market; (iii) a general moratorium on commercial banking activities shall have been declared by United States federal or New York State authorities or comparable authorities in the State of Israel; or (iv) there shall have occurred any outbreak or escalation of hostilities or any change in financial markets or any calamity or crisis, either within or outside the United States, that, in the judgment of the Representatives, is material and adverse and makes it impracticable or inadvisable to proceed with the offering, sale or delivery of the Shares on the Closing Date or the Additional Closing Date, as the case may be, on the terms and in the manner contemplated by this Agreement, the Pricing Disclosure Package and the Prospectus.

10.     Defaulting Underwriter .

(a)    If, on the Closing Date or the Additional Closing Date, as the case may be, any Underwriter defaults on its obligation to purchase the Shares that it has agreed to purchase hereunder on such date, the non-defaulting Underwriters may in their discretion arrange for the purchase of such Shares by other persons satisfactory to the Company on the terms contained in this Agreement. If, within 36 hours after any such default by any Underwriter, the non-defaulting Underwriters do not arrange for the purchase of such Shares, then the Company shall be entitled to a further period of 36 hours within which to procure other persons satisfactory to the non-defaulting Underwriters to purchase such Shares on such terms. If other persons become obligated or agree to purchase the Shares of a defaulting Underwriter, either the non-defaulting Underwriters or the Company may postpone the Closing Date or the Additional Closing Date, as the case may be, for up to five full business days in order to effect any changes that in the opinion of counsel for the Company or counsel for the Underwriters may be necessary in the Registration Statement and the Prospectus or in any other document or arrangement, and the Company agrees to promptly prepare any amendment or supplement to the Registration Statement and the Prospectus that effects any such changes. As used in this Agreement, the term " **Underwriter** " includes, for all purposes of this Agreement unless the context otherwise requires, any person not listed in Schedule 1 hereto that, pursuant to this Section 10, purchases Shares that a defaulting Underwriter agreed but failed to purchase.

(b)    If, after giving effect to any arrangements for the purchase of the Shares of a defaulting Underwriter or Underwriters by the non-defaulting Underwriters, the Company as provided in paragraph (a) above, the aggregate number of Shares that remain unpurchased on the Closing Date or the Additional Closing Date, as the case may be, does not exceed one-eleventh of the aggregate number of Shares to be purchased on such date, then the Company shall have the right to require each non-defaulting Underwriter to purchase the number of Shares that such Underwriter agreed to purchase hereunder on such date plus such Underwriter's pro rata share (based on the number of Shares that such Underwriter agreed to purchase on such date) of the Shares of such defaulting Underwriter or Underwriters for which such arrangements have not been made.

(c)     If, after giving effect to any arrangements for the purchase of the Shares of a defaulting Underwriter or Underwriters by the non-defaulting Underwriters, the Company as provided in paragraph (a) above, the aggregate number of Shares that remain unpurchased on the Closing Date or the Additional Closing Date, as the case may be, exceeds one-eleventh of the aggregate amount of Shares to be purchased on such date, or if the Company shall not exercise the right described in paragraph (b) above, then this Agreement or, with respect to any Additional Closing Date, the obligation of the Underwriters to purchase Shares on the Additional Closing Date, as the case may be, shall terminate without liability on the part of the non-defaulting Underwriters. Any termination of this Agreement pursuant to this Section 10 shall be without liability on the part of the Company, except that the Company will continue to be liable for the payment of expenses as set forth in Section 11 hereof and except that the provisions of Section 7 hereof shall not terminate and shall remain in effect.

(d)     Nothing contained herein shall relieve a defaulting Underwriter of any liability it may have to the Company or any non-defaulting Underwriter for damages caused by its default.

11.     <u>Payment of Expenses</u> .

(a)     Whether or not the transactions contemplated by this Agreement are consummated or this Agreement is terminated, the Company will pay or cause to be paid all costs and expenses incident to the performance of its obligations hereunder, including without limitation, (i) the costs incident to the authorization, issuance, sale, preparation and delivery of the Shares to the Underwriters and any taxes payable in that connection; (ii) the costs incident to the preparation, printing and filing under the Securities Act of the Registration Statement, the Preliminary Prospectus, any Issuer Free Writing Prospectus, any Pricing Disclosure Package and the Prospectus (including all exhibits, amendments and supplements thereto) and the distribution thereof solely to the Underwriters; (iii) the costs of reproducing and distributing this Agreement; (iv) the fees and expenses of the Company's counsel and independent accountants; (v) the fees and expenses incurred in connection with the registration or qualification and determination of eligibility for investment of the Shares under the laws of such jurisdictions as the Representatives may designate and the preparation, printing and distribution of a Blue Sky Memorandum (including the related fees and expenses of counsel for the Underwriters) in an amount that, when taken together with any fees and expenses of counsel to the Underwriters pursuant to clause (viii), is not greater than $30,000; (vi) the cost of preparing stock certificates; (vii) the costs and charges of any transfer agent and any registrar; (viii) all expenses and application fees incurred in connection with any filing with, and clearance of the offering by, FINRA, in an amount that, when taken together with any fees and expenses of counsel to the Underwriters pursuant to clause (v), is not greater than $30,000; (ix) all expenses incurred by the Company in connection with any "road show" presentation to potential investors (provided that the cost of any aircraft chartered for the road show shall be borne 50% by the Underwriters); and (x) all expenses and application fees related to the listing of the Shares on the Exchange.

(b)     If (i) this Agreement is terminated pursuant to clause (i) or (ii) of Section 9, (ii) the Company for any reason fails to tender the Shares for delivery to the Underwriters or (iii) the Underwriters decline to purchase the Shares for any reason permitted under this Agreement, the

Company agrees to reimburse the Underwriters for all documented out-of-pocket costs and expenses (including the fees and expenses of their counsel) reasonably incurred by the Underwriters in connection with this Agreement and the offering contemplated hereby.

12.     Persons Entitled to Benefit of Agreement . This Agreement shall inure to the benefit of and be binding upon the parties hereto and their respective successors and the officers and directors and any controlling persons referred to herein and the affiliates of each Underwriter referred to in Section 7 hereof. Nothing in this Agreement is intended or shall be construed to give any other person any legal or equitable right, remedy or claim under or in respect of this Agreement or any provision contained herein. No purchaser of Shares from any Underwriter shall be deemed to be a successor merely by reason of such purchase.

13.     Survival . The respective indemnities, rights of contribution, representations, warranties and agreements of the Company and the Underwriters contained in this Agreement or made by or on behalf of the Company or the Underwriters pursuant to this Agreement or any certificate delivered pursuant hereto shall survive the delivery of and payment for the Shares and shall remain in full force and effect, regardless of any termination of this Agreement or any investigation made by or on behalf of the Company or the Underwriters or the directors, officers, controlling persons or affiliates referred to in Section 7 hereof.

14.     Certain Defined Terms . For purposes of this Agreement, (a) except where otherwise expressly provided, the term " **affiliate** " has the meaning set forth in Rule 405 under the Securities Act; (b) the term " **business day** " means any day other than a day on which banks are permitted or required to be closed in New York City; and (c) the term " **subsidiary** " has the meaning set forth in Rule 405 under the Securities Act.

15.     Compliance with USA Patriot Act . In accordance with the requirements of the USA Patriot Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)), the Underwriters are required to obtain, verify and record information that identifies their respective clients, including the Company, which information may include the name and address of their respective clients, as well as other information that will allow the Underwriters to properly identify their respective clients.

16.     Recognition of the U.S. Special Resolution Regimes .

(a)    In the event that any Underwriter that is a Covered Entity becomes subject to a proceeding under a U.S. Special Resolution Regime, the transfer from such Underwriter of this Agreement, and any interest and obligation in or under this Agreement, will be effective to the same extent as the transfer would be effective under the U.S. Special Resolution Regime if this Agreement, and any such interest and obligation, were governed by the laws of the United States or a state of the United States.

(b)    In the event that any Underwriter that is a Covered Entity or a BHC Act Affiliate of such Underwriter becomes subject to a proceeding under a U.S. Special Resolution Regime, Default Rights under this Agreement that may be exercised against such Underwriter are permitted to be exercised to no greater extent than such Default Rights could be exercised under

the U.S. Special Resolution Regime if this Agreement were governed by the laws of the United States or a state of the United States.

(c)  For purposes of this Section 16, a " **BHC Act Affiliate** " has the meaning assigned to the term "affiliate" in, and shall be interpreted in accordance with, 12 U.S.C. § 1841(k). " **Covered Entity** " means any of the following: (i) a "covered entity" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 252.82(b); (ii) a "covered bank" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 47.3(b); or (iii) a "covered FSI" as that term is defined in, and interpreted in accordance with, 12 C.F.R. § 382.2(b). " **Default Right** " has the meaning assigned to that term in, and shall be interpreted in accordance with, 12 C.F.R. §§ 252.81, 47.2 or 382.1, as applicable. " **U.S. Special Resolution Regime** " means each of (i) the Federal Deposit Insurance Act and the regulations promulgated thereunder and (ii) Title II of the Dodd-Frank Wall Street Reform and Consumer Protection Act and the regulations promulgated thereunder.

17.  Miscellaneous .

(a)  *Notices.* All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given if mailed or transmitted and confirmed by any standard form of telecommunication. Notices to the Underwriters shall be given to the Representatives c/o J.P. Morgan Securities LLC, 383 Madison Avenue, New York, New York 10179 (fax: (212) 622-8358); Attention: Equity Syndicate Desk, c/o Barclays Capital Inc., 745 Seventh Avenue, New York, New York 10019-6801, Attention: Syndicate Registration (fax: (646) 834-8133) and c/o Jefferies LLC, 520 Madison Avenue, New York, New York, 10022 (fax: (646) 619-4437); Attention General Counsel. Notices to the Company shall be given to it at Tufin Software Technologies Ltd., 5 Shoham Street, Ramat-Gan 52521, Israel, Attention: General Counsel. (b)  *Governing Law.* This Agreement and any claim, controversy or dispute arising under or related to this Agreement shall be governed by and construed solely in accordance with the laws of the State of New York.

(b)  *Submission to Jurisdiction* . The Company hereby submits to the exclusive jurisdiction of the U.S. federal and New York state courts in the Borough of Manhattan in The City of New York in any suit or proceeding arising out of or relating to this Agreement or the transactions contemplated hereby. The Company waives any objection which it may now or hereafter have to the laying of venue of any such suit or proceeding in such courts. The Company agrees that final judgment in any such suit, action or proceeding brought in such court shall be conclusive and binding upon the Company, and may be enforced in any court to the jurisdiction of which Company is subject by a suit upon such judgment. The Company irrevocably appoints Tufin Software North America, Inc., located at 2 Oliver Street, Suite 702, Boston, Massachusetts 02109-4901, as its authorized agent upon which process may be served in any such suit or proceeding, and agrees that service of process upon such authorized agent, and written notice of such service to the Company by the person serving the same to the relevant address provided in this Section 17, shall be deemed in every respect effective service of process upon the Company in any such suit or proceeding. The Company hereby represents and warrants that such authorized agent has accepted such appointment and has agreed to act as such

authorized agent for service of process. The Company further agrees to take any and all action as may be necessary to maintain such designation and appointment of such authorized agent in full force and effect for a period of seven years from the date of this Agreement.

(c)     *Judgment Currency* . The Company agrees to indemnify each Underwriter, its directors, officers, affiliates and each person, if any, who controls such Underwriter within the meaning of Section 15 of the Securities Act or Section 20 of the Exchange Act, against any loss incurred by such Underwriter as a result of any judgment or order being given or made for any amount due hereunder and such judgment or order being expressed and paid in a currency (the " **judgment currency** ") other than U.S. dollars and as a result of any variation as between (i) the rate of exchange at which the U.S. dollar amount is converted into the judgment currency for the purpose of such judgment or order, and (ii) the rate of exchange at which such indemnified person is able to purchase U.S. dollars with the amount of the judgment currency actually received by the indemnified person. The foregoing indemnity shall constitute a separate and independent obligation of the Company and shall continue in full force and effect notwithstanding any such judgment or order as aforesaid. The term " **rate of exchange** " shall include any premiums and costs of exchange payable in connection with the purchase of, or conversion into, the relevant currency.

(d)     *Waiver of Immunity* . To the extent that the Company has or hereafter may acquire any immunity (sovereign or otherwise) from jurisdiction of any court of (i) the State of Israel, (ii) the United States or the State of New York, (iii) any jurisdiction in which it owns or leases property or assets or from any legal process (whether through service of notice, attachment prior to judgment, attachment in aid of execution, execution, set-off or otherwise) with respect to themselves or their respective property and assets or this Agreement, the Company hereby irrevocably waives such immunity in respect of its obligations under this Agreement to the fullest extent permitted by applicable law.

(e)     *Waiver of Jury Trial.* Each of the parties hereto hereby waives any right to trial by jury in any suit or proceeding arising out of or relating to this Agreement.

(f)     *Counterparts.* This Agreement may be signed in counterparts (which may include counterparts delivered by any standard form of telecommunication), each of which shall be an original and all of which together shall constitute one and the same instrument.

(g)     *Amendments or Waivers.* No amendment or waiver of any provision of this Agreement, nor any consent or approval to any departure therefrom, shall in any event be effective unless the same shall be in writing and signed by the parties hereto.

(h)     *Authority of the Representatives* . Any action by the Underwriters hereunder may be taken by the Representatives on behalf of the Underwriters and any such action taken by the Representatives shall be binding upon the Underwriters.

(i)     *Headings; Construction.* The headings herein are included for convenience of reference only and are not intended to be part of, or to affect the meaning or interpretation of, this Agreement. As used in this Agreement, the words "include" and "including," and variations

thereof, shall not be deemed to be terms of limitation, but rather shall be deemed to be followed by the words "without limitation."

[Remainder of Page Intentionally Left Blank]

If the foregoing is in accordance with your understanding, please indicate your acceptance of this Agreement by signing in the space provided below.

Very truly yours,

Tufin Software Technologies Ltd.

By: _____

Title:

Accepted: As of the date first written above

J.P. MORGAN SECURITIES LLC

For itself and on behalf of the
several Underwriters listed
in Schedule 1 hereto.

By: _____

Authorized Signatory

Accepted: As of the date first written above

BARCLAYS CAPITAL INC.

For itself and on behalf of the
several Underwriters listed
in Schedule 1 hereto.

By: _____

Authorized Signatory

JEFFERIES LLC

For itself and on behalf of the
several Underwriters listed
in Schedule 1 hereto.

By: _____

Authorized Signatory

| Underwriter | Number of Shares |
|---|---|
| J.P. Morgan Securities LLC | [_____] |
| Barclays Capital Inc. | [_____] |
| Jefferies LLC | [_____] |
| Oppenheimer & Co. Inc. | [_____] |
| Piper Jaffray & Co. | [_____] |
| Stifel, Nicolaus & Company, Incorporated | [_____] |
| William Blair & Company, L.L.C. | [_____] |
| | |
| Total | [_____] |

**a.  Pricing Disclosure Package**

**b.  Pricing Information Provided Orally by Underwriters**

Annex A-2- 1

Written Testing-the-Waters Communications

Annex B- 1

Tufin Software Technologies Ltd.

<u>Pricing Term Sheet</u>

EGC – Testing the waters authorization (to be delivered by the issuer to J.P. Morgan in email or letter form)

In reliance on Section 5(d) of the Securities Act of 1933, as amended (the " **Act** "), Tufin Software Technologies Ltd. (the " **Issuer** ") hereby authorizes J.P. Morgan Securities LLC (" **J.P. Morgan** "), Barclays Capital Inc. (" **Barclays** ") and Jefferies LLC (" **Jefferies** ") and their respective affiliates and employees (the " **Authorized Underwriters** "), to act on behalf of the Issuer in undertaking oral and written communications with potential investors that are "qualified institutional buyers," as defined in Rule 144A under the Act, or institutions that are "accredited investors," as defined in Regulation D under the Act, to determine whether such investors might have an interest in the Issuer's contemplated initial public offering (" **Testing-the-Waters Communications** ") in the United States. Any such Testing-the-Waters Communications must be made in accordance with Section 5(d) of the Act. A " **Written Testing-the-Waters Communication** " means any Testing-the-Waters Communication that is a written communication within the meaning of Rule 405 under the Act. Any Written Testing-the-Waters Communication shall be subject to prior approval by the Issuer's [Chief Executive Officer or Chief Financial Officer] prior to its dissemination to a potential investor, provided, however, that no such approval shall be required for any written communication that is solely administrative in nature (i.e., scheduling meetings) or that solely contains information already contained in a communication previously approved by the Issuer. The Issuer has advised the Authorized Underwriters that it does not intend to provide or authorize any written communications to potential investors in connection with the Issuer's contemplated initial public offering other than communications that are solely administrative in nature or agreed upon by and between the Issuer and the Authorized Underwriters.

The Issuer represents that (i) except as disclosed to the Authorized Underwriters, it has not alone engaged in any Testing-the-Waters Communication and (ii) it has not authorized anyone other than the Authorized Underwriters to engage in Testing-the-Waters Communications. The Issuer agrees that it shall not authorize any other third party to engage on its behalf in oral or written communications with potential investors in connection with the Issuer's contemplated initial public offering without the written consent of the Authorized Underwriters. The Issuer also represents that, as of the date hereof, it is an "emerging growth company," as defined in Section 2(a) of the Act (an " **Emerging Growth Company** "). The Issuer agrees to promptly notify the Authorized Underwriters in writing if the Issuer hereafter ceases to be an Emerging Growth Company while this authorization is in effect. In connection with any Testing-the-Waters Communication, the Issuer will comply with the guidelines as set forth in writing and agreed by the Issuer and the Authorized Underwriters.

If at any time following the distribution of any Written Testing-the-Waters Communication there occurred or occurs an event or development as a result of which such Written Testing-the-Waters Communication included or would include an untrue statement of a material fact or omitted or would omit to state a material fact necessary in order to make the statements therein, in light of the circumstances existing at that subsequent time, not misleading, the Issuer will promptly

notify the Authorized Underwriters and will promptly amend or supplement, at its own expense, such Written Testing-the-Waters Communication to eliminate or correct such untrue statement or omission. For the avoidance of doubt, delivery of the preliminary prospectus shall satisfy the Issuer's obligation to promptly amend or supplement such Written Testing-the-Waters Communication to eliminate or correct such untrue statement or omission.

Nothing in this authorization is intended to limit or otherwise affect the ability of the Authorized Underwriters, to engage in communications in which they could otherwise lawfully engage in the absence of this authorization, including, without limitation, any written communication containing only one or more of the statements specified under Rule 134(a) under the Act; provided, however, that the Authorized Underwriters shall not take any action that would result in the Company being required to file with the Securities and Exchange Commission under Rule 433(d) under the Act a free writing prospectus prepared by or on behalf of Authorized Underwriters that otherwise would not be required to be filed by the Company thereunder, but for the action of Authorized Underwriters. This authorization shall remain in effect until the Issuer has provided to the Authorized Underwriters a written notice revoking this authorization. All notices as described herein shall be sent by email to the attention of [ *name of JPM banker* ] at [ *email* @jpmorgan.com], with copies to [ *as applicable* ], [ *name of Barclays banker* ] at [ *email* @barclays.com], with copies to [ *as applicable* ] and [ *name of Jefferies banker* ] at [ *email* @jefferies.com], with copies to [ *as applicable* ].

Exhibit B

**[Form of Waiver of Lock-up]**


**Tufin Software Technologies Ltd.**


Public Offering of Ordinary Shares

, 20__

[Name and Address of
Officer or Director
Requesting Waiver]

Dear Mr./Ms. [Name]:

This letter is being delivered to you in connection with the offering by Tufin Software Technologies Ltd. (the " **Company** ") of [_____] ordinary shares, par value NIS 0.01 per share, of the Company (the " **Ordinary Shares** "), and the lock-up letter dated [_____], 20[__ ](the " **Lock-up Letter** "), executed by you in connection with such offering, and your request for a [waiver] [release] dated [_____], 20[__], with respect to [_____] Ordinary Shares (the " **Shares** ").

J.P. Morgan Securities LLC hereby agrees to [waive] [release] the transfer restrictions set forth in the Lock-up Letter, but only with respect to the Shares, effective [ _____], 20[__] ; <u>provided</u> , <u>however</u> , that such [waiver] [release] is conditioned on the Company announcing the impending [waiver] [release] by press release through a major news service at least two business days before effectiveness of such [waiver] [release]. This letter will serve as notice to the Company of the impending [waiver] [release].

Except as expressly [waived] [released] hereby, the Lock-up Letter shall remain in full force and effect.

Yours very truly,

**[Signature of J.P. Morgan Securities LLC Representative]**

**[Name of J.P. Morgan Securities LLC Representative]**

cc: Company

Exhibit C

**[Form of Press Release]**

**Tufin Software Technologies Ltd.**

**[Date]**

Tufin Software Technologies Ltd. (" **Company** ") announced today that J.P. Morgan Securities LLC, the lead book-running manager in the Company's recent public sale of [____] ordinary shares of the Company, is [waiving] [releasing] a lock-up restriction with respect to [____] ordinary shares of the Company held by [certain officers or directors] [an officer or director] of the Company. The [waiver] [release] will take effect on [_____], 20[__], and the shares may be sold on or after such date.

**This press release is not an offer for sale of the securities in the United States or in any other jurisdiction where such offer is prohibited, and such securities may not be offered or sold in the United States absent registration or an exemption from registration under the United States Securities Act of 1933, as amended.**

FORM OF LOCK-UP AGREEMENT

November 19, 2018

J.P. MORGAN SECURITIES LLC
BARCLAYS CAPITAL INC.
JEFFERIES LLC
As Representatives of
  the several Underwriters listed in
  Schedule 1 to the Underwriting
  Agreement referred to below
c/o J.P. Morgan Securities LLC
383 Madison Avenue
New York, NY 10179

      Re:    Tufin Software Technologies Ltd.—Public Offering

Ladies and Gentlemen:

The undersigned understands that you, as Representatives of the several Underwriters, propose to enter into an underwriting agreement (the " **Underwriting Agreement** ") with Tufin Software Technologies Ltd., a company organized under the laws of the State of Israel (the " **Company** "), providing for the public offering (the " **Public Offering** ") by the several Underwriters named in Schedule 1 to the Underwriting Agreement (the " **Underwriters** ") of ordinary shares of the Company (the " **Securities** "). Capitalized terms used herein and not otherwise defined shall have the meanings set forth in the Underwriting Agreement.

In consideration of the Underwriters' agreement to purchase and make the Public Offering of the Securities, and for other good and valuable consideration receipt of which is hereby acknowledged, the undersigned hereby agrees that, without the prior written consent of J.P. Morgan Securities LLC, on behalf of the Underwriters, the undersigned will not, during the period beginning on the date of this letter agreement (this " **Letter Agreement** ") and ending 180 days after the date of the prospectus relating to the Public Offering (the " **Prospectus** ") (such period, the " **Restricted Period** "), (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any ordinary shares, par value NIS 0.01 per share, of the Company (the " **Ordinary Shares** ") or any securities convertible into or exercisable or exchangeable for Ordinary Shares (including without limitation, Ordinary Shares or such other securities which may be deemed to be beneficially owned by the undersigned in accordance with the rules and regulations of the Securities and Exchange Commission (the " **SEC** ") and securities which may be issued upon exercise of a share option or warrant) (such securities, collectively, " **Lock-Up Securities** "), or

publicly disclose the intention to make any offer, sale, pledge or disposition, (2) enter into any swap or other agreement that transfers, in whole or in part, any of the economic consequences of ownership of Lock-Up Securities, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Lock-Up Securities, in cash or otherwise or (3) make any demand for or exercise any right with respect to the registration of any Ordinary Shares or any security convertible into or exercisable or exchangeable for Ordinary Shares without the prior written consent of J.P. Morgan Securities LLC, on behalf of the Underwriters, except, solely with respect to this clause (3), as will not require a public filing or other public disclosure to be made in connection therewith during 180-day period referred to above. Notwithstanding the foregoing, the undersigned may transfer the undersigned's Securities:

(A) to the Underwriters pursuant to the Underwriting Agreement;

(B) in connection with the conversion of convertible securities in connection with the consummation of the Public Offering, the exercise of warrants, or the exercise of share options granted pursuant to the Company's share option/incentive plans, employee benefit plans or other arrangements described in the Prospectus insofar as such warrant, convertible security or option is outstanding on the date hereof or the date of the Underwriting Agreement; provided, that the restrictions of this Letter Agreement shall apply to any Lock-Up Securities issued upon such exercise or conversion;

(C) in connection with a written plan meeting the requirements of Rule 10b5-1 under the Securities Exchange Act of 1934, as amended (the " **Exchange Act** ") for the transfer of Ordinary Shares, *provided* that such plan does not provide for the transfer of Ordinary Shares during the Restricted Period;

(D) as a charitable donation or a *bona fide* gift;

(E) by operation of law, including pursuant to a domestic relations order or divorce decree;

(F) by will or intestacy;

(G) to any investment fund, corporation, partnership, limited liability company or other entity that controls, is controlled by, or is under common control with, the undersigned;

(H) if the undersigned is a partnership, limited liability company or a corporation, distributions or transfers of Lock-Up Securities to partners, members or shareholders of the undersigned;

(I) if the undersigned is a trust, to a trustor, trustee or beneficiary of the trust or to the estate of a beneficiary of such trust, *provided* that no transfers will be permitted to any person who is not a beneficiary of such trust as of the date of the Underwriting Agreement;

(J) if the undersigned is a natural person, to any immediate family member of the undersigned or any trust, partnership, limited liability company or other entity for the direct or indirect benefit

of the undersigned and/or the immediate family of the undersigned (for purposes of this Letter Agreement, " **immediate family member** " shall mean any relationship by blood, marriage or adoption, not more remote than first cousin);

(K) (1) to the Company pursuant to the exercise on a "net exercise" basis, of any option to purchase Ordinary Shares granted by the Company pursuant to employee benefit plans or arrangements described in the registration statement solely for the purpose of exercising such option solely in the case of termination of employment or board service following death, disability or other than for cause if such option that would otherwise expire during the Restricted Period, or (2) on a "net exercise" basis solely for the purpose of satisfying withholding taxes (including estimated taxes) due with respect to the vesting or settlement of restricted share awards, or the exercise of options, granted under the Company's share option/incentive plans or employee benefit plans or arrangements described in the Prospectus, insofar as such restricted shares or options is outstanding as of the date of the Prospectus (the term "net exercise" referring to the sale to the Company of a portion of the option shares or previously owned ordinary shares to cover payment of the exercise price or withholding taxes, as the case may be);

(L) acquired in open market transactions after the completion of the Public Offering;

(M) to a nominee or custodian of a person or entity to whom a disposition or transfer would be permissible under clauses (A) through (K) above;

(N) following execution of the Underwriting Agreement, pursuant to a bona fide third-party tender offer, merger, consolidation or other similar transaction made to all holders of the Company's capital stock and approved by the Company's board of directors as a result of which any "person" (as defined in Section 13(d)(3) of the Exchange Act), or group of persons, becomes the beneficial owner (as defined in Rules 13d-3 and 13d-5 of the Exchange Act) of at least 90% of the total voting power of the voting shares of the Company or the surviving entity (a "Change of Control Transaction"), provided that in the event that any such Change of Control Transaction is not completed, the provisions in this clause (M) will not be applicable and the Lock-up Securities held by the undersigned shall remain subject to the provisions of this Letter Agreement; or

()) pursuant to an order of a court or regulatory agency.

provided that (i) in the case of any transfer or distribution pursuant to clause (F), (G), (H), (I) and (J) such transfer shall not involve a disposition for value; (ii) in the case of any transfer or distribution pursuant to clause (D), (E), (F), (G), (H), (I), and (J) each donee, transferee or distributee shall execute and deliver to J.P. Morgan Securities LLC a lock-up letter in the form of this Letter Agreement; (iii) in the case of any transfer or distribution pursuant to clause (D), (E), (F), (G), (H), (I) or (J) or the entry into any plan contemplated by (C), no filing by any party (donor, donee, transferor or transferee) under the Exchange Act, or other public announcement shall be required or shall be made voluntarily in connection with such transfer or distribution (other than a filing on a Form 5 made after the expiration of the Restricted Period); and (iv) in the case of any cashless exercise pursuant to clause (K), if a filing by the Company or the undersigned under the Exchange Act or other public announcement shall be required, it shall clearly indicate in the footnotes thereto or otherwise that the filing relates to the cashless exercise of a stock option, that no shares were

sold by the undersigned other than to the Company and that the shares received upon exercise of the stock option are subject to all of the restrictions set forth in this Lock-Up Agreement. If the undersigned is an officer or director of the Company, the undersigned further agrees that the foregoing provisions shall be equally applicable to any Company-directed Securities the undersigned may purchase in the Public Offering.

If the undersigned is an officer or director of the Company, (i) J.P. Morgan Securities LLC on behalf of the Underwriters agrees that, at least three business days before the effective date of any release or waiver of the foregoing restrictions in connection with a transfer of Ordinary Shares, J.P. Morgan Securities LLC on behalf of the Underwriters will notify the Company of the impending release or waiver, and (ii) the Company has agreed in the Underwriting Agreement to announce the impending release or waiver by press release through a major news service at least two business days before the effective date of the release or waiver. Any release or waiver granted by J.P. Morgan Securities LLC on behalf of the Underwriters hereunder to any such officer or director shall only be effective two business days after the publication date of such press release. The provisions of this paragraph will not apply if (a) the release or waiver is effected solely to permit a transfer not for consideration and (b) the transferee has agreed in writing to be bound by the same terms described in this Letter Agreement to the extent and for the duration that such terms remain in effect at the time of the transfer.

In furtherance of the foregoing, the Company, and any duly appointed transfer agent for the registration or transfer of the securities described herein, are hereby authorized to decline to make any transfer of securities if such transfer would constitute a violation or breach of this Letter Agreement.

The undersigned hereby represents and warrants that the undersigned has full power and authority to enter into this Letter Agreement. All authority herein conferred or agreed to be conferred and any obligations of the undersigned shall be binding upon the successors, assigns, heirs or personal representatives of the undersigned.

It is understood that, if any of the following occurs: (1) the Registration Statement related to the Public Offering does not become effective by April 30, 2019, (2) the Company notifies the Underwriters in writing that it does not intend to proceed with the Public Offering, (3) the Company files and later withdraws the Registration Statement relating to the Public Offering, or (4) the Underwriting Agreement (other than the provisions thereof which survive termination) shall terminate or be terminated prior to payment for and delivery of the Securities, this Letter Agreement shall immediately be terminated and the undersigned shall be released from all obligations under this Letter Agreement. The undersigned understands that the Underwriters are entering into the Underwriting Agreement and proceeding with the Public Offering in reliance upon this Letter Agreement.

[Remainder of Page Intentionally Left Blank]

This Letter Agreement and any claim, controversy or dispute arising under or related to this Letter Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to the conflict of laws principles thereof.

Very truly yours,

[NAME OF SHAREHOLDER]

By: _____

Name:

Title:

Exhibit 3.1

# Amended and Restated Articles

# of

# Tufin Software Technologies Ltd.

**Company Number** 513627398

**A Company Limited By Shares**

## Preliminary, Definitions And Interpretation

1.    The following articles shall, subject to repeal, addition and alteration as provided by the Companies Law (as defined in Article 2 below) or these Articles (as defined in Article 2 below).

2.    In these Articles, if not inconsistent with the context, the words standing in the first column of the following table shall bear the meanings set opposite them.

| Words | Meanings |
|---|---|
| **Affiliate** | With respect to any Person, any other Person, directly or indirectly, through one or more intermediary Persons, (i) which Controls or is Controlled by or is under common Control with such Person, (ii) in respect of any Person which is a limited or general partnership, its partners, affiliated partnerships managed by the same management company or managing (general) partner or by an entity which Controls, is Controlled by, or is under common Control with, such management company or managing (general) partner. |
| **Articles** | These Articles, as amended from time to time according to the provisions of the Companies Law and the provisions herein. |
| **Auditors** | The Company's accounting auditors appointed according to the provisions of the Companies Law and the provisions herein. |
| **Board** | The Company's board of directors lawfully appointed in accordance with the provisions of Article 32 below. |
| **Business Day(s)** | A day, or days, on which customer services are provided by the majority of the major commercial banks in Israel (including, for the avoidance of doubt, Fridays). |
| **CEO** | The chief executive officer of the Company lawfully appointed in accordance with the provisions of Article 38 below. |
| **Chairman** | The chairman of the Board. |
| **Companies Law** | The Israeli Companies Law, 5759-1999, any provisions of the Companies Ordinance [New Version], 1983 still in effect, and any rules and regulations promulgated pursuant thereto, as the same shall be in effect from time to time. |
| **Company** | Tufin Software Technologies Ltd., corporate registration number 513627398. |

| | |
|---|---|
| **Control** | The possession directly or indirectly of more than 50% (fifty percent) of the voting power, the right to appoint at least 50% of the members of the Board, or the right to receive more than 50% of the distributed profits of such shareholder. |
| **Conversion Price** | The applicable conversion price of the Preferred Shares, as described in Article 12.4 below. |
| **Conversion Rate** | The quotient obtained by dividing the Original Issue Price of each class of Preferred Shares by the Conversion Price of each corresponding class of Preferred Shares then in effect. |
| **Conversion Rights** | The conversion rights of the Preferred Shares as detailed in Article 12.4 below. |
| **Conversion Shares** | The Ordinary Shares issued or issuable pursuant to the conversion or reclassification of the Preferred A Shares, Preferred B Shares, Preferred C Shares, Preferred C-1 Shares and the Preferred D Shares. |
| **Convertible Securities** | Options, warrants and rights to purchase or rights to subscribe for Ordinary Shares or convertible loans or debentures and any other securities by their terms convertible into or exchangeable for Ordinary Shares, or options or rights to purchase or subscribe for such convertible or exchangeable securities. |
| **Dividend** | Any asset transferred by the Company to a Shareholder in respect of such Shareholder's Shares, whether in cash or in any other way, including a transfer without valuable consideration, but excluding bonus shares. |
| **Deemed Liquidation** | Unless otherwise agreed by: (i) the holders of the Preferred Majority (ii) the holders of 75% of all issued and outstanding Preferred C Shares; and (iii) the holders of two-thirds or more of the Preferred D Shares, any sale of voting control, acquisition, merger of the Company with or into another entity in which the shareholders of the Company do not own (by virtue of their pre-merger shares) a majority of the shares of the surviving entity, consolidation, sale of all or substantially all of the Company's assets or shares, license of all or substantially all of the Company's intellectual property in a transaction which is economically similar to a sale of such intellectual property or any other transaction in which the shareholders do not retain a majority of the voting power in the surviving or acquiring corporation (other than an IPO), all of the foregoing, whether in a single transaction or a series of related transactions. |
| **Director** | A Person duly appointed as a member of the Board in accordance with the provisions of these Articles and holding office from time to time. |

| | |
|---|---|
| **ESOP** | One or more share options or purchase plans approved by the Board in accordance with the provisions of these Articles or any other agreement to which the Company is subject in connection therewith, for the purpose of issuing options to purchase Shares or issuing Shares to employees, officers, consultants, directors and other service providers of the Company, all from the ESOP Pool. |
| **ESOP Pool** | All Ordinary Shares reserved for issuance under the ESOP. Subject to the terms of Article 36.3, the Board may increase the total number of shares reserved under the ESOP Pool, provided that prior to any such increase, the Company and the Preferred Investors (as defined below) shall confer on whether such an increase is warranted. |
| **Founder** | Each of Reuven Kitov and Reuven Harrison. |
| **General Meetings: Annual General Meeting, Special General Meeting and Class Meeting** | *Annual General Meeting* : the annual general meeting of the Company's Shareholders held once every calendar year at such time, being not more than 15 months after the holding of the last preceding general meeting at a place determined by the Board. |
| | *Special General Meeting* : any other general meeting of the Company's Shareholders called by the Directors or any of the Shareholders pursuant to these Articles or the Companies Law, other than the Annual General Meeting. |
| | *Class Meeting* : a separate Special General Meeting of the holders of a particular class of Shares. |
| | The Annual and Special General Meeting may each be referred to as a General Meeting. |
| **Interested Party Transaction** | Any transaction between the Company and any " **Interested Party** " (as defined in the Israeli Securities Law, 5723-1968). |
| **IPO** | The closing of a sale of the Company's Ordinary Shares to the public in a bona fide, underwritten, public offering pursuant to a registration statement under the U.S. Securities Act of 1933, as amended, the Israel Securities Law or similar securities laws of another jurisdiction and the listing of such Ordinary Shares for trading on a recognized international stock exchange, or the listing thereof on NASDAQ or another recognized, automated quotation system. |
| **Liquidation** | (a) any dissolution, winding-up or liquidation of the Company, and (b) any foreclosure by creditors of the Company on substantially all assets of, or equity interests in the Company, all whether voluntarily or involuntarily; |
| **Majority Preferred A Shareholders** | The holders of a majority of the issued and outstanding Preferred A Shares, on an as converted basis. |

| | |
|---|---|
| **Month** | A Gregorian calendar month. |
| **Office** | The registered office of the Company. |
| **Office Holder** | As such term is defined in the Companies Law. |
| **Ordinary Share(s)** | The Company's Ordinary Shares of nominal value NIS 0.01 each. |
| **Ordinary Resolution** | A resolution adopted by a simple majority of the votes of the holders of the issued and outstanding share capital of the Company, present in person or by proxy, at a duly convened General Meeting and which are entitled to vote thereat. |
| **Original Issue Price** | The price at which a Share was issued by the Company, for each Preferred A Share: US$0.4; for each Preferred B Share: US$1.1242973; for each Preferred C Share: US$1.76706814; for each Preferred C-1 Share: US$1.94377495; for each Preferred D Share: US$ $2.86827895; all subject to appropriate adjustments for any Recapitalization Event (as defined below). |

**Permitted Transferee**

(a)  a transferee by operation of law;

(b)  in the case of an individual Shareholder - a spouse, child, brother, sister or trustee of the Shareholder and any corporate entity which is Controlled by the Shareholder;

(c)   in the case of any incorporated Shareholder (whether a company or a partnership or any other legal entity) an Affiliate of such Shareholder; and

(d)   a trust which does not permit any of the settled property or the income therefrom to be applied other than for the benefit of the relevant Shareholder and no power or control over the voting powers conferred by any shares are subject to the consent of any Person other than the trustees of such Shareholder;

*provided that* , (A) the Permitted Transferee agrees in writing to be bound by and subject to the terms and conditions of (i) these Articles, and (ii) any agreement (except for employment related agreements) between the transferor and the Company, whether or not with other parties, and (B) all Permitted Transferees of the same transferor shall designate in writing one entity to be their sole and exclusive representative and to act on their behalf and in their name for any and all purposes relating to these Articles and to any other agreement between the transferor and the Company including without limitation for the purpose of receiving notices of General Meetings and such sole representative will receive an irrevocable proxy to vote all shares held by such Permitted Transferees, and (C) the number of Shareholders of the Company following such proposed transfer does not exceed fifty (50).

| | |
|---|---|
| **Person** | An individual, corporation, partnership, joint venture, trust, and any other body corporate or unincorporated organization. |
| **Preferred A Investors** | Each of, Catalyst Private Equity Partners (Israel II LP) (" **Catalyst** "), Regev Law Firm, and Mark Gershinson, each individually referred to as a " **Preferred A Investor** ". |
| **Preferred B Investor** | Marker TF Investments Ltd. |
| **Preferred C Investors** | Marker Lantern II Ltd., SBT Venture Fund I, L.P. and CAIVS 1 (Compartiment 2). |
| **Preferred D Investors** | Vintage Investment Partners V (Cayman), L.P., Vintage Investment Partners V (Israel) L.P., Vintage Investment Partners VI (Cayman), L.P., and Vintage Investment Partners VI (Israel) L.P. |
| **Preferred Investors** | Preferred A Investors, the Preferred B Investor, the Preferred C Investors and the Preferred D Investors. |
| **Preferred A Shares** | The Company's Series A Preferred Shares of nominal value NIS 0.01 each. |
| **Preferred A Shareholder(s)** | Holder(s) of Preferred A Shares. |
| **Preferred B Shares** | The Company's Series B Preferred Shares of nominal value NIS 0.01 each. |
| **Preferred B Shareholder(s)** | Holder(s) of Preferred B Shares. |
| **Preferred C Shares** | The Company's Series C Preferred Shares and Series C-1 Preferred Shares of nominal value NIS 0.01 each. |
| **Preferred C Shareholder(s)** | Holder(s) of Preferred C Shares and/or Preferred C-1 Shares. |
| **Preferred C-1 Shares** | The Company's Series C-1 Preferred Shares of nominal value NIS 0.01 each. |
| **Preferred D Shares** | The Company's Series D Preferred Shares of nominal value NIS 0.01 each. |
| **Preferred D Shareholder(s)** | Holder(s) of Preferred D Shares. |
| **Preferred Majority:** | Holders of at least 70% of the issued and outstanding Preferred Shares, on an as-converted basis, voting as a single class. |
| **Preferred Shares** | Preferred A Shares, Preferred B Shares, Preferred C Shares, Preferred C-1 Shares and Preferred D Shares. |
| **Preferred Shareholder(s)** | Holder(s) of Preferred A Shares, Preferred B Shares, Preferred C Shares, Preferred C-1 Shares and Preferred D Shares. |

| | |
|---|---|
| **Purchase Date (of a Share)** | As to each Share, the date on which such Share was issued by the Company. |
| **QIPO or Qualified IPO** | An IPO at a minimum Company pre-money valuation of $250,000,000 and resulting in minimum gross proceeds to the Company of $50,000,000 (before deductions for underwriters commissions and expenses). |
| **Qualified Shareholder** | Each Shareholder holding at least (i) five percent (5%) of the Company's issued and outstanding share capital (on an as-converted basis); (ii) each Preferred C Shareholder holding either (a) at least one and thirty eight one hundredths of one percent (1.38%) of the Company's issued and outstanding share capital (on an as-converted basis) or (b) at least 1,500,000 Preferred C Shares; and (iii) each Preferred D Shareholder holding at least 1,600,000 Preferred D Shares. |
| **Recapitalization Event** | Any event of share split, share subdivision or combination, distribution of a share dividend or bonus shares or any other reclassification, reorganization or recapitalization of the Company's share capital. |
| **Securities** | Securities of the Company of any kind, including shares of any class, and Convertible Securities. |
| **Share(s) and Shareholder(s)** | Each of the Ordinary Share(s), Preferred A Share(s), Preferred B Shares, Preferred C Shares, Preferred C-1 Shares and Preferred D Shares; and the holder of a Share or Shares, respectively. |
| **Shareholders Register** | The register of Shareholders of the Company administered in accordance with the Companies Law, or if the Company shall have any branch register(s) - any such branch register(s), as the case may be. |
| **Transfer** | Any sale, transfer, assignment, pledge, encumbrance, or other disposition (with or without consideration, voluntarily or involuntarily by operation of law) of any transferable, assignable or disposable interest. |
| **in writing** | Refers to written, printed, photocopied, typed, sent via facsimile, e-mail or produced by any visible substitute for writing, or partly one and partly another, and "signed" shall be construed accordingly. |
| **Year** | Refers to twelve (12) consecutive Months. |

3.  In these Articles and unless the context otherwise requires:

3.1  Expressions defined in the Companies Law, shall have the meanings so defined.

3.2  Words importing the singular shall include the plural, and vice versa; Words importing the masculine gender shall include the female and neuter genders; Words importing persons shall include bodies corporate and other legal entities.

3.3 The titles of these Articles are for ease of reference only and shall not be deemed to be part thereof. The word "including" shall imply including without limitation.

3.4 All references to number of days mean calendar days, unless expressly indicated otherwise.

3.5 All references to dollars, Dollars, U.S. Dollars, $ or US$ means the lawful currency of the United States of America; All references to New Israeli Shekel or NIS means the lawful currency of the State of Israel.

4. The provisions of Sections 3 to and including Section 10 of the Interpretation Law, 5741-1981, will apply to the interpretation of these Articles with the necessary adaptations, unless a logical interpretation of the context clearly requires otherwise.

5. To the extent that these Articles make reference to a provision of law that has been amended or replaced, such provision will be deemed enforceable as if it was included and made part of these Articles as amended or replaced, unless and to the extent explicitly repealed by law.

## Limited Liability

6. The liability of each Shareholder for the Company's obligations is limited to the payment of the consideration (including the premium) for the Shares which were issued to it, but not less than the nominal value of the Company's Shares held thereby, except in the event that said Shares have been lawfully issued for a consideration which is below the nominal value, in which event the Shareholder's liability will be limited to the payment of the consideration for which said Shares were issued.

## Purposes Of The Company And Contributions

7. Subject to any limitations contained herein, the Company shall engage in any legal occupation or business and conduct its business according to business considerations and for the purpose of making profits. The Company may make reasonable contributions for worthy causes regardless of business considerations.

## Office

8. The Office of the Company shall be at such place as the Board shall determine from time to time.

## Private Company

9. The Company is a private company and accordingly:

9.1 The number of Shareholders of the Company (exclusive of persons who are in the employment of the Company and of former employees of the Company who became Shareholders of the Company while so employed) shall not exceed fifty (50), provided that where two (2) or more persons hold one (1) or more Share(s) in the Company jointly, they shall, for the purposes of these Articles, be treated as a single Shareholder;

9.2 Any invitation to the public to subscribe for any Shares, debentures, debenture stock or any other securities of the Company is hereby prohibited;

9.3 The right of Transfer of Shares and Securities shall be restricted as hereinafter provided.

## 10. **Share Capital**

The authorized and registered share capital of the Company is NIS 1,083,011 (one million eighty three thousand and eleven New Israeli Shekels), divided into: (a) 79,000,068 (seventy nine million and sixty eight) Ordinary Shares; (b) 15,000,000 (fifteen million) Preferred A Shares; (c) 5,000,000 (five million Preferred B Shares; (d) 5,000,000 (five million) Preferred C Shares; (e) 2,000,000 (two million) Preferred C-1 Shares; and (f) 2,301,032 (two million, three hundred one thousand, and thirty two) Preferred D Shares.

**Shares**

## 11. **Ordinary Shares**

Subject to the rights and privileges of the Preferred Shares, the Ordinary Shares shall rank pari passu between them and shall have all residual rights not specifically associated with the Preferred Shares and shall, including without limitation, entitle their holders:

11.1 To receive notices of, and to attend, General Meetings where each Ordinary Share shall have one (1) vote for all purposes;

11.2 To share, on a per Share basis, in the distribution by the Company of any bonus shares, bonuses, profits or other distributions as may be declared by the Board and approved by the Shareholders, if required, out of funds legally available therefore, subject to Article 12.2 below;

11.3 Upon occurrence of a Liquidation or a Deemed Liquidation Event - to participate in the distribution of the assets of the Company legally available for distribution to Shareholders after payment of all debts and other liabilities of the Company, in accordance with the terms of these Articles;

11.4 To appoint, dismiss, and replace Directors pursuant to the provisions of these Articles; and

11.5 To examine and receive copies of any register, document, report, or account of the Company as prescribed and conferred by the Companies Law.

The holders of Ordinary Shares shall not be entitled to any class vote on a Class Meeting, except with respect to direct changes to the rights attached exclusively to Ordinary Shares under these Articles.

## 12. **Preferred Shares**

The Preferred Shares confer on the holders thereof all rights accruing to holders of Ordinary Shares in the Company on an as converted basis, and in addition the Preferred Shares are entitled to the following rights:

12.1 *Liquidation Preference* . Until a Qualified IPO, in the event of any Liquidation, or Deemed Liquidation, then the assets or proceeds available for distribution to the Shareholders or otherwise payable to them in their capacity as such (the " **Distributable Proceeds** ") shall be distributed or allocated among the Shareholders according to the

following order of preference:

12.1.1   First, each of the holders of Preferred D Shares shall be entitled to receive, from the Distributable Proceeds, prior and in preference to the holders of Preferred C Shares, the holders of Preferred B Shares, the holders of Preferred A Shares and the holders of Ordinary Shares, an amount equal to 1.5 times the Original Issue Price of the Preferred D Shares (whether or not such consideration was paid directly to the Company), plus any declared but unpaid dividends, reduced by any amounts paid to such holders in respect of the Preferred D Dividend Preference (the " **Preferred D Preference Amount** "). In the event that the Distributable Proceeds shall be insufficient for the distribution and satisfaction of the Preferred D Preference Amount in full to all of the holders of Preferred D Shares, then the Distributable Proceeds shall be distributed or allocated among the holders of Preferred D Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Distributable Proceeds been sufficient for the distribution in full of the Preferred D Preference Amount.

12.1.2   Second, after payment in full of the Preferred D Preference Amount, each of the holders of Preferred C Shares shall be entitled to receive, from the remaining Distributable Proceeds (if any), on a pro rata basis amongst themselves, prior and in preference to the holders of Preferred B Shares, the holders of Preferred A Shares and the holders of Ordinary Shares, an amount equal to one (1) time the total amount paid by the Preferred C Shareholder in consideration of its Preferred C Shares, plus any declared but unpaid dividends, reduced by any amounts paid to such holders in respect of the Preferred C Dividend Preference (the " **Preferred C Preference Amount** "). In the event that the Distributable Proceeds following the distribution of the Preferred D Preference Amount shall be insufficient for the distribution and satisfaction of the Preferred C Preference Amount in full to all of the holders of Preferred C Shares, then the Distributable Proceeds shall be distributed or allocated among the holders of Preferred C Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Distributable Proceeds been sufficient for the distribution in full of the Preferred C Preference Amount.

12.1.3   Third, after payment in full of the Preferred D Preference Amount and the Preferred C Preference Amount, each of the holders of Preferred B Shares shall be entitled to receive, from the remaining Distributable Proceeds (if any), prior and in preference to the holders of Preferred A Shares and the holders of Ordinary Shares, an amount equal to 1.55 times the total amount paid by the Preferred B Shareholder in consideration of its Preferred B Shares, plus any declared but unpaid dividends, reduced by any amounts paid to such holders in respect of the Preferred B Dividend Preference (the " **Preferred B Preference Amount** "). In the event that the remaining Distributable Proceeds following the distribution of the Preferred D Preference Amount and the Preferred C Preference Amount shall be insufficient for the distribution and satisfaction of the Preferred B Preference Amount in full to all of the holders of Preferred B Shares, then the remaining Distributable Proceeds shall be distributed or allocated among the holders of Preferred B Shares on a pro rata

*pari passu* basis in proportion to the amounts such holders would have received had the Distributable Proceeds been sufficient for the distribution in full of the Preferred B Preference Amount.

12.1.4 Fourth, after payment in full of the Preferred D Preference Amount, the Preferred C Preference Amount and the Preferred B Preference Amount, each of the holders of Preferred A Shares shall be entitled to receive, from the remaining Distributable Proceeds (if any), prior and in preference to any other securities of the Company except for the Preferred D Shares, the Preferred C Shares and the Preferred B Shares, an amount equal to 1.33 times the total amount paid by such Preferred A Shareholder in consideration of its Preferred A Shares, plus any declared but unpaid dividends, reduced by any amounts paid to such holders in respect of the Preferred A Dividend Preference (the " **Preferred A Preference Amount** and together with Preferred B Preference Amount, the Preferred C Preference Amount and the Preferred D Preference Amount, the " **Liquidation Preference** "). In the event that the remaining Distributable Proceeds following the distribution of the Preferred D Preference Amount, the Preferred C Preference Amount and the Preferred B Preference Amount shall be insufficient for the distribution and satisfaction of the Preferred A Preference Amount in full to all of the holders of Preferred A Shares, then the remaining Distributable Proceeds shall be distributed or allocated among the holders of Preferred A Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Distributable Proceeds been sufficient for the distribution in full of the Preferred A Preference Amount.

12.1.5 Fifth, after payment of the full Liquidation Preference, any remaining Distributable Proceeds available for distribution, if any, shall be distributed or allocated pro rata among all the holders of Ordinary Shares of the Company, including holders of Preferred Shares (on an as converted basis).

Notwithstanding the Liquidation Preferences stated in Articles 12.1.1 to 12.1.4 above, in the event the Distributable Proceeds in a Liquidation or Deemed Liquidation shall equal or exceed US$136,900,000, then the foregoing Liquidation Preferences shall be disregarded with respect to the Preferred C Shares, the Preferred B Shares and the Preferred A Shares and the Distributable Proceeds shall be distributed or allocated to all holders of Shares of the Company (other than the Preferred D Shares) on a pro rata (as converted) basis, *provided however* that in the event the Distributable Proceeds in a Liquidation or Deemed Liquidation shall provide the holders of the Preferred D Shares an amount per each Preferred D Share equal to three (3) times the Original Issue Price of the Preferred D Shares in consideration of its Preferred D Shares (the " **Preferred D Hurdle** "), or more, then the Liquidation Preference shall also be disregarded with respect to the Preferred D Shares, and each Preferred D Shareholder shall instead receive for each Preferred D Share the greater of (x) its pro rata portion of any distribution and (y) the Preferred D Hurdle.

12.2 *Dividend Preference*. In the event of any declaration of a Dividend by the Company (a " **Dividend Declaration** "), then the cash or property legally available for distribution to the Shareholders (the " **Dividend Distribution** ") shall be distributed or allocated

11

among the Shareholders according to the following order of preference:

12.2.1 First, each of the holders of Preferred D Shares shall be entitled to receive, from the Dividend Distribution, prior and in preference to the holders of the Preferred C Shares, the holders of the Preferred B Shares, the holders of Preferred A Shares and the holders of the Ordinary Shares, an amount equal to 1.5 times, the Original Issue Price of the Preferred D Shares (whether or not such consideration was paid directly to the Company) (the " **Preferred D Dividend Preference** "). In the event that the Dividend Distribution shall be insufficient for the distribution and satisfaction of the Preferred D Dividend Preference in full to all of the holders of Preferred D Shares, then the Dividend Distribution shall be distributed among the holders of Preferred D Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Dividend Distribution been sufficient for the distribution in full of the Preferred D Dividend Preference.

12.2.2 Second, after payment in full of the Preferred D Dividend Preference, each of the holders of Preferred C Shares shall be entitled to receive, from the Dividend Distribution, prior and in preference to the holders of Preferred B Shares, the holders of Preferred A Shares and the holders of Ordinary Shares, an amount equal to one (1) time the total amount paid by the Preferred C Shareholder in consideration of its Preferred C Shares (the " **Preferred C Dividend Preference** "). In the event that the Dividend Distribution shall be insufficient for the distribution and satisfaction of the Preferred C Dividend Preference in full to all of the holders of Preferred C Shares, then the Dividend Distribution shall be distributed among the holders of Preferred C Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Dividend Distribution been sufficient for the distribution in full of the Preferred C Dividend Preference.

12.2.3 Third, after payment in full of the Preferred D Dividend Preference and the Preferred C Dividend Preference, each of the holders of Preferred B Shares shall be entitled to receive, from the remaining Dividend Distribution, prior and in preference to the holders of Preferred A Shares and the holders of Ordinary Shares, an amount equal to 1.55 times the total amount paid by such Preferred B Shareholder in consideration of its Preferred B Shares (the " **Preferred B Dividend Preference** "). In the event that the remaining Dividend Distribution following the distribution of the Preferred D Dividend Preference and the Preferred C Dividend Preference shall be insufficient for the distribution and satisfaction of the Preferred B Dividend Preference in full to all of the holders of Preferred B Shares, then the Dividend Distribution shall be distributed among the holders of Preferred B Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Dividend Distribution been sufficient for the distribution in full of the Preferred B Dividend Preference.

12.2.4 Fourth, after payment in full of the Preferred D Dividend Preference, the Preferred C Dividend Preference and the Preferred B Dividend Preference, each of the holders of Preferred A Shares shall be entitled to receive, from the

remaining Dividend Distribution, prior and in preference to any other securities of the Company except for the Preferred C Shares and the Preferred B Shares, an amount equal to 1.33 times the total amount paid by such Preferred A Shareholder in consideration for its Preferred A Shares (the " **Preferred A Dividend Preference** " and together with the Preferred B Dividend Preference, the Preferred C Dividend Preference and the Preferred D Dividend Preference, the " **Preferred Dividend Preference** "). In the event that the remaining Dividend Distribution following the distribution of the Preferred D Dividend Preference, the Preferred C Dividend Preference and the Preferred B Dividend Preference shall be insufficient for the distribution of the Preferred A Dividend Preference in full to all of the holders of Preferred A Shares, then the Dividend Distribution shall be distributed among the holders of Preferred A Shares on a pro rata *pari passu* basis in proportion to the amounts such holders would have received had the Dividend Distribution been sufficient for the distribution in full of the Preferred A Dividend Preference.

12.2.5    Fifth, after payment in full of the Preferred Dividend Preference, the remaining Dividend Distribution available for distribution, if any, shall be distributed pro rata among all the holders of Ordinary Shares and Preferred Shares of the Company (treating all Preferred Shares on an as converted basis).

Notwithstanding the Preferred Dividend Preferences stated in Articles 12.2.1 through 12.2.4 above, in the event that the aggregate Dividend Distributions shall equal or exceed US$136,900,000, then the foregoing Preferred Dividend Preference shall be disregarded with respect to the Preferred C Shares, the Preferred B Shares and the Preferred A Shares and the Dividend Distribution shall be distributed or allocated to all holders of Shares of the Company (other than the Preferred D Shares) on a pro rata (as converted) basis *provided however* that in the event that the aggregate Dividend Distributions shall provide the holders of the Preferred D Shares an amount per each Preferred D Share equal to the Preferred D Hurdle, or more, then the Preferred Dividend Preference shall also be disregarded with respect to the Preferred D Shares, and each Preferred D Shareholder shall instead receive for each Preferred D Share the greater of (x) its pro rata portion of any distribution and (y) the Preferred D Hurdle.

12.3    The Company shall give each holder of record of Preferred Shares written notice of any impending Liquidation, Distribution of Dividends or Deemed Liquidation event not later than ten (10) Business Days prior to the General Meeting called to approve such event or transaction, as applicable, or ten (10) Business Days prior to the closing of such event or transaction, as applicable, whichever is earlier, and shall also notify such holders in writing of the final approval of such event or transaction, as applicable. The first of such notices shall describe the material terms and conditions of the impending event or transaction, as applicable, and the provisions of this Article 12, and the Company shall thereafter give such holders prompt notice of any material changes. The event or transaction, as applicable, shall in no event take place sooner than ten (10) Business Days after the Company has given the first notice provided for herein or sooner than ten (10) Business Days after the Company has given notice of any material changes to the information provided in a notice provided for herein; provided, however, that such periods may be shortened upon the written consent of the Preferred Majority.

13

For the avoidance of doubt, the Preferred Shareholders may at any time prior to such distribution convert their shares into Ordinary Shares.

12.4    *Conversion* . The Preferred Shareholders shall have the Conversion Rights as follows:

12.4.1  **_Right to Convert_** . Each Preferred Share shall be convertible, at the option of the holder of such share, at any time after the Purchase Date of such Share, into such number of fully paid and nonassessable Ordinary Shares of the Company as is determined by dividing the applicable Original Issue Price for such class of Shares by the Conversion Price at the time in effect for such class of Shares. The initial Conversion Price per each Preferred Share shall be the Original Issue Price for such class of Shares, such that the initial Conversion Rate shall be one to one; *provided, however* , that the Conversion Price for each Preferred Share shall be subject to adjustment in accordance with any Recapitalization Event and pursuant to the anti-dilution provisions set forth herein.

12.4.2  **_Automatic Conversion_** . Notwithstanding anything to the contrary herein, each Preferred Share shall automatically be converted into fully paid and non-assessable Ordinary Shares at the then applicable Conversion Rate, upon: (i) a Qualified IPO, or (ii) upon the consent in writing of the majority of the outstanding Preferred Shares (including the holders of two thirds or more of the Preferred D Shares).

12.4.3  **_Mechanics of Conversion_** . Before any Preferred Shareholder shall be entitled to convert any Preferred Share into Ordinary Shares, the Preferred Shareholder shall surrender the certificate(s) thereof at the Office and shall give written notice to the Company of the election to convert the same. The Company shall, as soon as practicable thereafter, issue and deliver to such Preferred Shareholder a certificate(s) for the number of Ordinary Shares to which such Preferred Shareholder shall be entitled as aforesaid. Such conversion shall be deemed to have been made immediately prior to the close of business on the date of such surrender of the Preferred Shares to be converted, and the Person(s) entitled to receive the Ordinary Shares issuable upon such conversion shall be treated for all purposes as the record holder(s) of such Ordinary Shares as of such date. In the case of conversion pursuant to Article 12.4.2, such conversion shall be deemed to have been made immediately prior to the close of business on the date of the occurrence of any of the events listed in Article 12.4.2 and subject to the actual occurrence of such event, and the Person(s) entitled to receive the Ordinary Shares issuable upon such conversion shall be treated for all purposes as the record holder(s) of such Ordinary Shares as of such date; provided that the event does actually occur.

12.4.4  **_Conversion Price Adjustments of Preferred Shares_** . In the event that prior to the Qualified IPO, the Company issues any Additional Securities (as defined below) at a price per Share lower than the applicable Conversion Price of a class or series of Preferred Shares in effect immediately prior to such issuance, *then* upon each such issuance, the Conversion Price of such class shall be reduced, for no additional consideration, in accordance with the following

formula:

$$CP_2 = CP_1 * (A+B) / (A+C)$$

in which:

$CP_2$ = the new Conversion Price.

$CP_1$ = the Conversion Price, as applicable, in effect immediately prior to such issuance of Additional Securities.

A = **the number of Ordinary Shares deemed to be outstanding immediately prior to such issuance of Additional Securities (includes all Ordinary Shares outstanding, all Preferred A Shares, all Preferred B Shares, all Preferred C Shares and all Preferred D Shares outstanding, on an as-converted basis).**

B = the aggregate consideration received by the Company with respect to such issuance of Additional Securities, divided by $CP_1$.

C = the number of Additional Securities issued.

12.4.4.1 No adjustment of such Conversion Price pursuant to Article 12.4.4 above shall be made if it has the effect of increasing the Conversion Price above the Conversion Price in effect immediately prior to such adjustment.

12.4.4.2 In the case of the issuance of Additional Securities for cash, the consideration shall be deemed to be the amount of cash received therefor after giving effect to any discounts, finder's fees, or underwriting commissions paid or incurred by the Company in connection with the issuance and sale thereof.

12.4.4.3 In the case of the issuance of Additional Securities for a consideration in whole or in part other than cash, the consideration other than cash shall be deemed to be the fair value thereof, as shall be determined in good faith by the Board.

12.4.4.4 In the case of the issuance of warrants or options to purchase, or rights to subscribe for, Additional Securities, or securities which by their terms are convertible into or exchangeable for Additional Securities or options to purchase or rights to subscribe for such convertible or exchangeable securities (collectively, "Options"), the Additional Securities deliverable upon exercise (assuming the satisfaction of any conditions to exercisability, including without limitation the passage of time, but without taking into account potential anti-dilution adjustments), conversion or exchange, as the case may be, of such Options, shall be deemed to have been issued at the time of

issuance of such Options at a consideration equal to the consideration (determined in the manner provided in Articles 12.4.4.2 and 12.4.4.3), if any, received by the Company for such Options upon the issuance of such Options plus any additional consideration payable to the Company pursuant to the terms of such Options (without taking into account potential anti-dilution adjustments) for the Additional Securities covered thereby provided, however, that if any options as to which an adjustment to the Conversion Price has been made pursuant to this Article 12.4.4.4 expire without having been exercised, then the Conversion Price shall be readjusted as if such Options had not been issued (without any effect, however, on adjustments to the Conversion Price as a result of other events described in this Article).

12.4.4.5      For purposes of Article 12.4.4, the consideration for any Additional Securities shall be taken into account at the U.S. dollar equivalent thereof, on the day such Additional Securities are issued or deemed to be issued pursuant to Article 12.4.4.4 above.

12.4.4.6      " **Additional Securities** " means any Securities issued by the Company following the Purchase Date of the Preferred D Shares, other than securities issued (the " **Excluded Securities** "): (i) pursuant to the ESOP and up to the ESOP Pool; (ii) upon conversion or reclassification of outstanding Preferred Shares; (iii) upon exercise of a warrant or other convertible security outstanding as at the date of adoption of these Articles, if any; and (iv) as dividend or bonus shares, distributed to all Shareholders on a pro-rata basis (provided that each Shareholder receives dividend shares of the same class and series as the class and series held by such Shareholder).

12.4.5 ***Recapitalization Event*** . If at any time or from time to time there shall be a Recapitalization Event (other than any actions under Article 12.4.4), and other than a Liquidation, Dividend Distribution or Deemed Liquidation under Articles 12.1 and 12.2 above, provision shall be made so that the Preferred Shareholders shall thereafter be entitled to receive upon conversion of the Preferred Shares the number of Ordinary Shares or other securities or property of the Company or otherwise, to which a holder of Ordinary Shares deliverable upon conversion of the Preferred Shares would have been entitled immediately prior to such Recapitalization Event. In any such case, appropriate adjustment shall be made in the application of the provisions of this Article 12.4 with respect to the rights of the Preferred Shareholders after the recapitalization to the end that the provisions of this Article 12.4 (including adjustment of the Conversion Price then in effect and the number of shares issuable upon conversion of the Preferred Shares) shall be applicable after that event as nearly equivalent as may be practicable.

12.4.6 ***No Fractional Shares and Certificates as to Adjustments*** . No fractional Shares shall be issued upon conversion of the Preferred Shares, and the number of Ordinary Shares to be issued shall be rounded to the nearest whole share.

12.4.7 ***Computation***. Upon the occurrence of each adjustment of the Conversion Price pursuant to this Article 12.4, the Company, at its expense, shall promptly compute such adjustment in accordance with the terms hereof and prepare and furnish to each Preferred Shareholder a certificate setting forth each adjustment and showing in detail the facts upon which such adjustment is based. The Company shall furnish or cause to be furnished to such holder a like certificate setting forth (i) such adjustment, (ii) the Conversion Price at the time in effect, and (iii) the number of Ordinary Shares and the amount, if any, of other property which at the time would be received upon the conversion of a Preferred Share.

12.4.8 ***Notices of Record Date***. In the event of any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any Dividend or other Distribution, any right to subscribe for, purchase or otherwise acquire any shares of any class or any other securities or property, or to receive any other right, the Company shall mail to each holder of shares, at least 15 Business Days prior to the date specified therein, a notice specifying the date on which any such record is to be taken for the purpose of such Dividend Distribution or other right, and the amount and character of such Dividend Distribution or other right.

12.4.9 ***Reservation of Shares***. The Company shall at all times reserve and keep available out of its authorized but un-issued Ordinary Shares, solely for the purpose of effecting the conversion of the Preferred Shares, such number of its Ordinary Shares as shall from time to time be sufficient to effect the conversion of all outstanding Preferred Shares; and if at any time the number of authorized but un-issued Ordinary Shares shall not be sufficient to effect the conversion of all then outstanding Preferred Shares, then the Company will take such corporate action as may be necessary to increase its authorized but un-issued Ordinary Shares to such number of shares as shall be sufficient for such purposes.

12.5 ***Voting Rights***. Each Preferred Share shall initially have one (1) vote. The Preferred Shares shall vote together with the other Ordinary, and not as a separate class, in all General Meetings, except as required herein or by any applicable law, with each Preferred Share having votes in such number as if then converted into Ordinary Shares taking into account any adjustments under Article 12.4 ("on an as-converted basis").

**13.** **General Provisions Regarding Shares**

13.1 Subject to the rights of the Preferred Shareholders and of the Preferred Shares, and without prejudice to any special rights previously conferred by the issued outstanding Shares in the Company, the Company may issue Shares with such preferred or deferred rights of redemption or other special rights or such restrictions, whether concerning dividends, voting, repayment of share capital or otherwise, as may be determined by the Company from time to time.

13.2

13.2.1 Subject to the rights of the Preferred Shareholders and of the Preferred Shares,

with the exception of the rights granted in Articles 12, 14 and 16, the Company may change, convert, broaden, add to, vary, adversely affect or change in any other manner (" **Change** ") the rights, advantages, restrictions, and provisions attached to any class of the Company's Shares, only after receipt of the written consent of the holders of more than 75% of the issued and outstanding Shares, on an as-converted basis. Any Change to any provisions of Articles 12, 14 and 16 shall require the written consent of the holders of (i) more than 75% of the issued and outstanding Shares, on an as-converted basis, (ii) more than 75% of all issued and outstanding Preferred C Shares, and (iii) more than two-thirds of all issued and outstanding Preferred D Shares. Any changes to these Articles that would Change only one class of shares or class of Preferred Shares shall separately require written consent of the holders of more than 75% of the issued and outstanding Shares of the class so affected. It is hereby clarified that the creation or issuance of any class of shares with rights that are equal or superior to any existing class of the Company's shares shall not constitute a Change which requires any consent under this Article 13.2.1.

13.2.2 Notwithstanding anything to the contrary herein, in addition to the consents required under the Articles, consent of the holders of two-thirds or more of the Preferred D Shares shall be required for any amendment of these Articles (including an amendment effected by merger, consolidation and other reorganization) that (i) adversely affects the rights, preferences and privileges of the Preferred D Shares, *provided however* that the creation or issuance of new class of shares with rights that are equal or superior to the Preferred D Shares shall not constitute an adverse Change to the rights of the Preferred D Shares and shall not require the consent of the holders of two-thirds or more of the Preferred D Shares (ii) reclassifies any existing issued shares of the Company into shares with preference over the Preferred D Shares, or (iii) increases or decreases the number of authorized Preferred D Shares.

13.2.3 Notwithstanding anything to the contrary herein, in addition to the consents required under the Articles, consent of the holders of 75% of the issued and outstanding Preferred C Shares shall be required for any amendment of these Articles (including an amendment effected by merger, consolidation and other reorganization) that (i) adversely affects the rights, preferences and privileges of the Preferred C Shares, *provided however* that the creation or issuance of new class of shares with rights that are equal or superior to the Preferred C Shares shall not constitute an adverse Change to the rights of the Preferred C Shares and shall not require the consent of the holders of 75% of the issued and outstanding Preferred C Shares (ii) reclassifies any existing issued shares of the Company into shares with preference over the Preferred C Shares, or (iii) increases or decreases the number of authorized Preferred C Shares.

13.2.4 Nothing in these Articles of Association will be construed as granting the holders of Preferred C Shares or the holders of Preferred D Shares the right to prevent, block, restrict, or otherwise condition or limit a Deemed Liquidation, provided that the Distributable Proceeds in such Deemed Liquidation are distributed or allocated among the Shareholders (including the holders of Preferred C Shares and the holders of Preferred D Shares, as applicable)

according to the applicable order of preference set forth in Article 12.1, including without limitation the payment in full or in part of the Preferred D Preference Amount and the Preferred C Preference Amount, as and if applicable, all in accordance with Article 12.1.

13.2.5 Subject to the provisions of Articles 13.2.1, 13.2.2, 13.2.3 and 13.2.4 above and Article 36 below, the Company may from time to time amend these Articles by Ordinary Resolution.

13.3 *Aggregation of Shares* . All Shares held by two or more Shareholders who are Affiliates of one another shall be aggregated together for the purpose of determining the availability of any rights under these Articles for such Shareholders, including rights which are conditioned on the relevant Shareholder holding Shares representing a minimum percentage, etc.

13.4 Subject to the provisions of Articles 14 and 36 below and to the rights of the Preferred Shareholders and of the Preferred Shares, the un-issued Shares of the Company shall be at the disposal of the Board who may offer, allot, grant options over or otherwise dispose of Shares to such Persons, at such times and upon such terms and conditions as the Company may by resolution of Board determine.

13.5 The Company may, subject to applicable law, issue redeemable shares *and* redeem the same.

## 14. **Preemptive Rights**

14.1 Until the consummation of a Qualified IPO, and except:

(i) to the extent the right to receive such offer has or shall have been waived in writing by a Qualified Shareholder who would otherwise be entitled thereto (such waiver being effective only with respect to such Qualified Shareholder waiving such right);

(ii) for the issuance of Excluded Securities;

(iii) for securities offered to the public in an IPO;

(iv) for securities issued in connection with or as part of a Deemed Liquidation,

- the following provisions shall govern the issuance of any Securities of the Company.

14.2 If the Company proposes to issue Securities (the " **Offered Securities** "), it shall give each Qualified Shareholder a written notice of its intention to do so (the " **Rights Notice** "), describing the Offered Securities, the price and the general terms upon which the Company proposes to issue them. Each Qualified Shareholder shall have twenty (20) Business Days from delivery of the Rights Notice (the " **Pre Emptive Period** ") to agree to purchase all or any part of its pro-rata share of such Offered Securities, which will enable it to maintain its shareholding percentage of the issued and outstanding share capital of the Company (calculated on an as-converted basis) immediately prior to such issuance, for the price and upon the terms specified in the Rights Notice, by giving written notice to the Company setting forth the quantity of Offered Securities which the Qualified Shareholder wishes to purchase.

14.3 If a Qualified Shareholder does not provide written notice of its intention to purchase its pro-rata share of the Offered Securities by the end of the Pre Emptive Period (a " **Non-Accepting Shareholder** "), each Qualified Shareholder that has notified the Company of its intention to purchase its pro-rata share of the Offered Securities (an " **Accepting Shareholder** ") shall have a right of over-allotment to purchase the Non-Accepting Shareholders portion of the Offered Securities (the " **Available Securities** "). The Company, within ten (10) days from end of the Pre Emptive Period, shall notify each Accepting Shareholder of its right to purchase the Available Securities. Each Accepting Shareholder shall then have ten (10) Business Days after such notice is delivered (the " **Over Allotment Period** ") to agree to purchase the Available Securities for the price and upon the terms specified in the Rights Notice, by giving written notice to the Company. If more than one Accepting Shareholder notifies the Company that it wishes to purchase the Available Securities, the Available Securities shall be allocated among such Accepting Shareholders pro-rata, according to the ratio of the number of issued shares owned by such Accepting Shareholder immediately prior to the issuance of Offered Securities (calculated on an as-converted basis), to the total number of shares owned by all Accepting Shareholders immediately prior to the issuance of Offered Securities, (calculated on an as-converted basis).

14.4 The pre-emptive rights set forth in this Article 14 may be waived only with the written consent of (i) the Preferred Majority; (ii)  the holders of 75% of all of the issued and outstanding Preferred C Shares and (iii) more than two-thirds of all issued and outstanding Preferred D Shares.

14.5 If the Qualified Shareholders fail to exercise in full their preemptive right by the end of the Over Allotment Period, *then* the Company shall have ninety (90) days after delivery of the Rights Notice to sell the unsold Offered Securities at a price and upon general terms no more favorable to the purchasers thereof than specified in the Rights Notice. If the Company has not sold the Offered Securities within said ninety (90) day period the Company shall not thereafter issue or sell any Offered Securities without first offering such securities to the Preferred Shareholders in the manner provided above.

15. **Transfer, Transmission and Sale of Shares in the Company**

Any Transfer of Securities in the Company shall be subject to the following provisions:

15.1 No Transfer of Shares shall be effective unless the Transfer is made in accordance with the provisions of this Article 15 and Articles 16, 17 and 20 below, *provided* , *however* , that the Board, at its discretion, may refuse to register any Transfer to any person or entity that is a competitor of the Company.

The Board shall not register or record a Transfer in the Shareholders Register, if such Transfer is effected in violation of these Articles.

Any purported Transfer in contravention of the provisions of these Articles relating to the Transfer of Shares shall be null and void.

Prior to the registration of a Transfer of Shares, the Board may require proof of compliance with the provisions of these Articles in respect of such Transfer. If the Board makes use of its powers under this Article 15.1 and refuses to register or otherwise record a Transfer of Shares, it must provide written notice to the contemplated transferee and to the transferor of such refusal within fourteen (14) days from the date the instrument or other deed of Transfer was furnished to the Company.

15.2 Each Transfer of Shares shall be made in writing in the form appearing below, or in a similar form, or in any form as may be determined by the Board from time to time. Such form of transfer shall be delivered to the Office together with the certificates representing the transferred Shares and any other reasonable proof the Board shall require.

**Instrument/Deed of Transfer of Shares**

I, _____ of _____ (the " **Transferor** ") do hereby transfer to _____, of _____ (the " **Transferee** ") _____ share(s) having nominal value of NIS _____ each one in **Tufin Software Technologies Ltd.** , to hold unto the Transferee, his executors, administrators, and assigns, subject to the several conditions on which I held the same at the time of the execution hereof; and I, the Transferee, do hereby agree to take said share(s) subject to the conditions aforesaid. As witness we have hereunto set our hands the ____ day of _____ 20__.

| | |
|---|---|
| Transferee | Transferor |
| Address & Profession | Address & Profession |
| Witness to Transferee's Signature | Witness to Transferor's Signature |
| Address of Witness | Address of Witness |

15.3 The instrument of Share transfer shall be executed by both the transferor and the contemplated transferee, and the transferor shall remain the registered holder of the Share until the name of the transferee is entered into the Shareholders Register in respect thereof.

15.4 The Board or whomever the Board shall appoint for this purpose, shall maintain a Shareholders Register. The ownership of Shares shall be in accordance with that appearing in the Shareholders Register.

15.5 The Shareholders Register may be closed at such dates and for such other periods as determined by the Board from time to time, provided that the Shareholders Register may not be closed for more than thirty (30) days per year.

15.6 Notwithstanding Article 16 below, upon the death of a Shareholder, the remaining holders (in the event that the deceased was a joint holder of a Share) or the administrators or executors or heirs of the deceased (in the event the deceased was the sole holder of the Share or was the only one of the joint holders of the Share to remain alive) shall be recognized by the Company as the sole holders of any title to the Shares

of the deceased. However, nothing aforesaid shall release the estate of a joint holder of a Share from any obligation with respect to the Share that the deceased held jointly with any other holder.

15.7 Any person becoming entitled to a Share in consequence of the death or bankruptcy or liquidation of a Shareholder shall, upon such evidence being produced as may from time to time be required by the Board, have the right, either to be registered as a Shareholder in respect of such Share upon the consent of the Board (which has the authority to refuse pursuant to Article 15.1 above) or, instead of being registered himself, to transfer such Share to another person, subject to the provisions contained in Article 15.1 above and elsewhere in these Articles with respect to Transfers.

15.8 A person becoming entitled to a Share in consequence of the death of a Shareholder shall not be entitled to receive notices of General or Class Meetings, or to participate or vote thereat with respect to that Share, or to exercise any right of a Shareholder, until such person has notified the Company of his entitlement and has been recorded in the Shareholders Register as the registered holder of such Share. Subject to compliance with the foregoing provisions, the Company shall record such person in the Company's Shareholders Register no later than 30 days following receipt of such notice.

15.9 Additionally, each Transfer of Shares shall be subject to and conditioned upon the transferee undertaking in writing and in advance, to be bound by such terms of any contractual obligations with respect to the transferred Shares by which the transferor was bound immediately prior to the Transfer, including under any agreements to which the Company is also a party, and the Company shall not record nor otherwise give any force or effect to any Transfer made not in violation of this Article 15.9.

## 16. <u>Right of First Refusal</u>

16.1 Until an IPO, each Preferred Shareholder shall have a right of first refusal with respect to a Transfer of all or any of the Securities of the Company by any Shareholder (the " **ROFR Transferor** ").

16.2 Any ROFR Transferor proposing to Transfer all or any of its Securities (the " **Offered Shares** ") shall first provide the Preferred Shareholders with an offer stating the identity of the ROFR Transferor and of the transferee and the terms of the proposed Transfer (the " **Offer** "). Each Preferred Shareholder may accept such Offer in respect of any portion of the Offered Shares (" **Accepting Preferred Shareholder** ") by giving the Company notice to that effect within fourteen (14) Business Days after being served with the Offer (the " **ROFR Period** ", and an " **Acceptance** ", respectively).

16.3 If the Acceptances, in the aggregate, are in respect of all of, or more than, the Offered Shares, then the Accepting Preferred Shareholders shall acquire the Offered Shares, on the terms aforementioned, in proportion to their respective holdings of the Company's issued and outstanding share capital (calculated on an as-converted basis), *provided, however* , that no Accepting Preferred Shareholder shall be entitled or shall be forced to acquire under the provisions of this Article 16 more than the number of Offered Shares initially accepted by such Accepting Preferred Shareholder under the Acceptance, and upon the allocation to it of the full number of Offered Shares so

accepted, such Accepting Preferred Shareholder shall be disregarded in any subsequent computations and allocations hereunder. Any Offered Shares remaining after the computation of such respective entitlements shall be re-allocated among the remaining Accepting Preferred Shareholders (other than those to be disregarded as aforesaid), in the same manner, until one hundred percent (100%) of the Offered Shares have been allocated as aforesaid.

16.4 If the Acceptances are in respect of less than all of the Offered Shares, then the Accepting Preferred Shareholders shall not be entitled to acquire the Offered Shares, and the ROFR Transferor, at the expiration of the aforementioned fourteen (14)-business day period, shall be entitled to Transfer all (but not less than all) of the Offered Shares to the proposed transferee(s) identified in the Offer, *provided, however,* that in no event shall the ROFR Transferor Transfer any of the Offered Shares to any transferee other than such proposed transferee(s) or Transfer the same on terms more favorable to the transferee(s) than those stated in the Offer, *provided, further* , that any Offered Shares not Transferred within ninety (90) days after the expiration of such ROFR Period, shall again be subject to the provisions of this Article 16.

16.5 The ROFR Transferor shall be bound, upon payment of the offer price, to Transfer to the Accepting Preferred Shareholders the Offered Shares which have been allocated to the Accepting Preferred Shareholders pursuant to this Article 16. If, after becoming so bound, the ROFR Transferor defaults in Transferring the Offered Shares, the Company may receive the purchase price therefor and the Transferor shall be deemed to have appointed any member of the Board as his agent to execute a Transfer of the Offered Shares to the Accepting Preferred Shareholders and, upon execution of such Transfer, the Company shall hold the purchase price therefor in trust for the ROFR Transferor.

## 17.    <u>No Sale</u>

Each Founder may Transfer up to 100,000 Shares held by such Founder in each twelve (12) month period, subject to the right of first refusal contained in Article 16 above and the Co-Sale rights contained in Article 20, provided that other than the foregoing Shares, neither Founder may Transfer any other Shares.

## 18.    <u>Bring Along</u>

18.1 Notwithstanding Articles 16 and 17 above and without limitation of any provision of applicable law, but subject to Article 36, if, at any time prior to an IPO, Shareholders holding the Preferred Majority accept (either by vote or in writing) an offer to sell all of their Shares to a third party, and such offer is conditioned upon the sale of all remaining outstanding Shares to such third party (the " **Purchase Offer** "), *then* all remaining Shareholders (including the Founders) shall be required to sell their Shares in such transaction, on the same terms and conditions of the Purchase Offer, *provided that* such Purchase Offer shall be distributed or allocated in accordance with Article 12.1 above.

18.2 The majority set forth in Article 18.1 above for Shareholders accepting the Purchase Offer shall be deemed the majority required under Section 341(d) of the Companies Law.

18.3 Each Shareholder hereby agrees to vote in favor of any resolution brought before a General and/or Class Meeting in order to consummate the transaction contemplated in the Purchase Offer, and to take all steps and actions, including signing all documents and delivery of Share certificates, as are required to fully effect such transaction and hereby waives any appraisal rights with respect thereto.

18.4 Without derogating from Article 18.3 above, all Shareholders shall be deemed to have given an irrevocable proxy to such person as shall be designated by the Shareholders who accepted the Purchase Offer to vote for, and sign all documents in connection with, the acceptance of such Purchase Offer and at the closing of such Purchase Offer all of the Shareholders will transfer all their Securities to such person or entity at the same price and terms as the Purchase Offer. If a Shareholder fails to surrender its Share certificate, or any other instrument evidencing its Securities in connection with the consummation of the Purchase Offer, such certificate or instrument shall be deemed canceled, the Company shall be authorized to issue a new certificate or instrument in the name of the person making the Purchase Offer, the Board shall be authorized to establish an escrow account into which the consideration for such canceled Securities shall be deposited and a trust to administer such account.

18.5 The Company shall not issue any Securities, or effect any Transfer of Securities by any Shareholder until it has satisfactory evidence that such subscriber or transferee (to the extent not a Shareholder prior to the issuance or Transfer) shall be bound by, and be subject to, the provisions of this Article 18.

## 19. <u>Exemptions</u>

19.1 The right of first refusal and the right to bring along set forth in Articles 16 and 18 above, respectively, shall not apply to Transfers of Securities from a Shareholder to the Permitted Transferees of such Shareholder, back to the original Shareholder and/or to a Permitted Transferee of such Permitted Transferee *, provided, that* such Permitted Transferee remains within the definition of a Permitted Transferee of the Transferor **.**

19.2 In addition to and without derogating from the above, a Transfer of Shares held by any trustee pursuant to an ESOP to any participant of the ESOP, shall not be subject to the rights of first refusal set forth in these Articles.

## 20. <u>Right of Co-Sale</u>

Notwithstanding any provision to the contrary herein, the Preferred Shareholders shall be entitled to participate, on a pro rata basis and on identical terms, in any Transfer of Shares (the " **Transferred Shares** ") by any Founder or other members of management (holding a title of vice president or higher) (the " **Co-sale Transferor** "), according to the following provisions:

20.1 *Exercise of Right* . If the Transferred Shares intended to be sold by the Co-sale Transferor are not acquired pursuant to the rights of first refusal set forth in these Articles, the Preferred Shareholders (hereinafter the " **Offerees** "), shall have the right, exercisable by written notice to the Co-sale Transferor within the ROFR Period, to require the Co-sale Transferor to provide as part of his proposed sale, that such Offeree

shall be given the right to participate in the sale in a pro rata proportion (the " **Offeree Pro-Rata Share** ") equal to the product obtained by multiplying (i) the aggregate number of Shares covered by the sale, by (ii) a fraction, the numerator of which is the number of Shares owned by such Offeree at the time of the sale and the denominator of which is the total number of Shares owned by all Preferred Shareholders at the time of sale, on the same terms and conditions as the Co-sale Transferor. If any Offeree exercises its rights hereunder, the Co-sale Transferor must cause the purchaser of the Offered Shares (the " **Buyer** ") to purchase, as part of the sale agreement, the Offeree Pro Rata Share (or any part thereof chosen by such Offeree to be sold, if it gave notice with respect to less than its Pro-Rata Share), and the Co-sale Transferor shall not proceed with such sale unless such Offeree is given the right to so participate in the sale.

20.2    If an Offeree does not respond to the Offer by the end of the ROFR Period clearly stating its wish to participate in the sale, such Offeree shall be deemed to have declined waived its co sale right under this Article 20.

20.3    The Co-sale Transferor shall be entitled to sell all, or the appropriate pro rata portion (together with the participating Offerees' Shares), as applicable, of the Offered Shares, to the Buyer at any time within ninety (90) days after the lapse of the ROFR Period. Any such Transfer shall be on not less favorable terms and conditions to the Buyer than those specified in the Offer. Any of the Co-sale Transferor's Shares in the Company not so sold within such 90-day period shall continue to be subject to the requirements of this Article 20.

20.4    The exercise or non-exercise of the right to participate hereunder with respect to a particular sale by a Co-sale Transferor shall not adversely affect the right of the Preferred Shareholders to participate in subsequent sales by shareholders pursuant to this Article 20.

20.5    Notwithstanding the aforesaid, if any Transfer proposed to be made by shareholder, in one or more related transactions, shall result in a change in Control of the Company, then the Co-sale Transferor shall, prior to effecting such Transfer, notify the Offerees of same, and the Offerees shall be entitled to participate in such transaction(s) and effect a Transfer of all of their Securities in the Company (on an as-converted basis) in accordance with the provisions of this Article 20.

20.6    If a shareholder purports to effect a Transfer of any Securities in contravention of the provisions of these Articles (the " **Defaulting Shareholder** " and a " **Prohibited Transfer** ", respectively), then: (i) the Company shall not record the sale and Transfer in the Shareholders Register nor otherwise give any force or effect to such Prohibited Transfer, and (ii) in addition to the Company's obligation in (i) herein, the Offerees may proceed to protect and enforce their rights herein by suit in equity or by action at law against the Defaulting Shareholder, whether for the specific performance of any provision contained herein or for an injunction against the breach of any such provision, or to enforce any other legal or equitable right of the Offerees.

20.7    Notwithstanding anything to the contrary in this Article 20, for the purposes of this Article 20, reference to a Shareholder shall include the Shareholder's Affiliates

**21.**      <u>**Modification of Capital**</u>

Subject to the rights of the Preferred Shareholders and further subject to the provisions of Article 13.2 above and Article 36 below, the Company may, from time to time, by Ordinary Resolution:

21.1    consolidate and divide its share capital or a part thereof into shares of greater value than its existing Shares;

21.2    cancel any Shares which have not been purchased or agreed to be purchased by any Person;

21.3    by subdivision of its existing Shares, or any of them, divide the whole, or any part, of its Share capital into shares of lesser value than is fixed by these Articles, and in a manner so that with respect to the shares created as a result of the division it will be possible to grant to one or more shares a right of priority, preference or advantage with respect to dividend, capital, voting or otherwise over the remaining or similar share;

21.4    reduce its Share capital, and any fund reserved for capital redemption, in the manner that it shall deem to be desirable under the provisions of Section 287 of the Companies Law;

21.5    reclassify all or any part of its share capital, regardless if such Shares are issued or not; or

21.6    increase its Share capital, regardless of whether or not all of its Shares have been issued, or whether the Shares issued have been paid in full, by the creation of new shares, divided into shares in such nominal value, and with such preferred or deferred or other special rights (subject always to the provisions of these Articles), and subject to any conditions and restrictions with respect to Dividends, return of capital, voting or otherwise, as shall be directed by the resolution.

**22.**      <u>**Registered Holder**</u>

22.1    If two (2) or more Persons are registered as joint holders of a Share, they shall be jointly and severally liable for any calls or any other liability with respect to such Share. However, with respect to voting, powers of attorney and furnishing notices, the joint holder registered first in the Shareholders Register shall be deemed to be the sole owner of the Share, unless all the registered joint holders of such Share shall notify the Company in writing that another one of them is to be treated by the Company as the sole owner of such Share, as aforesaid.

22.2    If two (2) or more Persons are registered together as holders of a Share, each one of them shall be permitted to give receipts binding all the joint holders for Dividends or other amounts and distributions made in connection with such Share(s), and the Company shall be permitted to pay all Dividends, distributions or other amounts due with respect to the Share(s) to one (1) or more of the joint holders, as it shall deem fit.

22.3    If, by the terms of issuance of any Share, the whole or any part of the price thereof shall be payable by installments, every such installment shall, when due, be paid to

the Company by the then registered holder of the Share or by his administrators.

22.4 The Company shall not be bound to recognize any equitable, contingent, future or partial interest in any share or any other right whatsoever in any share other than an absolute right to the entirety thereof of the registered holder.

## 23. <u>Share Certificates</u>

23.1 Each Share certificate evidencing title to Shares shall carry the signature of at least one (1) Director and/or of any other Person(s) authorized thereto by the Board, together with the rubber stamp or printed name of the Company.

23.2 A Shareholder shall be entitled to receive from the Company, without payment, one (1) certificate for each class of Shares held by such Shareholder, containing the number of Shares registered in the name of such Shareholder, their class and serial numbering. Shares of different classes may not be included in the same certificate. A Shareholder who has Transferred a portion of his Shares shall be entitled to a certificate representing the balance of his Shares, without charge, against the surrender of the original Share certificate issued thereto or evidence of loss or destruction of such Share certificate, to the extent that a Share certificate was in fact originally issued.

23.3 For joint holders of a Share(s), the Company shall not be obligated to issue more than one (1) certificate to all such joint holders, and the delivery of such a certificate to one (1) of the joint holders shall be deemed to be a delivery to all of the joint holders. Delivery of the Share certificate to the joint holder first named on the Shareholders Register in respect of such joint ownership shall be deemed delivery to all joint holders.

23.4 If a Share certificate is defaced, lost or destroyed, it may be replaced upon payment of such fee, if any, and on such terms as to evidence and indemnity, if any, as the Board may deem fit.

## 24. <u>Calls</u>

24.1 No Person shall be entitled to any right as a Shareholder of the Company (including without limitation the right to receive Dividends or to vote in the Company's General or Class Meetings) with respect to Shares not fully paid for according to their terms of issuance, except as otherwise agreed to by the Company (following approval of the Board) and such Person.

24.2 The Board may make calls for payment from Shareholders of the amount due and not yet paid up on their shares as the Board shall deem fit, *provided that* the Company gives the Shareholders a prior notice of at least fourteen (14) days on every call. Each Shareholder shall pay the amount called to the Company on the date and at the place prescribed in the Company's notice. Unless otherwise stipulated in the resolution of the Board (and in the notice referred to above), each payment in response to a call shall be deemed to constitute a pro rata payment on account of all the shares of the Shareholder in respect of which such call was made

24.3 The joint holders of a share shall be jointly and severally liable to pay the calls for payment on such share and all interest payable thereon in full.

24.4    If the amount called is not paid by the prescribed date, the Person from whom it is due shall be liable to pay such linkage differentials and interest as the Board shall determine, from the date on which payment was prescribed until the day on which it is actually paid, but the Board may forego the payment of such linkage differentials or interest, in whole or in part.

24.5    Any amount that, according to the conditions of issuance of a Share, must be paid at the time of issuance or at a fixed date, whether on account of the par value of the share or premium, shall be deemed for the purposes of these Articles to be a call for payment that was duly made. In the event of non-payment of such amount all the provisions of these Articles shall apply in respect of such amount as if a proper call for its payment has been made and an appropriate notice thereof given.

24.6    At the time of issuance of shares the Board may make arrangements that differentiate between Shareholders, in respect of the amounts of calls for payment, their dates of payment or the rate of interest.

24.7    The Board may, if it deems fit, accept from any Shareholder for his Shares any amount of money not yet payable, and may approve the payment by the Company of (i) interest for that advance until the day on which such amount would be payable, at a rate agreed between the Company and such Shareholder, and (ii) any Dividends that may be paid for that part of the Shares for which the Shareholder has paid in advance from the date of such payment. The Board may at any time cause the Company to repay all or any part of the money so advanced, without premium or penalty.

25.     **Forfeiture of Shares**

25.1    If a Shareholder fails to pay any amount payable by virtue of a call, installment of a call, or interest thereon on the day appointed for payment thereof, the Board may, at any time thereafter so long as any part of such call, installment or interest remains unpaid, forfeit all or any of the Shares in respect of which such payment was called for. Any interest which may have accrued and any expenses that were incurred as a result of such non-payment (including without limitation attorneys' fees and costs of legal proceedings) shall be added to, and shall for all purposes (including the accrual of interest thereon) constitute part of the amount payable to the Company in respect of such call.

25.2    Following the adoption of a resolution as to the forfeiture of a Shareholder's Share, a notice which specifies a date not less than fourteen (14) days from the date of the notice, on or before which the payment of the call or installment or part thereof is to be made together with interest and any expenses incurred as a result of such non-payment shall be given to such Shareholder. The notice shall also state the place the payment is to be made and that in the event of non-payment at or before the time appointed, the share in respect of which the call was made will be de facto forfeited.

25.3    The forfeiture shall apply to those Dividends that were declared but not yet distributed with respect to the forfeited Shares.

25.4    A share so forfeited shall be deemed to be the property of the Company and can be sold or otherwise disposed of, on such terms and in such manner as the Board deems

fit. At any time before a sale or disposition the forfeiture may be canceled on such terms as the Board deems fit.

25.5 A Person whose Shares have been forfeited shall cease to be a Shareholder in respect of the forfeited Shares, but shall notwithstanding remain liable to pay, and shall promptly pay, to the Company all amounts which, at the date of forfeiture, were payable by him to the Company in respect of the shares, together with interest thereon from the time of forfeiture until actual payment at the rate prescribed above.

25.6 The forfeiture of a Share shall cause, at the time of forfeiture, the cancellation of all such Shareholder's rights in the Company and of any claim or demand against the Company with respect to that Share, and of other obligations that the Company may have towards such Shareholder with respect to such Share.

25.7 The Person to whom the forfeited Share may be sold shall be registered as the holder of the Share and his title to the Share shall not be affected by any irregularity or invalidity in the proceedings in reference to the forfeiture, sale or disposal of the Share.

25.8 The provisions of these Articles as to forfeiture shall apply in the case of non-payment of any sum which, by the terms of issue of a Share, becomes payable at a fixed time, whether on account of the par value of the Share or by way of a premium, as if the same had been payable by virtue of a call duly made and notified.

## 26. **<u>Lien</u>**

26.1 The Company shall have a lien and first pledge on every Share that was not paid up in full, in respect of money due to the Company on calls for payment or payable at fixed times, whether or not presently payable, or the fulfillment and performance of the obligations and commitments to which the Company is entitled in respect of the Share. The lien on a Share shall also apply to Dividends and other distributions payable on it. The Board may exempt any Share, in full or in part, temporarily or permanently, from the provisions of this Article 26.

26.2 The Company may sell any Share on which it has a lien in any manner the Board deems fit, but such Share shall not be sold before the date of payment of the amount in respect of which the lien exists, or the date of fulfillment and performance of the obligations and commitments in consideration of which the lien exists, has arrived, and until fourteen (14) days have passed after written notice has been given to the registered holder at that time of the Share, demanding payment of the amount against which the lien exists, or the fulfillment and performance of the obligations and commitments in consideration of which the lien exists, and such payment or fulfillment and performance have not been made.

26.3 The net proceeds of the sale, after payment of the costs thereof, shall be applied in payment of the amount due to the Company or the fulfillment and performance of the obligations and commitments in respect of such Share as aforesaid in the preceding Article (whether or not the same have matured), and the remainder, if any, shall be paid to whoever is entitled to the Share on the day of the sale.

26.4 After the execution of a sale of pledged Shares as aforesaid, the Board shall be permitted

29

to sign or to appoint someone to sign a deed of transfer of the sold Shares and to register the purchaser's name in the Shareholders Register as the owner of the Shares so sold, and it shall not be the obligation of the purchaser to supervise the application of the purchase price nor will his right in the Shares be affected by any fault or error in the procedure of sale.

**General Meetings**

27. The Company shall not have to hold an Annual General Meeting except to the extent necessary for purpose of appointing the Company's Auditors. Any Annual General Meeting, to the extent convened, shall be held at least once every year, at such place and time as may be prescribed by the Board, but in any event not more than fifteen (15) months after the preceding General Meeting. The Company shall hold an Annual General Meeting at such time and place as prescribed by the Board. The Company shall hold Special General Meetings and Class Meetings if and when called.

28. A General Meeting may be convened in the manner provided by the Companies Law.

29. **Notices of General Meetings** .

    Notices of General Meetings shall be given as follows:

    29.1  A prior notice of at least seven (7) days and no more than 45 days of any General Meeting shall be given with respect to the place, date and hour of the meeting and the nature of every subject on its agenda.

    29.2  The notice shall be given to Shareholders entitled pursuant to these Articles to receive notices from the Company, as hereinafter provided.

    29.3  Non-receipt of a notice, given as aforesaid, or the accidental omission to give notice of a meeting to any Shareholder, shall not invalidate the resolution passed or the proceedings held at the relevant meeting.

    29.4  With the consent of all the Shareholders who are entitled at such time to receive notices, the Company shall be permitted to convene General Meetings and to resolve any resolution, upon shorter notice or without any notice and in such manner, generally, as shall be approved by the Shareholders.

30. **Proceedings At General Meetings** .

    30.1  The General Meeting shall have the right to discuss and vote on such matters as set forth in these Articles and the Companies Law.

    30.2  *Quorum* . No matter shall be discussed at a General Meeting unless a quorum is present at the time when the General Meeting starts its discussions. Subject to the provisions of these Articles, two or more Shareholders present, personally or by proxy, who hold or represent in the aggregate the majority of the voting rights in the Company, on an as converted basis, shall constitute a quorum for General Meetings.

    30.3  If within half an hour from the time appointed for the General Meeting a quorum is not present, the General Meeting, shall stand adjourned to the same place and time two (2) Business Days from the date of the original General Meeting. If a notice of

the adjourned General Meeting has been given to the Shareholders, and a quorum is not present at the adjourned General Meeting within half an hour from the time appointed for the General Meeting, one or more Shareholder(s) present personally or by proxy, shall constitute a quorum, and shall be entitled to deliberate and to resolve in respect of the matters for which the General Meeting was convened.

30.4 The Chairman or a director appointed by the Board for such purpose shall open all General Meetings and shall preside as chairman at the General Meeting. If there is no such Chairman, or if at any General Meeting such Chairman is not present within fifteen (15) minutes after the time fixed for holding the General Meeting or is unwilling to act as chairman, the Shareholders present shall choose someone of the Shareholders present to be chairman.

30.5 The provisions of these Articles relating to General Meetings shall, mutatis mutandis, apply to any Class Meeting, *provided, however* , that the requisite quorum at any such Class Meeting shall be one or more Shareholders present in person or proxy and holding not less than fifty percent (50%) of the issued and outstanding shares of such class.

**31.**      <u>**Vote By Shareholders**</u> .

31.1 Every resolution put to the vote at a General Meeting shall be decided by a count of votes. Subject to any provision in the Companies Law or in these Articles requiring a higher or other specified majority, all resolutions shall be passed as Ordinary Resolutions (calculated on an as-converted basis). A declaration by the chairman that a resolution has been carried unanimously, or carried by a particular majority, or lost, and an entry to that effect in the minute book of the Company, shall be prima facie evidence of the fact without proof of the number or proportion of the votes recorded in favor of or against such resolution.

31.2 Subject to the provisions of these Articles, in a count of votes, each Shareholder present at a General Meeting, personally or by proxy, shall be entitled to one (1) vote for each Share held by it on an as converted basis; *provided that* , no Shareholder shall be permitted to vote at a General Meeting or to appoint a proxy to vote thereat unless he has paid all calls for payment and all amounts then due to the Company from him with respect to his Shares.

31.3 If the number of votes for and against is equal, the chairman of the General Meeting shall not have a casting vote, and the resolution proposed shall be deemed rejected.

31.4 In the case of joint holders of a Share, the vote of the senior holder who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other joint holders. The appointment of a proxy to vote on behalf of a Share held by joint holders shall be executed by the signature of the senior of the joint holders. For the purposes of this Article, seniority shall be determined by the order in which the names of the joint holders stand in the Shareholders Register.

31.5 An objection to the right of a Shareholder or a proxy to vote in a General Meeting must be raised at such General Meeting or at such adjourned General Meeting wherein that Person was supposed to vote, and every vote not disqualified at such a General Meeting shall be valid for each and every matter. The chairman of the General Meeting

31

shall decide whether to accept or reject any objection raised at the appointed time with regard to the vote of a Shareholder or proxy, and his decision shall be final.

31.6 A Shareholder of unsound mind, or in respect of whom an order to that effect has been made by any court having jurisdiction, may vote, only through his legal guardian or such other Person, appointed by the aforesaid court, who performs the function of a representative or guardian. Such representative, guardian, or other Person may vote by proxy.

31.7 A Shareholder which is a corporation shall appoint a person who it shall deem fit to be its representative at every General Meeting of the Company. The representative appointed as aforesaid shall be entitled to exercise on behalf of the Shareholder he represents all the powers that the Shareholder itself could have exercised as if it were a natural person.

31.8 In every vote, a Shareholder entitled to vote as set forth in these Articles, shall be entitled to vote either personally or by proxy. A proxy need not be a Shareholder.

31.9 Shareholders may participate in a General Meeting by means of a conference telephone call or similar communications equipment by means of which all Persons participating in the General Meeting can hear each other and participation in a General Meeting pursuant to this Article shall constitute presence in person at such General Meeting.

31.10 Shareholders may also vote in writing, by delivery to the Company, prior to a General Meeting, of a written notice stating their affirmative or negative vote on an issue to be considered by such General Meeting.

31.11 A letter of appointment of a proxy, power of attorney or other instrument pursuant to which the appointee is acting shall be in writing. An instrument appointing a proxy, whether for a specific General Meeting or otherwise, may be in the following form or in any other similar form prescribed by the Board:

"I, *[Name of Shareholder]* , of *[Address of Shareholder]* , a Shareholder holding shares in _____ Ltd. hereby appoint *[Name of Proxy]* of *[Address of Proxy]* as my proxy to vote in my name and place at the General Meeting of the Company to be held on _____, and at any adjournment thereof.
In witness whereof signed by me this day of _____,_____

_____
Appointor's Signature"

31.12 Such instrument or a copy thereof shall be deposited at the Office, or at such other place as the Board may direct from time to time, not less than 24 hours before the time appointed for the General Meeting or adjourned General Meeting wherein the Person referred to in the instrument is appointed to vote, or presented to the chairman at the General Meeting in which such Person shall vote that Share. An instrument appointing a proxy which is not limited in time shall expire twelve (12) months after the date of its execution; if the appointment shall be for a limited period (whether limited by time or until the occurrence of a certain event), whether in excess of twelve (12) month or not, the instrument shall be for the period stated therein.

31.13 A vote pursuant to an instrument appointing a proxy shall be valid notwithstanding the death of the appointor, or the appointor becoming of unsound mind, or the cancellation of the proxy or its expiration in accordance with any law, or the Transfer of the Shares with respect to which the proxy was given, unless a notice in writing of any such event was received at the Office not less than 24 hours before the General Meeting took place. A facsimile transmission of the letter of appointment or power of attorney or other certificate shall be sufficient for the purpose of the General Meeting(s) for which it is intended.

31.14 A Shareholder is entitled to vote by a separate proxy with respect to each Share held by him, *provided that* each proxy shall have a separate letter of appointment specifying the number of Share(s) with respect to which such proxy is entitled to vote.

31.15 Subject to the provisions of any law, a resolution in writing signed by all Shareholders entitled to vote with respect to such Shares at General Meetings, or a resolution as aforesaid agreed upon by facsimile or e-mail, shall have the same validity as any resolution carried in a General Meeting of the Company duly convened and conducted for the purpose of passing such a resolution. If all the Shareholders shall consent in writing, or by facsimile or e-mail to any action to be taken by the Shareholders, such action shall be as valid as though it had been unanimously authorized at a duly convened General Meeting.

## Board Of Directors

**32.** **Composition of the Board**

32.1 *Number of Directors* . The number of Directors shall consist of no less than ~~one~~ six ( ~~1~~ 6 ) directors and no more than ~~seven~~ ten ( ~~7~~ 10 ) directors to be appointed and/or nominated as follows:

32.1.1 two (2) Directors shall be appointed, removed and replaced by the Majority Preferred A Shareholders (the " **Preferred A Director(s)** ");

32.1.2 one (1) Director shall be appointed, removed and replaced by the Preferred B Investor (the " **Preferred B Director** ");

32.1.3 two (2) Directors shall be appointed, removed and replaced by the holders of a majority of the Ordinary Shares (the " **Ordinary Director(s)** "); and

32.1.4 ~~two~~ five ( ~~2~~ 5 ) Director s shall be an industry expert appointed, removed and replaced by unanimous consent of the other members of the Board.

32.2 *Chairman of the Board* . The Chairman shall be designated and appointed by a majority of the Directors.

32.3 *Appointment Instrument* . Appointment, removal and replacement of Directors shall be effected by furnishing written notification to the Company, and shall become effective on the date fixed in such notice, or if not date is fixed, then on the date of receipt of such notification by the Company.

32.4 If any Director is not designated or appointed, or if the office of any Director is vacated,

the other Directors may act in every way and manner provided for under these Articles and the Companies Law as long as their number does not fall below the quorum required by these Articles for a Board meeting.

32.5 *Alternate Director*. Any Director is entitled, to appoint an alternate director, subject to the provisions of the Companies Law. Any Person, including a Director or an alternate director, may be such alternate Director (an " **Alternate Director** "), if such Person is qualified to serve as a director of the Company. Any Alternate Director shall have a vote equal to the votes of the Directors that he substitutes. An Alternate Director shall have, subject to his letter of appointment, all authorities vested in the Directors he substitutes. The tenure of office of an Alternate Director shall automatically be terminated upon the dismissal of the Director, or upon the vacation of office, for any reason, of, the Directors he substitutes, or upon the occurrence of one of the situations stated in Article 32.8 below in relation to such Alternate Director. Notwithstanding the foregoing, the appointment of an Alternative Director by the Preferred B Director shall not be effective unless approved by Marker TF Investments Ltd. in advance.

32.6 A Director shall not be required to hold Shares in the Company.

32.7 A Director may hold another paid position or function, except as accountant-auditor, in the Company, or in any other company of which the Company is a shareholder or in which the Company has some other interest, or that has an interest in the Company, together with his position as a Director, upon such conditions with respect to salary and other matters as determined by the Board and approved by the General Meeting.

32.8 Subject to the provisions of the Companies Law or these Articles, the tenure of office of a Director shall automatically be terminated upon the occurrence of one of the following:

32.8.1 if the Director becomes bankrupt;

32.8.2 if the Director is declared insane or becomes of unsound mind;

32.8.3 if the Director resigns by an instrument in writing delivered to the Company; or

32.8.4 upon the death of the Director, and if the Director is a corporation or other entity, upon the liquidation of such corporation or other entity.

32.9 Directors shall not receive any remuneration from the Company's funds, unless otherwise resolved by the General Meeting, and at a rate decided by such resolution. The Directors shall be entitled to reimbursement of their expenses in the course of their performance of their duties as Directors, including expenses in relation of participating in Board meetings, all as shall be determined by the Board.

32.10 The Preferred D Investors shall be entitled to appoint one non-voting board observer to the Board and to the board of directors of each material subsidiary (the " **Preferred D Designee** "). The Preferred D Designee shall be invited to all Board meetings and receive all notices, minutes consents and other information provided to members of the Board.

32.11 The Preferred D Designee will be reimbursed for the reasonable costs and expenses of transportation and accommodations associated with attending each Board meeting.

## 33. <u>Powers and Duties of Directors</u>

33.1 The Board shall determine and direct the Company's policy and shall supervise and inspect the performance of the CEO or General Manager and his or her actions and responsibilities. The Board shall be entitled to exercise the Company's powers and authorities pursuant to the applicable provisions of the Companies Law and these Articles. For the avoidance of doubt, all decisions regarding appointment or dismissal of the Company's senior management may be made by the CEO or other management members.

33.2 Without limiting the generality of the preceding provision, the Board may from time to time, in its discretion, cause the Company to borrow or secure the payment of any sum of money for the purposes of the Company, and it may cause the Company raise or secure the repayment of such sum in such manner, at such times and upon such terms and conditions in all respects as it thinks fit, and, in particular, by the issue of bonds, perpetual or redeemable debentures, debenture stock, or any mortgages, charges, or other securities on the whole or any part of the property of the Company, both present and future, including its uncalled capital for the time being and its called but unpaid capital.

## 34. <u>Proceedings and Functions of the Board of Directors</u>

34.1 The Board may meet in order to transact business, to adjourn its meetings or to organize them otherwise as it shall deem fit, in accordance with these Articles. The Board will meet at least once in each fiscal quarter.

34.2 *Quorum*. The presence of a majority of the Directors then in office at the opening of a Board meeting, one of whom must be a Preferred A Director, one of whom must be a Preferred B Director, and one of whom must be an Ordinary Director, shall constitute a quorum for meetings of the Board. Notwithstanding the aforesaid, if within half an hour of the time arranged for the Board meeting no quorum is present, such meeting shall stand adjourned to the same place and time three (3) Business Days from the date of the original meeting, and in such adjourned meeting if no quorum is present within half an hour of the time arranged, the presence of at least two (2) Directors then in office at such adjourned meeting, one of whom must be a Preferred Director, and one of whom must be an Ordinary Director, shall be deemed a quorum.

34.3 The Board may delegate any of its powers to committees and may from time to time revoke such delegation; *provided* that such delegation does not contradict Section 112 of the Companies Law; and provided further that the Preferred B Director shall be a member of every such committee if he/she elects to do so. Each committee to which any powers of the Board have been delegated shall abide by any regulations enacted by the Board with respect to the exercise of such delegated powers. In the absence of such regulations or if such regulations are incomplete in any respect, the committee shall conduct its business in accordance with the provisions of these Articles relating to the Board.

34.4 Directors or members of a committee of the Board may participate in a meeting of the Board or the committee, as applicable, by means of a conference telephone call or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this Article shall constitute presence in person at such meeting.

34.5 Each director may at any time request that a Board meeting be called and the Chairman shall call such a meeting upon such request.

34.6 Any notice of a Board meeting shall be given in writing in accordance with the notice provisions of these Articles, and shall include reasonable detail of the issues of such meeting. Notice shall be given at least three (3) Business Days before the time appointed for the meeting, unless all Directors at that time agree to a shorter notice, or waive notice altogether. Despite anything to the contrary in these Articles, failure to deliver notice to a Director of any such meeting in the manner required hereby may be waived by such Director, and a meeting shall be deemed to have been duly convened despite such defective notice following such waiver.

34.7 Subject to the provisions of Article 36 below, issues raised before all meetings of the Board shall be decided by the majority of the Directors present and entitled to vote at the meeting of the Board. If the number of votes for and against a resolution is equal, the chairman of the meeting shall have a casting vote.

34.8 A resolution in writing signed or agreed to in writing (including by facsimile or e-mail) by all of the Directors entitled to participate and vote on the issue at stake (or any respective Alternate Directors) shall be valid for any purpose as a resolution adopted at a Board meeting that was duly convened and held.

34.9 Subject to the provisions of applicable Law, all actions performed bona fide by the Board or by any Person acting as Director or as an Alternate Director shall be as valid as if each and every such Person were duly and validly appointed and fit to serve as a Director or an Alternate Director, as the case may be, even if at a later date a flaw shall be discovered in the appointment of such a Director or such a Person acting as aforesaid, or in his qualifications so to serve.

34.10 The Board shall cause minutes of all General Meetings of the Company, Board meetings and meetings of any committee of the Board, to be taken which minutes shall include at least the following items, if applicable: the names of the Persons present; the matters discussed at the meeting; the results of votes taken; resolutions adopted at the meeting; and directives given by the meeting. The minutes of any meeting, signed or appearing to be signed by the chairman of the meeting, shall serve as prima facie evidence of the accuracy of the contents of the minutes.

## 35. **Personal Interest**

35.1 All transactions and actions in which an Office Holder in the Company has a personal interest shall be approved in accordance with the provisions of the Companies Law and Article 36 below.

35.2 Prior to the approval of any such transaction with an Officer Holder, the Office Holder

having a personal interest in a transaction with the Company or in a transaction with another Person in which the Office Holder has a personal interest, shall disclose to the Company in advance all of the relevant facts of his personal interest in the proposed transaction.

**36.** **Protective Provisions**

36.1 Except as otherwise provided in these Articles, until a Qualified IPO, the Company shall not, without the consent of the Preferred Majority, or, if the decision is taken solely at the Board level under applicable Law, the consent of one (1) Preferred A Director and the Preferred B Director to take any action that:

36.1.1 subject to Articles 13.2.1, 13.2.2, 13.2.3, and 13.2.4 amends or otherwise modifies or waives any rights under these Articles or recapitalizes any of the Company's Shares, other than share splits, share dividends, and other technical changes in the Company's share capital;

36.1.2 subject to Articles 13.2.1, 13.2.2, 13.2.3, and 13.2.4 alters or changes the rights, preferences, or privileges of any class or series of the Preferred Shares, in any manner whatsoever, including, without limitation, by merger, consolidation or acquisition of the Company;

36.1.3 subject to Articles 13.2.1, 13.2.2, 13.2.3, and 13.2.4 creates (by reclassification or otherwise) or issues any class or series of shares or other Securities of the Company, having rights, preferences or privileges senior to or on parity with any class of the Preferred Shares in any respect;

36.1.4 increases or decreases the authorized number of Ordinary or Preferred Shares or any series of Preferred Shares;

36.1.5 effects a Liquidation, Deemed Liquidation, or other winding up of the Company or the cessation of all or substantially all of the business of the Company;

36.1.6 results in the payment or declaration of any dividend on any Ordinary Shares or Preferred Shares.

36.1.7 results in the redemption of any Preferred Shares or Ordinary Shares (other than pursuant to equity incentive agreements with service providers giving the Company the right to repurchase Shares upon the termination of services);

36.1.8 results in any merger, other corporate reorganization, sale of control, or any transaction in which all or substantially all of the assets of the Company are sold;

36.1.9 effects an IPO other than a Qualified IPO;

36.1.10 involves any transaction with an Interested Party;

36.1.11 effects any material change in the business of the Company;

36.1.12 without derogating from sub-parts 36.1.5 and 36.1.8 above, for so long

as the outstanding Preferred Shares represent at least seven percent (7%) of the issued and outstanding Shares on a fully diluted basis, involves the Transfer or license of any material asset in excess of $50,000 including intellectual property rights of the Company, or any substantial part thereof, other than in the ordinary course of business;

36.1.13 effects an acquisition of assets, other than acquisitions for less than US$300,000 per acquisition;

36.1.14 approves any loans or advances to employees or other than in the ordinary course of business as travel advances;

36.1.15 increases or decreases the authorized size of the Board as provided hereunder; and

36.1.16 guaranties an obligation of another or creates or approves any mortgage, pledge or other security interest on any material asset, other than in the ordinary course of business, of the Company or a subsidiary.

36.2 The same consents as set out in Article 36.1 above shall be required, *mutatis mutandis,* for any of the actions listed therein taken by, or with respect to, any subsidiary of the Company.

36.3 The ESOP Pool may not be increased by more than 1,000,000 Ordinary Shares per calendar year in the aggregate (" **Annual Increase** ") (i.e. any unutilized portion of the Annual Increase may be carried over to subsequent calendar years) without the consent of the holders of: (i) the Preferred Majority; (ii)  the holders of 75% of all of the issued and outstanding Preferred C Shares; and (iii) at least two-thirds of the issued and outstanding Preferred D Shares, on an as-converted basis, and provided that any increase of the ESOP Pool shall be subject to the approval of the Board.

36.4 The definition of "Deemed Liquidation" in these Articles may not be amended without the written consent of: (i) the holders of the Preferred Majority; (ii) the holders of 75% of all issued and outstanding Preferred C Shares; and (iii) the holders of two-thirds or more of the Preferred D Shares.

**General Provisions Relating To Management Of The Company**

**37.** **Local Management**

37.1 The Board may organize from time to time arrangements for the management of the Company's business in any particular place, whether in Israel or abroad, as it shall deem fit.

37.2 The Board may appoint any Person to be a member of such local management, or to be an agent, terminate such Person's appointment at any time, and decide such Person's manner of compensation and scope of authority.

**38.** <u>**CEO, General Manager, President, Secretary, Other Officers And Attorneys**</u>

38.1 The Board may from time to time appoint one or more Persons, whether or not he is a Director, as the CEO of the Company. The appointment may be either for a fixed period of time or without limiting the time that the CEO will stay in office. The Board may, from time to time, subject to any provision in these Articles and any contract between the CEO and the Company, release him from his office and appoint another or others in his or their place. The CEO shall be responsible for the current operation of the Company's affairs within the bounds of the policy determined by the Board and subject to its directions. In addition, the Board may from time to time, subject to the provisions of applicable law, grant and bestow upon the CEO those powers and authorities that it exercises pursuant to these Articles and under the provisions of Section 92 of the Companies Law, as it shall deem fit, and may grant those powers and authorities for such period, and to be exercised for such objectives and purposes, in such time and conditions, and on such restrictions, as it shall decide; and it can from time to time revoke, repeal, or change any one or all of those powers or authorities.

38.2 Subject to the provisions of these Articles, the Board may from time to time appoint a Secretary to the Company, a Treasurer and/or Comptroller or Chief Financial Officer as well as other officers, personnel, agents and servants, including management companies, for fixed, provisional or special duties, as the Board may from time to time deem fit, and may from time to time, in its discretion, suspend and/or dismiss any one or more of such Persons. The Board may determine the powers and duties of such Persons, and may demand security in such cases and in such amounts as it deems fit.

38.3 Subject to the provisions of these Articles, the wages and any other compensation of the CEO and other managers, or officers shall be determined from time to time by the Board, and it may be paid by way of a fixed salary or commission, or a percentage of profits or of the Company's turnover or of any other company in which the Company has an interest, or by participation in such profits, or in any combination of the aforementioned methods, or such other method as the Board shall determine.

38.4 The Board may from time to time directly or indirectly authorize any company, firm, Person or group of people to be the attorneys in fact of the Company for purposes and with powers and discretion which shall not exceed those conferred upon the Board or which the Board can exercise pursuant to these Articles, and for such a period of time and upon such conditions as the Board may deem proper. Every such authorization may contain such directives as the Board deems proper for the protection and benefit of the Persons dealing with such attorneys. The Board may also grant such an attorney the right to transfer to others, in part or in whole, the powers, authorities and discretions granted to him, and may terminate

39

and revoke the appointments or revoke all or any part of the powers granted to them.

**39.**     **Registers**

    39.1     The Company shall keep such registers as required by the Companies Law, including but not limited to the Shareholders Register and a register of Directors.

    39.2     The Company may, subject to and in accordance with the provisions of the Companies Law and these Articles, keep in every other country where those provisions shall apply, branch register(s) of Shareholders and/or directors living in that other country as aforesaid, and exercise any other powers referred to in the Companies Law with respect to such branch registers.

**40.**     **Stamp and Signatory Rights**

    40.1     The Company shall have at least one stamp.

    40.2     Subject to the provisions of these Articles, the Board may designate any Person(s) (even if they are not members of the Board) to act and sign in the name of the Company, and to apply the Company's stamp; the acts and signature of such a Person(s) shall bind the Company, insofar as such Person(s) have acted and signed within the limits of their authority.

    40.3     The printed or typed name of the Company by any means next to the signatures of the authorized signatories of the Company, as aforesaid, shall be valid as if the stamp of the Company was affixed.

**41.**     **Books of Account, Accounts and Audit**

    41.1     The Board shall, to the extent required under applicable law or by these Articles, cause correct accounts to be kept:

       41.1.1   of the assets and liabilities of the Company;

       41.1.2   of moneys received or expended by the Company and the matters for which such moneys are expended or received; and

       41.1.3   of all purchases and sales made by the Company.

    41.2     Subject to these Articles, the account books shall be kept in the Office or at such other place as the Board deems fit, and they shall be open for inspection by the Directors.

    41.3     Subject to these Articles, the Board shall determine from time to time, in any specific case or type of cases, or generally, whether and to what extent, and at what times and places, and under what conditions or regulations, the accounts and books of the Company, or any of them, shall be open for inspection by the Shareholders and no Shareholder other than a Director

shall have any right to inspect any account book or document of the Company except as conferred by the Companies Law or authorized by the Board and provided that such Shareholder has entered into confidentiality undertakings reasonably satisfactory to the Board.

41.4  Auditors shall be appointed and their function shall be set out in accordance with applicable Law.

41.5  The Company shall prepare annual financial reports that shall include a balance sheet, a profit and loss account and cash flow statement for the period after the preceding financial year, all as required by applicable Law.

## 42.  **<u>Notices</u>**

42.1  A notice or any other document may be served by the Company upon any Shareholder either personally or by sending it by first class mail, facsimile or electronic mail, addressed to such Shareholder at its address, wherever situated, as appearing in the Shareholders Register.

42.2  A notice or any other document may be served by any Shareholder or other Security holder upon the Company either personally or by sending it by first class mail, facsimile or electronic mail, addressed to the Company at its Office.

42.3  All notices directed to be given to the Shareholders shall, with respect to any Shares to which Persons are jointly entitled, be given to one of the joint holders, and any notice so given shall be sufficient notice to all joint holders of such Share.

42.4  A notice may be given by the Company to the Persons entitled to a Share in consequence of the death or bankruptcy of a Shareholder by sending it by first class mail, postage prepaid, by facsimile or electronic mail, addressed to them by name, at the address, if any, furnished for the purpose by the Persons claiming to be so entitled or, until such an address has been so furnished, by giving the notice in any manner in which the same might have been given if the death or bankruptcy had not occurred.

42.5  A Shareholder registered in the Shareholders Register who shall from time to time furnish the Company with an address at which notices may be served, shall be entitled to receive all notices he is entitled to receive according to these Articles at that address. However, except for the aforesaid, no Shareholder whose address is not registered in the Shareholders Register shall be entitled to receive any notice from the Company.

42.6  Any notice or other document, (i) if delivered personally, shall be deemed to have been served on the next Business Day after delivery, (ii) if sent by internationally recognized overnight courier, freight prepaid, shall be deemed to have been served on the next Business Day after delivery; (iii) if sent by facsimile, shall be deemed to have been served on the next

Business Day after delivery, if facsimile transmission is confirmed; and (iv) if sent by electronic mail, shall be deemed to have been served on the date of written acknowledgment of receipt of such e-mail by the recipient, provided that, if no written or electronic mail confirmation is delivered by the recipient of such notice to the sender thereof within 24 hours following the delivery of such notice, such notice shall have to be resent via facsimile and shall be deemed to have been served or delivered on the next Business Day following the date that such notice was resent via facsimile. A notice that is defectively addressed or that otherwise fails to comply with the provisions of this Article 42.6 shall nevertheless be deemed to have been served if and when actually received by the addressee.

42.7 In any case where it is necessary to give prior notice of a certain number of days or a notice valid for a certain period, the date of delivery shall be taken into account in the number of days or period.

42.8 In addition to furnishing a notice pursuant to the above Article, and without derogating from such obligation, the Company may furnish a notice to the Shareholders entitled to receive notice, or to part of them, by publication of a notice in a newspaper distributed in the area wherein the Office is located, or any other place, in Israel or abroad, as the Board shall determine from time to time.

## 43. <u>Dividends</u>

43.1 Subject to these Articles and the provisions of Sections 301 through 311 (inclusive) of the Companies Law, the Company, at a General Meeting and upon the recommendation of the Board, may declare a Dividend to be paid to the Shareholders, according to their rights and benefits under these Articles, and to decide the time of payment. A Dividend may not be declared in excess of that recommended by the Board, although the Company at a General Meeting may declare a smaller Dividend.

43.2 A notice of the declaration of a Dividend shall be given to the Shareholders registered in the Shareholders Register, in the manner provided for in these Articles.

43.3 Subject to the provisions of these Articles, and subject to any rights or conditions attached at that time to any share in the capital of the Company granting preferential, special or deferred rights or not granting any rights with respect to Dividends, the profits of the Company which shall be declared as Dividends shall be distributed according to the proportion of the nominal value paid up to account of the Shares held at the record date fixed by the Company, without regard to premium paid in excess of the nominal value, if any. No amount paid or credited as paid on a Share in advance of calls shall be treated for purposes of this Article as paid on a Share.

43.4 The Board may issue any Share upon the condition that a Dividend shall be paid at a certain date, or that a portion of the declared Dividend for a

certain period shall be paid, or that the period for which a Dividend shall be paid shall commence at a certain date, or any similar condition; in any such case, subject to the Companies Law and these Articles, the Dividend shall be paid in respect of such a Share in accordance with such a condition.

43.5 At the time of declaration of a Dividend the Company's Shareholders may decide that such a Dividend shall be paid in whole or in part by way of distribution of certain properties, including by means of distribution of fully paid up shares or debentures or debenture stock of the Company, or by means of distribution of fully paid up shares or debentures or debenture stock of any other company, or in one or more of the aforesaid ways.

43.6 The Company shall have a lien on any Dividend paid in respect of a Share on which the Company has a charge, and may use it to pay any debts, obligations or commitments to which the charge applies.

43.7 The Persons registered in the Shareholders Register as Shareholders on the record date for declaration of the Dividend shall be entitled to receive the Dividend. A Transfer of shares shall not transfer the right to a Dividend, which has been declared after the Transfer but before the registration of the Transfer.

43.8 A Dividend may be paid by, *inter alia,* check or payment order to be mailed to the address of a Shareholder or Person entitled thereto as registered in the Shareholders Register, or in the case of joint owners, to the address of one of the joint owners as registered in the Shareholders Register. Every such check shall be made out to the Person to whom it is sent. The receipt of the Person who on the record date in respect of the Dividend is registered as the holder of any Share or, in the case of joint holders, of one of the joint holders, shall serve as a release with respect to payments made in connection with that Share.

43.9 If at any time the share capital is divided into different classes of shares, the distribution by way of Dividend of fully paid up shares or from funds shall be made in one of the following manners, as shall be determined by the Board:

43.9.1 all holders of Shares entitled to fully paid up Shares shall receive one uniform class of Shares; or

43.9.2 each holder of shares entitled to fully paid up shares shall receive shares of the class of shares held by such holder and entitling him to fully paid up shares.

43.10 In order to give effect to any resolution in connection with a Dividend Distribution, the Board may resolve any difficulty that shall arise with respect to such Dividend Distribution in such way as it shall deem proper, including in connection with fractional shares issuable in such Dividend Distribution and the determination of the value of certain property for purposes of Dividend Distribution. The Board may further decide that

payment in cash shall be made to a Shareholder on the basis of value decided for that purpose, or that a fraction of the value which is less than one NIS shall not be taken into account for the purpose of adjusting the rights of all the parties. The Board shall be permitted in this regard to grant cash or property to trustees in escrow for the benefit of Persons entitled thereto, as the Board shall see fit. Wherever required, an agreement shall be submitted to the Registrar of Companies and the Board may appoint a Person to execute such an agreement in the name of the Persons entitled to any Dividend, property, fully paid-up shares or debentures as aforesaid, and such an appointment shall be valid and binding on the Company.

43.11 The Board may, with respect to all Dividends not demanded within thirty (30) days after their declaration, invest or use them in another way for the benefit of the Company, until they shall be demanded. The payment by the Board of any unclaimed dividend or such other moneys into a separate account shall not constitute the Company a trustee in respect thereof.

43.12 The Company shall not be obligated to pay interest on any Dividend, including in the circumstances set forth in the preceding Article 43.11.

43.13 All Articles relating to Dividends, shall apply, *mutatis mutandis* , to any other distribution by the Company of any of its assets, shares or the like.

## 44. <u>Reserves</u>

44.1 The Board may set aside from the profits of the Company the sums it deems proper, as a reserve fund or reserve funds for extraordinary uses, or for special dividends or other funds or for the purpose of preparing, improving or maintaining any property of the Company, and for such other purposes as shall, in the discretion of the Board, be beneficial to the Company, and the Board may invest the various sums so set aside in such investments as they deem proper, and from time to time deal in, change, or transfer such investments, in part or in whole, for the benefit of the Company. The Board may also divide any reserve liability fund to special funds as it shall deem proper, transfer moneys from fund to fund and use every fund or any part thereof in the business of the Company, without being required to keep such sums separate from the rest of the Company's property. The Board may generally create funds as it deems necessary, either those resulting from profits of the Company or from re-evaluation of property, or from premiums paid for shares or from any other source, and use them in its discretion as it deems fit so long as the creation, changes or uses of such funds does not violate any provision of the Companies Law or accepted accounting principles and practices.

44.2 All premiums received from the issue of Shares shall be capital funds, and shall be treated for every purpose as capital and not as profits distributable as Dividends. The Board may organize a reserve capital liability account and transfer from time to time all such premiums to the reserve capital liability account, or use such premiums and moneys to cover depreciation or doubtful loss. The Board may use moneys credited to the capital reserve

liability account in any manner that these Articles or the Companies Law permit.

44.3    Any amounts transferred and credited to the account of income and expense fund or general reserve liability account or capital liability reserve account, may, until otherwise used in accordance with these Articles, be invested together with such other moneys of the Company in the day to day business of the Company, without having to differentiate between these investments and the investment of other moneys of the Company.

**45.**    **Capitalization of Reserves**

The Company may from time to time resolve at a General Meeting that any amount, investment or property not required as a source for payment of fixed preferential Dividends and (i) standing credited at that time to any fund or to any reserve liability account of the Company, including also premiums received from issuance of shares, debentures, or debenture stock of the Company, or (ii) being net profits not distributed and remaining in the Company, shall be capitalized, and that such amount shall be distributed as bonus shares, in the manner so directed by such resolution. The Board may use such investment, sum or property, according to such a resolution, for full payment of such shares of the Company's capital not issued to the Shareholders, and to issue such shares and to distribute them as fully paid shares among the Shareholders according to their pro rata right for payment of the value of the shares and their rights in the amount capitalized. The Board may also use such investment, sum or property, or any part thereof, for the full payment of the Company's capital issued and held by such Shareholders, or such investment, sum or property in any other manner permitted by such a resolution. If any difficulty shall arise with respect to such a distribution, the Board may act, and shall have all the powers and authorities, as set forth in Article 43.11 above, *mutatis mutandis*

**Exemption, Insurance and Indemnity Of Office Holders**

**46.**    **Insurance of Office Holders** .

Subject to the provisions of the Companies Law and any other applicable law, the Company may enter into a contract to insure against the liabilities of its Office Holders for an obligation imposed on an Office Holder in consequence of an act done by the Office Holder in his capacity as an Office Holder of the Company, in any of the following cases:

46.1    A breach of the duty of care owed to the Company or to any other person;

46.2    A breach of the fiduciary duty owed to the Company, *provided that,* the Office Holder acted in good faith and had reasonable grounds to assume that such act would not injure the Company;

46.3    A monetary liability imposed on him in favor of another person.

**47.**    **Indemnification of Office Holders** .

Subject to the provisions of the Companies law, including the receipt of all approvals as required therein or under any other applicable Law, the Company may indemnify any of its

Office Holders to the fullest extent permitted by the Companies Law as follows:

47.1 retrospectively; and

47.2 undertake in advance to indemnify the Office Holders with respect to liabilities or expenses, imposed on such Officer or incurred by him in consequence of an act which he has performed by virtue of being an Officer, as listed below:

47.2.1 A monetary obligation imposed on the Office Holder in favor of another Person pursuant to a judgment, including a judgment given in settlement or a court-approved arbitration award, *provided that* the undertaking to indemnify will be limited to: (1) those categories of events which the Board resolves that in its opinion can be foreseen at the time the undertaking to indemnify is given in light of the Company's then current activities; and (2) such amounts or criteria which the Board sets as reasonable under the circumstances;

47.2.2 Reasonable litigation expenses, including attorney's legal fees, actually paid by the Office Holder in consequence of an investigation or proceeding instituted against the Office Holder by an authority that is authorized to conduct such investigation or proceeding, and which was concluded without an indictment against the Office Holder and without any monetary obligation in lieu of criminal proceedings, or which was concluded without an indictment against the Office Holder but with imposing on such Office Holder a monetary obligation in lieu of criminal proceedings in respect of an offense that does not require the proof of criminal intent;

For the purposes hereof: (i) "a proceeding that ended without an indictment in a matter in respect of which an investigation was conducted"; and (ii) "financial obligation in lieu of a criminal proceeding", shall have the meanings specified in Section 260(a)(1A) of the Companies Law.

47.2.3 Reasonable litigation costs, including attorney's legal fees incurred by the Office Holder or which the Office Holder is ordered to pay by a court, in a proceeding instituted against the Office Holder by the Company or on its behalf or by another person, or in a criminal charge of which the Office Holder is acquitted, or in a criminal charge of which the Office Holder is convicted of an offense that does not require criminal intent.

48. **Exemption of Office Holders** .

Subject to the provisions of the Companies Law, the Company may exempt its Office Holders in advance for all or any of such Office Holders' liability for damage in consequence of a breach of the duty of care vis-à-vis the Company, other than for a breach of duty of care stemming from a distribution (as such term is defined in the Companies Law) and for a willful or reckless breach of duty of care, excluding a breach of duty of care due to negligence.

49. **General** .

The provisions of Articles 46, 47 and 48 above are not intended, and shall not be interpreted,

to restrict the Company in any manner in respect of the procurement of insurance and/or in respect of indemnification and/or exemption from liability in connection with any Person who is not an Office Holder, including, without limitation, any employee, agent, consultant or contractor of the Company who is not an Office Holder, or in connection with any Office Holder to the extent that such insurance and/or indemnification and/or exemption from liability is permitted under the Companies Law.

**50.**  **<u>Translation of Articles.</u>**

In the event that a Hebrew version of these Articles is filed with any regulatory or governmental agency, including the Israeli Registrar of Companies, then such Hebrew version shall be considered solely a convenience translation and shall have no binding effect, as between the Shareholders of the Company and with respect to any third party. The English version shall be the only binding version of these Articles, and in the event of any contradiction or inconsistency between the meaning of the English version and the meaning of the Hebrew version of these Articles, the Hebrew version shall be disregarded, shall have no binding effect and shall have no impact on the interpretation of these Articles or any provision hereof.

Exhibit 3.2

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**AMENDED AND RESTATED ARTICLES OF ASSOCIATION**

**TABLE OF CONTENTS**

INTERPRETATION   1

NAME OF THE COMPANY   2

OBJECTIVES   2

PUBLIC COMPANY   2

LIMITED LIABILITY   2

CAPITAL, SHARES AND RIGHTS   2

REGISTERED HOLDER   3

TRANSFER OF SHARES   3

TRANSMISSION OF SHARES   4

CALLS ON SHARES   4

ALTERATIONS OF THE REGISTERED SHARE CAPITAL   5

MODIFICATION OF CLASS RIGHTS   6

BORROWING POWERS   6

BUSINESS COMBINATIONS WITH INTERESTED SHAREHOLDERS   6

GENERAL MEETINGS   9

    Notice of General Meetings   10

PROCEEDINGS AT GENERAL MEETINGS   11

    Quorum   11

    Chairman of the General Meeting   11

VOTE OF SHAREHOLDERS   11

DIRECTORS   12

    Powers, Number of Directors, Composition & Election   12

    Remuneration   17

    Chairman of the Board   17

PROCEEDINGS OF THE DIRECTORS   17

    Quorum   17

    Methods of Attending Meetings   18

    Committees   18

    Approval of Certain Transactions with Related Parties   18

    Records and Validity of Acts   19

    Chief Executive Officer   19

| | |
|---|---|
| INSURANCE, EXCULPATION, AND INDEMNITY | 19 |
| Insurance of Office Holders | 19 |
| Indemnity of Office Holders | 20 |
| Advance Indemnity | 20 |
| Retroactive Indemnity | 20 |
| Exculpation | 21 |
| Insurance, Exculpation and Indemnity – General | 21 |
| APPOINTMENT OF AN AUDITOR | 21 |
| INTERNAL AUDITOR | 21 |
| MERGER AND REORGANIZATION | 21 |
| SIGNATORIES | 21 |
| DISTRIBUTIONS | 21 |
| REDEEMABLE SECURITIES | 22 |
| DONATIONS | 22 |
| NOTICES | 22 |

<strong>AMENDED AND RESTATED ARTICLES OF ASSOCIATION</strong>

<strong>of</strong>

<strong>TUFIN SOFTWARE TECHNOLOGIES LTD.</strong>

<strong>INTERPRETATION</strong>

1. In these Articles the following terms shall bear the meanings set opposite to them, unless the context otherwise requires:

| **T E R M S** | | **M E A N I N G S** |
|---|---|---|
| Articles | | These Amended and Restated Articles of Association as may be amended from time to time. |
| Auditor ( *Roeh Cheshbon Mevaker)* | | As defined under the Law. |
| Board | | The Board of Directors of the Company. |
| CEO | | Chief Executive Officer, also referred to under the Law as the General Manager. |
| Class Meeting | | A meeting of the holders of a class of shares. |
| Chairman | | Chairman of the Board. |
| Company | | Tufin Software Technologies Ltd. |
| Companies Regulations | | All regulations promulgated from time to time under the Companies Law. |
| Distribution | | As defined under the Law. |
| External Director | | As defined under the Law. |
| Internal Auditor | | An internal auditor appointed by the Company in accordance with Section 146(a) of the Companies Law. |
| The Law or the Companies Law | | The Israeli Companies Law, 5759 – 1999 and the Companies Regulations, or any other law and regulations which may come in their stead, in each case, as amended from time to time. |
| NIS | | New Israeli Shekel, the lawfully denominated currency of the State of Israel. |
| The Office | | The registered office of the Company from time to time. |
| Office Holder | | As defined under the Law. |
| Ordinary Share(s) | | The Company's Ordinary Shares, NIS 0.015 par value each. |
| Person | | A company, corporate body, partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof, or an individual. |
| Register | | The Company's shareholders register, maintained in accordance with the Companies Law. |
| Simple Majority | | A majority of more than fifty percent (50%) of the votes cast by those shareholders voting in person or by proxy (including by voting deed), not taking into consideration abstaining votes. |
| Special Majority | | A majority of sixty six and two thirds percent (66 2/3%) or more of the votes cast by those shareholders voting in person or by proxy (including by voting deed), not taking into consideration abstaining votes. |

| The Statutes | The Law and, to the extent applicable to the Company, the Israeli Companies Ordinance (New Version) 1983, the Securities Law, 5728 – 1968 (the "Securities Law") and all applicable laws and regulations applicable in any relevant jurisdiction (including without limitation U.S. federal laws and regulations), and rules of any stock market in which the Company's shares are registered for trading as shall be in force from time to time. |
|---|---|

Subject to the provisions of this Article 1 and unless the context necessitates another meaning, terms and expressions in these Articles which have been defined in the Statutes shall have the meanings ascribed to them therein.

2. Words importing the singular shall include the plural, and *vice versa* . Any pronoun shall include the corresponding masculine, feminine and neuter forms; and words importing persons shall include corporate bodies.

Any provision or part thereof of these Articles, prohibited by applicable law, shall be ineffective, without invalidating any other part of these Articles.

### NAME OF THE COMPANY

3. The name of the Company is Tufin Software Technologies Ltd. (and in Hebrew: תופין טכנולוגיות תוכנה בע"מ).

### OBJECTIVES

4. The objectives of the Company shall be to engage in any legal occupation or business and to conduct its business according to business considerations and for the purpose of making profits.

### PUBLIC COMPANY

5. The Company is a public company as such term is defined under the Companies Law.

### LIMITED LIABILITY

6. The liability of each shareholder for the Company's obligations is limited to the payment of the nominal value of the shares held by such shareholder, subject to the provisions of the Companies Law.

### CAPITAL, SHARES AND RIGHTS

7. The registered share capital of the Company consists of one hundred fifty million (150,000,000) Ordinary Shares, par value NIS 0.015 per share.

8. All issued and outstanding shares of the Company of the same class are of equal rights between them for all intents and purposes concerning the rights set forth in these Articles.

9. Each issued Ordinary Share entitles its holder to the rights as described below:

9.1. The equal right to participate in and vote at the Company's general meetings, whether ordinary meetings or special meetings, and each of the shares in the Company shall entitle the holder thereof, who is present at the meeting and participating in the vote, whether in person, or by proxy, to one vote.

9.2. The equal right to participate in any Distribution or distribution of bonus shares.

9.3. The equal right to participate in the distribution of assets available for distribution in the event of liquidation of the Company.

10.

    10.1. If two or more persons are registered as joint holders of any shares, any one of such persons may give effectual receipts for any dividend or other monies in respect of such share and his or her confirmation will bind all holders of such share.

    10.2. Any payment for a share shall be initially credited against the par value of said share and any excess amount shall be credited as a premium for said share, unless determined otherwise in the conditions of the allocation.

## SHARE CERTIFICATES

11.    A shareholder who is registered in the Register is entitled to receive from the Company, without payment and at such shareholder's request, within a period of three months after the allocation or registration of the transfer, one share certificate with respect to all the shares registered in his name, which shall specify the aggregate number of the shares held by such shareholder. In the event of a jointly held share, the Company shall issue one share certificate for all the joint holders of the share, and the delivery of such certificate to one of the joint holders shall be deemed to be delivery to all of them. Every certificate shall bear the Company's stamp or seal or a facsimile copy thereof and be signed by an Office Holder of the Company, a director of the Company, the Company's secretary or by any other person appointed by the Board for such purpose.

12.    The Company may issue a new certificate *in lieu of* a certificate that was issued and was lost, defaced, or destroyed, on the basis of such proof and guarantees as the Company may require, and after payment of an amount that shall be prescribed by the Company, and the Company may also replace existing certificates with new certificates, free of charge, subject to such conditions as the Company shall stipulate.

## REGISTERED HOLDER

13.    Except as otherwise provided in these Articles, the Company shall be entitled to treat the registered holder of any share as the absolute owner thereof, and, accordingly, shall not, except as ordered by a court of competent jurisdiction, or as required by statute, be bound to recognize any equitable or other claim to, or interest in such share on the part of any other person.

14.    To the extent required by the Law a trustee must inform the Company of the fact that such trustee is holding shares of the Company in trust for another person at such time as may be required by the Law. The Company shall register that fact in the Register in respect of such shares. The trustee shall be deemed to be the sole holder of said shares.

## TRANSFER OF SHARES

15.    Subject to the Statutes, and subject to any applicable agreements or undertakings of any specific shareholder, the shares shall be freely transferable.

16.    A transfer of registered shares shall be made in writing or any other manner, in a form specified by the Board or the transfer agent appointed by the Company, and such transfer form should be signed by both the transferee and the transferor and delivered to the Office or to such transfer agent, together with the certificates of the shares due to be transferred, if such certificates have been issued. The Board may approve other methods of recognizing the transfer of shares in order to facilitate the trading of the Company's shares on the New York Stock Exchange, Nasdaq or on any other applicable stock exchange. The transferee shall be deemed to be the shareholder with respect to the transferred shares only from the date of registration of his name in the Register.

17. Notwithstanding anything to the contrary herein, shares registered in the name of The Depository Trust Company or its nominee shall be transferrable in accordance with the policies and procedures of The Depository Trust Company.

18. The Board may close the Register and suspend the registration of transfers for such period of time as the Board shall deem fit, provided that the period of closure of any such book shall not exceed 30 days each year. The Company shall notify the shareholders of such decision.

## TRANSMISSION OF SHARES

19. In the case of the death, liquidation, bankruptcy, dissolution, winding-up or a similar occurrence of a shareholder, the legal successors, receivers or liquidators (as the case may be) of such shareholder shall be the only persons recognized by the Company as having any title to such shares, but nothing herein contained shall release the estate of the predecessor from any liability in respect of such shares.

20. The legal successors may, upon producing such evidence of title as the Board shall require, be registered themselves as holders of the shares, or subject to the provisions as to transfers herein contained, transfer the same to some other person.

## CALLS ON SHARES

21. The Board may, from time to time, make such calls as it may deem appropriate upon shareholders with respect to any sum unpaid in respect of shares held by such shareholders which is not, by the terms of allotment thereof or otherwise, payable at a fixed time, and each shareholder shall pay the amount of every call so made upon him (and of each installment thereof if the same is payable in installments), to the person(s) and at the time(s) and place(s) designated by the Board, as any such time(s) may be thereafter extended and/or such person(s) or place(s) changed. Unless otherwise stipulated by the Board (and in the notice hereafter referred to), each payment in response to a call shall be deemed to constitute a pro rata payment on account of all shares in respect of which such call was made.

22. Notice of any call shall be given in writing to the applicable shareholder(s) not less than fourteen (14) days prior to the time of payment, specifying the time and place of payment, and designating the person to whom and the place where such payment shall be made; provided , however , that before the time for any such payment, the Board may, by notice in writing to such shareholder(s), revoke such call in whole or in part, extend such time, or alter such designated person and/or place. In the event of a call payable in installments, only one notice thereof need be given.

23. If, by the terms of allotment of any share or otherwise, any amount is made payable at any fixed time, every such amount shall be payable at such time as if it were a call duly made by the Board and of which due notice had been given, and all the provisions herein contained with respect to calls shall apply to each such amount.

24. The joint holders of a share shall be jointly and severally liable to pay all calls in respect thereof and all interest payable thereon.

25. Any amount unpaid in respect of a call shall bear interest from the date on which it is payable until actual payment thereof, at such rate (not exceeding the then prevailing debtor rate charged by leading commercial banks in Israel), and at such time(s) as the Board may prescribe.

26. A shareholder shall not be entitled to his rights as shareholder, including the right to dividends, unless such shareholder has fully paid all the notices of call delivered to him, or which according to these Articles are deemed to have been delivered to him, together with interest, linkage and

expenses, if any, unless otherwise determined by the Board. Upon the allotment of shares, the Board may provide for differences among the allottees of such shares as to the amount of calls and/or the times of payment thereof.

### ALTERATIONS OF THE REGISTERED SHARE CAPITAL

27. (a) Subject to the Statutes, a general meeting of shareholders may from time to time resolve to:

(1) alter or add classes of shares that shall constitute the Company's registered capital, including shares with preference rights, deferred rights, conversion rights or any other special rights or limitations;

(2) increase the Company's registered share capital by creating new shares either of an existing class or of a new class;

(3) consolidate and/or split all or any of its share capital into shares of larger or smaller par value than the existing shares;

(4) cancel any registered shares not yet allocated, provided that the Company has made no commitment to allocate such shares; and

(5) reduce the Company's share capital and any reserved fund for redemption of capital.

(b) In executing any resolution adopted according to Article 27(a) above, the Board may, at its discretion, resolve any related issues.

(c) If as a result of a consolidation or split of shares authorized under these Articles, fractions of a share will stand to the credit of any shareholder, the Board is authorized at its discretion, to act as follows:

(1) Determine that fractions of shares that do not entitle their owners to a whole share, will be sold by the Company and that the consideration for the sale be paid to the beneficiaries, on terms the Board may determine;

(2) Allot to every shareholder, who holds a fraction of a share resulting from a consolidation and/or split, shares of the class that existed prior to the consolidation and/or split, in a quantity that, when consolidated with the fraction, will constitute a whole share, and such allotment will be considered valid immediately prior to the consolidation or split;

(3) Determine the manner for paying the amounts to be paid for shares allotted in accordance with Article 27(c)(2) above, including on account of bonus shares; and/or

(4) Determine that the owners of fractions of shares will not be entitled to receive a whole Share in respect of a share fraction or that they may receive a whole share with a different par value than that of the fraction of a share.

28. Except as otherwise provided by or pursuant to these Articles or by the conditions of issue, any new share capital shall be considered as part of the original share capital, and shall be subject to the same provisions of these Articles with reference to payment of calls, lien, transfer, transmission, forfeiture and otherwise, which applies to the original share capital.

## MODIFICATION OF CLASS RIGHTS

29. If at any time the share capital is divided into different classes of shares, any change to the rights and privileges of the holders of any such class of shares shall require the approval of a Class Meeting of such class of shares by a Simple Majority (unless otherwise provided by the Statutes or by the terms of issue of the shares of that class), in addition to the Simple Majority of all classes of shares voting together as a single class at a shareholder meeting.

30. The rights and privileges of the holders of any class of shares shall not be deemed to have been altered by creating or issuing shares of any class, including a new class (unless otherwise provided by the terms of issue of the shares of that class).

## BORROWING POWERS

31. The Company may, by resolution of the Board, from time to time, raise or borrow or secure the payment of any sum or sums of money for the purposes of the Company. The Company, by resolution of the Board, may also raise or secure the payment or repayment of such sum or sums in such manner and upon such terms and conditions in all respects as it deems fit, and in particular by the issue of debentures or debenture stock of the Company charged upon all or any part of the property of the Company (both present and future) including its unissued and/or its uncalled capital for the time being. Issuance of any series of debentures shall require Board approval.

## BUSINESS COMBINATIONS WITH INTERESTED SHAREHOLDERS

32.

(a) Notwithstanding any other provision of these Articles and subject to the provisions of applicable law, the Company shall not engage in any Business Combination (as defined below) with any Interested Shareholder (as defined below) for a period of three (3) years following the time that such shareholder became an Interested Shareholder, unless:

(1) prior to the time that such shareholder became an Interested Shareholder, the Board of Directors approved either the Business Combination or the transaction which resulted in the shareholder becoming an Interested Shareholder, or

(2) upon consummation of the transaction which resulted in the shareholder becoming an Interested Shareholder, the Interested Shareholder owned at least 85% of the Voting Shares (as defined below) of the Company outstanding at the time the transaction commenced excluding for purposes of determining the Voting Shares outstanding (but not the outstanding Voting Shares owned by the Interested Shareholder) those shares owned by persons who are directors and also officers, or

(3) at the time that such shareholder became an Interested Shareholder, or subsequent to such time, the Business Combination is approved by the Board of Directors and authorized at a general meeting of shareholders by the affirmative vote of at least 66 2/3% of the Voting Shares outstanding that are not owned by the Interested Shareholder.

(b) The restrictions set forth in this Article shall not apply if shareholder becomes an Interested Shareholder inadvertently and (i) as soon as practicable divests itself of ownership of sufficient shares so that the shareholders ceases to be an interested shareholder; and (ii) would not, at any time within the 3-year period immediately prior to a Business Combination between the Company and such shareholder, have been an Interested Shareholder but for the inadvertent acquisition of ownership;

(c) As used in this Article only, the term:

(i) "Affiliate" means a Person (as defined below) that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with another Person.

(ii) "Associate" when used to indicate a relationship with any Person, means (A) any corporation, partnership, unincorporated association or other entity of which such Person is a director, officer or partner or is, directly or indirectly, the owner of twenty percent (20%) or more of any class of Voting Shares, (B) any trust or other estate in which such Person has at least a twenty percent (20%) beneficial interest or as to which such Person serves as trustee or in a similar fiduciary capacity, and (C) any relative or spouse of such Person, or any relative of such spouse, who has the same residence as such Person.

(iii) "Business Combination" when used in reference to the Company and any Interested Shareholder of the Company, means:

A. any merger or consolidation of the Company or any direct or indirect majority owned subsidiary of the Company with (1) the Interested Shareholder, or (2) with any other corporation, partnership, unincorporated association or other entity if the merger or consolidation is caused by the Interested Shareholder and as a result of such merger or consolidation subsection (a) of this Article is not applicable to the surviving entity;

B. any sale, lease, exchange, mortgage, pledge, transfer or other disposition (in one transaction or a series of transactions), except proportionately as a shareholder of such Company, to or with the Interested Shareholder, whether as part of a dissolution or otherwise, of assets of the Company or of any direct or indirect majority owned subsidiary of the Company, which assets have an aggregate market value equal to ten percent (10%) or more of either the aggregate market value of all of the assets of the Company determined on a consolidated basis or the aggregate market value of all of the outstanding shares of the Company;

C. any transaction which results in the issuance or transfer by the Company or by any direct or indirect majority-owned subsidiary of the Company of any shares of the Company or of such subsidiary to the Interested Shareholder, except (1) pursuant to the exercise, exchange or conversion of securities exercisable for or convertible into shares of the Company or any such subsidiary, which securities were outstanding prior to the time that the Interested Shareholder became such; (2) pursuant to Section 337(a) or Section 337(a1) of the Companies Law, (3) pursuant to a dividend or distribution paid or made, or the exercise, exchange or conversion of securities exercisable for, exchangeable for or convertible into shares of the Company or any such subsidiary, which security is distributed pro-rata to all holders of shares of the Company subsequent to the time the Interested Shareholder became such; (4) pursuant to an exchange offer by the Company to purchase shares made on the same terms to all holders of said shares; or (5) any issuance or transfer of shares by the Company; provided, that in no case under (2) through (5) above shall there be an increase in the Interested Shareholder's proportionate share of the shares or of the voting shares of the Company;

D. any transaction involving the Company or any direct or indirect majority-owned subsidiary of the Company which has the effect directly or indirectly of increasing the proportionate share of the shares of any class or series or securities convertible into the shares of any class or series of the Company or of any such subsidiary which is owned by the Interested Shareholder except as a result of immaterial changes due to fractional share adjustments or as a result of any purchase or redemption of any shares not caused, directly or indirectly, by the Interested Shareholder; or

E. any receipt by the Interested Shareholder of the benefit, directly or indirectly (except proportionately as a shareholder of such company), of any loans, advances, guarantees, pledges or any other financial benefits (other than those expressly permitted in subparagraphs A. through D. above) provided by or through the Company or any direct or indirect majority owned subsidiary.

(iv) "Control" including the term "Controlling", "Controlled by" and "under common control with" means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of Voting Shares, by contract or otherwise. A Person who is the owner of twenty percent (20%) or more of the outstanding Voting Shares of any corporation, partnership, unincorporated association or other entity shall be presumed to have control of such entity. Notwithstanding the foregoing, a presumption of control shall not apply where such Person holds Voting Shares in good faith and not for the purpose of circumventing this Article as an agent, bank, broker, nominee, custodian or trustee for one or more owners who do not individually or as a group have control of such entity.

(v) "Interested Shareholder" means any person (other than the Company and any direct or indirect majority-owned subsidiary of the Company) that (A) is the Owner of fifteen percent (15%) or more of the outstanding Voting Shares of the Company, or (B) is an Affiliate or Associate of the Company and was the Owner of fifteen percent (15%) or more of the outstanding Voting Shares of the Company at any time within the 3-year period immediately prior to the date on which it is sought to be determined whether such person is an Interested Shareholder, and the Affiliates and Associates of such person. Notwithstanding the foregoing, the term Interested Shareholder shall not include any Person whose ownership of outstanding Voting Shares in excess of the fifteen percent (15%) limitation set forth herein is the result of action taken solely by the Company; provided that such Person shall be an Interested Shareholder if thereafter such person acquires, without prior approval of the Board, additional Voting Shares of the Company, except as a result of further corporate action not caused, directly or indirectly, by such Person. For the purpose of determining whether a person is an Interested Shareholder, the Voting Shares of the Company deemed to be outstanding shall include shares deemed to be owned by the person through application of paragraph (ix) of this subsection but shall not include any other unissued shares of the Company which may be issuable pursuant to any agreement, arrangement or understanding, or upon exercise of conversion rights, warrants or options, or otherwise.

(vi) "Person" means any individual, corporation, partnership, unincorporated association or other entity.

(vii) "Share" means with respect to any corporation shares of its capital and with respect to any other entity any equity interest.

(viii) "Voting Shares" means with respect to any corporation Shares of any class or series entitled to vote generally in the election of directors and, with respect to any entity that is not a corporation, any equity interest entitled to vote generally in the election of the governing body of such entity.

(ix) "Owner" including the terms "own" and "owned", when used with respect to any Share, means a Person that individually or with or through any of its Affiliates or Associates:

A. beneficially owns such share, directly or indirectly: or

B. has (1) the right to acquire such share (whether such right is exercisable immediately or only after the passage of time) pursuant to any agreement, arrangement or understanding or upon the exercise of conversion rights, warrants or options, or otherwise; provided however, that a Person shall not be deemed the owner of share tendered pursuant to a tender or exchange; or (2) the right

to vote such share pursuant to any agreement, arrangement or understanding; provided however, that a person shall not be deemed the owner of any share because of such person's right to vote such share if the agreement, arrangement, or understanding to vote such share arises solely from a recoverable proxy or consent given in response to a proxy or consent solicitation made to ten (10) or more Persons: or

C. has any agreement, arrangement or understanding for the purpose of acquiring, holding, voting (except voting pursuant to a revocable proxy or consent as described in item (2) of clause B of this paragraph) or disposing of such Share with any other Person that beneficially owns or whose Affiliates or Associates beneficially own, directly or indirectly, such share.

(d) Any change to this Article 32 shall only be carried out by a resolution of the shareholders of the Company, adopted by the holders of securities representing at least 85% of the Voting Shares of the Company then outstanding.

## GENERAL MEETINGS

33.  Annual general meetings shall be held at least once a calendar year, at such place and time as determined by the Board, but not later than fifteen (15) months after the last annual general meeting. Such general meetings shall be called "Annual Meetings" and all other general meetings of the Company shall be called "Special Meetings". The Annual Meeting shall review the Company's financial statements and shall transact any other business required pursuant to these Articles or the Law, and any other matter as shall be determined by the Board.

34.  The Board may convene a Special Meeting by its resolution, and is required to convene a Special Meeting should it receive a request, in writing, from a person or persons entitled, under the Companies Law, to demand such meeting.

Any request for convening a meeting must specify the purposes for which the meeting is to be called, shall be signed by the persons requesting the meeting, and shall be delivered to the Company's registered offices.

35.  In addition, subject to the Law, these Articles (including this Article 35) and any applicable law and stock exchange rules and regulations, the Board may accept a request of a shareholder holding not less than 1% of the voting rights at the general meeting (the " **Proposing Shareholder** ") to include a subject in the agenda of a general meeting (" **Proposal Request** "), provided that such subject is a proper subject for action by shareholders under the Law and these Articles and only if the request also sets forth: (a) the name, address, telephone number, fax number and email address of the Proposing Shareholder and, if an entity, the name(s) of the person(s) that controls or manages such entity; (b) the number of Shares held by the Proposing Shareholder(s), directly or indirectly (and, if any of such Shares are held indirectly, an explanation of how they are held and by whom), which shall be in such number no less than as is required to qualify as a Proposing Shareholder, accompanied by evidence satisfactory to the Company of the record holding of such Shares by the Proposing Shareholder(s) as of the date of the Proposal Request, and a representation that the Proposing Shareholder(s) intends to appear in person or by proxy at the meeting; (c) the matter requested to be included on the agenda of a general meeting, all information related to such matter, the reason that such matter is proposed to be brought before the general meeting, the complete text of the resolution that the Proposing Shareholder proposes to be voted upon at the general meeting and, if the Proposing Shareholder wishes to have a position statement in support of the proposal request, a copy of such position statement that complies with the requirement of any applicable law (if any), (d) a description of all arrangements or understandings between the shareholder and any other Person or Persons (naming such Person or Persons) in connection with the subject which is

requested to be included in the agenda and a declaration signed by all Proposing Shareholder(s) of whether any of them has a personal interest in the matter and, if so, a description in reasonable detail of such personal interest; (e) a description of all Derivative Transactions (as defined below) by each Proposing Shareholder(s) during the previous twelve (12) month period, including the date of the transactions and the class, series and number of securities involved in, and the material economic terms of, such Derivative Transactions; and (f) a declaration that all the information that is required under the Law and any other applicable law and stock exchange rules and regulations to be provided to the Company in connection with such subject, if any, has been provided. Furthermore, the Board, may, in its discretion to the extent it deems necessary, request that the shareholders making the request provide additional information necessary so as to include a subject in the agenda of a general meeting, as the Board may reasonably require.

In order for the Board of Directors to consider a Proposal Request and whether to include the matter stated therein in the agenda of a General Meeting, notice of the Proposal Request must be timely delivered in accordance with applicable laws. The Proposal Request must be in writing, signed by all of the Proposing Shareholder(s) making such request, delivered, either in person or by certified mail, postage prepaid, and received by the Company's secretary (or, in the absence thereof, by the CEO). The announcement of an adjournment or postponement of a General Meeting shall not commence a new time period (or extend any time period) for the delivery of a Proposal Request as described above.

A "Derivative Transaction" means any agreement, arrangement, interest or understanding entered into by, or on behalf or for the benefit of, any Proposing Shareholder or any of its affiliates or associates, whether of record or beneficial: (1) the value of which is derived in whole or in part from the value of any class or series of shares or other securities of the Company, (2) which otherwise provides any direct or indirect opportunity to gain or share in any gain derived from a change in the value of securities of the Company, (3) the effect or intent of which is to mitigate loss, manage risk or benefit of security value or price changes, or (4) which provides the right to vote or increase or decrease the voting power of, such Proposing Shareholder, or any of its affiliates or associates, with respect to any shares or other securities of the Company, which agreement, arrangement, interest or understanding may include, without limitation, any option, warrant, debt position, note, bond, convertible security, swap, share appreciation right, short position, profit interest, hedge, right to dividends, voting agreement, performance-related fee or arrangement to borrow or lend shares (whether or not subject to payment, settlement, exercise or conversion in any such class or series), and any proportionate interest of such Proposing Shareholder in the securities of the Company held by any general or limited partnership, or any limited liability company, of which such Proposing Shareholder is, directly or indirectly, a general partner or managing member.

The information required pursuant to this Article shall be updated as of (i) the record date of the general meeting, (ii) five days before the general meeting, and (iii) as of the general meeting, and any adjournment or postponement thereof.

36. Subject to applicable law, the Board shall determine the agenda of any general meeting.

37. An amendment to Articles 35, 36 or this Article 37 shall require a Special Majority.

**Notice of General Meetings**

38. Unless otherwise required by the Law and these Articles, the Company is not required to give notice under Section 69 of the Companies Law. A notice of general meeting shall be published by the Company on the website of (i) the United States Securities and Exchange Commission, and (ii) the Company, as a Current Report on Form 6-K or Form 8-K (or such other form prescribed by the

Statutes), at least 21 days prior to the general meeting (or earlier if so required under the Statutes) and, if so published, shall be deemed to have been duly given on the date of such publication to any shareholder.

## PROCEEDINGS AT GENERAL MEETINGS

### Quorum

39. No business shall be transacted at any general meeting of the Company unless a quorum of shareholders is present at the opening of the general meeting.

   Except as provided in the following Article with regard to an adjourned general meeting, the quorum for any general meeting shall be the presence of at least two shareholders in person or by proxy (including by voting deed) holding 1/3 (one third) or more of the voting rights in the Company. For this purpose, abstaining shareholders shall be deemed present at the general meeting.

40. If within half an hour from the time appointed for the holding of a general meeting a quorum is not present, the general meeting shall stand adjourned to the same day in the following week at the same time and place or to such other day, time and place as the Board may indicate in a notice to the shareholders. At such adjourned general meeting any number of shareholders shall constitute a quorum for the business for which the original general meeting was called.

### Chairman of the General Meeting

41. The Chairman shall preside as the chairman at every general meeting, but if there shall be no such Chairman or if at any meeting the Chairman shall not be present within fifteen (15) minutes after the time appointed for holding the same, or shall be unwilling to act as chairman, then the Board members present at the meeting shall choose one of the Board members as chairman of the meeting and if they shall not do so then the shareholders present (by person or by proxy) shall choose a Board member, or if no Board member be present or if all the Board members present decline to take the chair, they shall choose any other person present to be chairman of the meeting.

42. The chairman of the general meeting may, with the consent of a general meeting at which a quorum is present, and shall if so directed by the general meeting, adjourn any meeting, discussion or the resolution with respect to a matter that is on the agenda, from time to time and from place to place as the meeting shall determine. Except as may be required by the Law, no shareholder shall be entitled to any notice of an adjournment or of the business to be transacted at an adjourned meeting. No business shall be transacted at any adjourned meeting other than the business which might have been transacted at the meeting from which the adjournment took place.

43. A vote in respect of the election of the chairman of the meeting or regarding a resolution to adjourn the meeting shall be carried out immediately. All other matters shall be voted upon during the meeting at such time and order as decided by the chairman of the general meeting.

## VOTE OF SHAREHOLDERS

44. All resolutions proposed at any general meeting will require a Simple Majority, unless otherwise expressly required by the Statutes or these Articles. Except as otherwise expressly required by the Statutes or these Articles, alteration or amendment of these Articles shall require a Simple Majority.

45. A declaration by the chairman of the meeting that a resolution has been carried, or has been carried unanimously or by a particular majority, or rejected, or not carried by a particular majority and an entry to that effect in the minutes of the meeting shall be *prima facie* evidence thereof.

46. The chairman of the meeting will not have a second and/or a casting vote. If the vote is tied with regard to a certain proposed resolution such proposal shall be deemed rejected.

47. If two or more persons are jointly entitled to a share, the vote of the senior one who tenders a vote, whether in person or by proxy, shall be accepted to the exclusion of the votes of the other registered holders of the share, and for this purpose seniority shall be determined by the order in which the names stand in the Register.

48. A proxyholder need not be a shareholder of the Company.

49. The instrument appointing a proxy shall be in writing signed by the appointer or of his attorney-in-fact duly authorized in writing. A corporate entity shall vote by a representative duly appointed in writing by such entity. Any instrument appointing a proxy or a representative of a corporate entity (whether for a specified meeting or otherwise) shall be in a form satisfactory to the Company.

    Such instrument shall be duly signed by the appointer or his duly authorized attorney or, if such appointer is a company or other corporate body, under its common seal, stamp or printed name or the hand of its duly authorized agent(s) or attorney(s).

50. Unless otherwise determined by the Board, the instrument of appointment must be submitted to the Office no later than 48 hours prior to the general meeting to be attended by such proxy or representative. Notwithstanding the above, the chairman of the meeting shall have the right to waive the time requirement provided above with respect to all instruments of appointment and to accept any and all instruments of appointment until the beginning of a general meeting.

51. A proxy may be appointed in respect of only some of the shares held by a shareholder, and a shareholder may appoint more than one proxy, each empowered to vote by virtue of a portion of the shares.

52. A shareholder being of unsound mind or pronounced to be unfit to vote by a competent court of law may vote through a legally appointed guardian or any other representative appointed by a court of law to vote on behalf of such shareholder.

53. A shareholder entitled to vote may signify in writing his approval of, or dissent from, or may abstain from any resolution included in a proxy instrument furnished by the Company. A proxy instrument may include resolutions pertaining to such issues which are permitted to be included in a proxy instrument according to the Statutes, and such other issues which the Board may decide, in a certain instance or in general, to allow voting through a proxy. A shareholder voting or abstaining through a proxy instrument shall be taken into account in determining the presence of a quorum as if such shareholder is present at the meeting.

54. The chairman of the general meeting shall be responsible for recording the minutes of the general meeting and any resolution adopted.

55. The provisions of these Articles relating to general meetings shall, mutatis mutandis, apply to Class Meetings.

### DIRECTORS

**Powers, Number of Directors, Composition & Election**

56. The Board shall have and execute all powers and/or responsibilities allocated to the Board by the Statutes and these Articles, including, without limitation, (i) the powers granted to the Board pursuant to Section 92 of the Companies Law and (ii) setting the Company's policies and supervision over the execution of the powers and responsibilities of the CEO. The Board may

execute any power of the Company that is not specifically allocated by the Statutes or by these Articles to another organ of the Company.

57. The number of directors on the Board shall be no less than six (6) but no more than ten (10), including any External Directors required to be appointed by the Companies Law (if required) and including the Founder Director permitted to be appointed pursuant to Article 65 (unless the Appointment Right pursuant to such Article is suspended). A reduction of the maximum number of directors on the Board under this Article 57 , shall not affect the term in office of serving directors determined prior to such reduction.

58. The directors, excluding the External Directors and excluding the Founder Director appointed pursuant to Article 65, shall be classified, with respect to the term for which they each severally hold office, into three classes, as nearly equal in number as practicable, hereby designated as Class I, Class II and Class III. The Board may assign members of the Board already in office to such classes at the time such classification becomes effective.

58.1. The term of office of the initial Class I directors shall expire at the first Annual Meeting to be held in 2020 and when their successors are elected and qualified,

58.2. The term of office of the initial Class II directors shall expire at the first Annual Meeting following the Annual Meeting referred to in Article 58.1 above and when their successors are elected and qualified, and

58.3. The term of office of the initial Class III directors shall expire at the first Annual Meeting following the Annual Meeting referred to in Article 58.2 above and when their successors are elected and qualified.

59. At each Annual Meeting, commencing with the Annual Meeting to be held in 2020, each of the successors elected to replace the directors of a Class whose term shall have expired at such Annual Meeting shall be elected to hold office until the third Annual Meeting next succeeding his or her election and until his or her respective successor shall have been elected and qualified. Notwithstanding anything to the contrary, each director shall serve until his or her successor is elected and qualified or until such earlier time as such director's office is vacated. A director whose term shall expire at an Annual Meeting may be re-elected at such Annual Meeting.

60. The Board may at any time and from time to time appoint any person as a director to fill a vacancy (whether such vacancy is due to a director no longer serving or due to the number of directors serving being less than the maximum number stated in Article 57 above). In the event of one or more such vacancies in the Board, the continuing directors may continue to act in every matter; provided, however, that if their number is less than the minimum number provided for pursuant to Article 57 above, they may only act in an emergency or to fill the office of a director which has become vacant up to a number equal to the minimum number provided for pursuant to Article 57 above. The office of a director that was appointed by the Board to fill any vacancy shall only be for the remaining period of time during which the director whose service has ended was filled would have held office, or in case of a vacancy due to the number of directors serving being less than the maximum number stated in Article 57 above, the Board shall determine at the time of appointment the class pursuant to Article 58 above, to which the additional director shall be assigned. Other than as provided in this Article 60, directors may be elected only at Annual Meetings.

61. Prior to every General Meeting of the Company at which directors are to be elected, and subject to Article 58 above, the Board of Directors (or a Committee thereof) shall select, by a resolution adopted by a majority of the Board of Directors (or such Committee), the Persons to be proposed to the Shareholders for election as directors at such General Meeting (the " **Nominees** "). Any

Proposing Shareholder requesting to include on the agenda of a General Meeting a nomination of a Person to be proposed to the Shareholders for election as director (such person, an " **Alternate Nominee** "), may so request provided that it complies with this Article 61 and Article 35 and applicable law. In addition to any information required to be included in accordance with applicable law, such a Proposal Request shall include information required pursuant to Article 35, and shall also set forth: (i) the name, address, telephone number, fax number and email address of the Alternate Nominee and all citizenships and residencies of the Alternate Nominee; (ii) a description of all arrangements, relations or understandings between the Proposing Shareholder(s) or any of its affiliates and each Alternate Nominee; (iii) a declaration signed by the Alternate Nominee that he consents to be named in the Company's notices and proxy materials relating to the General Meeting, if provided or published, and, if elected, to serve on the Board of Directors and to be named in the Company's disclosures and filings, (iv) a declaration signed by each Alternate Nominee as required under the Companies Law and any other applicable law and stock exchange rules and regulations for the appointment of such an Alternate Nominee and an undertaking that all of the information that is required under law and stock exchange rules and regulations to be provided to the Company in connection with such an appointment has been provided (including, information in respect of the Alternate Nominee as would be provided in response to the applicable disclosure requirements under Annual Report on Form 20-F or any other applicable form prescribed by the United States Securities and Exchange Commission); (v) a declaration made by the Alternate Nominee of whether (s)he meets the criteria for an independent director and/or External Director of the Company under the Companies Law and/or under any applicable law, regulation or stock exchange rules, and if not, then an explanation of why not; and (vi) any other information required at the time of submission of the Proposal Request by applicable law, regulations or stock exchange rules. In addition, the Proposing Shareholder shall promptly provide any other information reasonably requested by the Company. The Board may refuse to acknowledge the nomination of any person not made in compliance with the foregoing. The Company shall be entitled to publish any information provided by a Proposing Shareholder pursuant to this Article 61 and Article 35, and the Proposing Shareholder shall be responsible for the accuracy and completeness thereof.

62. The Nominees or Alternate Nominees shall be elected by a Simple Majority (provided, however, that in the case of contested election, the Nominees or Alternate Nominees shall be elected by a vote of plurality of the votes cast), and by a resolution adopted at the Annual Meeting at which they are subject to election, unless the number of directors is less than the minimum number of directors required by Article 57 above and the Board did not appoint any person to fill the vacancy, in which case, the Alternate Nominees may be elected at any General Meeting.

For the purposes of these Articles, any General Meeting shall be considered a "contested election" if the total number of nominees for election to the Board of Directors at such meeting (including all persons (i) with respect to whom a shareholder has delivered, in due time pursuant to the Companies Law and these Articles, a notice of its intent to nominate at such meeting and (ii) with respect to whom such notice of intent to nominate has not been withdrawn by such shareholder prior to the date of the definitive proxy statement filed by the Company with the United States Securities and Exchange Commission with respect to such meeting, as such date is set forth in the definitive proxy statement) made in compliance with these Articles and the Companies Law exceeds the total number of Nominees or Alternate Nominees to be elected at such meeting. At any General Meeting at which Nominees or Alternate Nominees are to be elected, each shareholder shall be entitled to cast a number of votes with respect to nominees for election to the Board of Directors up to the total number of Nominees or Alternate Nominees to be elected at such meeting.

63. The term of office of a director shall commence on the date of such director's election by the Annual Meeting or by the Board or on a later date, should such date be determined in the resolution

of appointment of the Annual Meeting or of the Board. Subject to Articles 65 and 66 below, a General Meeting may dismiss a director during the term, with or without cause, only by a Special Majority vote .

64. An amendment to Articles 56-65 shall require a Special Majority.

65. For so long as the Founders, together with their respective Permitted Transferees, each hold Voting Control of two percent (2%) or more of the Company's outstanding ordinary shares, the Founders shall jointly have the sole right (the " **Appointment Right** ") to appoint (by way of written notice signed by both Founders) one (1) director to the Board (the " **Founder Director** ") which director may be either of the Founders and the Founders may in like manner remove (by way of written notice signed by both Founders) with or without cause any Founder Director so appointed and may in like manner appoint another person (which is not a Founder) in his or her stead; provided, however, that the Appointment Right shall be suspended if either Founder is otherwise serving on the Board. In the event that only one Founder, together with his Permitted Transferees, holds Voting Control of two percent (2%) or more of the Company's outstanding ordinary shares, the Appointment Right and right of removal set forth in the previous sentence shall inure solely to such Founder (by way of written notice signed by such Founder); provided, however, that the Appointment Right shall be suspended if such Founder is otherwise serving on the Board. The term of office of the Founder Director appointed pursuant to this Article shall expire at the earlier of (i) such time as the Appointment Right is suspended and (ii) such time as the Founders, together with their respective Permitted Transferees, no longer jointly hold Voting Control of two percent (2%) or more of the Company's outstanding ordinary shares; provided, however, that at such time as the Appointment Rights are no longer suspended, the Founders will have the Appointment Rights provided in this Article. Once the Founders, together with their respective Permitted Transferees, do not jointly hold Voting Control of two percent (2%) or more of the Company's outstanding ordinary shares, the Appointment Right of this Article shall terminate. It is hereby clarified that nothing in this Article 65 is intended, nor shall it be construed, to create a separate class for the Company's ordinary shares held by any of the Founders (and their Permitted Transferees) and such shares shall be voted together with the ordinary shares held by any other shareholders at any annual or special meeting of the shareholders and not as a separate class.

For the purposes of these Articles, " **Permitted Transferee** " means:

(A) a trust for the benefit of such Founder or the Immediate Family of such Founder so long as such Founder has sole dispositive power and exclusive Voting Control with respect to the ordinary shares held by such trust; provided that the establishment of such trust does not involve any payment to the Founder of cash, securities, property or other consideration (other than an interest in such trust);

(B) a trust under the terms of which such Founder has retained a "qualified interest" within the meaning of §2702(b)(1) of the Internal Revenue Code and/or a reversionary interest so long as the Founder has sole dispositive power and exclusive Voting Control with respect to the ordinary shares held by such trust;

(C) an Individual Retirement Account, as defined in Section 408(a) of the Internal Revenue Code, or a pension, profit sharing, share bonus or other type of plan or trust of which such Founder is a participant or beneficiary and which satisfies the requirements for qualification under Section 401 of the Internal Revenue Code; provided that in each case such Founder has sole dispositive power and exclusive Voting Control with respect to the ordinary shares held in such account, plan or trust; and

(D) a corporation, partnership or limited liability company in which such Founder directly, or indirectly through one or more Permitted Transferees, owns shares, partnership interests or membership interests, as applicable, with sufficient Voting Control in the corporation, partnership or limited liability company, as applicable, or otherwise has legally enforceable rights, such that the Founder retains sole dispositive power and exclusive Voting Control with respect to the shares of ordinary shares held by such corporation, partnership or limited liability company.

For the purposes of these Articles, " **Change of Control Transaction** " means (i) the sale, lease, exchange, or other disposition (other than liens and encumbrances created in the ordinary course of business, including liens or encumbrances to secure indebtedness for borrowed money that are approved by the Company's Board, so long as no foreclosure occurs in respect of any such lien or encumbrance) of all or substantially all of the Company's property and assets (which shall for such purpose include the property and assets of any direct or indirect subsidiary of the Company), provided that any sale, lease, exchange or other disposition of property or assets exclusively between or among the Company and any direct or indirect subsidiary or subsidiaries of the Company shall not be deemed a "Change of Control Transaction"; (ii) the merger, consolidation, business combination, or other similar transaction of the Company with any other entity, other than a merger, consolidation, business combination, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or by being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company and more than fifty percent (50%) of the total number of outstanding shares of the Company's share capital, in each case as outstanding immediately after such merger, consolidation, business combination, or other similar transaction, and the shareholders of the Company immediately prior to the merger, consolidation, business combination, or other similar transaction continuing to own voting securities of the Company, the surviving entity or its parent immediately following the merger, consolidation, business combination, or other similar transaction in substantially the same proportions (vis a vis each other) as such shareholders owned of the voting securities of the Company immediately prior to the transaction; (iii) a recapitalization, liquidation, dissolution, or other similar transaction involving the Company, other than a recapitalization, liquidation, dissolution, or other similar transaction that would result in the voting securities of the Company outstanding immediately prior thereto continuing to represent (either by remaining outstanding or being converted into voting securities of the surviving entity or its parent) more than fifty percent (50%) of the total voting power represented by the voting securities of the Company and more than fifty percent (50%) of the total number of outstanding shares of the Company's share capital, in each case as outstanding immediately after such recapitalization, liquidation, dissolution or other similar transaction, and the shareholders of the Company immediately prior to the recapitalization, liquidation, dissolution or other similar transaction continuing to own voting securities of the Company, the surviving entity or its parent immediately following the recapitalization, liquidation, dissolution or other similar transaction in substantially the same proportions (vis a vis each other) as such shareholders owned of the voting securities of the Company immediately prior to the transaction.

For the purposes of these Articles, " **Founder** " means each of Ruvi Kitov and Reuven Harrison.

For the purposes of these Articles, " **Immediate Family** " means any child, stepchild, grandchild or other descendant, any parent, stepparent, grandparent or other ancestor, any spouse, domestic partner, sibling, niece, nephew, uncle, aunt, mother-in-law, father-in-law, son-in-law, daughter-in-law, or brother-in-law or sister-in-law, including adoptive relationships.

For the purposes of these Articles, " **Voting Control** " means the power (whether directly or indirectly) to vote or direct the voting of an equity interest by proxy, voting agreement, or otherwise. Notwithstanding the foregoing, a person shall still be considered to possess Voting Control notwithstanding (a) the grant of a proxy to officers or directors of the Company at the request of the Board in connection with actions to be taken at an annual or special meeting of shareholders; (b) the fact that the spouse of any Founder possesses or obtains an interest in such Founder's ordinary shares arising solely by reason of the application of the community property laws of any jurisdiction, so long as no other event or circumstance shall exist or have occurred that grants such spouse the power to vote or direct the voting of such ordinary shares; or (c) in connection with a Change of Control Transaction that has been approved by the Board, the entering into a support, voting, tender or similar agreement or arrangement, and/or the grant of a proxy, that has also been approved by the Board.

66. Notwithstanding anything to the contrary in these Articles, the election, qualification, removal or dismissal of External Directors shall be only in accordance with the applicable provisions set forth in the Companies Law.

### Remuneration

67. The Company shall determine the remuneration of the directors, if any, in accordance with the Law.

### Chairman of the Board

68. The Board shall appoint one of its members to serve as the Chairman and may replace the Chairman from time to time. The Chairman shall preside at meetings of the Board, but if at any meeting the Chairman is not present within fifteen (15) minutes after the time appointed for holding the meeting, the present directors shall choose a present director to be chairman of such meeting.

## PROCEEDINGS OF THE DIRECTORS

69. The directors shall meet together for the dispatch of business, adjourn and otherwise regulate their meetings as they deem fit, subject to these Articles.

Unless otherwise determined by the Board, written notice of any meeting of the Board and the agenda setting out the matters to be discussed at such meeting, shall be given to all directors at least seventy two (72) hours (or such shorter notice (i) if all the directors so agree or (ii) in the case of emergency, if a majority of the directors so agree) before the meeting. A majority of the members of the Board may decide to hold a meeting without such notice, provided the Chairman participates in such meeting.

### Quorum

70. No business shall be transacted at any meeting of the Board unless a quorum of directors is present when a meeting is called to order. A quorum shall be deemed to exist when there are present at least half of the directors then in office.

If a quorum is not present at the meeting of the Board within half an hour after the time scheduled for the meeting, the meeting may be adjourned to another time as shall be decided by the Chairman, or in his absence, the directors present at the meeting, provided that notice of no less than twenty four (24) hours in advance shall be given to all the directors of the time of the adjourned meeting. The directors may waive the necessity of such notice either beforehand or retrospectively. The quorum for the commencement of the adjourned meeting shall be at least one member of the Board.

**Methods of Attending Meetings**

71. Some or all of the directors may attend meetings of the Board through computer network, telephone or any other media of communication, enabling the directors to communicate with each other, in the deemed presence of all of them, provided that due prior notice detailing the time and manner of holding a given meeting is served upon all the directors. The directors may waive the necessity of such notice either beforehand or retrospectively.

    Any resolution adopted by the Board in such a meeting, pursuant to the provisions of these Articles, will be recorded in writing and signed by the Chairman (or in his absence by the chairman of the meeting), and shall be valid as if adopted at a meeting of the Board duly convened and held.

72. A resolution in writing signed by all of the directors eligible to participate in the discussion and vote on such resolution, or in respect of which all such directors have agreed (in writing by mail, fax or electronic mail) not to convene, shall be as valid and effective for all purposes as if passed at a meeting of the Board duly convened and held.

    Any such resolution may consist of several counterparts, each signed by one or more directors. Such resolution in writing shall be effective as of the last date appearing on the resolution, or if the resolution is signed in two or more counterparts, as of the last date appearing on the counterparts.

73. While exercising his/her voting right, each director shall have one vote. Resolutions of the Board will be decided by a simple majority of the directors present and voting, not taking into consideration abstaining votes, except as otherwise provided in these Articles or by the Statutes. In the event the vote is tied, the Chairman of the Board shall have a casting vote.

74. Reserved.

**Committees**

75. The Board may set up committees and appoint members to these committees subject to the Statutes. A resolution passed or an act done by such a committee pursuant to an authority granted to such committee by the Board shall be treated as a resolution passed or act done by the Board, unless expressly otherwise prescribed by the Board or the Statutes for a particular matter or in respect of a particular committee.

76. Meetings of committees and proceedings thereat (including the convening of the meetings, the election of the chairman and the votes) shall be governed by the provisions herein contained for regulating the meetings and proceedings of the Board so far as the same are applicable thereto and unless otherwise determined by the Board, including by an adoption of a charter governing the committee proceedings.

**Approval of Certain Transactions with Related Parties**

77. Subject to the Law and pursuant to Section 271 of the Law, a transaction between the Company and an Office Holder (other than with respect to the compensation terms of such Office Holder), and a transaction between the Company and another entity in which an Office Holder of the Company has a personal interest, which is not an Extraordinary Transaction (as defined by the Law), may be approved by either the Board or a committee of the Board or any other body or person (who has no personal interest in the transaction) authorized by the Board. Such authorization, as well as the actual approval by the authorized body or person, may be for a particular transaction or more generally for specific type of transactions.

**Records and Validity of Acts**

78. The resolutions of the Board shall be recorded in the Company's Minutes Book, as required under the Statutes, signed by the Chairman or the chairman of a certain meeting. Such signed minutes shall be deemed *prima facie* evidence of the meeting and the resolutions resolved therein.

79. All acts done bona fide by any meeting of the Board or of a committee of the Board or by any person acting as a director, shall, notwithstanding it be afterwards discovered that there was some defect in the appointment of any such director or person acting as aforesaid, or that they or any of them were disqualified, be as valid as if every such person had been duly appointed and was qualified to be a director.

**Chief Executive Officer**

80. The Board shall appoint at least one CEO, for such period and upon such terms as the Board deems fit.

81. The CEO shall have all managing and execution powers within the policies and guidelines set forth by the Board, and shall be under the supervision of the Board. The CEO may delegate any of his powers to his subordinates, subject to the approval of the Board.

## INSURANCE, EXCULPATION, AND INDEMNITY

**Insurance of Office Holders**

82. The Company may insure the liability of an Office Holder, to the fullest extent permitted under the Statutes.

83. Without derogating from the aforesaid, the Company may enter into a contract to insure the liability of an officer therein for an obligation imposed on him in consequence of an act done in his capacity as an Office Holder, in any of the following cases:

    83.1. A breach of the duty of care vis-a-vis the Company or vis-a-vis another person, to the extent such a breach arises out of the negligent conduct of the office holder;

    83.2. A breach of the duty of loyalty vis-a-vis the Company, provided that the Office Holder acted in good faith and had a reasonable basis to believe that the act would not harm the Company;

    83.3. A monetary obligation imposed on him in favor of another person;

    83.4. A monetary liability imposed on such Office Holder in favor of a payment to a breach offended at an Administrative Procedure as set forth in Section 52(54)(a)(1)(a) to the Securities Law and expenses regarding Administrative Procedures conducted in connection with such Office Holder and/or in connection with a monetary sanction, including reasonable litigation expenses and reasonable attorney's fees;

    83.5. Any other matter in respect of which it is permitted or will be permitted under applicable law to insure the liability of an Office Holder in the Company.

**Indemnity of Office Holders**

84. The Company may indemnify an Office Holder, to the fullest extent permitted under the Statutes. Without derogating from the aforesaid, the Company may indemnify an Office Holder for a liability or expense imposed on him in consequence of an act done in his capacity as an Office Holder in the Company, as follows:

84.1. a monetary liability incurred by or imposed on the Office Holder in favor of another person pursuant to a court judgment, including pursuant to a settlement confirmed as judgment or arbitrator's decision approved by a competent court;

84.2. reasonable litigation expenses, including reasonable attorneys' fees, which were incurred by the Office Holder as a result of an investigation or proceeding filed against the Office Holder by an authority authorized to conduct such investigation or proceeding, provided that such investigation or proceeding was either (i) concluded without the filing of an indictment against such Office Holder and without the imposition on him of any monetary obligation in lieu of a criminal proceeding; (ii) concluded without the filing of an indictment against the Office Holder but with the imposition of a monetary obligation on the Office Holder in lieu of criminal proceedings for an offense that does not require proof of criminal intent; or (iii) in connection with a monetary sanction;

84.3. reasonable litigation expenses, including attorneys' fees, incurred by the Office Holder or which were imposed on the Office Holder by a court (i) in a proceeding instituted against the Office Holder by the Company, on its behalf, or by a third party, or (ii) in connection with criminal indictment of which the Office Holder was acquitted, or (iii) in a criminal indictment which the Office Holder was convicted of an offense that does not require proof of criminal intent;

84.4. a monetary liability imposed on the Office Holder in favor of all the injured parties by the breach in an Administrative Procedure as set forth in Section 52(54)(a)(1)(a) to the Securities Law;

84.5. expenses expended by the Office Holder with respect to an Administrative Procedure under the Securities Law, including reasonable litigation expenses and reasonable attorneys' fees; and

84.6. any other obligation or expense in respect of which it is permitted or will be permitted under applicable law to indemnify an Office Holder.

**Advance Indemnity**

85. The Company may give an advance undertaking to indemnify an Office Holder therein in respect of the following matters:

85.1. matters as detailed in Article 84.1, provided however, that the undertaking is restricted to events, which in the opinion of the Board, are anticipated in light of the Company's activities at the time of granting the obligation to indemnify and is limited to a sum or measurement determined by the Board as reasonable under the circumstances. The indemnification undertaking shall specify such events and sum or measurement; and

85.2. matters as detailed in Articles 83.2 through 83.6.

**Retroactive Indemnity**

86. The Company may indemnify an Office Holder retroactively with respect of the matters as detailed in Article 84, subject to any applicable law.

**Exculpation**

87. The Company may exempt an Office Holder in advance for all or any of his liability for damage in consequence of a breach of the duty of care vis-a-vis the Company, to the fullest extent permitted under the Statutes. However, the Company may not exempt a director in advance from his liability toward the Company due to the breach of his/her duty of care in a Distribution.

**Insurance, Exculpation and Indemnity – General**

88. The above provisions with regard to insurance, exemption and indemnity are not and shall not limit the Company in any way with regard to its entering into an insurance contract and/or with regard to the grant of indemnity and/or exemption in connection with a person who is not an Office Holder of the Company, including employees, contractors or consultants of the Company, all subject to any applicable law.

89. The Company may enter into a contract in relation to exemption, indemnification and insurance of Office Holders in companies under its control, related companies and other companies in which it has any interest, to the maximum extent permitted under the Statutes, and in this context the foregoing provisions in relation to exemption, indemnification and insurance of Office Holders in the Company shall apply, *mutatis mutandis* .

90. An undertaking in relation to exemption, indemnification and insurance of an Office Holder as aforesaid may also be valid after the office of such Office Holder in the Company has terminated.

## APPOINTMENT OF AN AUDITOR

91. Subject to the Statutes, the Annual Meeting shall appoint an Auditor for a period ending at the next Annual Meeting, or for a longer period, but no longer than until the third Annual Meeting after the meeting at which the Auditor has been appointed. The same Auditor may be re-appointed.

    Subject to the Statutes, the terms of service (including fees) of the Auditor for the audit services shall be determined by the Board, at its discretion, or a committee of the Board if such determination was delegated to a committee, including undertakings or payments to the Auditor. The Board shall report the fees of the Auditor to the Annual Meeting.

## INTERNAL AUDITOR

92. So long as the Company is a Public Company, the Board shall appoint an Internal Auditor pursuant to the recommendation of the Audit Committee.

93. The organizational superior of the Internal Auditor shall be the Chairman. The Internal Auditor shall submit a proposed annual or periodic work plan to the Audit Committee or the Board, which will approve such plan with changes as it deems fit, at its discretion.

## MERGER AND REORGANIZATION

94. Notwithstanding anything to the contrary hereunder, the majority required for the approval of a merger by the general meeting or by a class meeting, if any, shall be a Simple Majority.

## SIGNATORIES

95. Signatory rights on behalf of the Company shall be determined from time to time by the Board.

## DISTRIBUTIONS

96. The Board may decide on a Distribution, subject to the provisions set forth under the Law and these Articles.

97. The Board will determine the method of payment of any Distribution. The receipt of the person whose name appears on the record date on the Register as the owner of any share, or in the case of joint holders, of any one of such joint holders, shall serve as confirmation with respect to all the payments made in connection with that share and in respect of which the receipt was received. All dividends unclaimed after having been declared may be invested or otherwise used by the Directors for the benefit of the Company until claimed, provided however that the Company shall not be required to accept any claim made following the 7th anniversary of the declaration date, or an earlier date as may be determined by the Board. No unpaid dividend shall bear interest or accrue linkage differentials.

98. For the purpose of implementing any resolution concerning any Distribution, the Board may settle, as it deems fit, any difficulty that may arise with respect to the Distribution, including determining the value for the purpose of the said Distribution of certain assets, and deciding that payments in cash shall be made to the shareholders based on the value so determined, and determining provisions with respect to fractions of shares or with respect to the non-payment of small sums.

## REDEEMABLE SECURITIES

99. The Company shall be entitled to issue redeemable securities which are, or at the option of the Company may be, redeemed on such terms and in such manner as shall be determined by the Board. Redeemable securities shall not constitute part of the Company's capital, except as provided in the Law.

## DONATIONS

100. The Company may make donations of reasonable amounts of money for purposes which the Board deems to be worthy causes, even if the donations are not made in relation to business considerations for increasing the Company's profits.

## NOTICES

101. Subject to the Statutes, notice or any other document which the Company shall deliver and which it is entitled or required to give pursuant to the provisions of these Articles and/or the Statutes shall be delivered by the Company to any person, in any one of the following manners as the Company may choose: in person, by mail, transmission by fax or by electronic form.

Any notice or other document which shall be sent shall be deemed to have reached its destination on the third day after the day of mailing if sent by registered mail or regular mail, or on the first day after transmission if delivered in person, transmitted by fax or electronic form.

Should it be required to prove delivery, it shall be sufficient to prove that the notice or document sent contains the correct mailing, e-mail, or fax details as registered in the Register or any other address which the shareholder submitted in writing to the Company as the address and fax or e-mail details for the submission of notices or other documents.

Notwithstanding anything to the contrary hereunder, subject to the provisions of the Statutes, a notice to a shareholder may be served, as a general notice to all shareholders, published by the Company on the website of (i) the United States Securities and Exchange Commission, and (ii) the Company, in accordance with applicable rules and regulations of any stock market upon which the Company's shares are listed and, if so published, shall be deemed to have been duly given on the date of such publication to any shareholder.

In cases where it is necessary to give advance notice of a particular number of days or notice which shall remain in effect for a particular period, the day the notice was sent shall be excluded and the scheduled day of the meeting or the last date of the period shall be included in the count.

The Company shall not be required to give notice to its registered shareholders pursuant to the Companies Law, unless otherwise required by Statutes. Subject to the Statutes, the Company shall not be required to send notices to any shareholder who is not registered in the Register or has not provided the Company with accurate and sufficient mailing details.

102. Any notice to be given to the shareholders shall be given, with respect to joint shareholders, to the person whose name appears first in the Register as the holder of the said share, and any notice so given shall be sufficient notice for all holders of the said share.

103. Any notice or other document served upon or sent to any shareholder in accordance with these Articles shall, notwithstanding that he be then deceased or bankrupt, and whether the Company received notice of his death or bankruptcy or not, be deemed to be duly served or sent in respect of any shares held by him (either alone or jointly with others) until some other person is registered in his stead as the holder or joint holder of such shares, and such service or sending shall be a sufficient service or sending on or to his heirs, executors, administrators or assigns and all other persons (if any) interested in such share.

104. The accidental omission to give notice to any shareholder or the non-receipt of any such notice shall not cancel or annul any action made in reliance on the notice.

## WINDING-UP

105. If the Company is wound up, then, subject to applicable law and to the rights of the holders of shares with special rights upon winding up, the assets of the Company available for distribution among the shareholders shall be distributed to them in proportion to the nominal value of their respective holdings of the shares in respect of which such distribution is being made.

*********************

**Exhibit 4.1**

**SPECIMEN SHARE CERTIFICATE**



Tufin Software Technologies Ltd.

Number | Shares

TUFN | CUSIP: M8893U 102

**See Reverse for**
**Certain**
**Definitions**

**TUFIN SOFTWARE TECHNOLOGIES LTD.**
**INCORPORATED UNDER THE LAWS OF THE STATE OF ISRAEL**

THIS CERTIFIES that

is the Registered Holder of

**FULLY PAID AND NON-ASSESSABLE ORDINARY**
**SHARES OF NIS 0.015 PAR VALUE EACH**

of Tufin Software Technologies Ltd. transferable on the books of the Company by the holder hereof in person or by duly authorized attorney only upon surrender of this Certificate properly endorsed or with an appropriate instrument of transfer. This Certificate and the shares represented hereby are issued and shall be held subject to all the provisions of the Amended and Restated Articles of Association of the Company and amendments thereto, to all of which the holder by the acceptance hereof assents. This Certificate is not valid unless countersigned and registered by the Transfer Agent and Registrar.

IN WITNESS WHEREOF, the Company has caused this Certificate to be issued under the facsimile seal of the Company.

Dated:

Tufin Software
Technologies Ltd.
Corporate Seal                     ISRAEL

/s/ Reuven Kitov

Reuven Kitov
Chief Executive Officer

The following abbreviations, when used in the inscription on the face of this Certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| | | | | |
|---|---|---|---|---|
| TEN COM - | as tenants in common | UNIF GIFT MIN ACT | _____ Custodian _____ | |
| TEN ENT - | as tenants by the entireties | | (Cust) | (Minor) |
| JT TEN - | as joint tenants with right of survivorship and not | | | |
| | as tenants in common | under Uniform Gifts to Minors | | |
| | | Act | (State) | |

    Additional abbreviations may also be used though not in the above list.

FOR VALUE RECEIVED, _____ HEREBY SELLS, ASSIGNS AND TRANSFERS UNTO

PLEASE INSERT SOCIAL SECURITY OR OTHER IDENTIFYING NUMBER OF ASSIGNEE

PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE

_____ SHARES REPRESENTED BY THE WITHIN CERTIFICATE, AND SO HEREBY IRREVOCABLY CONSTITUTES AND APPOINTS

ATTORNEY TO TRANSFER THE SAID SHARES ON THE BOOKS OF THE WITHIN-NAMED CORPORATION AND FULL POWER OF SUBSTITUTION IN THE PREMISES.

DATED: _____

_____

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE, IN EVERY PARTICULAR, WITHOUT ALTERATION OR ENLARGEMENT, OR ANY CHANGE, WHATSOEVER.

Signature(s) Guaranteed:

_____

THE SIGNATURE(S) SHOULD BE GUARANTEED BY AN ELIGIBLE GUARANTOR INSTITUTION (BANKS, STOCKBROKERS, SAVINGS AND LOAN ASSOCIATIONS AND CREDIT UNIONS WITH MEMBERSHIP IN AN APPROVED SIGNATURE GUARANTEE MEDALLION PROGRAM), PURSUANT TO S.E.C. RULE 17 Ad-15.

**Exhibit 5.1**

GROSS · KLEINHENDLER · HODAK
HALEVY · GREENBERG · SHENHAV & CO.
GKH LAW OFFICES

April 1, 2019

Tufin Software Technologies Ltd.
5 Shoham Street
Ramat Gan 52521
Israel

Ladies and Gentlemen:

We have acted as Israeli counsel to Tufin Software Technologies Ltd. (the "Company"), an Israeli company, in connection with the offering, issuance and sale of an aggregate of up to 8,855,000 Ordinary Shares (the "Ordinary Shares"), NIS 0.015 par value per share, of the Company, including 1,155,000 Ordinary Shares that are subject to an option granted by the Company to the underwriters of the offering to purchase additional shares (collectively, the "Offered Securities"). The Offered Securities are registered by the Company in connection with the underwritten initial public offering of the Company (the "Offering") and issued pursuant to a registration statement on Form F-1 (Registration Statement No. 333-230109) (the "Registration Statement") filed with the Securities and Exchange Commission (the "Commission") under the Securities Act of 1933, as amended (the "Securities Act").

In connection with this opinion, we have examined and relied upon the (i) Registration Statement, (ii) the Company's articles of association currently in effect, (iii) the Company's articles of association to be in effect upon closing of the Offering, (iv) resolutions of the Company's board of directors and shareholders provided to us by the Company, (v) the form of underwriting agreement by and between the Company and J.P. Morgan Securities LLC, Barclays Capital Inc. and Jefferies LLC on behalf of themselves and as representatives of the several underwriters listed in Schedule 1 thereto (collectively, the "Underwriters"), and (vi) such statutes, regulations, corporate records, documents, certificates and such other instruments that we have deemed relevant and necessary for the basis of our opinions hereinafter expressed.

In such examination, we have assumed: (i) the authenticity of original documents and the genuineness of all signatures; (ii) the conformity to the originals of all documents submitted to us as copies; (iii) the truth, accuracy and completeness of the information, representations and warranties contained in the corporate records, documents, certificates and instruments we have reviewed; (iv) the due execution and delivery of all documents where due execution and delivery are a prerequisite to the effectiveness thereof; and (v) the legal capacity of all natural persons. As to any facts material to such opinion, to the extent that we did not independently establish relevant facts, we have relied on certificates of public officials and certificates of officers or other representatives of the Company.

We are members of the Israel Bar and we express no opinion as to any matter relating to the laws of any jurisdiction other than the laws of the State of Israel and have not, for the purpose of giving this opinion, made any investigation of the laws of any jurisdiction other than the State of Israel.

On the basis of the foregoing, and in reliance thereon, we are of the opinion that the Offered Securities to be sold to the Underwriters as described in the Registration Statement have been duly authorized, and upon issuance and delivery of the Offered Securities as described in the Registration Statement, against payment to the Company of the consideration per Offered Security in such amount and form as shall be



determined by the Company's board of directors or an authorized committee thereof, the Offered Securities will be validly issued, fully paid and non-assessable.

We hereby consent to the filing of this opinion as an exhibit to the Registration Statement and to the use of our name wherever it appears in the Registration Statement. In giving such consent, we do not believe that we are "experts" within the meaning of such term as used in the Securities Act, or the rules and regulations of the Commission issued thereunder with respect to any part of the Registration Statement, including this opinion as an exhibit or otherwise.

Very truly yours,

/s/ Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co.

Gross, Kleinhendler, Hodak, Halevy, Greenberg, Shenhav & Co.

2

**Exhibit 10.1**

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT**

**THIS AMENDED AND RESTATED INVESTORS' RIGHTS AGREEMENT** (the **"Agreement"** ) is made as of the 6 th day of March, 2019, by and among Tufin Software Technologies Ltd., a company incorporated under the laws of the State of Israel, having its main place of business at 5 Shoham Street, Ramat Gan 52521, Israel (the " **Company** ") and each of the parties set forth in **Exhibit I** attached hereto (the " **Investors** " and each an " **Investor** "), and each of the parties set forth in **Exhibit II** attached hereto (the " **Existing Shareholders** " and together with the Investors, the " **Shareholders** " and each a " **Shareholder** ").

RECITALS

**WHEREAS** , the Company, certain Investors and the Existing Shareholders are parties to that certain Investors' Rights Agreement dated as of July 5, 2013, as amended and restated as of August 28, 2014 (the " **Prior IRA** "); and

**WHEREAS** , the Shareholders that were parties to the Prior IRA constituting the Holders of Majority Registrable Securities and the Company desire to amend and restate the Prior IRA in its entirety in anticipation of a potential Initial Offering so that this Agreement shall be the sole source of terms between the parties hereto with respect to the subject matters herein.

**NOW, THEREFORE** , in consideration of the mutual promises, covenants, conditions, representations and warranties set forth herein, and intending to be legally bound hereby, the parties agree as follows:

**1.** **Registration Rights** .

**1.1** Definitions . For purposes of this Agreement:

(i) The term " Adverse Disclosure " means public disclosure of material non-public information that, in the good faith judgment of the Board: (i) would be required to be made in any registration statement filed with the Securities and Exchange Commission (the " **SEC** ") by the Company so that such registration statement, from and after its effective date, does not contain an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading; (ii) would not be required to be made at such time but for the filing, effectiveness or continued use of such registration statement; and (iii) the Company has a bona fide business purpose for not disclosing publicly.

(ii) The term " Act " means the U.S. Securities Act of 1933, as amended or equivalent securities law of another jurisdiction acceptable to the Company and Holders of Majority Registrable Securities.

(iii) The term " Articles " means the Company's Amended and Restated Articles of Association in effect from time to time.

(iv) The term " Board " means the Company's board of directors.

1

(v)     The term " <u>Business Day</u> " means any day that is not Friday, Saturday or Sunday or any other day on which banks in the City of New York or the State of Israel are permitted or required to be closed.

(vi)    The term " <u>Excluded Registration</u> " means a registration relating solely to the sale of securities to participants in an employee benefit plan, a registration relating to a corporate reorganization or other transaction under Rule 145 of the Act, a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the sale of Registrable Securities, or a registration in which the only Ordinary Shares being registered are Ordinary Shares issuable upon conversion of debt securities that are also being registered.

(vii)   The terms " <u>Form S-3</u> " and " <u>Form F-3</u> " mean such form under the Act as in effect on the date hereof or any registration form under the Act subsequently adopted by the SEC that permits inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(viii)  The term " <u>Holder</u> " means any person owning Registrable Securities or shares convertible into Registrable Shares or any assignee thereof in accordance with Section 1.14 hereof.

(ix)    The term " <u>Holders of Majority Registrable Securities</u> " means the holders of 75% of the Registrable Securities then outstanding.

(x)     The term " <u>Initial Offering</u> " means the Company's "IPO" as defined in the Articles.

(xi)    The term " <u>Ordinary Shares</u> " shall mean ordinary shares of the Company par value NIS 0.01 each.

(xii)   The term " <u>Preferred Shares</u> " shall mean the Series A Preferred Shares, the Series B Preferred Shares, the Series C Preferred Shares and the Series D Preferred Shares.

(xiii)  The term " <u>Series A Preferred Shares</u> " shall mean Series A Preferred Shares of the Company, par value NIS 0.01 each.

(xiv)   The term " <u>Series B Preferred Shares</u> " shall mean Series B Preferred Shares of the Company, par value NIS 0.01 each.

(xv)    The term " <u>Series C Preferred Shares</u> " shall mean Series C Preferred Shares of the Company, par value NIS 0.01 each and Series C-1 Preferred Shares of the Company, par value NIS 0.01 each.

(xvi)   The term " <u>Series D Preferred Shares</u> " shall mean Series D Preferred Shares of the Company, par value NIS 0.01 each

(xvii)  The term " <u>register</u> ," " <u>registered,</u> " and " <u>registration</u> " refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Act, and the effectiveness of such registration statement or document by the SEC or the equivalent actions under the laws of another jurisdiction acceptable to the Company and Holders of Majority Registrable Securities.

2

(xviii)  The term " <u>Registrable Securities</u> " means (i) the Ordinary Shares issuable or issued upon conversion of the Preferred Shares, and (ii) any Ordinary Shares issued as (or issuable upon the conversion or exercise of any warrant, right or other security that is issued as) a dividend or other distribution with respect to, or in exchange for, or in replacement of, the shares referenced in (i) above, excluding in all cases, however, any securities (A) with respect to which registration rights have terminated pursuant to Section 1.17 below, or (B) that may be sold without restriction pursuant to Rule 144 under the Act (or similar rule) if such shares are held by a holder of less than 4% of the outstanding Ordinary Shares of the Company, calculated on an as converted basis.

(xix)  The number of shares of " <u>Registrable Securities then outstanding</u> " shall be determined by the number of Ordinary Shares outstanding, which are Registrable Securities, calculated on an as-converted basis.

(xx)  The term " <u>WKSI</u> " means a well-known seasoned issuer, as defined in Rule 405 of the Act.

(xxi)  The term " <u>1934 Act</u> " means the U.S. Securities Exchange Act of 1934, as amended or equivalent securities law of another jurisdiction acceptable to the Holders of Majority of Registrable Securities.

**1.2**  <u>Request for Registration</u> .

(i)  Subject to the conditions of this Section 1.2, if at any time after the closing of an Initial Offering, the Company shall receive a written request from the Holders of 25% or more of the Registrable Securities then outstanding (the " **Initiating Holders** ") that the Company file a registration statement under the Act covering the registration of Registrable Securities, then the Company shall, within ten (10) days of the receipt thereof, deliver written notice of such request to all Holders, and subject to the limitations of this Section 1.2, use commercially reasonable efforts to effect, as soon as practicable, the registration under the Act of all Registrable Securities that the Holders request to be registered in a written request received by the Company within twenty (20) days of the providing of the Company's notice pursuant to this Section 1.2(i).

(ii)  If the Initiating Holders intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 1.2 and the Company shall include such information in the written notice referred to in Section 1.2(i). In such event the right of any Holder to include its Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting by the Initiating Holders and reasonably acceptable to the Company.

(iii)  If the managing underwriter(s) advise(s) the Company that marketing factors require a limitation of the number of securities underwritten (including Registrable Securities), then the Company shall so advise all Holders of Registrable Securities that would otherwise be underwritten pursuant hereto, and there shall be excluded from registration to the extent necessary to satisfy such limitation, first shares held by shareholders

other than Holders (if any) and then shares which the Company may wish to register for its own account, and thereafter shares of the Holders of such Registrable Securities, on a pro rata basis based on the number of Registrable Securities held by the Holders including Registrable Securities in the registration (including the Initiating Holders). Any Registrable Securities excluded or withdrawn from such underwriting shall be withdrawn from the registration. The Company shall not register securities for sale for its own account in any registration requested pursuant to this Section 1.2 unless permitted to do so by the written consent of Initiating Holders holding a majority of the Registrable Securities held by the Initiating Holders, as to which registration has been requested. Except as stated in Section 1.2(iv)(b) below, the Company may not cause any other registration of securities for sale for its own account (other than an Excluded Registration) to be initiated after a registration requested pursuant to this Section 1.2 and to become effective less than ninety (90) days after the effective date of any registration requested pursuant to this Section 1.2.

(iv) The Company shall not be required to effect a registration pursuant to this Section 1.2:

(a) after the Company has effected two (2) registrations pursuant to this Section 1.2, and such registrations have been declared or ordered effective as promptly as practicable; or

(b) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and, subject to Section 1.7, ending on a date ninety (90) days following the effective date of, a Company-initiated registration pursuant to this Section 1.2 or an Underwritten Shelf Takedown offering pursuant to Section 1.5 below, provided that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective or such Underwritten Shelf Takedown to be completed as promptly as practicable; or

(c) if the anticipated aggregate proceeds to the Holders in such registration will be less than US$5,000,000 (net of underwriting discounts and commissions); or

(d) if the Company is eligible to use Form S-3 or Form F-3; or

(e) in the event of a Suspension pursuant to Section 1.6.

(v) The Company shall not effect a registration pursuant to this Section 1.2 if any Holder is subject to a contractual restriction imposed by an underwriter of the Initial Offering or any subsequent offering of the Company's Ordinary Shares which contractual restriction, if such Holder was to participate in such registration or related offering (i) would prevent such Holder from participating in the registration or related offering, and (ii) has not been waived in connection with such participation in the registration or subsequent offering to the same extent as it has been waived for any other Holder.

**1.3**     Company Offering . If (but without any obligation to do so) the Company proposes to conduct a public offering of any of its shares or other securities for its own account or that of others (other than an offering pursuant to an Excluded Registration), then the Company shall promptly (but in no event less than twenty (20) days prior to the anticipated pricing or trade date) give each Holder written notice (a " **Piggyback Notice** ") of such public offering. Such Piggyback Notice shall offer the Holders the opportunity to sell in such public offering such Holder's Registrable Securities upon the written request of each Holder given within ten (10) days of the Company providing such notice in accordance with Section 3.8. The Company

shall, subject to the provisions of Section 1.3(ii), include in such public offering all of the Registrable Securities that each such Holder has requested to be included therein.

(i)     Right to Terminate Offering . The Company shall have the right to terminate or delay any public offering initiated by it under this Section 1.3 prior to the pricing or trade date, whether or not any Holder has elected to include securities in such offering. The Company shall give written notice of such determination to each Holder and, thereupon (i) in the event of a termination, shall be relieved of its obligation to offer any Registrable Securities in connection with such public offering and (ii) in the event of a delay, shall be permitted to delay offering any Registrable Securities in connection with such public offering; in each case, without prejudice to the rights of any Holders pursuant to Sections 1.2, 1.4 or 1.5.

(ii)     Underwriting Requirements . In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required under this Section 1.3 to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting, in customary form, as agreed upon between the Company and the underwriters selected by it, and enter into such underwriting agreement. If the managing underwriter(s) advise(s) the Company in writing that marketing factors require a limitation of the number of shares to be underwritten, then there shall be excluded from such offering and underwriting to the extent necessary to satisfy such limitation, _first_ , shares held by shareholders other than the Holders of Registrable Securities, and _second,_ to the extent necessary, shares held by the Holders of Registrable Securities (on a pro rata basis based on the number of Registrable Securities held by the Holders including Registrable Securities in the offering); _provided_ that in any event all Registrable Securities must be included in such offering prior to any other shares of the Company (with the only exception of shares to be issued or sold by the Company to the public), provided further that in no event shall (x) the amount of Registrable Securities requested to be included in the offering be reduced below twenty five percent (25%) of the total amount of securities included in such offering, unless such offering is the Initial Offering, in which case the Registrable Securities may be excluded if the managing underwriter(s) make the determination described above and no other shareholder's securities are included, and (y) the amount of Registrable Securities included in the offering be reduced unless all other securities requested to be sold by any holder other than Holders of Registrable Securities and the Company are first excluded from such offering.

**1.4**     Form S-3 or Form F-3 Registration . In case the Company shall receive from any Holder (at such time as the Company is eligible to file a registration statement on Form S-3 or Form F-3), a written request or requests that the Company effect a registration on Form S-3 or Form F-3 (a " **Shelf Registration Statement** ") and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company shall:

(i)    within ten (10) days (or two (2) Business Days in connection with an underwritten "block trade") deliver written notice of the proposed registration, and any related qualification or compliance, to all other Holders, which notice shall specify the amount of Registrable Securities to be registered and offer each such Holder the opportunity to include such Holder's Registrable Securities in the Shelf Registration Statement; and

(ii)     use commercially reasonable efforts to effect, as soon as practicable, such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and

distribution of all or such portion of such Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holders joining in such request as are specified in a written request given within ten (10) days (or two (2) Business Days in connection with an underwritten "block trade") after receipt of such written notice from the Company, <u>provided</u>, however, that the Company shall not be obligated to effect any such registration, qualification or compliance, pursuant to this Section 1.4:

(a) if Form S-3 or Form F-3 is not available for such offering by the Holders; or

(b) if the Company has an existing Shelf Registration Statement that would permit or facilitate the sale and distribution of such Holders' Registrable Securities; or

(c) if the Company has already effected two (2) registrations pursuant to this Section 1.4 in any 12 (twelve) month period and such registrations have become effective; or

(d) during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of the filing of, and, subject to Section 1.7, ending on a date ninety (90) days following the effective date of, a Company-initiated offering pursuant to Section 1.3 above, <u>provided</u> that the Company is actively employing in good faith commercially reasonable efforts to cause such registration statement to become effective; or

(e) if the anticipated aggregate proceeds to the Holders in such registration will be less than US$1,000,000; or

(f) in the event of a Suspension pursuant to Section 1.6.

(iii)    If at the time of a request pursuant to this Section 1.4 the Company is a WKSI, such Shelf Registration Statement will cover an unspecified amount of Registrable Securities to be sold by unspecified Holders. Registrations effected pursuant to this Section 1.4 shall not be counted as requests for registration effected pursuant to Sections 1.2 or 1.5.

(iv)   The Company shall use commercially reasonable efforts to keep such Shelf Registration Statement continuously effective under the Act in order to permit the prospectus forming part of the Shelf Registration Statement to be usable by Holders until the earlier of: (i) the date as of which all Registrable Securities have been sold pursuant to the Shelf Registration Statement or another registration statement filed under the Act (but in no event prior to the applicable period referred to in Section 4(a)(3) of the Securities Act and Rule 174 thereunder); and (ii) the date as of which no Holder holds Registrable Securities (such period of effectiveness, the " **Shelf Period** "); <u>provided</u>, <u>however</u>, that where Registrable Securities are registered on a Shelf Registration Statement filed pursuant to Rule 462(e) under the Securities Act, the Company shall use commercially reasonable efforts to keep such Shelf Registration Statement effective for three (3) years from the date of effectiveness pursuant to Rule 415(a)(5) under the Securities Act.

**1.5**    Shelf Takedown .

(i)    At any time the Company has an effective Shelf Registration Statement with respect to Registrable Securities, any Holder may make a written request (a " **Shelf Takedown Request** ") to the Company to effect

a public offering of such securities, including by means of an underwriting (an " **Underwritten Shelf Takedown** "), of all or a portion of such Holder's Registrable Securities that are registered on such Shelf Registration Statement, and as soon as practicable the Company shall amend or supplement the Shelf Registration Statement as necessary for such purpose.

(ii)    The Company shall, within ten (10) days of receiving a Shelf Takedown Request (or two (2) Business Days in connection with an underwritten "block trade") for any Underwritten Shelf Takedown, deliver written notice (the " **Shelf Takedown Notice** ") of such request to all Holders of Registrable Securities covered by the applicable Shelf Registration Statement, or to all Holders if such Registration Statement is undesignated (each, a " **Potential Takedown Participant** "). The Shelf Takedown Notice shall offer each such Potential Takedown Participant the opportunity to include in any Underwritten Shelf Takedown such number of Registrable Securities as each such Potential Takedown Participant may request in writing within ten (10) days (or two (2) Business Days in connection with an underwritten "block trade") after the date that the Shelf Takedown Notice has been delivered. Any Potential Takedown Participant's request to participate in an Underwritten Shelf Takedown shall be binding on the Potential Takedown Participant; provided that each such Potential Takedown Participant that elects to participate may condition its participation on the Underwritten Shelf Takedown being completed within ten (10) Business Days of its acceptance at a price per share (after giving effect to any underwriters' discounts or commissions) to such Potential Takedown Participant of not less than ninety percent (90%) (or such lesser percentage specified by such Potential Takedown Participant) of the closing price for the shares on their principal trading market on the Business Day immediately prior to such Potential Takedown Participant's election to participate (the " **Participation Conditions** "). Notwithstanding the delivery of any Shelf Takedown Notice, but subject to the Participation Conditions (to the extent applicable), all determinations as to whether to complete any Underwritten Shelf Takedown and as to the timing, manner, price and other terms of any Underwritten Shelf Takedown contemplated by this Section 1.5 shall be determined by the Shelf Takedown Initiating Holders (as defined below) holding a majority of the Registrable Securities held by the Shelf Takedown Initiating Holders.

(iii)    If the Holders initiating a shelf takedown pursuant to this Section 1.5 (the " **Shelf Takedown Initiating Holders** ") intend to distribute the Registrable Securities covered by such Shelf Takedown Request by means of an underwriting, they shall so advise the Company as a part of their Shelf Takedown Request and the Company shall include such information in the Shelf Takedown Notice. In such event the right of any Holder to include its Registrable Securities in such Underwritten Shelf Takedown shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Shelf Takedown Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall enter into an underwriting agreement in customary form with the underwriter(s) selected for such underwriting by the Shelf Takedown Initiating Holders and reasonably acceptable to the Company.

(iv)    If the managing underwriter(s) advise(s) the Company that marketing factors require a limitation of the number of securities underwritten (including Registrable Securities), then the Company shall so advise all Holders of Registrable Securities that would otherwise be underwritten pursuant hereto, and there shall be excluded from the proposed Underwritten Shelf Takedown to the extent necessary to satisfy such limitation,

7

first shares held by shareholders other than Holders (if any) and then shares which the Company may wish to register for its own account, and thereafter shares of the Holders of such Registrable Securities, on a pro rata basis based on the number of Registrable Securities held by the Holders including Registrable Securities in the offering (including the Shelf Takedown Initiating Holders). Any Registrable Securities excluded or withdrawn from such underwriting shall be withdrawn from the Underwritten Shelf Takedown. The Company shall not offer securities for sale for its own account in any offering pursuant to this Section 1.5 unless permitted to do so by the written consent of the Shelf Takedown Initiating Holders holding a majority of the Registrable Securities held by the Shelf Takedown Initiating Holders.

(v)     The Company shall not be required to effect an Underwritten Shelf Takedown pursuant to this Section 1.5:

      (a)     if the Company has (i) effected a registration pursuant to Section 1.2 or a public offering pursuant to Section 1.3 or (ii) an Underwritten Shelf Takedown was consummated within the preceding ninety (90) days, subject to Section 1.7; or

      (b)     if the anticipated aggregate proceeds to the Holders in such offering will be less than US$5,000,000 (net of underwriting discounts and commissions); or

      (c)     in the event of a Suspension pursuant to Section 1.6.

**1.6**     <u>Suspension of Registration</u> . If the filing, initial effectiveness or continued use of a registration statement pursuant to Sections 1.2 or 1.5 at any time would require the Company to make an Adverse Disclosure, the Company may, upon giving prompt written notice of such action to the Holders, delay the filing or initial effectiveness of, or suspend use of, such registration statement (a " **Suspension** "), <u>provided</u> that the Company shall not be permitted to exercise a Suspension (i) more than twice during any twelve (12)-month period, (ii) for a period exceeding ninety (90) days on any one occasion or (iii) for an aggregate of more than one hundred and twenty (120) days in any twelve (12)-month period. In the case of a Suspension, the Holders agree to suspend use of the applicable prospectus in connection with any sale or purchase of, or offer to sell or purchase, Registrable Securities, upon receipt of the notice referred to above. The Company shall immediately notify the Holders in writing upon the termination of any Suspension, amend or supplement the prospectus, if necessary, so it does not contain any untrue statement or omission and furnish to the Holders such numbers of copies of the prospectus as so amended or supplemented as the Holders may reasonably request.

**1.7**     <u>Registration Preference and Underwriter Waiver</u> . (a) If any shareholders of the Company shall have the option to sell shares of the Company in an Initial Offering or in any subsequent registration the holders of Registrable Securities shall have preference over all other shareholders to register and sell their shares. In an offering initiated by the Company, the Company shall have first priority.

(b) The provisions of Section 1.2(iv)(b), Section 1.4(ii)(d) and 1.5(v)(a) permitting the Company not to file a Registration Statement or conduct an offering until the passage of ninety (90) days after a previous filing or offering shall not apply to the extent that the underwriters for a previous offering elect to waive restrictions contained in a contractual restriction to which any Holder is a party to with such underwriters; provided,

8

however, that such waiver shall be applicable to all Holders that elect to participate in such registration or offering to the same extent.

**1.8**    Obligations of the Company . Whenever required under Section 1 to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(i)    prepare and file with the SEC or foreign equivalent a registration statement with respect to such Registrable Securities and use commercially reasonable efforts to cause such registration statement to become effective, and, unless otherwise stated, upon the request of the Initiating Holders of the shares registered thereunder, use best efforts to keep such registration statement effective for a period of up to one hundred and twenty (120) days or, if earlier, until the distribution contemplated in the Registration Statement has been completed;

(ii)    prepare and file with the SEC or foreign equivalent such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Act with respect to the disposition of all securities covered by such registration statement;

(iii)    furnish to the Holders such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them;

(iv)    use commercially reasonable efforts to register and qualify the securities covered by such registration statement under such other securities or Blue Sky laws of such jurisdictions as shall be reasonably requested by the Holders, provided that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions;

(v)    in the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter(s) of such offering;

(vi)    notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein not misleading in the light of the circumstances then existing;

(vii)    notify each Holder of Registrable Securities covered by such registration statement, promptly after the Company shall receive notice thereof, of the time when such registration statement or any post-effective amendment becomes effective or when any amendment or supplement or any prospectus forming a part of such registration has been filed.

(viii)    notify each Holder of Registrable Securities covered by such registration statement, promptly of any request by the SEC or foreign equivalent for the amending or supplementing of such registration statement or prospectus or for additional information.

9

(ix)     advise each Holder whose Registrable Securities are included in such registration statement promptly after the Company shall receive notice or otherwise obtain knowledge of the issuance of any order by the SEC or foreign equivalent suspending the effectiveness of such registration statement or amendment thereto or of the initiation or threatening of any proceeding for that purpose; and promptly use commercially reasonable efforts to prevent the issuance of any stop order or to obtain its withdrawal promptly if a stop order should be issued.

(x)     use commercially reasonable efforts to furnish on the date that such Registrable Securities are delivered to the underwriters for sale in connection with a registration pursuant to this Agreement, if such securities are being sold through underwriters, and on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for the purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and to the Holders requesting registration of Registrable Securities and (ii) a letter dated such date, from the registered independent public accountants of the Company, in form and substance as is customarily given by registered independent public accountants to underwriters in an underwritten public offering, addressed to the underwriters, if any, giving comfort as to certain accounting and financial matters.

(xi)     cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange on which similar securities issued by the Company are then listed; and

(xii)     provide a transfer agent and registrar for all Registrable Securities registered pursuant hereunder and a CUSIP number for all such Registrable Securities, in each case not later than the effective date of such registration.

**1.9**     Discontinuing Registration . Each Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Sections 1.8(vi) and (ix), such Holder will discontinue disposition of Registrable Securities pursuant to such registration statement until such Holder is advised in writing by the Company that the use of the prospectus may be resumed, and has received copies of any additional or supplemental filings that are incorporated by reference in the prospectus, or any amendments or supplements thereto, and if so directed by the Company, such Holder shall deliver to the Company (at the Company's expense) all copies, other than permanent file copies then in such Holder's possession, of the prospectus covering such Registrable Securities current at the time of receipt of such notice. In the event the Company shall give any such notice, the period during which the applicable registration statement is required to be maintained effective shall be extended by the number of days during the period from and including the date of the giving of such notice to and including the date when each seller of Registrable Securities covered by such registration statement is advised in writing by the Company that the use of the prospectus may be resumed.

**1.10**     Information from Holder . Each Holder shall promptly furnish to the Company such information regarding itself, the Registrable Securities held by it, and the intended method of disposition of such securities as shall be required to effect the registration of such Holder's Registrable Securities.

**1.11**    Expenses . All expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings, qualifications or offerings pursuant to Sections 1.2, 1.3, 1.4 and 1.5, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of one counsel for the selling Holders shall be borne by the Company. Notwithstanding the foregoing, the Company shall not be required to pay for any expenses of any registration proceeding or offering, as applicable, begun pursuant to Sections 1.2, 1.4 or 1.5 if the registration or offering request is subsequently withdrawn or terminated at the request of the Holders of a majority of the Registrable Securities to be registered or offered (in which case all participating Holders shall bear such expenses pro rata based upon the number of Registrable Securities held by the Holders including Registrable Securities in the registration or offering), provided , however , that if at the time of such withdrawal or termination, the Holders have learned of a material adverse change in the condition, business, or prospects of the Company from that known to the Holders at the time of their request and have withdrawn or terminated the request with reasonable promptness following disclosure by the Company of such material adverse change, then the Holders shall not be required to pay any of such expenses and shall retain their rights pursuant to Sections 1.2, 1.4 or 1.5, as applicable.

**1.12**    Indemnification . In the event any Registrable Securities are included in a registration statement under Section 1:

(i)    The Company will indemnify and hold harmless to the fullest extent permitted by law, each Holder, the partners or officers, directors and shareholders of each Holder, legal counsel and accountants for each Holder, any underwriter (as defined in the Act) for such Holder and each person (together " Holder Indemnified Persons ") if any, who controls such Holder or underwriter within the meaning of the Act or the 1934 Act, against any and all losses, claims, damages or liabilities (joint or several), costs and expenses (including any amounts paid in settlement with the consent of the Company) to which they may become subject under the Act, the 1934 Act or any other applicable laws or otherwise, insofar as such losses, claims, damages, or liabilities (or actions or proceedings in respect thereof), costs or expenses arise out of or are based upon any of the following statements, omissions or violations (collectively a " Violation "): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein in light of the circumstances in which they are made, not misleading, or (iii) any violation or alleged violation by the Company of the Act, the 1934 Act, any state securities laws or other applicable securities law or any rule or regulation promulgated under the Act, the 1934 Act or any state securities laws or other applicable securities law; and the Company will reimburse each such Holder Indemnified Person, promptly upon demand, for any legal or other expenses reasonably incurred by them in connection with investigating, preparing to defend or defending or appearing as a third party witness in connection with any such loss, claim, damage, liability, action or proceeding; provided , however , that the indemnity agreement contained in this Section 1.12(i) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Company, nor shall the Company be liable in any such case for any such loss, claim, damage, liability or action to the extent that it arises out of or is based upon a Violation that occurs in reliance upon and in conformity with written information furnished expressly for use in connection with such registration by any such Holder, underwriter or controlling

11

person. Such indemnity shall remain in full force and effect regardless of any investigation made by or on behalf of the Holder, the Indemnified Person, and regardless of any sale in connection with such offering by the selling shareholder. Such indemnity shall survive the transfer of securities by a selling shareholder.

(ii)     To the extent permitted by law, each selling Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Act, any underwriter, any other Holder selling securities in such registration statement and any controlling person of any such underwriter or other Holder, against any losses, claims, damages or liabilities (joint or several), costs and expenses (including any amounts paid in settlement with the consent of the Company) to which any of the foregoing persons may become subject, under the Act, the 1934 Act or any other applicable laws or otherwise, insofar as such losses, claims, damages, liabilities (or actions in respect thereto), costs or expenses arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration; and each such Holder will reimburse any person intended to be indemnified pursuant to this Section 1.12(ii), promptly upon demand, for any legal or other expenses reasonably incurred by such person in connection with investigating, preparing to defend or defending or appearing as a third party witness in connection with any such loss, claim, damage, liability, action or proceeding; provided , further , that this indemnity shall not be deemed to relieve any underwriter of any of its due diligence obligations; and provided , however , that the indemnity agreement by a Holder contained in this Section 1.12(ii) shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld), and provided further that in no event shall any indemnity under this Section 1.12(ii) exceed the proceeds from the offering received by such Holder (net of underwriting discounts and commissions).

(iii)     Promptly after receipt by an indemnified party under this Section 1.12 of notice of the commencement of any action (including any governmental action) involving the subject matter of the foregoing indemnity provisions, such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this Section 1.12, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; provided , however , that an indemnified party (together with all other indemnified parties that may be represented without conflict by one counsel) shall have the right to retain one separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. After notice from the indemnifying party to such indemnified party of its election so to assume the defense thereof, the indemnifying party will not be liable to such indemnified party pursuant to the provisions of said Section 1.12 for any legal or other expense subsequently incurred by such indemnified party in connection with the defense thereof, unless (i) the indemnified party shall have employed counsel in accordance with the provision of the preceding sentence, (ii) the indemnifying party shall not have employed counsel reasonably satisfactory to the indemnified party to represent the indemnified party within a reasonable time after the notice of the commencement of the action and within 15 days after written notice

of the indemnified party's intention to employ separate counsel pursuant to the previous sentence, or (iii) the indemnifying party has authorized the employment of counsel for the indemnified party at the expense of the indemnifying party. If the indemnifying party assumes the defense, the indemnifying party shall not have the right to settle such action without the consent of the indemnified party. No indemnifying party shall consent to entry of any judgment or enter into any settlement which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of an unconditional release from all liability in respect to such claim or litigation without the prior written consent of such indemnified party. If such defense is not assumed by the indemnifying party, the indemnifying party will not be subject to any liability for any settlement made without its prior written consent, but such consent may not be unreasonably withheld. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if prejudicial to its ability to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this Section 1.12, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this Section 1.12.

(iv)    If the indemnification provided for in this Section 1.12 is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage or expense referred to herein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other in connection with the statements or omissions that resulted in such loss, liability, claim, damage or expense, as well as any other relevant equitable considerations. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission. In no event shall any payment by a Holder under this Section 1.12(iv) exceed the net proceeds from the offering received by such Holder (net of underwriting discounts and commissions). No person guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Act) shall be entitled to contribution from any person who was not guilty of such fraudulent misrepresentation. The amount paid or payable by an indemnified party shall be deemed to include, subject to the limitations set forth above, any legal or other expenses reasonably incurred by such indemnified party in connection with investigating or defending any such action or claim. If indemnification is available, the indemnifying parties shall indemnify each indemnified party to the full extent provided in Section 1.12 without regard to the provisions of this Section 1.12(iv). The remedies provided for in this Section 1.12 are not exclusive and shall not limit any rights or remedies which may otherwise be available to any indemnified party at law or in equity.

(v)    Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control.

(vi)    The obligations of the Company and Holders under this Section 1.12 shall survive the completion of any offering of Registrable Securities in a registration statement under Section 1, and otherwise.

**1.13**   <u>Reports Under Securities Exchange Act of 1934</u> . With a view to making available to the Holders the benefits of Rule 144 promulgated under the Act and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3 or Form F-3, the Company agrees at all times after ninety (90) days after it has become subject to the reporting requirements of Section 13 or 15(d) of the 1934 Act, to use commercially reasonable efforts to:

(i)   make and keep public information available, as those terms are understood and defined in SEC Rule 144, at all times after the effective date of the Initial Offering;

(ii)   file with the SEC in a timely manner all reports and other documents required of the Company under the Act and the 1934 Act; and

(iii)   furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request (i) a written statement by the Company that it has complied with the reporting requirements of SEC Rule 144 (at any time after ninety (90) days after the effective date of the first registration statement filed by the Company), the Act and the 1934 Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 or Form F-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC that permits the selling of any such securities without registration or pursuant to such form.

**1.14**   <u>Assignment of Registration Rights</u> . The rights to cause the Company to register Registrable Securities pursuant to this Agreement may be assigned (but only with all related obligations) by a Holder to a transferee or assignee of such securities <u>provided</u> that such transfer or assignment is made pursuant to the provisions of the Articles and any other provisions and/or agreements relating to transfer of securities, and <u>provided further</u> that: (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned; (b) such transferee or assignee agrees in writing to be bound by and subject to the terms and conditions of this Agreement, including without limitation the provisions of Section 1.17 below; and (c) such assignment shall be effective only if immediately following such transfer the further disposition of such securities by the transferee or assignee is restricted under the Act.

**1.15**   <u>Apportionment</u> . For purposes Sections 1.2(iii), 1.3(ii) and 1.5(iv) concerning apportionment, for any shareholder that is a Holder of Registrable Securities that is a partnership or corporation, all the partners, retired partners and shareholders of such Holder, or the estates and family members of any such partners and retired partners and any trusts for the benefit of any of the foregoing persons or any entity that directly or indirectly controls or is controlled by or is under common control or management with the respective Holder, shall be deemed to be a single "Holder," as applicable and any pro rata reduction with respect to such "Holder" shall be based upon the aggregate amount of Registrable Securities owned by all such related entities and individuals.

**1.16** Limitations on Subsequent Registration Rights . From and after the date of this Agreement, the Company shall not, without the prior written consent of the Holders of Majority Registrable Securities, enter into any agreement with any holder or prospective holder of any securities of the Company that would grant such holder or prospective holder any future registration rights.

**1.17** " Market Stand-Off" Agreement . Each Shareholder hereby agrees that it will not, without the prior written consent of the managing underwriter(s), during the period commencing on the date of the final prospectus relating to any offering of the Company and ending on the date specified by the Company and the managing underwriter(s) (such period not to exceed one hundred eighty (l80) days in the case of an Initial Offering or ninety (90) days in any subsequent offering), (i) sell, contract to sell, sell any option or contract to purchase, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any Registrable Shares, or any securities convertible into or exercisable or exchangeable for Registrable Shares (whether such shares or any such securities are then owned by the Holder or are thereafter acquired), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Registrable Shares, whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of Ordinary Shares or such other securities that have been registered, in cash or otherwise; provided that the foregoing provisions of this Section 1.16 shall only be applicable to the Holders if all officers and directors and, in the case of an Initial Offering, greater than 1% (one percent) shareholders of the Company enter into similar agreements. The Company undertakes that it will not issue any shares to any person or entity, unless such person or entity enters into a "Market Stand-Off" undertaking based on substantially similar terms as set forth herein.

In order to enforce the foregoing covenant, the Company may impose stop-transfer instructions with respect to the Registrable Securities of each shareholder of the Company (and the shares or securities of every other person subject to the foregoing restriction) until the end of such period.

**1.18** Termination . The obligations of the Company to register or offer Registrable Securities under Sections 1.2, 1.3, 1.4 or 1.5 shall terminate five years following the closing of the Initial Offering.

**2. Affirmative Covenants .** Until the consummation of the Initial Offering, the Company undertakes, as follows:

**2.1** Delivery of Financial Information . The Company will furnish the following reports to (x) each Investor and (y) to each Existing Shareholder holding at least 5% of the Company's issued and outstanding share capital on an as converted basis (with respect to (y) only, a " **Major Holder** "):

(i) As soon as practicable after the end of each fiscal year and in any event within ninety (90) days thereafter, the consolidated balance sheet and statement of shareholder equity of the Company as of the end of such fiscal year, and the consolidated statements of income and cash flow for the fiscal year then ended, all in reasonable detail, stating in each case in comparative form the figures of the preceding fiscal year, United States dollar denominated, audited and certified by independent public accounting firm which is one of (or is affiliated with one of) the "Big Four" US accounting firms, with offices in Israel who are members of the Israeli Institute of Certified Public Accountants, in each case in English and accompanied by an opinion in English of such firm which opinion shall state that such balance sheet and statements of shareholder equity,

income and cash flow have been prepared in accordance with United States generally accepted accounting principles (" **GAAP** ") applied on a basis consistent with that of the preceding fiscal year, and present fairly and accurately in all material respects the financial position of the Company as of the date, and the results of the Company's operations during the periods, to which they relate, and that the audit by such accountants in connection with such financial statements has been made in accordance with United Stated generally accepted auditing standards.

(ii)    As soon as practicable, and in any event within forty-five (45) days after the end of the first, second and third quarters of each fiscal year of the Company, un-audited, but reviewed by independent public accounting firm which is one of (or is affiliated with one of) the "Big Four" US accounting firms, with offices in Israel who are members of the Israeli Institute of Certified Public Accountants, United States dollar denominated consolidated balance sheets of the Company as of the end of such quarter and consolidated statements of income and cash flow of the Company for such quarter and for the portion of the fiscal year ending with such period, in each case in English and in reasonable detail, stating in each case in comparative form the figures for the corresponding period of the preceding fiscal year.

(iii)    As soon as practicable, and in any event within thirty (30) days after the end of each month, a monthly report in English, in the format and detail determined by the Board, which report shall include business update and overview, profit and loss and cash-flow statement (not audited and not reviewed).

(iv)    As soon as practicable, and in any event at least thirty (30) days before the beginning of each fiscal year, the Company's annual operating plan and budget for the following year.

(v)    An updated capitalization table of the Company within five (5) days of the end of each quarter or the occurrence of any change in the capitalization

(vi)    Such other information relating to the financial condition, business, prospects or corporate affairs of the Company as any Investor or Major Holder may from time to time reasonably request, without derogating from such Investor's and Major Holders' statutory rights.

**2.2**    Inspection and Visitation . Until the consummation of the Initial Offering, the Company will permit each Investor and Major Holder and its representatives full and free access, during normal business hours and upon reasonable notice, to visit and inspect any of the properties of the Company, to examine its books and records, to receive other information as requested by such Investor or Major Holder and its representatives and to discuss its affairs, finances and accounts with the Company's officers and auditor.

**2.3**    Confidentiality . Each Investor and Major Shareholder (for the purposes of this Section 2, a " **Receiving Party** ") undertakes that it shall keep in confidence, and not use for any purpose whatsoever, except for internal purposes, any and all information relating to the Company which has been provided to it by the Company or was otherwise obtained by it, except for information which (i) is generally available to the public at the time of disclosure, or subsequently becomes generally available to the public, except by a breach by the Receiving Party of its obligations hereunder; (ii) Receiving Party can demonstrate is rightfully received by the Receiving Party from a third party exempt from confidentiality undertakings and without imposing on the Receiving Party any restriction on its further disclosure or use; (iii) Receiving Party can demonstrate

16

was rightfully in the possession of the Receiving Party at the time of disclosure without any restrictions as to its use or disclosure; or (iv) the Receiving Party is compelled by a court or government action or pursuant to applicable law to disclose such information, <u>provided</u> , <u>however</u> , that the Receiving Party gives the Company prompt notice thereof so that the Company may seek a protective order or other appropriate remedy, and further provided that in the event that such protective order or other remedy is not obtained, the Receiving Party shall furnish only that portion of the confidential information which is legally required, and shall exercise reasonable efforts to obtain confidential treatment for such information at the expense of the Company. Notwithstanding the aforesaid, a Receiving Party may disclose such information (a) to its attorneys, accountants, consultants, and other professionals to the extent necessary to obtain their services in connection with monitoring its investment in the Company; (b) to any prospective purchaser of any Registrable Securities from such Receiving Party, if such prospective purchaser agrees to be bound by the provisions of this Section 2.3; or (c) in connection with periodic reports to its investors, shareholders, partners or Permitted Transferees (as defined in the Articles), provided such information is limited to general statements, not containing technical or other confidential information, regarding the nature and progress of the Company's business, and provided further, that in its reports to its respective shareholders, investors, partners or Permitted Transferees, a Receiving Party may provide summary information regarding the Company's financial information, but may not annex to such reports the full financial information provided hereunder by the Company. With respect to the foregoing, the Company acknowledges that certain of the Investors are in the business of venture capital investing and, therefore, review the business plans and related proprietary information of many enterprises, including enterprises that may have products or services that compete directly or indirectly with those of the Company. The Company also further acknowledges that each Investor may now be or may hereafter become affiliated with entities that have or may have products or services that compete directly or indirectly with those of the Company. The Company and each party hereto agrees that nothing in this Agreement shall preclude or in any way restrict (i) any Investor from investing in any particular enterprise regardless of whether such enterprise has products or services that compete with those of Company; or (ii) any Investor or any entity affiliated with any Investor from conducting its business regardless of whether such entity has products or services that compete with those of Company; provided that no use or disclosure of the Company's confidential or proprietary information is made in connection therewith.

**2.4**     <u>Accounting</u> . The Company will maintain and cause each of its subsidiaries to maintain a system of accounting established and administered in accordance with GAAP consistently applied, and will set aside on its books and cause each of its subsidiaries to set aside on its books all such proper reserves as shall be required by GAAP.

**2.5**     <u>Proprietary Information Agreements</u> . The Company shall not employ, or continue to employ, any person who will have access to confidential information with respect to the Company and its operations unless such person has executed and delivered a Proprietary Information and Invention Assignment Agreement in accordance with the policy adopted by the Board.

**2.6**     <u>Directors Indemnity Insurance</u> . The Company shall continue to maintain and keep valid its directors indemnity insurance policy for acts and omissions of each of the Company's directors in the amount of at least five million US Dollars ($5,000,000).

**2.7**    Information Required by Investors for Tax Purposes . In connection with a "Qualified Electing Fund" election made by any of the Investors' US investors pursuant to Section 1295 of the Code or a "Protective Statement" filed by the Investors pursuant to U.S. Treasury Regulation Section 1.1295-3, as amended (or any successor thereto), the Company shall provide annual financial information to each of the Investors as soon as reasonably practicable following the end of each taxable year of the Investors (but in no event later than 90 days following the end of each such taxable year), and shall provide the Investors with access to such other Company information as may be required for purposes of filing U.S. federal income tax returns in connection with such Qualified Electing Fund election or otherwise.

The Company shall use its best commercial efforts to take such actions, including making an election to be treated as a corporation or refraining from making an election to be treated as a partnership, as may be required to ensure that at all times the Company is treated as corporation for U.S. federal income tax purposes.

In the event that an Investor's interest in the Company is determined by counsel or accountants for such Investor to be subject to additional regulatory reporting requirements, the Company agrees, upon request from such Investor, to provide such information to such Investor as may be reasonably necessary to fulfill such Investor's obligations thereunder.

**2.8**    Compliance with Prohibition on Money Laundering Laws. The Company shall not use any corporate funds for unlawful contributions, gifts, entertainment or other unlawful expenses relating to political activity, make any unlawful payment to foreign or domestic government officials or employees or make any bribe, rebate, payoff, influence payment, kickback or other similar unlawful payment, or take any action which would cause it to be in violation of the Israeli Prohibition on Money Laundering Law, 2000 (the " **Money Laundering Law** "), or any other applicable anti-bribery or anti-corruption law. The Company shall and shall cause each of its subsidiaries and affiliates to maintain systems of internal controls and shall adopt applicable guidelines, policies and guidebooks to ensure compliance with the Money Laundering Law or any other applicable anti-bribery or anti-corruption law.

**3.    Miscellaneous** .

**3.1**    Further Assurances. Each of the parties hereto shall perform such further acts and execute such further documents as may reasonably be necessary to carry out and give full effect to the provisions of this Agreement and the intentions of the parties as reflected thereby.

**3.2**    Successors and Assigns . The rights and duties of each Holder as set forth herein may be freely assigned, in whole or in part, by a Holder to a transferee of such Holder's shares, subject only to any limitations applying to the transfer of shares by a Holder, as set forth in the Articles.

**3.3**    Aggregation of Holdings . For purposes of computing minimum shareholdings required for any purposes under this Agreement, each Shareholder shall be entitled to aggregate its holdings in the Company with the holdings of any of its Permitted Transferees (as defined in the Articles), and the aggregate holdings shall be considered to be held by such Shareholder and its Permitted Transferees.

**3.4**    Effect of Change in Company's Capital Structure . If, from time to time, there is any share dividend, share split, issuance of bonus shares or other change in the character or amount of any of the outstanding

shares of the Company, then in such event any and all new, substituted or additional securities to which a shareholder is entitled by reason of the shareholder's ownership of the shares of the Company shall be immediately subject to the rights and obligations set forth in this Agreement, with the same force and effect as the shares subject to such rights immediately before such event.

**3.5** <u>Governing Law; Jurisdiction</u>. This Agreement shall be governed by and construed in accordance with the internal substantive laws of the State of Israel, and the parties hereby consent and submit to the exclusive jurisdiction of the competent courts of Tel Aviv Israel over all matters relating to this Agreement.

**3.6** <u>Counterparts</u>. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

**3.7** <u>Titles and Subtitles</u>. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

19

**3.8**     <u>Notices</u> . All notices or other communications provided for in this Agreement shall be in writing and shall be given in person, by registered mail (registered air mail if mailed internationally), by an overnight courier service which obtains a receipt to evidence delivery, by facsimile transmission (evidenced by written confirmation of transmission), or electronic mail, addressed as set forth below:

|  |  |
|---|---|
| Company | **Tufin Software Technologies Ltd.**<br>8 Shoham Street<br>Ramat Gan<br>Israel<br>Tel: (972) 03-612-8118<br>Fax: (972) 03-600-5142<br>Attn: Reuven Kitov, Director<br>E-mail: Ruvi.Kitov@tufin.com<br><br>with copies to (which shall not constitute service of process):<br><br>Gross, Kleinhendler, Hodak, Halevy, Greenberg & Co.<br>1 Azrieli Center<br>Round Tower<br>Tel Aviv 67021, Israel<br>Tel: (972) 03-607-4444<br>Fax: (972) 03-607-4542<br>Attn: Etai Shay, Adv.<br>E-mail: etai@gkh-law.com<br><br>White & Case LLP<br>1221 Avenue of the Americas<br>New York, New York 10017<br>Tel: +1 (212) 819-8754<br>Fax: +1 (212) 354-8113<br>Attn: Colin Diamond, Esq.<br>Email: cdiamond@whitecase.com |
| Investors: | To the addresses set forth in Exhibit I |
| Existing Shareholders | To the addresses set forth in Exhibit II |

or such other address as any party may designate to the other in accordance with the aforesaid procedure. All notices and other communications delivered in person, by facsimile transmission or by electronic mail shall be deemed to have been given as of one business day after sending thereof, all notices and other communications delivered by overnight air courier shall be deemed to have been given as of the third business day after posting; and all notices and other communications sent by registered mail shall be deemed given ten (10) days after posting

**3.9**    Expenses . If any action at law or in equity is necessary to enforce or interpret the terms of this Agreement, the prevailing party shall be entitled to reasonable attorneys' fees, costs and necessary disbursements in addition to any other relief to which such party may be entitled.

**3.10**    Entire Agreement: Termination of Other Existing Registration Rights or Information Rights; Amendments and Waivers . This Agreement (including the Exhibits hereto, if any), constitutes the full and entire understanding and agreement among the parties with regard to the subjects hereof and thereof, and supersede all prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof.

Each undersigned Shareholder hereby irrevocably agrees that any registration rights, information rights and/or any other similar rights previously granted to it, if applicable, in the Prior IRA, that certain Series A Preferred Share Purchase Agreement, dated December 16, 2007, that certain Series B Preferred Share Purchase Agreement, dated August 8, 2011, or otherwise, are herby considered null and void and will have no further force and effect and each undersigned Shareholder, by signing below, declares that the only registration or information rights provided to it or held by it are set forth in this Agreement.

Any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of the Company and the Holders of Majority Registrable Securities; provided , however , that in the event that such amendment or waiver adversely changes specific obligations and/or rights of (i) one or more Holder, such amendment or waiver shall also require the written consent of such Holder(s) unless such amendment or waiver applies to all Holders in the same fashion, (ii) a specific class of shares only, such amendment or waiver shall require the written consent of the holders of at least 75% of the issued and outstanding share capital of such specific class of shares; or (iii) any amendment of the information rights provided in Section 2 shall also require the written consent of the holders of 75% of the issued and outstanding Series C Preferred Shares and the holders of two thirds of the issued and outstanding Series D Preferred Shares. Any amendment or waiver effected in accordance with this paragraph shall be binding upon each shareholder of the Company and each future holder of shares, and the Company.

Notwithstanding anything else herein to contrary, the Holders of Majority Registrable Securities may, through their written consent and without consent of the Company, amend this Agreement and the Schedules hereto so as to add to the definition and amount of Registrable Securities, securities held by officers or employees of the Company from time to time including Ordinary Shares issued pursuant to the exercise or conversion of any such securities

**3.11**    Severability . If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms; provided , however , that in such event this Agreement shall be interpreted so as to give effect to the greatest extent consistent with and permitted by applicable law, to the meaning and intention of the excluded provision as determined by such court of competent jurisdiction.

**3.12**    Delays or Omissions . No delay or omission to exercise any right, power, or remedy accruing to any party upon any breach or default under this Agreement, shall be deemed a waiver of any other breach or default theretofore or thereafter occurring. Any waiver, permit, consent, or approval of any kind or character on the part of any party of any breach or default under this Agreement, or any waiver on the part of any party

of any provisions or conditions of this Agreement, must be in writing and shall be effective only to the extent specifically set forth in such writing.

[ *Signature Pages Follow* ]

22

**IN WITNESS WHEREOF** , the parties hereto have executed this Amended and Restated Investors' Rights Agreement as of the date first written above.

**Tufin Software Technologies Ltd.**

| | |
|---|---|
| By: | Reuven Kitov |
| Title: | CEO |
| Signature: | /s/ Reuven Kitov |

**Marker TF Investments Ltd.**

| | |
|---|---|
| By: | /s/ Richard Scanlon |
| Name: | Richard Scanlon |
| Title: | Director |

**Marker II LP**

| | |
|---|---|
| By: | its general partner Marker II GP, Ltd. |

| | |
|---|---|
| By: | /s/ Richard Scanlon |
| Name: | Richard Scanlon |
| Title: | Director |

**Marker Lantern II Ltd.**

| | |
|---|---|
| By: | /s/ Richard Scanlon |
| Name: | Richard Scanlon |
| Title: | Director |

**CAIVS 1 (Compartiment 2)**

| | |
|---|---|
| By: | |
| Title: | |
| Name: | |

**SBT Venture Fund I, L.P.**

| | |
|---|---|
| By: | |
| Title: | |
| Name: | |

**Catalyst Private Equity Partners (Israel) II, Limited Partnership**

By:        its general partner Catalyst Investments II, L.P.

By:        its general partner Catalyst Equity (2006) Ltd.

By:        /s/ Yair Shamir

Title:     Managing Partner

Name:    Yair Shamir

**Regev Law Firm**

/s/ Reuven Kitov

**Reuven Kitov**

/s/ Reuven Harrison

**Reuven Harrison**

**VINTAGE INVESTMENT PARTNERS VI (ISRAEL), L.P.**

By:        its general partner Vintage Investments VI LP

By:        its general partner Vintage Fund 6 Ltd.

| By: | /s/ Alan Feld | By: | /s/ Michael Blajwas |
|---|---|---|---|
| Name: | Alan Feld | Name: | Michael Blajwas |
| Title: | CEO | Title: | COO |

**VINTAGE INVESTMENT PARTNERS VI (CAYMAN), L.P.**

By:        its general partner Vintage Investments VI LP

By:        its general partner Vintage Fund 6 Ltd.

| By: | /s/ Alan Feld | By: | /s/ Michael Blajwas |
|---|---|---|---|
| Name: | Alan Feld | Name: | Michael Blajwas |
| Title: | CEO | Title: | COO |

**VINTAGE INVESTMENT PARTNERS V (CAYMAN) L.P.**
By: its general partner Vintage Investments 5 L.P.
By: its general partner Vintage Fund 5 Ltd.

By: /s/ Alan Feld

Alan Feld, CEO


By: /s/ Michael Blajwas

Michael Blajwas, COO


**VINTAGE INVESTMENT PARTNERS V (ISRAEL) L.P.**
By: its general partner Vintage Investments 5 L.P.
By: its general partner Vintage Fund 5 Ltd.

By: /s/ Alan Feld

Alan Feld, CEO


By: /s/ Michael Blajwas

Michael Blajwas, COO

25

**Exhibit I – The Investors**

| Name | Address |
|---|---|
| **Marker Lantern II Ltd.** | 63 Forest Avenue<br>Locust Valley, New York 11560<br>Attn: Clayton Prugh<br>Fax No.: 516-676-2401<br>Email: cp@marker-llc.com<br><br>And<br><br>PO Box 309<br>Ugland House<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Marker II LP** | 63 Forest Avenue<br>Locust Valley, New York 11560<br>Attn: Clayton Prugh<br>Fax No.: 516-676-2401<br>Email: cp@marker-llc.com<br><br>And<br><br>PO Box 309<br>Ugland House<br>Grand Cayman KY1-1104<br>Cayman Islands |
| **Marker TF Investments Ltd.** | 63 Forest Avenue<br>Locust Valley, New York 11560<br>Attn: Clayton Prugh<br>Fax No.: 516-676-2401<br>Email: cp@marker-llc.com<br><br>And<br>190 Elgin Ave.<br>George Town<br>Grand Cayman KY1-9005<br>Cayman Islands |
| **Catalyst Private Equity Partners (Israel) II** | Catalyst Private Equity Partners (Israel) II<br>3 Daniel Frisch St.<br>Tel Aviv. 64731<br>Fax No.: +972-3-695-0222 |

| | |
|---|---|
| **CAIVS 1 (Compartiment 2)** | c/o Omnes Capital Luxembourg<br>5 Allée Scheffer L525 Luxembourg<br>Luxembourg<br>Fax No. + Fax No.: +972-9-952-5450<br>Email: bernard.nabet@omnescapital.com<br>Attn. Bernard Nabet<br><br>With a copy to:<br>Kadouch & Co., Law Offices<br>8b Abba Eban Blvd.<br>Herzliya 46733<br>Fax No.: +972-9-952-5450<br>E-mail: Emmanuel@kadouchlaw.com<br>Attn. Emmanuel Kadouch, Adv. |
| **SBT Venture Fund I, L.P.** | SBT Venture Fund I, L.P.<br>c/o SBT Venture Fund GP, Ltd.<br>c/o Intertrust Corporate Services (Cayman)<br>190 Elgin Avenue<br>George Town, Grand Cayman KY1-9005<br>Cayman Islands<br>Email: MFMihaescu@sberbank.ru<br>Attn. Mircea Mihaescu |
| **Regev Law Firm** | Shuky Regev Adv. CPA<br>45 Rayness St.<br>Tel Aviv 64587<br>Fax No.: +972-3-5227139 |
| **Vintage Investment Partners V (Cayman) L.P.** | Vintage Venture Partners, L.P.<br>12 Abba Eban Blvd.<br>Ackerstein Bldg. D, 10th floor<br>Herzliya Pituach, 46120<br>Israel<br>Attention: Alan Feld<br>Fax: 972-9-9541012<br>Email: legal@vintage-ip.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Yigal Arnon & Co.<br>22 Rivlin Street<br>Jerusalem, Israel<br>Attn: Barry Levenfeld, Adv and Yarom Romem, Adv.<br>Fax: 972-2-623-9200<br>Email: barry@arnon.co.il ; yaromr@arnon.co.il |

| | |
|---|---|
| **Vintage Investment Partners V (Israel) L.P.** | Vintage Venture Partners, L.P.<br>12 Abba Eban Blvd.<br>Ackerstein Bldg. D, 10th floor<br>Herzliya Pituach, 46120<br>Israel<br>Attention: Alan Feld<br>Fax: 972-9-9541012<br>Email: legal@vintage-ip.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Yigal Arnon & Co.<br>22 Rivlin Street<br>Jerusalem, Israel<br>Attn: Barry Levenfeld, Adv and Yarom Romem, Adv.<br>Fax: 972-2-623-9200<br>Email: barry@arnon.co.il ; yaromr@arnon.co.il |
| **Vintage Investment Partners VI (Cayman) L.P.** | Vintage Venture Partners, L.P.<br>12 Abba Eban Blvd.<br>Ackerstein Bldg. D, 10 th floor<br>Herzliya Pituach, 46120<br>Israel<br>Attention: Alan Feld<br>Fax: 972-9-9541012<br>Email: legal@vintage-ip.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Yigal Arnon & Co.<br>22 Rivlin Street<br>Jerusalem, Israel<br>Attn: Barry Levenfeld, Adv and Yarom Romem, Adv.<br>Fax: 972-2-623-9200<br>Email: barry@arnon.co.il ; yaromr@arnon.co.il |
| **Vintage Investment Partners VI (Israel) L.P.** | Vintage Venture Partners, L.P.<br>12 Abba Eban Blvd.<br>Ackerstein Bldg. D, 10th floor<br>Herzliya Pituach, 46120<br>Israel<br>Attention: Alan Feld<br>Fax: 972-9-9541012<br>Email: legal@vintage-ip.com<br><br>with a copy (which shall not constitute notice) to:<br><br>Yigal Arnon & Co.<br>22 Rivlin Street<br>Jerusalem, Israel<br>Attn: Barry Levenfeld, Adv and Yarom Romem, Adv.<br>Fax: 972-2-623-9200<br>Email: barry@arnon.co.il ; yaromr@arnon.co.il |

<u>**Exhibit II – The Existing Shareholders**</u>

| NAME | ADDRESS |
|---|---|
| **Reuven Kitov** | 75 Einstein Street,, Tel Aviv 69102 Israel |
| **Reuven Harrison** | 11 Zamenhoff St., Tel Aviv 64373 Israel |

Exhibit 10.11

**TUFIN SOFTWARE TECHNOLOGIES LTD** .

**2019 EQUITY-BASED INCENTIVE PLAN**

_____

_____

**Adopted: March 21, 2019**

_____

## 1. PURPOSE; TYPES OF AWARDS; CONSTRUCTION

1.1    Purpose. The purpose of this 2019 Equity-Based Incentive Plan (as may be amended, this " **Plan** ") is to afford an incentive to eligible employees, directors, officers, consultants, advisors of Tufin Software Technologies Ltd., an Israeli company (together with any successor corporation thereto, the " **Company** "), or any Affiliate of the Company, which now exists or hereafter is organized or acquired by the Company or its Affiliates, to increase their efforts on behalf of the Company or its Affiliates and to promote the success of the Company's business, by providing such Grantees with opportunities to acquire a proprietary interest in the Company by the issuance of Shares or restricted Shares (" **Restricted Shares** ") of the Company, and by the grant of options to purchase Shares (" **Options** "), Restricted Share Units (" **RSUs** ") and other Share-based Awards pursuant to Section 11 of this Plan. The provisions specified hereunder apply to persons who are subject to taxation by the State of Israel with respect to their Awards. In addition to the issuance of Awards under the relevant tax regime in the State of Israel, and without derogating from the generality of Section 23, this Plan contemplates issuances to Grantees in other jurisdictions or under other tax regimes with respect to which the Committee is empowered, but is not required, to make the requisite adjustments in this Plan and set forth the relevant conditions in an appendix to this Plan or in the Company's agreement with the Grantee in order to comply with the requirements of such other tax regimes.

1.2    Types of Awards . This Plan is intended to enable the Company to issue Awards under various tax regimes, including:

(i)    pursuant and subject to the provisions of Section 102 of the Ordinance (or the corresponding provision of any subsequently enacted statute, as amended from time to time), and all regulations and interpretations adopted by any competent authority, including the Israeli Income Tax Authority (the " **ITA** "),  including the Income Tax Rules (Tax Benefits in Stock Issuance to Employees) 5763-2003 or such other rules so adopted from time to time (the " **Rules** "), (such Awards that are intended to be (as set forth in the Award Agreement) and which qualify as such under Section 102 of the Ordinance and the Rules, " **102 Awards** "); and

(ii)    pursuant to Section 3(i) of the Ordinance or the corresponding provision of any subsequently enacted statute, as amended from time to time (such Awards, " **3(i) Awards** ").

1.3    Company Status . This Plan contemplates the issuance of Awards by the Company, both as a private and public company.

1.4    Construction . To the extent any provision herein conflicts with the conditions of any relevant tax law, rule or regulation which are relied upon for tax relief in respect of a particular Award to a Grantee, the Committee is empowered, but is not required, hereunder to determine that the provisions of such law, rule or regulation shall prevail over those of this Plan and to interpret and enforce such prevailing provisions.

## 2. <u>**DEFINITIONS**</u> .

2.1  <u>Terms Generally</u> . Except when otherwise indicated by the context, (i) the singular shall include the plural and the plural shall include the singular; (ii) any pronoun shall include the corresponding masculine, feminine and neuter forms; (iii) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, restatements, supplements or modifications set forth therein or herein); (iv) references to any law, constitution, statute, treaty, regulation, rule or ordinance, including any section or other part thereof, shall refer to it as amended from time to time and shall include any successor thereof; (v) reference to a "company" or "entity" shall include a partnership, corporation, limited liability company, association, trust, unincorporated organization, or a government or agency or political subdivision thereof, and reference to a "person" shall mean any of the foregoing or an individual; (vi) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Plan in its entirety, and not to any particular provision hereof; (vii) all references herein to Sections shall be construed to refer to Sections to this Plan; (viii) the words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation"; and (ix) use of the term "or" is not intended to be exclusive.

2.2  <u>Defined Terms</u> . The following terms shall have the meanings ascribed to them in this Section 2:

" **Affiliate** " shall mean either: (i) with respect to any person, any other person that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such person (with the term "control" or "controlled by" within the meaning of Rule 405 of Regulation C under the Securities Act); or (ii) for the purpose of 102 Awards, a present or future company that either: Controls the Company, is Controlled by the Company; or is under common Control with the Company.

" **Applicable Law** " shall mean any applicable law, rule, regulation, statute, pronouncement, policy, interpretation, judgment, order or decree of any federal, provincial, state or local governmental, regulatory or adjudicative authority or agency, of any jurisdiction, and the rules and regulations of any stock exchange, over-the-counter market or trading system on which the Company's shares are then traded or listed.

" **Award** " shall mean any Option, Restricted Share, RSU or any other Share-based award granted under this Plan.

" **Board** " shall mean the Board of Directors of the Company.

" **Change in Board Event** " shall mean any time at which individuals who, as of the Effective Date, constitute the Board (the " **Incumbent Board** ") cease for any reason to constitute at least a majority of the Board; *provided* , *however* , that any individual becoming a director subsequent to the Effective Date whose election, or nomination for election by the Company's shareholders, was approved by a vote of at least a majority of the directors then comprising the Incumbent Board shall be considered as though such individual were a member of the Incumbent Board, but excluding, for this purpose, any such individual whose initial assumption of office occurs as a result of an actual or threatened election contest with respect to the election or removal of directors or other actual or threatened solicitation of proxies or consents by or on behalf of a Person other than the Board.

" **Committee** " shall mean a committee established or appointed by the Board to administer this Plan, subject to Section 3.1.

" **Companies Law** " shall mean the Israel Companies Law, 5759-1999, and the regulations promulgated thereunder, all as amended from time to time.

" **Control** " shall have the meaning ascribed thereto in Section 102 of the Ordinance.

" **Controlling Shareholder** " shall have the meaning set forth in Section 32(9) of the Ordinance.

" **Disability** " shall mean the inability of a Grantee to engage in any substantial gainful activity or to perform the major duties of the Grantee's position with the Company or its Affiliates by reason of any medically determinable physical or mental impairment, as determined by a qualified doctor acceptable to the Company, that can be expected to last or has already lasted for a continuous period of which can be expected to result in death or which has already lasted or can be expected to last for a continuous period of not less than 12 months.

" **Employee** " shall mean any person treated as an employee in the records of the Company or any of its Affiliates (and in the case of 102 Awards, subject to Section 7.3). The Company shall determine in the exercise of its discretion whether an individual has become or has ceased to be an employee and the effective date of such individual's employment or termination of employment, as the case may be. For purposes of a person's rights, if any, under this Plan as of the time of the Company's determination, all such determinations by the Company shall be final, binding and conclusive, notwithstanding that the Company or any court of law or governmental agency subsequently makes a contrary determination.

" **Employment** ," " **Employed** " and words of similar import shall be deemed to refer to the employment of Employees or to the services of any other Service Provider, as the case may be.

" **Exercise** ," " **Exercised** " and words of similar import, when referring to an Award that does not require exercise or that is settled upon vesting (such as may be the case with RSUs or Restricted Shares, if so determined in their terms), shall be deemed to refer to the vesting of such an Award (regardless of whether or not the wording included reference, to vesting of such an Awards explicitly).

" **Exercise Period** " shall mean the period, commencing on the date of grant of an Award, during which an Award shall be exercisable, subject to any vesting provisions thereof (including any acceleration thereof, if any) and subject to the termination provisions hereof.

" **Exercise Price** " shall mean the exercise price for each Share covered by an Option or the purchase price for each Share covered by any other Award.

" **Fair Market Value** " shall mean, as of any date, the value of a Share or other property as determined by the Committee, in its sole discretion, with full authority to determine the method for making such determination and which determination shall be conclusive and binding on all parties, and shall be made after such consultations with outside legal, accounting and other experts as and if the Committee deems advisable; *provided* , *however* , that, if applicable, the Fair Market Value of the Shares shall be determined in accordance with Section 102, if applicable.

" **Grantee** " shall mean a person who has been granted an Award(s) under this Plan.

" **IPO** " shall mean the closing of an initial public offering of the Shares pursuant to an effective registration statement filed under the Securities Act or equivalent law in another jurisdiction as a result of which the Shares become listed on one or more nationally recognized securities exchange(s).

" **Ordinance** " shall mean the Israeli Income Tax Ordinance (New Version) 1961, and the regulations and rules (including the Rules) promulgated thereunder, all as amended from time to time.

" **Prior Plan** " shall mean each of the Company's 2007 Israeli Share Option Plan, and 2018 Equity-Based Incentive Plan, in each case, as amended.

" **Retirement** " shall mean a Grantee's retirement pursuant to Applicable Law or in accordance with the terms of any tax-qualified retirement plan maintained by the Company or any of its Affiliates in which the Grantee participates or is subject to.

" **Securities Act** " shall mean the U.S. Securities Act of 1933, and the rules and regulations promulgated thereunder, all as amended from time to time.

" **Service Provider** " shall mean an Employee, director, officer, consultant, advisor and any other person or entity who provides services to the Company or any Affiliate of the Company. Service Providers shall include prospective Service Providers to whom Awards are granted in connection with written offers of an employment or other service relationship with the Company or any Affiliate of the Company, *provided, however* , that such employment or service shall have actually commenced.

" **Shares** " shall mean Ordinary Shares, par value NIS 0.01, of the Company (as adjusted for stock split, reverse stock split, bonus shares, combination or other recapitalization events), or shares of such other class of shares of the Company as shall be designated by the Board in respect of the relevant Award(s). " **Shares** " include any securities or property issued or distributed with respect thereto.

" **Trustee** " shall mean the trustee appointed by the Committee to hold the Awards (and, in relation with 102 Awards, approved by the ITA), if so appointed.

2.3 <u>Other Defined Terms</u> . The following terms shall have the meanings ascribed to them in the Sections set forth below:

| Term | Section |
|---|---|
| 102 Awards | 1.2(i) |
| 102 Capital Gain Track Awards | 7.1 |
| 102 Non-Trustee Awards | 7.2 |
| 102 Ordinary Income Track Awards | 7.1 |
| 102 Trustee Awards | 7.1 |
| 3(i) Awards | 1.2(ii) |
| Award Agreement | 6 |
| Cause | 6.6.4.3 |
| Change in Control | 12.2 |
| Company | 1.1 |
| Effective Date | 22.1 |
| Election | 7.2 |
| Eligible 102 Grantees | 7.3 |
| ITA | 1.2(i) |
| Market Stand-Off | 15.1 |
| Market Stand-Off Period | 15.1 |
| Options | 1.1 |
| Plan | 1.1 |
| Pool | 5.1 |
| Recapitalization | 12.1 |
| Representative | 3.7 |
| Required Holding Period | 7.5.1 |
| Restricted Period | 9.2 |
| Restricted Share Agreement | 9 |
| Restricted Share Unit Agreement | 10 |
| Restricted Shares | 1.1 |
| RSUs | 1.1 |
| Rules | 1.2(i) |
| Securities | 15.1 |
| Successor Corporation | 12.2.1 |
| Withholding Obligations | 16.4 |

**3.** **ADMINISTRATION** .

3.1     To the extent permitted under Applicable Law, the Articles of Association and any other governing document of the Company, this Plan shall be administered by the Committee. In the event that the Board does not appoint or establish a committee to administer this Plan, this Plan shall be administered by the Board. In the event that an action necessary for the administration of this Plan is required under Applicable Law to be taken by the Board without the right of delegation, or if such action or power was explicitly reserved by the Board in appointing, establishing and empowering the Committee, then such action shall be so taken by the Board. In any such event, all references herein to the Committee shall be construed as references to the Board. Even if such a Committee was appointed or established, the Board may take any

actions that are stated to be vested in the Committee, and shall not be restricted or limited from exercising all rights, powers and authorities under this Plan or Applicable Law.

3.2 The Board shall appoint the members of the Committee, may from time to time remove members from, or add members to, the Committee, and shall fill vacancies in the Committee, however caused, *provided that* the composition of the Committee shall at all times be in compliance with any mandatory requirements of Applicable Law, the Articles of Association and any other governing document of the Company. The Committee may select one of its members as its Chairman and shall hold its meetings at such times and places as it shall determine. The Committee may appoint a Secretary, who shall keep records of its meetings, and shall make such rules and regulations for the conduct of its business as it shall deem advisable and subject to mandatory requirements of Applicable Law.

3.3 Subject to the terms and conditions of this Plan, any mandatory provisions of Applicable Law and any provisions of any Company policy required under mandatory provisions of Applicable Law, and in addition to the Committee's powers contained elsewhere in this Plan, the Committee shall have full authority, in its discretion, from time to time and at any time, to determine any of the following, or to recommend to the Board any of the following if it is not authorized to take such action according to Applicable Law:

(i) eligible Grantees;

(ii) grants of Awards and setting the terms and provisions of Award Agreements (which need not be identical) and any other agreements or instruments under which Awards are made, including, but not limited to, the number of Shares underlying each Award and the class of Shares underlying each Award (if more than one class was designated by the Board);

(iii) the time or times at which Awards shall be granted;

(iv) the terms, conditions and restrictions applicable to each Award (which need not be identical) and any Shares acquired upon the exercise or (if applicable) vesting thereof, including, without limitation, (1) designating Awards under Section 1.2; (2) the vesting schedule, the acceleration thereof and terms and conditions upon which Awards may be exercised or become vested, (3) the Exercise Price, (4) the time of the expiration of the Awards, (5) the effect of the Grantee's termination of employment with the Company or any of its Affiliates, and (6) all other terms, conditions and restrictions applicable to the Award or the Shares not inconsistent with the terms of this Plan;

(v) to accelerate, continue, extend or defer the exercisability of any Award or the vesting thereof, including with respect to the period following a Grantee's termination of employment or other service;

(vi) the interpretation of this Plan and any Award Agreement and the meaning, interpretation and applicability of terms referred to in Applicable Laws;

(vii) policies, guidelines, rules and regulations relating to and for carrying out this Plan, and any amendment, supplement or rescission thereof, as it may deem appropriate;

(viii) to adopt supplements to, or alternative versions of, this Plan, including, without limitation, as it deems necessary or desirable to comply with the laws of, or to accommodate the tax regimes or customs of, foreign jurisdictions whose citizens or residents may be granted Awards;

(ix) the Fair Market Value of the Shares or other property;

(x)     the tax track (capital gains, ordinary income track or any other track available under the Section 102 of the Ordinance) for the purpose of 102 Awards;

(xi)    the authorization and approval of conversion, substitution, cancellation or suspension under and in accordance with this Plan of any or all Awards or Shares;

(xii)   the amendment, modification, waiver or supplement of the terms of each outstanding Award (with the consent of the applicable Grantee, if such amendment refers to the increase of the Exercise Price of Awards or reduction of the number of Shared underlying an Award (but, in each case, other than as a result of an adjustment or exercise of rights in accordance with Section 12) unless otherwise provided under the terms of this Plan;

(xiii)  without limiting the generality of the foregoing, and subject to the provisions of Applicable Law, to grant to a Grantee, who is the holder of an outstanding Award, in exchange for the cancellation of such Award, a new Award having an Exercise Price lower than that provided in the Award so canceled and containing such other terms and conditions as the Committee may prescribe in accordance with the provisions of this Plan or to set a new Exercise Price for the same Award lower than that previously provided in the Award;

(xiv)   to correct any defect, supply any omission or reconcile any inconsistency in this Plan or any Award Agreement and all other determinations and take such other actions with respect to this Plan or any Award as it may deem advisable to the extent not inconsistent with the provisions of this Plan or Applicable Law,

(xv)    to designate any of the Company's officers or other persons to manage the day-to-day administration of the Awards granted under the Plan (such designation shall initially include the Company's finance, legal and human resources departments and the Representative(s) pursuant to Section 3.7) or authorize any of them to act on behalf of the Committee with respect to any matter, right, obligation, determination or election which is the responsibility of or which is allocated to the Committee herein;

(xvi)   to determine that Awards, Shares issuable upon the exercise or (if applicable) vesting of Awards and/or any securities issued or distributed with respect thereto, shall be allocated or issued to, or held by, the Representative in trust for the benefit of the Grantees; and

(xvii)  any other matter which is necessary or desirable for, or incidental to, the administration of this Plan and any Award thereunder.

3.4     The authority granted hereunder includes the authority to modify Awards to eligible individuals who are foreign nationals or are individuals who are employed outside Israel to recognize differences in local law, tax policy or custom, in order to effectuate the purposes of this Plan but without amending this Plan.

3.5     The Board and the Committee shall be free at all times to make such determinations and take such actions as they deem fit. The Board and the Committee need not take the same action or determination with respect to all Awards, with respect to certain types of Awards, with respect to all Service Providers or any certain type of Service Providers and actions and determinations may differ as among the Grantees, and as between the Grantees and any other holders of securities of the Company.

3.6     All decisions, determinations and interpretations of the Committee, the Board and the Company under this Plan shall be final and binding on all Grantees (whether before or after the issuance of Shares pursuant to Awards), unless otherwise determined by the Committee, the Board or the Company,

respectively. The Committee shall have the authority (but not the obligation) to determine the interpretation and applicability of Applicable Laws to any Grantee or any Awards. No member of the Committee or the Board shall be liable to any Grantee for any action taken or determination made in good faith with respect to this Plan or any Award granted hereunder.

3.7     Any officer or authorized manager of the Company or other persons designated by the Company from time to time (including, without limitation, the Trustee) (any such person, the " **Representative** ") shall have the authority to act on behalf of the Company with respect to any matter, right, obligation, determination or election which is the responsibility of, or which is allocated to the Company herein, *provided* such Representative has apparent authority with respect to such matter, right, obligation, determination or election. The Representative shall not be liable to any Grantee for any action taken, or omission or determination made in good faith with respect to this Plan or any Award granted hereunder.

4.     **ELIGIBILITY** .

Awards may be granted to Service Providers of the Company or any Affiliate thereof, taking into account (at the Committee's full discretion), the qualification under each tax regime pursuant to which such Awards are granted. A person who has been granted an Award hereunder may be granted additional Awards, if the Committee shall so determine, subject to the limitations herein. However, eligibility in accordance with this Section 4 shall not entitle any person to be granted an Award, or, having been granted an Award, to be granted an additional Award.

Awards may differ in number of Shares covered thereby, the terms and conditions applying to them or on the Grantees or in any other respect (including, that there should not be any expectation (and it is hereby disclaimed) that a certain treatment, interpretation or position granted to one shall be applied to the other, regardless of whether or not the facts or circumstances are the same or similar).

5.     **SHARES** .

5.1     The maximum aggregate number of Shares that may be issued pursuant to Awards under this Plan (the " **Pool** ") shall be the sum of (a) 2,750,000 Shares, plus (b) on January 1 of each calendar year commencing in 2020, a number of Shares equal to the lesser of: (i) an amount determined by the Board, if so determined prior to January 1 of the calendar year in which the increase will occur, (ii) 5% of the total number of Shares outstanding on December 31 of the immediately preceding calendar year, and (iii) 5,000,000 Shares; in all events, subject to adjustment as provided in Section 12.1. The Board may, at its discretion, reduce the number of Shares that may be issued under the Plan at any time ( *provided that* such reduction does not adversely impact then outstanding Awards).

5.2     Any Shares (a) underlying an Award granted hereunder or an award granted under any Prior Plan (in an amount not to exceed 813,515 Shares under the Prior Plans) that has expired, or was canceled, terminated, forfeited, repurchased or settled in cash in lieu of issuance of Shares, for any reason, without having been exercised; (b) tendered to pay the Exercise Price of an Award (or the exercise price or other purchase price of any option or other award under the Prior Plans), or withholding tax obligations with respect to an Award (or any awards under the Prior Plans); or (c) subject to an Award (or any award under the Prior Plans) that is not delivered to a Grantee because such Shares are withheld to pay the Exercise Price of such Award (or of any award under the Prior Plans), or withholding tax obligations with respect to such Award (or such other award) shall automatically, and without any further action on the part of the Company or any Grantee, again be available for grant of Awards and Shares issued upon exercise of (if applicable) vesting thereof for the purposes of this Plan (unless this Plan shall have been terminated) or unless the Board determines otherwise. Such Shares may, in whole or in part, be authorized but unissued Shares, treasury

8

shares (dormant shares) or Shares otherwise that shall have been or may be repurchased by the Company (to the extent permitted pursuant to the Companies Law).

5.3 Any Shares under the Pool that are not subject to outstanding or exercised Awards at the termination of this Plan shall cease to be reserved for the purpose of this Plan.

5.4 From and after the Effective Date, no further grants or awards shall be made under the Prior Plans; however, grants or awards made under the Prior Plans before the Effective Date shall continue in effect in accordance with their terms.

## 6. <u>TERMS AND CONDITIONS OF AWARDS</u> .

Each Award granted pursuant to this Plan shall be evidenced by a written or electronic agreement between the Company and the Grantee or a written or electronic notice delivered by the Company (the " **Award Agreement** "), in substantially such form or forms and containing such terms and conditions, as the Committee shall from time to time approve. The Award Agreement shall comply with and be subject to the following general terms and conditions and the provisions of this Plan (except for any provisions applying to Awards under different tax regimes), unless otherwise specifically provided in such Award Agreement, or the terms referred to in other Sections of this Plan applying to Awards under such applicable tax regimes, or terms prescribed by Applicable Law. Award Agreements need not be in the same form and may differ in the terms and conditions included therein.

6.1 <u>Number of Shares</u> . Each Award Agreement shall state the number of Shares covered by the Award.

6.2 <u>Type of Award</u> . Each Award Agreement may state the type of Award granted thereunder, *provided that* the tax treatment of any Award, whether or not stated in the Award Agreement, shall be as determined in accordance with Applicable Law.

6.3 <u>Exercise Price</u> . Each Award Agreement shall state the Exercise Price, if applicable. Unless otherwise set forth in this Plan, an Exercise Price of an Award of less than the par value of the Shares shall comply with Section 304 of the Companies Law, 1999, as amended. Subject to Section 3, the Committee may reduce the Exercise Price of any outstanding Award, on terms and subject to such conditions as it deems advisable. The Exercise Price shall also be subject to adjustment as provided in Section 12 hereof.

6.4 <u>Manner of Exercise</u> . An Award may be exercised, as to any or all Shares as to which the Award has become exercisable, by: (a) written notice delivered in person or by mail (or such other methods of delivery prescribed by the Company) to the Representative, and in the absence thereof to such other person as determined by the Committee, or in any other manner as the Committee shall prescribe from time to time, specifying the number of Shares with respect to which the Award is being exercised (which may be equal to or lower than the aggregate number of Shares underlying Options that have become exercisable at such time, subject to the last sentence of this Section 6.4); and (b) payment of the aggregate Exercise Price for such Shares in the manner specified in the following sentence. The Exercise Price shall be paid in full with respect to each Share, either in (i) cash, (ii) if the Company's shares are listed for trading on any securities exchange or over-the-counter market, and if the Committee so determines, all or part of the Exercise Price and any withholding taxes may be paid by the delivery (on a form prescribed by the Company) of an irrevocable direction to a securities broker approved by the Company to sell Shares and to deliver all or part of the sales proceeds to the Company, the Representative and/or to the Trustee, as applicable, or (iii) in such other manner as the Committee shall determine, which may include procedures for cashless exercise.

6.5 <u>Term and Vesting of Awards</u> .

6.5.1   Each Award Agreement shall provide the vesting schedule for the Award as determined by the Committee. The Committee shall have the authority to determine the vesting schedule and accelerate the vesting of any outstanding Award at such time and under such circumstances as it, in its sole discretion, deems appropriate.

6.5.2   The Award Agreement may contain performance goals and measurements (which, in case of 102 Awards, shall, if then required, be subject to obtaining a specific tax ruling or determination from the ITA), and the provisions with respect to any Award need not be the same as the provisions with respect to any other Award. Such performance goals may include, but are not limited to, sales, earnings before interest and taxes, return on investment, earnings per share, any combination of the foregoing or rate of growth of any of the foregoing, as determined by the Committee. The Committee may adjust performance goals pursuant to Awards previously granted to take into account changes in law and accounting and tax rules and to make such adjustments as the Committee deems necessary or appropriate to reflect the inclusion or the exclusion of the impact of extraordinary or unusual items, events or circumstances.

6.5.3   The Exercise Period of an Award will be ten (10) years from the date of grant of the Award, unless otherwise determined by the Committee and stated in the Award Agreement, but subject to the vesting provisions described above and the early termination provisions set forth in Sections 6.6 and 6.7 hereof. At the expiration of the Exercise Period, any Award, or any part thereof, that has not been exercised within the term of the Award and the Shares covered thereby not paid for in accordance with this Plan and the Award Agreement shall terminate and become null and void, and all interests and rights of the Grantee in and to the same shall expire.

6.6   Termination .

6.6.1   Unless otherwise determined by the Committee, and subject to Section 6.7 hereof, an Award may not be exercised unless the Grantee is then a Service Provider of the Company or an Affiliate thereof, and unless the Grantee has remained continuously so employed since the date of grant of the Award and throughout the vesting dates.

6.6.2   In the event that the employment or service of a Grantee shall terminate (other than by reason of death, Disability or Retirement), all Awards of such Grantee that are unvested at the time of such termination shall terminate on the date of such termination, and all Awards of such Grantee that are vested and exercisable at the time of such termination may be exercised within up to three (3) months after the date of such termination (or such different period as the Committee shall prescribe), but in any event no later than the date of expiration of the Award's term as set forth in the Award Agreement or pursuant to this Plan; *provided* , *however* , that if the Company (or its Affiliate, when applicable) shall terminate the Grantee's employment or service for Cause (as defined below) or if at any time during the Exercise Period (whether prior to and after termination of employment or service, and whether or not the Grantee's employment or service is terminated by either party as a result thereof), facts or circumstances arise or are discovered with respect to the Grantee that would have constituted Cause, all Awards theretofore granted to such Grantee (whether vested or not) shall, to the extent not theretofore exercised, terminate on the date of such termination (or on such subsequent date on which such facts or circumstances arise or are discovered, as the case may be) unless otherwise determined by the Committee.

6.6.3   Notwithstanding anything to the contrary, the Committee, in its absolute discretion, may, on such terms and conditions as it may determine appropriate, extend the periods for which Awards held by any Grantee may continue to vest and be exercisable; it being clarified that such Awards may lose their entitlement to certain tax benefits under Applicable Law as a result of the

modification of such Awards and/or in the event that the Award is exercised beyond the later of: (i) three (3) months after the date of termination of the employment or service relationship; or (ii) the applicable period under Section 6.7 below with respect to a termination of the employment or service relationship because of the death, Disability or Retirement of Grantee.

6.6.4 For purposes of this Plan:

6.6.4.1 a termination of employment or service of a Grantee shall not be deemed to occur in case of (i) a transition or transfer of a Grantee among the Company and its Affiliates (except to the extent required by Applicable Law with respect to certain Awards), (ii) a change in the capacity in which the Grantee is employed or renders service to the Company or any of its Affiliates or a change in the identity of the employing or engagement entity among the Company and its Affiliates, *provided* , in case of (i) and (ii) above, that the Grantee has remained continuously employed by and/or in the service of the Company and its Affiliates since the date of grant of the Award and throughout the vesting period, or (iii) if the Grantee takes any unpaid leave as set forth in Section 6.8 below.

6.6.4.2 In the case of a Grantee whose principal employer or service recipient is an Affiliate of the Company, the Grantee's employment shall also be deemed terminated for purposes of this Section 6.6 as of the date on which such principal employer or service recipient ceases to be an Affiliate of the Company.

6.6.4.3 The term " **Cause** " shall mean (irrespective of, and in addition to, any definition included in any other agreement or instrument applicable to the Grantee, and unless otherwise determined by the Committee) any of the following: (i) any theft, fraud, embezzlement, dishonesty, willful misconduct, breach of fiduciary duty for personal profit, falsification of any documents or records of the Company or any of its Affiliates, felony or similar act by the Grantee (whether or not related to the Grantee's relationship with the Company); (ii) an act of moral turpitude by the Grantee, or any act that causes significant injury to, or is otherwise adversely affecting, the reputation, business, assets, operations or business relationship of the Company (and its Affiliate, when applicable); (iii) any breach by the Grantee of any material agreement with or of any material duty of the Grantee to the Company or any Affiliate thereof (including breach of confidentiality, non-disclosure, non-use, non-competition or non-solicitation covenants towards the Company or any of its Affiliates) or failure to abide by code of conduct or other policies (including, without limitation, policies relating to confidentiality and reasonable workplace conduct); or (iv) any act which constitutes a breach of a Grantee's fiduciary duty towards the Company or its Affiliate, including disclosure of confidential or proprietary information thereof or acceptance or solicitation to receive unauthorized or undisclosed benefits, irrespective of their nature, or funds, or promises to receive either, from individuals, consultants or corporate entities that the Company or its Affiliate does business with; (v) the Grantee's unauthorized use, misappropriation, destruction, or diversion of any tangible or intangible asset or corporate opportunity of the Company or any of its Affiliates (including, without limitation, the improper use or disclosure of confidential or proprietary information); or (vi) any circumstances that constitute grounds for termination for cause under the Grantee's employment or service agreement with the Company or its Affiliate, to the extent applicable. For the avoidance of doubt, the determination as to whether a termination is for Cause for purposes of this Plan, shall be made in good faith by the Committee and shall be final and binding on the Grantee.

6.7     Death, Disability or Retirement of Grantee .

6.7.1     If a Grantee shall die while employed by, or performing service for, the Company or its Affiliates, or within the three (3) month period (or such longer period of time as determined by the Board, in its discretion) after the date of termination of such Grantee's employment or service (or within such different period as the Committee may have provided pursuant to Section 6.6 hereof), or if the Grantee's employment or service shall terminate by reason of Disability, all Awards theretofore granted to such Grantee may (to the extent otherwise vested and exercisable and unless earlier terminated in accordance with their terms) be exercised by the Grantee or by the Grantee's estate or by a person who acquired the legal right to exercise such Awards by bequest or inheritance, or by a person who acquired the legal right to exercise such Awards in accordance with Applicable Law in the case of Disability of the Grantee, as the case may be, at any time within one (1) year (or such longer period of time as determined by the Board, in its discretion) after the death or Disability of the Grantee (or such different period as the Committee shall prescribe), but in any event no later than the date of expiration of the Award's term as set forth in the Award Agreement or pursuant to this Plan. In the event that an Award granted hereunder shall be exercised as set forth above by any person other than the Grantee, written notice of such exercise shall be accompanied by a certified copy of letters testamentary or proof satisfactory to the Committee of the right of such person to exercise such Award.

6.7.2     In the event that the employment or service of a Grantee shall terminate on account of such Grantee's Retirement, all Awards of such Grantee that are exercisable at the time of such Retirement may, unless earlier terminated in accordance with their terms, be exercised at any time within the three (3) month period after the date of such Retirement (or such different period as the Committee shall prescribe).

6.8     Suspension of Vesting . Unless the Committee provides otherwise, vesting of Awards granted hereunder shall be not suspended during unpaid leaves of absence.

6.9     Voting Proxy . Until immediately after the listing for trading on a stock exchange or market or trading system of the Company's (or the Successor Corporation's) shares, the Shares subject to an Award or to be issued pursuant to an Award or any other Securities, shall, unless otherwise determined by the Committee, be subject to an irrevocable proxy and power of attorney by the Grantee, the Representative or the Trustee (if so requested by the Company), as the case may be, to the Company, which shall designate such person or persons (with a right of substitution) from time to time as determined by the Committee (and in the absence of such determination, the Chief Executive Officer or Chairman of the Board, *ex officio* ). Each of the Trustee and the Representative is deemed to be instructed by the Grantee to sign such proxy, as requested by the Company. The proxy shall entitle the holder thereof to receive notices, vote and take such other actions in respect of the Shares or other Securities. Any person holding or exercising such voting proxies shall do so solely in his capacity as the proxy holder and not individually. All Awards granted hereunder shall be conditioned upon the execution of such irrevocable proxy in substantially the form prescribed by the Committee from time to time. So long as any such Shares are subject to such irrevocable proxy and power of attorney or held by a the Representative or the Trustee (and unless a proxy was given by them as aforesaid), (i) in any shareholders' meeting or written consent in lieu thereof, such Shares shall be voted by the proxy holder (or the Trustee or Representative, as applicable), unless directed otherwise by the Board, in the same proportion as the result of the vote at the shareholders' meeting (or written consent in lieu thereof) in respect of which the Shares are being voted (whether an extraordinary or annual meeting, and whether of the share capital as one (1) class or of any class thereof), and (ii) or in any act or consent of shareholders under the Company's Articles of Association or otherwise, such Shares shall be cast by the proxy holder (or the Trustee or Representative, as applicable), unless directed otherwise by the Board, in the

same proportion as the result of the shareholders' act or consent. The provisions of this Section 6.9 shall apply to the Grantee and to any purchaser, assignee or transferee of any Shares.

6.10    Other Provisions . The Award Agreement evidencing Awards under this Plan shall contain such other terms and conditions not inconsistent with this Plan as the Committee may determine, at or after the date of grant, including provisions in connection with the restrictions on transferring the Awards or Shares covered by such Awards, which shall be binding upon the Grantees and any purchaser, assignee or transferee of any Awards, and other terms and conditions as the Committee shall deem appropriate. Awards shall be subject to any other governing documents of the Company, all policies, manuals and internal regulations adopted by the Company from time to time, in each case, as may be amended from time to time, including any provisions included therein concerning restrictions or limitations on exercise of Awards (such as, but not limited to, lock up/market stand-off), any provisions concerning restrictions on the use of inside information and other provisions deemed by the Company to be appropriate. Each Grantee shall promptly execute (and authorizes any person designated by the Company to so execute) such separate agreement(s) or confirmations as may be requested by the Company relating to matters set forth in this Section 6.10. The execution of such separate agreement(s) may be a condition by the Company to grant or exercise of any Award.

## 7.    **102 AWARDS** .

Awards granted pursuant to this Section 7 are intended to constitute 102 Awards and shall be granted subject to the following special terms and conditions, the general terms and conditions specified in Section 6 hereof and other provisions of this Plan, except for any provisions of this Plan applying to Awards under different tax laws or regulations. In the event of any inconsistency or contradictions between the provisions of this Section 7 and the other terms of this Plan, this Section 7 shall prevail.

7.1    Tracks . Awards granted pursuant to this Section 7 are intended to be granted pursuant to Section 102 of the Ordinance pursuant to either (i) Section 102(b)(2) or Section 102(b)(3) thereof, as applicable, under the capital gain track (" **102 Capital Gain Track Awards** "), or (ii) Section 102(b)(1) thereof under the ordinary income track (" **102 Ordinary Income Track Awards** ," and together with 102 Capital Gain Track Awards, " **102 Trustee Awards** "). 102 Trustee Awards shall be granted subject to the special terms and conditions contained in this Section 7, the general terms and conditions specified in Section 7 hereof and other provisions of this Plan, except for any provisions of this Plan applying to Options under different tax laws or regulations.

7.2    Election of Track . Subject to Applicable Law, the Company may grant only one type of 102 Trustee Awards at any given time to all Grantees who are to be granted 102 Trustee Awards pursuant to this Plan, and shall file an election with the ITA regarding the type of 102 Trustee Awards it elects to grant before the date of grant of any 102 Trustee Awards (the " **Election** "). Such Election shall also apply to any other securities, including bonus shares, received by any Grantee as a result of holding the 102 Trustee Awards. The Company may change the type of 102 Trustee Awards that it elects to grant only after the expiration of at least twelve (12) months from the end of the year in which the first grant was made in accordance with the previous Election, or as otherwise provided by Applicable Law. Any Election shall not prevent the Company from granting Awards pursuant to Section 102(c) of the Ordinance without a Trustee (" **102 Non-Trustee Awards** ").

7.3    Eligibility for Awards . Subject to Applicable Law, 102 Awards may only be granted to an "employee" within the meaning of Section 102(a) of the Ordinance (which, as of the date of the adoption of this Plan, means (i) individuals employed by an Israeli company being the Company or any of its Affiliates, and (ii) individuals who are serving and are engaged personally (and not through an entity) as "office holders"

by such an Israeli company), but may not be granted to a Controlling Shareholder (" **Eligible 102 Grantees** "). Eligible 102 Grantees may receive only 102 Awards, which may either be granted to a Trustee or granted under Section 102 of the Ordinance without a Trustee.

7.4 102 Award Grant Date .

7.4.1 Each 102 Award will be deemed granted on the date determined by the Committee, subject to Section 7.4.2, *provided that* (i) the Grantee has signed all documents required by the Company or pursuant to Applicable Law, and (ii) with respect to 102 Trustee Award, the Company has provided all applicable documents to the Trustee in accordance with the guidelines published by the ITA.

7.4.2 Unless otherwise permitted by the Ordinance, any grants of 102 Trustee Awards that are made on or after the date of the adoption of this Plan or an amendment to this Plan, as the case may be, that may become effective only at the expiration of thirty (30) days after the filing of this Plan or any amendment thereof (as the case may be) with the ITA in accordance with the Ordinance shall be conditional upon the expiration of such 30-day period, such condition shall be read and is incorporated by reference into any corporate resolutions approving such grants and into any Award Agreement evidencing such grants (whether or not explicitly referring to such condition), and the date of grant shall be at the expiration of such thirty (30) day period, whether or not the date of grant indicated therein corresponds with this Section. In the case of any contradiction, this provision and the date of grant determined pursuant hereto shall supersede and be deemed to amend any date of grant indicating in any corporate resolution or Award Agreement.

7.5 102 Trustee Awards .

7.5.1 Each 102 Trustee Award, each Share issued pursuant to the exercise of any 102 Trustee Award, and any rights granted thereunder, including bonus shares, shall be issued to and registered in the name of the Trustee and shall be held in trust for the benefit of the Grantee for the requisite period prescribed by the Ordinance or such longer period as set by the Committee (the " **Required Holding Period** "). In the event that the requirements under Section 102 of the Ordinance to qualify an Award as a 102 Trustee Award are not met, then the Award may be treated as a 102 Non-Trustee Award or 3(i) Award, all in accordance with the provisions of the Ordinance. After expiration of the Required Holding Period, the Trustee may release such 102 Trustee Awards and any such Shares, *provided that* (i) the Trustee has received an acknowledgment from the ITA that the Grantee has paid any applicable taxes due pursuant to the Ordinance, or (ii) the Trustee and/or the Company and/or its Affiliate withholds all applicable taxes and compulsory payments due pursuant to the Ordinance arising from the 102 Trustee Awards and/or any Shares issued upon exercise or (if applicable) vesting of such 102 Trustee Awards. The Trustee shall not release any 102 Trustee Awards or Shares issued upon exercise or (if applicable) vesting thereof prior to the payment in full of the Grantee's tax and compulsory payments arising from such 102 Trustee Awards and/or Shares or the withholding referred to in (ii) above.

7.5.2 Each 102 Trustee Award shall be subject to the relevant terms of the Ordinance, the Rules and any determinations, rulings or approvals issued by the ITA, which shall be deemed an integral part of the 102 Trustee Awards and shall prevail over any term contained in this Plan or Award Agreement that is not consistent therewith. Any provision of the Ordinance, the Rules and any determinations, rulings or approvals by the ITA not expressly specified in this Plan or Award Agreement that are necessary to receive or maintain any tax benefit pursuant to Section 102 of the Ordinance shall be binding on the Grantee. The Grantee granted a 102 Trustee Award shall comply with the Ordinance and the terms and conditions of the trust agreement entered into between the

14

Company and the Trustee. The Grantee shall execute (and authorizes any person designated by the Company to so execute) any and all documents that the Company and/or its Affiliates and/or the Trustee determine from time to time to be necessary in order to comply with the Ordinance and the Rules.

7.5.3 During the Required Holding Period, the Grantee shall not release from trust or sell, assign, transfer or give as collateral, the Shares issuable upon the exercise or (if applicable) vesting of a 102 Trustee Awards and/or any securities issued or distributed with respect thereto, until the expiration of the Required Holding Period. Notwithstanding the above, if any such sale, release or other action occurs during the Required Holding Period it may result in adverse tax consequences to the Grantee under Section 102 of the Ordinance and the Rules, which shall apply to and shall be borne solely by such Grantee. Subject to the foregoing, the Trustee may, pursuant to a written request from the Grantee, but subject to the terms of this Plan, release and transfer such Shares to a designated third party, *provided that* both of the following conditions have been fulfilled prior to such release or transfer: (i) payment has been made to the ITA of all taxes and compulsory payments required to be paid upon the release and transfer of the Shares, and confirmation of such payment has been received by the Trustee and the Company, and (ii) the Trustee has received written confirmation from the Company that all requirements for such release and transfer have been fulfilled according to the terms of the Company's corporate documents, any agreement governing the Shares, this Plan, the Award Agreement and any Applicable Law.

7.5.4 If a 102 Trustee Award is exercised or (if applicable) vested, the Shares issued upon such exercise or (if applicable) vesting shall be issued in the name of the Trustee for the benefit of the Grantee.

7.5.5 Upon or after receipt of a 102 Trustee Award, if required, the Grantee may be required to sign an undertaking to release the Trustee from any liability with respect to any action or decision duly taken and executed in good faith by the Trustee in relation to this Plan, or any 102 Trustee Award or Share granted to such Grantee thereunder.

7.6 102 Non-Trustee Awards . The foregoing provisions of this Section 7 relating to 102 Trustee Awards shall not apply with respect to 102 Non-Trustee Awards, which shall, however, be subject to the relevant provisions of Section 102 of the Ordinance and the applicable Rules. The Committee may determine that 102 Non-Trustee Awards, the Shares issuable upon the exercise or (if applicable) vesting of a 102 Non-Trustee Award and/or any securities issued or distributed with respect thereto, shall be allocated or issued to, or held by, the Trustee or the Representative, who shall hold such 102 Non-Trustee Awards and all accrued rights thereon (if any), in trust for the benefit of the Grantee and/or the Company, as the case may be, until the full payment of tax arising from the 102 Non-Trustee Awards, the exercise thereof, the Shares issuable upon the exercise or (if applicable) vesting of a 102 Non-Trustee Awards and/or any securities issued or distributed with respect thereto. Alternatively, if no trust is implemented with respect to 102 Non-Trustee Awards, then the Grantee, at the request of the Company or any of its Affiliates or the Representative, shall extend to the Company, its Affiliates or the Representative a security or guarantee for due and timely payment of all taxes and other compulsory payments due at the time of sale of Shares, to the satisfaction of each of the Company, its Affiliates or the Representative.

7.7 Israeli Index Base for 102 Awards . Each 102 Award will be subject to the Israeli index base of the Value of Benefit, as defined in Section 102(a) of the Ordinance, as determined by the Committee in its discretion, pursuant to the Rules, from time to time. The Committee may amend (which may have a retroactive effect) the Israeli index base, pursuant to the Ordinance, without the Grantee's consent.

7.8    <u>Written Grantee Undertaking</u> . To the extent and with respect to any 102 Trustee Award, and as required by Section 102 of the Ordinance and the Rules, by virtue of the receipt of such Award, the Grantee is deemed to have undertaken and confirmed in writing the following (and such undertaking is deemed incorporated into any documents signed by the Grantee in connection with the employment or service of the Grantee and/or the grant of such Award). The following written undertaking shall be deemed to apply and relate to all 102 Awards granted to the Grantee, whether under this Plan or other plans maintained by the Company, and whether prior to or after the date hereof.

7.8.1    The Grantee shall comply with all terms and conditions set forth in Section 102 of the Ordinance with regard to the "Capital Gain Track" or the "Ordinary Income Track," as applicable, and the applicable rules and regulations promulgated thereunder, as amended from time to time.

7.8.2    The Grantee is familiar with, and understands the provisions of, Section 102 of the Ordinance in general, and the tax arrangement under the "Capital Gain Track" or the "Ordinary Income Track" in particular, and its tax consequences; the Grantee agrees that the 102 Awards and Shares that may be issued upon exercise or (if applicable) vesting of the 102 Awards (or otherwise in relation to the 102 Awards), will be held by a trustee appointed pursuant to Section 102 of the Ordinance for at least the duration of the Holding Period (as such term is defined in Section 102) under the "Capital Gain Track" or the "Ordinary Income Track", as applicable. The Grantee understands that any release of such Awards or Shares from trust, or any sale of the Share prior to the termination of the Holding Period, as defined above, will result in taxation at marginal tax rate, in addition to deductions of appropriate social security, health tax contributions or other compulsory payments.

7.8.3    The Grantee agrees to the trust deed signed between the Company, his employing company and the trustee appointed pursuant to Section 102 of the Ordinance.

## 8.    <u>3(i) AWARDS</u> .

Awards granted pursuant to this Section 8 are intended to constitute 3(i) Awards and shall be granted subject to the general terms and conditions specified in Section 6 hereof and other provisions of this Plan, except for any provisions of this Plan applying to Awards under different tax laws or regulations. In the event of any inconsistency or contradictions between the provisions of this Section 8 and the other terms of this Plan, this Section 8 shall prevail.

8.1    To the extent deemed by the Committee to be advisable or, if required by Applicable Law, the 3(i) Awards and/or any shares or other securities issued or distributed with respect thereto granted pursuant to this Plan shall be allocated or issued to, or held by, the Trustee or the Representative who shall hold the same and all accrued rights thereon (if any), in trust for the benefit of the Grantee and/or the Company, as the case may be, until the full payment of tax arising from the 3(i) Awards, the exercise thereof, Shares issuable upon the exercise or (if applicable) vesting thereof and/or any securities issued or distributed with respect thereto, pursuant to the Company's instructions from time to time as set forth in a trust agreement, which will have been entered into between the Company and the Trustee. If determined by the Board or the Committee, and subject to such trust agreement, the Trustee or the Representative shall be responsible for withholding any taxes to which a Grantee may become liable upon issuance of Shares, whether due to the exercise or (if applicable) vesting of Awards. Alternatively, if no trust is implemented with respect to 3(i) Awards, then the Grantee, at the request of the Company or any of its Affiliates or the Representative, shall extend to the Company, its Affiliates or the Representative a security or guarantee for due and timely payment of all taxes and other compulsory payments due at the time of exercise of Awards and sale of Shares, to the satisfaction of each of the Company, its Affiliates or the Representative.

16

8.2    Shares pursuant to a 3(i) Award shall not be issued unless the Grantee delivers to the Company payment in cash or by bank check or such other form acceptable to the Committee of all withholding taxes due, if any, on account of the Grantee acquired Shares under the Award or gives other assurance satisfactory to the Committee of the payment of those withholding taxes.

## 9.    **RESTRICTED SHARE** .

The Committee may award Restricted Shares to any eligible Grantee, including under Section 102 of the Ordinance. Each Award of Restricted Shares under this Plan shall be evidenced by a written agreement between the Company and the Grantee (the " **Restricted Share Agreement** "), in such form as the Committee shall from time to time approve. The Restricted Shares shall be subject to all applicable terms of this Plan, which in the case of Restricted Shares granted under Section 102 of the Ordinance shall include Section 7 hereof, and may be subject to any other terms that are not inconsistent with this Plan. The provisions of the various Restricted Shares Agreements entered into under this Plan need not be identical. The Restricted Share Agreement shall comply with and be subject to Section 6 with the necessary changes, and the following terms and conditions, unless otherwise specifically provided in such Agreement and not inconsistent with this Plan, or Applicable Law:

9.1    Purchase Price . Section 6.4 shall not apply. Each Restricted Share Agreement shall state an amount of Exercise Price to be paid by the Grantee, if any, in consideration for the issuance of the Restricted Shares and the terms of payment thereof, which may include payment in cash or, subject to the Committee's approval, by issuance of promissory notes or other evidence of indebtedness on such terms and conditions as determined by it.

9.2    Restrictions . Restricted Shares may not be sold, assigned, transferred, pledged, hypothecated or otherwise disposed of, except by will or the laws of descent and distribution (in which case, they shall be transferred subject to all restrictions then or thereafter applicable thereto), until such Restricted Shares shall have vested (the period from the date on which the Award is granted until the date of vesting of the Restricted Share thereunder being referred to herein as the " **Restricted Period** "). The Committee may also impose such additional or alternative restrictions and conditions on the Restricted Shares, as it deems appropriate, including the satisfaction of performance criteria. Such performance criteria may include, but are not limited to, sales, earnings before interest and taxes, return on investment, earnings per share, any combination of the foregoing or rate of growth of any of the foregoing, as determined by the Committee or pursuant to the provisions of any Company policy required under mandatory provisions of Applicable Law. Certificates for shares issued pursuant to Restricted Share Awards, if issued, shall bear an appropriate legend referring to such restrictions, and any attempt to dispose of any such shares in contravention of such restrictions shall be null and void and without effect. Such certificates may, if so determined by the Committee, be held in escrow by an escrow agent appointed by the Committee, or, if a Restricted Share Award is made pursuant to Section 102 of the Ordinance, by the Trustee. In determining the Restricted Period of an Award the Committee may provide that the foregoing restrictions shall lapse with respect to specified percentages of the awarded Restricted Shares on successive anniversaries of the date of such Award. To the extent required by the Ordinance or the ITA, the Restricted Shares issued pursuant to Section 102 of the Ordinance shall be issued to the Trustee in accordance with the provisions of the Ordinance and the Restricted Shares shall be held for the benefit of the Grantee for at least the Required Holding Period.

9.3    Forfeiture; Repurchase . Subject to such exceptions as may be determined by the Committee, if the Grantee's continuous employment with or service to the Company or any Affiliate thereof shall terminate for any reason prior to the expiration of the Restricted Period of an Award or prior to the timely payment in full of the Exercise Price of any Restricted Shares, any Shares remaining subject to vesting or with respect to which the purchase price has not been paid in full, shall thereupon be forfeited, transferred to, and redeemed,

repurchased or canceled by, as the case may be, in any manner as set forth in Section 6.6, subject to Applicable Laws and the Grantee shall have no further rights with respect to such Restricted Shares.

9.4 <u>Ownership</u> . During the Restricted Period the Grantee shall possess all incidents of ownership of such Restricted Shares, subject to Section 6.9 and Section 9.2, including the right to vote and receive dividends with respect to such Shares and with respect to 102 Awards, all in accordance with the provisions of Section 102 and the Rules. All securities, if any, received by a Grantee with respect to Restricted Shares as a result of any stock split, stock dividend, combination of shares, or other similar transaction shall be subject to the restrictions applicable to the original Award.

## 10. <u>RESTRICTED SHARE UNITS</u> .

An RSU is an Award covering a number of Shares that is settled, if vested and (if applicable) exercised, by issuance of those Shares. An RSU may be awarded to any eligible Grantee, including under Section 102 of the Ordinance, *provided that* , to the extent required by Applicable Laws, a ruling is obtained from the ITA to grant RSUs as 102 Trustee Awards. The Award Agreement relating to the grant of RSUs under this Plan (the " **Restricted Share Unit Agreement** "), shall be in such form as the Committee shall from time to time approve. The RSUs shall be subject to all applicable terms of this Plan, which in the case of RSUs granted under Section 102 of the Ordinance shall include Section 9 hereof, and may be subject to any other terms that are not inconsistent with this Plan. The provisions of the various Restricted Share Unit Agreements entered into under this Plan need not be identical. RSUs may be granted in consideration of a reduction in the recipient's other compensation.

10.1 <u>Exercise Price</u> . No payment of Exercise Price shall be required as consideration for RSUs, unless included in the Award Agreement or as required by Applicable Law (including, Section 304 of the Companies Law, 1999, as amended), and Section 6.4 shall apply, if applicable.

10.2 <u>Shareholders' Rights</u> . The Grantee shall not possess or own any ownership rights in the Shares underlying the RSUs and no rights as a shareholder shall exist prior to the actual issuance of Shares in the name of the Grantee. No rights as a shareholder shall exist prior to the actual issuance of Shares in the name of the Trustee, in case of 102 Trustee Awards.

10.3 <u>Settlements of Awards</u> . Settlement of vested RSUs shall be made in the form of Shares. Distribution to a Grantee of an amount (or amounts) from settlement of vested RSUs can be deferred to a date after settlement as determined by the Committee and is further subject to the provisions of Section 16. The amount of a deferred distribution may be increased by an interest factor or by dividend equivalents. Until the grant of RSUs is settled, the number of Shares underlying such RSUs shall be subject to adjustment pursuant hereto.

## 11. <u>OTHER SHARE OR SHARE-BASED AWARDS</u> .

11.1 The Committee may grant other Awards under this Plan pursuant to which Shares (which may, but need not, be Restricted Shares pursuant to Section 9 hereof), cash (in settlement of Share-based Awards) or a combination thereof, are or may in the future be acquired or received, or Awards denominated in stock units, including units valued on the basis of measures other than market value.

11.2 The Committee may also grant stock appreciation rights without the grant of an accompanying option, which rights shall permit the Grantees to receive, at the time of any exercise of such rights, cash equal to the amount by which the Fair Market Value of the Shares in respect to which the right is so exercised exceed the exercise price thereof.

11.3     Such other Share-based Awards as set forth above may be granted alone, in addition to, or in tandem with any Award of any type granted under this Plan.

## 12.    **EFFECT OF CERTAIN CHANGES** .

12.1     <u>General</u> . In the event of a division or subdivision of the outstanding share capital of the Company, any distribution of bonus shares (stock split), consolidation or combination of share capital of the Company (reverse stock split), reclassification with respect to the Shares or any similar recapitalization events (each, a " **Recapitalization** "), a merger (including a reverse merger and a reverse triangular merger), consolidation, amalgamation or like transaction of the Company with or into another corporation, a reorganization (which may include a combination or exchange of shares, spin-off or other corporate divestiture or division or other similar occurrences), the Committee shall have the authority to make, without the need for a consent of any holder of an Award, such adjustments as determined by the Committee to be appropriate, in its discretion, in order to adjust (i) the number and class of shares reserved and available for grants of Awards, (ii) the number and class of shares covered by outstanding Awards, (iii) the Exercise Price per share covered by any Award, (iv) the terms and conditions concerning vesting and exercisability and the term and duration of the outstanding Awards, and (v) any other terms of the Award that in the opinion of the Committee should be adjusted. Any fractional shares resulting from such adjustment shall be treated as determined by the Committee, and in the absence of such determination shall be rounded to the nearest whole share, and the Company shall have no obligation to make any cash or other payment with respect to such fractional shares. No adjustment shall be made by reason of the distribution of subscription rights or rights offering to outstanding shares or other issuance of shares by the Company, unless the Committee determines otherwise. The adjustments determined pursuant to this Section 12.1 (including a determination that no adjustment is to be made) shall be final, binding and conclusive.

12.2     <u>Change in Control</u> . In the event of (i) a sale of all or substantially all of the assets of the Company, or a sale (including an exchange) of all or substantially all of the shares of the Company, to any person, or a purchase by a shareholder of the Company or by an Affiliate of such shareholder, of all or substantially all the shares of the Company held by all or substantially all other shareholders or by other shareholders who are not Affiliated with such acquiring party; (ii) a merger (including, a reverse merger and a reverse triangular merger), consolidation, amalgamation or like transaction of the Company with or into another corporation; (iii) a scheme of arrangement for the purpose of effecting such sale, merger, consolidation, amalgamation or other transaction; (iv) Change in Board Event; (v) approval by the shareholders of the Company of a complete liquidation or dissolution of the Company; or (vi) such other transaction or set of circumstances that is determined by the Board (being the Incumbent Board in case of a Change in Board Event), in its discretion, to be a transaction subject to the provisions of this Section 12.2; excluding any of the above transactions in clauses (i) through (v) if the Board (being the Incumbent Board in case of a Change in Board Event) determines that such transaction should be excluded from the definition hereof and the applicability of this Section 12.2 (any of such transactions, a " **Change in Control** "), then, without derogating from the general authority and power of the Board or the Committee under this Plan, without the Grantee's consent and action and without any prior notice requirement:

12.2.1     Unless otherwise determined by the Committee in its sole and absolute discretion, any Award then outstanding shall be assumed or be substituted by the Company, or by the successor corporation in such Change in Control or by any Affiliate thereof, as determined by the Committee in its discretion (the " **Successor Corporation** "), under terms as determined by the Committee or the terms of this Plan applied by the Successor Corporation to such assumed or substituted Awards.

For the purposes of this Section 12.2.1, the Award shall be considered assumed or substituted if, following a Change in Control, the Award confers on the holder thereof the right to purchase or

19

receive, for each Share underlying an Award immediately prior to the Change in Control, either (i) the consideration (whether stock, cash, or other securities or property, or any combination thereof) distributed to or received by holders of Shares in the Change in Control for each Share held on the effective date of the Change in Control (and if holders were offered a choice or several types of consideration, the type of consideration as determined by the Committee), or (ii) regardless of the consideration received by the holders of Shares in the Change in Control, solely shares or any type of awards (or their equivalent) of the Successor Corporation at a value to be determined by the Committee in its discretion, or a certain type of consideration (whether stock, cash, or other securities or property, or any combination thereof) as determined by the Committee. Any of the above consideration referred to in clauses (i) and (ii) may be subject to vesting, expiration and other terms as determined by the Committee in its discretion and may differ from the vesting, expiration and other terms applying on the Awards immediately prior to the Change in Control. The foregoing shall not limit the Committee's authority to determine, in its sole discretion, that in lieu of such assumption or substitution of Awards for Awards of the Successor Corporation, such Award will be substituted for any other type of asset or property, including as set forth in Section 12.2.2 hereunder.

12.2.2    Regardless of whether or not Awards are assumed or substituted the Committee may (but shall not be obligated to), in its sole discretion:

12.2.2.1    Provide for the Grantee to have the right to exercise the Award or otherwise for the acceleration of vesting of the Award in respect of all or part of the Shares covered by the Award which would not otherwise be exercisable or vested, under such terms and conditions as the Committee shall determine, and the cancellation of all unexercised (whether vested or unvested) Awards upon or immediately prior to the closing of the Change in Control; and/or

12.2.2.2    Provide for the cancellation of each outstanding and unexercised Awards at or immediately prior to the closing of such Change in Control, and payment to the Grantee of an amount in cash, shares of the Company, the acquirer or of a corporation or other business entity which is a party to the Change in Control or other property, as determined by the Committee to be fair in the circumstances, and subject to such terms and conditions as determined by the Committee. The Committee shall have full authority to select the method for determining the payment (being the Black-Scholes model or any other method). The Committee's determination may further provide that payment shall be set to zero (0) if the value of the Shares is determined to be less than the Exercise Price or in respect of Shares covered by the Award which would not otherwise be exercisable or vested, or that payment may be made only in excess of the Exercise Price.

12.2.3    The Committee may determine that any payments made in respect of Awards shall be made or delayed to the same extent that payment of consideration to the holders of the Shares in connection with the Change in Control is made or delayed as a result of escrows, indemnification, earn-outs, holdbacks or any other contingencies; and the terms and conditions applying to the payment made to the Grantees, including participation in escrow, indemnification, releases, earn-outs, holdbacks or any other contingencies.

12.2.4    Notwithstanding the foregoing, in the event of a Change in Control, the Committee may determine, in its sole discretion, that upon completion of such Change in Control, the terms of any Award shall be otherwise amended, modified or terminated, as the Committee shall deem in good faith to be appropriate and without any liability to the Company or its Affiliates and to their respective officers, directors, employees and representatives, and the respective successors and

assigns of any of the foregoing, in connection with the method of treatment or chosen course of action permitted hereunder.

12.2.5    Neither the authorities and powers of the Committee under this Section 12.2, nor the exercise or implementation thereof, shall (i) be restricted or limited in any way by any adverse consequences (tax or otherwise) that may result to any holder of an Award, and (ii) as, *inter alia* , being a feature of the Award upon its grant, be deemed to constitute a change or an amendment of the rights of such holder under this Plan, nor shall any such adverse consequences (as well as any adverse tax consequences that may result from any tax ruling or other approval or determination of any relevant tax authority) be deemed to constitute a change or an amendment of the rights of such holder under this Plan, and may be effected without consent of any Grantee and without any liability to the Company or its Affiliates and to their respective officers, directors, employees and representatives and the respective successors and assigns of any of the foregoing. The Committee need not take the same action with respect to all Awards or with respect to all Service Providers. The Committee may take different actions with respect to the vested and unvested portions of an Award. The Committee may determine an amount or type of consideration to be received or distributed in a Change in Control which may differ as among the Grantees, and as between the Grantees and any other holders of shares of the Company.

12.2.6    The Committee's determinations pursuant to this Section 12 shall be conclusive and binding on all Grantees.

12.2.7    If determined by the Committee, the Grantees shall be subject to the definitive agreement(s) in connection with the Change in Control as applying to holders of Shares including such terms, conditions, representations, undertakings, liabilities, limitations, releases, indemnities and participation in transaction expenses and escrow arrangements, in each case, as determined by the Committee. Each Grantee shall execute (and authorizes any person designated by the Company to so execute) such separate agreement(s) or instruments as may be requested by the Company, the Successor Corporation or the acquirer in connection with such Change in Control and in the form required by them. The execution of such separate agreement(s) may be a condition to the receipt of assumed or substituted Awards, payment in lieu of the Award or the exercise of any Award.

12.3    Reservation of Rights . Except as expressly provided in this Section 12 (if any), the Grantee of an Award hereunder shall have no rights by reason of any Recapitalization of shares of any class, any increase or decrease in the number of shares of any class, or any dissolution, liquidation, reorganization (which may include a combination or exchange of shares, spin-off or other corporate divestiture or division, or other similar occurrences) or Change in Control. Any issue by the Company of shares of any class, or securities convertible into shares of stock of any class, shall not affect, and no adjustment by reason thereof shall be made with respect to the number, type or price of shares subject to an Award. The grant of an Award pursuant to this Plan shall not affect in any way the right or power of the Company to make adjustments, reclassifications, reorganizations or changes of its capital or business structures or to merge or to consolidate or to dissolve, liquidate or sell, or transfer all or part of its business or assets or engage in any similar transactions.

## 13.    **NON-TRANSFERABILITY OF AWARDS; SURVIVING BENEFICIARY** .

13.1    All Awards granted under this Plan by their terms shall not be transferable other than by will or by the laws of descent and distribution, unless otherwise determined by the Committee or under this Plan, *provided that* with respect to Shares issued upon exercise or (if applicable) the vesting of Awards, the restrictions on transfer shall be the restrictions referred to in Section 14 hereof. Subject to the above provisions,

the terms of such Award, this Plan and any applicable Award Agreement shall be binding upon the beneficiaries, executors, administrators, heirs and successors of such Grantee. Awards may be exercised or otherwise realized during the lifetime of the Grantee, only by the Grantee or by his guardian or legal representative, to the extent provided for herein. Any transfer of an Award not permitted hereunder (including transfers pursuant to any decree of divorce, dissolution or separate maintenance, any property settlement, any separation agreement or any other agreement with a spouse) and any grant of any interest in any Award to, or creation in any way of any direct or indirect interest in any Award by any party other than the Grantee shall be null and void and shall not confer upon any party or person, other than the Grantee, any rights. A Grantee may file with the Committee a written designation of a beneficiary, who shall be permitted to exercise such Grantee's Award or to whom any benefit under this Plan is to be paid, in each case, in the event of the Grantee's death before he or she fully exercises his or her Award or receives any or all of such benefit, on such form as may be prescribed by the Committee and may, from time to time, amend or revoke such designation. If no designated beneficiary survives the Grantee, the executor or administrator of the Grantee's estate shall be deemed to be the Grantee's beneficiary. Notwithstanding the foregoing, upon the request of the Grantee and subject to Applicable Law, the Committee, at its sole discretion, may permit the Grantee to transfer the Award to a trust whose beneficiaries are the Grantee and/or the Grantee's immediate family members (all or several of them).

13.2    As long as the Shares are held by the Trustee or the Representative in favor of the Grantee, all rights possessed by the Grantee over the Shares are personal, and may not be transferred, assigned, pledged or mortgaged, other than by will or laws of descent and distribution.

13.3    The provisions of this Section 13 shall apply to the Grantee and to any purchaser, assignee or transferee of any Shares.

## 14.    **CONDITIONS UPON ISSUANCE OF SHARES; GOVERNING PROVISIONS** .

14.1    <u>Legal Compliance</u> . The grant of Awards and the issuance of Shares upon exercise or settlement of Awards shall be subject to compliance with all Applicable Laws as determined by the Company, including applicable requirements of federal, state and foreign law with respect to such securities. The Company shall have no obligations to issue Shares pursuant to the exercise or settlement of an Award and Awards may not be exercised or settled if the issuance of Shares upon exercise or settlement would constitute a violation of any Applicable Laws as determined by the Company, including applicable federal, state or foreign securities laws or other law or regulations or the requirements of any stock exchange or market system upon which the Shares may then be listed. In addition, no Award may be exercised unless (i) a registration statement under the Securities Act or equivalent laws of other applicable jurisdictions shall at the time of exercise or settlement of the Award be in effect with respect to the shares issuable upon exercise of the Award, or (ii) in the opinion of legal counsel to the Company, the shares issuable upon exercise of the Award may be issued in accordance with the terms of an applicable exemption from the registration requirements of the Securities Act or equivalent laws of other applicable jurisdictions. The inability of the Company to obtain authority from any regulatory body having jurisdiction, if any, deemed by the Company to be necessary to the lawful issuance and sale of any Shares hereunder, and the inability to issue Shares hereunder due to non-compliance with any Company policies with respect to the sale of Shares, shall relieve the Company of any liability in respect of the failure to issue or sell such Shares as to which such requisite authority or compliance shall not have been obtained or achieved. As a condition to the exercise of an Award, the Company may require the person exercising such Award to satisfy any qualifications that may be necessary or appropriate, to evidence compliance with any Applicable Law or regulation and to make any representation or warranty with respect thereto as may be requested by the Company, including to represent and warrant

at the time of any such exercise that the Shares are being purchased only for investment and without any present intention to sell or distribute such Shares, all in form and content specified by the Company.

14.2     Provisions Governing Shares . Shares issued pursuant to an Award shall be subject to the Articles of Association of the Company, any limitation, restriction or obligation included in any shareholders' agreement applicable to all or substantially all of the holders of shares (regardless of whether or not the Grantee is a formal party to such shareholders' agreement), any other governing documents of the Company, all policies, manuals and internal regulations adopted by the Company from time to time, in each case, as may be amended from time to time, including any provisions included therein concerning restrictions or limitations on disposition of Shares (such as, but not limited to, right of first refusal and lock up/market stand-off) or grant of any rights with respect thereto, forced sale and bring-along provisions, any provisions concerning restrictions on the use of inside information and other provisions deemed by the Company to be appropriate in order to ensure compliance with Applicable Laws. Each Grantee shall execute (and authorizes any person designated by the Company to so execute) such separate agreement(s) as may be requested by the Company relating to matters set forth in this Section 14.2. The execution of such separate agreement(s) may be a condition by the Company to the grant and/or exercise of any Award.

14.3     Forced Sale . In the event that the Board approves a Change in Control effected by way of a forced or compulsory sale (whether pursuant to the Company's Articles of Association or pursuant to Section 341 of the Companies Law), then, without derogating from such provisions and in addition thereto, the Grantee shall be obligated, and shall be deemed to have agreed to the offer to effect the Change in Control on the terms approved by the Board (and the Shares held by or for the benefit of the Grantee shall be included in the shares of the Company approving the terms of such Change in Control for the purpose of satisfying the required majority), and shall sell all of the Shares held by or for the benefit of the Grantee on the terms and conditions applying to the holders of Shares, in accordance with the instructions then issued by the Board, whose determination shall be final. No Grantee shall contest, bring any claims or demands, or exercise any appraisal rights related to any of the foregoing. The proxy pursuant to Section 6.9 includes an authorization of the holder of such proxy to sign, by and on behalf of any Grantee, such documents and agreements as are required to affect the sale of Shares in connection with such Change in Control.

14.4     Share Transfer Restrictions . Any transfer or other disposition of Shares or any interest therein is subject to the prior approval of the Committee, which, if granted (without any obligation to do so), may be subject to such terms, conditions and restrictions as it deems appropriate. The terms, conditions and restrictions of any approval may differ from one Grantee to another, and need not be the same. Any transfer or otherwise grant of any interest in any Shares to any third party that does not comply with this Section 14.4 shall be null and void and shall not confer upon any person, other than the Grantee, any rights. This Section 14.4 shall terminate immediately after the IPO. This Section 14.4 shall apply in addition to any other limitation, restriction and/or condition in this Plan (including, without limitation, after the application of Section 14), any Award Agreement, shareholders agreement, Company's Articles of Association or other instrument between the Grantee and the Company or by which the Grantee is bound. This Section 14.4 shall not apply to a transfer of Shares in a sale of all or substantially all of the shares of the Company which was approved by the Board or pursuant to the Company's Articles of Association or upon a Change in Control.

## 15.     **MARKET STAND-OFF** .

15.1     In connection with any underwritten public offering of equity securities of the Company pursuant to an effective registration statement filed under the Securities Act or equivalent law in another jurisdiction, the Grantee shall not directly or indirectly, without the prior written consent of the Company or its underwriters, (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose

of, directly or indirectly, any Shares or other Awards, any securities of the Company (whether or not such Shares were acquired under this Plan), or any securities convertible into or exercisable or exchangeable (directly or indirectly) for Shares or securities of the Company and any other shares or securities issued or distributed in respect thereto or in substitution thereof (collectively, " **Securities** "), or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the Securities, whether any such transaction described in clauses (i) or (ii) is to be settled by delivery of Securities, in cash or otherwise. The foregoing provisions of this Section 15 shall not apply to the sale of any shares to an underwriter pursuant to an underwriting agreement. Such restrictions (the " **Market Stand-Off** ") shall be in effect for such period of time (the " **Market Stand-Off Period** "): (A) following the first public filing of the registration statement relating to the underwritten public offering until the extirpation of one hundred eighty (180) days following the effective date of such registration statement relating to the IPO or ninety (90) days following the effective date of such registration statement relating to any other public offering, in each case, *provided* , *however* , that if (1) during the last seventeen (17) days of the initial Market Stand-Off Period, the Company releases earnings results or announces material news or a material event or (2) prior to the expiration of the initial Market Stand-Off Period, the Company announces that it will release earnings results during the fifteen (15) day period following the last day of the initial Market Stand-Off Period, then, in each case, the Market Stand-Off Period will be automatically extended until the expiration of the eighteen (18) day period beginning on the date of release of the earnings results or the announcement of the material news or material event; or (B) such other period as shall be requested by the Company or the underwriters. Notwithstanding anything herein to the contrary, if the underwriter(s) and the Company agree on a termination date of the Market Stand-Off Period in the event of failure to consummate a certain public offering, then such termination shall apply also to the Market Stand-Off Period hereunder with respect to that particular public offering.

15.2    In the event of a subdivision of the outstanding share capital of the Company, the distribution of any securities (whether or not of the Company), whether as bonus shares or otherwise, and whether as dividend or otherwise, a recapitalization, a reorganization (which may include a combination or exchange of shares or a similar transaction affecting the Company's outstanding securities without receipt of consideration), a consolidation, a spin-off or other corporate divestiture or division, a reclassification or other similar occurrence, any new, substituted or additional securities which are by reason of such transaction distributed with respect to any Shares subject to the Market Stand-Off, or into which such Shares thereby become convertible, shall immediately be subject to the Market Stand-Off.

15.3     In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Shares acquired under this Plan until the end of the applicable Market Stand-Off period.

15.4     The underwriters in connection with a registration statement so filed are intended third-party beneficiaries of this Section 15 and shall have the right, power and authority to enforce the provisions hereof as though they were a party hereto. Without derogating from the provisions of this Section 15 and their applicability to the Grantees, each Grantee shall execute (and authorizes any person designated by the Company to so execute) such separate agreement(s) as may be requested by the Company or the underwriters in connection with such registration statement and in the form required by them, relating to Market Stand-Off (which need not be identical to the provisions of this Section 15, and may include such additional provisions and restrictions as the underwriters deem advisable) or that are necessary to give further effect thereto. The execution of such separate agreement(s) may be a condition by the Company to the exercise of any Award.

15.5     Without derogating from the above provisions of this Section 15 or elsewhere in this Plan, the provisions of this Section 15 shall apply to the Grantee and the Grantee's heirs, legal representatives, successors, assigns, and to any purchaser, assignee or transferee of any Awards or Shares.

24

**16.    AGREEMENT REGARDING TAXES; DISCLAIMER** .

16.1    <u>TAX LIABILITY</u> . ALL TAX CONSEQUENCES UNDER ANY APPLICABLE LAW WHICH MAY ARISE FROM THE GRANT OF ANY AWARDS OR THE EXERCISE THEREOF, THE SALE OR DISPOSITION OF ANY SHARES GRANTED HEREUNDER OR ISSUED UPON EXERCISE OR (IF APPLICABLE) THE VESTING OF ANY AWARD, THE ASSUMPTION, SUBSTITUTION, CANCELLATION OR PAYMENT IN LIEU OF AWARDS OR FROM ANY OTHER ACTION IN CONNECTION WITH THE FOREGOING (INCLUDING, WITHOUT LIMITATION, ANY TAXES AND COMPULSORY PAYMENTS, SUCH AS SOCIAL SECURITY OR HEALTH TAX PAYABLE BY THE GRANTEE OR THE COMPANY IN CONNECTION THEREWITH) SHALL BE BORNE AND PAID SOLELY BY THE GRANTEE, AND THE GRANTEE SHALL INDEMNIFY THE COMPANY, ITS AFFILIATES, THE TRUSTEE AND THE REPRESENTATIVE, AND SHALL HOLD THEM HARMLESS AGAINST AND FROM ANY LIABILITY FOR ANY SUCH TAX OR PAYMENT OR ANY PENALTY, INTEREST OR INDEXATION THEREON. EACH GRANTEE AGREES TO, AND UNDERTAKES TO COMPLY WITH, ANY RULING, SETTLEMENT, CLOSING AGREEMENT OR OTHER SIMILAR AGREEMENT OR ARRANGEMENT WITH ANY TAX AUTHORITY IN CONNECTION WITH THE FOREGOING WHICH IS APPROVED BY THE COMPANY.

16.2    <u>NO TAX ADVICE</u> . THE GRANTEE IS ADVISED TO CONSULT WITH A TAX ADVISOR WITH RESPECT TO THE TAX CONSEQUENCES OF RECEIVING, EXERCISING OR DISPOSING OF AWARDS HEREUNDER. THE COMPANY DOES NOT ASSUME ANY RESPONSIBILITY TO ADVISE THE GRANTEE ON SUCH MATTERS, WHICH SHALL REMAIN SOLELY THE RESPONSIBILITY OF THE GRANTEE, AND NO INFORMATION PROVIDED BY THE COMPANY, ITS AFFILIATES, THE TRUSTEE OR THE REPRESENTATIVE AND ANY PERSONS ASSOCIATED WITH ANY OF THE FOREGOING, IN CONNECTION WITH THIS PLAN SHALL BE DEEMED TO BE TAX ADVICE TO THE GRANTEE.

16.3    <u>TAX TREATMENT</u> . THE COMPANY DOES NOT UNDERTAKE OR ASSUME ANY LIABILITY OR RESPONSIBILITY TO THE EFFECT THAT ANY AWARD SHALL QUALIFY WITH ANY PARTICULAR TAX REGIME OR RULES APPLYING TO PARTICULAR TAX TREATMENT, OR BENEFIT FROM ANY PARTICULAR TAX TREATMENT OR TAX ADVANTAGE OF ANY TYPE AND THE COMPANY SHALL BEAR NO LIABILITY IN CONNECTION WITH THE MANNER IN WHICH ANY AWARD IS EVENTUALLY TREATED FOR TAX PURPOSES, REGARDLESS OF WHETHER THE AWARD WAS GRANTED OR WAS INTENDED TO QUALIFY UNDER ANY PARTICULAR TAX REGIME OR TREATMENT. THIS PROVISION SHALL SUPERSEDE ANY TYPE OF AWARDS OR TAX QUALIFICATION INDICATED IN ANY CORPORATE RESOLUTION OR AWARD AGREEMENT, WHICH SHALL AT ALL TIMES BE SUBJECT TO THE REQUIREMENTS OF APPLICABLE LAW. THE COMPANY DOES NOT UNDERTAKE AND SHALL NOT BE REQUIRED TO TAKE ANY ACTION IN ORDER TO QUALIFY THE AWARD WITH THE REQUIREMENT OF ANY PARTICULAR TAX TREATMENT. NO INDICATION IN ANY DOCUMENT TO THE EFFECT THAT ANY AWARD IS INTENDED TO QUALIFY FOR ANY TAX TREATMENT SHALL IMPLY SUCH AN UNDERTAKING. NO ASSURANCE IS MADE BY THE COMPANY OR ANY OF ITS AFFILIATES THAT ANY PARTICULAR TAX TREATMENT ON THE DATE OF GRANT WILL CONTINUE TO EXIST OR THAT THE AWARD WOULD QUALIFY AT THE TIME OF GRANT, EXERCISE OR DISPOSITION THEREOF WITH ANY PARTICULAR TAX TREATMENT. THE COMPANY AND ITS AFFILIATES SHALL NOT HAVE ANY LIABILITY OR OBLIGATION OF ANY NATURE IN THE EVENT THAT AN AWARD DOES NOT QUALIFY FOR ANY PARTICULAR TAX TREATMENT, REGARDLESS OF WHETHER THE COMPANY COULD HAVE OR SHOULD HAVE TAKEN ANY ACTION TO CAUSE SUCH QUALIFICATION TO BE MET AND SUCH QUALIFICATION REMAINS AT ALL TIMES AND UNDER ALL CIRCUMSTANCES AT THE RISK OF THE GRANTEE. THE

COMPANY DOES NOT UNDERTAKE OR ASSUME ANY LIABILITY TO CONTEST A DETERMINATION OR INTERPRETATION (WHETHER WRITTEN OR UNWRITTEN) OF ANY TAX AUTHORITIES, INCLUDING IN RESPECT OF THE QUALIFICATION UNDER ANY PARTICULAR TAX REGIME OR RULES APPLYING TO PARTICULAR TAX TREATMENT. IF THE AWARDS DO NOT QUALIFY UNDER ANY PARTICULAR TAX TREATMENT, IT COULD RESULT IN ADVERSE TAX CONSEQUENCES TO THE GRANTEE.

16.4     If the Company shall so require, as a condition of exercise of an Award, the release of Shares by the Trustee or the Representative (as applicable) or the expiration of the Required Holding Period, the Grantee will, no later than the date of such occurrence, pay to the Company (or the Trustee, or the Representative, as applicable) or make arrangements satisfactory to the Company, the Representative and the Trustee (if applicable) regarding payment of any applicable taxes and compulsory payments of any kind required by Applicable Law to be withheld or paid. The Company, any Affiliate thereof, the Trustee or the Representative (as applicable) may take such action as it may deem necessary or appropriate, in its discretion, for the purpose of or in connection with the withholding of any taxes and compulsory payments which the Trustee, the Company or any Affiliate thereof, or the Representative (as applicable) is required by any Applicable Law to withhold in connection with any Awards (collectively, " **Withholding Obligations** "). Such actions may include (i) requiring a Grantee to remit in cash an amount sufficient to satisfy such Withholding Obligations and any other taxes and compulsory payments, payable by the Company any Affiliate thereof, the Trustee and the Representative (as applicable) in connection with the Award or the exercise or (if applicable) the vesting thereof; (ii) deducting (or authorizing to deduct) an amount sufficient to satisfy such Withholding Obligations from any compensation otherwise payable to a Grantee by the Company or its Affiliate, whether or not under the Plan; (iii) allowing the Grantees to provide Shares to the Company, the Trustee or the Representative (as applicable), in an amount that, at such time, reflects a value sufficient to satisfy such Withholding Obligations; (iv) withholding Shares otherwise issuable upon the exercise of an Award sufficient to satisfy such Withholding Obligations; or (v) any combination of the foregoing. The Company shall not be obligated to allow the exercise of any Award by or on behalf of a Grantee until all tax consequences arising from the exercise of such Award are resolved in a manner acceptable to the Company.

16.5     Each Grantee shall notify the Company in writing promptly and in any event within ten (10) days after the date on which such Grantee first obtains knowledge of any tax bureau inquiry, audit, assertion, determination, investigation, or question relating in any manner to the Awards granted or received hereunder or Shares issued thereunder and shall continuously inform the Company of any developments, proceedings, discussions and negotiations relating to such matter, and shall allow the Company and its representatives to participate in any proceedings and discussions concerning such matters. Upon request, a Grantee shall provide to the Company any information or document relating to any matter described in the preceding sentence, which the Company, in its discretion, requires.

16.6     For the purpose hereof "tax(es)" means (a) all federal, state, local or foreign taxes, charges, fees, imposts, levies or other assessments, including all income, capital gains, transfer, withholding, payroll, employment, social security, national security, health tax, wealth surtax, stamp, registration and estimated taxes, customs duties, fees, assessments and charges of any similar kind whatsoever, (b) all interest, indexation differentials, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with any item described in clause (a), (c) any transferee or successor liability in respect of any items described in clauses (a) or (b) payable by reason of contract, assumption, transferee liability, successor liability, operation of Applicable Law, or as a result of any express or implied obligation to assume taxes or to indemnify any other person, and (d) any liability for the payment of any amounts of the type described in clause (a) or (b) payable as a result of being a member of an affiliated, consolidated, combined, unitary or aggregate group for any taxable period, or otherwise.

**17.** **RIGHTS AS A SHAREHOLDER; VOTING AND DIVIDENDS** .

17.1    Subject to Section 9.4, a Grantee shall have no rights as a shareholder of the Company with respect to any Shares covered by an Award until the Grantee shall have exercised the Award, paid the Exercise Price therefor and become the record holder of the subject Shares. In the case of 102 Awards or 3(i) Awards (if such Awards are being held by a Trustee), the Trustee shall have no rights as a shareholder of the Company with respect to the Shares covered by such Award until the Trustee becomes the record holder for such Shares for the Grantee's benefit, and the Grantee shall not be deemed to be a shareholder and shall have no rights as a shareholder of the Company with respect to the Shares covered by the Award until the date of the release of such Shares from the Trustee to the Grantee and the transfer of record ownership of such Shares to the Grantee ( *provided* , *however* , that the Grantee shall be entitled to receive from the Trustee any cash dividend or distribution made on account of the Shares held by the Trustee for such Grantee's benefit, subject to any tax withholding and compulsory payment). No adjustment shall be made for dividends (ordinary or extraordinary, whether in cash, securities or other property) or distribution of other rights for which the record date is prior to the date on which the Grantee or Trustee (as applicable) becomes the record holder of the Shares covered by an Award, except as provided in Section 12 hereof.

17.2    With respect to all Awards issued in the form of Shares hereunder or upon the exercise or (if applicable) the vesting of Awards hereunder, any and all voting rights attached to such Shares shall be subject to Section 6.9, and the Grantee shall be entitled to receive dividends distributed with respect to such Shares, subject to the provisions of the Company's Articles of Association, as amended from time to time, and subject to any Applicable Law.

17.3    The Company may, but shall not be obligated to, register or qualify the sale of Shares under any applicable securities law or any other Applicable Law.

**18.** **NO REPRESENTATION BY COMPANY** .

By granting the Awards, the Company is not, and shall not be deemed as, making any representation or warranties to the Grantee regarding the Company, its business affairs, its prospects or the future value of its Shares. The Company shall not be required to provide to any Grantee any information, documents or material in connection with the Grantee's considering an exercise of an Award. To the extent that any information, documents or materials are *provided* , the Company shall have no liability with respect thereto. Any decision by a Grantee to exercise an Award shall solely be at the risk of the Grantee.

**19.** **NO EMPLOYMENT OR RETENTION RIGHTS** .

Nothing in this Plan, any Award Agreement or in any Award granted or agreement entered into pursuant hereto shall confer upon any Grantee the right to be (or be treated as) an employee of, or continue in the employ of, or be in the service of the Company or any Affiliate thereof as a Service Provider or to be entitled to any remuneration or benefits not set forth in this Plan or such agreement, or to interfere with or limit in any way the right of the Company or any such Affiliate to terminate such Grantee's employment or service (including any right of the Company or any of its Affiliates to immediately cease the Grantee's employment or service or to shorten all or part of the notice period, regardless of whether notice of termination was given by the Company or its Affiliates or by the Grantee). Awards granted under this Plan shall not be affected by any change in duties or position of a Grantee, subject to Sections 6.6 through 6.8. No Grantee shall be entitled to claim, and the Grantee hereby waives any claim against the Company or any Affiliate thereof, that he or she was prevented from continuing to vest Awards as of the date of termination of his or her employment with, or services to, the Company or any Affiliate thereof. No Grantee shall be entitled to

any compensation in respect of the Awards which would have vested had such Grantee's employment or engagement with the Company (or any Affiliate thereof) not been terminated.

**20.** **PERIOD DURING WHICH AWARDS MAY BE GRANTED** .

Awards may be granted pursuant to this Plan from time to time within a period of ten (10) years from the Effective Date. From and after such date (as extended) no grants of Awards may be made and this Plan shall continue to be in full force and effect with respect to Awards or Shares issued thereunder that remain outstanding.

**21.** **AMENDMENT OF THIS PLAN AND AWARDS** .

21.1 The Board at any time and from time to time may suspend, terminate, modify or amend this Plan, whether retroactively or prospectively. Any amendment effected in accordance with this Section 21.1 shall be binding upon all Grantees and all Awards, whether granted prior to or after the date of such amendment, and without the need to obtain the consent of any Grantee. No termination or amendment of this Plan shall affect any then outstanding Award unless expressly *provided* by the Board.

21.2 The Board or the Committee at any time and from time to time may modify or amend any Award theretofore granted, including any Award Agreement, whether retroactively or prospectively.

**22.** **APPROVAL** .

22.1 This Plan shall take effect upon its adoption by the Board (the " **Effective Date** ").

22.2 102 Awards are conditional upon the filing with or approval by the ITA, if required, as set forth in Section 7.4. Failure to so file or obtain such approval shall not in any way derogate from the valid and binding effect of any grant of an Award, which is not a 102 Award.

**23.** **RULES PARTICULAR TO SPECIFIC COUNTRIES** .

Notwithstanding anything herein to the contrary, the terms and conditions of this Plan may be supplemented or amended with respect to a particular country or tax regime by means of an appendix to this Plan, and to the extent that the terms and conditions set forth in any appendix conflict with any provisions of this Plan, the provisions of such appendix shall govern. Terms and conditions set forth in such appendix shall apply only to Awards granted to Grantees under the jurisdiction of the specific country or such other tax regime that is the subject of such appendix, and solely for as long as such Awards and/or Grantees remain subject to such jurisdiction or regime, to the extent required under the same. The adoption of any such appendix shall be subject to the approval of the Board or the Committee, and if determined by the Committee to be required in connection with the application of certain tax treatment, pursuant to applicable stock exchange rules or regulations or otherwise, then also the approval of the shareholders of the Company at the required majority.

**24.** **GOVERNING LAW; JURISDICTION** .

This Plan and all determinations made and actions taken pursuant hereto shall be governed by the laws of the State of Israel, except with respect to matters that are subject to tax and securities laws, regulations and rules of any specific jurisdiction, which shall be governed by the respective laws, regulations and rules of such jurisdiction. Certain definitions, which refer to laws other than the laws of such jurisdiction, shall

be construed in accordance with such other laws. The competent courts located in Tel-Aviv-Jaffa, Israel, shall have exclusive jurisdiction over any dispute arising out of or in connection with this Plan and any Award granted hereunder. By signing any Award Agreement or any other agreement relating to an Award, each Grantee irrevocably submits to such exclusive jurisdiction.

**25.** <u>**NON-EXCLUSIVITY OF THIS PLAN**</u> .

The adoption of this Plan shall not be construed as creating any limitations on the power or authority of the Company to adopt such other or additional incentive or other compensation arrangements of whatever nature as the Company may deem necessary or desirable or preclude or limit the continuation of any other plan, practice or arrangement for the payment of compensation or fringe benefits to employees generally, or to any class or group of employees, which the Company or any Affiliate thereof now has lawfully put into effect, including any retirement, pension, savings and stock purchase plan, insurance, death and disability benefits and executive short-term or long-term incentive plans.

**26.** <u>**MISCELLANEOUS**</u> .

26.1     <u>Survival</u> . The Grantee shall be bound by and the Shares issued upon exercise or (if applicable) the vesting of any Awards granted hereunder shall remain subject to this Plan after the exercise or (if applicable) the vesting of Awards, in accordance with the terms of this Plan, whether or not the Grantee is then or at any time thereafter employed or engaged by the Company or any of its Affiliates.

26.2     <u>Additional Terms</u> . Each Award awarded under this Plan may contain such other terms and conditions not inconsistent with this Plan as may be determined by the Committee, in its sole discretion.

26.3     <u>Fractional Shares</u> . No fractional Share shall be issuable upon exercise or vesting of any Award and the number of Shares to be issued shall be rounded down to the nearest whole Share, with in any Share remaining at the last vesting date due to such rounding to be issued upon exercise at such last vesting date.

26.4     <u>Severability</u> . If any provision of this Plan, any Award Agreement or any other agreement entered into in connection with an Award shall be determined to be illegal or unenforceable by any court of law in any jurisdiction, the remaining provisions hereof and thereof shall be severable and enforceable in accordance with their terms, and all provisions shall remain enforceable in any other jurisdiction. In addition, if any particular provision contained in this Plan, any Award Agreement or any other agreement entered into in connection with an Award shall for any reason be held to be excessively broad as to duration, geographic scope, activity or subject, it shall be construed by limiting and reducing such provision as to such characteristic so that the provision is enforceable to fullest extent compatible with Applicable Law as it shall then appear.

26.5     <u>Captions and Titles</u> . The use of captions and titles in this Plan or any Award Agreement or any other agreement entered into in connection with an Award is for the convenience of reference only and shall not affect the meaning or interpretation of any provision of this Plan or such agreement.

26.6     <u>Non-certificated Shares</u> . To the extent that the Plan provides for issuance of certificates to reflect the transfer of Shares, the transfer of such Shares may nevertheless be effected on a non-certificated basis, to the extent not prohibited by Applicable Law or the rules of any stock exchange.

* * * * * *

# TUFIN SOFTWARE TECHNOLOGIES LTD.

## APPENDIX A - U.S.

## To The 2019 Equity Incentive Plan

## Adopted: March 21, 2019

(a) This Appendix (this " **US Appendix** ") is part of the 2019 Equity Incentive Plan (the " **Plan** ") adopted by **Tufin Software Technologies Ltd** . (the " **Company** "), and is effective as of March 21, 2019 (the " **Effective Date** ").

(b) This US Appendix governs grants of Awards by the Company to Service Providers who are United States citizens or who are resident aliens of the United States of America for United States federal income tax purposes.

(c) The purpose of this US Appendix is to establish certain rules and limitations applicable to Awards that may be granted to Service Providers from time to time, in compliance with Applicable Law (including securities laws). Except as otherwise provided by this US Appendix, all Awards granted pursuant to this US Appendix shall be governed by the terms of the Plan.

(d) The provisions of this US Appendix shall supersede and govern in the case of any inconsistency between the provisions of this US Appendix and the provisions of the Plan, *provided, however* , that this US Appendix shall not be construed to grant any rights not consistent with the terms of the Plan, unless specifically provided herein.

(e) Titles and headings of the Sections in this US Appendix are for convenience of reference only, and in the event of any conflict, the text of this US Appendix, rather than such titles or headings, shall prevail.

**1.** **Definitions** . Capitalized terms not otherwise defined herein shall have the meaning assigned to them in the Plan. The following additional definitions will apply to the grant of Awards made pursuant to this US Appendix:

" **Code** " means the U.S. Internal Revenue Code of 1986, and any applicable regulations promulgated thereunder, all as amended from time to time.

" **Disability** " means (i) the inability of a Grantee to engage in any substantial gainful activity or to perform the major duties of the Grantee's position with the Company or its Affiliates by reason of any medically determinable physical or mental impairment, as determined by a qualified doctor acceptable to the Company, that can be expected to last or has already lasted for a continuous period of which can be expected to result in death, or which has already lasted or can be expected to last for a continuous period of not less than twelve (12) months, (ii) if applicable, a "permanent and total disability" as defined in Section 22(e)(3) of the Code or Section 409A(a)(2)(c)(i) of the Code, as amended from time to time, or (iii) as defined in a policy of the Company that the Committee deems applicable to this Plan, or that makes reference to this Plan, for purposes of this definition.

" **Incentive Stock Option** " means an Option intended to qualify as an incentive stock option within the meaning of Section 422(b) of the Code.

" **Nonqualified Stock Option** " means an Option not intended to qualify as an Incentive Stock Option.

" **Parent** " means any company (other than the Company), which now exists or is hereafter organized, (i) in an unbroken chain of companies ending with the Company if, at the time of granting an Award, each of the companies (other than the Company) owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other companies in such chain, or (ii) if applicable and for purposes of Incentive Stock Options, that is a "parent corporation" of the Company, as defined in Section 424(e) of the Code.

" **Subsidiary** " means any company (other than the Company), which now exists or is hereafter organized or acquired by the Company, (i) in an unbroken chain of companies beginning with the Company if, at the time of granting an Award, each of the companies other than the last company in the unbroken chain owns stock possessing fifty percent (50%) or more of the total combined voting power of all classes of stock in one of the other companies in such chain, or (ii) if applicable and for purposes of Incentive Stock Options, that is a "subsidiary corporation" of the Company, as defined in Section 424(f) of the Code.

" **Ten Percent Shareholder** " means a Grantee who, at the time an Award is granted to the Grantee, owns shares possessing more than ten percent (10%) of the total combined voting power of all classes of shares of the Company or

any Parent or Subsidiary, within the meaning of Section 422(b)(6) of the Code.

**2.** **Grant of Options** . The awards of Options granted pursuant to the Plan and this US Appendix shall be treated as either Nonqualified Stock Options or Incentive Stock Options. To the extent that any Option is not designated as an Incentive Stock Option under the provisions of the Plan, this US Appendix and the Code, it shall be treated as a Nonqualified Stock Option.

**3.** **Incentive Stock Options** .

3.1     Maximum Number of Incentive Stock Options . Subject to the provisions of the Plan relating to the number of Shares reserved under the Plan, and the provisions relating to capitalization adjustments, the maximum number of Shares that may be delivered in the form of Incentive Stock Options granted under the Plan and this US Appendix shall be the number of Shares set forth in Section 5.1 of the Plan, as adjusted pursuant to Section 5.2 of the Plan. To the extent that an outstanding Incentive Stock Option expires or terminates or is cancelled or forfeited, the Shares subject to such Incentive Stock Option shall again be available for re-issuance under the Plan.

3.2     Eligibility for Incentive Stock Options . Incentive Stock Options may be granted only to Employees of the Company, or to Employees of a Parent or Subsidiary of the Company, that are considered employees for the purpose of Section 422 of the Code, determined as of the date of grant of such Options. An Incentive Stock Option granted to a prospective Employee upon the condition that such person become an Employee shall be deemed granted effective on the date such person commences employment, with an exercise price determined as of such date in accordance with Section 3.3.

3.3     Exercise Price . The Exercise Price of an Incentive Stock Option shall be determined in a manner that satisfies the applicable requirements of and subject to Section 422 of the Code, and shall not be less than one hundred percent (100%) of the Fair Market Value of a Share on the date of grant of such Option or such other price as may be determined pursuant to the Code. Notwithstanding the foregoing, an Incentive Stock Option may be granted with an exercise price lower than the minimum exercise price set forth above if such Option is granted pursuant to an assumption or substitution for another option in a manner that complies with the provisions of Section 424(a) of the Code.

3.4     Date of Grant . Notwithstanding any other provision of this Plan to the contrary, no Incentive Stock Options may be granted under this US Appendix after ten (10) years from the date this US Appendix is adopted, or the date this US Appendix is approved by the shareholders, whichever is earlier.

3.5     Exercise Period . No Incentive Stock Option shall be exercisable after the expiration of ten (10) years after the effective date of grant of such Award, subject to Section 3.7. No Incentive Stock Option granted to a prospective Employee may become exercisable prior to the date on which such person commences employment.

3.6     $100,000 Per Year Limitation . The aggregate Fair Market Value (determined as of the date the option is granted) of the Shares with respect to which all Incentive Stock Options granted under this US Appendix and all other "incentive stock option" plans of the Company, or of any Parent or Subsidiary, become exercisable for the first time by each Grantee during any calendar year shall not exceed one hundred thousand United States dollars ($100,000) with respect to such Grantee. To the extent that the aggregate Fair Market Value of Shares with respect to which such Incentive Stock Options and any other such incentive stock options are exercisable for the first time by any Grantee during any calendar year exceeds one hundred thousand United States dollars ($100,000), such options shall be treated as Nonqualified Stock Options. The foregoing shall be applied by taking options into account in the order in which they were granted. If the Code is amended to provide for a different limitation from that set forth in this Section 3.6, such different limitation shall be deemed incorporated herein effective as of the date and with respect to such Awards as required or permitted by such amendment to the Code. If an Option is treated as an Incentive Stock Option in part and as a Nonqualified Stock Option in part by reason of the limitation set forth in this Section 3.6, the Grantee may designate which portion of such Option the Grantee is exercising. In the absence of such designation, the Grantee shall be deemed to have exercised the Incentive Stock Option portion of the Option first. Separate certificates representing each such portion may be issued upon the exercise of the Option.

3.7     Ten Percent Shareholder . In the case of an Incentive Stock Option granted to a Ten Percent Shareholder, (i) the Exercise Price shall not be less than one hundred and ten percent (110%) of the Fair Market Value of a Share on the date of grant of such Incentive Stock Option, and (ii) the Exercise Period shall not exceed five (5) years from the effective date of grant of such Incentive Stock Option.

3.8     Payment of Exercise Price . Each Award Agreement evidencing an Incentive Stock Option shall state each alternative method by which the Exercise Price thereof may be paid.

3.9     Leave of Absence . Notwithstanding Section ý6.8 of the Plan, a Grantee's employment shall not be deemed to have terminated if the Grantee takes any leave as set forth in Section ý6.8(i); *provided, however* , that if any such leave exceeds three (3) months, on the day that is six (6) months following the commencement of such leave any Incentive Stock Option held by the Grantee shall cease to be treated as an Incentive Stock Option and instead shall be treated thereafter as a Nonqualified Stock Option, unless the Grantee's right to return to employment is guaranteed by statute or contract.

3.10     Exercise Following Termination for Disability . Notwithstanding anything else in the Plan to the contrary, Incentive Stock Options that are not exercised within three (3) months following termination of the Grantee's employment with the Company or its Parent or Subsidiary or a corporation issuing or assuming an Option in a transaction to which Section 424(a) of the Code applies, or within one (1) year in case of termination of the Grantee's employment with the Company or its Parent or Subsidiary due to a Disability (within the meaning of Section 22(e)(3) of the Code), shall be deemed to be Nonqualified Stock Options.

3.11     Adjustments to Incentive Stock Options . Any Award Agreement providing for the grant of Incentive Stock Options shall indicate that adjustments made pursuant to the Plan with respect to Incentive Stock Options could constitute a "modification" of such Incentive Stock Options (as that term is defined in Section 424(h) of the Code), or could cause adverse tax consequences for the holder of such Incentive Stock Options and that the holder should consult with his or her tax advisor regarding the consequences of such "modification" on his or her income tax treatment with respect to the Incentive Stock Option.

3.12     Notice to Company of Disqualifying Disposition . Each Grantee who receives an Incentive Stock Option must agree to notify the Company in writing immediately after the Grantee makes a Disqualifying Disposition of any Shares received pursuant to the exercise of Incentive Stock Options. A "Disqualifying Disposition" is any disposition (including any sale) of such Shares before the later of (i) two (2) years after the date the Grantee was granted the Incentive Stock Option, or (ii) one (1) year after the date the Grantee acquired Shares by exercising the Incentive Stock Option. If the Grantee dies before such Shares are sold, these holding period requirements do not apply and no disposition of the Shares will be deemed a Disqualifying Disposition.

3.13     Non Transferability . Notwithstanding any other provisions of the Plan to the contrary, no Incentive Stock Option may be sold, transferred, pledged, assigned or otherwise alienated or hypothecated, other than by will or by the laws of descent and distribution or in accordance with a beneficiary designation pursuant to Section 13.1 of the Plan. Further, all Incentive Stock Options granted to a Grantee shall be exercisable during his or her lifetime only by such Grantee.

**4.     Nonqualified Stock Options** . Options granted pursuant to this Section 4 are intended to constitute Nonqualified Stock Options and shall be subject to the general terms and conditions specified in Section 6 of the Plan and other provisions of the Plan and this US Appendix, except for any provisions of the Plan applying to Awards under different tax laws or regulations. In the event of any inconsistency or contradictions between the provisions of this Section 4 and the other terms of the Plan and this US Appendix with respect to Nonqualified Stock Options, this Section 4 shall prevail.

4.1     Certain Limitations on Eligibility for Nonqualified Stock Options . Nonqualified Stock Options may not be granted to a Service Provider who is deemed to be a resident of the United States for purposes of taxation or who is otherwise subject to United States federal income tax unless the Shares underlying such Options constitute "service recipient stock" under Section 409A of the Code or unless such Options comply with the payment requirements of Section 409A of the Code.

4.2     Exercise Price . The Exercise Price of a Nonqualified Stock Option shall not be less than one hundred percent (100%) of the Fair Market Value of a Share on the date of grant of such Option, unless the Committee specifically indicates that the Option will have a lower Exercise Price and, the Option complies with Section 409A of the Code. Notwithstanding the foregoing, a Nonqualified Stock Option may be granted with an exercise price lower than the minimum exercise price set forth above if such Option is granted pursuant to an assumption or substitution for another option in a manner that complies with Section 1.409A-1(b)(5)(v)(D) of the U.S. Treasury Regulations or any successor guidance.

**5.** **Other Awards** .

    5.1    <u>Restricted Share Units</u> . Notwithstanding anything to the contrary set forth in the Plan, any RSUs granted under this US Appendix that are not exempt from the requirements of Section 409A of the Code shall contain such restrictions or other provisions so that such RSUs will comply with the requirements of Section 409A of the Code, if applicable to the Company. Such restrictions, if any, shall be determined by the Committee and contained in the Restricted Share Unit Agreement evidencing such RSU. For example, such restrictions may include a requirement that any Shares that are to be issued in a year following the year in which the RSU vests must be issued in accordance with a fixed, pre-determined schedule.

    5.2    <u>Stock Appreciation Rights</u> . Notwithstanding the provisions of Section 11.2 of the Plan, The exercise price of any such stock appreciation right granted to a Grantee who is subject to U.S. federal income tax shall be determined in compliance with Section 4.2.

**6.** **Section 409A** .

    6.1    It is the intention of the Company that no Award under this US Appendix shall be deferred compensation subject to Code Section 409A, unless and to the extent that the Committee specifically determines otherwise as provided in Section 6.2, and the Plan and the terms and conditions of all Awards shall be interpreted and administered accordingly.

    6.2    The terms and conditions governing any Awards under this US Appendix that the Committee determines will be subject to Section 409A of the Code, including any rules for payment or elective or mandatory deferral of the payment or delivery of Shares or cash pursuant thereto, and any rules regarding treatment of such Awards in the event of a Change in Control, shall be set forth in the applicable Award Agreement and shall be intended to comply in all respects with Section 409A of the Code, and the Plan and the terms and conditions of such Awards shall be interpreted and administered accordingly. The Committee shall not extend the period to exercise an Option or stock appreciation right granted under this US Appendix to the extent that such extension would cause the Option or stock appreciation right to become subject to Code Section 409A. The Company shall have complete discretion to interpret and construe the Plan and any Award Agreement granted under this US Appendix in any manner that establishes an exemption from (or compliance with) the requirements of Code Section 409A. If, for any reason, such as imprecision in drafting, any provision of the Plan and/or any Award Agreement does not accurately reflect its intended establishment of an exemption from (or compliance with) Code Section 409A, as demonstrated by consistent interpretations or other evidence of intent, such provision shall be considered ambiguous as to its exemption from (or compliance with) Code Section 409A and shall be interpreted by the Company in a manner consistent with such intent, as determined in the discretion of the Company. If, notwithstanding the foregoing provisions of this Section 6.2, any provision of the Plan or any such agreement would cause a Grantee to incur any additional tax or interest under Code Section 409A, the Company shall reform such provision in a manner intended to avoid the incurrence by such Grantee of any such additional tax or interest; *provided* that the Company shall maintain, to the extent reasonably practicable, the original intent and economic benefit to the Grantee of the applicable provision without violating the provisions of Code Section 409A.

    6.3    Notwithstanding the provisions of Section 12 of the Plan to the contrary, (1) any adjustments made pursuant to Section 12 of the Plan to Awards that are considered "deferred compensation" subject to Section 409A of the Code shall be made in compliance with the requirements of Section 409A of the Code; (2) any adjustments made pursuant to Section 12 of the Plan to Awards that are not considered "deferred compensation" subject to Section 409A of the Code shall be made in such a manner as to ensure that after such adjustment, the Awards either (A) continue not to be subject to Section 409A of the Code, or (B) comply with the requirements of Section 409A of the Code; and (3) in any event, neither the Committee nor the Board shall have any authority to make any adjustments, substitutions or changes pursuant to Section 12 of the Plan to the extent the existence of such authority would cause an Award that is not intended to be subject to Section 409A of the Code at the grant date thereof to be subject to Section 409A of the Code.

    6.4    If any Award is subject to Section 409A of the Code, the provisions of Section 12.2 of the Plan shall be applicable to such Award only to the extent specifically provided in the Award Agreement and permitted pursuant to Section 6.2.

6.5    Notwithstanding any other provision in the Plan, any Award Agreement in respect of Award granted under this US Appendix, or any other written document establishing the terms and conditions of such Award, if any Grantee is a "specified employee," within the meaning of Section 409A of the Code, as of the date of his or her "separation from service" (as defined under Section 409A of the Code), then, to the extent required by Treasury Regulation Section 1.409A-3(i)(2) (or any successor provision), any payment made to such Grantee on account of his or her separation from service shall not be made before a date that is six months after the date of his or her separation from service. The Committee may elect any of the methods of applying this rule that are permitted under Treasury Regulation Section 1.409A-3(i)(2)(ii) (or any successor provision).

6.6    Notwithstanding any other provision of this Section 6 to the contrary, although the Company intends to administer this US Appendix so that Awards will be exempt from, or will comply with, the requirements of Code Section 409A, the Company does not warrant that any Award under this US Appendix will qualify for favorable tax treatment under Code Section 409A or any other provision of federal, state, local, or non-United States law. The Company shall not be liable to any Grantee for any tax, interest, or penalties the Grantee might owe as a result of the grant, holding, vesting, exercise, or payment of any Award under this US Appendix.

**7.**    **Section 83(b) Election** . If a Grantee makes an election under Section 83(b) of the Code to be taxed with respect to an Award as of the date of transfer of Shares rather than as of the date or dates upon which the Grantee would otherwise be taxable under Section 83(a) of the Code, such Grantee shall deliver a copy of such election to the Company upon or prior to the filing such election with the U.S. Internal Revenue Service. Neither the Company nor any Affiliate thereof shall have any liability or responsibility relating to or arising out of the filing or not filing of any such election or any defects in its construction

**8.**    **Term of this US Appendix** . The Board or the Committee may suspend or terminate this US Appendix at any time. Unless terminated earlier, including by means of expiration of the Plan, this US Appendix shall terminate on the day before the tenth (10th) anniversary of the earlier of the date the Plan was amended to include this US Appendix, or the date this US Appendix was approved by the Company's shareholders.

**9.**    **Amendmets** . Subject to changes in Applicable Law that would permit otherwise, without the approval of the Company's shareholders, there shall be (i) no increase in the maximum aggregate number of Shares that may be issued under this US Appendix as Incentive Stock Options (except by operation of the provisions of Section ý12.1 of the Plan), (ii) no change in the class of persons eligible to receive Incentive Stock Options, and (iii) no other amendment of this US Appendix that would require approval of the Company's shareholders under any Applicable Law. With respect to Incentive Stock Option, unless not permitted by Applicable Law, if the grant of an Award is subject to approval by shareholders, the date of grant of the Award shall be determined as if the Award had not been subject to such approval, and failure to obtain approval by the shareholders shall not in any way derogate from the valid and binding effect of any grant of an Award, which is not an Incentive Stock Option.

**10.**    **Approval** . This US Appendix shall also be subject to shareholders' approval, within one (1) year of the Effective Date, by a majority of the votes cast on the proposal at a meeting or a written consent of shareholders (however, if the grant of an Award is subject to approval by shareholders, the date of grant of the Award shall be determined as if the Award had not been subject to such approval). Failure to obtain such approval by the shareholders within such period shall not in any way derogate from the valid and binding effect of any grant of an Award, except that any Options previously granted under this US Appendix shall not qualify as Incentive Stock Options but, rather, shall constitute Nonqualified Stock Options. Upon approval of this Plan by the shareholders of the Company as set forth above, all Incentive Stock Options granted under this US Appendix on or after the Effective Date shall be fully effective as if the shareholders of the Company had approved this US Appendix on the Effective Date.

\* \* \* \* \* \*

Exhibit 10.13

**COMPENSATION POLICY**

**TUFIN SOFTWARE TECHNOLOGIES LTD.**

**Compensation Policy for Executive Officers (including Directors)**

## Table of Contents

|  |  | Page |
|---|---|---|
| A. | Overview and Objectives | A- 3 |
| B. | Base Salary and Benefits | A- 5 |
| C. | Cash Bonuses (Excluding Directors) | A- 7 |
| D. | Equity-Based Compensation | A- 10 |
| E. | Retirement and Termination of Service Arrangements (Excluding Directors) | A- 11 |
| F. | Exemption, Indemnification and Insurance | A- 12 |
| G. | Arrangements upon Change of Control | A- 12 |
| H. | Board of Directors Compensation | A- 13 |
| I. | Miscellaneous | A- 14 |

**A. <u>Overview and Objectives</u>**

1.  **<u>Introduction</u>**

    This document sets forth the compensation policy for executive officers (this " **Compensation Policy** " or " **Policy** ") of Tufin Software Technologies Ltd. (" **Tufin** " or the " **Company** " and " **Executive Officers** ", accordingly), in accordance with the requirements of the Companies Law 5759-1999 (the " **Companies Law** ").

    Compensation is a key component of Tufin's overall human capital strategy to attract, retain, reward, and motivate highly skilled individuals that will enhance Tufin's value and otherwise assist Tufin to reach its business and financial short and long-term goals. Accordingly, this Policy was established to tie the compensation of each Executive Officer to Tufin's goals and performance.

    For purposes of this Policy, " **Executive Officers** " shall mean "Office Holders" as such term is defined in Section 1 of the Companies Law.

    This Compensation Policy shall apply to compensation agreements and arrangements that are approved after the date on which this Compensation Policy is approved by the general meeting of Tufin's shareholders and shall serve as Tufin's Compensation Policy for the maximum period permitted by any applicable law. This Compensation Policy will not, and is not intended to, apply to or be deemed to amend employment and/or compensation terms of Executive Officers that were duly approved prior to its effective date. The Compensation Committee (upon its appointment in accordance with applicable law) and the Board of Directors of Tufin (the " **Compensation Committee** " and " **Board** ", respectively) shall administer, review and reassess the adequacy of this Policy from time to time, as required by the Companies Law. Subject to the terms and conditions of this Policy and any mandatory provisions of applicable law, and in addition to the Board's powers provided elsewhere in this Policy and by the Companies Law, the Board shall have full authority in its discretion, from time to time and at any time, to (i) interpret this Policy; (ii) prescribe, amend and rescind rules and regulations relating to and for carrying out this Policy, as it may deem appropriate; and (iii) and any other matter which it determined to be necessary or desirable for, or incidental to, the administration of this Policy and any determination made pursuant thereto.

    It should be clarified, that wherever reference is made to the required approvals in this Compensation Policy, such reference relates to the applicable law as of the date of approval of this Compensation Policy and in any case is subject to the provisions of Sections 33 and 35 below.

    Each of the Executive Officers may be engaged as employee and/or as an independent service provider (including through a company controlled by him, against the issuance of a tax invoice to the Company), provided that if the Executive Officers is engaged as an independent service provider the total amount paid to him (including, but not limited to, value added tax) shall not exceed the maximum amounts paid to Executive Officers who are engaged as employees as specified in this Policy.

    This Policy shall not apply to any subsidiaries of the Company except for an employee of a Company subsidiary who is also an Executive Officer of the Company.

2.  **<u>Objectives</u>**

    Tufin's objective in adopting this Compensation Policy is to foster a merit- and performance-based culture in order to attract, motivate and retain highly qualified personnel that enhances short-term and long-term shareholder value while adhering to Tufin's core values. To that end, this Policy is designed, among other things:

    2.1   to closely align the interests of the Executive Officers with those of Tufin's shareholders with a view to enhancing shareholder value;

    2.2   to provide the Executive Officers with a structured compensation package, while creating a balance between fixed components ( *i.e.* , base salary and social benefits) and variable components ( *i.e.* bonuses and equity-based compensation) in order to minimize potential conflicts between the interests of Executive Officers and Tufin;

    2.3   to discourage excessive risk taking in advancing Tufin's business; and

    2.4   to strengthen retention and the motivation of Executive Officers in the short and long term.

This Compensation Policy was prepared taking into account the Company's nature, size and business and financial characteristics.

3. **Compensation structure and instruments**

Compensation instruments under this Compensation Policy may include the following:

- base salary;

- benefits and perquisites;

- cash bonuses (short-to-medium term incentive);

- equity based compensation (medium-to-long term incentive);

- retirement and termination of service arrangements payments; and

- change of control arrangements.

For the purpose of this Compensation Policy:

" **Base Salary** " shall mean gross salary, before contributions to social benefits; and

" **Employment Cost** " shall mean any payment for employment, including contributions to social benefits, car and expenses of the use thereof, bonuses and any other benefit or payment.

4. **Overall Compensation**

4.1   .General

In setting the compensation of an Executive Officer, the Compensation Committee and the Board shall consider, among other things, the following factors:

- the education, qualifications, professional experience, seniority and accomplishments of the Executive Officer; and

- the Executive Officer's position, responsibilities and prior compensation arrangements.

In setting the compensation of an Executive Officer, the Compensation Committee and the Board may also consider, among other things, the following factors:

- the Executive Officer's expected contribution to the Company's future growth, profitability and stability;

- the degree of responsibility imposed on the Executive Officer;

- the need to retain Executive Officers who have relevant skills, know-how or unique expertise;

- accounting and tax considerations and implications;

- the Company's financial status;

- data of other companies (including U.S.-based companies), including companies in comparable industries and/or geographic markets, and compensation for comparably situated executives; and

- any requirements prescribed by the Companies Law, U.S. securities laws and NYSE rules from time to time.

The Compensation Committee and Board may engage compensation advisors and other professionals to assist in formulating compensation packages in line with this Policy, including, without limitation, to assist in preparing, collecting and analyzing applicable compensation and benefit surveys and other relevant data; framing the appropriate parameters to be considered; and evaluating the different parameters.

*4.2   Ratio Between Fixed and Variable Compensa* tion

This Policy aims to balance the mix of "fixed compensation", comprised of base salary and benefits ("Fixed Compensation") and "variable compensation", comprised of cash bonuses and equity based compensation1 (including but not limited to adjustment period/retirement bonuses, granted in accordance with Section 20 below) ("Variable Compensation") in order to, among other things, appropriately incentivize Executive Officers to meet Tufin's short and long term goals while taking into consideration the Company's need to manage a variety of business risks.

The total Variable Compensation of each Executive Officer shall not exceed 95% of the total compensation package of an Executive Officer on an annual basis. The Board believes that such limit reflects the appropriate compensation mix in the event that all performance objectives are achieved and assumes that all compensation elements are awarded with respect to a given year.

It should be clarified that the Fixed Compensation may constitute 100% of the total compensation package for an Executive Officer in any year (under circumstances in which a variable component is not approved for that year and/or in the event of a failure to meet previously established goals, if and when determined).

5. **Intra-Company Compensation Ratio**

In drafting this Policy, Tufin's Board has considered the ratio between employer cost, as such term is defined in the Companies Law, associated with the engagement of the Executive Officers and the average and median employer cost associated with the engagement of the other employees (including those employed through manpower companies) of Tufin (the " **Ratio** "). The Board believes that the current Ratio does not adversely impact the work environment in Tufin.

**B. Base Salary and Benefits (Excluding Directors)**

6. **Base Salary**

    6.1    Base Salary varies among Executive Officers, is individually determined by the Company and may be reviewed and adjusted by the Company on a periodic basis at its sole discretion. When determining Base Salary, the Company may also consider, at its sole discretion, prevailing pay levels in the relevant market, Base Salary and the total compensation package of comparable Executive Officers in the Company, the ratio between the Executive Officer's compensation package and the compensation of other employees in the Company and specifically the median and average salaries and the effect of such ratios on working relations at the Company.

    6.2    Base Salary shall not exceed the amount specified in the table below:

| The Executive Officer | Maximum Base Salary |
|---|---|
| CEO | $600,000 |
| CTO | $350,000 |
| Other Executive Officers (excluding directors) | $350,000 |

The Company may link the Base Salary of an Executive Officer to the Israeli Consumer Index or to the exchange rate of any currency.

The exchange rate of US dollar to NIS will be the representative rate of exchange determined by the Bank of Israel as of the date of approval of the compensation of the relevant Executive Officer by the Company's board of directors.

Since the Executive Officers hold senior management positions, as defined in the Hours of Work and Rest Law, 5711-1951, this law shall not apply to the terms of their office, and they shall not be entitled to any form of compensation for overtime or for working during weekly rest periods.

---

1    Determined according to acceptable valuation practices at the time of grant.

The maximum Base Salary set forth in this section is based on the Executive Officer's full-time position. With respect to an Executive Officer employed by the Company on a part-time basis, the Base Salary maximum will be reduced proportionately, with the Board having the authority to determine the scope of the position of the Executive Officer and change it from time to time.

7. **Benefits**

7.1 In addition to the Base Salary, the following benefits may be granted to the Executive Officer in order to, among other things, comply with legal requirements:

- paid vacation days in accordance with market practice and applicable law, up to a cap of 45 days per annum, including, if applicable, the redemption thereof;

- sick days in accordance with market practice and applicable law; however, the Company may decide to cover sick days from the first day;

- convalescence pay;

- medical insurance;

- severance pay;

- with respect to Executive Officers employed in Israel: monthly remuneration for a study fund ("Keren Hishtalmut"), as allowed by applicable tax law and with reference to Tufin's practice and common market practice;

- employer contribution to an insurance policy or a pension fund for severance and pension in accordance with market practice and applicable law (including, payment of such contribution or any portion thereof, directly to the Executive Officer);

- employer contribution towards work disability insurance in accordance with market practice and applicable law; and

- holiday and special occasion gifts.

The above list is non-exclusive, and subject to receiving any approvals that are required under applicable law, Tufin may grant its Executive Officers other similar, comparable or customary benefits. In addition, Executive Officers employed outside of Israel may receive other similar or comparable benefits that are customary in the jurisdiction in which they are employed.

7.2 The Company may offer additional benefits to its Executive Officers, including but not limited to: telecommunication and electronic devices and communication expenses, company car and travel benefits, newspaper subscriptions, periodic medical examinations, holiday and special occasion gifts, academic and professional studies. For the avoidance of doubt, the grant of registration rights to an Executive Officer shall not be deemed an employment benefit for any purpose.

7.3 The Company may reimburse its Executive Officers for reasonable work-related expenses incurred as part of their activities, including without limitations, meeting participation expenses, reimbursement of business travel, including a daily stipend when traveling and accommodation expenses. The Company may provide advance payments to its Executive Officers in connection with work-related expenses.

8. **Signing Bonus**

Tufin may grant a newly recruited Executive Officer a signing bonus. Such bonus may be granted in cash, equity or a combination of both (in addition to a cash bonus that can be granted under Chapter C and in addition to equity that can be granted under Chapter D). The signing bonus will not exceed:

8.1 100% of such Executive Officer's annual Base Salary, if the signing bonus is granted in cash;

8.2 (i) $5 million maximum fair value for the Chief Executive Officer and (ii) $1.5 million maximum fair value for other Executive Officers, if the signing bonus is granted in equity, in each case determined according to acceptable valuation practices at the time of grant;

8.3 In case the signing bonus is a combination of cash and equity, its ceiling shall be proportional to the cash and equity components, calculated in accordance with the ratios mentioned in Sections 8.1 and 8.2 above.

To the extent possible under the circumstances of each case, the Compensation Committee and the Board shall consider awarding a signing bonus only to provide for the replacement awards that the newly hired Executive Officer forfeited from his or her previous employer, and to the extent possible shall structure such signing bonus to reflect performance, vesting and other conditions equivalent to the forfeited awards; provided however that such bonus shall not be greater than the amounts specified in Sections 8.1 and 8.2 above.

9. **Reimbursement for Relocation**

Tufin may reimburse an Executive Officer for relocation and related expenses in an amount not to exceed $500,000 for each relocation.

## C. Cash Bonuses (Excluding Directors)

The Company may grant cash bonuses to its Executive Officers (excluding directors) quarterly, annually or on a shorter or longer basis, in accordance with the principles detailed below.

10. **Annual Bonuses**

10.1 The annual bonus that may be paid for any fiscal year shall not exceed twenty-four (24) monthly Base Salaries.

10.2 Bonus Criteria

The annual bonus will be based mainly on measurable criteria (referring to Company and/or individual performance measures), and a non-material portion of the annual bonus shall be determined at the discretion of the Compensation Committee and the Board, in accordance with the following metrics:

| Position | Company/Individual Performance Measures | Company's Discretion |
|---|---|---|
| CEO | up to 100% | not to exceed the higher of: (i) three monthly salaries; or (ii) 25% of the annual variable compensation. |

The measurable criteria, target level of achievement and maximum level of achievement, and their relative weight shall be determined (and brought to the attention of the Executive Officers when determined prior to the relevant year or in the beginning of such year (i.e., by March 31 of each year).

In addition, to be eligible for an annual bonus, the Executive Officer must be actively employed by the Company or one of its subsidiaries during the relevant year to which the bonus relates, which condition may be subject to additional limitations, which may include being employed for a minimum period of time during the relevant year or through a certain date.

During a specific year, the Compensation Committee may change the measurable criteria and their relative weight for that year, insofar as exceptional events occur that warrant such a change taking into account: (i) the date of the update; (ii) the balance of the period until the end of the year; (iii)

the expectation of the Executive Officers who are affected by the update of the criteria; and (iv) the need for effective new criteria that create an incentive for the Executive Officers.

Examples of measurable criteria that will be considered include, without limitation:

- financial results (e.g., collections, revenues, pre-tax profits);

- sales and marketing objectives;

- cost savings;

- internal and external customer satisfaction;

- success in raising capital and/or debt;

- meeting the Company's budget;

- number of customers; and

- other key performance indicators.

Examples of non-measurable criteria that will be considered include, without limitation:

- contribution to the Company's business, profitability and stability;

- the need to retain an Executive Officer with skills, know-how or unique expertise;

- the responsibility imposed on the Executive Officer;

- changes that occurred in the responsibility imposed on the Executive Officer during the year;

- performance satisfaction, including assessing the degree of involvement of the Executive Officer and devotion of efforts in the performance of his or her duties;

- assessment of the Executive Officer's ability to work in coordination and cooperation with other employees; and

- the contribution to an appropriate control environment and ethical environment.

The bonus for meeting the objectives that an Executive Officer has met, shall be calculated by multiplying: (i) the weighting of such objective by (ii) the bonus amount.

An Executive Officer will be entitled to a bonus on a pro rata basis for partial compliance of at least 80% of the objective set for such Executive Officer, unless otherwise determined by the Board and the compensation committee.

Notwithstanding the provisions of Section 10.2 above, the annual bonus to Executive Officers which are not the CEO may be based in whole or in part on discretion (including based on the CEO's opinion on the contribution of the Executive Officer to the Company), provided that it does not exceed the ceiling specified in Section 10.1 above.

11. **Special Bonuses**

In addition to the annual bonus, Tufin may award an Executive Officer a special bonus based on the achievement by the Company or the Executive Officer of specific goals or the occurrence of specific corporate events (such as private or public offerings, mergers and acquisitions or specific projects, achieving target budget or business plan under exceptional circumstances or for special recognition in the case of retirement). A special bonus shall not exceed twelve (12) monthly Base

Salaries. A Special Bonus together with an Annual Bonus shall not exceed thirty six (36) monthly Base Salaries

**Additional Provisions Relating to Cash Bonuses**

11.1. **Pro Rata Payment**

Should the employment or service of the Executive Officer terminate prior to the end of a fiscal year, Tufin may, in its discretion, and to the extent not already required under the terms of the Executive Officer's employment agreement, pay the Executive Officer his or her pro-rata share of that fiscal year's bonus, based on: (i) whether or not the objectives for that calendar year were achieved; and (ii) the period such Executive Officer was employed by the Company or has served in the Company.

11.2. **Compensation Recovery ("Clawback")**

11.2.2 The terms of employment of each Executive Officer shall entitle the Company to recover from such Executive Officer any compensation, including equity-based compensation, in the amount by which such compensation exceeded what would have been paid under the financial statements as restated (" **Compensation Recovery** "), provided that a claim is made by Tufin prior to the third (3 $^{rd}$ ) anniversary of the fiscal year end of the restated financial statements.

11.2.3 Notwithstanding the aforesaid, the Compensation Recovery will not be triggered in the following events:

- The financial restatement is required due to changes in applicable financial reporting standards; or

- The Company (subject to any required approval by the applicable law) has determined that clawback proceedings in the specific case would be impossible, impractical or not commercially or legally efficient.

11.3. **Reduction or Postponement**

In the event of the termination of office of an Executive Officer under circumstances in which he or she will not be entitled to severance pay, the Company (subject to the approvals of the Compensation Committee and the Board) may revoke the entitlement of such an Executive Officer to an annual bonus and to all parts of the annual bonus which have not yet been paid to him.

11.4. **Timing of Payment**

Annual bonuses will be paid to Executive Officers in respect of each calendar year of the employment period no later than the date of payment of the first salary after the date of approval by the Board of the Company's annual audited financial statements.

Unless a personal employment agreement explicitly determines otherwise, any payment that is made to the Executive Officer on account of variable compensation according to this Compensation Policy, if paid, is not and will not be deemed as part of the Executive Officer's base salary for all intents and purposes and will not constitute a basis for calculation or for entitlement or for accrual of any related right, including, and without derogating from the generality of the aforesaid, not as a component included in the payment of leave, severance pay, contributions to the provident funds etc.

11.5. **Taxation**

Insofar as any tax liability or other mandatory payment shall be levied on the variable compensation (national insurance, national health tax etc.), the Executive Officer shall bear all such taxes pursuant to law (insofar as it shall apply to the Executive Officer pursuant to law).

**D. Equity Compensation**

12. **General and Objectives**

12.1. The Company may grant from time to time equity-based compensation which will be individually determined and awarded, among other things, based on the performance, educational background, prior business experience, qualifications, role and the personal responsibilities of the Executive Officer. Equity-based compensation may also be awarded to the Company's directors provided that any director that is also employed by the Company shall not receive any additional equity compensation in his or her capacity as a director.

12.2. The primary objective of equity-based compensation is to enhance the alignment between the interests of the Executive Officers and those of Tufin and its shareholders, and to retain and motivate the Executive Officers. In addition, since equity-based awards are structured to vest over several years, their incentive value to recipients is aligned with medium and longer-term strategic plans.

12.3. The equity-based compensation offered by Tufin is intended to be in a form of stock options exercisable for shares of Company common stock, restricted shares or restricted share units (" **RSUs** "), performance share units and/or other equity-based awards in accordance with the Company's 2019 Equity Incentive Plan, as amended from time to time, and under such other equity incentive plans for service providers of the Company or its Affiliates that the Company may adopt from time to time.

13. **Fair Market Value**

The fair market value of equity compensation for each Executive Officer granted during a calendar year shall not exceed 20X his or her annual Base Salary, determined according to acceptable valuation practices at the time of grant.

14. **Taxation Regime**

Subject to any applicable law, Tufin may determine, the tax regime under which equity-based compensation may be granted, including a tax regime which will maximize the benefit to the Executive Officers.

15. **Exercise Period**

The exercise price for a stock option awarded to an Israeli-resident Executive Officer who is not a United States taxpayer shall equal the average price of the Company's closing share price over the thirty (30) consecutive trading days on the stock exchange or quotation system on which the Company's shares are traded prior to the grant date of the stock options. If the Company's shares are traded on more than one stock exchange and/or quotation system, the Company shall determine the relevant stock exchange or quotation system for these purposes. The fair market value for a stock option awarded to a non-Israeli-resident Executive Officer shall equal the closing price of the Company's shares on the date of grant.

Unless otherwise determined by the Compensation Committee, and subject to the provisions of any applicable law, restricted shares and RSUs are not exercised, but rather shares become issued to the holder upon vesting or settlement of the award, as applicable, except to the extent that the holder is required to pay the par value of any underlying shares. In addition, it shall be clarified,

that the vesting of restricted shares and RSUs may be subject to the achievement of goals set in advance and approved in accordance with the applicable law.

Stock options may be exercised on a "cashless" basis.

The Board considered the possibility of determining a ceiling for the exercise value of the variable equity components and decided, taking into account the purpose of the equity-based compensation, not to set such a ceiling in this Policy.

16. **Vesting**

17. All equity-based incentives granted to the Executive Officers shall be subject to vesting periods in order to promote long-term retention of such recipients. Grants to Executive Officers (excluding directors) shall vest gradually over a period of no less than three (3) years and no more than four (4) years, while grants to newly appointed directors shall vest over a period of no less than three (3) years and currently serving directors no less than one (1) year. Such grants may be vested on a quarterly, semi-annual or an annual basis, or based on other time periods (which may not be necessarily equal), as determined by the Company. The Company may condition the vesting of part or all of the equity-based incentives, for some or all of its Executive Officers, upon the achievement of predetermined performance goals. The Company (subject to the abovementioned required approvals) may also set terms relating to vesting in connection with an Executive Officer leaving the Company (due to a dismissal, resignation, death or disability). For details regarding ceilings with respect to director's equity-based compensation see section 29 below.

18. **General**

All other terms of the equity awards shall be in accordance with Tufin's incentive plans and other related practices and policies. Accordingly, the Company may extend the period of time for which an award is to remain exercisable and make provisions with respect to the acceleration of the vesting period of any Executive Officer's awards, including, without limitation, in connection with a corporate transaction involving a change of control, subject to any additional approval as may be required by applicable law. The Committee may amend other terms of an Executive Officer's grant to the extent provided in the applicable equity incentive plan.

**E. Retirement and Termination of Service Arrangements (Excluding Directors)**

19. **Advanced Notice Period**

19.1. Tufin may provide each Executive Officer (excluding directors), pursuant to an Executive Officer's employment agreement advance notice of termination of up to twelve (12) months (the " **Advance Notice Period** "). During the Advance Notice Period, the Executive Officer shall continue to be entitled to all compensation elements, and to the continuation of vesting of equity awards.

19.2. During the Advance Notice Period, an Executive Officer will be required to keep performing his/her duties pursuant to his or her agreement with the Company, unless the Company waives such performance and pays the amount of compensation payable during such Advance Notice Period in lieu of notice.

20. **Adjustment Period/Retirement Bonus**

In addition to the Advance Notice Period, the Company may provide an adjustment period/retirement payment that will be determined by, among other things, taking into consideration the Executive Officer's seniority in the Company, his or her performance during employment, his or her contribution to Tufin achieving its goals and the circumstances of the Executive Officer's retirement or termination. The maximum adjustment period/retirement payment that may be paid to each Executive Officer shall be up to twelve (12) monthly Base Salaries and may only be granted to Executive Officers who have served in the Company for at least twelve (12) months.

21. **Additional Retirement and Termination Benefits**

Tufin may provide additional retirement and terminations benefits and payments: (i) as may be required by applicable law (e.g., mandatory severance pay under Israeli labor laws- unless employment/term of service was terminated for cause); or (ii) which will be comparable to customary market practices, provided however that they shall not exceed twenty four (24) monthly Base Salaries (inclusive of any advance notice period).

**F. Exemption, Indemnification and Insurance**

22. **Exemption**

Tufin may exempt, either in advance and/or retroactively, its Executive Officers from any liability to the Company, in whole or in part, for damages in consequence of his or her duty of care vis-a-vis the Company, to the fullest extent permitted by law and subject to the provisions of the Company's Articles of Association.

23. **Indemnification**

Tufin may indemnify its Executive Officers to the fullest extent permitted by applicable law and the Company's Articles of Association, for any liability and expense that may be imposed on the Executive Officer, as provided in the Indemnity Agreement between such individuals and Tufin, all subject to applicable law and the Company's Articles of Association.

24. **Insurance**

24.1. Tufin may provide "Directors' and Officers' Liability Insurance" (the " **Insurance Policy** "), as well as a "run off" insurance policy for its Executive Officers as follows:

- The annual premium to be paid by Tufin shall not exceed $750,000 of the aggregate coverage of the Insurance Policy;

- The limit of liability of the insurer shall be up to $75 million per event and in the aggregate in the insurance period.

- The deductible amount per each claim shall not exceed $1 million.

- The Insurance Policy, as well as the limit of liability and the premium for each extension or renewal shall be approved by the relevant organs of the Company, which ensure that the terms of the Insurance Policy comply with the above.

- The policy will also cover the liability of the controlling shareholders due to their positions as Executive Officers in the Company, from time to time, provided that the coverage terms in this respect do not exceed those of the other Executive Officers in the Company.

**G. Arrangements upon Change of Control**

25. Upon a "Change of Control" (as defined in the relevant agreement with each Executive Officer) following which the employment of the Executive Officer is terminated, the following benefits may be granted to the Executive Officers in addition to the benefits applicable in the case of any retirement or termination of service:

25.1. accelerated vesting of equity awards;

25.2. extension of the exercise period of equity awards for a period of up to twenty-four (24) months following the date of termination of employment to the extent it complies with applicable law;

12

25.3. extension of the Advance Notice Period set forth in section 19.1 above by up to nine (9) additional months; and

25.4. an adjustment period/retirement bonus in accordance with section 20 above, of up to twelve (12) months of Employment Cost.

The total Advance Notice Period and adjustment period/retirement bonus shall not exceed twenty four (24) monthly Base Salaries.

## H. <u>Board of Directors Compensation</u>

26. The compensation of the Company's directors (including external directors and independent directors) shall not exceed the following:

    26.1. Base payment of $50,000 per year (the " **Base Payment** ");

    26.2. Chairman of the Board- an additional amount of $35,000 per year to the Base Payment;

    26.3. Committee Chairman- an additional amount of $15,000 per year to the Base Payment;

    26.4. Committee member- an additional amount of $7,500 per year to the Base Payment;

27. In addition, the Company may engage with its directors (excluding external and independent directors) for the receipt of consulting services and/or other special services, for a consideration of up to $1,000 per day, plus reasonable expense reimbursement. Such compensation shall be paid for a maximum of 6 days per year for each director.

28. Directors may be granted equity-based compensation in accordance with the applicable principles detailed in Section D of this Policy, and subject to the provisions of the Companies Law and the regulations thereunder. [2]

    Equity based-compensation granted to the Company's directors, shall not exceed the following amounts (subject to any applicable law): [3]

    28.1. $250,000 for each year of grant according to acceptable valuation practices at the time of grant (the " **Equity Compensation** "); and

    28.2. Upon joining the Board, $500,000 according to acceptable valuation practices at the time of grant;

29. An active Chairman of the Board may receive compensation in accordance with the criteria for compensation of Executive Officer who is not the CEO who are not directors, adjusted to the scope of his position.

30. Tufin's external and independent directors may be entitled to reimbursement of expenses in accordance with the Companies Law and the regulations thereunder.

---

2. The equity-based compensation is determined according to acceptable valuation practices at the time of grant,

3  Determined according to acceptable valuation practices at the time of grant.

**I. <u>Miscellaneous</u>**

31. This Policy is designed solely for the benefit of Tufin. Nothing in this Compensation Policy shall be deemed to grant any of Tufin's Executive Officers or employees or any third party any right or privilege in connection with their employment by the Company or its subsidiaries and their compensation thereof. Such rights and privileges, to which Executive Officers or employees serving in the Company or that will serve in the Company in the future, are entitled for, shall be governed by the respective personal employment agreements.

32. This Policy is subject to applicable law and is not intended, and should not be interpreted as limiting or derogating from, provisions of applicable law to the extent not permitted, nor should it be interpreted as limiting or derogating from the Company's Articles of Association.

33. This Policy is not intended to affect current agreements nor affect obligating customs (if applicable) between the Company and its Executive Officers as such may exist prior to the approval of this Compensation Policy, subject to any applicable law.

34. In the event of amendments made to the Companies Law or any regulations promulgated thereunder providing relief in connection with Tufin's compensation to its Executive Officers, Tufin may elect to act pursuant to such relief without regard to any conflict with this Policy.

35. The Company (subject to any required approvals by the applicable law) may determine that none or only part of the payments, benefits and perquisites shall be granted, and is authorized to cancel or suspend a compensation package or part of it.

36. An immaterial change in the terms of office of Executive Officers (excluding the CEO, directors, a controlling shareholder or a controlling shareholder's relative) during the term of this Compensation Policy, will be subject to the approval of the Company's CEO only (changes in the terms of office of the CEO shall be approved in accordance with the Companies Law). An immaterial change in this matter shall be deemed to be a change that: (i) does not exceed ten percent (10%) of the total annual compensation of such Executive Officer; and (ii) is in line with the provisions of this Compensation Policy.

37. The compensation components detailed in this Policy do not relate to various components that the Company may provide to all or part of its employees and/or its Executive Officers, such as: parking spaces, entry permits for its assets, reimbursement for meals and accommodation expenses, vacations, company events, etc.

38. This Policy shall take effect upon its approval in accordance with the Companies Law. The term of this Policy shall not be limited in time, except that it will terminate at the earlier of (i) such time that the Policy is no longer in effect under the Companies Law, or (ii) such time that the Policy is terminated by the Board, to the extent that the Board has the power under the Companies Law to terminate the Policy or (iii) such time as the Company shall determine that the Terms of Office and Engagement of Office Holders is not required to be made pursuant to a Compensation Policy under the Companies Law, including, without limitation of the foregoing, in the event that the Company ceases to be a Public Company (as defined in the Companies Law), in which case this Policy shall have no effect with respect to the period after the Company ceasing to be a Public Company.

39. This Policy shall be governed by the laws of the State of Israel, excluding its conflict of law rules, except with respect to matters that are subject to tax or labor laws in any specific jurisdiction, which shall be governed by the respective applicable law of such jurisdiction.

*********************

14

**Exhibit 23.1**



## CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the use in this Amendment No. 2 to the Registration Statement on Form F-1 of Tufin Software Technologies Ltd. of our report dated March 6, 2019, except for the effects of the reverse share split as discussed in Note 2(z) to the consolidated financial statements, as to which the date is April 1, 2019, relating to the financial statements, which appears in this Registration Statement. We also consent to the reference to us under the heading "Experts" in such Registration Statement.

| | |
|---|---|
| Tel-Aviv, Israel | /s/ Kesselman & Kesselman |
| April 1, 2019 | Certified Public Accountants (Isr.) |
| | A member firm of PricewaterhouseCoopers International Limited |

*Kesselman & Kesselman, Trade Tower, 25 Hamered Street, Tel-Aviv 6812508, Israel,*
*P.O Box 50005 Tel-Aviv 6150001 Telephone: +972 -3- 7954555, Fax:+972 -3- 7954556, www.pwc.com/il*

**Exhibit 99.2**

## Consent of Director Nominee

Tufin Software Technologies Ltd. (the "Company") has filed a Registration Statement on Form F-1 with the Securities and Exchange Commission under the Securities Act of 1933, as amended (the "Securities Act"), in connection with the proposed initial public offering of its ordinary shares. In connection therewith, I hereby consent, pursuant to Rule 438 of the Securities Act, to being named and described as a nominee to the board of directors of the Company in such Registration Statement, as may be amended from time to time and to the filing or attachment of this consent with such Registration Statement and any amendment or supplement thereto.

/s/ Peter Campbell
_____
Peter Campbell

March 22, 2019