**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE TUFIN SOFTWARE TECHNOLOGIES LTD. SECURITIES LITIGATION | Master File No. 1:20-cv-5646-GHW<br><br>Hon. Gregory H. Woods |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'**
**MOTION TO DISMISS THE CONSOLIDATED AMENDED COMPLAINT**

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ........................................................................................................ i

**TABLE OF AUTHORITIES** ................................................................................................ ii

**INTRODUCTION** .................................................................................................................1

**STATEMENT OF FACTS** ....................................................................................................2

**ARGUMENT** .........................................................................................................................7

     **I.**      **THE COMPLAINT ADEQUATELY STATES A SECTION 11 CLAIM** .......7

          A.     Applicable Pleading Standards Favor Denial of the Motion ......................7

          B.     The Registration Statement Misrepresented Tufin's Sales Process.............9

          C.     Inaccuracies About Tufin's Sales Process are not Puffery ........................11

          D.     Defendants' Attacks on the Confidential Witnesses Fail ..........................15

          E.     The Bespeaks-Caution Doctrine is Inapplicable to Statements of Existing Fact and Misleading, Vague Risk Disclosures .........................................21

     **II.**     **THE COMPLAINT ADEQUATELY STATES A SECTION 15 CLAIM** .....24

**CONCLUSION** .....................................................................................................................25

## TABLE OF AUTHORITIES

**Cases**                                                                              **Page numbers**

*Adair v. Bristol Tech. Sys.*,
     179 F.R.D. 126 (S.D.N.Y. 1998) .......................................................................................8

*Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE),
     2020 U.S. Dist. LEXIS 146995 (S.D.N.Y. Aug. 14, 2020) .......................................20, 21

*ATSI Comms., Inc. v. Shaar Fund, Ltd.*,
     493 F.3d 87 (2d Cir. 2007)...............................................................................................9

*Bank of America AIG Disclosure Secs. Litig.*,
     980 F. Supp. 2d 564 (S.D.N.Y. 2013)............................................................................23

*Bauer v. Prudential Fin., Inc.*, No. 09-1120 (JLL),
     2010 U.S. Dist. LEXIS 64384, *38 (D.N.J. June 29, 2010) ..............................................11

*Caiafa v. Sea Containers Ltd.*,
     525 F. Supp. 2d 398 (S.D.N.Y. 2007)................................................................................7

*Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*,
     No. 08 Civ. 7062 (PAC),
     2010 U.S. Dist. LEXIS 122127 (S.D.N.Y. Nov. 17, 2010) ..............................................10

*Citiline Holdings, Inc. v. iStar Fin., Inc.*,
     701 F. Supp. 2d 506 (S.D.N.Y. 2010) ...............................................................................8

*City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*,
     450 F. Supp. 3d 379 (S.D.N.Y. 2020)..............................................................................13

*City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*,
     752 F.3d 173 (2d Cir. 2014)............................................................................................15

*ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*,
     553 F.3d 187 (2d Cir. 2009)..................................................................................8, 13, 14

*Flag Telecom Holdings, Ltd. Sec. Litig.*,
     618 F. Supp. 2d 311 (S.D.N.Y. 2009)................................................................................8

*Francisco v. Abengoa, S.A.*,
     481 F. Supp. 3d 179 (S.D.N.Y. 2020)..............................................................................19

*Ganino v. Citizens Utils. Co.*,
     228 F.3d 154 (2d Cir. 2000)..............................................................................................8

*Gregory v. Pronai Therapeutics Inc.*,
     297 F. Supp. 3d 372 (S.D.N.Y. 2018)..............................................................................21

*Haw. Structural Ironworkers Pen. Tr. Fund v. AMC Entm't Holdings, Inc.*,
    422 F. Supp. 3d 821 (S.D.N.Y. 2019)..................................................................................15

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983)..............................................................................................................8

*Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*,
    252 F.3d 63 (2d Cir. 2001)..................................................................................................20

*In re Aratana Therapeutics Inc. Sec. Litig.*,
    315 F. Supp. 3d 737 (S.D.N.Y. 2018)...........................................................................13, 14

*In re Avon Secs. Litig.*, No. 19 Civ. 01420 (CM)
    2019 U.S. Dist. LEXIS 200816 (S.D.N.Y. Nov. 18, 2019)................................................12

*In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS),
    2016 U.S. Dist. LEXIS 41484 (S.D.N.Y. Mar. 29, 2016) .................................................24

*In re Diebold Nixdorf, Inc. Sec. Litig.*, No. 19-CV-6180 (LAP),
    2021 U.S. Dist. LEXIS 62449 (S.D.N.Y. Mar. 30, 2021)  ...........................................13, 14

*In re Dynagas LNG Partners LP Sec. Litig.*, No. 19-CV-4512 (AJN),
    2020 U.S. Dist. LEXIS 221593 (S.D.N.Y. Nov. 25, 2020)................................................24

*In re Elan Corp. Sec. Litig.*,
    543 F. Supp. 2d 187 (S.D.N.Y. 2008)...............................................................................17

*In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP),
    2015 U.S. Dist. LEXIS 109941 (S.D.N.Y. Aug. 19, 2015)...............................................22

*In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS),
    2015 U.S. Dist. LEXIS 50726 (S.D.N.Y. Mar. 31, 2015) .................................................20

*In re Frontier Comms. Corp. Stockholders Litig.*, No. 3:17-cv-1617 (VAB),
    2020 U.S. Dist. LEXIS 50063 (D. Conn. Mar. 24, 2020)..................................................19

*In re IAC/InterActiveCorp Sec. Litig.*,
    478 F. Supp. 2d 574 (S.D.N.Y. 2007)...............................................................................19

*In re IAC/InterActiveCorp Sec. Litig.*,
    695 F. Supp. 2d 109 (S.D.N.Y. 2010)...............................................................................19

*In re IndyMac Mortg.-Backed Sec. Litig.*,
    718 F. Supp. 2d 495 (S.D.N.Y. 2010)...............................................................................20

*In re Initial Pub. Offering Sec. Litig.*,
    483 F.3d 70 (2d Cir. 2007)...................................................................................................9

iii

*In re LeapFrog Enters., Inc. Sec. Litig.*,
    527 F. Supp. 2d 1033 (N.D. Cal. 2007) ..............................................................................23

*In re MF Glob. Holdings Secs. Litig.*,
    982 F. Supp. 2d 277 (S.D.N.Y. 2013)...........................................................................21, 22

*In re Micro Focus Int'l PLC Sec. Litig.*, No. 1:18-cv-06763-ALC,
    2020 U.S. Dist. LEXIS 180621 (S.D.N.Y. Sept. 29, 2020)................................................24

*In re Morgan Stanley Info. Fund Sec. Litig.*,
    592 F.3d 347 (2d Cir. 2010)..............................................................................................9

*In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS),
    2010 U.S. Dist. LEXIS 34459 (S.D.N.Y. Mar. 31, 2010) .................................................23

*In re Qudian Secs. Litig.*, No. 17-CV-9741 (JMF),
    2019 U.S. Dist. LEXIS 167072 (S.D.N.Y. Sept. 27, 2019)...............................................20

*In re Petrobras Sec. Litig.*,
    116 F. Supp. 3d 368 (S.D.N.Y. 2015)...............................................................................12

