USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 2/25/2022

aUNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------------------X
                                                                     :
                                                                     :
IN RE TUFIN SOFTWARE TECHNOLOGIES   :            1:20-cv-5646-GHW
LTD. SECURITIES LITIGATION           :
                                                                     :    MEMORANDUM OPINION &
                                                                     :             ORDER
                                                                     :
------------------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

    This lawsuit arises from the April 2019 initial public offering ("IPO") by Defendant Tufin

Software Technologies Ltd.'s ("Tufin" or "Defendant").  Lead plaintiff Mark Henry ("Plaintiff")

alleges that the registration statement Tufin filed in connection with that IPO included materially

misleading misstatements related to, among other things, the length of its sales cycle and as well as

its training practices.

    Because of those alleged misstatements, Plaintiff brought this putative class action alleging

that Defendant, as well as various of its directors and officers, violated Sections 11 and 15 of the

1933 Securities Act.  Defendants moved to dismiss.  Because Plaintiff sufficiently alleges that

statements regarding the length of Tufin's sale's cycle were materially misleading to investors,

Plaintiff states a claim under Section 11 and Section 15.

## I.    BACKGROUND[1]

### a.    Factual Background

#### 1. Tufin's Software

    Tufin develops and sells cybersecurity software designed to help its customers guard against

cyber-crime.  Dkt. No. 55 ("FAC") ¶¶37, 41.  To prevent cyber-crime, companies generally use

multiple third-party tools and products, such as firewalls.  *Id.* ¶ 38.  Companies rely on in-house

---

[1] The following facts are drawn from the Amended Complaint.  Dkt. No. 55.  The Court "accept[s] all facts alleged in
the [amended] complaint as true and draw[s] all reasonable inferences in the plaintiff's favor."  *Burch v. Pioneer Credit
Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam).

employees to manage manually the numerous policies governing those third-party tools and products. *Id.* ¶ 39. According to Plaintiff, such manual policy management "increases the risk of human error and cybersecurity vulnerabilities and delays the pace of application releases." *Id.*

Tufin's software consists of a "suite of five interrelated instances of software" that is intended to "unif[y] and automat[e]" its customers' policies governing the third-party cybersecurity-related products and tools. *Id.* ¶ 43–44. Defendant represents that this software—the "Tufin Orchestration Suite"—is an "effective, comprehensive way for [its customers] to manage their additional firewalls, endpoint security, identity and access management, and other solutions." *Id.* ¶ 40.

<h3 align="center">2. The Length of Tufin's Sales Cycle</h3>

Plaintiff alleges that "many customers were indifferent" to Tufin's software, viewing the Tufin Orchestration Suite as a "nice-to-have, not a must-have product." *Id.* ¶ 43. Confidential witnesses ("CWs")—all of whom are ex-Tufin employees—reported, among other things, that "only large companies with at least 200 firewalls would need Tufin's products," and that "Tufin's pricing was out of line with the market," leading to "low demand and exorbitant costs." *Id.* ¶ 43.

In addition, CW7 noted that selling Tufin's software could require "years of meetings and navigating other companies' procurement systems." *Id.* ¶ 56. CW11 reported that many customers required approvals from their networking and security teams "and in many companies[,] th[ose] divisions were competing for budget dollars," which could extend the sales process. *Id.* CW1 observed that it would take "six to eight months just to get a meeting scheduled with the right person" in order to "demo the product." *Id.*

As a result, CW2 stated that "deals took eighteen months to two years to close," and CW1 reported that the sales cycle for Tufin software was "typically at least a year." *Id.* ¶ 55. CW11 believed that a "six-month close was only achievable with luck." *Id.* Plaintiff alleges that Tufin's

salespeople "consistently reported" that the length, technicality, and complexity of the Suite's sales cycle "was not understood," because Tufin did not "explain the complexity and length of the sales cycle to new hires."  *Id.* ¶ 54.  CW1 believed that "new salespeople needed at least six months to understand and sell Tufin's products" and CW2 believed that it could "take up to a year."  *Id.* ¶ 60.

### 3. Tufin's Sales Practices and Salesperson Turnover

CWs reported that Tufin salespeople felt Tufin did not allocate sufficient resource to its sales force.  While salespeople received training consisting of "learning about the Suite at Tufin's corporate headquarters," CW10 stated that new salespeople "were left to handle sales calls on their own, without any on-the-job training by experienced salespeople."  ¶ 54.  CW2 remarked that Tufin kept its salespeople on half salary during "their initial ramp-up," and also complained that Tufin "had a policy disfavoring expense spending" and that "if salespeople took a client out for drinks, the salespeople were expected to pay for the second round out of their pockets."  *Id.* ¶ 60.  CW2 also reported that "after less than a year of insufficient sales support, many salespeople would either give up or be forced out."  *Id.* ¶ 63.