*In re Philip Servs. Corp. Sec. Litig.*,
    383 F. Supp. 2d 463 (S.D.N.Y. 2004)...............................................................................17

*In re Vivendi, S.A. Sec. Litig.*,
    838 F.3d 223 (2d Cir. 2016)............................................................................................13

*In re Weight Watchers Int'l Sec. Litig.*, No. 19cv2005,
    2020 U.S. Dist. LEXIS 223592 (S.D.N.Y. Nov. 30, 2020) ..............................................19

*In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07-cv-3994 (LTS)(AJP),
    2009 U.S. Dist. LEXIS 14838 (S.D.N.Y. Feb. 25, 2009)...........................................14, 15

*Iowa Pub. Empls. Ret. Sys. v. MF Glob., Ltd.*,
    620 F.3d 137 (2d Cir. 2010).............................................................................................21

*Kramer v. Time Warner, Inc.*,
    937 F.2d 767 (2d Cir. 1991)..............................................................................................9

*Litwin v. Blackstone Grp., L.P.*,
    634 F.3d 706 (2d Cir. 2011)..........................................................................................7, 9

*Local No. 38 IBEW Pen. Fund v. Am. Exp. Co.*,
    724 F. Supp. 2d 447 (S.D.N.Y. 2010)..............................................................................18

*McMahan & Co. v. Wherehouse Entm't, Inc.*,
    900 F.2d 576 (2d Cir. 1990)............................................................................................11

iv

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*,
  693 F.3d 145 (2d Cir. 2012)..................................................................................8, 9

*N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*,
  709 F.3d 109 (2d Cir. 2013)....................................................................................16

*Novak v. Kasaks*,
  216 F.3d 300 (2d Cir. 2000)...............................................................................16, 18

*ODS Cap. LLC v. JA Solar Holdings Co. Ltd.*, No. 18-CV-12083 (ALC),
  2020 U.S. Dist. LEXIS 223305 (S.D.N.Y. Nov. 30, 2020).........................................18, 19

*Ont. Teachers Pen. Plan Bd. v. Teva Pharm. Indus.*,
  432 F. Supp. 3d 131 (D. Conn. 2019)......................................................................13

*Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*, Case No. 14 Civ. 9443 (ER),
  2017 U.S. Dist. LEXIS 46852 (S.D.N.Y. Mar. 29, 2017)..............................................10

*Plevy v. Haggerty*,
  38 F. Supp. 2d 816 (C.D. Cal. 1998)......................................................................23

*Poptech, L.P. v. Stewardship Inv. Advs., LLC*,
  849 F. Supp. 2d 249 (D. Conn. 2012).....................................................................20

*Rombach v. Chang*,
  355 F. 3d 164 (2d Cir. 2004).......................................................................... *passim*

*SEC v. Mudd*, No. 14 Civ. 9443 (ER),
  2016 U.S. Dist. LEXIS 24233 (S.D.N.Y. Feb. 29, 2016)..............................................11

*Set Cap. LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)...............................................................................11, 17

*Singh v. Cigna Corp.*,
  918 F.3d 57 (2d Cir. 2019)....................................................................................13

*Slayton v. Am. Exp. Co.*,
  604 F.3d 758 (2d Cir. 2010).....................................................................................8

*Spitzberg v. Houston Am. Energy Corp.*,
  758 F.3d 676 (5th Cir. 2014)..................................................................................11

*Steinberg v. PRT Grp., Inc.*,
  88 F. Supp. 2d 294 (S.D.N.Y. 2000)........................................................................22

*Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin.
    (In re Synchrony Fin. Sec. Litig.)*,
  988 F.3d 157 (2d Cir. 2021)...............................................................................13, 14

*Wilson v. Merrill Lynch & Co.*,
       671 F.3d 120 (2d Cir. 2011)..............................................................................................22

*Zirkin v. Quanta Cap. Holdings Ltd.*, No. 07 Civ. 851 (RPP),
       2009 U.S. Dist. LEXIS 4667 (S.D.N.Y. Jan. 22, 2009) .....................................................22

**Statutes**

15 U.S.C. §77k................................................................................................................... *passim*

15 U.S.C. §77*o*................................................................................................................24

**Rules**

Fed. R. Civ. P. 8...................................................................................................................7

**Secondary sources**

SEVERAL, Black's Law Dictionary (11th ed. 2019)........................................................6

Lead Plaintiff Mark Henry ("Plaintiff"), by and through his undersigned counsel, respectfully submits this memorandum of law in opposition to Defendants' Motion to Dismiss the Consolidated Amended Complaint (the "Motion" and "Complaint," respectively; references to "¶__" refer to the respective Complaint paragraph, and "Def. Br. __" refer to Defendants' Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Complaint).

## INTRODUCTION

The Complaint's allegations of Tufin's inaccurate Registration Statement are straightforward. While the Registration Statement misleadingly claimed that Defendant Tufin Software Technologies Ltd.'s ("Tufin" or the "Company") sales cycle "usually lasts several months" (¶72), the Company's sales typically took at least a year, with a six-month cycle only achievable with luck. ¶¶4, 55, 56. Additionally, contrary to claims that the Company's "highly trained sales force" was the product of "invest[ing] significant time and resources in training new sales force personnel to understand our solutions and growth strategy" (¶75), the actual sales force was comprised of inexperienced and unknowledgeable salespersons, with insufficient training and support, and excessive turnover due to the resulting underproduction. ¶¶60-64.

Defendants do not seriously dispute these well-pleaded Complaint allegations of undisclosed risks to Tufin's sales process. Instead, the Motion attempts shopworn misdirections that the claim is based on "missed projections" (Def. Br. 7) instead of the undisclosed risks threatening those projections, and attacks the Complaint's confidential witnesses ("CWs")—largely comprised of sales managers—as somehow lacking bases for their corroborated accounts of insufficient sales resources and sales cycles that lasted years, not months as Tufin claimed. Moreover, Defendants misconstrue Securities Act jurisprudence by claiming that Plaintiffs must allege loss causation even though it is not an element of a Section 11 claim.

1

The Motion's other grounds for dismissal also fail.  The Registration Statement's specific statements about Tufin's sales cycle and resources are not "puffery," especially when considered in the context of a fledgling company trying to convince investors that its perpetual-license model, which recorded revenue in large unpredictable chunks, was a better prospect for success than the predictable, smooth, industry-dominant software-as-a-service or "SaaS" model.  Analysts were acutely aware of this context and impressed by the approach Tufin claimed to take in the Registration Statement, setting lofty price targets based on Tufin's "high velocity sales model" and "purpose[ful] invest[ment] in adding more sales capacity."  ¶70.  Additionally, the Motion's assertion that the Complaint is defective for want of an executive account with "knowledge of Tufin's sales operation as a whole" (Def. Br. 2) ignores both independent corroborating accounts from eleven CWs and established Second Circuit jurisprudence.  Moreover, the Registration Statement's risk disclosures were preceded by inaccuracies regarding then-existing problems with Tufin's inadequate sales force and lengthy sales cycles, which the Registration Statement portrayed as mere possibilities.  The "bespeaks caution" doctrine simply does not apply to these statements of past and existing fact in the Registration Statement's risk disclosures.  Further, the Motion concedes that a section 15 claim survives where, as here, the Complaint states a viable section 11 claim. The Motion should be denied.