Other CWs noted that Tufin had high employee turnover.  CW10 reported that "Tufin would routinely hire thirty to forty people, and then terminate all but one of them after a short amount of time due to low production."  *Id.* ¶ 64.  CW1 added that Tufin regularly terminated new salespeople "after a year's employment if they had not closed a deal."  *Id.* ¶ 64.  According to Plaintiff, "after terminating 96% of its new hires, Tufin would start over again with fresh hires who had to get up to speed on Tufin's products."  *Id.*

### 4. Tufin's Forecasting and Data Management

According to Plaintiff, the company put "excessive pressure" on its salespeople, which led to "inflated sales prospects."  *Id.* ¶ 57.  Tufin's salespeople recorded their potential sales in "Salesforce," a customer-relationship-management software.  CW8 opined that "Tufin's

management micromanaged the sales process through incessant Salesforce-generated reports." *Id.* ¶ 46. CW1 reported that Tufin's vice president of sales of the Americas required salespeople to update Salesforce with the next three steps for each of their prospects every time they had contact with a potential customer, which could "create a misleading expectation of sales because . . . not every prospect had three next steps." *Id.* ¶ 57. CW9 also complained that "Tufin required its salespeople to assign a value to every potential sale, even if the sale was unlikely," and CW3 observed that "salespeople were routinely pressured to forecast sales prematurely" and that "many of Tufin's salespersons routinely forecasted sales closings even before they had been approved by the customer's decisionmakers." *Id.*

Moreover, even though Tufin's sales cycle could allegedly take between one and two years, Plaintiff alleges that "new salespeople were expected to produce results in short time periods of three to four months." *Id.* ¶ 55. Indeed, according to Plaintiff, salespeople were "judged" on weekly progress. *Id.* ¶ 58. Seemingly as a result of that pressure, CW2 admitted that most of their recorded sale leads "did not exist or were otherwise bogus." *Id.* ¶ 57.

Two CWs reported instances in which managers had altered Salesforce data to make a sale seem more likely to close than it actually was. CW7 recounted an instance in which he did not believe that a grocery store chain was likely to purchase a product "by December 2019," but a manager "changed the grocery chain's status in Salesforce to 'commit' which falsely indicated to others in Tufin that the grocery chain had committed to close by December 2019." *Id.* ¶ 59. CW8, who began working at Tufin after its IPO, "received at least four other reports about altered sales-forecast data," in addition to CW7's account. *Id.*

### 5. Tufin's IPO

On November 20, 2018, in preparation for its IPO, Defendant filed a confidential draft registration statement on Form DRS with the Securities and Exchange Commission. *Id.* ¶ 65. It

4

then filed a registration statement with the SEC on March 6, 2019. *Id.* Defendant amended the registration statement on March 18, 2019 and April 1, 2019, and the SEC declared the registration statement effective on April 10, 2019 (the "Registration Statement"). *Id.* ¶¶ 67–68. Tufin began selling shares on April 11, 2019 at $14.00 per share. *Id.* ¶ 69.

On January 9, 2020, Tufin released preliminary unaudited revenue and non-GAAP operating loss estimates for the fourth quarter of 2019. *Id.* ¶ 6. While Tufin's previous guidance anticipated revenues ranging from $34 to $38 million, it reported total revenue ranging from only $29.5 to $30.1 million. Additionally, Tufin had anticipated non-GAAP operating loss ranging from $1.1 million to $2.6 million, but reported a non-GAAP operating profit in the range of $0 to $3.0 million. *Id.* According to Plaintiff, Tufin cited an "inability to close a number of transactions, primarily in North America" as the reason for its failure to meet its revenue forecast, noting that "deals were too complex and large, and that Tufin lacked the scale required in order to manage a substantial volume of complex deals." *Id.* ¶ 7.

Upon the publication of those disclosures, Tufin's share price fell 24.04% to close at $13.08 per share. *Id.* ¶ 8.

### b. Procedural Background

On July 21, 2020, Plaintiff Matthew Ellison filed a putative class action complaint against Tufin, Reuven Harrison, Ohad Finkelstein, Edouard Cukierman, Yair Shamir, Ronni Zehavi, Yuval Shachar (collectively, the "Individual Defendants"), and various underwriters alleging violations of Sections 11, 15 and 15 of the 1933 Securities Act (the "Securities Act"), 15 U.S.C. U.S.C. § 77k; 12(a)(2), 15 U.S.C. §12(a)(2)), §77o. Dkt. No. 1. On October 19, 2021, the Court granted a motion to consolidate Plaintiff's case with *Michaelson v. Tufin Software Technologies, Ltd. et al*, Case No. 1:20-cv-6290. Dkt. No. 44. Lead Plaintiff Mark Henry filed an amended complaint in the consolidated case on February 4, 2021 (the "Complaint" or "Amended Complaint"), alleging one cause of action

against Tufin and the Individual Defendants for violation of Section 11 of the Securities Act,[2] and one cause of action against the Individual Defendants for violations of Section 15 of the Securities Act.  *See* FAC.