## STATEMENT OF FACTS

Defendant Tufin is a self-described network-security policy-management company that offers products designed to protect against cybercrime—*i.e.*, crime involving unauthorized access to computer systems.  ¶¶2, 37-39.  As computer systems become more complex, and thus vulnerable to attack, companies employ several complicated tools to protect themselves, such as additional firewalls, endpoint security, identity and access management, and other security

solutions. ¶38.  These tools, developed by a multitude of third parties, require the coordination of the multi-sourced tools to work together effectively.  ¶39.  Typically, this coordination was accomplished by an in-house team to manually manage a company's cybersecurity policies. ¶39. According to Tufin, however, this practice "increases the risk of human error and cybersecurity vulnerabilities." *Id.*  As a result, Tufin claims to address these inefficiencies and vulnerabilities by helping companies "visualize, define and enforce a unified security approach."  ¶¶40-41.  To do so, Tufin offers a suite of five interrelated software products called the "Tufin Orchestration Suite" (the "Suite"), which consists of SecureTrack, SecureChange, SecureApp, Orca, and Iris. ¶41.

Selling the Suite was difficult, and its sales cycle was extremely long, technical, and complex. ¶55.  Instead of offering the Suite as a SaaS subscription model, Tufin sold the Suite as a one-time, perpetual license, with an average price exceeding $200,000. ¶66.  According to CW1, CW2, and CW3, the reaction by customers was that the Suite was "nice-to-have," but not a "must-have" product, which exacerbated the sales challenge presented by the Suite's high cost.  ¶43. CW4 added that most companies could manage their security policies manually, and that only large companies with hundreds of firewalls needed the automatic configuration that Tufin offered. ¶43. Accordingly, the low demand and exorbitant cost for Tufin's software made it difficult to predict when or if a sale would close.  *Id.*

Due to the customers' indifference and perceived lack of need regarding the Suite, Tufin's sales team needed an extraordinarily large amount of time, product knowledge, and technical expertise to effectively explain Tufin's product offerings and demonstrate how Tufin's software adds value to make a sale. ¶¶4, 43, 56, 60, 62.  CW1, CW2, and CW8 agreed that, even with prior experience in information-technology ("IT"), software, and technology sales, the complexity of

3

Tufin's product and its implementation, it took new salespeople a long time—at least six months to a year—to understand the product and the most effective way to sell it. ¶60.

Insufficient training and resources magnified the already steep learning curve to sell Tufin's Suite. CW4 reported that Tufin's sales training occurred at the Company's headquarters at the time salespersons were hired and consisted entirely of learning about the Suite. ¶54. CW10 reported that new salespeople were left to handle sales calls on their own, without crucial on-the-job training by experienced salespeople. ¶54. Further, Tufin employed an insufficient number of pre-sales engineers, such as CW5, who were needed to answer highly technical questions and develop specific solutions for potential customers. ¶62.

Another factor contributing to the Suite's lengthy sales cycle, according to Tufin's salespersons and managers, was the delay inherent in selling an expensive, unnecessary product. ¶57. CW1 reported that it often took six to eight months just to schedule a demonstration with the right person in an organization, while CW7 noted that closing a sale could require years of meetings. ¶56. CW11 and CW1 independently observed that because the expense of Tufin's product frequently required approval from distinct divisions in a company (usually networking and security), if any group pushed back or balked, it could delay or kill the deal entirely. ¶56.

Due to the combination of salesperson inexperience, low demand, and high cost, Tufin's sales cycle was significantly longer than "several months. ¶¶4, 43, 50-56, 60, 63, 73, 74. CW1 and CW2 both agreed that the sales cycle was typically at least a year. ¶55. CW11 observed typical cycles of two years and reported that a six-month close required luck. ¶55. CW4, a regional sales manager, believed that Tufin's long sales cycle made it a poor fit for any expectation of steady quarterly growth. ¶55.

CW1 and CW2 reported that, despite the reality of Tufin's lengthy, years-long sales cycle, which was compounded by long salesperson ramp-up periods, and inadequate training and sales-support resources, Tufin sales leadership regularly terminated new salespersons if they had not closed a deal after one year. ¶64. CW10 corroborated CW2's account, and added that Tufin would hire 30-40 people, fire all but one after a short time for low production, and then start over with a new batch of hires. ¶64.

Tufin's sales pipeline was highly important to Tufin's management, who, according to CW8, micromanaged the entire sales process, demanding regular, intraday updates from its salesforce. ¶46. CW6, a Regional Sales Manager, reported that Tufin required its salespeople to regularly update their progress on Salesforce,[1] which required salespeople to estimate the sale's close date. ¶48. According to CW9, who was also a Regional Sales Manager at the Company, Tufin's executives wanted regular Salesforce updates so they could show the strength of Tufin's sales pipeline to the Company's investors. ¶46. The strength of Tufin's pipeline was crucial to investors because, in contrast to the industry-standard SaaS billing model, "Tufin sells its product in the conventional model of software licenses," which "are heavily back-end-loaded," and less predictable than "[s]ubscription revenue [models] . . ., particularly when the average price tag of just the software – as it is in some cases at Tufin – climbs above $200,000." ¶61.

On March 6, 2019, Tufin filed its Registration Statement on Form F-1, and filed amendments on March 18 and April 1, 2019. ¶¶65, 67. The Registration Statement touted Tufin's "highly trained sales force" and told investors that the Company "invest[s] significant time and resources in training new sales force personnel to understand our solutions and growth strategy."

---

[1] Salesforce is customer-relationship-management software that allows management and sales to track and categorize each potential customer or sale by a variety of factors, including forecasting when the sale might close. ¶46.

¶¶72, 75.  In reality, however, Tufin's sales force was comprised of new hires with limited training at the time of hire that regularly required up to a year before they could close a sale and lacked sufficient resources to either develop customer relationships or technical solutions to customers' IT and security problems.  ¶¶4, 7, 50-52, 60-62.  As most sales took at least a year to close, and the Company routinely terminated salespersons after a year without a sale, Tufin's sales force was perpetually inexperienced.  ¶¶4, 55, 60, 63-64, 73, 76, 78.

The Registration Statement told investors that Tufin's "sales cycle usually lasts several months from proof of concept to purchase date, and is often longer for larger transactions."  ¶72. This (and other related statements in the Registration Statement) created the false and misleading impression that Tufin's sales cycle usually lasts "several" months ("more than one or two but not a lot" according to Black's Law Dictionary, *see* ¶74 n.11), but that longer intervals are possible. Actually, the majority of Tufin's sales took a least a year.  Defendants' misleading statement about the sales cycle misled investors using the "anchoring effect" – a cognitive bias in which a provided value (*e.g.*, a sales cycle of "several months") anchors an estimate (*e.g.*, what a reasonable investor believes is meant by "longer").  ¶74.  As a result, when considering the phrase "several months . . . and is often longer," investors anchored "often longer" to "several months" and reasonably understood that a sale would sometime take a few additional months to close—not years.  ¶¶73-74, 78.