Tufin and the Individual Defendants moved to dismiss on May 20, 2021.  Dkt. No. 62 ("Mem.").  Plaintiff filed his opposition on July 19, 2021.  Dkt. No. 64. ("Opp'n").  Tufin and the Individual Defendants filed their reply on August 25, 2021.  Dkt. No. 68 ("Reply").

## II.   LEGAL STANDARD

Rule 8(a)'s pleading standard—not Rule 9(b)'s—applies in this case.  Rule 8(a) governs Section 11 claims that are premised on allegations of negligence, whereas Rule 9(b)'s more stringent standard governs Section 11 claims that are premised on allegations of fraud.  *See Rombach v. Chang*, 355 F.3d 164, 171 (2d Cir. 2004) (differentiating between the circumstances in which each pleading standard is appropriate, noting that "[f]raud is not an element or a requisite to a [Section 11 Securities Act] claim" and "a plaintiff need allege no more than negligence to proceed under" that provision.).  Here, Plaintiff pleads his claims under a theory of negligence.  FAC ¶ 71 ("The Registration Statement was negligently prepared and contained false statements of material fact or omitted to state other facts necessary to make the statements made not false or misleading.").  Defendants do not dispute that Rule 8(a)'s pleading standard governs.  Accordingly, the Court will evaluate the sufficiency of Plaintiff's allegations under Rule 8(a).

Under Rule 8(a), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face'" to survive a motion to dismiss.  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[2] Because the underwriters were not named in the Amended Complaint, those parties were terminated as parties in this case on April 8, 2021.  Dkt. No. 59.

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

A court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). But the Court is "not required to credit conclusory allegations or legal conclusions couched as factual allegations." *Rothstein v. UBS AG*, 708 F.3d 82, 94 (2d Cir. 2013). And a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *DeJesus v. HF Mgmt. Servs., LLC*, 726 F.3d 85, 87–88 (2d Cir. 2013) (quoting *Iqbal*, 556 U.S. at 678–79).

In ruling on a motion to dismiss, a court "may consider any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).

## II. DISCUSSION

### a. Plaintiff's Section 11 Claims

Section 11 of the Securities Act provides for liability where "any part of the registration statement, when such part became effective, contain[s] an untrue statement of a material fact or

7

omitted to state a material fact required to be stated therein or necessary to make the statements

therein not misleading." 15 U.S.C.A. § 77k(a). To state a claim under Section 11 of the Securities

Act, "a plaintiff need show that a registration statement: (1) contained an untrue statement of

material fact; (2) omitted to state a material fact required to be stated therein; or (3) omitted to state

a material fact necessary to make the statement therein not misleading." *Arfa v. Mecox Lane Ltd.*, 10

Civ. 9053, 2012 WL 697155, at *4 (S.D.N.Y. Mar. 5, 2012) *aff'd*, 504 Fed. App'x 14 (2d Cir. 2012)

(internal quotation marks omitted). "Section 11 imposes strict liability on issuers and signatories,

and negligence liability on underwriters, '[i]n case any part of the registration statement, when such

part became effective, contained an untrue statement of a material fact or omitted to state a material

fact required to be stated therein or necessary to make the statements therein not misleading.'"

*NECA-IBEW Health & Welfare Fund v. Goldman Sachs & Co.*, 693 F.3d 145, 156 (2d Cir. 2012)

(quoting 15 U.S.C. § 77k(a)).

　　　"When analyzing offering materials for compliance with the securities laws, [courts] review

the documents holistically and in their entirety." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d

347, 365 (2d Cir. 2010). To evaluate whether a statement is untrue, "the veracity of a statement or

omission is measured not by its literal truth, but by its ability to accurately inform rather than

mislead prospective buyers." *Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt., LLC*,

595 F.3d 86, 92 (2d Cir. 2010). "The literal truth of an isolated statement is insufficient; the proper

inquiry requires an examination of defendants' representations, taken together and in context." *In re*

*Morgan Stanley*, 592 F.3d at 366. "'[A] statement which is literally true, if susceptible to quite another

interpretation by the reasonable investor . . . may properly . . . be considered a material

misrepresentation.'" *Beecher v. Able,* 374 F. Supp. 341, 347 (S.D.N.Y.1974) (quoting *SEC v. First Am.*

*Bank & Trust Co.,* 481 F.2d 673, 678 (8th Cir.1973)). "Some literally accurate statements can,

'through their context and manner of presentation, [become] devices which mislead investors.'"
*McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir. 1990).[3]

"The veracity of a registration statement which may give rise to liability under [Section 11] is determined by assessing the facts as they existed when the statement became effective." *Ladmen Partners, Inc. v. Globalstar, Inc.*, No. 07 Civ. 0976, 2008 WL 4449280, at *10 (S.D.N.Y. Sept. 30, 2008) (alterations in original); *Scott v. Gen. Motors Co.*, 46 F. Supp. 3d 387, 394 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) ("Plaintiffs must, 'at a minimum, plead facts to demonstrate that allegedly omitted facts both existed, and were known or knowable, at the time of the offering.'") (quoting *Lin v. Interactive Brokers Grp., Inc.*, 574 F.Supp.2d 408, 421 (S.D.N.Y. 2008)).