On April 11, 2019, Defendants filed a Prospectus on Form 424B4 that amended the Registration Statement and allowed the sale of securities to the public to proceed.  ¶69.  Based on the Defendants' statements about its experienced sales force and sales cycle, analysts covering the Company issued lofty price targets for the Company.  Although shares initially sold at $14.00 per share during the IPO, analysts at Jeffries set a price target of $28.00 per share in part because Tufin

6

"built out its inside sales teams to help facilitate a high velocity sales model."  ¶70.  Similarly, analysts at Barclays set an "overweight" $29 price target in part because of the Company's claimed "purpose[ful] invest[ment] in adding more sales capacity."  ¶70.

Tufin's Offering began selling shares on April 11, 2019 at $14.00 per share, and ultimately sold 7.7 million shares, receiving approximately $100.3 million in net proceeds from the IPO.  ¶69. Tufin later disclosed that its fourth quarter revenue would be between 11.5% and 22.4% lower than previously guided, which it attributed to a lack of scale and ability to manage and close a substantial volume of large, complex transactions, primarily in North America.  ¶79.  On February 26, 2020, Tufin's stock closed for trading at a price of $12.15 per share.  ¶8.

**ARGUMENT**

## I.   THE COMPLAINT ADEQUATELY ALLEGES A SECTION 11 CLAIM

### A.   Applicable Pleading Standards Favor Denial of the Motion.

To state a claim under Section 11, Plaintiff is only required to allege that Tufin's Registration Statement "(1) contained an untrue statement of material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state a material fact necessary to make the statement therein not misleading."  *Caiafa v. Sea Containers Ltd.*, 525 F. Supp. 2d 398, 408 (S.D.N.Y. 2007). Defendants do not dispute that (a) fraud is not alleged here, (b) the heightened pleading standards of the Private Securities Litigation Act do not apply, and (c) the Complaint's sufficiency is governed by Rule 8(a)'s notice-pleading standard.  *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 715 (2d Cir. 2011) (citing Fed. R. Civ. P. 8(a)).

"To survive a motion to dismiss, a complaint must plead enough facts to state a claim to relief that is plausible on its face."  *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009).  On a Rule 12(b)(6) motion, a court must "accept all

factual allegations in the complaint as true and must consider the complaint in its entirety," *Slayton v. Am. Exp. Co.*, 604 F.3d 758, 766 (2d Cir. 2010), and draw all reasonable inferences in the plaintiffs' favor. *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000).

As Section 11 imposes strict liability, there is no fraud or scienter requirement, *see Rombach v. Chang*, 355 F. 3d 164, 169, n. 4 (2d Cir. 2004), nor is there any reliance or loss causation requirement. *Id.; see also Adair v. Bristol Tech. Sys.*, 179 F.R.D. 126, 135 (S.D.N.Y. 1998). Thus, the burden on a Section 11 plaintiff is "minimal" and even innocent misstatements are actionable. *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983) (emphasis added); *see also NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 148 (2d Cir. 2012).

The Motion claims that "[t]he Court may consider . . . other publicly filed disclosure documents" in resolving it. Def. Br. 9. This is wrong. "'Court[s] cannot rule that the scattered disclosures in various amendments, annexes and exhibits to the Prospectus and Registration Statement were sufficient as a matter of law to disclose the material facts to reasonable investors.'" *Citiline Holdings, Inc. v. iStar Fin., Inc.*, 701 F. Supp. 2d 506, 515 (S.D.N.Y. 2010) (quoting *Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009)). Along these same lines, statements that are not incorporated into the Registration Statement are insufficient to render false or misleading statements in the Registration Statement immaterial as a matter of law. *iStar Fin.*, 701 F. Supp. 2d at 515.

The Motion's citations (*see* Def. Br. 9) to *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87 (2d Cir. 2007) and *Kramer v. Time Warner, Inc.*, 937 F.2d 767, 774 (2d Cir. 1991) concern section 10(b) Exchange Act claims, not section 11 Securities Act claims, and do not apply here.

### B.    The Registration Statement Misrepresented Tufin's Sales Process

8

The Securities Act "imposes strict liability on issuers and signatories . . . 'in case any part of the registration statement . . . contained an untrue statement of a material fact or omitted to state a material fact required to be statement therein or necessary to make the statements therein not misleading.'" *NECA-IBEW*, 693 F.3d at 156 (quoting 15 U.S.C. §77k(a)). Where Plaintiff establishes either "a material misrepresentation" or "a material omission of information that is necessary to prevent existing disclosures from being misleading—then, in a Section 11 case, 'the general rule is that an issuer's liability  . . . is absolute." *Litwin*, 634 F.3d at 715-16 (citing *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 360 (2d Cir. 2010) and quoting *In re Initial Pub. Offering Sec. Litig.*, 483 F.3d 70, 73 n.1 (2d Cir. 2007). Here, well-pleaded Complaint allegations establish Defendants' liability under both bases: The Registration Statement misrepresented Tufin's perpetually inexperienced, undertrained, and under supported sales force as "highly trained" and the recipient of "significant time and resources [to] train[] new sales force personnel to understand [Tufin's] solutions and growth strategy." Moreover, the Registration Statement created in investors the false impression that Tufin's years-long sales cycle was usually only a handful of months, with only the occasional slightly-longer cycle for larger transactions, instead of the other way around.

The Motion does not seriously contest the sufficiency of the Complaint's allegations of falsity and misleading impressions. *See* Def. Br. 13-15, 18-20. Instead, while Defendants cite black-letter law about examining the false and misleading statements in context, the Motion uses extrinsic, post-IPO documents out of context to raise inappropriate fact arguments that must wait for resolution by a jury. This is improper, as "[t]he truth of a statement made in the registration statement 'is adjudged by the facts as they existed when the registration statement became effective.'" *Pehlivanian v. China Gerui Adv. Materials Grp., Ltd.*, Case No. 14 Civ. 9443 (ER),

9

2017 U.S. Dist. LEXIS 46852, at *25 (S.D.N.Y. Mar. 29, 2017) (quoting *Charter Twp. of Clinton Police & Fire Ret. Sys. v. KKR Fin. Holdings LLC*, No. 08 Civ. 7062 (PAC), 2010 U.S. Dist. LEXIS 122127 (S.D.N.Y. Nov. 17, 2010)).

For example, Defendants improperly use Tufin's quarterly reports for June and September 2019 (two and five months post-IPO) to argue that Tufin reported a post-IPO increase in its "sales and marketing" expenses.  Def. Br. 14.  But Tufin's reporting of a *post*-IPO increase of an aggregate line item in its income statement is not evidence of Tufin's *pre*-IPO spending on its salesforce's training or sales support.  Defendants also claim that Tufin's revenue increases post-IPO proves that its salesforce was sufficiently trained and supported at the time of the IPO.  Indeed, if Tufin raised salaries of people in the training department, expenses would have increased but not the quantity or extent of the training that the CW's testified was sorely lacking. ¶¶4, 50-52, 54, 60-63.  This Post-IPO increase is another red herring seeking to divert attention away from the allegations in the Amended Complaint.  The allegations of material misrepresentations in the Registration Statement are not directed at the revenue figure contained therein, but material misrepresentations about the quantity and quality of the training and support available to the sales team to drive increased revenue. These materially misleading statements were cited by analysts, *see* Jeffries and Barclays analyst reports (¶70), as reasons for increasing their Tufin stock projections.