Regarding materiality, the Second Circuit has "consistently rejected a formulaic approach to assessing the materiality of an alleged misrepresentation." *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 162 (2d Cir. 2000). Instead, "[t]he central inquiry . . . is whether the representations therein, taken together and in context, would have misled a reasonable investor." *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 761 (2d Cir.1991)). "Generally, materiality is a mixed question of law and fact ordinarily left to the finder of fact to determine." *Lau v. Opera Ltd.*, 527 F. Supp. 3d 537, 551 (S.D.N.Y. 2021). But "where the alleged misstatements are 'so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance,' a court may find the misstatements immaterial as a matter of law." *Feinman v. Dean Witter Reynolds, Inc.*, 84 F.3d 539, 540–41 (2d Cir. 1996) (quoting *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir. 1985)).

Regarding the scope of information that must be disclosed,

[i]n general there is no duty to disclose a fact in the offering documents merely because a reasonable investor would very much like to know that fact, but

---

[3] Analysis of falsity and materiality is the same for Section 11 claims and claims brought under Section 10 of the Securities Exchange Act. *See City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 188 (2d Cir. 2014) "[T]he definition of "materiality" under § 11 of the Securities Act is the same as under § 10(b) of the Exchange Act."; *Ho v. Duoyuan Glob. Water, Inc.*, 887 F. Supp. 2d 547, 574 (S.D.N.Y. 2012) (applying the same falsity analysis to Section 10b and Section 11 claims).

> [d]isclosure is required . . . when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading.  Even when there is no existing independent duty to disclose information, once a company speaks on an issue or topic, there is a duty to tell the whole truth.

*Meyer v. Jinkosolar Holdings Co.*, 761 F.3d 245, 250-51 (2d Cir. 2014) (internal quotation marks and citations omitted).  "A defendant is not required to disclose all known information, but has a duty to disclose any information that is necessary to make other statements not misleading." *In re Alliance Pharmaceutical Corp. Sec. Litig.*, 279 F. Supp. 2d 171, 182 (S.D.N.Y.2003) (citation and quotation omitted).

"[I]ntent is not an element of [a Section 11] claim, as Section 11 and 12(a) provide for strict liability." *In re Farfetch Ltd. Sec. Litig.*, No. 19-CV-08657 (AJN), 2021 WL 4461264, at *8 (S.D.N.Y. Sept. 29, 2021) (citing *Rombach v. Chang*, 355 F.3d 164, 169 n.4 (2d Cir. 2004)).  Accordingly, "[P]laintiffs bringing claims under sections 11 . . . need not allege scienter, reliance, or loss causation." *In re Morgan Stanley Info. Fund Sec. Litig.*, 592 F.3d 347, 359 (2d Cir. 2010).

1.  <u>Plaintiff Does Not Sufficiently Allege that the Statements that Tufin's Sales Force was "Highly Trained" and that Defendant Devoted "Significant" Resources to Training and Customer Education Are False</u>

Plaintiff does not adequately plead a Section 11 claim based on statements related to Defendant's training practices and customer education.  First, Plaintiff argues that the statement "our highly trained sales force is responsible for overall market development" is false and materially misleading.  FAC ¶ 72.  But Plaintiff has not sufficiently alleged that the statement is, in fact, false.  Plaintiff expressly acknowledges that new hires did, in fact, receive training—training that "consisted of learning about the Suite [of Defendant's products] at Tufin's corporate headquarters."  FAC ¶ 54.  Plaintiff does not allege that *no* training occurred, and the meaning of the term "highly" is indeterminate and too general to provide meaningful information regarding the substance, quality, or quantity of Tufin's training practices.  Thus, without any facts supporting a conclusion that Tufin's sales force was not, in fact, "highly trained," Plaintiff has not alleged that statement was false so as

to mislead a reasonable investor.  *See City of Coral Springs Police Officers' Ret. Plan v. Farfetch Ltd.*, No.

19-CV-8720 (AJN), 2021 WL 4481119, at *10 (S.D.N.Y. Sept. 30, 2021) (rejecting arguments that a

defendant's general statements about its business model were false where the plaintiff did not make

any allegations that demonstrated those statements were, in fact, untrue).

> Plaintiff also challenges the following statements:

> The training and integration of a large number of sales and marketing personnel in a
> short time requires the allocation of *significant* internal resources.  We invest *significant*
> time and resources in training new sales force personnel to understand our solutions
> and growth strategy.