Similarly, the Motion does not, and cannot (at this stage) contest allegations that Tufin's sales cycle was really one to two years, not the "several months" referenced in the Registration Statement.  The Motion argues the Registration Statement is literally true because the "several months" figure was qualified by language that the cycle could be longer for larger transactions,

(Def. Br. 14-15, 19-20).[2]  But "the law is well settled that so-called 'half-truths'—literally true statements that create a misleading impression"—are actionable under the securities laws; total contradiction, as the Motion asserts (Def. Br. 18) is not required.  *See Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (applying analysis to §10(b) claim); *see also, e.g.*, *McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990) ("[A] statement which is literally true, *if susceptible to quite another interpretation* . . . [is] a material misrepresentation.") (emphasis added, internal quotation marks omitted); *SEC v. Mudd*, No. 14 Civ. 9443 (ER), 2016 U.S. Dist. LEXIS 24233, at \*13-14 (S.D.N.Y. Feb. 29, 2016) (citing *McMahan*); *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 689 (5th Cir. 2014) (declining to consider defendant's interpretation of a term used in the defendant's statements because plaintiff's interpretation was plausible); *see also Bauer v. Prudential Fin., Inc.*, No. 09-1120 (JLL), 2010 U.S. Dist. LEXIS 64384, \*38 (D.N.J. June 29, 2010) (same).   Here, the Registration Statement misled investors by anchoring their expectation of Tufin's sales cycle to "several months" instead of the correct timing of one to two years.  ¶¶73-74, 78.  To the extent Defendants wish to argue otherwise, they must do so with credible evidence before the jury at trial.

> ### C.    Inaccuracies About Tufin's Sales Process are not Puffery

Defendants and analysts all agreed that Tufin's "several months"-long sales cycle and the "investment of significant time and resources in training new sales force personnel to understand our solutions and growth strategy" were critical to the continued success of Tufin, a nascent Tech company offering complex, expensive IT-security software that appealed mainly to only the largest companies and institutions. ¶¶2, 3, 39-43, 55-56, 66, 70, 72, 75, 79.  Tufin's sales cycle was particularly important given the Company's decision to use a perpetual-license model, which

---

[2] The Motion's claim that the Complaint "ignores" this clause is strange in light of the Motion's citation of the Complaint for this language.  *See* Def. Br. 14-15 (citing ¶77).

recorded revenue in large chunks, instead of the industry-dominant, smooth, software-as-a-service or SaaS billing model.  ¶¶45, 66, 70.  The Motion does not argue otherwise.  Instead, it improperly attempts to distract from this importance by plucking terms out of context and claiming they are too "generalized" to be deemed important.  Def. Br. 12-13.  But determining whether statements are puffery or actionable "depends, in part, on the context in which it is made," especially when made to "reassure the investing public" about a sensitive part of the business.  *In re Petrobras Sec. Litig.*, 116 F. Supp. 3d 368, 381 (S.D.N.Y. 2015); *see also In re Avon Secs. Litig.*, 2019 U.S. Dist. LEXIS 200816, *47 (S.D.N.Y. Nov. 18, 2019) (finding "Avon's content-free, unverifiable statements that their Brazilian business was generally healthy or that a particular campaign was a success[,] misled investors").

Here, importantly, analysts who act as surrogates of the market, found the statements about the salesforce supported a huge increase in the valuation of Tufin's stock price.  As noted above, analysts at Jeffries set a price target of $28.00 per share in their initiating-coverage report, in part because Tufin "built out its inside sales teams to help facilitate a high velocity sales model."  ¶70. Analysts at Barclays similarly set an "overweight" $29 price target in their initiating report in part because of the Company's claimed "purpose[ful] invest[ment] in adding more sales capacity." ¶70. The statements in the Registration Statement and Prospectus regarding the salesforce were not considered mere puffery by the market, but part of the total mix of information important to investors making a decision on whether to purchase Tufin stock. In the case of Jefferies and Barclays, the information was important enough to value the upside of Tufin at an additional $10-$11 per share. Thus, the market did not consider the alleged statements to be mere puffery.

Courts also have found similar statements not to be mere puffery. For example, statements of a company's "intent[ion] to continue to invest in our sales force," misrepresented the

12

Company's practice of replacing its experienced sales people with less qualified and effective staff. *City of Omaha Police & Fire Ret. Sys. v. Evoqua Water Techs. Corp.*, 450 F. Supp. 3d 379, 405, 407-08 (S.D.N.Y. 2020). Similarly, statements such as "we believe in competition" and "we believe we have a focused on competitive pricing strategy" were found to be actionable in context, despite their imprecision, "given the lack of competition in the market." *Ont. Teachers Pen. Plan Bd. v. Teva Pharm. Indus.*, 432 F. Supp. 3d 131, 166 (D. Conn. 2019). Here, given the importance of how the Company generated its sales, the amount of time it took to close a sale, and the technical expertise required to effectively sell its products, there is no legitimate question as to the importance of statements anchoring Tufin's sales cycle to "several months" and representations about the quantum of training and support provided to its sales force. These statements were intended not to simply convey optimism, but to assuage investors' concerns about Tufin's sales process.

The Motion's cited cases (Def. Br. 11-13) appropriately rejected "statements that 'lack the sort of definite positive projections that might require later correction." *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 245 (2d Cir. 2016). In contrast to Defendants' misstatements, which were tethered to the current timing of Tufin's sales process and the vigor of its sales force, the *Singh* Court found inactionable "general declarations about the importance of actually lawfully and with integrity." *See Singh v. Cigna Corp.*, 918 F.3d 57, 63 (2d Cir. 2019). The *Synchrony*, *JP Morgan*, *Rombach, Diebold*, and *Aratana* Courts, meanwhile, found the relevant statements to be nonactionable corporate optimism about future events, not, as here, specific facts about the company's current sales operations. *Stichting Depositary APG Developed Mkts. Equity Pool v. Synchrony Fin. (In re Synchrony Fin. Sec. Litig.*, 988 F.3d 157, 171, 173 (2d Cir. 2021) (finding "generic statements about Synchrony's overall business model" and "statements that the company

13

was 'pretty confident' and 'pretty positive' about the prospect of renewing partnerships . . . best characterized as inactionable corporate puffery"); *JP Morgan*, 553 F.3d at 205-06 (holding assertions of "risk management process" as "highly disciplined" and "'set[ting] the standard for integrity" were "too general" and could not "amount to guarantee that its choices would prevent failures in its risk management practices") *Rombach*, 355 F.3d at 175 (holding opinion of integration of new facilities as "well underway" was nonactionable expression of corporate optimism); *In re Diebold Nixdorf, Inc. Sec. Litig.*, No. 19-CV-6180 (LAP), 2021 U.S. Dist. LEXIS 62449 (S.D.N.Y. Mar. 30, 2021) (finding rosy, vague confidence about "excellence" and "progress" regarding future events inactionable puffery); *In re Aratana Therapeutics Inc. Sec. Litig.*, 315 F. Supp. 3d 737, 757 (S.D.N.Y. 2018) (finding "statements [that] do no more than place a positive spin on developments in the [FDA approval] process . . . constitute[] puffery").