FAC ¶ 75 (emphasis added)

> We and our channel partners often spend *significant* time and resources to better
> educate and familiarize potential customers with the value proposition of our
> products and platform.

FAC ¶ 77 (emphasis added).

> For similar reasons to those outlined above, Plaintiff fails to plead that those statements are

false.  The Registration Statement stated that Tufin had invested "significant" time and resources in

training and customer education, but the term "significant" is vague and highly general.  And, as

previously noted, Plaintiff does not allege that Defendants expended *no* time or resources into

training or customer education; indeed, Plaintiff expressly alleges that Tufin *did* expend resources on

training.  FAC ¶ 54.  Accordingly, Plaintiff has not sufficiently alleged that statements regarding the

resources dedicated to training and customer education were false.  *See City of Coral Springs*, 2021 WL

4481119, at *11 (determining that the plaintiffs had not pleaded falsity regarding statements related

to the defendant's growth strategies in part because "none of the alleged statements regarding

growth strategies . . . are literally false").

2.   <u>Plaintiff Sufficiently Alleges that Defendants' Statements Regarding the Length of Tufin's Sales Cycle Are False and Materially Misleading</u>

Plaintiff sufficiently pleads that Defendants' statements that Tufin's "sales cycle usually lasts several months from proof of concept to purchase order, and is often longer for larger transactions," FAC ¶ 72, and that "[o]ur sales cycle usually last several months from proof of concept to purchase order from our customers," FAC ¶ 77, are false and materially misleading. FAC ¶ 77.  While statements that are "too general to cause a reasonable investor to rely upon them" are not misleading, "more definite statements about a company's business practices may invoke reasonable reliance by investors." *In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 611 (S.D.N.Y. 2017).  Moreover, "[t]he law is well settled that so called 'half truths'—literally true statements that create a materially misleading impression—will support claims for securities fraud." *SEC v. Syron*, 934 F. Supp. 2d 609, 629 (S.D.N.Y. 2013) (internal quotation marks and citation omitted).

Here, Plaintiff sufficiently alleges that those statements regarding the length of Tufin's sales cycle are false.  Three confidential witnesses reported that the sales cycle was not "usually several months," but instead "was typically at least a year," could take "at least two years to close," and that "a six-month deal was only achievable with luck."  FAC ¶ 55.  If a "six-month" deal was only achievable with luck, the statement that the sales cycle "usually" took only several months may have been false.  *See In re Inv. Tech. Grp., Inc. Sec. Litig.*, 251 F. Supp. 3d 596, 613 (S.D.N.Y. 2017) (concluding that the defendant's statement "we don't cheat" was materially misleading when in fact the defendant's misconduct was "shocking").

While Defendants do not dispute the issue here, Plaintiff also sufficiently alleges that information about the length of the sales cycle would be material to investors.  "Because materiality is a mixed question of law and fact, in the context of a Fed. R. Civ. P. 12(b)(6) motion, 'a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are

not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" *ECA, Loc. 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quoting *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000)). Here, drawing all inferences in favor of Plaintiff, Plaintiff sufficiently alleges that a reasonable investor would not consider the length of Tufin's sales cycle to be "obviously unimportant"—including because, when certain analysts gave Tufin a "buy" rating, those analysts mentioned that Tufin's "average sales cycle is six to nine months, but larger deals can take longer" and that the "company recently built out its inside sales teams to help facilitated a high velocity sales model." FAC ¶ 70.

Defendants argue that those statements are not false because Tufin adequately disclosed the length of its sales cycle. They note that the Registration Statement states, "[o]ur sales cycle usually lasts several months from proof of concept to purchase order, and is often longer for larger transactions" that transactions are "often even longer [than several months], less predictable, and more resource-intensive for larger transactions," and that "[o]ur sales cycle is long and unpredictable." *Id.* ¶¶ 72, 77. But the use of the term "usually" suggests that, more often than not, the sales cycle lasted only several months. That a sales cycle was "often" longer would not, as a matter of law, preclude a reasonable investor from interpreting Defendant's statement to mean that the sales cycle usually lasted only several months instead of one to two years. *See McMahan & Co. v. Wherehouse Entm't, Inc.*, 900 F.2d 576, 579 (2d Cir.1990) ("Even a statement which is literally true, if susceptible to quite another interpretation by the reasonable investor[,] may properly be considered a material misrepresentation.").