Moreover, the Motion's assertion that "[c]ourts have rejected challenges to nearly identical statements" fatally ignores the context in which each of those other statements were made. Allegations that the Registration Statement misrepresented Tufin's sales cycle and the amount of training and support provided to its salespersons distinguish this case from *Xinhua*, which not only found investors would not rely on "soft adjectives" like "strong," "experienced," and "capable" when describing an officer, but found additionally that those adjectives did not create a duty to disclose the officer's "close connections" to companies involved in regulatory action. *In re Xinhua Fin. Media, Ltd. Sec. Litig.*, No. 07-cv-3994 (LTS)(AJP), 2009 U.S. Dist. LEXIS 14838, at *22 (S.D.N.Y. Feb. 25, 2009). Similarly, the lack of any contrary disclosures in the Registration Statement distinguish this case from some of the statements in *AMC*, which found that disclosure of an recently-integrated cinema company's "past revenue weaknesses" and its "'slow start' when it came to installing recliners'" rendered as puffery language that integration was "'quick[],' 'very

14

smooth,' and showing 'great progress.'" *Haw. Structural Ironworkers Pen. Tr. Fund v. AMC Entm't Holdings, Inc.*, 422 F. Supp. 3d 821, 845-46 (S.D.N.Y. 2019). As in *AMC*, the *UBS* Court found that "specific disclosures by UBS about its accumulation of mortgage-related securities" undercut the inference that Defendants ignored or concealed that their accumulation of mortgage-related securities "was inconsistent with their representations about risk management." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 186 (2d Cir. 2014). Further, in contrast to the Registration Statement's specific timing of Tufin's sales cycles and the training and resources provided to its sales force, the *UBS* Court properly found representations that UBS "prioritized '*adequate* diversification of risk' and 'avoidance of *undue* concentrations'" to be "too open-ended and subjective" to guarantee that UBS would not accumulate a $100 billion mortgage-backed-securities portfolio. *Id.* Thus, in context, Defendants statements are much more than vague corporate optimism that courts often find as inactionable puffery, and Defendants' statements assuring investors that the Company has a highly trained sales staff are actionable misstatements.

### D. Defendants' Attacks on the Confidential Witnesses Fail

There is no dispute that each of the confidential witnesses, as set forth below, "'are described in the complaint with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.'" *N.J. Carpenters Health Fund v. Royal Bank of Scot. Grp., PLC*, 709 F.3d 109, 123-24 (2d Cir. 2013) (quoting *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000)). That is all that is required. *Id.*

| CW# | Description of the Confidential Witness | Employment Period | Citation |
|---|---|---|---|
| CW1 | Business Development Representative based in Ohio | Aug. 2018 to Jan. 2020 | ¶26 |

15

| CW2 | Regional Sales Manager based in Michigan, responsible for 30 potential customer accounts in Indiana and Michigan | Mar. 2018 to Oct. 2018 | ¶27 |
|---|---|---|---|
| CW3 | Regional Sales Manager based in Ohio, responsible for 20 accounts | July 2019 to May 2020 | ¶28 |
| CW4 | Regional Sales Manager based on Pennsylvania | Apr. 2018 to June 2019 | ¶29 |
| CW5 | Senior Technical Account Manager/Sales Engineer, who traveled across the country to meet with customers and technical teams | Feb. 2018 to Mar. 2020 | ¶30 |
| CW6 | Regional Sales Manager whose sales territory covered part of the New York City metro area | Apr. 2017 to Aug. 2019 | ¶31 |
| CW7 | Regional Sales Director | Feb. 2019 to Mar. 2020 | ¶32 |
| CW8 | Channel Account Manager, based in Florida, who trained third party sellers of Tufin's products and managed sales to reseller partners | May 2019 to May 2020 | ¶33 |
| CW9 | Regional Sales Manager based in Tennessee | Dec. 2017 to May 2019 | ¶34 |
| CW10 | Sales Development Representative based in Ohio | Jan. 2019 to Apr. 2020 | ¶35 |
| CW11 | Sales Representative for Enterprise Accounts based in Washington DC area and assigned to accounts in the mid-Atlantic region | Apr. 2019 to Jan. 2020 | ¶36 |

The Motion does not dispute that each of these confidential witnesses has bases to support the probability that they possessed the information alleged regarding the true length of Tufin's sales cycle and insufficient training and support. Instead, the Motion sets up several unsupported straw men arguments that the confidential witnesses should be disregarded entirely (a) because none discusses loss causation, (b) each "lack[s] insight into an issuer's operation as a whole," (c) only eight of the eleven witnesses were employed on the day of Tufin's IPO, and (d) there are no "facts to corroborate" the witnesses' accounts. *See* Def. Br. 15-18. As detailed below, all should be rejected as lacking support:

16

**Allegations of loss causation not required**.  The Motion initially faults Plaintiff for "alleg[ing] no corrective disclosure whatsoever" or not including accounts that "say anything about the missed projections that Plaintiff cites as causing his loss."  Def. Br. 16.  In addition to mischaracterizing the Complaint, which in fact does not allege *anything* related to the cause of Plaintiff's loss, "a plaintiff bringing a claim under Section 11 need not allege . . . loss causation" so no corrective disclosure is required to state a claim.  *See Set Cap.*, 996 F.3d at 84.

**"[I]nsight into an issuer's operation as a whole" not required**.  Nor is Plaintiff required to produce a witness with personal knowledge of the complete picture of Tufin's operations in order to state a claim, as the Motion argues.  *See* Def. Br. 16.  Among the many factors courts evaluate in determining the credibility of a confidential witness's report is "the collaborative nature of the other facts alleged (including from other sources)" and "the number of sources."  *See, e.g.*, *In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 479 (S.D.N.Y. 2004); *In re Elan Corp. Sec. Litig.*, 543 F. Supp. 2d 187, 207 (S.D.N.Y. 2008).  Here, eleven Tufin employees from seven different locations (Ohio, Michigan, Pennsylvania, New York, Florida, Tennessee, and Washington) each corroborated each other's reports.  In particular, CW1, CW2, CW3, CW4, CW5, and CW6 (all of whom, CW1 excepted, were sales managers) corroborated reports that given the high cost of the Suite, only the largest companies actually needed Tufin's automation, and that smaller companies could manage their IT policies manually.  ¶43.  In addition, CW4 and CW10 separately reported a lack of crucial on-the-job training.  ¶54.  Moreover, CW1, CW2, CW7, CW9, and CW11 all agreed that a sales cycle of "several months" was inaccurate, and that a closer approximation of the cycle timing was in years, not months.  ¶¶55, 56, 58.  Further, CW1 and CW2 independently reported that it took six months (per CW1) to a year (per CW2) to get up to speed, while CW8 added that despite twenty years of selling software, Tufin's Suite still required a

17

significant time investment to learn to sell it.   ¶60.   CW1, CW2, and CW10 also consistently reported Tufin's excessive, speedy, and regular turnover and termination of its salesforce for underproduction, despite the lengthy time required to train the new hires and close a sale.   ¶¶63, 64.   These corroborating witness accounts pervading the Complaint plainly "support the probability that a person in the position occupied by the source would possess the information alleged."  *Novak v. Kasaks*, 216 F.3d at 314.