The disclosure that Tufin's sales process "is long and unpredictable" similarly fails to sufficiently counteract Plaintiff's statement that the sales cycle "usually" lasts several months— indeed, the terms "long" and "unpredictable" do not denote a specific amount of time. Defendants have not provided any compelling reason to suggest that a reasonable investor would interpret that

statement to mean that the sales cycle in fact took one or two years. Accordingly, Defendants'
statements that Tufin's sales cycle "is long and unpredictable" and "often" took longer than several
months are not sufficient to defeat Plaintiff's Section 11 claim, which focuses on the assertion that
the sales cycle was usually shorter.

a.   *Plaintiff's Confidential Witness Allegations Are Not "Deficient"*

Defendants do not prevail in arguing that the confidential witness allegations supporting
Plaintiff's arguments are "deficient" because those CWs were "low-level employees" and, as such,
could not "speak for Tufin as a whole." *See* Mem. 15–20. Courts in the Second Circuit allow
"plaintiffs to rely on unnamed sources so long as '[the unnamed sources] are described in the
complaint with sufficient particularity to support the probability that a person in the position
occupied by the source would possess the information alleged.'" *New Jersey Carpenters Health Fund v.
Royal Bank of Scotland Grp.,* 709 F.3d 109, 123–24 (2d Cir. 2013) (*quoting Novak v. Kasaks*, 216 F.3d
300, 314 (2d Cir. 2000)). In *New Jersey Carpenters*, the Second Circuit evaluated confidential witness
allegations and determined that plaintiffs had provided an "adequate basis for believing that the
defendants' statements were false." 709 F.3d at 123. There, the plaintiffs attributed a number of
allegations to "eight unnamed prior employees" of the defendant that had held various positions,
including former quality control auditors and account managers. *Id.* at 118. The defendants argued
that the confidential witness allegations should be discounted because "those few employees could
have conceivably described [defendant's] practices at only a tiny fraction of its 432 offices." *Id.* But
the Second Circuit rejected that argument: while it recognized that the employees had worked only
at regional offices, it nonetheless determined that the allegations were sufficient because the
complaint did not include allegations supporting the inference that the relevant practices were
experienced only in those regions, rather than on a company-wide level. *Id.*

Plaintiff's allegations in this case are analogous to those in *New Jersey Carpenters*:  Plaintiff primarily relies on CW1, CW2, and CW11 in support of their allegations regarding the length of Tufin's sales cycle.  *See* FAC ¶ 55 (CW1 providing that deals were expected to close in "three to four months, even though [deals] took eighteen months to two years to close" with CW2 agreeing that the sales cycle was "typically at least a year" and CW11 stating that "deals could take two years to close, and that a six-month close was only achievable with luck.").  Each of the confidential witnesses worked in Tufin's sales divisions—they held positions that suggest they would have knowledge of the length of Tufin's sales cycle, at least in their regional offices,[4] and no allegations suggest that their knowledge is specific to their respective regional areas.  As in *New Jersey* Carpenters, those allegations are sufficient bases for Plaintiff's Section 11 claims.

Defendants similarly argue that the confidential witness allegations are deficient because some of the CWs did not work at Tufin in the months preceding the IPO, citing *In re Micro Focus Int'l Plc Sec. Litig.* in support.  *See* No. 1:18-CV-06763-ALC, 2020 WL 5817275, at *8 (S.D.N.Y. Sept. 29, 2020) (declining to rely on allegations by a defendant's "former employees" where those allegations did not sufficiently establish that certain (and allegedly undisclosed) risks had materialized prior to the effective dates of the defendant's offering documents).  Here, however, the CWs worked at Tufin during that operative period.  CW1 worked at Tufin both before and after the IPO.  And while CW11 began his career at Tufin around the same time that the company went public and CW2 left the company prior to the IPO, their testimony corroborates CW1's testimony:  that the lengthy sales cycle was present both before and after the IPO does not suggest that the lengthy sales cycle was isolated to a certain time period.  *See New Jersey Carpenters*, 709 F.3d at 123–24 (crediting

---

[4] CW1 "worked as a business development representative at Tufin from August 2018 to January 2020, and was based in Ohio."  *Id.* ¶ 26.  CW2 "was a Regional Sales Manager at Tufin from March 2018 to October 2018 and was based in Michigan" and "was responsible for pursuing approximately thirty potential customer accounts located in Michigan and Indiana."  *Id.* ¶ 27.  And CW11 worked as a "Sales Representative for Enterprise Accounts" from April 2019 to January 2020 and was "assigned to accounts located in the mid-Atlantic region."  *Id.* ¶ 36

confidential witness testimony by regional sales employees who worked for defendant during all or part of the operative period preceding the release of allegedly misleading offering documents). Accordingly, Plaintiff adequately pleads a Section 11 claim based on the statement that its sales cycles was "usually several months."

> 3.   <u>Defendant's Statements Regarding the Hiring and Retention of its Sales Personnel Is Not Sufficient Grounds to Support a Section 11 Claim</u>

Plaintiff next challenges the following statements:

> Our future success depends, in part, on our ability to continue to expand, train and retain our sales force. ***Our inability to attract or retain qualified personnel or delays in hiring required sales personnel may seriously harm our business, financial condition and results of operations.*** Any of our employees may terminate their employment at any time, subject to certain notice requirements. Our ability to continue to attract and retain highly skilled personnel is critical to our future success.  During 2018, we increased the number of our sales and marketing personnel from 128 to 166. We expect to continue to expand our sales and marketing personnel significantly and face a number of challenges in achieving our hiring and integration goals.  There is intense competition for individuals with sales training and experience. . . . ***we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets in which we currently operate or where we seek to conduct business. Our failure to hire a sufficient number of qualified sales force members and train them to operate at target performance levels may materially and adversely impact our projected growth rate.***

FAC ¶ 75.