In contrast to this case, where it is undisputed that the witnesses possess the information alleged,[3] the cases cited in the Motion (Def. Br. 16-17) disregarded witnesses that did not possess the alleged information.  *See Local No. 38 IBEW Pen. Fund v. Am. Exp. Co.*, 724 F. Supp. 2d 447, 460-61 (S.D.N.Y. 2010) (rejecting accounts, for scienter purposes, of "low-level employees [who] had no contact with the individual defendants," and for falsity, where "most had no access to aggregated data regarding credit risk, and none averred that they received a directive from the Company to lower credit standards").   In contrast to the witness reports in this case, all from salespersons or managers about Tufin's sales practices, the *JA Solar* witnesses' job descriptions ("financial analysts, sales manager, and sales staff") suggested they were not in a position to know of the company's plans to relist, if any, and impermissibly based their reports on "secondhand accounts".  *ODS Cap. LLC v. JA Solar Holdings Co. Ltd.*, No. 18-CV-12083 (ALC), 2020 U.S. Dist. LEXIS 223305, *27-28 (S.D.N.Y. Nov. 30, 2020). Similarly, the *Frontier* Court rejected the account of a director of operations who claimed "not a single soul" in a certain region had access to video on demand, but lacked knowledge "about all video-on-demand functionality."  *In re*

---

[3] Defendants only challenge each witness's "ability to speak for training or sales cycles across Tufin as a whole." Def. Br. 16.

*Frontier Comms. Corp. Stockholders Litig.*, No. 3:17-cv-1617 (VAB), 2020 U.S. Dist. LEXIS 50063, *44-46 (D. Conn. Mar. 24, 2020).

**Independent corroboration of witnesses' accounts not required**.  As stated above, the confidential witnesses' accounts are extensively and independently corroborated.  But even assuming *arguendo* an absence of independently corroborated facts, "court[s] will credit confidential sources whose positions and/or job responsibilities are described sufficiently [as here, *see* ¶¶26-36] to indicate a high likelihood that they actually knew facts underlying their allegations."  *In re Weight Watchers Int'l Sec. Litig.*, No. 19cv2005, 2020 U.S. Dist. LEXIS 223592, *24 (S.D.N.Y. Nov. 30, 2020).  As stated above, Defendants do not argue that the Complaint's description of the witnesses' positions or responsibilities were insufficient, only that each lacked knowledge of the whole of Tufin's sales operation.  By contrast, *IAC* rejected witnesses who lacked "details that might help the Court evaluate whether these employees were actually in a position to know" the status of IAC Travel's relationships with hotel chains and customers."  *In re IAC/InterActiveCorp Sec. Litig.*, 478 F. Supp. 2d 574, 592 (S.D.N.Y. 2007), *dismissed after am.*, 695 F. Supp. 2d 109, 119 (S.D.N.Y. 2010) (discussing insufficient witness showing, and finding "[w]hat was true of plaintiff's First Complaint is true here").  Similarly, and unlike here, the complaint in *Abengoa* did not state "when FE2 [the challenged witness] worked for Abengoa or which entity he or she worked for. It does not even provide FE2's title."  *Francisco v. Abengoa, S.A.*, 481 F. Supp. 3d 179, 208-09 (S.D.N.Y. 2020).

**Witnesses' employment at IPO not required to establish competency**.  While conceding that eight of the eleven witnesses were employed at the time of Tufin's IPO, the Motion takes issue with three witnesses (CW2, CW3, and CW8) that did not work at Tufin on the day of its IPO.  Def. Br. 17.  But "[a]ny information that sheds light on whether class period statements

19

were false or materially misleading is relevant," including "pre-class period information." *Hollin v. Scholastic Corp. (In re Scholastic Corp. Sec. Litig.)*, 252 F.3d 63, 72 (2d Cir. 2001); *see also Poptech, L.P. v. Stewardship Inv. Advs., LLC*, 849 F. Supp. 2d 249, 271 (D. Conn. 2012). Here, CW2's account corroborates the condition of Tufin's sales environment in the months leading up to the IPO, while CW3's and CW8's post-IPO accounts indicate continued issues with Tufin's sales force. ¶¶43, 51, 55, 57-58, 60-61, 63.

Defendants' cases are irrelevant. While CW2 reported Tufin's sales environment in the months leading up to its IPO, with corroborating, contemporaneous accounts from other witnesses, the challenged witness in *Francesca's* reported on a discrete event that occurred *two years* after the witness left the company. *In re Francesca's Holdings Corp. Sec. Litig.*, No. 13-cv-6882 (RJS), 2015 U.S. Dist. LEXIS 50726, *38 (S.D.N.Y. Mar. 31, 2015). Similarly, *Qudian* properly rejected a witness who merely reported the company's lending practices "before November 2016," prior to both the October 2017 IPO and a 2017 material change in lending rules from regulators. *In re Qudian Secs. Litig.*, No. 17-CV-9741 (JMF), 2019 U.S. Dist. LEXIS 167072, *16-18 (S.D.N.Y. Sept. 27, 2019). Meanwhile, *IndyMac* likewise found that one witness's belief of "shoddy" appraisals "says nothing at all about whether the appraisals were made in accordance with USPAP ["Uniform Standards of Professional Appraisal Practice"]." *In re IndyMac Mortg.-Backed Sec. Litig.*, 718 F. Supp. 2d 495, 510 (S.D.N.Y. 2010). As with *Francesca's*, *Qudian*, and *IndyMac*, *Qihoo* rejected the sole witness's alleged account of the company's plans to relist following a merger, finding it "implausible that Qihoo would entrust a non-executive PR employee with secrets about high-level corporate strategy—more than 15 months before the actual relisting." *Altimeo Asset Mgmt. v. Qihoo 360 Tech. Co.*, No. 19 Civ. 10067 (PAE), 2020 U.S. Dist. LEXIS 146995, *30 (S.D.N.Y. Aug. 14, 2020). Moreover, while the witnesses here all consistently

corroborate the condition of Tufin's sales force, at and around the time of the IPO, *Pronai* (a §10(b) case) disregarded witnesses who could not specify when Defendants knew their statements were false. *Gregory v. Pronai Therapeutics Inc.*, 297 F. Supp. 3d 372, 409 (S.D.N.Y. 2018) ("The AC does not attempt to pinpoint when it became apparent that those studies as to the efficacy of DNAi and PNT2258 had yielded such dire results as to make the underlying therapeutic concept inescapably dubious.").

### E.    The Bespeaks-Caution Doctrine is Inapplicable to Statements of Existing Fact and Misleading, Vague Risk Disclosures

The "bespeaks caution" doctrine is inapplicable to the Registration Statement's inaccuracies about the Company's current speedy sales cycle or the resources, training, and support then provided to Tufin's sales force, because the "doctrine applies only to forward-looking statements" and "does not apply where [as here] a statement 'communicate[s] present or historical fact." *In re MF Glob. Holdings Secs. Litig.*, 982 F. Supp. 2d 277, 304 (S.D.N.Y. 2013) (quoting *Iowa Pub. Empls. Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010)); ¶¶72-78. Here, the Motion does not assert that any of the false and misleading statements were forward-looking, only that the risk disclosures themselves "are protected by the 'bespeaks caution' doctrine". Def. Br. 20. This assertion confuses "forward-looking statements" with the required "meaningful cautionary language" and is unsupported by any of the many cases cited in the Motion (*see* Def. Br. 20-24), despite the cautionary languages' use of forward-looking signals like "may." *See, e.g.*, *Rombach*, 355 F.3d at 173 (holding "optimistic statements" about company's view of "future performance of the newly acquired facilities" are forward looking); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950 (LAK)(AJP), 2015 U.S. Dist. LEXIS 109941, at *41-43 (S.D.N.Y. Aug. 19, 2015) (finding company's statement of future growth opportunity a forward-looking statement accompanied by meaningful cautionary language); *Zirkin v. Quanta Cap.*

21

*Holdings Ltd.*, No. 07 Civ. 851 (RPP), 2009 U.S. Dist. LEXIS 4667, at *37 (S.D.N.Y. Jan. 22, 2009) (statement of estimated future losses from hurricanes were accompanied by meaningful cautionary language); *Steinberg v. PRT Grp., Inc.*, 88 F. Supp. 2d 294, 300-01, 308 (S.D.N.Y. 2000) (noting that "[t]his doctrine only applies to forward-looking statements" and finding that "[t]he prospectus's prediction of increased Y2K business is counterbalanced by language that bespeaks caution"). The Motion simply misapprehends the bespeaks-caution doctrine, and its attempted use of the doctrine should be rejected.