Plaintiff theorizes that Defendant's inability to attract and retain qualified personnel had already occurred at the time the registration statement was declared effective, such that Defendant's suggestion that that risk *may* arise in the future would mislead a reasonable investor.  *See* FAC ¶ 76. Defendants, on the other hand, argue that those disclosures are protected under the bespeaks caution doctrine.

Defendants have the better argument.  The judicially-created "bespeaks caution" is a "corollary of 'the well-established principle that a statement or omission must be considered in context.'" *Iowa Pub. Emps. Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 141 (2d Cir. 2010) (quoting *In re*

*Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 364 (3d Cir. 1996)).  The doctrine provides that a "forward-looking statement accompanied by sufficient cautionary language is not actionable because no reasonable investor could have found the statement materially misleading."  *Id.*; *accord Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 235 (S.D.N.Y. 2006) ("Pursuant to the judicially-created 'bespeaks caution' doctrine, certain alleged misrepresentations, which are accompanied by meaningful cautionary statements, are considered immaterial as a matter of law.").  "It is settled that the bespeaks-caution doctrine applies only to statements that are forward-looking."  *Id.* at 142.

A threshold issue in determining the applicability of the bespeaks caution doctrine is a determination of whether the challenged statements are forward-looking in nature.  "As a general rule, statements whose truth cannot be ascertained until some time after they are made are 'forward-looking statements.'"  *In re Bear Stearns Cos., Inc. Sec., Derivative, and ERISA Litig.*, 763 F. Supp. 2d 423, 493 (S.D.N.Y. 2011) (citing cases).  In discussing the bespeaks caution doctrine in particular, the Second Circuit has contrasted "forward-looking" statements with statements of "present or historical facts," in other words, statements regarding "facts [that] exist and are known."  *P. Stolz Family P'Ship L.P. v. Daum*, 355 F.3d 92, 96-97 (2d Cir. 2004).  "A forward-looking statement (accompanied by cautionary language) expresses the issuer's inherently contingent prediction of risk or future cash flow; a non-forward-looking statement provides an ascertainable or verifiable basis for the investor to make his own prediction."  *Iowa Pub. Emp. Ret. Sys.*, 620 F.3d at 143.

However, "[c]autionary words about future risk cannot insulate from liability an issuer's failure to disclose that the risk has, in fact, materialized in the past and is virtually certain to materialize again."  *Set Cap. LLC v. Credit Suisse Grp. AG,* 996 F.3d 64, 85 (2d Cir. 2021).  In other words, "there is a 'critical distinction between disclosing the risk a future event might occur and disclosing actual knowledge that the event will occur'—particularly where that distinction holds 'enormous significance' for investors."  *Set Cap. LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 85 (2d Cir. 2021) (citing *Dolphin & Bradbury, Inc. v. S.E.C.*, 512 F.3d 634, 640 (D.C. Cir. 2008)).

Here, the challenged statements are inherently forward looking.  The statements that "we may be unable to hire or retain sufficient numbers of qualified individuals in the future in the markets in which we currently operate" and that Tufin's failure to hire employees "may materially and adversely impact [its] projected growth rate" predict a future risk.  Thus, those statements are not precluded from the protection of the bespeaks caution doctrine as non-forward looking statements.

Nonetheless, Plaintiff argues that those statements are misleading because it was a "historical fact" that Tufin "undertrain[ed] and undersupport[ed] its salespersons, causing excessive turnover." *See* Opp'n at 22.  But Plaintiff ignores the actual content of those statements in making that argument:  in those statements, Tufin cautioned that it may be "unable to *hire or retain sufficient numbers of qualified individuals* in the future in the markets in which we currently operate or where we seek to conduct business." FAC ¶ 75 (emphasis added).  Plaintiff does not allege that Tufin was unable to hire individuals to replace those who left the company; he alleges only that Tufin had high turnover.  That Tufin had a high rate of employee turnover, without more, does not imply that Tufin was unable to hire or retain sufficient numbers of individuals in the markets in which it operated.  Indeed, Plaintiff's allegations suggest that Tufin was readily able to replace employees who left the company.  *See, e.g.*, FAC ¶ 63 ("CW2 reported that after less than a year of insufficient sales support, many salespeople would either give up or be forced out, at which point the Company would simply *start over with a new batch of hires*.") (emphasis added).   Without any allegations that the risks disclosed in the Registration Statement had, in fact, occurred prior to the effective date of the Registration Statement, Plaintiff fails to sufficiently allege that Defendant's statements regarding Tufin's "inability to attract or retain qualified personnel" was misleading.  *See Y-GAR Cap. LLC v. Credit Suisse Grp. AG*, No. 19 CIV. 2827 (AT), 2020 WL 71163, at *5 (S.D.N.Y. Jan. 2, 2020), *appeal withdrawn*, No. 20-441, 2020 WL 2128749 (2d Cir. Apr. 15, 2020) (determining that plaintiffs failed to state a Section 11 claim where the plaintiffs alleged that the defendant had failed to disclose a

scheme to manipulate the value of certain notes, but did not sufficiently allege the existence of such a scheme in the first place).  Accordingly, Plaintiff's Section 11 claims based on those statements are dismissed.