Even if this Court considered the Registration Statement's risk disclosures to be forward-looking statements, Defendants still cannot use the bespeaks-caution doctrine because "'cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired.'" *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011) (quoting *Rombach*, 355 F.3d at 173). Indeed, Tufin's "superficial warning of possible risks" regarding the length of its sales cycle and potential failures to train and retain its sales force, "while failing to disclose critical facts" that Tufin's usual sales cycle was years, not months, and that it was undertraining and undersupporting its salespersons, causing excessive turnover, means its disclosures fall outside the bespeaks-caution doctrine, as "[c]autionary language that is misleading in light of historical fact cannot be meaningful." *MF Glob.*, 982 F. Supp. 2d at 318; ¶¶4, 50-56, 60-64, 73-78.

The cases cited in the Motion are inapposite to the facts of this case. In contrast to statements that Tufin "invest[s] significant time and resources in training new sales force personnel to understand our solutions and growth strategy" and that its "sales cycle usually lasts several months" both of which had been inaccurate for months, if not years (*see* ¶¶54-56, 58, 60-64), *Noah* found the risk disclosure itself, *i.e.*, that raw materials could increase in the future, inactionable

22

where the increase first appeared in the current quarter. *In re Noah Educ. Holdings, Ltd. Sec. Litig.*, No. 08 Civ. 9203 (RJS), 2010 U.S. Dist. LEXIS 34459, *22-23 (S.D.N.Y. Mar. 31, 2010). *Plevy v. Haggerty* merely states the uncontroversial rule that abundant and specific risk disclosures put investors on notice. *See* 38 F. Supp. 2d 816, 832 (C.D. Cal. 1998). *Leapfrog*, on the other hand, stands for the inverse of *Plevy*, that the risk factors were too boilerplate to be actionable. *In re LeapFrog Enters., Inc. Sec. Litig.*, 527 F. Supp. 2d 1033, 1049 (N.D. Cal. 2007). Neither *Plevy* nor *Leapfrog*, however, apply where, as here, factual background statements of current fact underlying the risk disclosures are themselves misleading. ¶¶76, 78.

The Motion's other related arguments are similarly misplaced. Contrary to the Motion's baseless assertion (*see* Def. Br. 22), there are ample "facts to show the risks" of Tufin's protracted sales cycle and underprovisioned sales force that "existed in a definitive way at the time of the IPO." ¶¶4, 43, 48, 50, 54-56, 60-64. This case is thus distinguished from *Bank of America AIG Disclosure Securities Litigation*, which found "general risk disclosures were not rendered misleading by the failure to include a disclosure about a lawsuit that could be filed at an uncertain date seeking damages that could not be estimated." *See* 980 F. Supp. 2d 564, 580 (S.D.N.Y. 2013).

Neither is there any requirement, as the Motion contends, that the risks to Tufin's sales process "had [to] materialize[] at the time of the Registration Statement." Def. Br. 23. The Motion provides no support for this contention, and Plaintiff is unaware of any. Even so, there are ample allegations that, at the time of the IPO, Tufin's sales force was undertrained and undersupported, and that its sales cycle was already much longer than "several months." ¶¶4, 43, 48, 50, 54-56, 60-64, 73-74, 76, 78. While the Motion claims that "Tufin's financial performance demonstrates" an absence of harm to its sales process (Def. Br. 23), this misses the point of Tufin's disclosure obligations, and in any event creates a factual dispute ill-suited for resolution by the Motion.

23

Despite the Motion's insistence that "*Micro Focus* is closely analogous," (Def. Br. 23), that case, as well as *Coty* (also cited on p. 23) both only apply to situations, unlike this case, where the witnesses lack the knowledge they claim to possess: in *Micro Focus*, of "well-known, wide-spread customer attrition at the relevant time, August 2017" (*In re Micro Focus Int'l PLC Sec. Litig.*, No. 1:18-cv-06763-ALC, 2020 U.S. Dist. LEXIS 180621, *23 (S.D.N.Y. Sept. 29, 2020)); and in *Coty*, of "facts that actually support their assertions that sales of Coty's color cosmetics were declining at the time of the IPO." *In re Coty Inc. Sec. Litig.*, No. 14-cv-919 (RJS), 2016 U.S. Dist. LEXIS 41484, *18 (S.D.N.Y. Mar. 29, 2016). The thrust of the Motion is that Defendants disagree with the well-pleaded allegations in the Complaint. This Court should deny the Motion and allow Defendants an opportunity to refute the Complaint's allegations.

## II.    THE COMPLAINT ADEQUATELY STATES A SECTION 15 CLAIM

To allege a claim under Section 15 of the Securities Act, a plaintiff must show a primary violation of Section 11 and control of the primary violator by defendants. *In re Dynagas LNG Partners LP Sec. Litig.*, No. 19-CV-4512 (AJN), 2020 U.S. Dist. LEXIS 221593, *75 (S.D.N.Y. Nov. 25, 2020) (denying motion to dismiss the §15 claim "as Defendants do not argue that Plaintiffs have failed to state a claim that Defendants exercise the requisite control"). The Motion does not dispute that, having otherwise alleged a primary violation under §11, the Complaint states claims for control-person liability under §15. Def. Br. 25; ¶¶95-99.

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

Dated: July 19, 2021                              LEVI & KORSINSKY, LLP


                                                  s/ Adam M. Apton

24

Adam M. Apton
55 Broadway, 10th Floor
New York, N.Y. 10006
T: (212) 363-7500
F: (212) 363-7171
aapton@zlk.com

*Attorneys for Lead Plaintiff Mark Henry
and the prospective class*

POMERANTZ LLP
Patrick V. Dahlstrom
Jared M. Schneider
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603
T: (312) 377-1181
F: (312) 377-1184
pdahlstrom@pomlaw.com
jschneider@pomlaw.com

Jeremy A. Lieberman
J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
T: (212) 661-1100
F: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com

THE ROSEN LAW FIRM, P.A.
Phillip Kim
Nick Manningham
275 Madison Avenue, 40th Floor
New York, New York 10016
T: (212) 686-1060
F: (212) 202-3827
pkim@rosenlegal.com
nmanningham@rosenlegal.com

*Additional Counsel for Plaintiff*

25