      4.   <u>Plaintiff Does Not Plead Section 11 Liability Based on Defendant's Statements Regarding "Accurate Forecasting"</u>

Plaintiff similarly fails to allege sufficient grounds for a Section 11 claim based on Defendants' statement that, "[w]e may not be able to accurately predict or forecast the timing of sales, which could cause our results to vary significantly from our expectations and the expectations of market analysts."  FAC ¶ 77.  Plaintiff claims that, at the time the Registration Statement was declared effective, Tufin "could not 'accurately predict or forecast the timing of its sales," such that the statement is not protected as a forward-looking statement by the bespeaks caution doctrine.  *See* FAC ¶ 78(5).  That argument is unpersuasive.  First, the Registration Statement expressly states, "[l]arge individual sales have, in some cases, occurred at quarters subsequent to those we anticipated or have not occurred at all," and also that, as a result of companies waiting to make spending decisions until the fourth quarter of the year "the timing of individual sales can be difficult to predict."  FAC ¶ 77; Declaration of Kimberly A. Havlin, Dkt. No. 63-1 9 ("Registration Statement") at 6.  Here, Defendant expressly disclosed that inaccurate sales forecasting *had already* occurred; that inaccurate forecasts *may also* occur in the future is not inconsistent with forecasts having also occurred in the past.  More plainly, it is simply implausible that a reasonable investor would understand the statement that Defendant may be "unable to accurately forecast" its sales in the future to mean that all of its then-current forecasts were always accurate—forecasts, by their nature, lack 100% accuracy.  Accordingly, Plaintiff does not state a Section 11 claim based on the statement regarding purported risk of inaccurate future forecasts. [5]

---

[5] Notably, Plaintiff does not argue in his opposition that the statement regarding inaccurate forecasting was misleading because Defendant failed to disclose that its salespeople were under "excessive pressure" to make sales—nor does

### b.   Plaintiff Adequately Pleads a Section 15 Violation

Because Plaintiff has adequately pleaded a Section 11 violation, he similarly pleads a violation of Section 15.   "Section 15 [of the Securities Act] imposes joint and several liability on '[e]very person who, by or through stock ownership, agency, or otherwise . . . controls any person liable under' § 11."   *In re Lehman Bros. Mortg.-Backed Sec. Litig.*, 650 F.3d 167, 185 (2d Cir. 2011) (quoting 15 U.S.C. § 77o(a)). "To establish § 15 liability, a plaintiff must show a 'primary violation' of § 11 and control of the primary violator by defendants."   *Id.*

Here, Plaintiff has sufficiently pleaded a primary violation of Section 11.   Defendants do not contest—at present—that Plaintiff has adequately alleged that the Individual Defendants are control persons under Section 15.   *See* Mem. at 24–25, Reply at 10.   Accordingly, Plaintiff has adequately pleaded a violation of Section 15.   *See Owen v. Elastos Found.,* No. 1:19-CV-5462-GHW, 2021 WL 5868171, at *16 (S.D.N.Y. Dec. 9, 2021) (finding Section 15 claims adequately pleaded where the defendants did not contest that the individual defendants were control persons).

## III.   LEAVE TO AMEND

Although Plaintiff has already amended his complaint once, Dkt. No. 55, the Court grants Plaintiff leave to replead the dismissed claims.   *See Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991) ("It is the usual practice upon granting a motion to dismiss to allow leave to replead."); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").   While leave may be denied "for good reason, including futility, bad faith, undue delay, or undue prejudice to the opposing party[,]" those circumstances do not apply in this case with respect to the majority of the dismissed claims.   *TechnoMarine SA v. Giftports, Inc.*, 758 F.3d

---

Plaintiff argue that Defendant had any obligation to disclose that some of its salespeople felt that they were under that pressure.

493, 505 (2d Cir. 2014) (quoting *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007)).  Any amended Complaint must be filed no later than March 31, 2022.

## IV.   CONCLUSION

For the reasons stated above, Defendants' motion to dismiss the amended complaint is granted in part and denied in part.  The Clerk of Court is ordered to terminate the motion at Dkt. No. 61.

SO ORDERED.


Dated:  February 25, 2022          _____
New York, New York                      GREGORY H. WOODS
                                                    United States District Judge